UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

VIRGINIA MILANES, *et al.*,                    :
                                               :
                    Plaintiffs,                :
                                               :          ECF Case
          v.                                   :
                                               :          08 Civ. 2354 (LMM) (KNF)
MICHAEL CHERTOFF, *et al.*,                     :
                                               :
                    Defendants.                :

------------------------------------------------------------------x

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS IN PART AND REMAND IN PART, OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT, AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR
A PRELIMINARY INJUNCTION AND CLASS CERTIFICATION

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York  10007
Tel:  (212) 637-2722
Fax:  (212) 637-2687

TOMOKO ONOZAWA
KIRTI VAIDYA REDDY
ROBERT WILLIAM YALEN
Assistant United States Attorneys
       – Of Counsel –

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    The Naturalization Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.    Statutory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.    Volume of Applications and Current Processing Times . . . . . . . . . . . . . 8

        3.    The FBI Name Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            a.    The FBI Name Check Process . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            b.    Origin of the FBI Name Check Requirement for
                Naturalization Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            c.    2002 Changes in Practice Regarding the FBI Name Check . . . . 17

    B.    Efforts to Reduce Application Processing Times . . . . . . . . . . . . . . . . . . . . . . 20

        1.    Factors Affecting Current Naturalization Processing Times . . . . . . . . . 20

            a.    The FBI Name Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            b.    The "Surge" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            c.    Individualized Factors Affecting Processing Times . . . . . . . . . 22

        2.    Efforts by USCIS and FBI to Reduce Current Processing Times . . . . . . 23

        3.    Congressional Response to Application Processing Times . . . . . . . . . . . 27

            a.    Pre-2007 Congressional Action . . . . . . . . . . . . . . . . . . . . . . . . 27

            b.    Congressional Action Since 2007 . . . . . . . . . . . . . . . . . . . . . . . 29

    C.    Plaintiffs' Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        1.    Allegations of the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        2.    Status of The Named Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3.  Status of the Proposed Class, Proposed Post-Interview
    Subclass, and "Preliminary Injunction Group" . . . . . . . . . . . . . . . . . . . . 37

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

I.    Plaintiffs' Complaint Should Be Dismissed in Part and Remanded
      in Part or, in the Alternative, Defendants Should Be Granted
      Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      A.    Plaintiffs' Claims Pursuant to APA Section 706(1)
            Should Be Dismissed for Lack of Jurisdiction . . . . . . . . . . . . . . . . . . . 39

            1.    Plaintiffs Are Not Challenging Discrete Agency Action . . . . . . . 40

            2.    USCIS Has No Duty to Act on a Naturalization Application
                  Prior to Receiving an FBI Name Check Response . . . . . . . . . . 41

            3.    FBI Has No Duty to Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

            4.    The Proposed Post-Interview Subclass's Specific, Adequate
                  Remedy Pursuant to 8 U.S.C. § 1447(b) Precludes Resort to
                  § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

      B.    In the Alternative, the Court Should Grant Summary Judgment on
            Plaintiffs' Section 706(1) Claims Because the Undisputed Facts
            Demonstrate that USCIS and FBI Have Not "Unreasonably
            Delayed" or "Unlawfully Withheld" Agency Action . . . . . . . . . . . . . . . . 48

            1.    Agency Action Has Not Been Unlawfully Withheld . . . . . . . . . 49

            2.    Agency Action Has Not Been Unreasonably Delayed . . . . . . . . 53

      C.    The Proposed Post-Interview Subclass's Claims Pursuant to 8
            U.S.C. § 1447(b) Should be Remanded for Processing Following
            the Completion of Any Outstanding FBI Name Checks . . . . . . . . . . . . . 61

      D.    Plaintiffs' Notice-and-Comment Claims Should Be Dismissed
            Because the 2002 Changes in Practice Were Not "Legislative
            Rules" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

            1.    The 2002 Changes in Practice Did Not Impose Extra-
                  Statutory Rights, Duties or Obligations . . . . . . . . . . . . . . . . . . . 64

       2.      That the 2002 Changes in Practice May Have Had
Substantial Effects Does Not Make Them
Legislative Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

    E.    Plaintiffs' Due Process Claim Should Be Dismissed for Failure
to State a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    F.    Plaintiffs Are Not Entitled to Injunctive or Declaratory Relief . . . . . . . . 71

II.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied . . . . . . . . . . 74

III.    Plaintiffs' Motion for Class Certification Should Be Denied . . . . . . . . . . . . . . 76

    A.    The Proposed Class and Proposed Post-Interview Subclass Are
Not Sufficiently Definite to Allow for Identification of Class
Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

    B.    Plaintiffs Cannot Demonstrate Typicality . . . . . . . . . . . . . . . . . . . . . . . . 79

    C.    With Regard to the Proposed Post-Interview Class, Plaintiffs
Cannot Demonstrate Adequacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    D.    Plaintiffs Cannot Satisfy the Rule 23(b)(2) Requirement that
Injunctive or Declaratory Relief Be Appropriate as to the Class
as a Whole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    E.    Members of the *Kaplan* Class Should be Excluded from the Class
in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

# TABLE OF AUTHORITIES

*CASES:*                                                                                    *PAGES:*

*A. L. Mechling Barge Lines, Inc. v. United States,*
    368 U.S. 324 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 75

*Action on Smoking and Health (ASH) v. Dep't of Labor,*
    100 F.3d 991 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 59

*Adams v. Suozzi,*
    517 F.3d 124 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Ahmadi v. Chertoff,*
    2007 WL 3022573 (N.D. Cal. Oct. 15, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 64

*Ahmed v. Mueller,*
    No. 07-0411, 2007 WL 2726250 (E.D. Pa. Sept. 14, 2007) . . . . . . . . . . . . . . . . . . . . 43

*Alzuraiki v. Heinauer,*
    No. 4:07CV3189, 2008 WL 413861 (D. Neb. Feb. 13, 2008) . . . . . . . . . . . . . . . . . 43, 46

*American Mining Congress v. Mine Safety & Health Administration,*
    995 F.2d 1106 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Antonishin v. Keisler,*
    No. 06 Civ. 2518, 2007 WL 2788841 (N.D. Ill. Sept. 20, 2007) . . . . . . . . . . 48, 62, 63, 64

*Auer v. Robbins,*
    519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Bakalar v. Vavra,*
    237 F.R.D. 59 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Balbuena v. Mattingly,*
    Nos. 05 Civ 2986(TPG) & 07 Civ 3308 (TPG),
    2008 WL 759348 (S.D.N.Y. Mar. 21, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Berenyi v. District Director,*
    385 U.S. 630 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Boim v. Quranic Literacy Institute,*
    291 F.3d 1000 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Borromeo Escaler v. U.S. Citizenship & Immigration Services,*
    No. 03 Civ. 8418 (BSJ), 2007 WL 197548546 (S.D.N.Y. July 6, 2007) . . . . . . . . . . . 47

*Bustamante v. Chertoff,*
    533 F. Supp. 2d 373 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 51, 61

*Central States Southeast & Southwest Areas Health & Welfare Fund*
*v. Merck-Medco Managed Care, L.L.C.,*
    504 F.3d 229 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Chan v. Gantner,*
    464 F.3d 289 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cmty. for Creative Non-Violence v. Lujan,*
    908 F.2d 992 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Cofone v. Manson,*
    594 F.2d 934 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Daniels v. City of New York,*
    198 F.R.D. 409 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Disabled in Action of Metropolitan New York v. Hammons,*
    202 F.3d 110 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 42

*Dong Liu v. Chertoff,*
    No. Civ. 07-0005-BEN-WMC, 2007 WL 1300127 (S.D. Cal. Apr. 30, 2007) . . . . . . . 57

*Dow Jones & Co., Inc. v. Harrods Ltd.,*
    346 F.3d 357 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Elizabeth M. v. Montenez,*
    458 F.3d 779 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Fedorenko v. United States,*
    449 U.S. 490 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Freeland v. AT & T Corp.,*
    238 F.R.D. 130 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*General Tel. Co. Of Southwest v. Falcon,*
    457 U.S. 147 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75, 78

*Hani v. Gonzales,*
    No. 3:07-CV-517-S, 2008 WL 2026092 (W.D. Ky. May 8, 2008) . . . . . . . . . . . . *passim*

*Heckler v. Day,*
    467 U.S. 104 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 84

*Heckler v. Chaney,*
    470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Hoo Loo v. Ridge*,
    No. Civ. 04-5553, 2007 WL 813000 (E.D.N.Y. Mar. 14, 2007) . . . . . . . . . . . . . . 35, 53

*Ibrahim v. Chertoff,*
    529 F. Supp. 2d 611 (E.D.N.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46

*ICC v. New York, N.H. & H.R. Co.,*
    287 U.S. 178 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Holocaust Victim Assets Litig.,*
    225 F.3d 191 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Barr Laboratories, Inc.,*
    930 F.2d 72 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 73, 74

*INS v. Pangilinan,*
    486 U.S. 875 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Jeffries v. Pension Trust Fund of Pension, Hospitalization and*
*Benefit Plan of Electrical Industry,*
    No. 99 Civ. 4174 (LMM), 2007 WL 2454111 (S.D.N.Y. Aug. 20, 2007) . . . . . . . . . . 78

*Kaplan v. Chertoff,*
    481 F. Supp. 2d 370 (E.D. Pa. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Kaplan v. Chertoff,*
　　　No. 06-5304 (E.D. Pa. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 86

*Lahrar v. USCIS,*
　　　485 F. Supp. 2d 705 (E.D. Va. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Langer v. McElroy,*
　　　No. 00 Civ. 2741(RWS), 2002 WL 31789757 (S.D.N.Y. Dec. 13, 2002) . . . . . . . . . . 47

*Lewis Tree Service, Inc. v. Lucent Technologies Inc.,*
　　　211 F.R.D. 228 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Liberty Fund, Inc. v. Chao,*
　　　394 F. Supp. 2d 105 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 58, 59, 60

*Lincoln v. Vigil,*
　　　508 U.S. 182 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 63, 65

*Lyng  v. Northwest Indian Cemetery Protective Ass'n,*
　　　485 U.S. 439 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Maldonado v. Ochsner Clinic Foundation,*
　　　493 F.3d 521 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Marisol A. v. Giuliani,*
　　　126 F.3d 372 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
　　　336 F.3d 1094 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 59

*Mathews v. Eldridge,*
　　　424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Matican v. City of New York,*
　　　524 F.3d 151 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Mejia-Ruiz v. Immigration & Naturalization Service,*
　　　51 F.3d 358 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65, 69

*Mocanu v. Mueller,*
　　　Nos. 07-0445, 07-0971, 07-3223, 07-2718, 07-2859,
　　　08-195, 2008 WL 372459 (E.D. Pa. Feb. 8, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 64, 68

*Monahan v. Dorchester Counseling Center, Inc.*,
961 F.2d 987 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

*National Audubon Soc'y v. Hoffman*,
132F. 3d at 14-15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Natural Resources Defense Council, Inc. v. Muszynski*,
268 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Natural Resources Defense Council v. Fox*,
93 F. Supp. 2d 531 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*New York State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*,
267 F.3d 128 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65, 69

*Olim v. Wakinekona*,
461 U.S. 238 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004)June 18, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Omar v. Mueller*,
501 F. Supp. 2d 636 (D.N.J. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Patil v. Mueller*,
No. 07 CV 71 (JCC), 2007 WL 1302752 (E.D. Va. Apr. 30, 2007) . . . . . . . . . . . . . . . 57

*Perales v. Sullivan*,
948 F.2d 1348 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Public Citizen Health Research Group v. Comm'r*,
740 F.2d 21 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Raymond Proffitt Found. v. United States Army Corps of Eng'rs*,
128 F. Supp. 2d 762 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Reddy v. CFTC*,
191 F.3d 109 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 79

*Rios v. Marshall*,
100 F.R.D. 395 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Rivera-Powell v. New York City Bd. of Elections,*
    470 F.3d 458 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Robinson v. First Nat. City Bank,*
    482 F. Supp. 92 (S.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Rodriguez v. McLoughlin,*
    214 F.3d 328 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Safadi v. Howard,*
    466 F. Supp. 2d 696 (E.D. Va. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Seattle Audubon Soc'y v. Norton,*
    No. C05-1835L, 2006 WL 1518895 (W.D. Wash. May 25, 2006) . . . . . . . . . . . . . . . . . 49

*Shalabi v. Gonzalez,*
    No. 4:06CV866, 2006 WL 3032413 (E.D. Mo. Oct. 23, 2006) . . . . . . . . . . 46, 62, 67, 74

*Sinha v. Upchurch,*
    No. 1:07 CV 2274, 2007 WL 4322225 (N.D. Ohio Dec. 7, 2007) . . . . . . . . . . . . . . 44, 46

*Sweet v. Sheehan,*
    235 F.3d 80 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Telecommunications Research and Action Center v. FCC ("TRAC"),*
    750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Tunick v. Safir,*
    209 F.3d 67 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*United States v. Ginsberg,*
    243 U.S. 472 (1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 71

*United States ex rel. Dunlap v. Black,*
    128 U.S. 40 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Harris,*
    13 F.3d 555 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Maria,*
    186 F.3d 65 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Velez v. Novartis Pharmaceuticals Corp.,*
    244 F.R.D. 243 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Walters v. Reno,*
    145 F.3d 1032 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Wang v. Gonzalez,*
    No. 07-2272 JWL-DJW, 2008 WL 45492 (D. Kan Jan. 2, 2008) . . . . . . . . . . . . . . 44, 47

*Webster v. Doe,*
    486 U.S. 592 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 76, 77

*White v. Shalala,*
    7 F.3d 296 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Wright v. Giuliani,*
    230 F.3d 543 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Yakus v. United States,*
    321 U.S. 414 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Yang v. California Dep't of Social Servs.,*
    183 F.3d 953 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50


*STATUTES:*

2 U.S.C. § 501(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

2 U.S.C. § 502(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

5 U.S.C. § 552(a)(6)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

5 U.S.C. § 5514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

5 U.S.C. § 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 40

8 U.S.C. § 1421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

8 U.S.C. § 1427 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8 U.S.C. § 1443(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. § 1445(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. § 1446 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8 U.S.C. § 1447 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8 U.S.C. § 1571(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

8 U.S.C. § 1571(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 49

8 U.S.C. § 1573 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 51

8 U.S.C. § 1574 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 49

8 U.S.C. § 1612(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

8 U.S.C. § 335.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

8 U.S.C. § 335.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

19 U.S.C. § 1673b(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

42 U.S.C. § 1316(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*REGULATIONS:*

8 C.F.R. §§ 100.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 C.F.R. § 335.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

8 C.F.R. § 335.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8 C.F.R. § 335.2(b)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

8 C.F.R. § 335.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52


*RULES:*

Fed. R. Civ. P. 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Fed. R. Civ. P. 23(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Fed. R. Civ. P. 23(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Fed. R. Civ. P. 23(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 84

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50


*OTHER:*

56 Fed. Reg. 50475 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

60 Fed. Reg. 6647 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Defendants Michael Chertoff ("Chertoff"), Jonathan Scharfen ("Scharfen")[1], Andrea

Quarantillo ("Quarantillo"), Michael B. Mukasey ("Mukasey"), and Robert S. Mueller, III

("Mueller") (collectively, "defendants" or the "Government"), all sued in their official capacities

as officers of or with authority over United States Citizenship and Immigration Services

("USCIS") or the Federal Bureau of Investigation ("FBI"), respectfully submit this memorandum

(*i*) in support of their motion to dismiss the complaint in part and to remand in part, or in the

alternative, for summary judgment, and (*ii*) in opposition to plaintiffs' motions for a preliminary

injunction and for class certification.

## PRELIMINARY STATEMENT

Plaintiffs seek to have this Court do what Congress has chosen not to do: Impose a six-

month deadline on the processing of naturalization applications, or some other deadline that

plaintiffs deem "reasonable." The processing times about which plaintiffs complain are not a

new phenomenon. Indeed, Congress, which has plenary power over naturalization, *see* Const.,

Art. I, § 8, cl. 4, has focused for decades on application processing times. Moreover, in recent

years, Congress has specifically addressed how to harmonize the country's interest in checking

the background of naturalization applicants with its interest in ensuring that applications are

processed in a timely fashion. Congress has chosen not to impose the six month deadline

plaintiffs' seek, nor to direct the agency to limit the extent to which it conducts background

checks on applicants, which is one cause of lengthy processing times. Instead, Congress has

appropriated additional funds to enable USCIS and FBI to reduce processing times while

---

[1] The complaint names Emilio Gonzalez ("Gonzalez"), then-director of United States Citizenship and Immigration Services ("USCIS"), as a defendant in his official capacity. Gonzalez has been succeeded in office by Scharfen, who became Acting Director of USCIS on April 21, 2008. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Scharfen has been automatically substituted for Gonzalez as defendant.

continuing to perform all necessary security checks, and has mandated that the agencies develop a business plan for doing so. The agencies have prepared such a business plan and are working to reduce processing times, as Congress intended. The Court should reject plaintiffs' request that it strike its own balance of efficiency and security, one different from what the political branches have set.

Each of plaintiffs' claims fails because plaintiffs' desired relief is inconsistent with Congress's scheme. First, plaintiffs' claims that USCIS has "unreasonable delayed" or "unlawfully withheld" agency action with respect to the naturalization applications, allegedly in violation of section 706(1) of the Administrative Procedure Act ("APA"), should be dismissed for lack of jurisdiction, and, in any event, the Court should grant defendants summary judgment on the merits. Section 706(1) waives the sovereign immunity of the United States only where plaintiffs challenge an agency's failure to take a discrete action that it is has a duty to take. Here, no waiver of sovereign immunity exists pursuant to section 706(1) and, therefore, the Court lacks subject-matter jurisdiction for several reasons: First, plaintiffs' purported class action does not seek an order compelling discrete agency action, but rather seeks a programmatic revision of USCIS's practices with respect to the statutory requirement that USCIS undertake a "full criminal background check" and a "personal investigation" of all naturalization applicants. *See infra* Part I.A.1. Second, USCIS does not have a duty to act on naturalization applicants prior to receiving the results of the FBI name check. *See infra* Part I.A.2. Third, FBI does not owe any duties to individuals whose name check it is running. *See infra* Part I.A.3. Additionally, jurisdiction is independently lacking for the section 706(1) claim of plaintiff Anthony Giovanny Sanchez and the subclass of individuals he purports to represent – those who have already had

their naturalization examinations (the "Proposed Post-Interview Subclass") – because those individuals have an alternative adequate remedy under the judicial review provision of 8 U.S.C. § 1447(b), precluding APA relief. *See infra* Part I.A.4. In any event, to the extent that jurisdiction is found to exist, defendants should be granted summary judgment as to plaintiffs' section 706(1) claims because taking into account all the relevant circumstances, including the intent of Congress and defendants' efforts to reduce naturalization application processing times, USCIS and FBI have neither unreasonably delayed nor unlawfully withheld any action. *See infra* Part I.B.

Second, the claim of plaintiff Sanchez, the sole named plaintiff purporting to represent the Proposed Post-Interview Subclass should be dismissed as moot because subsequent to the commencement of this action he has been naturalized as a United States citizen. Further, to the extent that the Court certifies the Proposed Post-Interview Subclass (notwithstanding the Government's arguments below and the lack of any named plaintiff), the claims of the Proposed Post-Interview Subclass should be remanded to USCIS for further action once any outstanding FBI name checks are completed as to those subclass members. Section 1447(b) provides the district court jurisdiction over a naturalization application that has been pending more than 120 days after the applicant has been examined without a determination, and provides district courts the discretion to decide the merits of a naturalization application or to remand it to the agency to adjudicate the application with appropriate instructions. Here, plaintiffs do not suggest that the Court should adjudicate the merits of each pending naturalization application of a subclass member. In light of the "full criminal background check" and "personal investigation" requirements, and Congress's decision not to impose deadlines or modify the FBI name check

requirement despite lengthy application processing times, the Court should remand these § 1447(b) claims to USCIS with instructions to process the applications in due course after receipt of a response to any pending FBI name checks.  *See infra* Part I.C.

Third, the Court should reject plaintiffs' claim that USCIS was required to engage in "notice-and-comment" rulemaking in making certain changes in practice in 2002 with respect to the FBI name check.  These 2002 changes in agency practice were not "legislative rules" having an extra-statutory effect on plaintiffs' rights, duties, or obligations, and neither placed any legal obligations on naturalization applicants, nor modified the substantive standards by which eligibility for naturalization would be assessed, including the requirement that applicants prove themselves to be of "good moral character."  Rather, the 2002 changes in practice amounted to "interpretative rules" reflecting USCIS's interpretation of the Congressional requirements that USCIS conduct a "personal investigation" of each applicant, including a "full criminal background check."  As such, the 2002 changes in agency practice were not subject to notice-and-comment rulemaking.  *See infra* Part I.D.

Fourth, plaintiffs' claims that the length of naturalization processing times violates the Due Process Clause of the United States Constitution should be rejected because no constitutional liberty or property interest of plaintiffs has been denied, and because in any event plaintiffs are receiving any process that would be due under the Constitution.  *See infra* Part I.E.

Fifth, regardless of whether plaintiffs could show that naturalization processing times were unduly long, the Court should deny plaintiffs' claims for injunctive and declaratory relief because Congress has chosen not to adopt the type of bright-line deadline that plaintiffs seek, and because USCIS and FBI are taking reasonable steps to reduce the time it takes to adjudicate

- 4 -

naturalization applications and resolve FBI name checks. The Supreme Court has made clear that where Congress has determined not to impose such deadlines and agencies are in the process of improving their programs, neither injunctive nor declaratory relief of the type sought by plaintiffs is warranted. *See infra* Part I.F.

Plaintiffs' motion for a preliminary injunction should be denied for essentially the same reasons set forth above. Plaintiffs can neither carry their burden of demonstrating a "clear or substantial likelihood of success" on the merits, nor demonstrate that preliminary injunctive relief is a proper exercise of discretion under the circumstances. *See infra* Part II.

Finally, plaintiffs' motion for class certification should be denied for several reasons. Plaintiffs' challenge to application processing times requires assessment of individualized issues related to each class member seeking relief, including whether that class member contributed to the length of his or her own processing times. Plaintiffs' effort to avoid this problem of individuation by excluding from their class applicants who have not "properly submitted" their applications or who have not "taken all actions requested of them by USCIS" results in a class definition that requires burdensome individual assessments to determine who is a class member, and therefore is not proper under Rule 23. Additionally, plaintiffs cannot satisfy the requirement of 23(b)(2) of the Federal Rule of Civil Procedure that injunctive or declaratory relief be appropriate as to "the class a whole," because the Supreme Court has held that class relief is not appropriate in this context, and because individualized issues preclude class-wide relief. Further, because USCIS has decided the naturalization applications of all but one named plaintiff, and the FBI name check for the final named plaintiff has already been completed, plaintiffs cannot demonstrate that they are typical of the class. Finally, in addition to these reasons for denying

the certification of any class, the Proposed Post-Interview Subclass should be denied under Rule 23's "adequacy" requirement because of inherent conflicts of interest, and any proposed class members who were members of settlement class in *Kaplan v. Chertoff*, No. 06-5304 (E.D. Pa.), should be excluded from this action because they have released the claims asserted on their behalf here.  *See infra* Part III.

## STATEMENT OF THE CASE

A.    The Naturalization Process

    1.    Statutory Framework

"Congress alone has the constitutional authority to prescribe rules for naturalization . . . ."  *Fedorenko v. United States*, 449 U.S. 490, 506 (1981); *see* U.S. Const., Art. I, § 8, cl. 4 (granting Congress the power "[t]o establish a uniform Rule of Naturalization.").  Pursuant to this authority, Congress has established the substantive prerequisites that an alien must satisfy to be eligible for naturalization.  *See* 8 U.S.C. § 1427.  Among other things, a naturalization applicant must demonstrate "good moral character," *id.* 1427(a)(3), as determined through, *inter alia*, USCIS's "personal investigation" of the applicant, *see id.* § 1446(a).  The burden of proof is on the applicant, *see id.* § 1427(e); *INS v. Pangilinan*, 486 U.S. 875, 886 (1988), and any doubts concerning eligibility must be resolved against the applicant, *see Berenyi v. District Director*, 385 U.S. 630, 637 (1967).  "No alien has the slightest right to naturalization unless all statutory requirements are complied with."  *United States v. Ginsberg*, 243 U.S. 472, 475 (1917).

Congress has provided that "[t]he sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General."  8 U.S.C. § 1421(a).  The Attorney General, in turn, delegated responsibility for adjudicating naturalization applications to the

former Immigration and Naturalization Service ("INS"), 8 C.F.R. §§ 100.2(a), 310.1(b), and that

responsibility has subsequently been assumed by USCIS, a bureau within the Department of

Homeland Security ("DHS"), *see* Homeland Security Act of 2002, Pub L. 107-296, Subtitle E,

§ 451(b)(2),116 Stat. 2135, 2196 (Nov. 25, 2002).  (USCIS and INS will be referred to herein

collectively as "USCIS").  USCIS has express authority, as delegate of the Attorney General, to

"make such rules and regulations as may be necessary to carry into effect the provisions of" the

naturalization laws.  8 U.S.C. § 1443(a).

      In its current form, the naturalization process has five general steps.  First, the applicant

submits a naturalization application and related documentation to USCIS.  *See* 8 U.S.C.

§ 1445(a).  Second, USCIS conducts a "personal investigation" of the applicant.  *See id.*

§ 1446(a).  As described in more detail below, this second step includes USCIS's obtaining a

"full criminal background check" from the files of FBI concerning the individual.  *See*

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies

Appropriations Act, 1998, Pub. L. No. 105-119, 111 Stat. 2440, 2448-49 (Nov. 26, 1997) ("1997

Appropriations Act").  In the third step, a USCIS naturalization examiner conducts an

examination of the applicant.  *See* 8 U.S.C. § 1446(b).  In the fourth step, the examiner issues a

determination regarding whether the application should be granted.  *See id.* § 1446(d).  The fifth

step, in the case of an application that the naturalization examiner has determined should be

granted, is the administration of the oath of citizenship.  *See id.* §§ 1421(b), 1448.

      If the examiner denies the application, the applicant has the right first to take an

administrative appeal to a USCIS hearing officer, *see id.* § 1447(a), and then, if that appeal is

unsuccessful, to seek *de novo* review of his or her eligibility for naturalization in district court,

*see id.* § 1421(c).  If the examiner has not issued a determination within 120 days of the

examination, the applicant has the option of seeking the assistance of the district court.  *See id.*

§ 1447(b).  In that event, the district court "has jurisdiction over the matter and may either

determine the matter or remand the matter, with appropriate instructions, to [USCIS] to

determine the matter."  *Id.* § 1447(b).

    2.    <u>Volume of Applications and Current Processing Times</u>

    USCIS receives hundreds of thousands of applications for naturalization every year, and

that number has been growing.  *See* Department of Homeland Security, Office of Immigration

Statistics, *2006 Yearbook of Immigration Statistics* ("2006 Yearbook")*,* Table 20, at 51-52 (Sept.

2007) (CIS006097-198, at CIS006153-54).[2]  Every year during the time period 2001-2007, the

number of new naturalization applications has annually exceeded 500,000, generally increasing

from year to year, with 501,000 having been filed in 2001 and 730,000 in 2006.  *See id.* at 52

(CIS006154).  In 2007, the number of new naturalization applications was an unprecedented 1.4

million.  *See* USCIS, *News Release: USCIS Updates Projected Naturalization Case Processing

Time* (Apr. 2, 2008) (CIS006388).

    For fiscal year 2001, USCIS has reported an outstanding caseload of 619,000  pending

naturalization applications filed in prior years.  (CIS006274).  In each year except one between

2001 and 2006, USCIS was able to adjudicate a greater number of applications than the number

of new applications received, reducing the number of pending applications.  *See* 2006 Yearbook,

---

[2] Documents Bates numbered with prefixes beginning "CIS" or "FBI" are documents in the administrative records filed with the Court in this case.  For the convenience of the Court, a disk containing these administrative records is attached as Exhibit A to the Declaration of Robert William Yalen ("Yalen Decl."), dated June 19, 2008, submitted herewith.

at 52 (CIS006154).  Because of the large number of new applications filed in 2007 – nearly double the number filed in the prior year – USCIS was not able to adjudicate a number of applications equivalent to the number received in 2007, resulting in an increase in pending cases to approximately 254,000 as of years' end.  (CIS006274).  In January, USCIS estimated that, on average, naturalization application processing times were approximately 16 to 18 months.  (CIS006240).  In April, USCIS announced that because of increased staffing and other resources, it had reduced its estimate of naturalization application processing times to 13 to 15 months.  (CIS006388).

The average length of processing times for naturalization applications are principally affected by two factors: First, the time it takes for FBI to conduct a "name check" of the applicant, *see infra* at 20, and resource constraints on processing the vast number of applications for naturalization and for other immigration benefits filed during in summer 2007, in what has been referred to as the "surge," *see infra* at 21-22.  In any individual case, however, the length of time that a naturalization application is pending may vary based on individual-specific factors, including, *inter alia*, whether the individual has ben asked to submit additional information to USCIS concerning his or her application, whether the individual has passed the English-language or civics naturalization examinations, whether the individual has a criminal history that, while not automatically disqualifying of naturalization, requires careful investigation and analysis by the agency, and whether the individual has a common name.  *See infra* at 23.

USCIS has implemented various staffing and other initiatives designed to reduce processing times for naturalization applications and resolve pending applications.  *See infra* at 23-26.  USCIS has adopted a plan to reduce increases in processing times caused by the surge.

*See infra* at 25-26.  Additionally, USCIS and FBI are working together to reduce the affect that the FBI name check has on application processing times.  *See infra* at 23-26.  USCIS and FBI have jointly adopted and submitted to Congress a business plan for reducing the time taken by the FBI name check so that by June 2009, 98% of all newly received name checks will be processed within 30 days, and the remaining 2% of newly received name checks will be processed within 90 days.  *See infra* at 32.

In addition to its processing of naturalization applications, USCIS also processes other immigrant benefit applications or petitions, including requests for refugee and asylee status and for lawful permanent resident status not made in the course of removal proceedings and requests for non-immigrant admission to the United States for work or other purposes.  *See* Immigration Services and Benefits, http://www.uscis.gov/ (follow "Services and Benefits" hyperlink).

  3. <u>The FBI Name Check</u>

   a. <u>The FBI Name Check Process</u>

As noted above, one contributing factor to average processing times for naturalization applications is the FBI name check.  As described in further detail below, USCIS is required by statute to obtain a "full criminal background check" from the FBI concerning every naturalization applicant, *see* 1997 Appropriations Act, 111 Stat. at 2448-49, which Congress understood to include both the FBI name check and a fingerprint check, *see* H.R. Rep. No. 105-405, at 106 (1997) (Conf. Rep.).[3]

_____

[3]In addition to the FBI name check and fingerprint check, USCIS performs at least one other background check on every naturalization applicant, through the U.S. Customs and Border Protection's Interagency Border Inspection System ("IBIS"), which contains information on suspect individuals, businesses, vehicles, aircraft, and vessels, and also contains historical and enforcement data on travelers to the United States.  (CIS004406).

The FBI name check is the method by which FBI disseminates information concerning an individual from its Central Records System ("CRS") to USCIS and federal agencies, congressional committees, the federal judiciary, foreign police and intelligence agencies, and state and local criminal justice agencies. (FBI000007); Declaration of Michael A. Cannon ("Cannon Decl."), June 6, 2008, ¶ 4.[4]  The CRS contains FBI's administrative, personnel, and investigative files, which contain approximately 99.1 million records of investigative and administrative cases. (FBI000007); Cannon Decl. ¶¶ 4, 9(c).

FBI's National Name Check Program ("NNCP") is the entity that conducts the name check searches. A 1990 Appropriations Act authorized the FBI to collect fees from non-law enforcement agencies making use of the NNCP. *See* Pub. L. 101-515, 104 Stat. 2101, 2112 (1990); *see also* (FBI000001; FBI000008; FBI000235; FBI000415; FBI000798).

NNCP has access to the CRS through FBI's searchable General Indices, entries which fall into two categories: (1) "main" entries, which contain the name of a subject of a file contained in the CRS, and (2) "reference" entries, which identify individuals, organizations, or entities that are referred to in a main file but not the subject of a main file. (FBI000085); Cannon Decl. ¶¶ 8, 11. "Reference" entries include subjects, suspects, and victims of the matter being investigated, and also include, in the discretion of the field agent and supervisor working the case, such additional individuals whose names are deemed likely to be pertinent, relevant, or essential information for retrieval on future cases. (FBI000142; FBI000177); Cannon Decl. ¶ 11.

---

[4]The Declaration of Michael Cannon is submitted herewith as a convenient summary of matters addressed in the FBI administrative record and to provide information concerning developments subsequent to the materials contained in that administrative record. *See San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002).

There are four stages in the completion of an individual name check:  batch processing, name searching, dissemination, and file review.  (FBI0000234); Cannon Dec. ¶ 13.  In the "batch processing" stage, name check requests sent by USCIS to FBI on magnetic tapes are uploaded to the FBI system and electronically searched against the General Indices to determine whether files exist with information concerning the individual.  (FBI0000234); Cannon Decl. ¶ 13. During this first phase, approximately 66% of the name checks are returned to USCIS within 48-72 hours as having "No Record," which means that the indices contain no identifiable information regarding a particular individual.  (FBI0000142); Cannon Decl. ¶ 13.  A "No Record" result returned to USCIS concludes the name check process for that particular request.

When batch processing results identify records potentially relating to an individual, NNCP conducts an expanded, manual search.  Thus, in the second stage of the name check process, FBI staff review entries with the applicant's name in a computer database and search different fields and information.  (FBI000234); Cannon Decl. ¶ 13.  This secondary manual name search is completed within 30 to 60 days, and allows NNCP to eliminate an additional 17% of USCIS requests as having "No Record."  (FBI000142); Cannon Decl. ¶ 14.  These "No Record" responses are returned to USCIS, completing the name check process for that individual. (FBI000234).

After first two stages of the name check, if it appears that available records do exist with respect to the individual, FBI "dissemination analysts" must then review the records identified by the stage one and stage two electronic searches to determine if those records have derogatory information appropriate for reporting to USCIS.  (FBI000235); Cannon Decl. ¶ 15.  These records may include investigation records generated by FBI field offices throughout the country.

(FBI000019, FBI000142). Stage three generally involves reviewing any records that have previously been scanned and are available to the analyst electronically. (FBI000019, FBI000142). In cases where all of the records identified by the electronic searches are available electronically, the name check may be resolved. In other cases, the name check proceeds to the fourth stage of review, which generally involves the review of paper files that often must be obtained from FBI field offices. (FBI000086); Cannon Decl. ¶ 15.

At each stage of processing, the NNCP system generally works on a first-in, first-served basis to ensure that applicants are treated fairly. (FBI000143, FBI000414); Cannon Decl. ¶ 17. The general exception to the first-in, first-served policy is when USCIS directs that a name check be handled on an expedited basis. (FBI000143, FBI000414); Cannon Decl. ¶ 18. To address general humanitarian and other policy concerns, it is USCIS practice to request expedited treatment for certain categories of name checks: (1) for aliens who are at risk of losing SSI disability due to processing times on their applications; (2) certain cases where aliens will risk "aging-out" of eligibility for citizenship or losing available visas, (3) "significant and compelling reasons, such as critical medical conditions," and (4) cases where the applicant is schedule to leave the United States on miliary deployment. (CIS004910). FBI has allotted USCIS up to 100 requests for expedited treatment per week, based on available resources and personnel. (FBI000026); Cannon Decl. ¶ 19.

Where FBI advises USCIS that it has found no derogatory information, USCIS may then proceed promptly to adjudication of the application. Where FBI identifies derogatory information, however, FBI will send a summary of that derogatory information to USCIS, (FBI000178), which must determine how to proceed on the application in light of FBI's

information.  Ultimately, USCIS considers the information provided by FBI in the context of all

the other information developed by USCIS in the personal investigation and at the applicant's

naturalization to determine whether to grant or deny the application.  (CIS001146-47).

       b.      <u>Origin of the FBI Name Check Requirement for Naturalization Cases</u>

As noted above, Congress has placed responsibility on the Attorney General and USCIS

to investigate each naturalization applicant prior to naturalization.

> Before a person may be naturalized, an employee of [USCIS], or of the United States
> designated by the Attorney General, shall conduct a personal investigation of the person
> applying for naturalization in the vicinity or vicinities in which such person has
> maintained his actual place of abode and in the vicinity or vicinities in which such person
> has been employed or has engaged in business or work for at least five years immediately
> preceding the filing of his application for naturalization.

8 U.S.C. § 1446(a).  "[T]he Attorney General may, in his discretion, waive a personal

investigation in an individual case or in such cases or classes of cases as may be designated by

him."  *Id.*

A "personal investigation" of an applicant for naturalization has been a requirement of

the Immigration and Nationality Act ("INA") since it was first enacted in 1952.  *See* Immigration

and Nationality Act, Pub. L. No. 82-414, § 335, 66 Stat. 163, 255-256 (June 27, 1952).  In

implementing the general mandate of a "personal investigation," USCIS has long obtained

potentially relevant information concerning naturalization applicants from FBI and other law

enforcement agencies to search their records.  (CIS000018-26; CIS000028-30; CIS000032-33).

This practice has evolved over time, in light of changed technology, resources, and policy

judgments including those involving national security, and, at various times, has called for

USCIS to seek information from agencies including the Central Intelligence Agency.

(CIS000030).  USCIS's practice in conducting the personal investigation has long included, in

appropriate circumstances, requesting that FBI search its records for the individual by name.

(CIS000080-87).

In 1991, USCIS promulgated a regulation reflecting its commitment to review all

appropriate governmental records as part of the "personal investigation" mandated by Congress:

> Subsequent to the filing of an application for naturalization, [USCIS] shall conduct an investigation of the applicant. *The investigation shall consist, at a minimum, of a review of all pertinent records,* police department checks, and a neighborhood investigation in the vicinities where the applicant has resided and has been employed, or engaged in business, for at least the five years immediately preceding the filing of the application. The district director may waive the neighborhood investigation of the applicant provided for in this paragraph.

8 C.F.R. § 335.1, issued as interim regulation, 56 Fed. Reg. 50475, 50497 (Oct. 7, 1991),

adopted as final regulation without changes, 60 Fed. Reg. 6647, 6650 (Feb. 3, 1995) (emphasis

added).

Only once has Congress directed how USCIS's was to exercise its discretion in

implementing the personal investigation, and that was by explicitly requiring USCIS to obtain

from FBI a "full criminal background check" on each naturalization applicant prior to deciding

the application:

> During fiscal year 1998 and each fiscal year thereafter, none of the funds appropriated or otherwise made available to the Immigration and Naturalization Service shall be used to complete adjudication of an application for naturalization unless the Immigration and Naturalization Service has received confirmation from the Federal Bureau of Investigation that a *full criminal background check* has been completed, except for those exempted by regulation as of January 1, 1997.

1997 Appropriations Act,  111 Stat. at 2448-49 (emphasis added).

As explained by the Congressional conference committee's report concerning this statute:

> A provision is included, as proposed in the House bill, which requires INS to wait for the FBI to complete *both a name and fingerprint* criminal history check before completing the adjudication of an application for citizenship.

- 15 -

H.R. Rep. No. 105-405, at 106 (1997) (Conf. Rep.) (emphasis added); *see also Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("Because a conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." (internal quotation marks omitted)).  This provision arose from then-recent disclosures that USCIS's efforts to reduce a backlog in naturalization applications pursuant to the agency's Citizenship U.S.A. ("CUSA") program had resulted in the agency's giving insufficient attention to background checks.  (CIS001977).  Although a principal focus of critics of the CUSA program was the agency's handling of fingerprint checks, the agency's handling of name checks was also criticized.  (CIS000724-34).  In this context, Congress thus acted to limit USCIS's authority by making a completed "full criminal background check" mandatory, notwithstanding the agency's discretion under other circumstances to waive the personal investigation requirement.  *See* 8 U.S.C. § 1446(a).

After the adoption of the "full criminal background check" requirement, USCIS endeavored to put in place a system under which no naturalization application was decided until a complete, definitive response was provided by FBI to USCIS's inquiries.  First, USCIS promptly amended its regulations to provide as follows:

> (b) Completion of criminal background checks before examination.  The Service will notify applicants for naturalization to appear before a Service officer for initial examination on the naturalization application only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed.  A definitive response that a full criminal background check on an applicant has been completed includes:
>
>> (1)     Confirmation from the Federal Bureau of Investigation that an applicant does not have an administrative or a criminal record;

(2) Confirmation from the Federal Bureau of Investigation that an applicant has an administrative or criminal record; or

(3) Confirmation from the Federal Bureau of Investigation that two properly prepared fingerprint cards (Form FD-258) have been determined unclassifiable for the purpose of conducting a criminal background check and have been rejected.

8 C.F.R. § 335.2(b).

Thereafter, USCIS studied the steps that might be taken to ensure that USCIS received a definitive response from the FBI name check in every case prior to the making of a determination on a naturalization application. CIS000099-102 (PricewaterhouseCoopers, *The G-325 Name Check, Project Overview*, Nov. 1998); CIS000184-86 (PricewaterhouseCoopers, *The New G-325 Back-End Process*, Apr. 1999). At the same time, USCIS conferred with FBI concerning the goal of "achiev[ing] a total definitive response program" for the FBI name check. CIS000132. Notwithstanding these efforts, prior to 2002, USCIS still did not receive definitive responses from FBI prior to adjudication in all cases, and operated under a policy pursuant to which naturalization applications could be adjudicated by USCIS naturalization examiners once 60 days had passed without a response from FBI. (CIS000122-123, CIS000250).

c. <u>2002 Changes in Practice Regarding the FBI Name Check</u>

Following the terrorist attacks of September 11, 2001, USCIS and the entire federal government placed a renewed emphasis on insuring that agencies addressed all national security issues appropriately. In particular, USCIS was criticized for what in hindsight was perceived as inattention to background check matters with regard to temporary alien visitors prior to the terrorist attacks. *See, e.g.*, The 9/11 Commission Report, 2004 WL 1634382, at *352 (2004) (concluding that "had the immigration system set a higher bar for determining whether

- 17 -

individuals are who or what they claim to be . . . it could have potentially excluded, removed, or come into further contact with several hijackers who did not appear to meet the terms for admitting short-term visitors."). Although the 9/11 terrorists were not applicants for naturalization, in 2002 security concerns relating to naturalization were brought into particular focus, when USCIS learned that an individual with ties to a terrorist organization had erroneously been naturalized. (FBI00008; CIS001150; CIS001154-76). USCIS's Office of Internal Audit conducted a review of the circumstances relating to this individual's naturalization, and identified a number of flaws in USCIS's processes. (CIS001154-76). Additionally, at a meeting between FBI and USCIS, FBI informed the USCIS that, based on FBI's interpretation of a 1985 memorandum of understanding between USCIS and FBI concerning the FBI name check, the FBI name check for naturalization applicants was only conducted through FBI's "main" files. (FBI00008, CIS001150).

The Office of Internal Audit's report recommended that USCIS "initiate steps to ensure that all required FBI name checks are properly conducted to include search detail that is comprehensive enough to disclose an applicant's known terrorist affiliations and criminal history." (CIS001175). Additionally, the report recommended that USCIS take steps to ensure that it receives a "definitive response" to FBI name check requests before processing naturalization applications. (CIS001175). Accordingly, in response to these developments, USCIS made two changes to its practices with respect to FBI name checks. First, USCIS concluded that FBI name checks for then-pending and future naturalization applications should be conducted through both the "main files" and the "reference files," to ensure comprehensiveness. (FBI00008-9, CIS001150-51). Second, USCIS instructed its own

personnel that they were prohibited from adjudicating any naturalization applications until the

USCIS received a definitive response from FBI regarding the individual's name check.

(CIS001178).  With certain modifications, these parameters continue to be in force today.

The FBI name check as currently structured is a valuable part of USCIS's personal

investigation of naturalization applicants, in addition to being mandated by the 1997

Appropriations Act.  For example, USCIS has conducted an analysis of  approximately twenty

positive FBI name check responses, and concluded that eight of the cases sampled had received

relevant information from the FBI name check that was not available from sources other than the

FBI name check.  (CIS004413).  Further, in 2006, USCIS conducted a comparative analysis of

135 FBI name check responses for the period May 18, 2006, to June 16, 2006.  (CIS004404,

CIS004406-07).  USCIS found that in 72.39% of the records reviewed, USCIS's IBIS check did

not return a positive identification, but the FBI name check did, (CIS004409; CIS004410), and

in 90.37% of the records reviewed, the FBI fingerprint check did not return a positive

identification, but the FBI name check did, (CIS004407; CIS004409; CIS004409).

B.    Efforts to Reduce Application Processing Times

     1.    Factors Affecting Current Naturalization Processing Times

          a.    The FBI Name Check

The FBI name check process is a contributing factor to the length of current

naturalization processing times.  As described above, FBI is able to provide USCIS a "no

record" response for approximately 83% of USCIS's name check requests within 60 days:  66%

within 48-72 hours, and 17% within 30 to 60 days.  The time necessary to process the remaining

17% of name check requests – those where electronic searching indicates that potentially

relevant files exist – is highly variable: factors affecting processing times include the number of potentially relevant files; whether the files in question have been scanned and are readily available for the FBI analyst in electronic form or exist only in paper and in distant FBI field offices; and whether the FBI analyst, upon review of the file, finds it necessary to discuss the file with the field agent working the case.  (FBI000178)

In fiscal year 2007, FBI processed more than four million name checks.  (FBI000816). Of the four million processed in fiscal year 2007, approximately 52% had been submitted by USCIS, with the remainder submitted by dozens of other agencies and law enforcement organizations.  (FBI000816).  As of March 5, 2008, FBI had approximately 251employees and contractors working in support of processing USCIS name checks, with an additional 129 employees and contractors expected to be hired thereafter.   (CIS006310-11); Cannon Decl. ¶¶ 32, 39.

b.    The "Surge"

As noted above, an additional cause for the length of current naturalization processing times is what has been referred to as the "surge" – a dramatic increase in naturalization applicants received by USCIS prior to an increase in fees in summer of 2007.  This increase, which was accompanied by a parallel increase in certain applications to USCIS for benefits other than naturalization, appears to have related principally to an increase in naturalization fees that went into effect in July 2007.  In June, July and August 2007 alone, USCIS received over 3 million applications for various immigration benefits.  (CIS006279).  In fiscal year 2007, USCIS received nearly 1.4 million applications for naturalization, which was nearly double the volume received for the previous fiscal year.  (CIS006279).  For the months of June and July 2007,

naturalization applications increased by nearly 350% compared to the same period in 2006 (CIS006279).  This "surge" in naturalization applications – along with the parallel increase in other applications for certain immigration benefits – has greatly taxed USCIS's resources for processing and adjudicating cases.  (CIS006221).

The fee increase was a step that USCIS undertook with the long-term objective of reducing processing times.  (CIS003368; CIS005107).  In that regard, USCIS application fees provide an essential source of funding for its operations.  As early as January 2004, the United States General Accounting Office had reported to Congress that USCIS's fees were set to low to support its functions.  *See* CIS003331-3383 (GAO report).  The GAO attributed lengthy processing times for immigration benefit applications in part due to USCIS's fee schedules being unable to provide appropriate funding for the timely processing of applications.  (USCIS003333).  In February 2007, USCIS issued a proposed rule calling for fee increases for a variety of benefit applications, including an increase in fees for naturalization application fees from $400 to $675.  (CIS004827-55).  This proposed rule was supported by extensive supporting documentation of its necessity.  (CIS004681-826).  In May 2007, USCIS promulgated its final fees rule.  (CIS005117-130).  After considering more than 3,900 comments submitted concerning this proposed rule change, USCIS reduced the naturalization fee increase somewhat, to $595.  (CIS005110).

Prior to the fee increase, USCIS analyzed the potential for an increase in the number of filed applications and adjusted its staffing levels and processes accordingly.  USCIS conducted a review and analysis of fee projections, which predicted both a smaller increase and filings prior to the fee increase, and a corresponding decrease in filings after the increase went into effect, and

staffing and production models were based upon these projections. (CIS004627-4643). Further, USCIS identified that fee receipts had exceeded projections during the initial part of the fiscal year, before the fee increase went into effect, and submitted a reprogramming request to Congress in June 2007. (CIS005323-5327). Finally, as it was identified that fee receipts had increased over the prior year, term appointments of employees were extended. Unfortunately, notwithstanding these efforts, the resulting surge far exceeded the projected increase in applications prior to the fee increase, and the projected decrease in applications below historical levels after the fee increase went into effect never materialized. (CIS006278-79).

c.    <u>Individualized Factors Affecting Processing Times</u>

Although the FBI name check process and the surge are responsible in substantial part for the current *average* processing times, it is important to note that in any individual case, a variety of individual factors affect processing times.

In part, these individualized factors are relevant because of the effect they have on FBI's processing of the name check. As noted, 83% of FBI name checks for naturalization cases are completed within sixty days, because they are resolved in one of the first two stages of the name check process. (FBI000177-78). Those cases that cannot be resolved in the first two steps and require FBI analysts to obtain and review FBI files matched to the applicant through the general indices take longer, particularly where the files in question are maintained only in paper at FBI field offices. (FBI000177-78).

Further, among other things, if an individual has been asked to submit additional information to USCIS concerning his or her application, that may lengthen the processing time for that application. (CIS006389). Similarly, individuals who do not pass their English-

- 22 -

language or civics naturalization tests and therefore need to be re-examined will have lengthier

processing times. (CIS006389). Moreover, if an applicant has an arrest or criminal record, even

if that record does not ultimately disqualify the individual from naturalization, it may take

USCIS or FBI longer to review and process that individual's name check and application.

Cannon Decl. ¶ 26. Further, if an applicant has a common name, that may lengthen the process

of determining whether relevant files exist with respect to that individual. Cannon Decl. ¶ 27.

These and other factors affect the processing times for individual naturalization applications.

    2.    <u>Efforts by USCIS and FBI to Reduce Current Processing Times</u>

Faced with increased numbers of naturalization applications, increased emphasis on

security concerns, and increased application processing times, USCIS and FBI have worked

consistently since 2002 to develop more efficient and effective processes, to minimize

processing times while continuing to allow for a full background check of each naturalization

applicant.

USCIS and FBI have adopted technological changes to facilitate the prompt requesting of

FBI name checks when USCIS receives a naturalization applicant, and the prompt dissemination

of the results of the FBI name check to USCIS adjudicators. Among other things, USCIS has

modified its computer processing system so that it automatically requests a name check on every

naturalization application, to avoid delays associated with manual requests. (CIS003221).

USCIS has also implemented procedures enabling adjudicators to have immediate access to FBI

name check results to facilitate prompt resolution of applications after FBI provides a response.

(CIS002581-82). Similarly, FBI has made numerous improvements in NNCP's software to

make the name check process more efficient and limit the amount of manual review of files

required.[5]  The NNCP is also working with Information Technology to improve search

techniques with existing technology to increase quality of searches.  (FBI000177).  Further, FBI

is working towards automating the Name Check program by scanning paper files to provide

machine-readable documents to reduce time spent locating files.  (FBI 000066-67; FBI 000176;

FBI000450).   FBI has requested a $4.2 million budget for fiscal year 2008 to initiate additional

technology upgrades.  (FBI 000177).

        USCIS and FBI together have greatly increased the staffing and infrastructure resources

available to the National Name Check Program for conducting FBI name checks for

naturalization applications.  FBI has made extensive use of overtime, contractors and detailed

employees,  (FBI000060; FBI000134), beginning as early as May 2002, requesting $304,100.00

to provide NNCP with approximately 10,000 hours of overtime to facilitate the time processing

of name checks.  (*See, e.g.,* FBI000001; FBI000004; FBI000041; FBI000046).  FBI has

additionally hired many new employees and contractors to expand the available workforce at

NNCP and has engaged hundreds of contractors, as well.  (*See, e.g.*, FBI0000041; FBI0000046,

FBI000057; FBI 000069-77; FBI000091; FBI 0000731).  Additionally, USCIS has detailed its

own employees to NNCP to assist with pending name checks (CIS004013), has reallocated  staff

---

        [5]  For example, in November 2003, the NNCP began development of a new software tool
for the dissemination sub-process that would identify duplicate name check submissions and
check a large volume of names quickly and accurately.  (FBI 41, 46, 79), and in September 2004,
the NNCP initiated a series of improvements on the NNCP software, increasing the speed of the
application  (FBI at 79).  In February 2005, the NNCP submitted a proposal for automation of
the initial name search.  (FBI at 79).  By August 2006, the newly revised Name Check
Dissemination database was ready for implementation, which would create a paperless
environment for processing name checks.  (FBI at 301).

to align resources with workload, and has redistributed workloads to offices with excess capacity.  (CIS003388-90; CIS003854-59; CIS004013; CIS004268).

USCIS and FBI have also modified the name check process and workflow to speed the review by FBI and more effectively winnow-out irrelevant information.  For example, the NNCP designated specific employees to process only cases that could be rapidly reviewed and closed. (FBI000079).  In January 3, 2006, FBI added nine additional positions to focus solely on still-remaining cases that had been re-run after the 2002 change in practices.  (FBI000132).  In addition, FBI and USCIS personnel have eliminated from the name check process specific categories of files unlikely to have relevant information.  (FBI000560; FBI000596; FBI000731) (FBI000764).  FBI and USCIS also implemented a pilot program in which USCIS personnel work on-site with NNCP personnel to evaluate derogatory information.  (FBI000596).

Further, in particular response to the summer 2007 "surge," USCIS adopted a "Surge Response Plan" dedicating increased resources and modified practices to the problem. (CIS004660-80); *see also* Yalen Decl. Ex. B.  The Surge Response Plan includes personnel matters such as the hiring of additional staff, the extension of the term employment of existing application adjudicators, and the authorization of overtime pay for adjudicators.  (CIS004661-62; CIS004664-65).  The Surge Response Plan also includes workflow improvements such as the reassignment of pre-processing work for naturalization applications from USCIS's Service Centers to its National Benefits Center, which would permit Service Centers staff to focus on core adjudication activities, as well as infrastructure and technological improvements. (CIS004663; CIS004666; CIS004668-80).

In other respects, as well, improvements have been made to facilitate the naturalization process. On April 10, 2006, a National Security and Records Verification Directorate was established to improve operational efficiency on security issues. (CIS004273). FBI and USCIS have also each established improved monitoring and tracking systems. (FBI000151; USCIS005228).

In fiscal year 2008, as of March 5, 2008, FBI has received 792,397 USCIS name check requests, of which it has completed 849,580. (CIS006309). As of that date, FBI was processing an additional 345,635 USCIS name check requests. Compared to the same time in fiscal year 2007, this represents a 9.5% increase in incoming USCIS name check requests, a 23% increase in completed USCIS name check requests, and a 13.4% decrease of pending USCIS name check requests. (CIS006309).

      3.     <u>Congressional Response to Application Processing Times</u>

           a.     <u>Pre-2007 Congressional Action</u>

Although it is possible to point to the FBI name check process and the "surge" as the principal contributing factors to the current processing times for naturalization applications, it is important to recognize that lengthy processing times for naturalization and other immigrant benefit applications have long existed, and Congress and USCIS have made numerous efforts over the years to shorten those processing times. In the 1980s, naturalization applications were greatly backlogged, prompting congressional action. *See* 135 Cong. Rec. H4539-02. At that time, principal responsibility for naturalization rested with the judiciary, with USCIS providing a facilitative role. Congress chose to address this problem in 1990, not by imposing any mandatory deadlines for application processing but instead removing principal authority over

naturalization applications from the courts and placing that responsibility with the Attorney General and the agency.  *See* Immigration Act of 1990, Pub. Law 101-649, 104 Stat. 4978 (Nov. 29, 1990); *see also Chan v. Gantner*, 464 F.3d 289, 290 (2d Cir. 2006) (noting that a principal purpose of the 1990 amendments was to speed the process of naturalization in the face of a judicial backlog of naturalization cases).

The 1990 amendments did adopt 8 U.S.C. § 1447(b), which, as described above, allows an applicant to seek judicial review of his or her naturalization application if more than 120 days pass after the examination before the examiner renders a decision.  *See* 8 U.S.C. § 1447(b). Section 1447(b) restores a portion of the pre-existing judicial authority over naturalization that the 1990 amendments generally removed; specifically, it authorizes a naturalization applicant to file in the district court if his or her application has not been adjudicated by USCIS within 120 days following an individual's examination.  *See id.*  Pursuant to section 1447(b), the district court may adjudicate the application itself or issue instructions to the agency for further processing of the application.  *See id.*  Section 1447(b), however, does not require USCIS to adjudicate an application within 120 days or any other specified period of time.  *See Bustamante v. Chertoff*, 533 F. Supp. 2d 373, 380 (S.D.N.Y. 2008)

In the late 1990s, Congress again grew concerned about "backlogs" in the processing of immigration benefits, including naturalization.  Therefore, in 2000, Congress enacted the Immigration Services and Infrastructure Improvements Act, Pub. L. No. 106-313, 114 Stat. 1262 (Oct. 17, 2000).  The stated purposes of this statute were to provide USCIS with "the mechanisms it needs to eliminate the current backlog in the processing of immigration benefit applications within 1 year after the enactment of this act" and "to provide for regular

congressional oversight" over the effort to eliminate this backlog.  *See id.* § 202(a)(1)-(2) (codified at 8 U.S.C. § 1571(a)).  By this statute, Congress authorized additional funding to be made available to the Attorney General to reduce the "backlog" of applications, defined as cases pending 180 days or more, *see id.* § 203(1) (codified at 8 U.S.C. § 1572), with the "objective" of reducing processing times within one year to such a level that all immigration benefits applications would be processed within 180 days of their submission, *see id.* § 204 (codified at 8 U.S.C. § 1573).  The statute required the Attorney General to make an initial report to Congress on processing times within 90 days, and annual reports thereafter.  *See id.* § 205 (codified at 8 U.S.C. § 1574).

Congress did not, however, impose any mandatory deadline for processing of applications.  Instead, the statute included an aspirational provision that stated, under the heading "policy," that "[i]t is the sense of Congress that the processing of an immigration benefit application should be competed not later than 180 days after the initial filing of the application." *Id.*, § 201(b), 114 Stat. at 1262 (codified at 8 U.S.C. § 1571(b)).  As noted above, this 180-day period is described in the statute, not as a mandatory requirement, but as an "objective" to be pursued.  *See id.* § 204 (codified at 8 U.S.C. § 1573).

b.    <u>Congressional Action Since 2007</u>

Congress is well aware of recent processing times for naturalization applications, as well as other applications, and the degree to which the FBI name check requirement has contributed to these processing times.  The administrative record contains at least eleven reports submitted

by USCIS to Congress on the subject between November 2004 and June 2007.[6]  Secretary

Michael Chertoff of DHS and former USCIS Director Emilio T. Gonzalez have testified before

Congress on naturalization processing times,[7] and FBI officials have testified concerning the FBI

name check program.[8]  The then-USCIS Ombudsman, a critic of the FBI name check

requirement, also submitted regular reports to Congress concerning USCIS operations, and

repeatedly raised issues concerning the length of naturalization processing times,[9] and USCIS

_____

[6] *See* USCIS, *Backlog Elimination Plan, Fiscal Year 2005, 1st Quarter Update* (May 25, 2005) (CIS003896-3905); USCIS, *Backlog Elimination Plan, Fiscal Year 2005, 2nd Quarter Update* (Aug. 15, 2005) (CIS003963-73); USCIS, *Backlog Elimination Plan, Fiscal Year 2004, 4th Quarter Update* (Mar. 16, 2005) (CIS003873-81); USCIS, *Backlog Elimination Plan, Fiscal Year 2004, 3rd Quarter Update* (Nov. 5, 2004) (CIS003862-69); USCIS, *Backlog Elimination Plan, Fiscal Year 2005, 3rd Quarter Update* (Sept. 6, 2005) (CIS003976-3982); USCIS, *Backlog Elimination Plan, Fiscal Year 2005, 4th Quarter Update* (Apr. 7, 2006) (CIS004263-72); USCIS, *Backlog Elimination Plan, Fiscal Year 2006, 1st Quarter Update* (Aug. 7, 2006) (CIS004414-23); USCIS, *Backlog Elimination Plan, Fiscal Year 2006, 2nd Quarter Update* (Sept. 28, 2006) (CIS004466-74); USCIS, *Backlog Elimination Plan, Fiscal Year 2006, 3rd Quarter Update* (Dec. 11, 2006) (CIS004614-26); USCIS, *Backlog Elimination Plan, Fiscal Year 2006, 4th Quarter Update* (Feb. 12, 2007) (CIS004900-09); USCIS, *Production Update, Fiscal Year 2007, 1st Quarter Update* (June 15, 2007) (CIS005313-5317).

[7] *See* Written Testimony Prepared for Emilio T. Gonzalez, Director, U.S. Citizenship and Immigration Services, for a Hearing on "Naturalization Delays: Causes, Consequences and Solutions," Before the House Judiciary Committee, Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law (Jan. 17, 2008) (CIS006277-82); Testimony, United States Senate Committee on the Judiciary, Oversight of the Department of Homeland Security (Apr. 2, 2008).

[8] *See* Testimony of David M. Hardy, Acting Assistant Director, Record/Information Dissemination Section, Records Management Division, FBI, Before the Senate Subcommittee on International Operations and Terrorism, *The FBI Name Check Process* (Oct. 23, 2003), *available at* http://www.fbi.gov/congress/congress03/hardy102303.htm; Testimony of Robert J. Garrity, Jr., Acting Assistant Director, Records Management Division, FBI, Before the House of Representatives, Committee on Government Reform, *The FBI's VISA Name Check Process* (July 10, 2003), available at http://www.fbi.gov/congress/congress03/garrity071003.htm.

[9] *See* Citizenship and Immigration Services Ombudsman, *Annual Report 2005* (June 30, 2005) (CIS003910-62); Citizenship and Immigration Services Ombudsman, *Annual Report 2006* (June 29, 2006) (CIS004284-4400); Citizenship and Immigration Services Ombudsman, *Annual*

has submitted responses to Congress.[10]  Additionally, other publically available information

concerning the FBI name check in naturalization process exists and is fully available for

Congress's consideration, such as a recent report by the Office of the Inspector General of the

United States Department of Justice.[11]

In light of this information, Congress has recently acted to reduce naturalization

processing times, but it has not chosen to take the actions that plaintiffs want the Court to

impose.  Although aware of the length of naturalization application processing times about

which plaintiffs complain, Congress has not, for example, imposed a deadline for the processing

of such applications.  Similarly, although aware of criticisms of the FBI name check as a

contributing factor to the length of processing times, Congress has not acted to modify the name

check requirement in the 1997 Appropriations Act or to limit USCIS's discretion in requiring a

name check as part of the personal investigation required for every applicant.  Instead, Congress

has chosen to increase funding to assist the agencies in reducing processing times and has

directed the agencies to develop plans for such reductions.

---

*Report 2007* (June 11, 2007) (CIS005168-5312).

[10] *See USCIS Response to 2005 Ombudsman Report*, CIS004043-58; *Response to the Citizenship and Immigration Services Ombudsman's 2006 Report*, CIS005076-106; *USCIS Response to CISO Recommendations, CIS Ombudsman Annual Report 2007*, CIS006225-46.

[11] *See* U.S. Department of Justice, Office of the Inspector General, Audit Division, *The Federal Bureau of Investigation's Security Check Procedures for Immigration Applications and Petitions*, Audit Report 08-24 (June 2008), available at http://www.usdoj.gov/oig/reports/ FBI/a0824/final.pdf.

Thus, in May 2007, in the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 ("May 2007 Appropriations Act"), Pub. L. No. 110-28, 121 Stat. 112 (May 25, 2007), Congress provided:

> For an additional amount for expenses of "United States Citizenship and Immigration Services" to address backlogs of security checks associated with pending applications and petitions, $8,000,000, to remain available until September 30, 2008:  Provided, That none of the funds made available under this heading shall be available for obligation until the Secretary of Homeland Security, in consultation with the United States Attorney General, submits to the Committees on Appropriations of the Senate and the House of Representatives a plan to eliminate the backlog of security checks that establishes information sharing protocols to ensure United States Citizenship and Immigration Services has the information it needs to carry out its mission.

*See id.*, tit. III, ch. 5, 121 Stat. at 143.  Pursuant to this mandate, USCIS submitted a plan to Congress describing its proposal to spend $15,000,000 (including the $8,000,000 appropriated by the May 2007 Appropriations Act) to fund an increase of FBI staffing committed to the name check process and to fund additional USCIS staffing to review cases with national security concerns.  *See* Yalen Decl. Ex. D.  (U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Background Check Enhancements Spend Plan Submitted Pursuant to Public Law 110-28* (Dec. 2007)).

Then, in December 2007, Congress again acted by appropriating additional funds to assist the agencies in reducing processing times, and required the agencies to develop a plan for reducing processing times.  *See* Consolidated Appropriations Act, 2008 (the "2008 Appropriations Act"), Pub. L. 110-161, Div. E, tit. IV, 121 Stat. 1844, 2067  (Dec. 26, 2007). The statute states:

> [O]f the total [appropriated for Department of Homeland Security in this act], $20,000,000 is provided to address backlogs of security checks associated with pending applications and petitions and shall not be available for obligation until the Secretary of Homeland Security and the United States Attorney General submit to the Committees on

> Appropriations of the Senate and the House of Representatives a plan to eliminate the backlog of security checks that establishes information sharing protocols to ensure United States Citizenship and Immigration Services has the information it needs to carry out its mission . . . .

*Id.* As directed by Congress, USCIS and FBI have developed and submitted to Congress a business plan for reducing processing times for FBI name checks for immigration and naturalization applications. *See* CIS006307-24 (Business Plan) (public version). The plan "outlines a strategy for eliminating USCIS name check requests pending over 30 days" by June 2009 (CIS006308), and to achieve a standard by June 2009 where 98% of all newly received name checks are processed within 30 days, and the remaining 2% of newly received name checks are processed within 90 days. (CIS006323). These goals are to be achieved through various improvements, including the hiring and training of additional contract staff and the implementation of improved work-flow management. (CIS006313-17). This business plan has been submitted to Congress, and the agencies are working to achieve it. In sum, Congress has decided to address the very processing times that plaintiffs challenge, not by restricting the agencies' mission or imposing deadlines, but rather by funding new plans to reduce the processing times.

C.    Plaintiffs' Complaint

        1.    Allegations of the Complaint

        Plaintiffs are six lawful permanent residents who, at the time of the filing of the complaint, had pending naturalization applications in the New York City District Office of USCIS:[12] Virginia Milanes ("Milanes"), Omar Miguel Farfan ("Farfan"), Manuel Alberto Martinez ("Martinez"), Anthony Giovanny Sanchez ("Sanchez"), Nancy Castro ("Castro"), and Margoth Perez de Chalampa ("Perez de Chalampa").  *See* Complaint ("Cplt.") ¶¶ 15-20. Plaintiffs allege, and defendants do not dispute, that at the time of the filing of their complaint each of their naturalization applications had been pending for periods of time ranging from seven months to three years and ten months.  *See id.*

        Plaintiffs purport to represent a class (the "Proposed Class") of plaintiffs described as follows:

> All lawful permanent residents who reside in the counties served by the New York District Office of USCIS who have properly submitted or will properly submit applications for naturalization to USCIS, who have taken all actions requested of them by USCIS, and whose applications for naturalization have not been or will not be adjudicated by USCIS within 180 days of the date of submission.

Plaintiffs' Memorandum of Law in Support of Their Motions for Preliminary Injunction, Class Certification and Expedited Discovery ("Pl. Br."), dated April 3, 2008, at 38.[13]

_____

        [12] The New York City Field Office has jurisdiction over New York City and the counties of Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk, Sullivan, Ulster, and Westchester, plus the United States immigration office in Hamilton, Bermuda.  *See* 8 C.F.R. § 100.4(b)(3).

        [13]  Plaintiffs' motion for class certification somewhat modifies the definition of the Proposed Class relative to what had been proposed in the complaint.  *Compare* Cplt. ¶ 45, *with* Pl. Br. at 38.  Accordingly, the Government will address plaintiffs' current proposed class definition rather than the one contained in their complaint.  *See In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 200-01 (2d Cir. 2000) (noting that class definitions can be modified).

Plaintiffs also allege, and defendants do not dispute for the purpose of this motion, that on October 13, 2005, plaintiff Sanchez was interviewed by a naturalization examiner, *see id.* ¶ 18. Accordingly, as alleged by plaintiffs, at the time of filing of their complaint approximately two years and four months had passed following Sanchez's interview without a determination on his application. *See id.* ¶ 18. Sanchez purports to represent a subclass (the "Proposed Post-Interview Subclass") of the Proposed Class:

> All lawful permanent residents who reside in the counties served by the New York District Office of USCIS who have properly submitted or will properly submit applications for naturalization to USCIS, who have taken all actions requested of them by USCIS, and whose applications for naturalization have not been or will not be adjudicated by USCIS within 120 days of the date of their initial examination.

Pl. Br. at 38.[14]

All plaintiffs, on behalf of themselves and the Proposed Class, assert essentially three claims: First, they claim that naturalization processing times in excess of 180 days amount to a failure to act within a "reasonable time," *see* 5 U.S.C. § 555(b), and allegedly therefore entitled them to relief pursuant to 5 U.S.C. § 706(1), which authorizes the courts to compel agency action that is "unreasonably delayed" or "unlawfully withheld." 5 U.S.C. § 706(1). Cplt. ¶¶ 133, 136, 137.[15] Second, they allege that USCIS and FBI's alleged failure to act within a reasonable time

---

[14] Again, plaintiffs' motion for class certification has modified the definition of the subclass, *compare* Cplt. ¶ 46, *with* Pl. Br. at 38, and the Government herein will address the proposed subclass as so modified.

[15] Plaintiffs do not allege that the "reasonable time" provision of 5 U.S.C. § 555(b) standing alone provides them a cause of action, but properly allege treat their alleged cause of action as arising under section 706(1). *See Hoo Loo v. Ridge*, No. Civ. 04-5553, 2007 WL 813000, at *3-*4 (E.D.N.Y. Mar. 14, 2007) (noting section 555 allegations but analyzing right to relief pursuant to section 706(1)).

violated plaintiffs' rights under the Due Process Clause of the U.S. Constitution.  Cplt. ¶ 137.

Third, they allge that USCIS's 2002 changes in agency practice concerning the FBI name check

violated the APA,5 U.S.C. § 553, because the agency did not use full notice-and-comment

rulemaking in adopting those changes in practice.  Cplt. ¶ 135.  Further, plaintiff Sanchez, on

behalf of himself and the Proposed Post-Interview Subclass, alleges that plaintiffs whose

applications have been pending 120 days or more after their examination are entitled to an order

compelling agency action for pursuant to 5 U.S.C. § 706(1) and 8 U.S.C. § 1447(b).  Cplt. ¶¶

134, 136, 137.

Plaintiffs's seek, among other things, an injunction compelling the Government to decide

all proposed class members naturalization applications "immediately," Cplt. at 31 (prayers for

relief 7(a) and 7(b)), and an order compelling "USCIS Defendants to adjudicate all naturalization

applications without waiting for the results of FBI name checks."  Cplt. 31 (prayer for relief 7(a)

and 7(c)).

Plaintiffs have now moved for class certification and for a preliminary injunction on

behalf of what they refer to as their "preliminary injunction group":  All class members who

filed applications for naturalization on or before April 3, 2008.  *See* Pl. Br. at 3.  As to this

preliminary injunction group, plaintiffs seek an injunction:

> order[ing] all Defendants to take all steps necessary to adjudicate the naturalization
> applications of [the preliminary injunction group], and to naturalize those who are found
> eligible for naturalization in time to register to vote in the November 2008 election, but
> no later that September 22, 2008; and, if necessary to achieve this goal, directing USCIS
> Defendants to adjudicate the applications of the preliminary injunction group without
> waiting for completion of the FBI name check.

Pl. Br. at 2-3.

2.    <u>Status of the Named Plaintiffs</u>

To date, the FBI name checks of all of the named plaintiffs have been completed, the naturalization applications of five of the named plaintiffs have been adjudicated, and three of the named plaintiffs have already taken the oath of citizenship.  *See* Declaration of David J. Keevis ("Keevis Decl.), dated June 19, 2008, ¶¶ 3-8; Cannon Decl. ¶¶ 43-48.

Plaintiff Farfan was naturalized as a United States citizen on April 25, 2008, when he took the oath of citizenship.  *See* Keevis Decl. ¶ 4.  His FBI name check was completed on March 10, 2008.  *See* Cannon Decl. ¶ 44.  His naturalization application was approved on April 7, 2008.  *See* Keevis Decl. ¶ 4.

Plaintiff Sanchez was naturalized as a United States citizen on May 2, 2008, when he took the oath of citizenship.  *See id.* ¶ 8.  His FBI name check was completed on March 5, 2008.  *See* Cannon Decl. ¶ 46.  His naturalization application was thereafter approved on April 7, 2008.  *See* Keevis Decl. ¶ 8.

Plaintiff Martinez was naturalized as a United States citizen on June 5, 2008, when he took the oath of citizenship.  *See id.* ¶ 5.  His FBI name check was completed on March 21, 2008.  *See* Cannon Decl. ¶ 45.  His naturalization application was thereafter approved on May 6, 2008.  *See* Keevis Decl. ¶ 5.

Plaintiff Castro's naturalization application was approved on June 9, 2008, and she is scheduled to be naturalized as a United States citizen at an oath ceremony on July 3, 2008.  *See id.* ¶ 3.  Her FBI name check was completed on May 22, 2007.  *See* Cannon Decl. ¶ 47.  On April 7, 2008, she was first examined by a naturalization examiner, but failed to achieve a passing score on the English-language test required of all naturalization applicants.  *See* Keevis

Decl. ¶ 3.  She was thereafter reexamined on June 9, 2008, at which time she passed the English test, and her application was approved.  *See id.* ¶ 3.

Plaintiff Perez De Chalampa's naturalization application was approved on May 12, 2008, and she is scheduled to be naturalized as a United States citizen at an oath ceremony on July 9, 2008.  *See* Keevis Decl. ¶ 7.  Her name check had been completed on September 17, 2007.  *See* Cannon Decl. ¶ 48.

Plaintiff Virginia Milanes's FBI name check was completed on June 6, 2008.  *See id.* ¶ 43.  Milanes's naturalization application is still pending.  *See* Keevis Decl. ¶ 6.  USCIS's records indicate at least one instance where mail sent to her by the agency was returned as undeliverable.  *See id.*

> ### 3.    Status of the Proposed Class, Proposed Post-Interview Subclass, and "Preliminary Injunction Group"

As described below, *see infra* Part III.A, whether any individual is a member of plaintiffs' proposed class and subclass – or a member of plaintiffs's proposed "preliminary injunction group," which is a subset of the class – cannot be determined without a fact-intensive analysis of whether any individual "properly submitted," Pl. Br. at 38, his or her naturalization application and has "taken all actions requested of [him or her] by USCIS," Pl. Br. at 38, two limitations imposed by plaintiffs on their class membership.

USCIS has conducted a search of its databases to determine the approximate number of individuals in the New York District whose naturalization applications had been pending with decision for 180 days or more as of April 3, 2008, without a regard to whether those individuals had "properly submitted" their applications or "taken all actions requested of them by USCIS." USCIS's search of its databases identified 55,458 individuals whose naturalization applications

had been pending six months without a determination as of April 3, 2008.  *See* Keevis Decl.

¶ 10.  In the ten weeks between April 3, 2008, and June 17, 2008, of these 55,458 individuals,

USCIS has made determinations on the applications of 17,108 individuals.  *See id.* ¶ 12.

USCIS has also conducted a search of its databases to determine the approximate number

of individuals resident in the Southern District of New York and served by the New York

District whose naturalization applications had been pending without a determination for 120

days or more following their naturalization examination as of April 3, 2008, again without a

regard to whether those individuals had "properly submitted" their applications or "taken all

actions requested of them by USCIS."  USCIS's search of its databases identified 2,077 such

individuals.  *See* Keevis Decl. ¶ 11.  As of June 17, 2008, of these 2,235 individuals, USCIS has

made determinations on 97 applications.  *See id.* ¶ 12.


**ARGUMENT**

I.    Plaintiffs' Complaint Should be Dismissed and Remanded in Part or, in the Alternative,
      Defendants Should be Granted Summary Judgment

      A.    Plaintiffs' Claims Pursuant to APA Section 706(1)
            Should Be Dismissed for Lack of Jurisdiction

Plaintiffs' claims pursuant to 5 U.S.C. § 706(1) "to compel agency action unlawfully

withheld or unreasonably delayed" should be dismissed for lack of jurisdiction, because although

5 U.S.C. § 706(1) contains a waiver of sovereign immunity to allow certain suits against the

Government, that waiver is limited in scope.  *See Norton v. Southern Utah Wilderness Alliance*,

542 U.S. 55, 63 (2004).  As the Supreme Court has explained "[f]ailures to act are sometimes

remediable under the APA, but not always."  *Id.* at 61.  In particular, the Supreme Court has held

that section 706(1) authorizes suits only where "an agency failed to take a *discrete* agency action that it is *required to take*." *Id.* at 64 (emphasis in original).

The limited scope of section 706(1) is rooted in basic issues of separation of powers and judicial efficiency:

> The principal purposes of [these] APA limitations . . . – and of the traditional limitations upon mandamus from which they were derived – is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.

*Id.* at 66. In particular, as the Court explained:

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved – which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Id.* at 66-67.

As plaintiffs in this case are neither challenging "discrete" agency action nor seeking to compel action that the USCIS and FBI are required to take, their claims fall outside the waiver of sovereign immunity in section 706(1) and, accordingly, must be dismissed for lack of jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (holding that in the absence of an applicable waiver of sovereign immunity, the Court lacks jurisdiction).

### 1. Plaintiffs Are Not Challenging Discrete Agency Action

The limitation of section 706(1) to claims challenging "discrete" agency action is designed to prevent plaintiffs from using 706(1) as a tool to mount a "broad programmatic attack" on agency policy. *Norton*, 542 U.S. at 61. Plaintiffs are seeking to do exactly that in this case. This is not a case where a plaintiff is challenging the Government's refusal to take some

specific action on a given application, nor a case where an application has "slipped through the cracks" and has somehow been overlooked by the agency.  Rather, this is a case where plaintiffs ask the Court to resolve their "abstract policy disagreements," *id.* at 66, about whether the FBI name check is of any "additional value to national security," *see* Cplt. ¶ 73, such that it is worth keeping as part of the naturalization process.  Based on plaintiffs' view of that the name check does not add value, they seek injunctive relief directing USCIS "to adjudicate all naturalization applications without waiting for the results of FBI name checks," Cplt. at 31(prayer for relief 7(c)).  In short, they want the Court to order USCIS to change its process for conducting background checks prior to naturalization.  As *Norton* explained, however, "[section] 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act, or 'to take action upon a matter, *without directing how it shall act*.'"  *Id.* at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)) (emphasis added).  Here, however, plaintiffs have mounted a broad programmatic challenge to *how* USCIS is implementing the "full criminal background check" and "personal investigation" requirements of the naturalization process.  Because the Court's involvement in such questions would "inject the [court] into day-to-day agency management" of the naturalization process, *see id.* at 67, plaintiffs' section 706(1) claims should be dismissed, *see id.*

> 2.  USCIS Has No Duty to Act on a Naturalization Application Prior to Receiving an FBI Name Check Response

The Court lacks jurisdiction not only because plaintiffs' broad programmatic attack is outside the scope of section 706(1), but also because the agency actions plaintiffs are seeking to compel is not action that is "legally required."  *Norton*, 542 U.S. at 63.  In this respect, practice under the APA tracks the traditional scope of the writ of mandamus, which would issue only to

compel enforcement of "a specific, unequivocal command," *i.e.*, "the ordering of a precise, definite act . . . about which [an official] had no discretion whatsoever." *Id.* (quoting *ICC v. New York, N.H. & H.R. Co.*, 287 U.S. 178, 204 (1932), and *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888)) (internal quotation marks omitted). Agency action that is not mandatory can be neither "unlawfully withheld" nor "unreasonably delayed" within the meaning of section 706(1). *See id.* at 63 & n.1.

Plaintiffs seek to have this Court impose a deadline requiring USCIS to decide all naturalization applications within 180 days of filing and, in any event, within 120 days of a naturalization examination, notwithstanding the pendency of an FBI name check. They further ask that the Court order FBI to complete FBI name checks in time to allow USCIS to meet the deadlines plaintiffs seek, and they ask the Court to order the Government to dispense with the FBI name check to the extent necessary to achieve plaintiffs' preferred timetable. Plaintiffs' claim must fail because, as discussed below, USCIS and FBI have no mandatory, non-discretionary duty to take the actions that the plaintiffs desire.

USCIS has no duty to act on naturalization applications until such time as USCIS has completed its personal investigation, *see* 8 U.S.C. § 1446(a), and, indeed, is prohibited from acting until FBI has completed a "full criminal background check," 1997 Appropriations Act, 111 Stat. at 2448-49. As discussed above, in the 1997 Appropriations Act, Congress expressly mandated that USCIS not "complete adjudication of an application for naturalization unless [it] has received confirmation from the Federal Bureau of Investigation that a full criminal background check has been completed." 1997 Appropriations Act, 111 Stat. at 2448-49. The Congressional conference report underlying this statute explains that Congress understood this

provision to require the agency "to wait for the FBI to complete *both a name and fingerprint*

criminal history check before completing the adjudication of an application for citizenship."

H.R. Rep. No. 105-405, at 106 (1997) (Conf. Rep.) (emphasis added).  The Second Circuit has

explained that "next to the statute itself" conference reports are "the most persuasive evidence of

congressional intent."  *Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110,

124 (2d Cir. 2000)  (internal quotation marks omitted)).  Accordingly, if there were any

ambiguity as to whether the Congressional requirement of a "full criminal background check"

included a FBI name check, the conference report dispels it.

Further, apart from the 1997 Appropriations Acts provisions that prohibit USCIS from

taking action prior to receiving a "full criminal background check," it is also a requirement of the

naturalization laws that "*[b]efore a person may be naturalized*, the personal investigation must

be completed."  8 U.S.C. § 1446(a) (emphasis added); *see also* 8 U.S.C. § 335.1 (regulation

providing that the personal investigation includes, "at a minimum, . . . a review of all pertinent

records").  Although the Attorney General may, "in his discretion," waive the personal

investigation, *see* 8 U.S.C. § 1446(a), the discretionary nature of this personal investigation

requirement shows that plaintiffs cannot prove that USCIS is *required* to act prior to receiving an

FBI name check response.

Numerous courts across the country have held that USCIS has no duty to act on

naturalization applications until after it receives a response from the FBI name check.  *See, e.g.,*

*Hani v. Gonzales*, No. 3:07-CV-517-S, 2008 WL 2026092, at *3 (W.D. Ky. May 8, 2008)

(holding that USCIS has no non-discretionary duty to act on a naturalization application prior to

interviewing the petitioner); *Ahmed v. Mueller*, No. 07-0411, 2007 WL 2726250, at *5 (E.D. Pa.

- 42 -

Sept. 14, 2007) (holding that "USCIS does not have a non-discretionary duty to conduct an

interview of applicant when the FBI has not yet completed his background check since the

regulations allow an interview to be scheduled only *after* the criminal background check is

complete"); *Omar v. Mueller*, 501 F. Supp. 2d 636, 639-40 (D.N.J. 2007) (holding that USCIS

has no to proceed with naturalization applications of individuals who have not been interviewed

prior to receiving the background check).[16]  Although "considerable excusable time could elapse

for background checks to be completed," this passage of time "is insufficient to confer

jurisdiction upon this court."  *Ahmed*, 2007 WL 2726250, at *6.[17]

---

[16]  *See also, e.g.*, *Alzuraiki v. Heinauer*, No. 4:07CV3189, 2008 WL 413861, at *3 (D. Neb. Feb. 13, 2008) (holding that plaintiff's APA claim failed because "USCIS is *prohibited* from interviewing Plaintiff until USCIS receives 'a definitive response from the [FBI] that a full criminal background check . . . has been completed.'  (emphasis in original)); *Wang v. Gonzales*, No. 07-2272 JWL-DJW, 2008 WL 45492, at *3 (D. Kan. Jan. 2, 2008) ("USCIS has no duty to adjudicate a naturalization application before receiving a definitive response from the FBI that the applicant's background check is complete.  Indeed it is prohibited from doing so."); *Ibrahim v. Chertoff*, 529 F. Supp. 2d 611, 614 (E.D.N.C. 2007) ("Plaintiff does not have a right to compel CIS to process his application faster because it cannot further proceed in the application, including examining plaintiff, until the name check is complete, which of course CIS does not control."); *Sinha v. Upchurch*, No. 1:07 CV 2274, 2007 WL 4322225, at *4 (N.D. Ohio Dec. 7, 2007) ("[W]hile the CIS Defendants may have a duty to act on an application for naturalization within a reasonable time, the time period does not commence until after the CIS Defendants receive a completed background check.  Any other conclusion would require the CIS Defendants to take action that is contrary to law."); *Kaplan v. Chertoff*, 481 F. Supp. 2d 370, 401 (E.D. Pa. 2007) (dismissing plaintiffs' APA claim against USCIS to the extent they alleged that the delay in processing naturalization applications was caused by FBI, because "CIS does not have a mandatory duty to take action on an application for naturalization until the FBI has completed its background checks.  In fact, Congress has *forbidden* CIS from taking any action until such checks are completed." (emphasis in original)).

[17] Although plaintiffs cite cases in support of their claim that USCIS had a duty to act notwithstanding an unresolved name check, *see*  Pl. Br. at 28-32, none of those cases fully considered the legislative history behind the "full criminal background check" or USCIS's discretion pursuant to the "personal investigation" requirement.  Indeed, nearly every immigration case cited by plaintiffs in their analysis of this issue does not involve a naturalization application at all, but instead an application for adjustment of status to lawful

Further, as described above, when Congress has been presented with the facts concerning the current processing times for naturalization applications and the contribution of the FBI name check process to these processing times, Congress has not chosen to impose a duty on USCIS to act in the absence of a definitive FBI name check response, nor has it imposed deadlines for adjudication. Rather, Congress has chosen to provide additional funds to support a program of reducing processing times while continuing to conduct thorough background checks. *See* May 2007 Appropriations Act, tit. III, ch. 5, 121 Stat. at 143; 2008 Appropriations Act, Div. E, tit. IV, 121 Stat. at 2067.

3.    <u>FBI Has No Duty to Act</u>

Similarly, the Court lacks jurisdiction over plaintiffs' section 706(1) claims with respect to FBI, because FBI does not owe a duty to plaintiffs with regard to the processing of their name checks. As described above, FBI has no direct relationship to plaintiffs, and conducts name checks on a fee-for-service basis for USCIS and other agencies. (FBI000001; FBI000008; FBI000235; FBI000415; FBI000798). The scope of the search conducted – including whether it is limited to "main files" or includes both "main files" and "reference files" – is determined not by FBI but by the client agency. (FBI000007-11; FBI000731).

No statute establishes that FBI owes a duty to individuals whose name check it is running to act within any particular time frame. Although Congress is well aware of the time it takes FBI

permanent residence, a distinct statutory regime lacking the statutory "full criminal background check" and "personal investigation" requirements. *See id.* (citing numerous adjustment of status cases, including, *inter alia*, *Alkeylani v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 258 (D. Conn. 2007); *Bondarenko v. Chertoff*, No. 07-mc-00002, 2007 WL 2693642 (W.D.N.Y. Sept. 11, 2007); *Eldeeb v. Chertoff*, No. 8:07-cv-236-T-17EAJ, 2007 WL 2209231 (M.D. Fla. July 30, 2007); *Huang v. Mukasey*, 545 F. Supp. 2d 1170 (W.D. Wash. Mar. 4, 2008)).

to process the millions of name check requests it receives from USCIS, Congress has not imposed any deadlines on FBI's processing of these applications. In marked contrast, Congress did impose deadlines on agencies involved on the processing of security clearances – including the conducting of FBI name checks – for government employees. *See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. 108-458, § 3001(g), 118 Stat. 3638, 3709 (Dec. 17, 2004); (FBI000208) (noting that the act "places new performance criteria on NNCPS"); *see also* (FBI000248; FBI000560-61). Accordingly, numerous courts have held that FBI does not have a mandatory duty to complete naturalization applicants name checks within any prescribed period of time. *See, e.g.*, *Hani*, 2008 WL 2026092, at *3 ("Neither the USCIS nor the FBI have a nondiscretionary duty to complete Group 2 Plaintiffs' name checks within a prescribed period of time."); *Wang*, 2008 WL 45492, at *3 (FBI has no express mandatory duty in connection with a naturalization application); *Alzuraiki*, 2008 WL 413861, at *4 ("No statute or regulation limits the FBI's discretion in how it complete Plaintiffs' background check, let alone the pace at which this check is undertaken.")[18]

---

[18] *See also, e.g.*, *Sinha*, 2007 WL 4322225, at *5 ("Upon review, the Court finds that it lacks jurisdiction over the FBI Defendants because they do not owe plaintiff a nondiscretionary duty to process background checks."); *Omar*, 501 F. Supp. 2d at 640 (noting that plaintiffs had failed to demonstrate that FBI owed a duty to complete the background check within a prescribed time period); *Ahmed*, 2007 WL 2726250, at *5 ("Further, the court has found no authority to require the FBI to conduct its criminal background check of the applicant within any specific time frame."); *Shalabi v. Gonzales*, No. 4:06CV866, 2006 WL 3032413 (E.D. Mo. Oct. 23, 2006) (noting that that "[t]here is no statute or regulation which imposes a deadline for the FBI to complete a criminal background check"); *Ibrahim*, 529 F. Supp. at 614-15 (court cannot consider plaintiff's APA claim against FBI, where plaintiff has no "clear right" to order compelling FBI to expedite name check). The only case cited by plaintiffs concerning whether 706(1) relief could properly be granted as against FBI, *see Alhamedi v. Gonzales*, No. 07 Civ. 2541(JGK), 2007 WL 1573935 (S.D.N.Y. May 30, 2007), does not analyze the "mandatory duty" requirement. *See id.* at *4.

4.    The Proposed Post-Interview Subclass's Specific, Adequate Remedy
Pursuant to 8 U.S.C. § 1447(b) Precludes Resort to Section 706(1)

Plaintiffs' complaint and motion identify only one proposed class representative for the

Proposed Post-Interview Subclass, *see* Cplt. ¶¶ 50, 52; Pl. Br. at 32, and that plaintiff, Mr.

Sanchez, has subsequently been naturalized, *see* Keevis Decl. ¶ 8.  Further, for reasons discussed

below, certification of this subclass would not be appropriate under Rule 23.  *See infra* Part

III.A, C.  Accordingly, in the absence of the identification of a new representative plaintiff and

class certification, no claims of the Proposed Post-Interview Subclass are before the Court.

In any event, the Court would lack jurisdiction over section 706(1) claims of the subclass

because subclass members have an adequate alternate remedy available under 8 U.S.C.

§ 1447(b).  Section 1447(b) was adopted by Congress specifically to provide the appropriate

means of judicial review for individuals who have not received a decision on their naturalization

applications within 120 days after having been examined by naturalization officers.  Because the

subclass may pursue judicial relief through section 1447(b), the Court may not exercise

jurisdiction pursuant to the APA over the subclass's claims.  *See* 5 U.S.C. § 702 (providing that

there is no APA jurisdiction where "any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought"); 5 U.S.C. § 704 (provides that APA jurisdiction is

limited to cases where "there is no other adequate remedy in a court").

In 1990, Congress removed principal responsibility for adjudication of naturalization

from the courts and transferred that responsibility to Attorney General.  *See* Immigration Act of

1990, Pub. L. No. 101-649, Title IV, 104 Stat. 4978, 5038-48 (Nov. 29, 1990).  Under the new

naturalization framework, "[t]he immigration statutes create two specific points at which a

district court may intervene in the naturalization process."  *Langer v. McElroy*, No. 00 Civ.

2741(RWS), 2002 WL 31789757, at *2 (S.D.N.Y. Dec. 13, 2002); *see also Borromeo Escaler v. U.S. Citizenship & Immigration Services*, No. 03 Civ. 8418 (BSJ), 2007 WL 1975485, at *3 (S.D.N.Y. July 6, 2007).  First, an individual whose application is denied may, after the exhaustion of the administrative process, seek review of the denial in district court.  *See* 8 U.S.C. § 1421(c).  Second, section 1447(b) provides that, if USCIS has not decided a naturalization application within 120 days of its examination of an applicant, that applicant may file a complaint in federal district court.  *See id.* § 1447(b).  In an action pursuant to § 1447(b), the district court "has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to [USCIS] to determine the matter."  *Id.*

Because Congress carefully and explicitly allocated responsibility for naturalization between the agency and the courts, and authorized the courts to address alleged delays in adjudication only under the circumstances specified in section 1447(b), the general APA review statute is inapplicable.  *See Lahrar v. USCIS*, 485 F. Supp. 2d 705, 708 (E.D. Va. 2007) (holding that general jurisdiction under APA and § 1331 does not exist in light of 8 U.S.C. § 1447(b)); *Antonishin v. Keisler*, No. 06 Civ. 2518, 2007 WL 2788841, at *5 (N.D. Ill. Sept. 20, 2007) (finding APA relief not available in light of 8 U.S.C. § 1447(b)); *Ahmadi v. Chertoff*, 2007 WL 3022573, at * 6-*7 (N.D. Cal. Oct. 15, 2007).

B.    In the Alternative, the Court Should Grant Summary Judgment
on Plaintiffs' Section 706(1) Claims Because the Undisputed Facts
Demonstrate that USCIS and FBI Have Not "Unreasonably Delayed"
or "Unlawfully Withheld" Agency Action

If, notwithstanding the arguments above, the Court were to find that it has jurisdiction over plaintiffs' section 706(1) claims, the Court should nonetheless grant the Government summary judgment on those claims, because the undisputed facts demonstrate the Government has neither unlawfully withheld nor unreasonably delayed agency action.  *See Matican v. City of New York,*  524 F.3d 151, 154 (2d Cir. 2008) ("Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.' (quoting Fed. R. Civ. P. 56(c))).  Because this matter is an Administrative Procedure Act case, the record for decision in the case is limited to the administrative records filed by the Government in this case, except insofar as one of the limited bases for expanding the record exists.  *See* Memorandum & Order, May 13, 2008 (Docket No. 18, *Milanes v. Chertoff*, 08 Civ. 2354 (LMM)); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *National Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997); *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990); *Seattle Audubon Soc'y v. Norton*, No. C05-1835L, 2006 WL 1518895, at *3 (W.D. Wash. May 25, 2006); *Raymond Proffitt Found. v. United States Army Corps of Eng'rs,*  128 F. Supp. 2d 762, 768 n.8 (E.D. Pa. 2000).

1.    Agency Action Has Not Been Unlawfully Withheld

Plaintiffs cannot demonstrate that agency action has been "unlawfully withheld" within the meaning of section 706(1), because neither USCIS's processing of naturalization applications nor FBI's processing of name checks is subject to a "clear deadline prescribed by Congress."

- 48 -

*Natural Resources Defense Council v. Fox*, 93 F. Supp. 2d 531, 543 (S.D.N.Y. 2000), *aff'd in part on other grounds and remanded in part on other grounds, Natural Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 93-94 (2d Cir. 2001).

Although plaintiffs ask the Court to impose a 180-day deadline, they do not suggest that a "clear deadline prescribed by Congress" applies, nor could they. Although, as discussed above, Congress passed an aspirational provision in 2002 stating, "POLICY – It is the sense of Congress that the processing of an immigration benefit application should be competed not later than 180 days after the initial filing of the application," 8 U.S.C. § 1571(b), it is well settled that such a provision is of no legal force. First, a "sense of Congress" provision by definition creates no legal rights or obligations. *See Yang v. California Dep't of Social Servs.*, 183 F.3d 953, 958-59 (9th Cir. 1999) (holding that "sense of Congress" provision is merely "precatory"); *Monahan v. Dorchester Counseling Center, Inc.*, 961 F.2d 987, 994 (1st Cir. 1992) (same). Second, Congress's use of the phrase "should be" demonstrates its lack of intent to impose a binding rule. *See United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999) (observing that "the common meaning of 'should' suggests or recommends a course of action," in contrast to the word "'shall' [which] describes a course of action that is mandatory"); *United States v. Harris*, 13 F.3d 555, 559 (2d Cir. 1994) (deeming "should" to indicate "guidance" that is "merely suggesting an approach"); *Yang*, 183 F.3d at 958-59 (emphasizing non-binding nature of the word "should"); *Monahan*, 961 F.2d at 994 ("The use of the terms 'should' and 'the sense of Congress' indicate that the statute is merely precatory."). Third, Congress's designation of this provision as "policy" again emphasizes that it lacks substantive force. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 454-55 (1988) (holding that statute describing

"the policy of the United States" does not contain "so much as a hint of any intent to create a cause of action or any judicially enforceable individual rights."); *Yang*, 183 F.3d at 958-59 (holding that sense of Congress provision following the heading "Congressional Statement" is simply "a policy statement that does not create positive, enforceable law."); *See* 1A Norman J. Singer, *Sutherland Statutory Construction*, § 20.12 ("The policy section . . . is not part of the substantive portion of the statute.").

Finally, that Congress did not intend section 1571(b) to have binding effect is clear from a review of the entirety of the act in which it was included. *See Yang*, 183 F.3d at 959 ("To determine the plain meaning of a particular statutory provision, we look to the provisions of the entire law."). That act describes the 180-day processing goal as an "objective" rather than a requirement, *see* Immigration Services and Infrastructure Improvements Act, § 204 (codified at 8 U.S.C. § 1573); adds funding to assist the reaching of this "objective," *id.* § 204(b); and establishes reporting requirements to determine how USCIS was fairing in meeting this objective, *see id.* § 205 (codified at 8 U.S.C. § 1574). In short, as with the current Congress's response to naturalization processing times, the Congress that adopted § 1751(b) did not intend to impose mandatory deadlines.

Although plaintiffs effectively concede that there is no "clear deadline prescribed by Congress" as to the Proposed Class, they do argue that such a deadline exists for the Post-Interview Subclass. Pl. Br. at 32. However, no such deadline exists. Although plaintiffs point to 8 U.S.C. § 1447(b), which provides that applicants may seek judicial relief if 120 days have passed following their examination without a decision, Pl. Br. at 33, "[a]ll that § 1447(b) does is give [an applicant] an alternative forum for an initial decision" on a naturalization application if

USCIS has not reached a decision after 120 days and "both [the applicant] and the district court

wish to take advantage of that alternative." *Bustamante*, 533 F. Supp. 2d at 380.  Section

1447(b) does not purport to limit a district court's discretion to conclude that the processing

times in a given case are appropriate under the circumstances, and that USCIS should be

permitted to complete its work.  As Judge McMahon recently held, "nothing in the 1990 Act

[adopting § 1447(b)] requires CIS to act on a naturalization petition within 120 days, or any

other specified period of time." *Id.*

    If Congress meant for the 120-day provision of § 1447(b) to constitute a fixed deadline

for agency action on the application, it would have said as much, as it has in many other statutes.

For example, in a statute concerning hearings for federal employees protesting the collection of

debts from their wages, Congress has provided, "[t]he hearing official shall issue a final decision

at the earliest practicable date, but not later than sixty days after the filing of the petition

requesting the hearing."  5 U.S.C. § 5514.  Many similar examples, all using clear language

imposing deadlines for action, exist throughout the U.S. Code.[19]

---

[19]  *See, e.g.*, 5 U.S.C. § 552(a)(6)(A) (providing that "[e]ach agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall . . . determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request . . . ."); 42 U.S.C. § 1316(a)(1) (Social Security Act provision stating that "[w]henever a State plan is submitted to the Secretary by a State for approval under subchapter I, X, XIV, XVI, or XIX of this chapter, he shall, not later than 90 days after the date the plan is submitted to him, make a determination as to whether it conforms to the requirements for approval under such subchapter. . . ."); 19 U.S.C. § 1673b(a)(2) (providing "the [United States International Trade] Commission shall make the determination described in paragraph (1) . . . in the case of a petition filed under section 1673(a)(b) of this title . . . within 45 days after the date on which the petition is filed . . . ."); 2 U.S.C. § 501(e) ("The [House Commission on Congressional Mailing Standards] shall issue a written decision on each complaint [concerning misuse of franked mail] under this subsection not later than thirty days after such a complaint has been filed or, if a hearing is held, not later than thirty days after the conclusion of such hearing."); 2 U.S.C. § 502(b) ("The [Select Committee on Standards and

In addition to section 1447(b), plaintiffs also point to 8 C.F.R. § 335.3 in support of their argument that agency action has been unlawfully withheld.  *See* Pl. Br. at 32, 36.  Section 335.3, however, which states the agency's policy of deciding naturalization application within 120 days of the initial examination of an applicant, does not support plaintiffs' claim for two reasons. First, the provision is an agency regulation, not a "deadline *prescribed by Congress*," *Natural Resources Defense Council*, 93 F. Supp. 2d at 543 (emphasis added), as required for an claim of action "unlawfully withheld."  Second, even if an agency regulation could constitute the relevant deadline for these purposes, the regulation must be read together with the *supervening* 1997 Appropriations Act, which mandates a "full criminal background check" including, as understood by Congress, the FBI name check.  *See* 1997 Appropriations Act, 111 Stat. at 2448-49; H.R. Rep. No. 105-405, at 106 (1997) (Conf. Rep.).  Because this Congressional imposed requirement would supercede any pre-existing regulatory rule, the regulation cannot support a finding of "unlawfully withheld" action.

Finally, plaintiffs also do not contend that any "clear deadline prescribed by Congress" applies to FBI's processing of name check requests for naturalization applications.  None does. As described above, the lack of a deadline in this regard is in sharp contrast to Congress's approach to the processing of security clearances for government employees.  In that context, unlike the naturalization context, Congress imposed specific deadlines affecting the processing of government employee background checks.  *See* Intelligence Reform and Terrorism Prevention

---

Conduct of the Senate] shall issue a written decision on each complaint under this subsection not later than thirty days after such a complaint [concerning misuse of franked mail] has been filed or, if a hearing is held, not later than thirty days after the conclusion of such hearing.")

Act of 2004, Pub. L. 108-458, § 3001(g), 118 Stat. 3638, 3709 (Dec. 17, 2004); (FBI000208);

(FBI000248); (FBI000560-61).

### 2.    Agency Action Has Not Been Unreasonably Delayed

Not only are plaintiffs unable to show that USCIS or FBI have "unlawfully withheld"

action, but also they cannot demonstrate "unreasonable delay" pursuant to section 706(1).  Even

lengthy processing times, by themselves, cannot support a finding unreasonable delay.  *See Hoo*

*Loo v. Ridge*, No. Civ. 04-5553, 2007 WL 813000, at *4 (E.D.N.Y. Mar. 14, 2007) ("[T]he

Supreme Court has held that evidence of the passage of time cannot, standing alone, support a

claim of unreasonable delay."); *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 115 (D.D.C.

2005) ("[M]easuring the delay by years alone cannot establish unreasonable delay.").  Rather,

the Second Circuit has emphasized that the courts must consider the "source of the delay" in this

analysis, including the "complexity" of the matter, as well as "the extent to which the [individual

challenging alleged delay] participated in delaying the proceeding."  *Reddy v. CFTC*, 191 F.3d

109, 121 (2d Cir. 1999).  The Circuit has cited approvingly a D.C. Circuit case further

elaborating that courts "'should consider the nature and extent of the interests prejudiced by

delay, the agency justification for the pace of the decision, and the context of the statutory

scheme out of which the disputes arises.'"  *Id.* at 121 (quoting *Public Citizen Health Research*

*Group v. Comm'r*, 740 F.2d 21, 35 (D.C. Cir. 1984).

Although plaintiffs rely heavily on the D.C. Circuit's analysis of "unreasonable delay" in

*Telecommunications Research and Action Center v. FCC ("TRAC")*, 750 F.2d 70 (D.C. Cir.

1984), the *TRAC* test, as applied and elaborated on by subsequent courts, is entirely consistent

with the totality-of-the-circumstances approach of the Second Circuit.  In *TRAC*, the D.C. Circuit

attempted to summarize the considerations relevant to an "unreasonable delay" claim:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (citations and internal quotation marks omitted).  The D.C. Circuit

explained that its "rule of reason" analysis is "hardly ironclad," but rather simply "provides

useful guidance" to assess the reasonableness of the time taken for agency action.  *See id.* at 80.

As part of the *TRAC* analysis, among other things, a court "should weigh any plea of

administrative error, administrative convenience, practical difficulty in carrying out a legislative

mandate, or need to prioritize in the face of limited resources."  *Cutler*, 818 F.2d at 898.  As the

D.C. Circuit has explained, "[t]he ultimate issue" is whether the agency's processing time

"satisfies the 'rule of reason.'"  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d

1094, 1101 (D.C. Cir. 2003).  Further, the court noted:

> That issue cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part, as we have said, upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.

*Id.*  This analysis, consistent with the method of analysis discussed by the Second Circuit in

*Reddy*, considers all of the relevant circumstances surrounding the delay, including the intent of

Congress.

- 54 -

Here, as detailed below, the Court should conclude that USCIS and FBI have not "unreasonably delayed" agency action, taking into account the following factors:

(1) Congress is aware of the length of current processing times for naturalization applications, but rather than impose deadlines or jettison the name check requirement, has chosen to fund efforts by the agencies' to improve their processes while still conducting the FBI name check.

(2) The FBI name check serves the important governmental interests relating to national security and determining the eligibility of aliens for the benefit of naturalization.

(3) With the approval of Congress, USCIS and FBI have adopted a plan designed to reduce the effect of the FBI name check on naturalization processing times.

(4) To the extent that "surge," is a cause of current processing times, USCIS has acted reasonably with regard to the surge and adopted a plan to mitigate its effects.

(5)  USCIS and FBI have acted to expedite cases raising concerns of "human health and welfare," *TRAC*, 750 F.2d at 80.

(6) The deadlines requested by plaintiffs would require a reallocation agency resources, likely resulting in plaintiffs and their class moving to the "head of the line," to the detriment of other applicants for naturalization or other benefits, or other agency priorities.

(7) USCIS and FBI have acted in good faith.

(8) Some plaintiffs may have contributed to the length of their own processing times.

As analyzed below, these factors all demonstrate that plaintiffs' claim must fail.

First, Congress is well aware of the length of naturalization processing times and the time it takes for processing of the FBI name check, but rather than adopt processing deadlines or limit USCIS's use of the FBI name check, Congress has followed a measured approach of urging the agencies to develop plans to reduce processing times, granting the agencies additional resources to assist it with this reduction, and requiring the agencies to report to Congress on the status of its efforts.  *See* May 2007 Appropriations Act , tit. III, ch. 5, 121 Stat. at 143; 2008

Appropriations Act), 121 Stat. at 2067; *see also Cutler*, 818 F.2d at 878 (holding that analysis of unreasonable delay "entails an examination of any legislative mandate in the statute and the degree of discretion given the agency by Congress").  Congress has not modified its mandate for a "full criminal background check," *see* 1997 Appropriations Act, 111 Stat. at 2448-49, which it understands to include both an FBI name check and a fingerprint check, *see* H.R. Rep. No. 105-405, at 106 (1997) (Conf. Rep.), nor has it limited USCIS's discretion in conducting the requisite "personal investigation," 8 U.S.C. § 1446(a).

Second, the agencies's and Congress's approach to the role of the FBI name check in the naturalization process reflects their understanding that it serves significant government interests as an element of the nation's national security screening, *see Safadi v. Howard*, 466 F. Supp. 2d 696, 701 (E.D. Va. 2006) ("[O]ur national security requires that caution and thoroughness in these matters not be sacrificed for the sake of expediency."); *see also Dong Liu v. Chertoff*, No. Civ. 07-0005-BEN-WMC, 2007 WL 1300127, at *5 (S.D. Cal. Apr. 30, 2007); *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1027 (7th Cir. 2002) ("[T]he government's interest in preventing terrorism is not only important but paramount."), and as a method to ensure that only eligible aliens receive the benefit of citizenship, *Berenyi*, 385 U.S. at 637 (describing the Government's "strong and legitimate interest" in preventing ineligible individuals from becoming citizens); *Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998) ("The Government's interests in the administration of its immigration laws and in preventing [immigration related] document fraud are likewise considerable.").  As one court has observed, "in this post-9/11 context, agencies must have the freedom to carefully and thoroughly investigate these

applications without interference in their priorities." *Patil v. Mueller*, No. 07 cv 71 (JCC), 2007 WL 1302752, at *2 (E.D. Va. Apr. 30, 2007).

Third, USCIS and FBI are working to reduce the effect of the FBI name check on current naturalization application processing times. Congress is aware of the immediate concern with processing times and has acted to address the issue by providing resources to the agencies and requiring the development of a business plan. USCIS and FBI have produced such a plan and are working towards its goals. (CIS006307-24); *see Action on Smoking and Health (ASH) v. Dep't of Labor*, 100 F.3d 991, 994 (D.C. Cir. 1996) (rejecting claim of unreasonable delay where the agency "has not been twiddling its thumbs" but rather has been working on the problem); *cf. TRAC*, 750 F.2d at 80 (declining even to determine whether delay was unreasonable, where the agency has begun "moving expeditiously"). Because the agency is implementing a program for the reduction of processing times within the resources and other constraints present, the Court should not upset the process by imposing a judicial remedy. *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 116, 120-21 (D.D.C.,2005) ("Under the "rule of reason," the agency's provision of a projected timeline for balancing competing priorities – one that provides relief in the foreseeable future – weighs against issuance of mandamus.").

Fourth, a principal cause of current processing times is the "surge," which far from evincing unreasonableness on the part of the agency reflects the legitimate efforts of the agency to improve efficiency. USCIS's decision to raise fees was made with full notice-and-comment rule-making and the awareness of Congress, in order to provide USCIS the funds necessary to improve its operations. (CIS004827-55). Indeed, a General Accounting Office report had urged USCIS to adopt such a fee increase specifically to enable it to reduce delays in processing of

benefits applications. (CIS003331-83). Further, as described in more detail above, USCIS appropriately examined the potential effects of a fee increase prior to putting the increase into effect, and determined that any "surge" would be modest in size and offset by a decline in applications in subsequent months. (CIS004627-43). Although in hindsight USCIS's estimates were inaccurate, that does not make the fee increase unreasonable. Further, USCIS has adopted a Surge Response Plan intended to reduce the effect of the surge on application processing times. (CIS004660-80). USCIS has hired numerous additional adjudicators, realigned work-flows, and taken other steps to improve processing times. (CIS006388).

Fifth, USCIS and FBI have acted consistently with a concern for cases involving "human health and welfare," *see TRAC*, 750 F.2d at 80, by providing for the expedited treatment of such cases. Although every applicant's desire to become a citizen of the United States is a matter of personal significance, USCIS has afforded expedited treatment for FBI name checks to those categories of applications that raise "emergent circumstances," as a departure from the usual practice of processing FBI name checks on a first-come, first-served basis. (FBI000180; CIS004910). "Emergent circumstances" include the loss or threatened loss of SSI benefits because of the seven-year time limit on benefit eligibility, certain cases where aliens will risk "aging-out" of eligibility for citizenship or losing available visas, "significant and compelling reasons, such as critical medical conditions," and cases where the applicant is schedule to leave on miliary deployment. (CIS004910).

Sixth, if USCIS or FBI were to be ordered to accelerate processing of the Proposed Class's applications to meet plaintiffs' proposed bright-line six-month rule, this would require shifting otherwise committed resources and disrupting other priorities of the agencies. *See*

*Action on Smoking and Health (ASH)*, 100 F.3d at 994 ("Perhaps the Administration could have moved faster by drawing on additional resources.  But then it would have threatened other items on its regulatory agenda."); *cf. Cutler*, 818 F.2d at 896 (recognizing that "[a]n agency has broad discretion to set its agenda and to fist apply its limited resources to the regulatory tasks it deems most pressing").  The D.C. Circuit has emphasized "the importance of 'competing priorities' in assessing the reasonableness of an administrative delay."  *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100.  Where agency resources are such that an order runs the risk of "at best, reorder[ing] the queue," and the system as a whole is likely to face "little net benefit," a finding of unreasonableness under section 706(1) is not appropriate.  *Sze*, 1997 WL 446236, at *8; *see also Liberty Fund*, 394 F. Supp. 2d at 117-18.  USCIS must consider the allocation of its resources to naturalization applications across all the districts of the country, and not simply the New York District, and must also process millions of applications for immigration benefits other than naturalization, including humanitarian benefits such as asylum.  FBI, of course, has a wide range of significant priorities other than the operating of the National Name Check Program, including law enforcement and counter-terrorism missions.  Unlike Congress's recent legislation on the issue, a court order can provide the agency additional resources to process cases.

Seventh, plaintiffs make no allegation of "bad faith" on the part of the agency, nor could they.  "[T]he good faith of the agency in addressing the delay weighs against mandamus." *Liberty Fund*, 394 F. Supp. 2d at 120; *see also In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("[T]he absence of bad faith, as here, is relevant to the appropriateness of mandamus).  The agency's good faith efforts to reduce processing times is a significant factor showing that current processing times are not unreasonable.

Finally, it is possible that plaintiffs have caused their own delay in this case. For example, at least two of the named plaintiffs in this case demonstrate the type of individualized factors that may cause a departure from average processing times. Plaintiff Nancy Castro was unable to pass the English test at her initial examination, requiring a re-examination, Keevis Decl. ¶ 3. Further, in one instance, mail sent by USCIS to plaintiff Milanes was returned as undeliverable, Keevis Decl. ¶ 6.[20]

    C.    <u>The Proposed Post-Interview Subclass's Claims Pursuant to 8 U.S.C. § 1447(b)</u>
              <u>Should be Remanded for Processing Following the Completion of Any</u>
              <u>Outstanding FBI Name Checks</u>

As noted above, the naturalization application of plaintiffs' only proposed subclass representative has been decided, and as described below, there is no basis for certification of this subclass. Accordingly, the claims of the subclass pursuant to section 1447(b) are not properly before the Court.

In any event, to the extent the Court deems it appropriate to consider these claims, the Court should exercise its discretion to remand the section 1447(b) claims brought against USCIS to the agency for processing in due course following the completion of any outstanding FBI name checks. Section 1447(b) does not contain mandatory standards for the Court, but instead calls for a discretionary, totality-of-the-circumstances review:

> If there is a failure to make a determination under section 1446 of this title before the end of the 120-day period after the date on which the examination is conducted under such section, the applicant may apply to the United States district court for the district in which the applicant resides for a hearing on the matter. Such court has jurisdiction over

---

[20] Other relevant characteristics of the named plaintiffs may exist, as well. The Government's depositions of the named plaintiffs, at which these issues may be explored, are not scheduled to occur until after the filing of this brief.

the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter.

8 U.S.C. § 1447(b).  One option of the Court, in a properly commenced section 1447(b) action, is to conduct a *de novo* hearing on the merits of the pending naturalization application, conducting its own review of the applicant's eligibility, including his or her good moral character, if the district court believes this approach makes sense under the circumstances, *see Bustamante*, 533 F. Supp. 2d at 380; for obvious reasons, plaintiffs do not suggest that this Court should decide the merits of all of the pending naturalization applications in the proposed subclass.

Section 1447(b) also gives the district court discretion to enter an order "with appropriate instructions" remanding a case back to the agency for processing.  For the reasons stated above, strong reasons counsel against the Court's disrupting USCIS's efforts in this regard: (1) the existence of the statutory "full criminal background check" requirement, which Congress understood to include the FBI name check; (2) the requirement that USCIS conduct a personal investigation of each applicant prior to naturalization; (3) Congress's decision not to adopt a specific deadline for adjudication of naturalization applications, even in cases where the examination has already occurred; (4) the efforts currently being undertaken by USCIS and FBI, with the approval of Congress, to reduce naturalization processing times; and (5) the fact that, in light of fixed resources, an order essentially pushing this subclass to the head of the line would likely have the effect of redirecting resources from the processing of other naturalization applications or applications for other immigration benefits.  *See, e.g.*, *Hani*, 2008 WL 2026092, at *2 (remanding with instructions to adjudicate plaintiffs' applications "as expeditiously as practical once the results of their background checks are received"); *Shalabi*, 2006 WL 3032413, at *5-*6 (remanding the matter to the USCIS "with instructions to make a determination as

expeditiously as possible" after receiving an FBI name check response); *Antonishin*, 2007 WL 2788841, at *4 (remanding and "declin[ing] to impose any particular deadline for adjudication of plaintiff's applications on remand").

Not only should the subclass's section 1447(b) claims against USCIS be remanded to the agency, but further to the extent the subclass purports to bring section 1447(b) claims against FBI, those claims should be dismissed.  Section 1447(b), which is a judicial review provision for naturalization applications, does not create a cause of action against the FBI, the only role of which is to process name checks requested by USCIS, just as it processes name checks requested by dozens of other agencies and law enforcement organizations.  *See, e.g.*, *Antonishin*, 2007 WL 2788841, at *6.

     D.    <u>Plaintiffs' Notice-and-Comment Claims Should be Dismissed<br>Because the 2002 Changes in Practice Were Not "Legislative Rules"</u>

The Court should dismiss, or in the alternative grant summary judgment with respect to, plaintiffs' "notice-and-comment" challenge to what plaintiffs call the "2002 Rule," the steps take by USCIS in 2002 to require that a definitive FBI name check, covering both FBI's "main files" and the "reference files," be completed prior to naturalization.

As an initial matter, it is important to note that plaintiffs do not challenge the *substance* of those USCIS's 2002 changes in practice, but simply the *procedures* by which those policies were adopted.  It would not be appropriate for the Court to issue orders regarding the substance of this policy, in light of Congress's "full criminal background check" requirement.  Further, even in the absence of that requirement, plaintiffs could not challenge the substance of the 2002 changes in practice because those changes of practice were well within the scope of the agency's discretion in conducting the "personal investigation" required by law.   *See* 8 U.S.C. § 1446(a).

In the personal investigation requirement, Congress established "no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), and accordingly USCIS's interpretation is "committed to agency discretion by law" and not subject to review under the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 701(a)(2); *see also, e.g.*, *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993); *Webster v. Doe*, 486 U.S. 592, 600 (1988); *Lunney*, 319 F.3d at 558.

Apparently recognizing that the Court would lack jurisdiction to entertain a challenge to the substance of the 2002 changes in practice, plaintiffs claim only that those policies are invalid because they should have been promulgated pursuant to the full notice-and-comment procedures contained in 5 U.S.C. § 553. *See* Pl. Br. at 21. The APA, however, expressly exempts from the notice-and-comment requirements rules that are "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). With the exception of *Mocanu v. Mueller*, Nos. 07-0445, 07-0971, 07-3223, 07-2718, 07-2859, 08-195, 2008 WL 372459 (E.D. Pa. Feb. 8, 2008), which is relied on heavily by plaintiffs and discussed below, every court to have considered the issue has rejected the contention that the 2002 changes in practice were subject to notice-and-comment procedures. *See Hani v. Gonzales*, No. 3:07-CV-517-S, 2008 WL 2026092, at *5 (W.D. Ky. May 8, 2008); *Ahmadi v. Chertoff*, 2007 WL 3022573 (N.D.Cal.) (N.D. Cal. Oct. 15, 2007); *Antonishin v. Keisler*, No. 06 Civ. 2518, 2007 WL 2788841, at *7-*9 (N.D. Ill. Sept. 20, 2007); *Tartakovsky v. Pierre*, 3:07-cv-1667-BEN-BLM, Slip Op. at 9-10 (S.D. Cal. Mar. 11, 2008) (unpublished) (attached as Yalen Decl. Ex. D).

1.    The 2002 Changes in Practice Did Not Impose
Extra-Statutory Rights, Duties or Obligations

The 2002 changes in practice were not "legislative rules" requiring notice-and-comment procedures because they did not impose "extra-statutory . . . rights, duties or obligations" on naturalization applicants. *White v. Shalala*, 7 F.3d 296, 304 (2d Cir. 1993). Only where agency rules "create new law, right, or duties, in what amounts to a legislative act," do they constitute a legislative rule. *New York State Elec. & Gas Corp. v. Saranac Power Partners*, L.P., 267 F.3d 128, 131 (2d Cir. 2001) (internal quotation marks omitted); *see also Mejia-Ruiz v. Immigration & Naturalization Service*, 51 F.3d 358, 363 (2d Cir. 1995) (same); *White*, 7 F.3d at 303 (same). A legislative rule is one with "effect[s] completely independent of the statute." *Mejia-Ruiz*, 51 F.3d at 363 (citations and emphasis omitted; brackets in original). Applicants have no additional responsibilities as a result of the 2002 changes in practice, and nothing in the 2002 changes in practice modifies the substance of "good moral character" requirement, or any component of statutory eligibility for naturalization, at all.

Rather than a legislative rule, the 2002 changes in practice are "interpretative rules" or "general statements of policy" that do not require notice-and-comment procedures. 5 U.S.C. § 553(b)(A). Interpretative rules "clarif[y] ambiguous term[s]" in the statute rather than impose new rights or duties, *White*, 7 F.3d at 304; *see also New York State Elec. & Gas Corp.*, 267 F.3d at 131 ("Interpretive rules . . . do not create rights, but merely clarify an existing statute or regulation."), and here, to the extent that there is any ambiguity in the meaning of "full criminal background check" requirement, the 2002 changes in practice simply clarified the agency's understanding of that term. *See White*, 7 F.3d at 304 ("[A] paradigmatic example of an interpretative rule" is one, like the 2002 changes in practice, that simply "determines only how [a

circumstance] will be treated under an existing statutory provision, rather than creating an extra-statutory requirement."). Similarly, as an announcement of how the agency intends to implement the personal investigation requirement, USCIS's decision is a "general statement of policy" exempt from the notice and comment requirements. *Lincoln*, 508 U.S. at 196-97 (explaining that a "general statement of policy" is a rule in which the agency announces how it "proposes to exercise a discretionary power").

Relying on two tests adopted by the D.C. Circuit to identify "legislative" rules, plaintiffs argue that the 2002 changes in practice were legislative because they purportedly lacked a "legislative basis" and amended prior legislative rules. *See* Pl. Br. 22-28. These tests, adopted initially by the D.C. Circuit in *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106, 1112 (D.C. Cir. 1993), have been noted by the Second Circuit but have not, contrary to plaintiffs' suggestion, *see* Pl. Br. at 22, been adopted in lieu of plaintiffs' own formulation of the definition of a "legislative" rule. *See Sweet v. Sheehan*, 235 F.3d 80, 91 (2d Cir. 2000) (discussing the D.C. Circuit test). In any event, even if these tests are applicable, plaintiffs are incorrect to suggest that either supports finding the 2002 changes in practice to be "legislative."

First, the D.C. Circuit's "legislative basis" requirement asks whether, in the absence of the rule in question, the agency would have had "an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties." *American Mining Congress*, 995 F.2d at 1112. Essentially, this test looks at the same question defined in Second Circuit cases: whether the agency is using the rule as the basis for an "extra-statutory imposition of rights, duties or obligations" on naturalization applicants. *White*, 7 F.3d at 304.

- 65 -

Here, the 2002 changes in practice – which include USCIS's implementation of the mandatory "full criminal background check requirement," which Congress understood to include the FBI name check, and the "personal investigation" of § 1446(a) – do not place any obligations on naturalization applicants or change the standards by which their applications are judged.

Second, plaintiffs claim incorrectly that the 2002 changes in practice must be "legislative" rules because they amended 8 C.F.R. § 335.2(b), which, they claim – without any argument – itself was a legislative rule.   Plaintiffs are incorrect on both counts.  As an initial matter, the 2002 changes in practices are consistent with § 335.2(b).  That section states that an applicant's initial examination before a naturalization examiner will not be scheduled until a "definitive response" to the full criminal background check is received, and explains circumstances qualifying as a definitive response.  *See id.*  The description of a "definitive response" is ambiguous: on the one hand, § 335.2(b) includes as a "definitive response" a statement by the FBI that an applicant does or does not have "an administrative or a criminal record," *see* 8 C.F.R. § 335.2(b)(1)-(2), which would require a response to the FBI name check; on the other hand, the section refers to the definitive response requirement as being satisfied by a statement that the applicant's fingerprints are "unclassifiable," *id.* § 335.2(b)(3), which obviously relates only to fingerprints.  In light of this ambiguity and the regulation's use of the term  "full criminal background check," *see id.* § 335.2(b), which Congress understood to mean "both name and fingerprint criminal history check," H.R. Rep. No. 105-405, at 106 (1997) (Conf. Rep.), it is USCIS's responsibility to reconcile this ambiguity, as the 2002 changes in practice do.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (according "controlling" weight to agency's interpretation of its own regulations, where not "plainly" incorrect); *see also Shalabi v.*

- 66 -

*Gonzales*, No. 4:06CV866, 2006 WL 3032413 (E.D. Mo. Oct. 23, 2006) ("A "name check" may

certainly be read into the requirement of a full criminal background check" contained in

§ 335.2.)

In any event, even if the 2002 changes in practice were inconsistent with § 335.2(b),

plaintiffs' unsupported assertion that § 335.2(b) was a "legislative" rule is incorrect.  It is well

settled that an *interpretative* rule may be amended by another interpretative rule; only the

amendment of a "legislative" rule requires the agency to act by a new legislative rule.  *See*

*White*, 7 F.3d at 304.  Just as USCIS's 2002 changes in practice concerning a "definitive

response" from the FBI name check impose no extra-statutory "rights, duties or obligations" on

the applicants, *see White*, 7 F.3d at 304, neither does section 335.2(b), which on its face is

simply a policy statement and interpretative rule setting out how USCIS will conduct the

personal investigation and full criminal background check, and when in the process USCIS will

schedule examinations for applicants.  *See* 8 C.F.R. § 335.2.  Section 335.2(b) is not a legislative

rule because it neither imposes obligations on applicants nor modifies the substance of the

standards for determining whether they are eligible for naturalization, including "good moral

character."  Accordingly, no notice-and-comment procedures were required, because "an

interpretive rule changing an agency's interpretation of a statute is not magically transformed

into a legislative rule." *White*, 7 F.3d at 304.[21]

---

[21] Although the *American Mining Congress* test refers to whether a rule has been
published in the Code of Federal Regulations as relevant to whether it is a "legislative rule," the
D.C. Circuit subsequently clarified that this factor does not receive significant weight in the
analysis.  *See Health Ins. Ass'n v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994) (describing
publication in the Code of Federal Regulations as nothing more than "a snippet of evidence of
agency intent"); *see also* Pl. Br. at 22 n.2 (noting modification of *American Mining Congress*
test).

2.    That the 2002 Changes in Practice May Have Had Substantial Effects Does Not Make Them Legislative Rules

Plaintiffs rely heavily on *Mocanu v. Mueller*, Nos. 07-0445, 07-0971, 07-3223, 07-2718, 07-2859, 08-195, 2008 WL 372459 (E.D. Pa. Feb. 8, 2008), to support their arguments.  The *Mocanu* court found that the 2002 changes in practice were legislative principally because they had a significant effect on the processing of naturalization applicants, the 2002 changes in practice.  *See id.* at *12.  The Second Circuit, however, has rejected such an analysis.

Although at one time the Second Circuit held that notice-and-comment procedures were required for all "substantive" rules, a term defined to include those that "produce . . . significant effects on private interests."  *White*, 7 F.3d at 303 (internal quotation marks omitted), the Circuit has subsequently expressly abandoned that approach.[22]  The Circuit recognized that "interpretative rules may have substantive effects," *id.*, and held that the relevant issue is, as described above, whether the agency imposes "extra-statutory . . . rights, duties or obligations," and not whether the rule in question has significant effects.  *See White*, 7 F.3d at 304.  Indeed, in numerous cases, the Second Circuit has found agency rules to be "interpretative" notwithstanding significant effects on private parties.  *See, e.g., New York State Elec. & Gas Corp.*, 267 F.3d at 131-32 (purported agency rule against untimely challenges to electricity rates); *Mejia-Ruiz*, 51 F.3d at 363 (rule effectively terminating right of judicial review of alien subject to deportation order, where the alien leaves the United States after taking an administrative appeal from an immigration judge's decision); *White*, 7 F.3d at 304 (rule reducing Supplemental Security Income disability benefits for a class of recipients).  Accordingly, the

---

[22] Accordingly the Second Circuit case that the plaintiffs rely on for this point is no longer good law.  *See* Pl. Br. 27 (citing *Perales v. Sullivan*, 948 F.2d 1348, 1354 (2d Cir. 1991)).

Court should reject the *Mocanu* approach that the effects of the 2002 rule on the processing of applications are sufficient to convert a non-legislative rule to a legislative rule.

  E.  <u>Plaintiffs' Due Process Claim Should be Dismissed for Failure to State a Claim</u>

  Plaintiffs' due process claim should be dismissed because they cannot, as a matter of law, demonstrate that they have been deprived of a constitutionally protected liberty interest or property interest, nor can they demonstrate that they failed to receive process that is constitutionally due. *See*, *e.g.*, *Adams v. Suozzi*, 517 F.3d 124, 127 (2d Cir. 2008) (in addressing a procedural due process claim, courts analyze "(1) whether plaintiffs possessed a protected liberty or property interest, and, if so, (2) what process plaintiffs were due" (internal quotation marks omitted)).

  Plaintiffs' claim of entitlement to a decision within six months is simply a claim of entitlement to process, not a claim that they are substantively entitled to naturalization. *See Hani v. Gonzales*, No. 3:07-CV-517-S, 2008 WL 2026092, at *6 (W.D. Ky. May 8, 2008) (dismissing due process challenge to processing times for naturalization applications because "naturalization applicants have no protected interest in having their applications adjudicated by any certain date"). It is well settled that such a claim is insufficient to allege a constitutionally protected liberty or property interest for due process purposes. *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Rodriguez v. McLoughlin*, 214 F.3d 328, 339 (2d Cir. 2000) ("[An] expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." (internal quotation marks omitted)); *Cofone v. Manson*, 594 F.2d 934, 938 (2d Cir. 1979) ("[a]lthough a Due Process

Clause liberty interest may be grounded in [a] law that places substantive limits on the authority of . . . officials, no comparable entitlement can derive from a statute that merely establishes procedural requirements").

To the extent that plaintiffs would go beyond their claim to process itself, and attempt to claim entitlement to naturalization, their claim equally must fail. First, plaintiffs do not – and cannot – suggest that all of their purported class members will be found substantively eligible to naturalize; many will be found ineligible and have their applications denied. Accordingly, as a matter of fact it is impossible for them to claim on a class-wide basis that they have a right to naturalization. Second, the completion of the name check process itself is part of the statutory requirements for naturalization and, accordingly, plaintiffs "have not met all statutory requirements for naturalization in that their FBI name checks are still pending," *Hani*, 2008 WL 2026092, at *6; *see United States v. Ginsberg*, 243 U.S. 472, 475 (1917) (applying the rule that "[n]o alien has the slightest right to naturalization unless all statutory requirements are complied with" to procedural requirements, allowing revocation of citizenship, without regard to substantive eligibility, where naturalization hearing was held in chambers in violation of the then-existing requirement of a public hearing).

Finally, even if plaintiffs could show deprivation of a constitutionally protected liberty or property interest, as a matter of law they have received all the process that is due. To determine what process is due before deprivation of a liberty or property interest, a court considers three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the

> Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 466 (2d Cir. 2006) (same).  Here, concerning the first factor, although applicants certainly have a personal interest in become United States citizens, as a legal matter they have no right to citizenship until "all statutory requirements are complied with," *Ginsberg*, 243 U.S. at 475, including the FBI background check required by the 1997 Appropriations Act, the "personal investigation" mandated by § 1446(a), and a finding of eligibility on all criteria for citizenship, including good moral character.  With regard to the second factor, it is the Government that is seeking to avoid any erroneous decision-making through sufficient procedural safeguards; plaintiffs do not propose any "additional or substantive" safeguards that they believe will reduce errors in decision-making.  Finally, as described above, the Government's interest in comprehensively vetting naturalization applicants has been deemed by Congress to be a critical interest.

     F.     <u>Plaintiffs Are Not Entitled to Injunctive or Declaratory Relief</u>

     Even if, notwithstanding the above, one or more individuals could demonstrate unreasonable delayed action, unlawfully withheld action, or a due process violation, the Court should deny injunctive and declaratory relief.  Injunctive relief should be denied, first, because the Supreme Court has explained that the courts may not issue injunctions imposing a deadline for the processing of allegedly delayed adjudications, where Congress is fully aware of the processing times involved and has chosen not to enact such a deadline.  *See Heckler v. Day*, 467 U.S. 104, 119 (1984) (vacating affirmance of injunction requiring adjudication of Social Security disability requests for reconsideration within 90 days, for a class of all present and future

applicants).  The Court recognized that in appropriate cases it may be proper for the courts to

impose deadlines on an agency to process a particular individual's request.  *See id.* at 119 n.33.

The Court held, however, that where, as here, Congress is "fully aware of the serious delays in

resolution of" pending applications but "declined to impose deadlines on the administrative

process."  *Id.* at 111, even "long delays that well may have caused serious deprivations" do "not

justify imposing absolute periods of limitations applicable to all claims – limitations that

Congress repeatedly has declined to enact."  *Id.* at 119 n.33.

        The injunctive relief sought by plaintiffs should also be denied because it is not in the

public interest.  "The decision to grant or deny permanent injunctive relief is an act of equitable

discretion by the district court . . . ."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

(2006); *see, e.g.*, *In re Barr Labs., Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991) ("Equitable relief,

particularly mandamus [as under § 706(1)], does not necessarily follow a finding of a violation . .

. .").  As part of its exercise of discretion, a court should ensure that "the public interest would

not be disserved by a permanent injunction."  *Id.*; *see also Weinberger v. Romero-Barcelo*, 456

U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay

particular regard for the public consequences in employing the extraordinary remedy of

injunction.")  "[A] federal judge sitting as chancellor is not mechanically obligated to grant an

injunction for every violation of law."  *Weinberger*, 456 U.S. at 313.  Here, in at least two

respects, the public interest would be strongly disserved by the sought after injunction.

        Complying with an injunction requiring adjudication of all applicants in the New York

district within six months will likely require the agency to transfer substantial resources from

other projects of significance, including the processing of naturalization applicants in other

districts in the country where such an order is not in effect.  *See Heckler*, 467 U.S. at 116 (noting that "judicially imposed deadlines may vary from case to case and from State to State, requiring HHS to shuffle its staff nationwide"); *In re Barr Labs., Inc.*, 930 F.2d at 75 (observing that "[a]ssuming constant resources . . .  a judicial order putting [a petitioner] at the head of the queue simply moves all others back one space and produces no net gain").  Even where there is a strict statutory deadline for agency action – which as described above does not exist for naturalization applications – where constant resources would likely simply transfer the burden from one class of individuals to another.  *See In re Barr Labs., Inc.*, 930 F.2d at 73.  "Perhaps Congress should earmark more funds specifically to" the naturalization program at issue here, "but that is a problem for the political branches to work out."  *In re Barr Labs., Inc.*, 930 F.2d at 75.

Moreover, the FBI name check has been adopted by Congress and USCIS for use in the naturalization process in an effort to protect national security and to ensure that all individuals who become naturalized are fully entitled to do so, and a court order imposing deadlines would risk upsetting this process.  *See Shalabi v. Gonzales*, No. 4:06CV866, 2006 WL 3032413, at *5 (E.D. Mo. Oct. 23, 2006) ("A background check that is rushed and incomplete due to an artificial, court imposed deadline would not meet the statutory and regulatory requirements of a 'full criminal background check' before the USCIS can make a determination on an application").  In that regard, "respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."  *In re Barr Labs.*, 930 F.2d at 74.  As the D.C. Circuit has explained:

> In short, we have no basis for reordering agency priorities.  The agency is in a unique-and authoritative-position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way.  Such budget flexibility as Congress has allowed the agency is not for us to hijack.

*In re Barr Labs., Inc.*, 930 F.2d at 76.

Not only is injunctive relief inappropriate but also declaratory relief is inappropriate in light of the agency's current efforts to reduce processing times. *See A. L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 331 (1961). The Declaratory Judgment Act does not require a district court to provide relief whether they have found a statutory violation, but simply "vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). A district considering whether to issue a declaratory judgment should ask, among other things, "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Dow Jones & Co., Inc.*, 346 F.3d at 359. The Supreme Court has held that, in exercising this discretion, "where it appears that a challenged 'continuing practice' is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted," "sound discretion withholds the remedy."" *A. L. Mechling Barge Lines, Inc.*, 368 U.S. at 331. This policy of withholding decision reflects the same institutional concerns that counsel against issuing injunctive relief under these circumstances.

## II.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied

Contrary to plaintiffs' contention, the usual balancing test for preliminary injunctive relief – requiring a plaintiff to show, in addition to irreparable injury,[23] "either (a) a likelihood of

---

[23] This Court has already ruled, at the April 11, 2008 conference in this matter, that plaintiffs have met the standard for demonstrating "irreparable harm." Accordingly, the Government does not seek to re-litigate that issue in these papers, while reserving the right to raise the issue on appeal or in any subsequent proceeding in this case.

success on the merits or (b) a sufficiently serious question going to the merits, with a balance of hardships tipping in favor of the party requesting the preliminary injunction," *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) – does not apply to this lawsuit, in which plaintiffs seek a mandatory preliminary injunction against USCIS's operation of its programs.  The Second Circuit has held, to the contrary, that in cases where plaintiffs seek a mandatory injunction against the Government, they must demonstrate a "clear or substantial" likelihood of success on the merits, in addition to irreparable harm.  *See Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000)).  As the Supreme Court has recently emphasized, "[a] preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  *Munaf v. Geren*, — S. Ct. — , 2008 WL 2369260, at *11 (June 12, 2008) (internal quotation marks and citations omitted).[24]

Plaintiffs' papers in support of their motion for a preliminary injunction raise the same claims as are presented in their complaint, except that they do not advance, in the preliminary injunction papers, their claim pursuant to the Due Process Clause.  For all the reasons described above, plaintiffs cannot demonstrate that they have any possibility of success on the merits, let alone the "clear and substantial" likelihood of success required for the preliminary injunction they seek.

Additionally, even if plaintiffs could demonstrate the clear and substantial likelihood of success required for issuance of a preliminary injunction, the preliminary injunction should still

---

[24] Indeed, it is no longer clear that the "serious question going to the merits" standard quoted by plaintiffs has continued viability even in cases not involving the government.  *See Munaf*, , 2008 WL 2369260, at *11 ("[A] party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits."  (internal quotation marks omitted)).  However, as it has long been clear that this standard does not apply in cases against the government, *see Wright*, 230 F.3d at 547, the Court need not reach the issue.

be denied because, as discussed above with regard to plaintiffs' claim for a permanent

injunction, such a court order would be contrary to the public interest and Congress's intent.

*See, e.g.*, *Weinberger*, 456 US at 312 (holding that courts should not issue equitable remedies

without considering the public interest).  As the Supreme Court has explained:

> The award of an interlocutory injunction by courts of equity has never been regarded as
> strictly a matter of right, even though irreparable injury may otherwise result to the
> plaintiff. . . .
>
> [W]here an injunction is asked which will adversely affect a public interest for whose
> impairment, even temporarily, an injunction bond cannot compensate, the court may in
> the public interest withhold relief until a final determination of the rights of the parties,
> though the postponement may be burdensome to the plaintiff.

*Yakus v. United States*, 321 U.S. 414, 440-41 (1944); *see also Weinberger*, 456 U.S. at 312-13

(same).  For the reasons discussed above in the context of the request for a permanent injunction,

the issuance of a preliminary injunction would be contrary to Congressional intent and the public

interest.

III.    <u>Plaintiffs' Motion for Class Certification Should be Denied</u>

Plaintiffs' motion for class certification should be denied because they fail to satisfy the

requirements of Rule 23.  Plaintiffs seek certification of the following class:

> All lawful permanent residents who reside in the counties served by the New York
> District Office of USCIS who have properly submitted or will properly submit
> application for naturalization to USCIS, who have taken all actions requested of them by
> USCIS, and whose applications for naturalization have not been or will not be
> adjudicated by USCIS within 180 days of the date of submission.

Pl. Br. at 38.  Plaintiffs also seek certification of the following sub-class:

> All lawful permanent residents who reside within the counties in the Southern District of
> New York served by the New York District Office of USCIS who have properly
> submitted or will properly submit application for naturalization to USCIS, who have
> taken all actions requested of them by USCIS, and whose applications for naturalization

- 76 -

have not been or will not be adjudicated by USCIS within 120 days of the date of their initial examination.

*Id.*

A class action may not be certified unless the Court "mak[es] determinations that each of the Rule 23 requirements has been met," *In re Initial Pub. Offering Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006), *clarified on unrelated points,* 483 F.3d 70 (2d Cir. 2007), and "[p]laintiffs bear the burden of establishing each requirement under Rule 23 for class certification." *Jeffries v. Pension Trust Fund of Pension, Hospitalization and Benefit Plan of Electrical Industry*, No. 99 Civ. 4174 (LMM), 2007 WL 2454111, at *10 (S.D.N.Y. Aug.. 20, 2007) (internal quotation marks omitted). The Court  must conduct a "rigorous analysis" of whether plaintiffs have met that burden. *See General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). On the motion for summary judgment, the Court must resolve all factual disputes necessary to a determination of whether plaintiffs have met their burden of demonstrating the satisfaction of each of the Rule 23 requirements. *See In re Initial Pub. Offering Secs. Litig.*, 471 F.3d at 41.

Plaintiffs' motion should be denied because they have failed to meet their burden here. Because of individualized variation within class and subclass that plaintiffs seek to represent, they satisfy neither the implicit requirement of Rule 23(a) that their class be administrative identifiable, *see supra*, nor the express Rule 23(a) requirements that the plaintiffs be "typical" and "adequate representatives" of the class they seek to represent, *see* Fed. R. Civ. P. 23(a). Further, because of both this variation and also the necessarily individualized nature of plaintiffs' claims, plaintiffs cannot satisfy the requirement of Rule 23(b) that "final injunctive relief or corresponding declaratory relief [be] appropriate respecting the class as a whole ," *see* Fed. R. Civ. P. 23(b)(2).

A.    The Proposed Class and Proposed Post-Interview Subclass Are Not Sufficiently Definite to Allow for Identification of Class Members

Plaintiffs' motion for class certification should be denied because it is not administratively feasible for the Court or the parties to determine who the members of the proposed class and subclass are.  Implicit in Rule 23 is the requirement that plaintiffs are purporting to represent "an identifiable class," *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323, 336 (S.D.N.Y. 2002), that is "sufficiently definite" to allow identification of class members, *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001).  *See Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006) ("Whether a proposed class is ascertainable is fundamental to certification.").  Although it is not required that plaintiffs be able to identify all class members at the time of the class certification motion, there must be reason to think that the class will become identifiable during the course of the litigation.  *Bakalar*, 237 F.R.D. at 64.  Rule 23 is not satisfied unless the class definition is sufficiently defined such that "it is administratively feasible for a court to determine whether a particular individual is a member." *Daniels*, 198 F.R.D. at 414 (internal quotation marks omitted); *accord also Bakalar*, 237 F.R.D. at 64; *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y, 1983); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1760.  "The court must be able to make this determination without having to answer numerous fact-intensive questions." *Daniels*, 198 F.R.D. at 414 (internal quotation marks omitted).

Apparently recognizing that class members whose conduct has caused their applications to be delayed would be unable to show that USCIS or FBI had "unreasonable delayed" or "unlawfully withheld" decision, *see Reddy v. CFTC*, 191 F.3d at 121, and that the need to

determine whether each class member was the cause of his or her own delay makes the matter

unsuitable for class-wide injunctive or declaratory relief –  plaintiffs have limited their class and

subclass to individuals who "properly submit" their naturalization applications and "who have

taken all actions requested of them by USCIS."  Pl. Br. at 38.  This attempt to cure the problem

of individualized decision-making presented by plaintiffs' claims, however, simply moves the

inherently individualized inquiry to the process of determining which of the thousands of

individuals with applications pending more than six months "properly" submitted their

applications and "have taken all actions requested of them by USCIS."  *Id.*

Plaintiffs suggest no process by which this determination could be made, but simply state

generally that they would rely on (undefined) "internal records" of defendants "from which the

exact size and identify of the class can be determined."  Pl. Br. at 40.  However, although certain

factors evidencing an applicant's failure to comply with instructions could be deduced from

USCIS's databases, other factors, such as whether applicants' applications contained errors or

whether applicants failed to appear for more than one scheduled examination, would require an

individualized review of the individuals' paper files and case history and would require the

parties to present evidence concerning each individuals' efforts, and even that extensive review

might be inconclusive.  Because the Court would be unable to "determine who is in the class and

bound by its ruling without engaging in numerous fact-intensive inquiries," *Bakalar*, 237 F.R.D.

at 64, class certification would be improper.

B.    Plaintiffs Cannot Demonstrate Typicality

Plaintiffs cannot satisfy the requirement that their "claims or defenses [be] typical of the

claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  All of the named plaintiffs except

plaintiff Milanes – including Sanchez, the only plaintiff who claims to be a representative of the Proposed Post-Interview Subclass – have already had their naturalization applications adjudicated, with the result that they are no longer members of their own purported class.[25]  "[A] class representative must be part of the class . . . ."  *General Telephone Co.*, 457 U.S. at 156; *see also In re Initial Pub. Offering Secs. Litig.*, Nos. 01 Civ. 3020 (SAS), *et al.*, 2008 WL 2050781, at *3 (S.D.N.Y. May 13, 2008) ("Plaintiffs have cited no case where a court permitted a class representative that was not a member of the class.").  Because "[n]o other members of the class have come forward to take the place of the named representatives," the Post-Interview Subclass must be denied, *Robinson v. First Nat'l City Bank*, 482 F. Supp. 92, 100 (S.D.N.Y. 1979), and plaintiff Milanes is the only potential class representative for the Proposed Class.  Milanes, in turn, is not typical of the class because her FBI name check has already been completed, with the result that she not longer has a stake in the principal legal theory advanced by the class, that the FBI name check is causing allegedly inappropriately long processing times.

In any event, neither plaintiff Milanes nor any of the other class members can satisfy the typicality requirement, because the claims of plaintiffs and the class are "highly individualized and differ[] from case to case."  *Lewis Tree Service, Inc. v. Lucent Technologies Inc.*, 211 F.R.D. 228, 234 (S.D.N.Y. 2002); *see also Balbuena v. Mattingly*, Nos. 05 Civ. 2986(TPG) & 07 Civ. 3308 (TPG), 2008 WL 759348, at *2 (S.D.N.Y. Mar. 21, 2008) (finding a lack of typicality where "the particular facts of each case are highly relevant to determining whether any . . . rights were violated").  Even the assertion of "a common legal theory does not establish typicality when

---

[25] Additionally, the individual claims of the named plaintiffs other than Milanes should be dismissed as moot, as they have already obtained an adjudication of their applications.

proof of a violation requires individualized inquiry." *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006); *see generally Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (noting that typicality requires that "each class member's claim arises from the same course of events" (internal quotation marks omitted)). Here again, as described with regard to the class definition, each class member's claim of injury inherently requires consideration of individualized issues relating to whether, under the circumstances, the agency's actions with respect to a particular individual, who may or may not have contributed to his or her own processing times, warrants the exercise of injunctive relief as to that individual. For example, as discussed above, plaintiff Castro initially failed her English test, requiring the rescheduling of a re-examination. Further, as noted above, it appears that mail sent by USCIS to Milanes was returned as undeliverable. Although the Government does not know the reason for the postal service's inability to deliver this mail, it is possible that this was the fault of Milanes or someone at her residence. Because such issues would need to be explored as to each class member to determine his or her entitlement to relief, class certification is inappropriate.

    C.    <u>With Regard to the Proposed Post-Interview Class,</u>
               <u>Plaintiffs Cannot Demonstrate Adequacy</u>

In addition to their inability to satisfy the "typicality" requirement of Rule 23, plaintiffs also cannot satisfy the rule's "adequacy" requirement, *see* Fed. R. Civ. P. 23(a)(4), because of a "conflict of interest between the named plaintiffs and other members of the plaintiff class." *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997). As noted above, the only purported class representative of the subclass is plaintiff Sanchez, who is no longer a member of the class. Even if a member of the subclass were to come forward to replace Sanchez, however, he or she

could not possibly be an adequate representative because of an inherent conflict of interest with the other members of the subclass.

As described above, 8 U.S.C. § 1447(b) is the only provision providing jurisdiction for individuals who have already had their naturalization examination. Under section 1447(b), applicants who have waited 120 days following their examination without receiving a determination by USCIS may seek relief in court, and the "court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter." 8 U.S.C. § 1447(b). The district court's jurisdiction to "determine the matter" includes the discretion to render a prompt, post-discovery ruling on the merits of the individual's application, as well as the authority to render a more limited ruling remanding to the agency with instructions. *Id.* Because the Court could not realistically render naturalization decisions on the merits as to each individual in plaintiffs' Proposed Post-Interview Subclass, however, plaintiffs are only seeking from the Court the more limited relief of an order instructing the agency to act within a given period of time. Although this approach might be plaintiffs' best solution as to how to make a class action manageable, it precludes those individual subclass members who would otherwise chose to bring their § 1447(b) action in the hopes of having the Court decide their individualized applications on the merits from doing so. In short, plaintiffs are not adequate class members because of the conflict between their willingness to limit the subclass's section 1447(b) relief to an order instructing prompt decision-making, and the right of such subclass members to seek an immediate ruling on the merits of their applications from the district court.

Although one court has held to the contrary, *Roshandel v. Chertoff*, No. C07-1739MJP, 2008 WL 1929894, at *7 (W.D. Wash. Apr. 25, 2008), this is not a scenario where the Court can remove this conflict of interests through the creation of an opt-out regime.  First, plaintiffs' proposed subclass includes any individual, now or in the future, who may become eligible for section 1447(b) relief.  *Future* class members have no basis to exercise any opt-out rights that are currently available to them.  Second, because of the expedited posture of the case, it would be impossible for plaintiffs to provide adequate notice even to all current section 1447(b) subclass members, let alone give them an opportunity to remove themselves from the case.  In any event, because plaintiffs have not even proposed a plan for notice and opt-outs, they cannot meet their burden of demonstrating adequacy.

    D.    <u>Plaintiffs Cannot Satisfy the Rule 23(b)(2) Requirement that Injunctive or Declaratory Relief Be Appropriate as to the Class as a Whole</u>

Not only are plaintiffs unable to meet the requirements of Rule 23(a), but also they are unable to satisfy the requirement of Rule 23(b)(2), pursuant to which they purport to bring this class action, that this be an action in which "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

As an initial matter, the Supreme Court's decision in *Heckler v. Day*, 467 U.S. 104 (1984), discussed above, precludes a finding that class-wide injunctive or declaratory relief would be appropriate.  The Supreme Court held in *Heckler* that the courts could not impose class-wide deadlines for agency adjudications where, as here, Congress had not imposed such deadlines and, to the contrary, had demonstrated its intent to the contrary to chose other methods of addressing agency backlogs.  *See id.* at 116-19.  In a footnote, the *Heckler* Court emphasized

that its ruling related only to class-wide relief, and that in appropriate cases a court could issue

individualized relief.  *See id.* at 118 n.33.

Even aside from the holding in *Heckler*, plaintiffs cannot satisfy the Rule 23(b)(2)

requirement because "certification under Rule 23(b)(2) is improper where an element of liability

must be proven on an individualized basis," *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 157

(S.D.N.Y. 2006), with the result that plaintiffs cannot show that "class treatment would be

efficient and manageable," *id.*; *see Velez v. Novartis Pharmaceuticals Corp.*, 244 F.R.D. 243,

270 (S.D.N.Y. 2007) (noting requirement that "class treatment . . . be efficient and

manageable").  As described above, whether processing times in excess of the 180 days are

"unreasonable," as plaintiffs claim, depends in part on individualized questions of fact, regarding

"the extent to which the [individual challenging alleged delay] participated in delaying the

proceeding." *Reddy*, 191 F.3d at 121 (2d Cir. 1999).  These individualized factors include not

only the things that plaintiffs have attempted (unsuccessfully, as described above) to screen out

through their class definition limiting the class to individuals who have properly submitted their

applications and have taken all actions requested of them by USCIS, *see supra* Part III.A, but

also other factors that plaintiffs have not purported to screen out, such as whether class members

have significant criminal histories or other factors that require more than the ordinary time for

agency consideration of whether to grant or deny the application.  Because reasonableness of the

processing times for a given applicant cannot be decided without individualized inquiry, the

requirements of Rule 23(b)(2) are not satisfied.  *See Maldonado v. Ochsner Clinic Foundation*,

493 F.3d 521, 524 (5th Cir. 2007) (holding that Rule 23(b)(2) is not satisfied where plaintiffs'

claims require an inquiry into whether charges were "reasonable," which is "necessarily an

individual inquiry that will depend [among other things] on the specific circumstances of each class member").

      E.     <u>Members of the *Kaplan* Class Should be Excluded from Any Class in this Case</u>

Further, to the extent that, notwithstanding the above, the Court deems it appropriate to certify a class in this case, the class should be defined to exclude any individual who released his or her claims as a class-member participating in the settlement of *Kaplan v. Chertoff*, No. 06-5304 (E.D.Pa.). In that case, the Government reached a settlement that involved certification of a nationwide class of individuals for whom naturalization processing times would lead to a denial of Social Security SSI benefits. These individuals claimed, among other things, that the Government "fail[ed] to process . . . naturalization applications in a timely and expeditious manner," First Amended Complaint for Declaratory, Injunctive, and Mandamus Relief ¶ 5, *Kaplan v. Chertoff*, No. 06-5304 (E.D. Pa. filed Jan. 31, 2007); that the Kaplan plaintiffs' "naturalization applications are most commonly delayed because of background and 'name check' investigations," *id.* ¶ 7, and that the application processing times amounted to action "unreasonably delayed or withheld" pursuant to the APA and a violation of Due Process, *id.* ¶ 8. The Kaplan plaintiffs also claimed that the Government violated the notice and rulemaking requirements of the Administrative Procedure Act. *See id.* ¶ 51.

By Order dated March 5, 2008, the Kaplan Court certified for settlement purposes a class composed of the following:

> all non-United States citizens who are receiving or have received Supplemental Security Income ("SSI") and are or will be subject to termination or suspension of SSI pursuant to 8 U.S.C. § 1612(a)(2)(A), prior to a decision on their current or future Application for Naturalization, Form N-400, and oath ceremony to become a United States citizen.

Stipulation of Settlement and Release, at ¶ 2 (CIS006249).  Pursuant to this settlement, all class members released all claims "that were asserted or could have been asserted by Class Members or anyone acting on behalf of or in place of a Class Member, based upon the facts alleged or that could have been alleged in the Amended Complaint relating to the subject of this action, including but not limited to the Due Process, Equal Protection, and APA claims related to the subject matter of the Kaplan case," except for "individual" (*i.e.*, non-class) actions brought pursuant to 8 U.S.C. § 1447(b) and certain actions under the Social Security laws.  *Id.* ¶ 10. (CIS006251) (definition of released claims); *see* ¶ 12  (CIS006251) (release).  Because any members of the Proposed Class or Proposed Post-Interview Subclass have released their claims in exchange for the benefits they are eligible for pursuant to the *Kaplan* settlement, the class should be defined to exclude those class members.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant its motion to dismiss in part and remand in part or, in the alternative, for summary judgment, and deny plaintiffs' motion for preliminary injunction and class certification.

Dated:        June 19, 2008
              New York, New York

                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York

                        By:   /s/ Robert William Yalen
                              TOMOKO ONOZAWA
                              KIRTI VAIDYA REDDY
                              ROBERT WILLIAM YALEN
                              Assistant United States Attorneys
                              86 Chambers Street
                              New York, New York  10007
                              Tel.:  (212) 637-2751 (Reddy)
                              Tel.:  (212) 637-2721 (Onozawa)
                              Tel.:  (212) 637-2722 (Yalen)
                              Fax:  (212) 637-2687
                              E-mail:  kirti.reddy@usdoj.gov
                              E-mail:  robert.yalen@usdoj.gov
                              E-mail:  tomoko.onozawa@usdoj.gov