UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

VIRGINIA MILANES, *et al.*,    :
                               :
            Plaintiffs,        :
                               :    ECF Case
      v.                       :
                               :    08 Civ. 2354 (LMM) (KNF)
MICHAEL CHERTOFF, *et al.*,    :
                               :
            Defendants.        :
-------------------------------------------------------------------x

DECLARATION OF ROBERT WILLIAM YALEN

I, Robert William Yalen, declare pursuant to the provisions of 28 U.S.C. § 1746 as follows:

1.    I am an Assistant United States Attorney representing the defendants in this matter.  I submit this declaration in support of defendants' motion to dismiss the complaint in part and remand in part, or in the alternative for summary judgment, and in opposition to plaintiffs' motions for a preliminary injunction and class certification, and to put certain documents before the Court.

2.    Attached as Exhibit A is a computer disk containing PDF copies of the administrative records filed in this matter.

3.    Attached as Exhibit B is a copy of USCIS's Surge Response Plan, which is Bates numbered CIS004660-80 and also appears on the disk attached as Exhibit A.

4.    Attached as Exhibit C is a copy of the joint USCIS-FBI National Name Check Program Business Plan for United States Citizenship and Immigration Services, which is Bates numbered CIS006307-24 and also appears on the disk attached as Exhibit A.

5.      Attached as Exhibit D is a copy of a document entitled U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, *Background Check Enhancements Spend Plan Submitted Pursuant to Public Law 110-28* (Dec. 2007)).  This document bears Bates number CIS_Aytes.e00704-707.  USCIS is in the process of determining whether this document should be filed with the Court in a supplement to the previously filed administrative records.

6.      Attached as Exhibit E is a copy of an unpublished decision cited in the Government's memorandum:  *Tartakovsky v. Pierre*, 3:07-cv-1667-BEN-BLM, Slip Op. at 9-10 (S.D. Cal. Mar. 11, 2008).

7.      Attached as Exhibit F is a copy of the amended complaint (without exhibits) in *Kaplan v. Chertoff* ("*Kaplan*"), No. 06-5304 (E.D. Pa. filed Jan. 31, 2007).

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        June 19, 2008

                                        /s/ Robert William Yalen
                                        ROBERT WILLIAM YALEN
                                        Assistant United States Attorney
                                        Tel. (212) 637-2722
                                        Fax (212) 637-2687

**EXHIBIT A**

TO BE FILED WITH THE COURT AS A COMPUTER
DISK CONTAINING PDF COPIES OF THE FBI AND
CIS ADMINISTRATIVE RECORDS

| | USCIS Surge Response Plan | | | | |
|---|---|---|---|---|---|
| | | FY 2008 | | FY 2009 | FY 2010 | FY08-10 |
| PAGE | Proposal | Pos | $ | $ | $ | $ |
| | | | | | | |
| 2 - 3 | **Additional Federal Staff** | | | | | |
| | Adjudicators | 573 | 19.1 | 46.7 | 30.3 | 96.2 |
| | Supervisors | 50 | 3.2 | 6.3 | 4.1 | 13.7 |
| | Adjudication Clerical | 36 | 1.2 | 2.0 | 1.3 | 4.5 |
| | Immigration Information Officers | 173 | 5.9 | 9.4 | 6.1 | 21.4 |
| | Administrative | 20 | 0.7 | 1.1 | 0.7 | 2.5 |
| | I.T. Specialists & Computer Scientists | 31 | 2.3 | 4.8 | 3.0 | 10.0 |
| | Space Management Specialists | 2 | 0.1 | 0.3 | 0.2 | 0.6 |
| | Night differential pay (10% for 33% of new staff) | -- | 0.5 | 1.9 | 1.2 | 3.6 |
| | Subtotal, Federal Staff: | 885 | 33.0 | 72.5 | 46.9 | 152.4 |
| 4 | **Field/Service Center Contract Support** | | | | | |
| | NBC/Records Transition -- Contract Clerical Staff | 239 | 14.1 | 14.5 | 0.0 | 28.6 |
| | Field Contract Clerical Staff | 288 | 17.4 | 18.7 | 0.0 | 36.1 |
| | Field Contract Clerical Staff Overtime | -- | 3.7 | 4.0 | 2.0 | 9.7 |
| | Subtotal, Adjudication-related Contract Costs: | 527 | 35.2 | 37.2 | 2.0 | 74.4 |
| 5 | **Extension of Term Adjudicators** | 379 | 9.9 | 25.4 | 15.7 | 50.9 |
| 6 | **Adjudication Officer Overtime** | -- | 12.8 | 21.2 | 7.0 | 41.0 |
| 7 | **Facility Cost for Federal/Contractor Staff** | -- | 10.0 | 13.0 | 0.0 | 23.0 |
| 8 | **Additional FBI Fingerprint/Namecheck** | -- | 40.4 | 0.0 | 0.0 | 40.4 |
| 9 | **Records Support** | -- | 0.5 | 0.3 | 0.2 | 1.0 |
| 10 | **Lock Box** | | | | | |
| | Development costs for centralized intake | -- | 20.0 | 0.0 | 0.0 | 20.0 |
| | Savings from centralizing intake at Lock Box | -- | 0.0 | (38.0) | (32.0) | (70.0) |
| 11-20 | **Information Technology** | | | | | |
| | Infrastructure, Set-up, & Management Services | -- | 42.9 | 15.7 | 5.0 | 63.6 |
| | New Applications & Tech Services | -- | 10.8 | 11.3 | 2.5 | 24.5 |
| | Legacy Applications & Tech Services | -- | 12.6 | 6.2 | 5.0 | 23.8 |
| | Enterprise End User Support | -- | 8.0 | 6.0 | 4.3 | 18.3 |
| | Security Remediation & Tech Services | -- | 2.7 | 2.0 | 0.0 | 4.7 |
| | | -- | 76.9 | 41.2 | 16.8 | 134.9 |
| | **GRAND TOTAL, ALL FEDERAL STAFF** | 1,264 | | | | |
| | **GRAND TOTAL, COST :** | | $238.7 | $172.8 | $56.6 | $468.0 |

CIS004660

<u>Plan Item</u>: **Additional Federal Staffing**

<u>Description/Justification</u>

Additional Federal hiring above planned fee rule increases is necessary to support adjudicative capacity needs.  Staffing would not be considered permanent; the resource plan reflects partial year funding in FY 2010 reflecting staff phase out.  During FY 2010, additional staffing added under the surge would either be reduced through attrition, would be used to backfill base level needs, or would be released.

As part of process improvement, USCIS will transfer the pre-processing of the Application for Naturalization (N-400) from the Service Centers to the National Benefits Center (NBC).  A total of 47 additional Federal positions are requested for the transition. This effort will help the Service Centers concentrate on core adjudication functions.

<u>Preliminary Cost Estimate</u>

**Government Staffing Rough Order of Magnitude (ROM) Cost Estimate**
**(Dollars in Thousands)**

| | Positions | FY08 | | FY09 | | FY10 | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| | | Cost | FTE | Cost | FTE | Cost | FTE | Cost | FTE |
| **Domestic Operations** | | | | | | | | | |
| Adjudicators | 573 | 19,111 | 229 | 46,721 | 544 | 30,349 | 344 | 96,181 | 1,117 |
| Supervisors | 50 | 3,216 | 20 | 6,349 | 48 | 4,126 | 30 | 13,691 | 98 |
| Adjudication Clerical | 36 | 1,228 | 14 | 1,954 | 34 | 1,268 | 22 | 4,450 | 70 |
| Imm Information Officers | 173 | 5,893 | 69 | 9,389 | 164 | 6,095 | 104 | 21,377 | 337 |
| Administrative | 20 | 681 | 8 | 1,085 | 19 | 705 | 12 | 2,471 | 39 |
| | | | | | | | | | |
| Extension of Term Employees | 379 | 9,854 | 152 | 25,374 | 379 | 15,681 | 227 | 50,909 | 758 |
| | | | | | | | | | |
| **Office of Information Technology** | | | | | | | | | |
| IT Specialists/Computer Scientists | 31 | 2,265 | 12 | 4,555 | 29 | 2,960 | 19 | 9,780 | 60 |
| | | | | | | | | | |
| **Office of Administration** | | | | | | | | | |
| Space Management Specialists | 2 | 129 | 1 | 254 | 2 | 165 | 1 | 548 | 4 |
| | | | | | | | | | |
| **Total - Government Staff** | 1,264 | $ 42,378 | 506 | $ 95,681 | 1,220 | $ 61,349 | 758 | $ 199,408 | 2,484 |

<u>Cost Estimate Key Assumptions</u>
- Pay grade assumptions: 323 new adjudicators brought on under the Federal Career Intern Program (FCIP) GS-5/7/9; 250 adjudicators are re-employed annuitants funded at GS 9/11/12 grade; supervisory adjudicators GS-13; IIO GS 5/7/9; administrative 5/6/7; OIT GS-13 (8) and GS-14 (23); space management GS-13.

- Adjudicators (except Terms) lapsed 75% in FY08, 5% in FY09 and 40% in FY 10.

- Non-Adjudicators lapsed 60% in FY08, 5% in FY09 and 50% in FY10.

- Terms will be on-board all of FY08; however, additional funding is only included for 40% of the fiscal year.  Anticipated lapse from the fee rule positions will fund the other 60%.

2

CIS004661

- Assumes 1/3 of all new adjudicators receive 10% night differential pay due to night shift work.

- A 3% COLA was included each year for government employees.

- Contract clerical staff costs are based on current contract rates for FY 2008. A 7% per year inflationary adjustment was included for FY 2009 and FY 2010.

### Adjudicator Breakout

**Adjudicator Hiring Summary**

| | Current Base | Est. Attrition Hiring | Fee Rule Planned | Fee Rule Hired | Fee Rule Balance | Proposed Additional | Grand Total Hiring |
|---|---|---|---|---|---|---|---|
| **Adjudicators** | | | | | | | |
| Full-Time Permanent (FTP) | 2,261 | - | - | - | - | - | - |
| Federal Career Intern Program (FCIP) | 144 | 89 | 723 | 325 | 398 | 573 | 1,060 |
| Term Postitions | 379 | 137 | | | - | - | 137 |
| **Total:** | **2,784** | **226** | **723** | **325** | **398** | **573** | **1,197** |

### Dependencies

- Ensuring that the additional staff are brought on board in a timely manner during FY 2008.

3

CIS004662

<u>Plan Item</u>: **Field/Service Center Contract Support**

<u>Description/Justification</u>

- USCIS will transfer the pre-processing of the Application for Naturalization (N-400) from the Service Centers to the National Benefits Center (NBC). The request provides the initial up-front contractor associated with transitioning this body of work from the Service Centers to the NBC. In addition, 47 new Federal positions are requested for the transition. This change will free up workload hours at the Service Centers so that they can concentrate on core adjudication activities.

- Field Office contract clerical estimates are tied to the additional Federal adjudication staffing.

<u>Preliminary Cost Estimate (excluding personnel)</u>

| $ M | POS | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|---|
| NBC/Records Clerical Staff | 239 | 14.1 | 14.5 | 0 |
| Field Office Clerical Staff | 288 | 17.4 | 18.7 | 0 |
| Field Office Clerical Staff Overtime | -- | 3.7 | 4.0 | 2.0 |
| **TOTAL:** | **527** | **35.2** | **37.2** | **2.0** |

<u>Cost Estimate Key Assumptions</u>

- Field Office Clerical. Costed at current contract rates in FY 2008. A 7% inflationary adjustment was added to FY 2009 and FY 2010.

- NBC. Assumes that by FY 2009 the cost of the transition of N-400 workload to the NBC will be offset by a cost reduction in the Service Center Data Entry contract.

<u>Dependencies</u>

- Transfer of the N-400 workload from the Service Centers to the NBC assumes installation of new servers and other infrastructure equipment needed to support the installation of C4 at the NBC. The current IT Infrastructure at the NBC is insufficient to support the installation of the C4 system at the field office.

CIS004663

<u>Plan Item</u>: **Extension of Term Adjudicators**

<u>Description/Justification</u>

The surge elimination plan assumes the use of 379 term adjudicators.  USCIS will extend current term adjudicators for the 24 month period of surge elimination plan.  Current term employees were recently extended through June of FY 2008.  Many current terms are being absorbed as permanent adjudication staff. USCIS will backfill terms up to the target level.

<u>Preliminary Cost Estimate (excluding personnel)</u>

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Extension of Term Adjudicators | 9.9 | 25.4 | 15.7 |

<u>Cost Estimate Key Assumptions</u>

Assumes 379 terms are priced at 40% for FY 2008, with any additional funding needs provided through existing funds.  Pricing in FY 2010 is provided at 60% of full-year needs given phase out plans.

<u>Dependencies</u>

- Must receive approval from OPM to extend current terms.

5

CIS004664

<u>Plan Item</u>: **Adjudication Officer Overtime**

<u>Description/Justification</u>

To minimize the dependency on additional staff to address the increased workload, Domestic Operations will provide overtime funding such that adjudicator staff will increase productive hours on average by 5%. This equates to an average of 4 hours per pay period for every employee.

<u>Preliminary Cost Estimate (excluding personnel)</u>

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Adjudication Officer Overtime | 12.8 | 21.2 | 7.0 |

Base funding for overtime in FY 2008 totals $16.1M

<u>Cost Estimate Key Assumptions</u>

Assumes that there will be greater use of overtime per capita in FY 2008 than in subsequent fiscal years as on-board field staff must rely upon overtime to offset the lack of production hours available due to the recruitment and training of new fee rule positions and any temporary surge position obtained through the reprogramming.

<u>Dependencies</u>

None

6

CIS004665

Plan Item: **Facilities for Surge Personnel**

Description/Justification

USCIS/Office of Administration must provide work space to house new staff hired during the surge response.

Preliminary Cost Estimate (excluding personnel)

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Facilities for surge personnel | 10.0 | 13.0 | 0 |

Cost Estimate Key Assumptions

- USCIS will not be able to obtain new space in FY08 to accommodate surge hiring
- Some offices will be able to accommodate surge staff within existing space
- FY 2008 and FY 2010 need would be based on 75% of a fiscal year, while FY 2009 funding represents full annualized cost.
- Shifts will be necessary to accommodate the surge activities
- Overtime guard service and annual operating expenses will be necessary to where ever USCIS is doing shifts for surge activities in existing space. Estimated overtime annual operating expenses are based on total square footage currently leased and include cleaning and utility costs.

Personnel Breakout

- Number of new federal staff: 2
- Type: Space Mgmt Specialists
- Grade: GS-12 is the standard grade for the current Space Mgmt Specialists.
- Hiring: Bring on board as soon as possible, before the bulk of the new hires are brought on-board

Dependencies

- Space costs will depend greatly on the number of actual hires at specific locations because some facilities have more capacity than others. Whether or not second shift operations are needed because of constraints will guide costs.

CIS004666

<u>Plan Item</u>: **FBI Fingerprint and Name Check**

<u>Description/Justification</u>

Additional funding is required to reimburse the FBI for USCIS submissions of federal Non-Criminal Applicant Fingerprints and Name Checks in accordance with our Interagency Agreement.

<u>Preliminary Cost Estimate (excluding personnel)</u>

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Fingerprint & Name Checks | 40.4 | 0 | 0 |

<u>Cost Estimate Key Assumptions</u>

- Workload estimates based on USCIS fee group projections update 9/18/07.

- The cost assumptions assume that all FBI – Fingerprint and Name Checks will be collected, run, and billed, within FY 2008, although some of the checks may not be fully completed until FY 2009.

- Assumes additional workload of 1.5M checks, on top of the existing base level assumption of 2.3M.

- The cost of each Fingerprint and Name Check is $27.50.

- Base funding for this activity totals $63M, including $51M in base fee funding and $12M in a fee rule enhancement.

<u>Dependencies</u>

None

CIS004667

Plan Item: **Records Support**

Description/Justification

Due to the surge in applications, the National Records Center and Harrisonburg have seen significant increases in workload.  In order to ensure continued support for Service Centers and field offices, additional funding is necessary.

Preliminary Cost Estimate (excluding personnel)

Costs include pulling records, merging A- & T-files, and shipping.  This is for both Harrisonburg File Storage Facility and the National Records Center.

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Shipping, merging, and pulling records | 0.5 | 0.3 | 0.2 |

Cost Estimate Key Assumptions

Personnel Breakout

NA

Dependencies

NA

9

CIS004668

Plan Item: **Lockbox – Intake and Deposit Operations**

Description/Justification

JPMorgan Chase (JPMC) Bank provides the Financial Management Services, Department of Treasury, and USCIS the mechanisms to electronically capture information from USCIS applications and petitions, deposit any associated fees, forward the electronic information to USCIS data systems and generate receipt and rejection notices to the applicants.  Currently JPMC is processing over 3,000,000 forms a year.

USCIS also contracts for these same services for applications and petitions that are received directly by Service Centers.  In FY 2007, USCIS and the Department of Treasury have agreed to transition all forms and related fees to the JPMC lockbox operations which will allow for centralized management of all USCIS intake. Implementation of this expanded use of the lockbox operations will take up to three years.

Preliminary Cost Estimate (excluding personnel)

Both organizations will share in the cost of the expansion development and operations, with USCIS' share estimated at 20%.  Development costs for the expansion of the lockbox operations to cover all forms are estimated at about $88 million.  USCIS' share of the development costs will be about 20% and there is an additional amount estimated for improvements in USCIS infrastructure to handle electronic workflow.

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Development Costs for Expanded Lockbox | 20.0 | -- | -- |
| Savings from Lockbox operations | | -38.0 | -32.0 |

Cost Estimate Key Assumptions

- USCIS anticipates at least $100 million in savings FY 2009-2010 from current Service Center Operations as a result of lockbox consolidation.

- Development cost estimates came from JPMC's formal proposal to the Department of Treasury.  JPMC operating costs estimates came from actual FY 2006 cost data maintained by the bank.  Operating costs related to applicable contract functions at the Service Centers were derived from an analysis of FY 2006 cost data with appropriate allocation for overhead related requirements.

CIS004669

<u>Plan Item</u>: **Infrastructure Purchases, Set up and Management Services**

<u>Description/Justification</u>

Procurement, set up and management for:
- End User Computing Environment (EUCE) - Desktops and peripherals
- Enterprise Operating Environment (EOE) (e.g., networks, servers, hardware and software licenses, maintenance)
- Telecommunications and Wireless Services
- Lockbox Expansion
- CLAIMS4 (C4) Business Process Optimization at National Benefits Center (NBC)
- Naturalization Certificate Production capability

<u>Preliminary Cost Estimate (excluding personnel)</u>

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| End User Computing Environment (EUCE) - Desktops and peripherals | 7.3 | 2.6 | 0.0 |
| Enterprise Operating Environment (EOE) (e.g., networks, servers, hardware and software licenses, maintenance) | 25.2 | 9.2 | 4.0 |
| Telecommunications and Wireless Services | 5.0 | 1.7 | 1.0 |
| Lockbox Expansion | 2.0 | 1.0 | 0.0 |
| CLAIMS 4 (C4) Business Process Optimization at NBC | 2.1 | 0.6 | 0.0 |
| Naturalization Certificate Production capability | 1.3 | 0.6 | 0.0 |
| **TOTAL:** | **42.9** | **15.7** | **5.0** |

CIS004670

Cost Estimate Key Assumptions

|  | Government Benefits/Assumptions/Issues |
|---|---|
| End User Computing Environment (EUCE) - Desktops and peripherals | Enterprise wide current workstation environment is obsolete. Many workstations incapable of effectively running XP (New Government wide minimum standard)<br><br>Accelerate the retirement of obsolete workstations and procure new workstations for expanded staff<br><br>Standardize image on new Federal Standard (XP or VISTA) |
| Enterprise Operating Environment (EOE) (e.g., networks, servers, hardware and software licenses, cabling, maintenance) | Expansion of capacity to accommodate growth of staff and anticipated demands of other technology enhancements.<br><br>Expansion of email capacity to meet growth of staff and current demands.<br><br>Expansion of intellectual property costs associated with expanded staff.<br><br>Expansion of cabling requirements to support EOE<br><br>Increased Level of Effort –IT Professional Services contract support (current incumbent: BAH)<br><br>Increased Level of Effort – Technology Operations Maintenance Information Support (TOMIS) contract support (current incumbent: GD)<br><br>Increased Level of Effort – IT Infrastructure Upgrade support (current incumbent – EG)<br><br>Increased Level of Effort- Acquisition Support Services –(current incumbent – PMC)<br><br>Increased Level of Effort- Engineering Support Services (current contract Information Technology Engineering Service Support (ITESS),  incumbent – SAIC) |
| Telecommunications and Wireless Services | Expansion of telecommunications for workforce surge<br><br>Expansion of wireless devices, services, maintenance for workforce surge<br><br>Expansion of Technical support for Telecommunications and Wireless Requirements |

CIS004671

|  | Increased Level of Effort –IT Professional Services contract support<br><br>Increased Level of Effort – TOMIS Contract support |
|---|---|
| Lockbox Expansion | Enterprise Service Bus adaptation for intake processing |
| CLAIMS4 (C4) Business Process Optimization at NBC | NBC infrastructure upgrade to address expanded requirements<br><br>NBC infrastructure consistent with revised C4 business processes<br><br>Assumes a Facility modification to improve HVAC – AC specifically requires 20 Tons in server room. |
| Naturalization Certificate Production capability | Eliminate inefficient and processes susceptible to fraud<br><br>Assumes the existing Federal Regulation must be modified to accommodate changes in form factor and look and feel of the certificate.<br><br>Assumes Integrated Card Production System (ICPS) tech refresh will be able to support the new naturalization certificate production once the form is designed.<br><br>Assumes additional 100 printers will be required in Field Offices. This assumes a logical follow on to the ICPS tech refresh future awardee. |

Personnel Breakout: N/A

Dependencies

- Deployment assumptions depend on funding in 2nd QTR 2008.

13

CIS004672

Plan Item: **New Applications and Technical Services**

Description/Justification

Multiple application development efforts exist across USCIS.  The requirement
establishes a nucleus effort from which to build and upgrades the other activities to a
more efficient consistent and repeatable software engineering environment better able to
support the improvements required for the surge.  The environment is consistent with
DHS and Transformation's strategies and vision.

Preliminary Cost Estimate (excluding personnel)

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Rules Engine Development System Qualified Adjudication (SQA) I-765, I-131, I-90 Temporary Protective Status (TPS) Notice Engine | 3.75 | 4.25 | 0.0 |
| Identity Management Mid-Range Optimization | 7.0 | 7.0 | 2.0 |
| **TOTAL:** | **10.75** | **11.25** | **2.0** |

Cost Estimate Key Assumptions

| | Government Benefits/Assumptions/Issues |
|---|---|
| Rules Engine Development SQA I-765, I-131, I-90 TPS Notice Engine | System Qualified Adjudication and other rules based process optimizing efficiency improving technology initiatives require:<br>• a specialized environment for development and maintenance efficiency<br>• specialized staff<br><br>Pilot Rules Engine and 1 Form  – 2008<br><br>Sustain 2 Forms per each outyear<br><br>Assumes 4 additional Government FTEs – 2008 in addition to leveraging existing incumbent and procuring new support contractor staff |
| Identity Management Mid-Range Optimization | Rationalize inconsistencies, overlaps and inefficiencies between BSS, BCS, BBSS, NEESRS and CIS. |

CIS004673

Personnel Breakout **(see "Additional Federal Staffing" for cost estimates)**

> ➢ New federal staff: 4
> ➢ Type of position: GS 1550, Computer Scientist
> ➢ Grade level: GS13. The expectation of the resources is to be GS 11/12/13/14 (FPL) Career ladder positions. This is a contemporary technology with a high value in the current private sector market. Government competitiveness requires senior grade levels.
> ➢ On board: 2008
> ➢ Existing base/rule: Yes. Multiple application development efforts exist across USCIS. The requirement establishes a nucleus effort from which to build and upgrades the other activities to a more efficient consistent and repeatable software engineering environment better able to support the improvements required for the surge. The environment is consistent with DHS and Transformation's strategies and vision.

Dependencies

- Deployment assumptions depend on funding in 2nd QTR 2008 to achieve Initial Operation Capability (IOC) in 4th QTR 2008 (Ref. Rules Engine).

15

CIS004674

Plan Item: **Legacy Applications and Technical Services**

Description/Justification

Resources would be used to upgrade existing legacy applications through business process engineering to establish functional alignment between business processes and the automated systems supporting them. The requirement establishes a nucleus effort from which to build and establishes a more efficient, consistent, and repeatable software engineering environment better able to support the improvements required for the surge.

Preliminary Cost Estimate (excluding personnel)

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| CLAIMS 3 | 4.2 | 4.2 | 4.0 |
| CLAIMS 4 | 1.2 | 0.5 | 0.0 |
| EDMS capability and capacity growth | 7.2 | 1.5 | 1.0 |
| **TOTAL:** | **12.6** | **6.2** | **5.0** |

Cost Estimate Key Assumptions

| | Government Benefits/ Assumptions/Issues |
|---|---|
| CLAIMS 3 | • Create automated interface to lockbox for expanded number of forms. (Assumes 10 forms per fiscal year)<br>• Expand Level of Effort contract support (current incumbent – CSC Corp)<br>• IV&V Support provided via new IV&V contract award (2008). Out-years require additional funding. |
| CLAIMS 4 | • Create automated interface to lockbox.<br>• Expand Level of Effort contract support (current incumbent –CSC Corp)<br>• IV&V Support provided via new IV&V contract award (2008). Out-years require additional funding. |
| EDMS capability and capacity growth | • Integrate lockbox processing with EDMS to enable electronic A-file based adjudication.<br>• Eliminate data entry requirements for lockbox cases.<br>• Expand Level of Effort contract support (current incumbent –CSC Corp)<br>• IV&V Support provided via new IV&V contract award (2008). Out-years require additional funding. |

CIS004675

Personnel Breakout **(see "Additional Federal Staffing" for cost estimates)**

- ➢ New federal staff: 2
- ➢ Type of positions: GS 2210, IT Specialist (SYSANAL)
- ➢ Grade level: GS 14.  The resources are business process engineering specialist in support of project management activities for the Legacy applications. Government competitiveness requires senior grade levels.
- ➢ On Board: 2008
- ➢ Existing base/rule: Yes. Upgrades to existing legacy applications will require business process engineering in order to establish functional alignment between the business processes and the automated systems supporting them. The requirement establishes a nucleus effort from which to build and establishes a more efficient, consistent, and repeatable software engineering environment better able to support the improvements required for the surge.

Dependencies

- Deployment assumptions depend on funding in 2nd QTR 2008.

17

CIS004676

Plan Item: **Enterprise End User Applications Support**

Description/Justification

Application specific to tier two support encompasses Subject Matter Experts (SMEs) used to assist users in the specific detailed usage of applications to process cases. The recommendation to include the Tier 2 support is to enable the new USCIS workforce to be as efficient as possible in the use of the USCIS application to process and adjudicate cases.

Preliminary Cost Estimate (excluding personnel)

| $ M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Application Specific Tier 2 Support | 8.0 | 6.0 | 4.3 |

Cost Estimate Key Assumptions

| | Government Benefits/Assumptions/Issues |
|---|---|
| Application Specific Tier 2 Support | Phase I (2008) assumes:<br><br>Applications support required for key Workload Surge applications only (e.g., C3, C4, CRIS/SMRT, Identify Mgmt Mid, SIMS, Rules Engine, PAS 2.0, NASS, and FDNS)<br><br>21 Government FTEs (expert knowledge of inherently governmental functions is a key requirement thus Government FTEs are required)<br><br>15 new contractor support from existing incumbent contracts within scope.<br><br>Identification and build-out of space (recommend vacant floor space in Seattle field office)<br>• Assumes co-located government and contract support staff<br>• 6x16 coverage of support (consistent with Domestic Operations expanded requirements for workload surge support)<br>• Build-out of facility<br>• Purchase of initial equipment. Assumes logical follow on of IT Infrastructure Upgrade (current incumbent –EG)<br>• Require additional Level of effort for Deployment and installation of Equipment.(Current incumbent – GD) |

CIS004677

| | Phase II – assumes:<br><br>Incremental support growth in outyears potential growth based on evaluation of utilization with legacy applications as well as new and Transformation applications.<br><br>Assumes approximately 20 additional contractor support |
|---|---|

**Personnel Breakout (see "Additional Federal Staffing" for cost estimates)**

- ➢ New federal staff: 21
  The 21 government FTEs is a forecasted level of staffing required predicated on the number of applications and an expected 6X16 operational support schedule for 10 applications. The level of Service desk planning would require 3 shifts with coverage for the 6X16 support.  The estimates provided for both the Government and contractor support reflect approximately 50/50 mixture of contractor staff and federal employees.   OIT estimates having approximately 2 application support staff per 1,000 adjudicators available during the service hours.
- ➢ Types of positions: GS 2210, IT Specialist (CUSTSPT)
- ➢ Grade level: GS14, advanced expert knowledge of USCIS business processes combined with advanced expert technology skills.
- ➢ On Board: 2008
- ➢ Existing base/rule: No.  The requirement is a current deficiency in the USCIS IT applications support model that will be severely exacerbated with the increased workload surge.  Large numbers of new government staff that are unfamiliar with complex core mission support applications will be hindered in their effectiveness and efficiency without this support.

Dependencies

- • Availability of qualified personnel to staff applications support desk. (Assumes 50% new hires experienced with applications and 50% senior adjudicator staff).

- • Deployment assumptions depend on funding in 2nd QTR 2008 to achieve Initial Operation Capability (IOC) in 1st QTR 2009.

CIS004678

Plan Item: **Security Remediation and Technical Services**

Description/Justification
- Establishment of New USCIS Accounts
- Creation of C&A packages for new applications

Preliminary Cost Estimate (excluding personnel)

| $M | FY 2008 | FY 2009 | FY 2010 |
|---|---|---|---|
| Establishment of New USCIS Accounts | 0.65 | 0 | 0 |
| Creation of C&A packages for new applications | 2.0 | 2.0 | 2.0 |
| **TOTAL:** | **2.65** | **2.0** | **0.0** |

Cost Estimate Key Assumptions

| | Government Benefits/Assumptions/Issues |
|---|---|
| Establishment of New USCIS Accounts | PICS and Active Directory<br><br>Assumes additional 4 Government FTE. Access Controls Supervision and oversight is considered inherently governmental function. |
| Creation of C&A packages for new applications | Rules Engine Development<br>  o   SQA I-765, I-131, I-90<br>  o   TPS<br>  o   Notice Engine<br><br>Identity Management  Mid-Range Optimization<br><br>Assumes leveraging IV&V, TOMIS, IT Legacy, Sytel, CSC Corp., ITESS, New ICPS Tech Refresh awardee and PMC contracts and increasing Level of effort as required. |

Personnel Breakout

➢ New federal staff: 4 (2 located at California Service Center and 2 at USCIS Eastern Region)
➢ Type of positions: GS 2210, IT Specialist (SECURITY)
➢ Grade level:  GS-13 – the supervision and oversight for account creation and management is an inherently governmental function that must be performed to provision new accounts for the surge workforce.
➢ Filled:  2008
➢ Existing base/rule: Yes. The increase in account activity created by the surge workforce requires a commensurate increase in federal government staffing to meet these requirements.

CIS004679

<u>Dependencies</u>

- Deployment assumptions depend on funding in 2nd QTR 2008.

CIS004680

**Federal Bureau of Investigation**
Records Management Division

National Name Check Program
Business Plan
for
United States Citizenship and Immigration Services

March 2008

CIS006307

# EXECUTIVE SUMMARY

This National Name Check Program (NNCP) Business Plan applies to name check services between the Federal Bureau of Investigation (FBI) and the United States Citizenship and Immigration Services (USCIS) and outlines a strategy for eliminating USCIS name check requests pending over 30 days, in addition to obtaining a steady state processing rate whereby most all USCIS name checks are completed within 30 days. The strategy as outlined reaches these goals by June 2009.

Because the steps required to meet these goals require commitment from both the FBI and USCIS, the FBI's Records Management Division (RMD), NNCP, is seeking Executive Management concurrence with the plan from the FBI and USCIS.

By signature, the undersigned convey that they have reviewed this Business Plan, are in agreement with this plan as a way forward to address the pending levels of USCIS name checks and are committed to provide the support as outlined herein to achieve the stated goals.


Timothy P. Murphy
Associate Deputy Director
Federal Bureau of Investigation


Jonathan R. Scharfen
Deputy Director
U.S. Citizenship and Immigration Services


John S. Pistole
Deputy Director
Federal Bureau of Investigation

CIS006308

## USCIS Name Checks Pending with the FBI

The Federal Bureau of Investigation's (FBI's) National Name Check Program (NNCP) is part of the Records Management Division (RMD). With a customer base of over 75 agencies, the NNCP researches and disseminates, in accordance with applicable laws, orders, rules and policy, information contained in the FBI's files in response to name check requests. In Fiscal Year (FY) 2007, the NNCP received over four million name check requests and also processed over four million name check requests (this number includes the residual work from the previous fiscal years). NNCP's largest customer is USCIS. In FY 2007, incoming name check work attributed to USCIS was 52% of all name check requests received (over 2.1 million), and 50% of all name checks completed (over 2.0 million). At the end of FY 2007, the NNCP had over 402,000 pending USCIS name checks.

## CURRENT CIRCUMSTANCES

### USCIS Name Check Data / Statistics

For FY 2008, as of March 5, 2008, the FBI has received 792,397 USCIS name check requests; completed 849,580 USCIS name check requests and is processing 345,635 USCIS name check requests. As compared to the same time in FY 2007, this level represents a 9.5% increase in incoming USCIS name check requests; an increase in completed USCIS name checks requests of 23%; and a decrease of pending USCIS name check requests of 13.4%.

The NNCP has its genesis as a paper-based process and still must rely partially on manual processing of name check requests. In the last few months, NNCP has significantly increased its production capacity in the most time intensive manual phases of the name check process through the acquisition and training of contract staff. This trend will continue to be fueled by the procurement of additional contractors. Increased production capacity combined with process improvements will continue to reduce pending levels until target goals are achieved.

CIS006309

The Chart below indicates the trends for USCIS over the past six FYs.



The chart shows an overall yearly increase of incoming USCIS name checks per FY since 9/11 and highlights the USCIS rerun where USCIS resubmitted 2.7 million name check requests over a five-week period from December 2002 – January 2003.

**Incoming Name Checks**

The table below shows the level of incoming name checks received in FY 2005 – FY 2007 and the amount forecasted for FY 2008 and FY 2009. The forecasted volume determines the staffing level described in the business plan.

| Fiscal Year | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 |
|---|---|---|---|---|---|
| USCIS | 1,514,076 | 1,633,349 | 2,113,672 | 1,899,990 | 1,558,012 |

**Personnel**

As of March 5, 2008, there are 251 employees and contractors working in support of processing USCIS name checks. This includes 40 FBI personnel in addition to 211 contractors jointly funded by the FBI and USCIS. Additionally, 10 more contractors are scheduled to come onboard by the end of March 2008, with 69 scheduled for June 2008 (of which 34 are supported by funding recently received by USCIS, with the remaining 35 to be funded under the execution of this Business Plan).

2

CIS006310

The time required to train a contractor to a full production level is approximately four months. Of the 211 contractors onboard as of March 5, 2008, 110 arrived onboard either during or before November 2007, and are working at full production. The remaining 101 contractors on board in February – March 2008 are not currently at full production capacity, and should reach full productivity by June – July 2008. The remaining 69 contractors scheduled for arrival in June 2008 should reach full productivity by October 2008.

Additionally, increased user fees have allowed the NNCP to increase the number of overall FBI staffing positions in FY 2008. Of the additional personnel the NNCP plans to hire, it is estimated that an increase of approximately 40 FBI personnel will be dedicated to processing USCIS name checks.

Lastly, the FBI is procuring additional contract expertise in the areas of Business Statistics/Risk Analysis, Financial Management, Information Technology (IT), and Production/Throughput. The addition of these skillsets will immediately, greatly enhance the FBI's ability to analyze data and reports. This will also allow the FBI to quickly develop and update business forecast models, assist in the planning and development of the financial aspect of the NNCP, allow greater concentration on business automation and execution of new IT systems, and enable intense focus on evaluating and implementing further ways to increase throughput. The FBI plans to use these business experts for one year with two option years. The long term goal is to hire or develop this expertise in-house so this contract support will no longer be required.

## PROJECT GOALS

### Development of Specialized Business Modeling Tools

In order to improve the NNCP's ability to forecast performance and timelines, the FBI funded the development of a business forecasting model, upon which the forecasts below are based. Because name checks vary in their complexity and time to process, forecasting production and estimating time to achieve goals can be a complex exercise. The procured model gives the FBI a solid, foundational baseline from which to make predictions. This model will not only increase the FBI's ability to more accurately forecast name check program performance, but also allows it to better define resource requirements and production rates required to meet any particular benchmark.

CIS006311

**Model Predictions**

The NNCP forecast establishes a number of milestones based on the age of the pending work. The FBI defines project milestones as follows based on additional staffing:



**Final Goal: Maintain USCIS name check processing at 98% within 30 days or less and 100% of all USCIS name checks processed in 90 days or less.**

The Model and projections are based on current USCIS operational priorities as recently conveyed to the FBI. The USCIS priorities that are assumed in the model are as follows:

- Because of the USCIS's priority to focus on Naturalization pending name checks that were submitted to the FBI prior to May 2006, projections are based on focusing 80% of the available FBI personnel/contractor resources (not including resources dedicated to processing expedites) processing these cases, which by the FBI's count is approximately 29,800 name checks.
- Once these pre-May 2006 Naturalization Name Checks are completed, the personnel resources allocated to that project will be redirected to focus on the oldest pending name checks regardless of the case type.

**Review of Target Goals**

Progress toward meeting the projected goals will be reviewed on a regular basis. As mentioned in the next section, first-line supervisors monitor metrics performance on a daily basis, with weekly reports to second-line supervisors, the Assistant Section Chief, and the Section Chief. Any operational adjustments required to meet projected goals will be conveyed to FBI and USCIS Executive Management. Monthly FBI and USCIS meetings will be held to review progress toward projected goals and any operational adjustments. Additionally, USCIS will be provided detailed reports on a biweekly basis summarizing Fiscal Year to date statistics regarding USCIS name checks.

CIS006312

## STEPS TO ACHIEVE PROJECT GOALS

### Improved Metrics Implementation

In order to maintain expected productivity and reach forecasted benchmarks, new employee performance-based metrics were developed to coincide with the production needed. The metrics were designed to be achievable while pushing employee performance with an incentive to perform at a higher level. Productivity rates to reach forecasted benchmarks according to the model average 0.77 name checks per hour per employee in the most difficult analytical phase of the name check process. The current contractual arrangements support this production rate with each contractor being required to process at a rate of 140 name checks per month. In addition to measuring average hourly production, metrics for oldest in queue, average processing time, and error rate will be examined. Constant review, feedback to the contractor or employee, and problem solving will be daily activities for first- and second-line supervisors.

Individual employees and supervisors are held accountable for performing in accordance with applicable metrics. First-line supervisors will monitor daily metrics to identify problem areas and provide employee/contractor feedback. Fluctuations in daily metrics may be substantial due to variances in the degree of difficulty in processing name checks. However, longer term 30-day averages will provide a reliable indication of an employee's production capability. First-line supervisors are held accountable for their individual team's performance, and will report weekly metrics to second-line supervisors at the Unit level who will review the report and make any additional inquiries or take corrective action as required to improve production.

Second-line supervisors at the Unit level are held accountable for Unit metric performance, and, after addressing any issues, will provide a weekly report to the NNCPS Assistant Section Chief, who is in charge of name check operations. The second-line supervisor's weekly report will provide production rates, relative change data, and supervisory comments. This information is important to demonstrate an employee's/contractor's improving or diminishing performance along with the first-line supervisor's insight. The NNCP Assistant Section Chief will review the reports with the second-line supervisors and provide direction as necessary to improve production.

The NNCP Assistant Section Chief is held accountable for NNCP Section metric performance regarding USCIS name check work, and will provide, at a minimum, a weekly report to the NNCP Section Chief containing a metric summary report, and a narrative analysis of the metrics, along with recommendations for improvement.

### Priority Workflow Management

The NNCP implemented new work queue management procedures will allow greater monitoring of work allocation relative to resources. This permits the prioritization of selected target areas for resource allocation, ensuring that the oldest cases are worked

CIS006313

first by contract staff. These targets are designated as "buckets," a pool of pending name checks from which analysts are required to draw when being assigned name checks to process.

Since the implementation of the work queues in November 2007, the number of USCIS name checks pending over four years has dropped from approximately 12,000 to under 3,000. By utilizing these tools, analysts are assigned the oldest cases first, thereby ensuring that the oldest cases are eliminated first. Projected name check reduction progress is annotated in the charts located in the Appendices of this Business Plan.

### File Review Workflow Modification

During FY 2008, NNCP has substantially changed the name check process. In FY 2007, incoming name checks progressed from the Batch phase where the names were electronically checked against the FBI's Universal Index, to the Name Search phase where the residual name checks were manually checked against electronically available information. From there, the names proceeded to the File Review phase, where paper records were located for a cursory manual review and scanning. In the final Dissemination phase, FBI files were analyzed with final results going back to the customer. Each phase could result in the elimination of pending name checks[1] with the results going back to the customer and the remaining name checks continuing to the next phase. For the 66% of the records accessed for name check purposes that are in electronic form, the File Review phase was simply a paper file chokepoint that increased queue times without adding value to the name check process.

Starting mid-January 2008, NNCP modified the process to move name checks from the Name Search phase directly to the Dissemination phase and designated the Dissemination phase as the point where paper records are reviewed. Currently, analysts in Dissemination request File Review/Scanning services as required in order to process name checks needing information contained in paper files. This workflow modification allows review of exactly the same paper files as before the change while providing a moderate increase in productivity levels and reducing queue times.

### Additional Name Check SubProcess Improvements

Name check analysts can categorize the name checks they process into two groups: those requiring external action, and those not requiring external action. Name checks requiring an external action – *e.g.*, files from the field or liaison with other divisions – require more effort and, therefore, have a lower production rate. The FBI has established special teams

---

[1] All name checks are processed against the FBI's Universal Index to identify matches to possible information in FBI files. Most checks do not result in a match, so the name check is completed at that point. Each name check receiving a "hit" on one or more possible files is then refined and evaluated in a multistage process. Each stage may resolve all possible file matches for a given name check, so the name check request becomes complete at that stage.

CIS006314

to address these name check subprocesses, so analysts can concentrate their time on higher production rate work – those not requiring external action. External action falls into two main categories, those requiring retrieval of files from other divisions, and those requiring liaison with other divisions. Special teams for each subprocess will allow analysts to concentrate on work that is more productive.



*New File Review Process and Special Teams Supporting Name Check Subprocesses*

### FBI IT Support

Because the FBI's primary name check data resides on the FBI's mainframe computer database, access to ad hoc reporting is limited and time consuming. To assist in the reaching of project goals, the FBI IT Operations Division (ITOD) will work to identify an alternative methodology resulting in greater access to the data allowing for the expedited running of reports and results required for projected name check filter analysis. Name check representatives will work with ITOD staff in providing specific IT reporting requirements needed.

### LABOR CAPACITY BOUNDARIES

The program enhancements and initiatives outlined in this business plan will quickly and substantially improve NNCP production capacity and efficiency. However, there are practical labor capacity boundaries that must be considered when increasing production capacity.

CIS006315

**Ramp-up Time**

The time to complete financial transfers, process contracting actions, hire cleared contract staff, and put workers through the four-month training program are the primary issues impacting ramp-up time for contractor staff. As delineated in this business plan, the last group of contractors is estimated to arrive in June 2008. Given the necessary four-month training time, these resources will not reach full productivity until October 2008, approximately halfway through the project.

**Technical Supervision of Contract Staff**

The business plan is highly dependent upon contract staff. However, these new resources are not autonomous and require experienced FBI staff to train, evaluate, guide, and provide technical supervision and approvals. The plan establishes an FBI reviewer to contractor ratio of about 1 to 15. Several of the supervisory activities are inherently governmental, especially where the release of information to other agencies is concerned. Expanding the contract staff beyond the indicated levels, while possible, will place an additional burden on the already overleveraged FBI staff.

**Infrastructure and Supporting Service Limitations**

The FBI is using two RMD sites for this project: the Interim Central Records Complex and an FBI off-site location in Washington, DC. The spaces are being fully leveraged, with multiple shifts already initiated. The FBI must support the increased staffing levels with various support services, *i.e.*, computers, networks, supplies, security, scanning, file services, etc. RMD's ability to provide the supporting infrastructure and services will limit future contractor staffing increases.

**Contractor Overtime Support**

The FBI will also focus on utilizing contractor staff on an overtime basis. Out of the three contracting companies currently utilized under the blanket purchase agreement, only one company allows for contractor overtime. The FBI is currently negotiating with this company regarding overtime rates that will directly affect both the cost of contractor overtime and the overall reduction of pending USCIS name checks.

CIS006316

## FINANCIAL REQUIREMENTS

To date, the combination of USCIS user fees, capital investment from USCIS, and capital investment from the FBI has funded over 250 contractors and will allow an increased level of FBI full-time employees supporting USCIS to over 80.

To accomplish the milestones outlined in this business plan, an additional capital investment of $15 million is needed. Of this amount, $2 million is required as soon as possible to partially fund an additional 35 contractors, and the remaining $13 million is needed by July 1, 2008. The $15 million will support the following initiatives:

| Total Investment from USCIS | $15,000,000.00 |
|---|---|
| Contractor Establishment of Production Metrics | $71,000.00 |
| Contractor Production Throughput Experts – 1 Year | $1,251,120.00 |
| Additional 35 Contractors – 1 Year | $4,095,000.00 |
| Exercise Option Year 1 on Contract Effort 2 – 72 contractors for 1 Year | $9,000,000.00 |
| Additional Overtime* | $582,880.00 |

* The Additional Overtime is for use by Name Check employees in addition to contractor overtime.

Any delay or lack of funding as described above will significantly impact NNCP's ability to meet the end goal and will require a reassessment of projections. To that end, the FBI Finance Division, in concert with RMD, will need to work closely with the USCIS's Office of the Chief Financial Officer to insure that fees regarding the processing of USCIS name check requests are expeditiously billed and collected. The expeditious facilitation and handling of all capital investment from USCIS are also required to make funding readily available for expenditure as soon as possible for NNCP operational use.

CIS006317

# APPENDICES

CIS006318

### A. Name Check Projected Production Charts

The following charts represent performance estimates and achievements of project milestones.



The charts show the total number of name checks pending for the parameters of each milestone. Estimates are predicated on current incoming volume projections, funding, and contractor arrival times. The project will continue until the final milestone is reached in **June of 2009**.

The term "bucket" is used to designate a restricted pool of pending USCIS name checks from which analysts must draw when obtaining new work, *e.g.,* name checks submitted in 2002 or 2003. This allows a focused management prioritization of work queues, insuring that the oldest name checks are worked first. An analyst can only move to another bucket containing newer name checks when all name checks in the older bucket to which the analyst is assigned are either completed or all assigned.

The only general exception to this rule is that expedites are worked as requested by USCIS, regardless of the age of the expedited name check request.

CIS006319



- Target for processing all the 29,800 naturalization name checks older than May 1, 2006 is May 2008.



- Target for processing all USCIS name checks pending over four years is March 2008.

CIS006320



- Target for processing all USCIS name checks pending over three years is May 2008.



- Target for processing all USCIS name checks pending over two years is July 2008.

CIS006321



- Target for processing all USCIS name checks pending over one year is November 2008.



- Target for processing all name checks over 180 days is February 2009.

CIS006322



- Target for processing all name checks over 90 days is May 2009.



- Target for processing 98% of name checks over 30 days is June 2009.
- **From this point going forward, 98% of all USCIS name checks will be processed within 30 days. The remaining 2% represent the most difficult name checks and require additional time to adequately complete. Notwithstanding, this remaining 2% will be processed within 90 days or less of receipt.**

CIS006323

# B. NNCP Funding Plan for Contractors

| | FY 07 QTR 4 | | | | QTR 1 FY 08 | | | QTR 2 FY 08 | | | QTR 3 FY 08 | | | QTR 4 FY 08 | | | QTR 1 FY 09 | | | QTR 2 FY 09 | | | QTR 3 FY 09 | | | QTR 4 FY 09 | | | QTR 1 FY 10 | | | QTR 2 FY 10 | | | QTR 3 FY 10 | | | QTR 4 FY 10 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
| **FBI Employees** | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 54 | 54 | 59 | 59 | 59 | 59 | 59 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| **Contractors Funded by User Fees** (FY 2008 User Fee / FY 2009 User Fee Funding / FY 2010 User Fee Funding) | | | | | | | | | | 80 | 111 | 111 | 111 | 111 | 111 | 111 | 111 | 111 | 111 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| **Contractors Funded by Capital Investments** (FBI Funded) | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | | | | | | | | | | | | | | | | | | |
| ($3mil FBI Funded and $6mil USCIS Funding) | | | | | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | | | | | | | | | | | | | | | | |
| (USCIS Funding) | | | | | | | | | | | | | | | | | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | | | | | | | | | | | | | | | |
| **Total On-board** | 68 | 68 | 68 | 68 | 140 | 140 | 140 | 220 | 275 | 275 | 349 | 349 | 349 | 349 | 349 | 349 | 359 | 359 | 359 | 299 | 299 | 299 | 230 | 192 | 192 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | | | |

Capital Investment funding notes:
- USCIS Funding - $4,028,000
- USCIS Funding - $8,000,000
- USCIS Funding - $8,073,000

**Note:** Extension of existing contracts funded by capital investments are dependent on level of USCIS funding received. The FBI employee counts above do not include supervisory personnel. In June 2009, 120 FTEs (not including supervisory personnel) will be needed to process the projected level of incoming name checks.

**Legend**

| | |
|---|---|
| FY 07 | |
| QTR 4 | |
| Funded | |
| To be Funded | |

1

CIS006324

# U.S Department of Homeland Security
# U.S. Citizenship and Immigration Services



**Background Check Enhancements Spend Plan**
**Submitted Pursuant to Public Law 110-28**

**December 2007**

CIS_Aytes.e 00704

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY**
**U.S. Citizenship and Immigration Services**
**Background Check Enhancements Spend Plan**
**Submitted Pursuant to Public Law 110-28**

## Legislative Requirement

The Fiscal Year 2007 U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, (Public Law 110-28) provided $8 million for USCIS to address backlogs of security checks associated with pending applications and petitions. As a condition of this appropriation, Congress stipulated:

> "That none of the funds made available under this heading shall be available for obligation until the Secretary of Homeland Security, in consultation with the United States Attorney General, submits to the Committees on Appropriations of the Senate and the House of Representatives a plan to eliminate the backlog of security checks that establishes information sharing protocols to ensure United States Citizenship and Immigration Services has the information it needs to carry out its mission."

## Background

U.S. Citizenship and Immigration Services (USCIS) conducts background checks on all applicants, petitioners, and beneficiaries seeking immigration benefits. This is done both to enhance national security and to ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens. It does this by conducting appropriate security screening to identify people who seek immigration benefits improperly or fraudulently. USCIS suspends the adjudication of primary applications until background check-related hits and other concerns are resolved.

> *Treasury Enforcement Communication System (TECS) / Interagency Border Inspection System (IBIS) Checks* — USCIS conducts name checks on all applicants, petitioners, and beneficiaries against TECS/IBIS. Through TECS/IBIS, USCIS is able to access records from a number of agencies that may provide information that the individual is ineligible for the immigration benefit sought. Examples of information include access to the Terrorist Screening Center's (TSC) Terrorist Screening Database (TSDB) records, the Federal Bureau of Investigations (FBI) wanted persons files ('hot files'), as well as records from Customs and Border Protection and Immigration and Customs Enforcement of immigration violators. USCIS conducts approximately 33 million TECS name checks per year.

> *FBI Fingerprint Check* — USCIS conducts FBI fingerprint checks on applicants for many types of immigration benefit applications. The FBI fingerprint check provides information relating to an applicant's criminal record within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit.

2

*DHS Fingerprint Check* — The fingerprints transmitted to the FBI are also enrolled in DHS IDENT, and benefit from the ongoing efforts from DHS and FBI to improve interoperability of DHS IDENT and FBI's IAFIS. Examples of information provided as a result include associations with terrorism, criminal history, and immigration violations. In addition, individuals enrolled in IDENT are "recurrently vetted." In other words, as new derogatory information becomes available, such as a new warrant for arrest made available to DHS through IDENT/IAFIS interoperability, USCIS is notified of this information – without having to resubmit prints.

*FBI Name Checks* — USCIS conducts FBI name checks on applicants seeking asylum, permanent residence, and naturalization. FBI records are searched to determine whether an individual is the subject of or, in select circumstances, referenced in the FBI's case system of record in connection with an investigation of criminal, security, or other activities that might render him or her ineligible for immigration benefits. The FBI's primary role is to provide USCIS with factual information to enable USCIS to adjudicate the application appropriately. On average, USCIS requests 1.3-1.6 million name checks per year. However, in FY 2007, this number increased to 2.1 million. Historically, approximately 68% of the name check requests are processed within 48 hours, and an additional 22% within 30-60 days. At present, a significant number of name check requests have been pending over six months, and thousands of FBI name checks have been pending multiple years. Both USCIS and the FBI find the current situation unacceptable.

## Initiatives to Date

USCIS and the FBI have recently concluded negotiations on a Memorandum of Agreement focusing name search criteria on those FBI subject files that both agencies believe offer meaningful information pertinent to the adjudications process. The revised agreement will ensure the more timely resolution of pending and future name check requests submitted by USCIS.

In addition, the FBI and USCIS have worked together and implemented a number of initiatives to improve the process for sharing the information necessary to render immigration benefit decisions in cases involving potential national security concerns. Initiatives under way include:

- *Memorandum of Understanding (MOU)*. An MOU has been signed between the Department of Justice and USCIS permitting USCIS to place personnel at the Terrorist Screening Center (TSC) to support USCIS security checks. The USCIS staff at TSC has been granted access to information contained in the Automated Case Support (ACS) system and may view investigative files to determine whether USCIS should seek to deny the benefit. The access to ACS, however, is limited to reviewing information related to known or suspected terrorist hits, which only comprise approximately 20% of the cases for which USCIS has security concerns.

CIS_Aytes.e 00706

- *Tear-line Product.* FBI and USCIS have agreed to a "tear-line" product – a method and product for sharing pertinent investigative information for use in an adjudicative decision.

- *Detailing Staff.* USCIS has detailed experienced personnel to the FBI Name Check Unit to assist in improving the quality of the Letterhead Memoranda (LHM), which summarizes the name check results, to ensure that the LHM contains the derogatory or pertinent information that is relevant to an adjudicative decision.

- *Background Check System (BCS).* USCIS has initiated the development of a new system, the Background Check System, which promises to provide increased efficiencies to the background check process. BCS will track the activity of all background checks from a centralized repository. USCIS plans to deploy BCS during FY 2008.

- *Fee Change to Support FBI Processing.* Finally, USCIS implemented a fee change on July 30, 2007, which incorporates increased funding for the FBI to provide timely name check results for new immigration applications.

**Resource Plan**

| Activity | Total Funding |
|---|---|
| FBI backlog staffing | $14,500,000 |
| Travel & overtime of detailed staff | $1,000,000 |
| **Total Spend Plan:** | **$15,500,000** |

Currently, USCIS is planning a total resource level of $15.5 million to address the backlog of FBI name checks. Of this amount, $7.5 million was funded from the Immigration Examinations Fee Account through an FY 2007 reprogramming notification to increase USCIS' spending authority. The remaining $8 million will come from funds appropriated in Public Law 110-28, to remain available until September 30, 2008. Funding will be used for the following purposes:

- $14,500,000, including the entire $8 million of appropriated funding, will be used for FBI staffing to address the backlog. To date, $6 million (from Fee Resources) has been provided to the FBI, which has already begun to bring on additional staff. The remaining $8.5 million will be provided to the FBI to support additional contract staffing at the FBI based on performance against backlog elimination metrics agreed to by both agencies. USCIS and the FBI have established monthly meetings to review funding and performance progress towards this goal.

- $1,000,000 will be used to fund travel and overtime costs associated with detailing field staff to USCIS headquarters or to FBI facilities to address the large workload associated with reviewing cases with potential national security concerns.

CIS_Aytes.e 00707

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10   DANIEL TARTAKOVSKY, MOHAMMAD          Case No.:  07cv1667-BEN (CAB)
     HASHIM NASEEM, ZAHRA JAMSHIDI,
11   MEHDI HORMOZAN,                        ORDER REMANDING
                                            ADJUDICATION OF
12                            Plaintiffs,   NATURALIZATION
                                            APPLICATIONS
         vs.
13                                          **[Dkt. No. 9]**

14   PAUL M. PIERRE, District Director, U.S.
     Department of Homeland Security, Bureau of
15   Citizenship and Immigration Services, San
     Diego District, et al.
16
                             Defendants.
17

18                        **I.  INTRODUCTION**

19           Plaintiffs filed claims under 8 U.S.C. § 1447(b) requesting this Court  adjudicate and grant

20   Plaintiffs' naturalization applications.  Plaintiffs additionally included claims for violations of the

21   Administrative Procedures Act ("APA") and Due Process.  Defendants move to remand or dismiss

22   all claims.  Plaintiffs oppose the motion.  For the reasons that follow, Plaintiffs' claims for

23   adjudication of their naturalization applications are **REMANDED** and Plaintiffs' additional claims

24   are **DISMISSED** without prejudice.

25                        **II.  BACKGROUND**

26           Plaintiffs, Daniel Tartakovsky, native of Russia, Mohammad Hashim Naseem, native of

27   Iraq, Zahra Jamshidi, native of Iran, and Mehdi Hormozan, native of Iran ("Plaintiffs"), are

28   permanent residents of the United States awaiting naturalization to United States citizenship.

1    Plaintiffs claim Defendants, Paul M. Pierre, District Director, U.S. Department of Homeland

2    Security, Bureau of Citizenship and Immigration Services, San Diego District, Emilo T. Gonzalez,

3    Director, U.S. Department of Homeland Security, Bureau of Citizenship and Immigration Services

4    ("USCIS"), Micheal Chertoff, Secretary of Homeland Security, Robert S. Mueller III, Director of

5    the Federal Bureau of Investigation ("FBI"), Michael Mukasey, Attorney General of the United

6    States (collectively "Defendants") have failed to timely adjudicate Plaintiffs' naturalization

7    applications.  Each Plaintiff has filed an application for naturalization and each received an initial

8    interview from USCIS.  Each Plaintiff's interview occurred before completion of a full criminal

9    background check required under 8 C.F.R. § 335.2 which includes a "FBI name check."  Each

10   Plaintiff has claimed some delay in processing their applications to adjudication.

11        On August 22, 2007, Plaintiffs filed this action pursuant to 8 U.S.C. § 1447(b).  Plaintiffs

12   seek to be naturalized by this Court and allege violations of the APA and Due Process.  On

13   October 29, 2007, Defendants filed a motion to remand or dismiss Plaintiffs' claims.

**III.  DISCUSSION**

**A.        Determination of Naturalization Under § 1447(b)**

**1.        Subject Matter Jurisdiction**

17        This Court has subject matter jurisdiction of Plaintiffs' claim for naturalization under 8

18   U.S.C. § 1447(b).  A lawful permanent resident alien is only eligible for naturalization as a U.S.

19   citizen if he or she: (1) satisfies a five-year statutory residency requirement; (2) has resided

20   continuously in the United States from the date of his or her application to the time of his or her

21   admission as a citizen; and (3) is of good moral character.  8 U.S.C § 1427.  If USCIS fails to

22   make a determination on an applicant's naturalization within 120 days of that applicant's

23   "examination," the applicant may seek a hearing on the matter from the United States District

24   Court in the district in which the applicant resides.  8 U.S.C. 1447(b).  The statute specifically

25   grants the District Court jurisdiction to "determine the matter or remand the matter, with

26   appropriate instructions" to USCIS for determination.  *Id.*

27        Plaintiffs' Complaint alleges that each Plaintiff's examination was completed more than

28   120 days ago and none of the Plaintiffs' applications for naturalization have been granted or

denied.  Under Ninth Circuit precedent, the 120-day period under § 1447(b) begins to run with the

initial interview of the applicant.  *U.S. v. Hovsepian*, 359 F.3d 1144, 1161 (9th Cir. 2004).

Plaintiff Tartakovsky's examination was conducted on June 4, 2003.  Plaintiff Naseem's

examination was conducted on March 15, 2005.  Plaintiff Jamshidi's examination was conducted

on February 4, 2004.  Plaintiff Hormozan's examination was conducted on September 4, 2003.

The passage of 120 days since the "date on which the examination [was] conducted" allows

Plaintiffs to apply to this Court for a hearing on the matter, giving this Court jurisdiction over

Plaintiffs' claims for adjudication of naturalization.

### 2. Determination of Application for Naturalization - § 1447(b)

USCIS is responsible for investigating applicants for naturalization.  8 U.S.C. § 1446.  The

naturalization decision rests in part on the results of an investigation by the FBI.  In 1997,

Congress prohibited USCIS from using any appropriation to adjudicate an application for

naturalization until USCIS received confirmation of completion of an FBI investigation of the

applicant.  Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies

Appropriations Act, Pub. L. No. 105-119, 111 Stat. 2448-49 (1997).

In addition to this restriction, under 8 C.F.R. § 335.2, USCIS cannot adjudicate an

applicant's application until the agency receives confirmation from the FBI that a full criminal

background check has been completed.  The in-person initial examination of the applicant required

for naturalization should only occur after USCIS receives confirmation of completion of the full

criminal background check on the applicant.  8 C.F.R. § 335.2.  This limitation precludes

naturalization by USCIS prior to completion of the FBI's full criminal background check.  In the

case of the four named Plaintiffs, USCIS conducted the applicant's interviews before completion

of the FBI background checks.

### 3. District Court's Options

In filing this action, Plaintiffs have invoked the exclusive jurisdiction of this Court for

adjudication of their naturalization.  *Hovsepian*, 359 F.3d at 1164 (finding the courts have

exclusive jurisdiction over naturalization applications properly before the court under § 1447(b)).

USCIS may not make a decision on Plaintiffs' naturalization applications while this Court retains

1   jurisdiction.  This is the case, even if the FBI has completed the name checks on all Plaintiffs, as

2   Defendants have asserted in their motion.  This Court has two options.  The Court may conduct a

3   hearing and adjudicate Plaintiffs' naturalization applications on its own, or the Court may remand

4   the matter to USCIS with instructions, thus returning jurisdiction to USCIS.  8 U.S.C. § 1447(b);

5   *Hovsepian*, 359 F.3d at 1164.

6                           **4.      Remanding to USCIS**

7          This Court remands adjudication of Plaintiffs' naturalization to USCIS with instructions.

8   The requirements within statutes and regulations to complete investigation and a full criminal

9   background check before decision on an application for naturalization evidences the importance of

10  this check to any proper determination of naturalization.  This Court declines to make a

11  determination of naturalization absent completion of the full criminal background check and

12  required investigation.

13         Even with investigation and a background check completed, USCIS is in a much better

14  position to interpret those results for determination of naturalization.  *See Khelifa v. Chertoff*, 843-

15  44 (E.D. Mich. 2006) (finding the USCIS has the expertise and experience to make an appropriate

16  assessment).  Generally, Courts should remand cases for agency determination of matters that

17  "statutes place primarily in agency hands."  *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002).

18  While this Court may be empowered to make this decision under § 1447(b), it is a decision that

19  generally falls to USCIS.

20         USCIS is in a better position because it brings its expertise to the matter.  *Ventura,* 537

21  U.S. at 16 (discussing how an "agency can bring its expertise to bear upon the matter" and its role

22  evaluating the evidence).  The statutory and regulatory schemes established to process citizenship

23  applications evidence the deference accorded the executive branch in immigration matters.  8

24  U.S.C. § 1446; 8 U.S.C. § 1421.  USCIS has greater expertise than this Court in identifying

25  problems in the background checks and resolving any problems identified.

26         There may be circumstances which justify this Court making a naturalization determination

27  under § 1447(b).  For instance, if the agency's conduct becomes extreme or abusive.  But here, the

28  Complaint alleges USCIS has failed to grant or deny Plaintiffs' applications for naturalization due

to delays in processing background checks.  This Court's jurisdiction is invoked under § 1447(b)

because USCIS conducted the Plaintiffs' initial interviews before completion of the full criminal

background check, resulting in passage of 120 days while awaiting completion of those checks.  8

C.F.R. 335.2(b).  This conduct does not raise serious concerns about the agency's ability to

complete the investigation process or grant or deny Plaintiffs' applications, nor does it suggest the

agency is acting in an extreme or abusive manner.

Under 8 U.S.C. § 1447(b), if the adjudication decision is remanded to USCIS, the order is

made with "appropriate instructions."  The Court will not impose a definitive time line for the

completion of a full criminal background check or a decision on Plaintiffs' applications for

naturalization.  While the Court notes that a significant amount of time has passed in processing

Plaintiffs' applications, this appears to be a result of USCIS awaiting completion of the full

criminal background checks, a required part of the naturalization determination.

USCIS is in the best position to determine when an application or background check

warrants expedited treatment to achieve completion on a particular date.  Ordering USCIS to

complete background checks or make decisions by a date certain does not take into account

practical considerations.  This Court is not in a position to evaluate these four applications in

relation to others and deem a particular Plaintiff a priority in the completion of background checks

over other needed background checks.

The Court is not insensitive to the position of the Plaintiffs who have patiently waited

through this lengthy process to become naturalized citizens.  USCIS shall, as it must under statutes

and regulations, await completion of the FBI's full criminal background check.  But, the Court

instructs USCIS to complete Plaintiffs' naturalization applications without unreasonable delay.

Therefore, Plaintiffs' claims for naturalization adjudication are **REMANDED** to USCIS

with instruction to complete processing of Plaintiffs' naturalization applications without

unreasonable delay.

### B.      Administrative Procedures Act - Unreasonable Delay

Having remanded Plaintiffs' claims under 8 U.S.C. 1447(b), Plaintiffs' additional claims

must invoke the subject matter jurisdiction of this Court.  Plaintiffs' seek declaratory and

injunctive relief for unreasonable delay in adjudicating Plaintiffs' naturalization applications.

Plaintiff asserts this delay is in violation of 8 U.S.C. § 1446(d) and 8 C.F.R. § 335 which, in turn,

violates the APA, 5 U.S.C. § 555. Plaintiffs request this court compel USCIS to act under 5

U.S.C. § 706(1), hold the agency's conduct unlawful, and set it aside under 5 U.S.C. § 706(2).

Federal courts are courts of limited jurisdiction. *Kokken v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). The APA alone does not provide subject matter jurisdiction to this Court. *California v. Sanders*, 430 U.S. 99, 107 (1977). Jurisdiction is only present under the APA when combined with 28 U.S.C. § 1331, providing that "the district courts shall have jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Plaintiffs are only entitled to the jurisdiction of this Court under the APA if they allege they are: (1) suffering a wrong because of the agency's failure to act; (2) there is no other adequate remedy in a court; (3) the action Plaintiffs seek to compel is discrete; and (4) the action Plaintiffs seek to compel is legally required. Agencies "shall proceed to conclude a matter presented to it." 5 U.S.C. 555(b). A Plaintiff "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief." 5 U.S.C. § 702; *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). Final agency actions are subject to judicial review only if "there is no other adequate remedy in a court." 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 161-62 (1997). Agency action includes an agency's failure to act which is "the omission of an action without formally rejecting a request." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). A court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *Norton*, 542 U.S. at 62.. "A claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton*, 542 U.S. at 64.

Plaintiffs' Complaint includes an allegation that they suffered a wrong because USCIS failed to adjudicate their naturalization applications and a discrete act. However, Plaintiffs have an adequate remedy in this Court and the action they seek to compel is not currently legally

required.  Therefore, their claim for relief under the APA lacks jurisdiction.

### 1.     Adequate Legal Remedy

First, Plaintiffs have an adequate remedy in this Court under 8 U.S.C. § 1447(b).  As previously discussed, this Court has jurisdiction to adjudicate or remand Plaintiffs' naturalization applications, the remedy available through 8 U.S.C. § 1447(b).  In opposing the motion, Plaintiffs have argued that because they allege a systemic problem in USCIS processing, § 1447(b) is inadequate.  However, the review process outlined in § 1447(b) provides a remedy to each Plaintiff in this case and any applicant facing the same situation as the Plaintiffs in this case.  Any applicant can seek relief from the District Court in the form of review and potentially adjudication of naturalization under § 1447(b) if the facts of that Plaintiff's case warrant such action.  Plaintiffs accurately note that resolution of all individual claims brought under § 1447(b) may be time consuming for the courts, but that is the process outlined in the statutory scheme and it is adequate to resolve the claims of these Plaintiffs and any other applicants facing the same situation.  8 U.S.C. § 1447(b).

### 2.     Legally Required Agency Action

Second, the action Plaintiffs seek to compel is not currently legally required.  USCIS is required to grant or deny an applicant's petition for naturalization, but not until the statutory requirements to reach that decision have been met.

The time lines specified within the statutory scheme are only implicated when certain criteria have been met.  The criteria implicating a time line for USCIS have not been met.  USCIS is required to make "a decision to grant or deny the application . . . at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization *under § 335.2*."  8 C.F.R. 335.3 (emphasis added).  However, the section referenced in § 335.3 with this mandate, 8 C.F.R. § 335.2,  has not been satisfied.  The examination specified under § 335.2, that triggers the 120-day time line, should only occur following "a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed."  8 C.F.R. 335.2.  Additionally, Pub. L. No. 105-119, 111 Stat. 2448-49 specifies that USCIS cannot process an application for naturalization until USCIS

receives confirmation of completion of an FBI investigation of the applicant.  These provisions indicate that a full criminal background investigation is a prerequisite for USCIS to conduct the applicants' interviews **and** to grant or deny applicants' applications for naturalization.  That USCIS conducted Plaintiffs' interviews before completion of a full criminal background investigation, does not negate the necessity of a complete full criminal background check before USCIS is required to grant or deny the applications.  Until the full criminal background checks are complete, USCIS is not legally required to grant or deny Plaintiffs' applications for naturalization.

The only other time lines potentially implicated are found in 8 U.S.C. 1447(b) and 8 U.S.C. § 1571.  These time lines also do not compel a legally required action.  As previously discussed, the 120-day time frame dictated in 8 U.S.C.§ 1447(b) provides this Court with jurisdiction to take appropriate action on Plaintiffs' applications.  That time line does not legally require any action by USCIS, rather it is a mechanism for frustrated applicants to seek the review of the District Court.

Congress' expression of their desire that immigration applications be processed in 180 days is not a mandatory time line sufficient to legally require agency action.  In 2000, Congress expressed "its sense that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application."  8 U.S.C. § 1571(b).  Under Ninth Circuit precedent, provisions using the language "should" and "sense of the Congress" yield the conclusion that the "provision is precatory" and does not bestow a right.  *Yang v. Cal. Dep't of Soc. Servs.*, 183 F.3d 953, 958 (9th Cir. 1999).  The Court went on to note that the heading "Congressional Statement" describes the provision as a "*policy* statement that does not create positive, enforceable law."  *Id.* at 959 (emphasis added).  Similarly, 8 U.S.C. § 1571 falls under the heading "Policy," further indicating it is not an enforceable time line, but rather the desire of the Congress to improve the speed of immigration services.

In conclusion, Plaintiffs have an adequate legal remedy in this Court under 8 U.S.C. 1447(b) and neither USCIS nor the FBI are required to take action because Plaintiffs' full criminal background checks are not complete.  In the absence of these elements, this Court does not have jurisdiction to review Plaintiffs' claim under the APA.  This claim is **DISMISSED** for lack of subject matter jurisdiction.

## C.     Administrative Procedures Act - Notice and Comment

Plaintiffs claim Defendants' use of the "FBI name check" constitutes a substantive rule that was implemented without giving notice and providing a period for public comment in violation of 5 U.S.C. § 553.  Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Defendants assert the notice and comment procedures are not required because inclusion of the "FBI name check" is only an interpretive rule.

A court may dismiss a case for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Under this standard, the Court accepts as true the factual allegations of Plaintiffs' Complaint.  *Church of Scientology of California v. Flynn*, 744 F.2d 694, 696 (9th Cir. 1984).  Plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

Federal agencies are generally required to provide notice of proposed rules and consider comments about those rules.  5 U.S.C. § 553.  However, "interpretive" rules are exempt from this process.  5 U.S.C. 553(b)(3)(A); *Gunderson v. Hood*, 268 F.3d 1149, 1155 (9th Cir. 2001). Interpretive rules generally clarify or explain, but cannot be inconsistent with or amend an existing rule.  *Gunderson,* 268 F.3d at 1155.  The question before this Court is whether the "FBI name check" is an interpretive rule, encompassed by existing regulations and exempt from the notice and comment procedures.

USCIS is required to investigate applicants for naturalization.  The "minimum" investigation shall include "a review of all pertinent records."  8 C.F.R. § 335.1.  The "full criminal background check" includes the applicants "administrative" record, in addition to the applicant's "criminal" record.  8 C.F.R. § 335.2.

The requirement that USCIS investigate, at a minimum, all pertinent records and the separate listing of criminal and administrative records indicates that the "FBI name check" is an interpretive rule.  The search is both consistent with and encompassed by the mandates of these regulations.  An FBI record on an applicant or connected to an applicant is surely "pertinent" to investigation of that applicant.  Even if these records were not pertinent, the regulation only requires review of pertinent records at a "minimum," suggesting that even broader investigations

are acceptable under the regulation.  Additionally, the inclusion of "administrative" records in addition to "criminal" records within 8 C.F.R. § 335.2 indicates more than the applicant's specific criminal history is encompassed in the full criminal background check mandated by the regulation.

Use of the "FBI name check"as part of the required "full criminal background check" is an interpretation of the investigations required under 8 C.F.R. § 335.1 & 335.2 and is consistent with these regulations.  Plaintiffs' claim for violation of the notice and comment procedures of the APA is **DISMISSED** for failure to state a claim.

### D.       Due Process

Plaintiffs claim Defendants have violated Plaintiffs' rights under the Due Process Clause of the Fifth Amendment by depriving them of their liberty interest in adjudication of their naturalization applications.  Although not stated in the Complaint, Plaintiffs are presumed to assert a procedural due process claim based on Plaintiffs' use of the *Valdez* rule articulated by the Ninth Circuit in reviewing a procedural due process claim.  Defendants move to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  Specifically, Defendants assert that Plaintiffs do not have a protected interest.

Plaintiffs must have a protected liberty or property interest to sustain a due process claim.  The Fifth Amendment's Due Process Clause prohibits the deprivation of "life, liberty, or property, without due process of law."  U.S. Const. amend. V.  A statute or regulation only creates the liberty interest necessary for a due process violation if it meets two requirements.  *Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 (9th Cir. 2002).  "First, the law must set forth 'substantive predicates' to govern official decisionmaking and, second, it must contain 'explicitly mandatory language' i.e., a specific directive to the decisionmaker that *mandates* a particular outcome if the substantive predicates have been met."  *Id* (emphasis added).

As previously discussed, with regard to Plaintiffs' claim of unreasonable delay under the APA, Plaintiffs do not have a legal right to the adjudication of their naturalization applications at this point.  The 120-day time line under 8 U.S.C. 1447(b) invokes the right to review by this Court.  Plaintiffs have exercised this right.  Other time lines within the regulations are not of a mandatory nature as required for a due process violation because those time lines are dependent on

1  completion of Plaintiffs' full criminal background checks. The required protected interest

2  necessary to sustain a due process claim is not present. Plaintiffs' Due Process Claim is

3  **DISMISSED** for failure to state a claim.

### IV.  CONCLUSION

5       Therefore, for the reasons discussed above, determination of Plaintiffs' application for

6  naturalization is **REMANDED** to USCIS, with instructions that USCIS adjudicate Plaintiffs'

7  naturalization without unreasonable delay. Plaintiffs' claim of unreasonable delay in violation of

8  the APA is **DISMISSED WITHOUT PREJUDICE**. Plaintiffs' claim for violation of the notice

9  and comment provisions of the APA is **DISMISSED WITHOUT PREJUDICE**. Plaintiffs'

10  claim for violation of due process is **DISMISSED WITHOUT PREJUDICE**.

12       **IT IS SO ORDERED**.

14       DATED: March 11, 2008

16       Hon. Roger T. Benitez
         United States District Judge

07cv1667-BEN (CAB)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SHMUL KAPLAN, TASIM MANDIJA,          :
FERIDE MANDIJA, ROUZBEH ALIAGHAEI     :
by and through his parents and guardians ad litem   :
MASHAALAH and MARYAMREZAEI ALIAGHAEI,   :
LIDIA BURTSEVA, NELLI OLEVSKAYA,      :
ESHETU MERI, SARA BACHMAN, MOISEY     :
BACKMAN, JOE BEOPLUE, SONYUNOR        :
BEOPLUE, GLAYON BLOUE, ISAAK ROZENBLIT,   :
SEMEN SAVRANSKIY, LYUDMILA SHIROKAYA,   :    CLASS ACTION
IGOR STEPANOV, YEVGENIYA              :
STRIZHEVSKAYA, individually and       :
on behalf of all others similarly situated,   :    Civil Action No. 06-5304
                                      :
        Plaintiffs,                   :
                                      :
    vs.                               :
                                      :
MICHAEL CHERTOFF, as Secretary of the   :
Department of Homeland Security,      :
ALBERTO GONZALES, as Attorney General   :
of the United States,                 :
EMILIO T. GONZALEZ,                   :
as Director of U.S. Citizenship and Immigration Services,   :
ROBERT S. MUELLER, III, as Director of the Federal   :
Bureau of Investigation,              :
JO ANNE B. BARNHART, as Commissioner of Social   :
Security,                             :
DONALD MONICA, as District Director of the U.S.
Citizenship and Immigration Services,
Philadelphia District Office,

        Defendants.

**FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE**
**AND MANDAMUS RELIEF**

**I.     INTRODUCTION**

1.     Named and class plaintiffs are all elderly or disabled humanitarian immigrants

whose Supplemental Security Income (SSI) disability payments have been or will be terminated

because of the actions and omissions of the defendants, in violation of plaintiffs' due process and

equal protection constitutional rights, as well as statutory rights under the Administrative Procedure Act.

2.     All plaintiffs have been found eligible for SSI benefits as a result of severe disabilities or advanced age and means-tested poverty. Plaintiffs would all be able to continue receiving this SSI entitlement, but for the defendants' delays in processing their applications for lawful permanent resident (LPR) status and thereafter for United States citizenship. These delays are beyond the control of plaintiffs.

3.     Affirmatively welcomed by our nation's immigration laws, most refugees and asylees obtain employment and achieve self-sufficiency after arrival. But a minority faces barriers to self-sufficiency due to age and medical disabilities often resulting from the persecution they experienced in their countries of origin.

4.     Humanitarian immigrants who arrive in the United States after August 22, 1996, are eligible for SSI benefits for seven years from either the date of their entry (for refugees) or from the date they were granted asylee status. Congress established a procedural pathway for humanitarian immigrants to avoid the termination of their SSI benefits by becoming United States citizens before the conclusion of their seven-year period of eligibility. Congress expected that the executive branch would promptly process LPR and naturalization applications so that there would be no interruption of SSI. Congress never intended that these refugees and asylees would lose their SSI after seven years if they pursued citizenship.

5.     Yet due to the defendants' failure to process LPR and naturalization applications in a timely and expeditious manner, over 6,000 humanitarian immigrants have lost their SSI benefits due to the expiration of the seven-year bar. Many of these immigrants have also lost the Medicaid that usually accompanies SSI. The Social Security Administration (SSA) projects that

over 46,000 immigrants will be cut off from SSI in the years 2006-2012 as a result of the delays in granting citizenship and the operation of the seven year rule.

6.      Having been approved for SSI, plaintiffs have a statutory property interest in continued receipt of SSI benefits.  Defendants' failure to process LPR and naturalization applications in a timely fashion and their failure to expedite these applications, even while knowing that many impoverished and severely disabled humanitarian immigrants rely upon SSI as subsistence income, denies plaintiffs a timely and fair determination on the merits of their citizenship applications even where they have done everything within their power to become citizens.  These failures violate the Constitution and statutes of the United States.

7.      Plaintiffs' applications for LPR and naturalization are most commonly delayed because of background and "name check" investigations, despite the fact that duly admitted refugees and asylees are particularly unlikely to pose a security risk.

8.      Plaintiffs therefore seek judicial relief pursuant to the due process and equal protection guarantees of the Fifth Amendment to the United States Constitution and the protections against improper rulemaking and unreasonably delayed or withheld federal agency actions under the Administrative Procedure Act, mandating defendants to reinstate and continue payment of SSI benefits to all named plaintiffs and their class until plaintiffs have been provided a fair opportunity to show that they are eligible for citizenship by completing the LPR and naturalization processes.

## II.    JURISDICTION AND VENUE

9.      This action arises under the Constitution of the United States; the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq., as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 1570; the Social Security Act, 42 U.S.C. § 405(g); and the Administrative Procedure Act (APA),

5 U.S.C. § 701 et seq.  This Court has jurisdiction under 28 U.S.C. § 1331 (federal question

jurisdiction); 42 U.S.C. § 405(g); 28 U.S.C. §§ 1361 (Mandamus Act) and 2201 (Declaratory

Judgment Act); and 5 U.S.C. §§ 701 - 702 (Administrative Procedure Act).  This Court may

grant relief pursuant to 28 U.S.C. §§ 1361 and 2202, and 5 U.S.C. § 702.

10.    Further exhaustion of administrative remedies, to the extent that any exist, would

be futile.  Plaintiffs have no adequate remedy at law.

11.    For all plaintiffs who have been terminated from SSI, the Social Security

Commissioner has made a final adverse decision, and exhaustion of administrative remedies

concerning the Commissioner's actions would be futile.

12.    Venue lies in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §

1391(e)(2) because a substantial part of the actions, omissions, or events giving rise to the claim

occurred in this judicial district and due to the provisions of 42 U.S.C. § 405(g).  In addition,

several named plaintiffs and at least one defendant reside in the Eastern District of Pennsylvania.

28 U.S.C. § 1391(e).

## III.    PARTIES

**Plaintiffs**

13.    Named and class representative plaintiffs in this action are Shmul Kaplan, Tasim

Mandija, Feride Mandija, Rouzbeh Aliaghaei by his parents and guardians ad litem

Maryamrezaei and Mashaalah Aliaghaei, Lidia Burtseva, Nelli Olevskaya, Eshetu Meri, Sara

Bachman, Moisey Bacman, Joe Beoplue, Sonyunor Beoplue, Glayon Bloue, Isaak Rozenblit,

Semen Savranskiy, Lyudmila Shirokaya, Igor Stepanov, and Yevgeniya Strizhevskaya, all of

whom are refugees or asylees lawfully residing in the United States.

**Defendants**

14.    Michael Chertoff is the Secretary of Homeland Security. He is charged with "[a]ll authorities and functions of the Department of Homeland Security [DHS] to administer and enforce the immigration laws," 8 C.F.R. § 2.1; 8 U.S.C. § 1103(a). He is sued in his official capacity.

15.    Alberto Gonzales is the Attorney General of the United States. He is charged with administering and enforcing the nation's immigration laws, 8 U.S.C. § 1103(a), (g). The Attorney General is the head of the Department of Justice (DOJ), of which the Executive Office of Naturalization is part. He also has the sole authority to naturalize persons as citizens of the United States. 8 U.S.C. § 1421. He is sued in his official capacity.

16.    Robert S. Mueller, III, is the Director of the Federal Bureau of Investigation (FBI). He is charged with administering the FBI's duties to perform investigations in connection with citizenship applications under review by CIS, including performing background and name checks. He is sued in his official capacity.

17.    Emilio T. Gonzalez is the Director of United States Citizenship and Immigration Services (CIS). He is charged with administering the immigration laws on behalf of the Secretary of Homeland Security throughout the United States, including the processing and adjudicating of LPR and citizenship applications. He is sued in his official capacity.

18.    Jo Anne Barnhart is the Commissioner of the Social Security Administration (SSA). She is charged with administering the provisions of the Social Security Act, including the SSI program. She is sued in her official capacity.

19.    Donald Monica is the District Director of the CIS Philadelphia District Office. He is sued in his official capacity.

20.     Defendants Michael Chertoff, Alberto Gonzalez, Emilio T. Gonzales and Donald Monica are responsible for the adjudication, grant and denial of applications for LPR and naturalization filed by named plaintiffs and their class pursuant to 8 U.S.C. § 1421; 8 U.S.C. § 1427; 8 U.S.C. § 1446; 8 C.F.R. § 2.1; 8 C.F.R. § 103.l(a); 8 C.F.R. § 310.2 and 8 C.F.R. § 316.3.

21.     Defendants Alberto Gonzales and Robert S. Mueller, III, are responsible for providing pertinent background and name check information relating to applicants for LPR and naturalization pursuant to 8 U.S.C. § 1427(d) and (e), and 8 C.F.R. § 316.10(b).  Defendant Jo Anne Barnhart is responsible for the administration of the SSI program pursuant to 42 U.S.C. § 1382a et seq.

## IV.     STATUTORY AND REGULATORY SETTING

### A.     Humanitarian Immigrant Eligibility for SSI

22.     "Humanitarian immigrants" are largely refugees and asylees, all of whom are granted permission to reside in the United States because they have demonstrated a reasonable fear of persecution in their country of origin.  Refugees are people who, prior to their entry, applied for and received permission to come to the United States due to the threat of persecution in their home country.  Asylees are those who have applied for and received protected status after coming to the U.S., likewise due to a threat of persecution.  Also included in this classification of humanitarian immigrants are a small number of Cuban and Haitian entrants and certain Amerasians.

23.     Supplemental Security Income (SSI) is a federal means-tested program administered by SSA that pays a subsistence cash benefit for necessities of life to very low income elderly, disabled and blind people.  Currently, SSI provides a monthly benefit of $603 for an individual and $904 for a couple.  In most states, including Pennsylvania, SSI recipients are

6

automatically entitled to receive Medicaid coverage, which insures access to needed health care. This coverage is especially important for those with severe mental and physical disabilities or advanced age.

24.    Immigrants who are found eligible for SSI under Title XVI of the Social Security Act have a constitutionally-protected property interest in continued receipt of SSI benefits. Those receiving SSI are, by definition, not expected to work because they are disabled or elderly. Until 1996, humanitarian immigrants, if they were otherwise eligible, could receive SSI without any time limitation, just as United States citizens do.

25.    In 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), which limited SSI benefits for humanitarian immigrants arriving after August 22, 1996, to five years. 8 U.S.C. § 1612(a)(2)(A). It was assumed that during these five years these immigrants could become United States citizens and continue receiving SSI benefits without interruption.

26.    Understanding that prompt action by the Executive Branch was key to fulfilling congressional intent, President Clinton, in signing the PRWORA, stated that he was directing the INS (now CIS) to: "...[remove] all bureaucratic obstacles that stand in the way of citizenship for legal immigrants who are eligible." Statement by President William J. Clinton Upon Signing H.R. 3734, 1996 U.S.C.C.& A.N. 2891, 2892; 32 Weekly Comp. Pres. Doc. 1487 (Aug. 26, 1996).

27.    After the signing of the PRWORA, the Attorney General issued Order No. 2049-96 (August 23, 1996) entitled "Specification of Community Programs Necessary for Protection of Life or Safety Under Welfare Reform Legislation." The purpose of this order was to protect

life and safety by providing certain exceptions to the law's disqualification of non-citizens from

receiving various public benefits.  Attached as Exhibit A.

28.     In the summer of 1997, pursuant to the Balanced Budget Act of 1997, Pub. L.

105-33, 111 Stat. 251, Congress extended the time period for humanitarian immigrants who

arrived after August 22, 1996, from five to seven years from the date of entry for refugees, and,

similarly, from five to seven years from the grant of asylum for asylees.  8 U.S.C. §§

1612(a)(2)(A)(i) - (ii).

29.     In enacting the extension to seven years, Congress made clear its intent to avoid

any interruption in the continuing receipt of SSI benefits.  "The 5-year exception in the welfare

law was designed to allow refugees and asylees, who often arrive in the U.S. with few

possessions, time to adjust to life here.  However, because of delays in adjusting to permanent

resident status, mandatory residency requirements before applying for citizenship, and recent

increases in waiting times in the naturalization process, under the 5-year eligibility period, many

would become ineligible for welfare benefits despite their attempting to naturalize at their

earliest opportunity. By extending the exception to allow these groups 7 instead of 5 years of

eligibility, these noncitizens would be given more time to naturalize while continuing to receive

welfare benefits without interruption." H. R. Report No.149, 105[th] Cong., 1[st] Sess. 1182 (1997)

(emphasis added).

30.     Consistent with the President's signing statement and the Attorney General's

Order, the Executive Office of Naturalization issued a Policy Memorandum on October 6, 1997,

establishing a policy and procedure of giving priority to applicants at risk of losing SSI benefits

as "emergent circumstances."  Executive Office of Naturalization Operations Policy

8

Memorandum No. 22: Guidance on Expeditious Naturalization Processing for Applicants Affected by the Welfare Reform Act. Attached as Exhibit B.

31.     The procedure concerning expedited applications in "emergent circumstances" was reiterated in further internal guidance on August 23, 2000, with the issuance of Field Operations Policy Memorandum No. 70: Processing Expedited Naturalization Applications by the Immigration Services Division. Attached as Exhibit C.

**B.     Lawful Permanent Residency**

32.     Immigrants must be lawful permanent residents (LPR) before they can apply for naturalization. Refugees may apply for LPR status one year after they enter the country. 8 C.F.R. § 209.1 (a)(1). Once granted, the LPR status of a refugee is back-dated to the date of entry into the United States. 8 C.F.R. § 209.1(e).

33.     Asylees may apply for LPR status one year after they are granted asylee status, but their permanent residency is back-dated only to one year before the date that the LPR status was granted. 8 C.F.R. §209.2(a)(1)(ii).

34.     LPR applicants are subjected to various name, background, and security investigations. These investigations have delayed the granting of applications for LPR status, a prerequisite for applying for naturalization.

**C.     Naturalization**

35.     The United States Constitution grants Congress the power to "establish a Uniform Rule of Naturalization." Art. I, § 8, cl. 4.

36.     The Attorney General has the "authority to naturalize persons as citizens of the United States," 8 U.S.C. § 1421(a); Pub. L. No. 101-649, Title IV, 104 Stat. 4978, 5038-48 (Nov.29, 1990), and has delegated the authority to administer and enforce the Immigration and

Nationality Act and all other laws relating to immigration, naturalization and nationality to the Director of Immigration and Naturalization Services (INS). 8 C.F.R.§ 100.2(a); 28 C.F.R. § 0.105. On March 1, 2003, INS ceased to exist and its principal functions were transferred to the newly created CIS within DHS. Homeland Security Act of 2002, Pub.L.No.107-296, § 471, 116 Stat. 2135, 2205 (codified at 6 U.S.C. § 291 (a)); 8 U.S.C. § 1103 (a) (1). Along with this transfer, the authority and responsibility to administer and enforce all laws pertaining to immigration, including the adjudication of applications for naturalization, was transferred from the Commissioner of INS to the Director of CIS. See 6 U.S.C. § 271(b)(2); 8 U.S.C. § 1103(a)(1).

37.    Immigrants, including refugees and asylees, are not permitted to apply for naturalization until ninety days prior to the five-year anniversary of the effective date of their LPR status. 8 U.S.C. § 1445(a)-(b); 8 C.F.R. §§ 316.4, 334.1, 334.2. Refugees who are granted LPR status, therefore, can apply for naturalization four years and nine months after their entry into the United States, since their permanent residency status is back-dated to the date of entry. Since asylees only have their LPR status back-dated to one year before the grant of that status, they must wait at least three years and nine months after the grant of LPR status to apply for naturalization.

38.    Applicants for naturalization initiate the process by completing and filing a lengthy application form and paying a $330 application fee. 8 C.F.R. § 334.2(a). Once the application has been filed, CIS conducts a background investigation of the applicant. 8 U.S.C. § 1446(a); 8 C.F.R. §§ 335.1, 335.2. Since 1997, the FBI must also conduct a criminal background check. Pub. L. 105-119, Title I; 111 Stat. 2440, 2448-49 (1997); 8 U.S.C. §1446; 8 C.F.R. §335.2(b). The applicant must pass tests of English proficiency and civic knowledge (unless CIS

waives the tests on medical grounds).  8 C.F.R. §§ 312.1, 312.2.  Also, CIS must conduct a face-to-face "examination" interview of the applicant. 8 U.S.C. § 1446(a); 8 C.F.R. §§ 335.2(a), 332.1.

39.    The CIS utilizes the FBI's National Name Check Program (NNCP) to access the FBI's Central Records Systems to do the requisite checks for naturalization applicants.  In fiscal year 2005, when the FBI processed a total of 3.7 million name checks; 45% of the total incoming name check requests were submitted by CIS.  The FBI has acknowledged that "CIS's name check requests outpace NNCP available resources."  Suppl. Decl. of Michael A. Cannon of Aug. 31, 2006, para. 21 filed in Yakubova v. Chertoff, No. 1:06-cv-3203-ERK-RLM (E.D.N.Y.). Since April 2006, or earlier, CIS will not schedule the naturalization "examination" interview until CIS has received a "definitive response" from the FBI that the background investigation has been completed.  8 C.F.R. § 335.2(b).

40.    The Inspector General of the Department of Homeland Security has issued a report critical of the inefficiencies and delays in the security check processes which have resulted in "stall[ed] application processing for long periods" and "stalled cases...contributing to hundreds of lawsuits against USCIS."  Office of Inspector General, Department of Homeland Security, "A Review of U.S. Citizenship and Immigration Services' Alien Security Checks," pp. 15, 24 (OIG-06-06, November 2005).

41.    As of July 2006, CIS has publicly acknowledged a "gross backlog" of 1.1 million unprocessed naturalization applications with 140,000 under CIS "control," and the other 960,000 not within its "control," the majority of the latter constituting applications which are pending before the FBI, described as "pending law enforcement security checks."  CIS News Release,

Sept. 15, 2006, available at:

http://www.uscis.gov/graphics/publicaffairs/newsrels/N400Bklg091506NR.pdf.

42.    On information and belief, every year, CIS processes and resolves the applications for LPR status and for naturalization of thousands of humanitarian immigrants within seven years. CIS and the FBI are capable of processing all applications of members of the plaintiff class within that time frame.

43.    In theory, CIS (and its predecessor, INS) have, at the direction of President Clinton, had a policy and procedure of expediting naturalization processing for applicants at risk of being cut off SSI due to the seven year limitation. The President's signing statement called for the removal of "all bureaucratic obstacles".

44.    Subsequently, the INS issued an Operations Policy Memorandum on October 6, 1997, acknowledging that, "Many LPRs fac[e]...termination of SSI... [and] are eligible to apply for citizenship. However, due to increasing naturalization application receipts and current naturalization processing times, many, if not most, will not be able to complete the naturalization process before the termination of benefits." The Memorandum then directed that applicants faced with "emergent circumstances," including "loss of [SSI] benefits," be given a priority in processing. Executive Office of Naturalization Operations Policy Memorandum No. 22: Guidance On Expeditious Naturalization Processing for Applicants Affected by the Welfare Reform Act, (Oct. 6, 1997), pp. 1-2. Attached as Exhibit B. Although applications are usually processed in chronological order of receipt, "an exception may be permitted... upon showing of emergent circumstances." Id.    The INS directive further recognized that "the expeditious processing of naturalization applications from individuals facing the loss of...SSI benefits from

the Welfare Reform Act [PRWORA] is in keeping with the spirit of concern for the protection of

life and safety in the [Attorney General] order." Id.

45.    The procedure for expediting applications in "emergent circumstances" was

reiterated in further guidance on August 23, 2000, with the issuance of Field Operations Policy

Memorandum No. 70: Processing Expedited Naturalization Applications by the Immigration

Services Division.  Attached as Exhibit C.

46.    These expediting policies and procedures, however, have been ineffective for the

plaintiff class for a variety of reasons.  First, CIS does not inform immigrant service agencies,

the public, or, perhaps most importantly, SSI recipients at risk of losing their eligibility, of the

existence of these policies and procedures.  Further, the policies are not published in the Federal

Register nor codified in the Code of Federal Regulations.  As a result, the policies and

procedures are rarely invoked.  Second, in the few cases where expedition is requested, the

request is often ignored.

47.    Moreover, SSA and CIS have no joint policy or procedure in place to identify

applicants whose SSI has been or will be terminated.  Thus, they cannot insure the expediting of

the LPR and naturalization applications of those humanitarian immigrants.  Like CIS, SSA has

no policy or procedure for advising recipients, immigration service agencies, or the public that an

applicant may seek expeditious handling of his or her applications for LPR status and for

citizenship based on the possible effect of the seven-year limitation.

48.    Indeed, the cases of humanitarian immigrants are often arbitrarily and irrationally

delayed well beyond seven years, resulting in the termination of SSI benefits to thousands of

refugees and asylees.

## IV.    **CLASS ALLEGATIONS**

49.    Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2), named plaintiffs bring this action on behalf of themselves and all similarly situated persons. The plaintiff class consists of:

> All people who have been or will be determined eligible to receive monthly benefits under the SSI program but have been or will be determined to be limited by the seven-year period of eligibility pursuant to 8 U.S.C. § 1612(a).

50.    The class is so numerous that joinder of all members is impracticable. According to SSA, from 1998 through December 2005, a total of 5,662 humanitarian immigrants have lost their SSI benefits as a result of the expiration of the seven-year period. SSA estimates that, in the years 2006-2012, an additional 46,780 humanitarian immigrants will lose their SSI due to such delays. See Freedom of Information Act (FOIA) response from Willie J. Polk, SSA, Oct. 20, 2006, attached as Exhibit D. SSA estimates that each year more humanitarian immigrants will reach the expiration of the seven-year time period without having been approved for citizenship. Id.

51.    There are questions of law and fact that are common to the class members, namely whether defendants, in failing to promptly process LPR and naturalization applications, and to properly implement expediting policies for the class, have violated plaintiffs' rights to due process and equal protection under the Fifth Amendment to the United States Constitution, violated the notice and rulemaking requirements of the Administrative Procedure Act (APA) and have unlawfully withheld and unreasonably delayed agency action to which plaintiffs are entitled under the APA.

52.    The claims of the named plaintiffs are typical of the claims of the class they seek to represent. Named plaintiffs seek to challenge and remedy delays in the LPR and naturalization process resulting in the termination of SSI benefits; these are the very claims made

14

by all class members.  There is no conflict between their interests and those of the class they seek to represent.

53.    In defending their own rights, the individual named plaintiffs will fairly and adequately defend the rights of all proposed class members.  Named plaintiffs are adequate representatives of the class and are represented by counsel with considerable experience and expertise in public benefits, immigration, and class action litigation.

54.    Defendants, by their delayed processing, their refusal to announce and implement an effective expediting processes, and their termination or threatened termination of SSI benefits, have acted or refused to act on grounds generally applicable to the class, so that final injunctive, declaratory, and mandamus relief is appropriate with respect to the class as a whole.

## V.    FACTS OF NAMED CLASS REPRESENTATIVE PLAINTIFFS

### Shmul Kaplan

55.    Shmul Kaplan is an 80-year-old Holocaust survivor and current resident of Levittown, Pennsylvania.  He had his right leg amputated above the knee in the former Soviet Union and lives with a prosthesis that does not function properly.  His left leg, which had been badly fractured, is now deformed and causes him pain.  Mr. Kaplan also has other serious health problems, including prostate and high blood pressure conditions.

56.    Mr. Kaplan was the victim of religious persecution in the former Soviet Union because of his Jewish background and activism.  He entered the United States in November 1996 at the age of 71 and was granted asylum in January 1997.  Mr. Kaplan established his eligibility for SSI and Medicaid in March 1997.  Five years later, Mr. Kaplan also qualified for the Medicare health insurance program.

57.    In 1998, Mr. Kaplan applied for permanent residency status, but defendants delayed ruling upon the application for five years.  It was not granted until September 2003.  Mr.

15

Kaplan cannot apply for naturalization until June 2007, over ten years after he was granted asylum.

58.    Because Mr. Kaplan had been living in the country for seven years, the Social Security Administration terminated his SSI in July 2004. He was also wrongly terminated from the Medicare health insurance program, losing access to his treating urologist, and not reinstated until over two years later.

**Tasim Mandija**

59.    Plaintiff Tasim Mandija is an 80-year-old resident of Philadelphia. He suffers from prostate cancer, cardiovascular disease, poor circulation, and neuropathy. He cannot stand for more than a few minutes at a time and must use a wheelchair or walker for mobility.

60.    Mr. Mandija is from Albania, where he was persecuted and spent four years in prison and five years in a concentration camp for his opposition to the government of Albania. He came to the United States with his wife, Feride Mandija, in September 1996. He was granted asylum as of November 24, 1998.

61.    Mr. Mandija was authorized to receive SSI and Medicaid benefits starting in November 1998.

62.    Mr. Mandija applied for LPR status in February 2000, but defendants delayed ruling upon the application for six years. CIS denied his application in February 2006 because it claimed not to have Mr. Mandija's fingerprints. In fact, Mr. Mandija had submitted his fingerprints to CIS, but the agency apparently lost or misfiled them. In August 2006, on its own motion CIS re-opened Mr. Mandija's application in order to take another set of fingerprints from Mr. Mandija.

63.    Even if Mr. Mandija's application for LPR status were granted before the end of 2006, he would not be able to apply for naturalization until late 2009.

64.    Mr. Mandija's SSI benefits were terminated in December 2005, seven years after he was granted asylum.

**Feride Mandija**

65.    Plaintiff Feride Mandija is a 67-year-old resident of Philadelphia and the wife of Tasim Mandija. She suffers from severe arthritis.

66.    Ms. Mandija is originally from Albania, where she was beaten by the Albanian police in order to force her to reveal her husband's whereabouts. She came to the United States with her husband, Tasim Mandija, in September 1996. She was granted asylum as of November 1998.

67.    Based upon her disabilities, Ms. Mandija was approved for SSI starting in November 1998.

68.    Ms. Mandija applied for lawful permanent residency status in February 2000, but defendants delayed ruling upon her LPR application for five years. It was finally granted on March 9, 2005, and backdated one year to March 9, 2004. As a result, Ms. Mandija can first apply for naturalization only on December 9, 2008. This date is ten years after she was granted asylum.

69.    Like her husband's, Ms. Mandija's SSI benefits ended in December 2005, seven years after she was granted asylum.

**Mashaalah and Maryamrezaei Aliaghaei on behalf of their son, Rouzbeh Aliaghaei**

70.    Mr. Mashaalah Aliaghaei and his wife, Ms. Maryamrezaei Aliaghaei, immigrated to the United States from Iran. They came with their children, including their son, Rouzbeh. They are currently residents of the Commonwealth of Virginia.

71.    Ms. Aliaghaei had been outspoken in Iran about the lack of freedom and equality for women. As a result, she was fired from her high school teaching job and jailed as a political

prisoner. She was incarcerated for the first three months of her pregnancy with Rouzbeh and received no prenatal care.

72.     Rouzbeh has Bannayan-Riley-Ruvalcaba Syndrome (BRRS), a rare genetic disorder which has caused severe macrocephaly (enlarged head), autism, seizures, impaired mobility, and marked mental retardation.

73.     Ms. Aliaghaei and Rouzbeh entered the United States on June 14, 1998.

74.     When Rouzbeh arrived in the United States, he was nine years old and suffered from the severe physical and cognitive disabilities associated with BRRS.

75.     Political asylum was granted to the entire family on February 12, 1999. Rouzbeh began receiving SSI on the basis of his severe disabilities in February 1999 upon the grant of asylum. Because he was eligible for SSI, Rouzbeh also received Medicaid.

76.     Mr. Aliaghaei and Rouzbeh's two siblings entered the United States on September 10, 1999.

77.     Mr. and Ms. Aliaghaei applied for lawful permanent residency for their entire family in November 2000. Defendants delayed ruling upon the LPR application for five years. The family was not granted legal permanent residency until October 2005. As a result of the defendants' delay in granting lawful permanent residency, the Aliaghaeis will not be eligible to apply for naturalization until July 2009.

78.     Today, at age 17, Rouzbeh is small in stature, nonverbal, and unresponsive to his surroundings. His estimated level of cognitive functioning is 2-3 years of age.

79.     Ms. Aliaghaei currently works as a teacher's aide in Fairfax County, Virginia. Mr. Aliaghaei is Rouzbeh's primary care giver. As a result of this major responsibility and the time it demands, Mr. Aliaghaei has been unable to obtain paid employment.

80.    Rouzbeh's SSI benefits were terminated in February 2006, because seven years had expired since the grant of asylum. Due to the loss of SSI, Rouzbeh's eligibility for Medicaid also came to an end. 8 U.S.C. § 1612(b)(2)(A)(i)(I). Rouzbeh no longer has access to the physical therapy, speech therapy, and medical treatment he needs.

**Lidia Burtseva**

81.    Lidia Burtseva, aged 59, is a resident of Warminster, Pennsylvania, and was born in the Ukraine – formerly part of the USSR – on June 20, 1947. She and her husband suffered persecution in the Ukraine because her husband was Jewish. Although Ms. Burtseva is not Jewish, she was persecuted because her husband was.

82.    The couple entered the United States on September 18, 1999, as refugees. Ms. Burtseva applied for lawful permanent residency status in April 2001 and was approved in September 2002, retroactive to September 1999.

83.    Ms. Burtseva initially worked as a home health aide from January 2000 until October 2002, when she became too disabled to work. Ms. Burtseva suffers from hypertension, major depression, and hallucinatory psychosis with reduced ability to recall or memorize basic facts necessary for her to function on a daily basis.

84.    Ms. Burtseva applied for SSI in March 2003 and was approved for benefits. Her SSI benefits were her only source of income. In November 2003, she and her husband were divorced.

85.    Ms. Burtseva applied for naturalization in October 2004, five years after her entry into the United States. As a result of her severe medical condition, she also applied for a waiver from the English language and United States history and government portions of the naturalization examination, pursuant to the Immigration and Nationality Act §312(b)(1). 8 U.S.C. §1423(b)(1).

19

86.     The CIS scheduled Ms. Burtseva's naturalization examination interview for July 11, 2005, but then abruptly cancelled it on July 5, 2005.

87.     In June 2006, Ms. Burtseva's lawyers at the HIAS and Council Migration Service of Philadelphia (HIAS and Council) wrote to Evangelia Klapakis, Acting District Director of the CIS Philadelphia office, requesting "expedite[d] processing" of the case due to Ms. Burtseva's "emergent circumstances" caused by the expected loss of her SSI benefits in September 2006, seven years after her entry as a refugee.   See Letter from Ayodele Gansallo, Esq., to Evangelia Klapakis, attached as Exhibit E.  Counsel cited the expedited processing policies averred above, namely Executive Office of Naturalization Operations Policy Memorandum No. 22: Guidance On Expeditious Naturalization Processing for Applicants Affected by the Welfare Reform Act (Oct. 6, 1997), attached as Exhibit B, and the Field Operations Policy Memorandum No. 70: Processing Expedited Naturalization Applications, issued by the Immigration Services Division (Aug. 23, 2000).  Attached as Exhibit C.  HIAS  did not receive a response to this letter Ms. Burtseva's SSI benefits were terminated in September 2006.

88.     However, following the filing of this initial complaint, Ms. Burtseva received a letter from CIS inviting her to be interviewed regarding her naturalization application. This took place on January 17, 2007. She was sworn in immediately thereafter.

**Nelli Olevskaya**

89.     Ms. Olevskaya is a 63-year-old refugee from the Ukraine.  As Jews, Ms. Olevskaya and her family suffered severe, open persecution.  Following the breakup of the Soviet Union in 1991, she could no longer maintain steady employment as a result of her ethnic origin and religious identity.

90.     In April 1999, Ms. Olevskaya, along with her husband, Yevegny, entered the United States as refugees. She applied for lawful permanent residency status in May 2000. In May 2001, her LPR status was approved, retroactive to April 1999.

91.     Ms. Olevskaya began to receive SSI benefits in 2002 as a result of severe multiple mental and physical impairments, including coronary artery disease, hypertension, hypothyroidism, and major depressive and personality disorders.

92.     Ms. Olevskaya applied for naturalization in March 2005.

93.     CIS initially scheduled Ms. Olevskaya for an examination on August 18, 2005. However, CIS postponed the examination "due to unforeseen circumstances."

94.     In June 2006, Ms. Olevskaya's lawyers at HIAS and Council wrote to Evangelia Klapakis, Acting District Director of the CIS Philadelphia, requesting "expedite[d] processing" of the case due to her "emergent circumstances" caused by the loss of her SSI benefits seven years after her entry as a refugee. Counsel cited the expedited processing policies averred above. See Letter from Ayodele Gansallo, Esq., to Evangelia Klapakis, attached as Exhibit E.

95.     HIAS did not receive a response to this letter. Ms. Olevskaya's SSI benefits were terminated on May 1, 2006

96.     However, following the filing of this initial complaint, Ms. Olevskaya received a letter from CIS inviting her to be interviewed regarding her naturalization application. This took place on January 17, 2007. She was sworn in immediately thereafter.

**Eshetu Meri**

97.     Eshetu Meri, age 51, is a blind Ethiopian, now living in Fairfax, Virginia with his wife and three children.

98.     In 1993, while still living in Ethiopia, Mr. Meri was fired from his job because of his political beliefs and ethnic identity. In 1998, while visiting the United States in an attempt to

treat his failing eyesight, Mr. Meri learned that the Ethiopian government had seized his property and that his life would be in danger if he returned to Ethiopia because of his civic activities to promote democracy. Mr. Meri stayed in the United States. He applied for and received political asylum in March 1999. His wife and three children also received asylum and joined him in the United States in 2000.

99.    When Mr. Meri was granted asylum in 1999, he was totally blind, diabetic, insulin dependent, and on medication for high blood pressure. Due to these disabilities, Mr. Meri was found eligible for SSI and Medicaid immediately upon the grant of asylum.

100.    Mr. Meri has since contracted coronary artery disease, prostate enlargement, and kidney infections, rendering him even more severely disabled and dependent on Medicaid. He had been receiving home health care for eight hours per day due to the life-threatening nature of his illnesses and his blindness.

101.    Mr. Meri applied for lawful permanent residency status in 2000, as soon as he was eligible to do so. However, defendants did not act upon his request for five years. It was only on September 30, 2005 that he was granted LPR status, effective September 30, 2004.

102.    The earliest Mr. Meri can now apply for naturalization is June 30, 2009, four years and nine months from September 30, 2004.

103.    In June 2006, Mr. Meri's SSI benefits were terminated due to the passage of seven years from the grant of asylum. After a failed administrative appeal, his Medicaid benefits were also terminated in October 2006. 8 U.S.C. § 1612(b)(2)(A)(i)(I). Mr. Meri has not been able to see a physician nor purchase medications, and his home health care has ended.

**Other Named Plaintiffs**

104.    Sara Bachman is a 74-year-old refugee from Moldova who is currently living in Philadelphia, Pennsylvania. She applied for naturalization on December 13, 2004. She had a naturalization interview scheduled for June 21, 2005. Unfortunately, CIS subsequently cancelled the interview. In November 2006, her SSI benefits were discontinued because she reached the end of her seven-year period of eligibility. As of January 2007, she has been without SSI for three months.

105.    Moisey Bachman is a 76-year-old refugee from Moldova who is currently living in Philadelphia, Pennsylvania. He applied for naturalization on December 13, 2004. He had a naturalization interview scheduled for June 21, 2005. Unfortunately, CIS subsequently cancelled the interview. In November 2006, his SSI benefits were discontinued because he reached the end of his seven-year period of eligibility. As of January 2007, he has been without SSI for three months

106.    Joe Beoplue is an 85-year-old refugee from Liberia who is currently living in Yeadon, Pennsylvania. He applied for naturalization on November 13, 2006. His SSI benefits were terminated in February 2006 because he had reached the end of his seven-year period of eligibility. In January, after his attorney requested that the CIS expedite his naturalization application, he received a notice scheduling him for a naturalization interview on February 9, 2007.

107.    Sonyunor Beoplue is a 74-year-old refugee from Liberia who is currently living in Yeadon, Pennsylvania. She applied for naturalization on November 13, 2006. Her SSI benefits were terminated in February 2006, because she had reached the end of her seven-year period of eligibility. In January, after her attorney requested that the CIS expedite her naturalization

application, she received a notice scheduling her for a naturalization interview on February 9, 2007.

108.    Glayon Bloue is a 99-year-old refugee from Liberia who is currently living in Yeadon, Pennsylvania. She applied for naturalization on November 13, 2006. Her SSI benefits were terminated in February 2006, because she had reached the end of her seven-year period of eligibility. In January, after her attorney requested that the CIS expedite her naturalization application, she received a notice scheduling her for a naturalization interview on February 9, 2007.

109.    Isaak Rozenblit is a 69-year-old refugee from Russia who is currently living in Philadelphia, Pennsylvania. He applied for naturalization on September 6, 2005. He had a naturalization interview scheduled for February 28, 2006. Unfortunately, CIS subsequently cancelled the interview. In July 2007, his SSI benefits are expected to be discontinued because he will reach the end of his seven-year period of eligibility.

110.    Semen Savaransky is a 79-year-old refugee from Russia who is currently living in Philadelphia, Pennsylvania. He applied for naturalization on August 25, 2005. He had a naturalization interview scheduled for February 21, 2006. Unfortunately, CIS subsequently cancelled the interview. In July 2007, his SSI benefits are expected to be discontinued because he will reach the end of his seven-year period of eligibility.

111.    Lyudmila Shirokaya is a 67-year-old refugee from the Ukraine who is currently living in Philadelphia, Pennsylvania. She applied for naturalization on August 9, 2004. She had a naturalization interview scheduled for June 7, 2005. Unfortunately, CIS subsequently cancelled the interview. In November 2006, her SSI benefits were discontinued because she reached the end of her seven-year period of eligibility. As of January 2007, she has been without

SSI for three months. In December, after her attorney requested that the CIS expedite her naturalization application, she received a notice scheduling her for a naturalization interview on February 21, 2007.

112.    Igor Stepanov is a 71-year-old refugee from Russia who is currently living in Philadelphia, Pennsylvania. He applied for naturalization on February 3, 2005. He had a naturalization interview scheduled for August 12, 2005. Unfortunately, CIS subsequently cancelled the interview. In April 2007, his SSI benefits are expected to be discontinued because he will reach the end of his seven-year period of eligibility.

113.    Yevhenia Strizhevskaya is a 70-year-old refugee from Russia who is currently living in Holland, Pennsylvania. She applied for naturalization on February 26, 2005. She had a naturalization interview scheduled for January 24, 2006. Unfortunately, CIS subsequently cancelled the interview. In April 2007, her SSI benefits are expected to be discontinued because she will reach the end of her seven-year period of eligibility.

## VI.    FACTS COMMON TO THE CLASS

114.    Class plaintiffs are humanitarian immigrants who have either applied for legal permanent residency status, or have applied for citizenship after the four year and nine months waiting period as LPRs. Due to a variety of delays at the hands of the defendants, class plaintiffs have not become citizens or will not become citizens within the allotted seven years.

115.    Class plaintiffs are all seriously disabled or elderly persons with little or no income or resources. They meet all eligibility criteria for receipt of SSI benefits other than United States citizenship.

116.    Class plaintiffs have lost, or are at risk of losing, eligibility for SSI, due to the expiration of the seven-year SSI limitation. They will not be eligible to have their SSI restored

until defendants act to review and make a final determination on their applications for naturalization.

117.    Class plaintiffs have actively pursued citizenship during the seven-year period afforded them.

118.    Defendants have failed to act in a timely fashion in reviewing and making determinations on applications by these humanitarian immigrants for lawful permanent residency, and thereafter on their applications to become United States citizens. This failure has resulted in unreasonable delays and the loss of eligibility for SSI.

119.    CIS and SSA have together failed to implement a joint plan and process to take requisite expediting actions in order to avoid the loss of SSI benefits because of the seven-year time period.

## VII.    CLAIMS FOR RELIEF

### First Claim – Due Process of Law Violation

120.    Plaintiffs hereby incorporate the averments as set forth above.

121.    Defendants have violated plaintiffs' rights to due process of law under the Fifth Amendment to the United States Constitution, in that they have terminated, or plan to terminate benefits in which plaintiffs possess a statutory property interest. In addition, defendants have deprived plaintiffs of a fair opportunity and process to demonstrate their qualifications for citizenship.

122.    Defendants' denial of a fair opportunity and process to achieve United States citizenship in a timely manner, including implementation of an effective expediting procedure, vitiates plaintiffs' interest in the receipt of SSI benefits which the Congress intended to be maintained without interruption.

### Second Claim – Equal Protection of the Laws Violation

123.    Plaintiffs hereby incorporate the averments as set forth above.

124.    Defendants have violated plaintiffs' right to equal protection of the laws under the
Fifth Amendment to the United States Constitution, in that defendants' actions and delays have
caused some humanitarian immigrants to be denied SSI, while other similarly situated
humanitarian immigrants have had their applications for citizenship processed in time to avoid
interruption in their SSI benefits.  This arbitrary treatment of two similarly situated groups
violates equal protection.

125.    Defendants' arbitrary and irrational processing of LPR and naturalization
applications results in an unconstitutional and discriminatory application of the seven year
provision and the arbitrary termination of SSI benefits for many humanitarian immigrants.

**Third Claim – Administrative Procedure Act Violation**

126.    Plaintiffs hereby incorporate the averments as set forth above.

127.    Defendants have violated the Administrative Procedure Act and abused their
discretion in that they have unlawfully withheld and unreasonably delayed agency action on
plaintiffs' applications for lawful permanent residency and for naturalization.

128.    Defendant Gonzalez of the CIS has also abused his discretion by refusing to
expedite processing of the naturalization applications for members of the class in accordance
with CIS' own stated policies and internal operating guidance, and has also abused his discretion
by failing to inform plaintiffs, refugee service agencies and the public of the opportunity for
expedited processing of naturalization applications.

129.    The direct consequence of withholding or delaying the administrative agency
actions has been the inability of class members to obtain naturalization and United States
citizenship within their first seven years of residency in the U.S., thereby leading to the
termination of life sustaining SSI benefits and the Medicaid which usually accompanies SSI.

27

130.    The Administrative Procedure Act provides that persons suffering a legal wrong because of an agency's failure to act are entitled to seek judicial review.  5 U.S.C. § 702.  The reviewing court must compel agency action unlawfully withheld or unreasonably delayed, and hold such unlawful agency action to be an abuse of discretion.  5 U.S.C. § 706(1), (2)(A).

## VIII.    REQUESTS FOR RELIEF

Wherefore, named plaintiffs and their class respectfully request that this Court:

a.    Declare on behalf of named plaintiffs and the certified class that defendants' failure to act in a timely fashion in reviewing and making determinations on plaintiffs' applications for lawful permanent residency and naturalization in accordance with defendants' own stated policies and internal operating guidance, and failure to implement policies to expedite naturalization applications, results in the unlawful termination of SSI benefits, and thus violates the guarantees to due process of law and the equal protection of the laws in the Fifth Amendment to the United States Constitution, and constitutes agency action unlawfully withheld or unreasonably delayed and an abuse of discretion, in violation of the Administrative Procedure Act.

b.    Issue a preliminary and final injunction, and a mandamus order requiring that SSA reinstate payment of SSI benefits to plaintiffs and those members of the plaintiff class whose SSI benefits have been terminated due to the expiration of the seven-year period, and continue SSI benefits to plaintiffs and their class until they have had a fair opportunity to complete the LPR and naturalization processes, and until defendants have fully ceased their arbitrary practices wherein class members' applications for lawful permanent residency and naturalization are unreasonably and arbitrarily delayed beyond the seven-year time period.

c.    Issue a preliminary and permanent injunction, and a mandamus order requiring that CIS and the FBI promptly process plaintiffs' applications for LPR status and naturalization,

28

including expediting all LPR and naturalization applications where loss of SSI benefits is present

or threatened, to avoid any terminations of SSI benefits after the expiration of the seven year

period.

      d.     Award plaintiffs the costs of suit and reasonable attorneys' fees pursuant to the

Equal Access to Justice Act.  28 U.S.C. § 2412.

      e.     Award such other relief as this Court may deem just and proper.

_____

JONATHAN M. STEIN, Attorney I.D. No. 15223
     Validation of Signature Code: jms211
RICHARD P. WEISHAUPT, Attorney I.D. No. 19382
MICHAEL R. FROEHLICH, Attorney I.D. No. 92767
Community Legal Services, Inc.
1424 Chestnut Street
Philadelphia, PA 19102-2505
Tel. (215) 981-3742
Fax (267) 765-6481

THOMAS B. ROBERTS, Attorney I.D. No. 31196
JORDANA GREENWALD, Attorney I.D. No. 93836
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Tel. (215) 665-8500

JUDITH BERNSTEIN-BAKER, Attorney I.D. No. 41831
Hebrew Immigrant Aid Society and Council
Migration Service of Philadelphia
2100 Arch Street
Philadelphia, PA 19103
Tel. (215) 832 –0900
Fax (215) 832 -0919

JOHN BOUMAN
Sargent Shriver National Center on Poverty Law
50 East Washington Street, Suite 500
Chicago, IL 60602
Tel. (312) 263-3830
Fax (312) 263-3846

Dated: January 31, 2007