UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

VIRGINIA MILANES, *et al.*,                                  :
                                                            :
                              Plaintiffs,                   :
                                                            :        ECF Case
                    v.                                      :
                                                            :        08 Civ. 2354 (LMM) (KNF)
MICHAEL CHERTOFF, *et al.*,                                 :
                                                            :
                              Defendants.                   :
------------------------------------------------------------------x


DECLARATION OF KIRTI VAIDYA REDDY

        I, Kirti Vaidya Reddy, declare pursuant to the provisions of 28 U.S.C. § 1746 as follows:


        1.      I am an Assistant United States Attorney representing the defendants in this

matter.  I submit this declaration in further support of defendants' motion to dismiss the

complaint in part and remand in part, or in the alternative for summary judgment, and to put

certain documents before the Court.

        2.      Attached as Exhibit A is the transcript of the deposition, dated July 1, 2008, of

Michael Aytes, Acting Deputy Director of United States Citizenship and Immigration Services

("USCIS").

        3.      Attached as Exhibit B is the transcript of the deposition, dated June 26, 2008, of

Michael Cannon, Section Chief of the National Name Check Program Section of the Federal

Bureau of Investigation ("FBI").

        4.      Attached as Exhibit C are excerpts of the transcript of the deposition, dated July

2, 2008, of Gregory Smith, Associate Director of the National Security and Records Verification

Directorate of USCIS.

5.      Attached as Exhibit D are excerpts is the transcript of the deposition, dated June

26, 2008, of Prakash Khatri, a former USCIS ombudsman.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        July 18, 2008

                              /s/ Kirti Vaidya Reddy
                              KIRTI VAIDYA REDDY
                              Assistant United States Attorney
                              Tel. (212) 637-2751
                              Fax (212) 637-2687

1

1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - x
3                          :
VIRGINIA MILANES, et al., :
4                          :
           Plaintiffs,   :
5                          : Case No.
v.                        : 08 Civ. 2354 (LMM)
6                          :
MICHAEL CHERTOFF, et al., :
7                          :
           Defendants.   :
8                          :
- - - - - - - - - - - - - x
9

10          Oral 30(b)(6) Deposition of

11   UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

12          By and Through Its Representative

13              MICHAEL L. AYTES

14               Washington, DC

15           Tuesday, July 1, 2008

16               9:39 a.m.

17

18

19   Job No.:  25501383

20   Pages 1 through 201

21   Reported by:  Rebecca L. Stonerock, RPR

22

Page 2

1      Oral 30(b)(6) Deposition of

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

2      By and Through its Representative

MICHAEL L. AYTES

3

4

5  Held at the offices of:

6  WEIL, GOTSHAL & MANGES

7  1300 Eye Street Northwest

8  Suite 900

9  Washington, DC  20005

10  (202) 682-7000

11

12

13

14

15

16

17

18

19  Taken pursuant to Notice, before Rebecca L.

20  Stonerock, Registered Professional Reporter and Notary

21  Public of the District of Columbia.

22

---

Page 3

1      A P P E A R A N C E S

2

3  ON BEHALF OF PLAINTIFFS:

4     MALICK W. GHACHEM, ESQUIRE

5     Weil, Gotshal & Manges

6     100 Federal Street Northwest

7     Boston, Massachusetts  02110

8     (617) 772-8806

9  and

10    ROBIN COOK, ESQUIRE

11    Weil, Gotshal & Manges

12    767 Fifth Avenue

13    New York, New York  10153

14    (202) 310-8000

15  and

16    JASON PARKIN, ESQUIRE

17    New York Legal Assistance Group

18    450 West 33rd Street, 11th Floor

19    New York, New York  10001

20    (212) 613-5000

21

22

---

Page 4

1  APPEARANCES (Continued):

2

3    ON BEHALF OF DEFENDANTS:

4     TOMOKO ONOZAWA, ESQUIRE

5     KIRTI VAIDYA REDDY, ESQUIRE

6     US Department of Justice

7     US Attorney's Office

8     Southern District of New York

9     86 Chambers Street, Third Floor

10    New York, New York  10007

11    Telephone:  (212) 637-2721

12  and

13    SHARVARI DALAL-DHEINI, ESQUIRE

14    US Citizenship and Immigration Services

15    Washington, DC

16    Telephone:  (202) 272-1414

17

18  ALSO PRESENT:

19    Caroline Aiello

20

21

22

---

Page 5

1     C O N T E N T S

2  EXAMINATION OF MICHAEL L. AYTES     PAGE

3  By Mr. Ghachem     8

4  By Ms. Onozawa     192

5  By Mr. Ghachem     195

6

7

8     E X H I B I T S

9    (Attached to Transcript)

10  AYTES DEPOSITION EXHIBITS     PAGE

11  Exhibit 1  Web page screen shot    27

12  Exhibit 2  12-13-02 Memo, Records Management

13    to Mueller, Bates CIS 001149 - 153  38

14  Exhibit 3  11-13-02 Memo, Williams

15    to Distribution List,

16    Bates CIS 002555 - 557    47

17  Exhibit 4  2-4-08 Memo, Aytes to Field

18    Leadership, Bates CIS 006284 - 285  65

19  Exhibit 5  8-2-06 USCIS FBI Name Check

20    Comparative Analysis,

21    Bates CIS 004401 - 413    96

22

---

Page 6

EXHIBITS (Continued):

1

2  Exhibit 6   April 2001 DOJ G-325 Name Check

3           Business Case Analysis Feasibility

4           Study, Bates CIS 000987 - 1022      107

5  Exhibit 7   12-8-98 PricewaterhouseCoopers,

6           A Blueprint for the New

7           Naturalization Process re G-325 Name

8           Check Evaluation and Recommendation,

9           Bates CIS 000119 - 127       112

10 Exhibit 8   4-25-06 Memorandum, Aytes to Regional

11          Directors, Bates CIS 004274 - 275   120

12 Exhibit 9   FY 08/09 Production Plan,

13          Domestic Operations

14          Bates CIS Neufeld 0045 - 048     143

15 Exhibit 10  Chapter from 2000 DOJ OIG report on

16          CUSA, Bates CIS 000585 - 771    146

17 Exhibit 11  Westlaw 8 CFR 335.2          158

18 Exhibit 12  10-18-02 INS, ISD Interagency Border

19          Inspection System Issues Paper,

20          Bates YAKUB 005460 - 470      170

21 Exhibit 13  4-14-08 E-mail, LaGonterie to Smith,

22          Bates CIS Smith.e 00002 - 004   172

Page 7

1           EXHIBITS (Continued):

2  Exhibit 14  "USCIS and the FBI Name Check,"

3           Bates CIS Smith 002-003       183

4                - - -

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 8

1                P R O C E E D I N G S

2               MICHAEL L. AYTES

3      having been duly sworn, testified as follows:

4         EXAMINATION OF MICHAEL L. AYTES

5  BY MR. GHACHEM:

6      Q   Good morning, Mr. Aytes.  My name's Malick

7  Ghachem.  I'm the attorney for the plaintiffs in this

8  case and I thank you for making yourself available to

9  answer our questions today.

10          MR. GHACHEM:  Tomoko, should we agree on

11     stipulations as an initial matter, that we reserve

12     our objections except as to form until, I guess,

13     the PI hearing in this case and then the trial if

14     there's a trial beyond that?

15          MS. ONOZAWA:  Yes.

16 BY MR. GHACHEM:

17     Q   Okay.  Mr. Aytes, if you need to take a

18 break at any point in this deposition, you know,

19 indicate that to me.

20         If my questions are unclear to you, please

21 let me know.  If you don't do so, I'll assume that you

22 understand my question?

Page 9

1          Have you had any prior deposition

2  experience?  Have you been deposed before?

3      A   Yes, I have.

4      Q   How many times?

5      A   Probably three or four.

6      Q   Are they in the last two or three years?

7      A   At least one was, yes.

8      Q   What was that case?

9      A   What was it?  The -- Kaplan, I believe, was

10 the name of it, social security citizenship case.

11     Q   What was the case about?

12     A   It had to do with naturalization processing

13 and loss of supplemental social security benefits.

14     Q   Okay.  And the other depositions that you

15 have given, were they also related to your work for

16 USCIS?

17     A   Yes, they were.

18     Q   All of them?

19     A   (Nodding head up and down.)

20     Q   Okay.  Did any of those other cases have to

21 do with naturalization delay claims?

22     A   Not that I recall.

Page 10

1    Q   So only the Kaplan case involved the
2  naturalization delay issue?
3    A   I believe so.
4    Q   Okay.
5    A   These things run together, so forgive me
6  if --
7    Q   Could you just give me a general sense of
8  what some of the other matters may have involved?
9    A   There was some litigation relating to
10  adjustment processing a couple of years ago.  There
11  was some litigation relating to employment-based case
12  processing.  That was probably three or four years
13  ago.
14    Q   All right.  Mr. Aytes, you understand that
15  you're appearing at this deposition as a 30(b)(6)
16  witness?  That means that you are representing your
17  agency, USCIS, and speaking on behalf of the agency.
18    A   I do.
19    Q   Do you understand what that means?
20    A   Yes, I do.
21    Q   And you also understand that I may be
22  asking you certain questions about your individual

Page 11

1  experience as an official at USCIS including certain
2  documents that you may have authored, and I'll be
3  asking you about your personal experience in that
4  sense insofar as it relates to your official duties?
5  Do you understand that as well?
6    A   I understand that.
7    Q   Okay.  Mr. Aytes, did you prepare for this
8  deposition?
9    A   We talked yesterday afternoon --
10    Q   Okay.
11    A   -- for a short time.
12    Q   Just that one occasion?
13    A   Yes.
14    Q   Did you review any documents in preparation
15  for this deposition?
16    A   No.
17    Q   Okay.  So you said you spoke with -- with
18  Tomoko and no other attorneys on your team?
19    A   There were three, I guess, there yesterday
20  afternoon.
21      MS. ONOZAWA:  Ms. Dalal-Dheini and my
22      colleague Kirti Reddy were also present.

Page 12

1      MR. GHACHEM:  Were also present, okay.
2      MS. ONOZAWA:  K-I-R-T-I  R-E-D-D-Y.
3      MR. GHACHEM:  And Ms. Dheini is -- what is
4    her position?
5      MS. DALAL-DHEINI:  CIS counsel.
6    Q   All right.  Mr. Aytes, I'm going to go
7  through the topics that we have requested testimony on
8  from USCIS and ask if you have prepared for those
9  topics and are prepared to speak today about them.
10      The first topic that we have listed in our
11  30(b)(6) Notice and that your lawyers have designated
12  you as the witness as is the following:  How USCIS
13  monitors the numbers of pending naturalization
14  applications, the length of processing time of
15  naturalization applications and/or delays in the
16  processing of naturalization applications.  Are you
17  prepared to testify about that topic?
18    A   Yes, I am.
19    Q   Second topic that we have requested
20  testimony on and that you were designated for is the
21  following:  Since the year 2000, the causes of delays
22  and/or backlogs in the processing of naturalization

Page 13

1  applications at USCIS, the harms that those delays
2  have caused, and any remedial efforts that USCIS has
3  engaged in to remedy those delays or backlogs.  Are
4  you prepared to testify about that topic?
5    A   I can certainly testify about the causes
6  and the actions that we take -- or that we took, not
7  specifically with regards to perceived harm on
8  individuals.
9    Q   Okay.
10      MS. ONOZAWA:  I would also interject and
11    state that to the extent any of these topics seek
12    materials protected by the deliberative process
13    privilege I would direct Mr. Aytes not to answer
14    those questions.
15    Q   Okay.  When I say "USCIS," Mr. Aytes, will
16  you understand that I mean USCIS from the time of its
17  existence in late 2002 onwards as well as INS -- the
18  predecessor INS agency, or would you like me to
19  specify INS and USCIS every time I refer to your
20  agency?
21    A   Unless you need to differentiate between
22  the two at some point, we can use USCIS as both

Page 14

1  agencies over time.

2      Q  Great.  The next topic that I'll be asking

3  you about, Mr. Aytes, is the follow:  Staffing and/or

4  resource requests within USCIS and/or decisions

5  related to the processing of naturalization

6  applications.  Are you ready to testify about that

7  topic?

8      A  Yes, I am.

9      Q  The next topic is instructions or

10  directives given by USCIS to the FBI to review and

11  accomplish the name checks of naturalization

12  applicants and/or any changes in those instructions by

13  USCIS to the FBI since engaging in the Memorandum of

14  Understand in 1985.  Are you prepared to testify about

15  that topic?

16      A  Not all the way back to 1985, but --

17      MS. ONOZAWA:  I would also interject and

18  state that --

19      MR. GHACHEM:  There is a time limit, yes.

20      MS. ONOZAWA:  2005 to 2007.

21      MR. GHACHEM:  Thanks.

22      Q  There is a time limitation on this.  It's

Page 15

1  2005 to 2007.  So within that three-year time period

2  are you prepared to testify about the issues that I

3  just mentioned?

4      A  Yes, I am.

5      Q  Okay.  How about the surge in applications

6  immediately preceding the July 2007 fee increase at

7  USCIS?  Are you prepared to testify about that topic?

8      A  Yes, I am.

9      Q  Same question for the February 2008

10  revisions to the name check policy for legal permanent

11  residents?  Are you prepared to testify about that

12  issue?

13      A  Yes, I am.

14      Q  And the last topic has to do with any plans

15  or proposals by USCIS to eliminate or reduce backlogs

16  or delays in the processing of naturalization

17  applications of -- of applicants for citizenship

18  including, but not limited to, the 2002 backlog

19  elimination plan, but other than the 2008 joint plan

20  to eliminate backlog?  So let me rephrase that.

21      A  Yeah, please.

22      Q  Are you prepared to testify about any USCIS

Page 16

1  plans or proposals to reduce the backlog in

2  naturalization applications prior to the most recent

3  April 2008 joint FBI/CIS plan to reduce the backlogs?

4      MS. ONOZAWA:  Just let me interject and

5  state that we've objected to any plans or

6  proposals that have not been implemented because

7  they are covered on the deliberative process

8  privilege.

9      MR. GHACHEM:  Okay.

10      A  I have to ask a clarification because you

11  connected it with the FBI.  Are you talking about the

12  name check backlog or are you talking about the case

13  processing in general?

14      Q  I'm talking about any backlogs or delays

15  having to do with CIS's processing of naturalization

16  applications.  And to the extent that those delays

17  involve backlogs at the FBI in terms of name check --

18  in terms of name checks, then that would include that

19  subject.

20      A  Okay.

21      Q  So you're prepared to testify about that

22  topic?

Page 17

1      A  I am going back through my tenure as

2  running domestic operations.  That does not run back

3  to 2002.

4      Q  When you say, "that does not run back to

5  2002" --

6      A  My tenure in that position doesn't run back

7  to 2002.

8      Q  Which position is that?

9      A  Associate director of domestic operations.

10      Q  Okay.  I'll review your biography with you

11  in just a minute.  Maybe you can tell me a little bit

12  more about the different positions you've been in and

13  what the areas of responsibility are.

14      A  Sure.

15      Q  Before I do that let me just ask you one

16  more preliminary question.  Do you understand,

17  Mr. Aytes, what this lawsuit is about?

18      A  Yes, I do.

19      Q  Could you tell me what your understanding

20  is?

21      A  My understanding is there are several

22  issues that plaintiffs have raised.  One is an

Page 18

1 entitlement to each case being processed within six
2 months. The other is harm with respect to delays
3 associated with case processing in general and with
4 regards to delays caused by the background checks that
5 we conduct, specifically with the FBI.
6    Q   Okay. Are there any other issues that
7 this -- that this lawsuit involves in your
8 understanding?
9    A   Not my -- you can clarify for me, I'm sure.
10    Q   Well, I think what I would tell you about
11 the lawsuit is that it involves first a claim that the
12 changes that CIS made in 2002 to require completion of
13 FBI name checks prior to adjudication of N-400
14 applications as well as the requirement that the FBI
15 search both its main files and it's reference files,
16 that those changes in policies were done without
17 authorization from Congress and, therefore, are in
18 violation of the Administrative Procedure Act. That's
19 one claim in the lawsuit.
20    The other claim is that the current backlog
21 and/or delays in naturalization application processing
22 constitute unreasonable delays under the

Page 19

1 Administrative Procedure Act. And so there are two
2 claims under the Administrative Procedure Act.
3    A   Okay.
4    Q   All right.
5    While we're looking for this document,
6 Mr. Aytes, which is simply a printout of your
7 biography from the CIS web page, let me ask you about
8 some of the positions that I understand you have held.
9 What's your current position right now at CIS?
10    A   I'm acting deputy director.
11    Q   And how long have you been acting deputy
12 director?
13    A   They asked me that yesterday. I guess it's
14 been about two months.
15    Q   Okay. Who did you replace? Who was the
16 deputy director before --
17    A   The director left the agency. The deputy
18 director, Jock Scharfen, became acting director, and I
19 moved into his position.
20    Q   And what are your responsibilities as
21 acting deputy director?
22    A   Easiest way to describe it is chief

Page 20

1 operating officer for the agency.
2    Q   And that would include, of course,
3 supervision of everything having to do with processing
4 of naturalization applications?
5    A   Yes, it would.
6    Q   And what was your position prior to
7 becoming acting deputy director of the agency?
8    A   Associate director for the directorate,
9 which was domestic operations.
10    Q   Is it still domestic --
11    A   Yeah.
12    Q   Is it still called that?
13    A   Yes, it is.
14    Q   So there is somebody now who is an
15 associate director of domestic operations?
16    A   My deputy is acting in that position.
17    Q   And who is that?
18    A   Don Neufeld, N-E-U-F-E-L-D.
19    Q   And what are the responsibilities of that
20 position, associate director of domestic operations?
21    A   Its responsibility is to manage the
22 operations of the directorate, the service centers,

Page 21

1 the local offices, both production operations,
2 management activities and associated policies.
3    Q   Okay. And does that -- does that person
4 also oversee -- does that person also supervise the
5 processing of naturalization applications?
6    A   Yes.
7    Q   And does that person, who's now
8 Mr. Neufeld, does that person report to you as acting
9 deputy director --
10    A   Yes.
11    Q   -- of the agency? And who do you report
12 to?
13    A   I report to the acting director.
14    Q   Who is Mr. Scharfen?
15    A   Mr. Scharfen.
16    Q   And who does Mr. Scharfen report to?
17    A   Mr. Scharfen reports to the deputy
18 secretary.
19    Q   Of Homeland Security?
20    A   Of Homeland Security.
21    Q   Prior to becoming associate director for
22 domestic operations what was your position at CIS?

Page 22

1    A   I was the director of the information and
2   customer service division.
3        Q   And what did that involve?
4        A   It involved managing the operations of our
5   call centers and our information services program that
6   provided information on our website for interaction
7   with customers in our local offices and associated
8   customer services.
9        Q   Okay.  So did that involve all immigration
10  benefit applications, not just naturalization
11  applications?
12       A   It involved all immigration benefit
13  applications.
14       Q   Okay.  So in that capacity you were working
15  with staff members who were processing adjustments for
16  LPR status, for example, correct?
17       A   Uh-huh.
18       Q   As well as naturalization applications?
19       A   Yes, we provided customer services
20  associated with inquiries and the like over the
21  breadth of applications the agency processed including
22  both the ones you cited.

Page 23

1        Q   Did you have any interactions with the FBI
2   in that capacity?
3        A   No.
4        Q   So is it correct to say that the first time
5   that you had interactions with the FBI involving name
6   checks and the processing of naturalization
7   applications was when you became associate director
8   for domestic operations?
9        A   Yes.
10       Q   Okay.  Prior to being director of
11  information and customer service -- how long were you
12  director of information and customer service?
13       A   Well, that predated the formation of CIS
14  back into INS.  I'd have to go back and check.  It was
15  probably late '90s.
16       Q   When you began serving as director of --
17       A   When I took that position.
18       Q   And prior to that what was your position at
19  CIS?
20       A   I was a -- for a short time a senior
21  counselor to the agency.
22       Q   What does a senior counselor do?

Page 24

1        A   In that -- what I did was a variety of
2   special project activity.  The creation of our new
3   card production operations, the creation of our call
4   center operations, those types of activities.
5        Q   Okay.  And then prior -- when was that
6   period of time?  When were you a senior counselor
7   at --
8        A   That was just for a short period of time, a
9   year or so, before we established the information and
10  customer service division.
11       Q   Okay.  And before that what was your
12  position, then, at CIS?
13       A   Before that I ran the adjudications
14  division and also managed service center operations,
15  which was the activities of the four service centers
16  that INS had at the time.
17       Q   For what period of time did you run the
18  adjudications division?
19       A   Mid '90s for a couple of years.
20       Q   Okay.
21       A   And that was a parallel responsibility.  I
22  managed -- my permanent job was managing service

Page 25

1   center operations.
2        Q   And did that include adjudication of
3   naturalization applications?
4        A   The adjudications division was the program
5   office for naturalization.  As a program office back
6   in the way the agency was constructed at that time, it
7   didn't have direct operational authority over the
8   operations in our local offices.
9        Q   So you -- so who had responsibility for
10  supervising the processing -- or the adjudication,
11  rather, of naturalization applications?
12       A   That would have been through the field
13  services division --
14       Q   Okay.
15       A   -- agency at that time.
16       Q   And you were at headquarters at this
17  time --
18       A   Yes, I was.
19       Q   -- when you were heading up the
20  adjudications division?
21       A   Uh-huh.
22       Q   Okay.  Is there any -- is there any

Page 26

1  oversight by the adjudications division in
2  headquarters over the field offices relating to
3  naturalization applications --
4      A  As a program function there is oversight.
5      Q  So you had oversight over the adjudication
6  of naturalization applications as the head of the
7  adjudications division back in the mid '90s --
8      A  That's correct.
9      Q  -- is that correct?  Okay.
10        Did you interact with the FBI during that
11  time period regarding name checks in connection with
12  naturalization applications?
13        MS. ONOZAWA:  Asked and answered.
14      Q  You may answer the question.
15      A  Not with regards to name checks.  Did have
16  interaction with the FBI with regards to fingerprint
17  check process.
18      Q  And did that involve adjudication of
19  naturalization applications?
20      A  It involved the adjudication of
21  applications in which we conducted a fingerprint
22  check, which included naturalization applications.

Page 27

1      Q  Okay.
2        MR. GHACHEM:  I'm going to hand the witness
3  what I'd like to have marked as Aytes Number 1.
4        (Exhibit 1 was marked for identification
5    and attached to the deposition transcript.)
6  BY MR. GHACHEM:
7      Q  Okay.  Mr. Aytes, I've handed you a
8  document that is marked as Aytes Number 1.  Do you
9  recognize this document?
10      A  It's from our website.
11      Q  Okay.  Can you tell me what it is?
12      A  We list bios of key managers on our website
13  for customer information.
14      Q  Okay.  But what is this document?
15      A  This is my bio.
16      Q  Okay.  Is this a current biography?
17      A  Yes, it is.  Well, let's see, does it have
18  my -- yeah, it does say "acting."  So yeah, it is a
19  current bio.
20      Q  Okay.  And does it -- do you want to take a
21  moment to take a quick look at it?
22      A  I don't pay much attention to bios, but --

Page 28

1  okay.  (Complying.)
2      Q  Does it include all of the positions that
3  we have just discussed going back as far as your
4  service as head of the adjudications division in the
5  mid '90s?
6      A  It doesn't specifically -- well, it does
7  mention assistant commissioner of adjudications, yeah,
8  '96 through '97.  Yep.
9      Q  Okay.  And so this is an accurate
10  representation of your -- of the positions that you've
11  had at USCIS since that time period?
12      A  Yes, it is.
13      Q  Okay.
14      A  Lousy picture, but yes.
15      Q  Have you ever personally adjudicated a
16  naturalization application at CIS?
17      A  Yes, I have.
18      Q  When was that?
19      A  Early '80s.
20      Q  Was that the last time you did so?
21      A  Personally?
22      Q  Yes.

Page 29

1      A  Yes.
2      Q  So since the early 1980's -- is that what
3  you said --
4      A  Uh-huh.
5      Q  -- you have never actually adjudicated a
6  naturalization application?
7      A  Correct.
8      Q  Have you handled an appeal of an
9  adjudication decision on an N-400 application since
10  then?
11      A  I worked at the administrative appellate
12  office, but I don't recall ever handling appeals of
13  that nature.
14      Q  Okay.  Mr. Aytes, I'm going to ask you a
15  few questions now about changes that were made in late
16  2002, November 2002 to the agency's policies for the
17  handling of name checks in connection with
18  naturalization applications.  And in particular I'm
19  going to refer to two changes.  One of the changes was
20  the decision to require completion of an FBI name
21  check prior to adjudicating an N-400 application.  The
22  other change I'm going to refer to is the change that

Page 30

1 required the FBI to conduct a search of its reference
2 files as well as its name files when doing a name
3 check -- when processing a name check request from
4 CIS. So prior to --
5     MS. ONOZAWA: I object to these questions
6 to the extent that they're outside the topics
7 designated for Mr. Aytes' 30(b)(6) deposition.
8     MR. GHACHEM: Well, I haven't actually
9 gotten to the topic yet. I'm going to be
10 referring to the 2002 rule changes in connection
11 with topics that I think are listed on his
12 deposition.
13     Q So right now all I'm asking, Mr. Aytes, is
14 if I use the phrase "2002 rule changes" to refer to
15 both of the two policy changes from late 2002 that I
16 just described, will you understand when I use that
17 phrase, then, "2002 rule changes," what I'm talking
18 about?
19     A Certainly.
20     Q Okay. Is there a unit, Mr. Aytes, within
21 CIS that handles changes in the regulations governing
22 CIS, governing the agency?

Page 31

1     A There are several depending on the
2 regulation.
3     Q What are the various units that deal with
4 regulatory changes at CIS?
5     A Well, we have a branch that's integrated
6 within service center operations called "business and
7 trade" that coordinates program activities associated
8 with employment-based cases.
9         There is a regulatory group embedded within
10 our field operations division that handles regulatory
11 and programmatic functions associated with
12 naturalization. For example, there is a separate
13 regulatory group within our refugee, asylum and
14 international affairs division that coordinates
15 programmatic activities for asylum and refugee
16 processing. And then we have a generalized policy
17 group within an office policy that is more of an
18 overall coordinator of regulatory development.
19     Q Okay. So of the various units that you
20 just mentioned, which one would have had
21 responsibility for the 2002 rule changes?
22     MS. ONOZAWA: Again, I object to the

Page 32

1 question. I just feel that that's outside the
2 scope of his 30(b)(6) deposition. He's not here
3 to testify on behalf of the agency about the 2002
4 rule change.
5     MR. GHACHEM: Okay. Are you instructing
6 him not to answer that question.
7     MS. ONOZAWA: Yes.
8     MR. GHACHEM: Okay.
9     Q Does the -- are there any other units
10 within CIS that deal with regulatory changes at the
11 agency?
12     A The units I described are the units as they
13 exist today. That has changed and evolved over time.
14 In 2002 the structure was somewhat different. I
15 wasn't directly involved in regulatory development at
16 that time, so I couldn't tell you.
17         Now just about anyone can be involved in
18 regulatory development, but the offices that I cited
19 are the offices that have responsibility for
20 coordinating and managing those functions.
21     Q Okay. Does CIS have a general counsel or
22 an office of legal counsel?

Page 33

1     A Yes, they do.
2     Q And do they share responsibility for
3 regulatory changes at the agency?
4     A They provide legal advice with regards to
5 our operations and including our regulatory process.
6 They are a regulatory development or management office
7 in and of themselves.
8     Q Can you tell me who is the current head of
9 the unit that handles regulatory changes in the area
10 of naturalization application processing?
11     A Sorry, I don't know the name of that
12 manager.
13     Q Okay. Can you give me -- can you tell me
14 what the name of the unit is?
15     A It's a naturalization program office within
16 our field operations division. Field operations
17 division is run by Jack Bulger.
18     Q Can you spell that, please?
19     A B-U-L-G-E-R.
20     Q Is he in Washington?
21     A Yes, he is.
22     Q Do you know who Mark Phillips is?

Page 34

1      A   Mark Phillips is a staff officer who's had
2  various assignments over time.
3      Q   Okay.  Do you know what his position was in
4  February of 2007?
5      A   I think he was part of our regulatory
6  program management division.
7      Q   Mr. Aytes, what does an FBI name check
8  involve?
9      A   An FBI name check involves the FBI
10 searching through their records for information
11 associated with that name.
12     Q   What kind of records does the FBI search
13 when it does a name check?
14     A   My understanding is it searches through its
15 various databases and records for any type of
16 information pertaining to the name, pertaining to the
17 individual.
18     Q   Does it look into the applicant's criminal
19 history?
20        MS. ONOZAWA:  I object.  I'm not sure where
21 these questions are going, but Mr. Smith has been
22 designated to testify on behalf of the agency as

Page 35

1  to the purpose, use and value of the FBI name
2  checks in addition to the types of files or the
3  information contained in these files.  I would
4  direct the witness not to answer.
5        MR. GHACHEM:  Well, topic number 3, which
6  you've designated Mr. Aytes for, inquires about
7  the causes of delays in the processing of
8  naturalization applications and any remedial
9  efforts that have been implemented to address
10 delays.  Topic number 5 deals with instructions or
11 directives given by CIS to the FBI to review and
12 accomplish name checks.  And so I think I'm
13 entitled to ask Mr. Aytes what the agency's
14 understanding of an FBI name check is in
15 connection with those topics.
16        MS. ONOZAWA:  All right.  But I would
17 caution you not to stray too far into topic number
18 7.  I understand those questions are necessary to
19 the extent you need to establish a foundation for
20 his knowledge as to --
21        MR. GHACHEM:  What's topic number 7 say?
22        MS. ONOZAWA:  The purpose, use and value of

Page 36

1  FBI name checks related to immigration benefit
2  applications.
3  BY MR. GHACHEM:
4      Q   All right.  So, Mr. Aytes, would you like
5  to answer my question, which is what -- does the FBI
6  name check involve a search into an applicant's
7  criminal history?
8      A   I believe it does give us criminal
9  information as well as other information.  And if I
10 can clarify, the FBI name check is part of a suite of
11 background checks the agency runs on certain types of
12 applications.  Now, it's one of those checks that we
13 conduct.
14     Q   And the other two checks, what are the
15 other two checks?
16     A   Well, we run an FBI fingerprint check on
17 many individuals which is designed to give us
18 information with regards to arrests and convictions.
19 And we run a check of a system called "TECS/IBIS,"
20 T-E-C-S slash I-B-I-S, that is an inspectional system
21 that gives us access to other information that's been
22 posted by different agencies.

Page 37

1      Q   Okay.  Are persons who apply for
2  naturalization with CIS people who already have lawful
3  permanent resident status in the United States?
4      A   Almost exclusively.
5      Q   Are there any -- are there any exceptions
6  to that?
7      A   I think there may be -- you're getting into
8  technical details.  I think there may be a very
9  limited exception relating to members of the military.
10 But I'm no longer an expert in that field, so I
11 couldn't tell you if that still exists.
12     Q   And are persons who are lawful permanent
13 residents of the United States people who have already
14 been subjected to a criminal history search prior to
15 becoming --
16     A   At the time they became a permanent
17 resident, whether that may be two years, five years,
18 20 years, at the time that they became a permanent
19 resident, yes.
20     Q   Okay.  And how did CIS accomplish that
21 criminal history search?
22     A   Similarly we conducted -- the TECS/IBIS

Page 38

1 system that I alluded to did not exist many years ago,
2 but the agency has historically run fingerprint checks
3 and, I believe, name checks.
4    Q  Can you tell me how long naturalization
5 applicants reside in the United States on a typical
6 basis before they apply for naturalization?
7    A  Typically?
8    Q  Yeah.
9    A  Even that varies over time.  I believe the
10 average is something over ten years.  Last year that
11 average increased significantly because a large number
12 of additional folks made the decision that they wanted
13 to become American citizens.
14    Q  Okay.  So the average naturalization
15 applicant is someone who has been residing in the US
16 for ten years about; is that correct?
17    A  Yes, my recollection.
18    MR. GHACHEM:  Okay.  I'd like to have this
19    document marked as Aytes Number 2.
20    (Exhibit 2 was marked for identification
21    and attached to the deposition transcript.)
22 BY MR. GHACHEM:

Page 39

1    Q  Mr. Aytes, I'm handing you a document that
2 is titled at the top, "Federal Bureau of
3 Investigation."  The date is December 13, 2002.  It is
4 addressed to the FBI Director's Office.  Do you
5 recognize this document?
6    A  No, I don't.  Doesn't -- I may not -- have
7 seen it at some point, but I do not recognize it.
8    Q  Sorry, let me clarify your answer there.
9 Are you saying you may have seen this document or you
10 haven't --
11    A  Can't tell you definitively that I have or
12 have not seen this document.
13    Q  Can you just take a minute, Mr. Aytes, and
14 look through it?  Then I'll ask you a few follow-up
15 questions about it.
16    A  (Complying.)  Okay.
17    Q  Okay.  What does this document appear to be
18 about?
19    MS. ONOZAWA:  I have to object to any
20    questions that relate to this document as they
21    relate to topic number 6, which is the 2002 name
22    check rule including, but not limited to, the

Page 40

1 reasons the 2002 name check rule was implemented.
2 That has been designated -- Mr. Collette has been
3 designated to be the agency's 30(b)(6) witness as
4 to the reasons underlying the 2002 name check rule
5 change.
6    MR. GHACHEM:  Okay.  Well, Tomoko, if you
7    look to -- well, if you just look to the first
8    page, you see that the document has to do with a
9    recheck of the 2.2 million names of naturalization
10    applicants that took place in 2002, which is a
11    cause of delay of the naturalization applications,
12    right?  And therefore, it falls under --
13    (Interruption.)
14    MR. GHACHEM:  -- and therefore, it falls
15    under topic number 3, causes of delays and/or
16    backlogs in the processing of naturalization
17    applications.
18    MS. ONOZAWA:  Understood.  I just wanted to
19    clarify for the record that to the extent there
20    are any questions about this document that relate
21    to the name check rule change itself I would
22    object.

Page 41

1    Q  Mr. Aytes, you can answer my question.
2    A  Could you repeat the question?
3    Q  What does this document appear to you to be
4 about?
5    A  Appears to be about modifications to the
6 criteria for conducting name checks and for rerunning
7 a population of checks.
8    Q  If you look at the first page of the
9 document, Mr. Aytes, do you see it says, "This
10 summer" -- under "Synopsis" midway through the page,
11 "This summarizes the current status of name checks for
12 the Immigration and Naturalization Service and
13 recommends approval for the FBI to waive one-half of
14 the user fees recheck 2.2 million names of aspiring
15 citizens"?
16    A  Yes.
17    Q  Did CIS ask the FBI to recheck 2.2 million
18 names of N-400 applicants in 2002?
19    A  From my reading of this document, it did.
20    Q  What about from your experience as an
21 official at USCIS?
22    A  My recollection is that the agency did ask

Page 42

1 the FBI to rerun over 2 million name checks.

2    Q  Why did it do so?

3    A  It do so because it felt that the criteria

4 that had been used at the time were -- that they were

5 originally run were incomplete and did not completely

6 search the FBI's records.

7    Q  Why did it feel that way?  Why --

8    A  Because --

9    Q  Sorry, let me complete my question,

10 Mr. Aytes.  Why did the agency feel that the FBI

11 searches were not complete?

12    A  Because there were a couple of example

13 cases that caused us to -- again, my recollection --

14 to ask them to restate what their criteria were, what

15 databases and records they were searching and not

16 searching.  And when they've -- it was determined that

17 that was not a complete search of their records, that

18 steps needed to be taken to rerun those names against

19 their full records.

20    Q  Can you look at page 2 of this document?

21    A  Uh-huh.

22    Q  Do you see where it says "'missed' name

Page 43

1 check" in the middle?

2    A  Uh-huh.

3    Q  And underneath that it reads, "INS recently

4 notified the FBI that one of the names searched with a

5 'no record' response has subsequently been determined

6 to be involved in a foreign counterintelligence

7 investigation."

8    A  Uh-huh.

9    Q  Is that one of the incidents that you just

10 referred to?

11       MS. ONOZAWA:  Objection.  I just see this

12 as covering topic number 6, which is designated to

13 Mr. Collette.  Direct the witness not to answer.

14    Q  Let me rephrase my question for you,

15 Mr. Aytes.  When the INS requested the FBI to recheck

16 2.2 million names in 2002, did that cause a delay in

17 the processing of naturalization applications at CIS?

18    A  Yes, it did.

19    Q  Why did it do that?

20    A  Why did it cause a delay?

21    Q  (Nodding head up and down.)

22    A  Because the agency waits until it gets the

Page 44

1 final results of a name check before it makes a

2 decision on an application, especially for

3 citizenship.

4    Q  When you say the agency waits on a final

5 decision from the FBI for a naturalization

6 application, what time period are you referring to?

7    A  I'm speaking of now, but I believe that

8 that was the policy at that point as well.

9    Q  What point is that?

10    A  Back in 2002.

11    Q  At what point in time in 2002?

12    A  I'm not aware that -- I'm not personally

13 aware that the agency -- let me think.

14       Back in the 1990s the agency used to move

15 forward with applications assuming that the FBI would

16 have notified us within a certain period of time if

17 there had been any derogatory information either from

18 the criminal check, the fingerprint check or the name

19 check.  That policy was later modified.  Specifically

20 I was involved in the modification on the fingerprint

21 check.  I believe it was subsequently modified with

22 regards to name checks, but given that I wasn't

Page 45

1 personally involved in that, I couldn't tell you the

2 date.

3    Q  When did the fingerprint modification roll

4 into place?

5    A  That was in around '96?

6    Q  Did INS in 2002 ask the FBI to recheck 2.2

7 million names because FBI had returned a "no record"

8 response in connection with a naturalization applicant

9 who had filed in the Newark, New Jersey field office?

10    A  Well, that's what's stated here that you

11 just cited on page 2.  You've offered some additional

12 details.  There was a Newark case that I've been told

13 of that did give the agency pause and was one of the

14 reasons why the agency went back to the FBI to ask for

15 a greater understanding of what databases they -- and

16 records the Bureau was searching and not searching.

17    Q  So you believe that that incident involving

18 the --

19       MS. ONOZAWA:  Objection.

20    Q  -- applicant out of the Newark, New

21 Jersey --

22       MS. ONOZAWA:  Objection.  This is outside

Page 46

1  the scope of the 30(b)(6) deposition. I think
2  we've established that 2.2 names were rerun as a
3  result of this incident, and I think that's
4  relevant to the reasons for any delays or backlogs
5  it would have caused after that, which is relevant
6  to topic number 3. I would direct the witness not
7  to answer.
8      MR. GHACHEM: Well, answer what? I haven't
9  even asked the question.
10     MS. ONOZAWA: I just believe this is
11  straying into the topics of the reasons for the
12  2002 name check change, which, again, is not a
13  topic that Mr. Aytes has been designated to
14  testify on behalf of the agency.
15     Q  All right. I'll rephrase my question for
16  you, Mr. Aytes. The incident from 2002 involving an
17  applicant who applied through the Newark, New Jersey
18  field office and who was later found out to be,
19  according to the FBI, affiliated with a terrorist
20  organization, did the FBI ever uncover a criminal
21  record on that person?
22     MS. ONOZAWA: I object as outside the scope

Page 47

1  of this 30(b)(6) topic. I direct the witness not
2  to answer.
3      MR. GHACHEM: Okay. Can we just take a
4  quick break, Mr. Aytes? I'm going to confer with
5  your attorney outside the room and I'll be right
6  back.
7      THE WITNESS: Sure.
8      MR. GHACHEM: Thanks.
9      (Recess taken.)
10     MR. GHACHEM: Okay. I'd like to have this
11  document marked as Aytes Number 3.
12     (Exhibit 3 was marked for identification
13  and attached to the deposition transcript.)
14  BY MR. GHACHEM:
15     Q  Mr. Aytes, I'm handing you a document that
16  is marked Aytes Number 3. The Bates number on the
17  beginning page is CIS 002555. It's dated November 13,
18  2002. Do you recognize this document?
19     A  Yes, I've seen this.
20     Q  Can you tell me what this is?
21     A  It's a memorandum from the then executive
22  associate commissioner for field operations that

Page 48

1  described specific responsibilities that adjudicators
2  had with respect to certain background checks and
3  reviews of INS and other records.
4      Q  Is this the document that implemented the
5  2002 rule changes?
6      A  That you were speaking of earlier?
7      Q  Yeah. Again just to remind you, when I say
8  "2002 rule changes" --
9      A  Yes.
10     Q  -- I mean the requirement of a definitive
11  response from the FBI as well as the requirement that
12  the FBI search both the reference and the main files.
13         Is this the document that implemented for
14  CIS the 2002 rule changes?
15     MS. ONOZAWA: I object to that question.
16  It relates to topic number 6, which is outside the
17  scope of his 30(b)(6) deposition.
18     MR. GHACHEM: Topic number 4 reads,
19  "Decisions related to the processing of
20  naturalization applications." Again, this is
21  something that may fall under topic number 6 as
22  well, but topic number 4 clearly encompasses this

Page 49

1  document. I'd like to be able to ask my question
2  before you -- before you instruct the witness not
3  to answer.
4      MS. ONOZAWA: You're asking Mr. Aytes if
5  this is the document that implemented the 2002
6  rule change, and that's outside the scope of this
7  deposition testimony. At least he's not
8  designated to speak as the agency representative
9  as to which document implemented the 2002 rule
10  change.
11     MR. GHACHEM: Is he designated as the
12  person to speak about decisions related to the
13  processing of naturalization applications under
14  topic 4?
15     MS. ONOZAWA: Topic 4 is --
16     MR. GHACHEM: Topic 4, "Staffing and/or
17  resource requests and/or decisions related to the
18  processing of naturalization applications." This
19  is a document that has to do with how adjudicators
20  processed naturalization applications.
21     MS. ONOZAWA: I would direct the witness to
22  answer "yes" or "no" if he knows that, but any

Page 50

1    further questions about the 2002 name check rule
2    change I would --
3        Q    You may answer my question, Mr. Aytes.
4        A    From the face of this, this did not
5    implement those changes.  This is simply an
6    instruction to adjudicators that says you have to
7    review the actual A-file, which is the account-based
8    file that we maintained on an individual, and that you
9    have to review the final results of the FBI name
10   check.  It doesn't allude to any changes or
11   modifications on how the FBI name check is -- search
12   is conducted by the FBI.
13       Q    Can you look to page 2 of the document?
14       A    Uh-huh.
15       Q    Can you read the first paragraph marked
16   number 2 there near the top of the page?
17       A    "If in response to a name check the FBI
18   indicates to the INS that a record may possibly exist
19   referred to in service guidance as 'IP' or 'indices
20   popular,' the application may not be decided until the
21   adjudicator obtains and reviews the information and
22   receives a specific determination from the FBI that

Page 51

1    the record does not relate to the applicant.  The
2    disposition of the IP response must be documented in
3    the file."
4            That simply says that you have to get the
5    FBI's final answer before you can proceed with an
6    adjudication.  Whether or not this is the document
7    that implemented that change of you have to wait for a
8    final answer I couldn't tell you.
9        Q    Is there -- is there another document that
10   did that, that implemented the 2002 rule changes?
11       A    As I said before, I'm not aware when there
12   was a change specifically as to you have to wait for
13   the result of the name check as opposed to initiating
14   the name check and waiting for a stipulated period of
15   time.  So that may have been done at 2002, it may have
16   been done separately.  Because I wasn't involved in
17   managing this aspect of operations at the time I
18   couldn't tell you.
19       Q    Who was Johnny Williams?
20       A    Johnny Williams was at the time the
21   executive associate commissioner for field operations
22   in INS.

Page 52

1        Q    What is his current position?
2        A    I believe Mr. Williams is retired.
3        Q    Can you tell me what prompted Mr. Williams
4    to issue this memo?
5            MS. ONOZAWA:  Objection, calls for
6        speculation.
7        Q    You may answer the question.
8        A    Other than inferring from the face of the
9    memo itself, no, I can't.
10       Q    Well, what would you infer from the face of
11   the memo was the cause of Mr. Williams' issuing this
12   memo?
13       A    To ensure that adjudicators waited to
14   review the final answer from the FBI, that they
15   reviewed the results of the separate IBIS background
16   check that was conducted, and that they went through a
17   series of stipulated procedures to ensure that,
18   wherever possible, the actual permanent A-file was
19   available and had been reviewed before making a
20   decision on an application.
21       Q    Did the decision to require adjudicators to
22   await a definitive response from the FBI on name

Page 53

1    checks cause delays in the processing of
2    naturalization applications at CIS?
3        A    As opposed to proceeding absent a final
4    result?
5        Q    Correct.
6        A    Certainly.
7        Q    Prior to 2002 did CIS require completion of
8    FBI name checks before making a decision on a
9    naturalization application?
10       A    As I said, I'm not sure of the time frame
11   in which the agency changed its position from ensure
12   that you've requested it, wait a stipulated period of
13   time because we're certain that the FBI will respond
14   with negative information, if there is on the case,
15   and if they don't you're free to proceed, to a
16   standard of no, we're going to wait until we get their
17   final answer because, you know, we've realized that
18   their processing time has attenuated.
19       Q    Okay.  So the answer is you don't know when
20   the --
21       A    I don't know definitively when that change
22   was made.  And I can't tell you whether or not this

Page 54

1  was the memo that executed that change with respect to

2  name check.

3      Q   What else can you tell me about this memo?

4      MS. ONOZAWA:  Objection, vague.

5      Q   You may answer the question.

6      A   I can read it to you.  Otherwise I've told

7  you what, based on my reading, the important

8  particulars are.

9      Q   Is this memo still in force at CIS?

10     A   It -- to my knowledge, it was never

11 specifically rescinded.  However, procedures have in

12 some respects subsequently been modified.

13     Q   When you say that procedures have been

14 modified, can you tell me how they have been modified

15 from the procedures that are described in this memo?

16     A   The NQP guidance that's referred to, which

17 is National Quality Procedures, for naturalization

18 applications have been modified since 2002.  And there

19 have been significant additional materials given to

20 adjudicators with respect to how to conduct an IBIS

21 check, for example.  And there have been some changes

22 made with regards to the policies, including my memo

Page 55

1  of February, with respect to adjustment applications

2  as to in which cases -- on what types of applications

3  we will definitively always wait before making a

4  final -- before making a decision on the application.

5      Q   When you referred to your memo of February,

6  is that your member dated February 4, 2008, making

7  changes in the processing of LPR adjustment

8  applications?

9      A   Of adjustment applications.  I don't recall

10 if it was the 4th, but yes.

11     Q   Other than the changes you've just

12 described to me, are there any other ways in which INS

13 has since November 13, 2002 modified the guidelines

14 that are contained in this memo?

15     A   This is such a broad area of IBIS checks,

16 fingerprint checks, A-file review, I'm sure there are

17 a number of minor or major revisions over time.  We're

18 talking about stipulated procedures from almost six

19 years ago, so I'm sure there are a few documents that

20 will in some way modify procedures with regards to the

21 processing of an application or petition.  So I can't

22 tell you definitively that the ones that I've

Page 56

1  mentioned are the only ones that could have affected

2  in some way the mandate laid out in this instruction.

3      Q   Do you know if there are any instructions

4  subsequent to November 13, 2002, that have modified

5  how the agency processes naturalization applications

6  in particular?

7      MS. ONOZAWA:  Objection, vague and

8  overbroad.  You can answer.

9      A   There are -- I couldn't even count the

10 number of memos that we have probably sent that in

11 some way, shape or form give instruction or modify or

12 clarify the processing of naturalization applications

13 from eligibility criteria to process steps, the

14 institution of decisional quality review, the

15 modifications over time to the national quality -- NQP

16 procedures.  There have been a number of substantive

17 and nonsubstantive changes in procedures.

18     Q   Do any of those substantive or

19 nonsubstantive changes in procedures involve changes

20 in the FBI name check policy?

21     A   No, the FBI name check policy continues to

22 be that we will wait for a final answer from the FBI

Page 57

1  before we make a decision on a naturalization

2  application.  We have, as that February memo mentions,

3  made some changes with regards to adjustment case

4  processing.

5      Q   Okay.  So as regards FBI name checks,

6  Mr. Williams' November 13, 2002 memo remains in force

7  at CIS; is that correct?

8      A   Yes.  The policy is still to wait for a

9  final answer.

10     Q   Have there been any discussions in 2008

11 about changing that policy?

12     A   In the context of the modifications that we

13 made for adjustment processing there were discussions

14 about whether or not that change should be made and

15 whether or not that change should be broader and

16 should affect other types of applications.

17     Q   Did that -- did those other types of

18 applications include naturalization applications?

19     A   There were discussions.  Can't say no one

20 ever mentioned the word "naturalization applications"

21 in the context of that policy.  The agency's decision

22 was we were not going to modify that policy with

Page 58

1  respect to naturalization.

2  Q   When did the discussions that you just

3  referred to take place, the discussions involving

4  possible change to the requirements for FBI name

5  checks in connection with naturalization applications?

6  MS. ONOZAWA:  Objection.  I'm not sure how

7  that answer -- or that question relates to any of

8  the 30(b)(6) topics designated -- for which

9  Mr. Aytes is designated to testify on.

10  MR. GHACHEM:  Topic 4, decisions related to

11  the processing of naturalization applications.

12  Q   You can answer my question, Mr. Aytes.

13  A   There were discussions about what changes

14  we might wish to make.  A government agency is always

15  looking for ways to do things better, so you're always

16  talking about possibilities.  The fact that you

17  discuss a possibility doesn't mean that it's

18  preferable.

19  We discussed what the limitations should be

20  with respect to -- and whether or not we should make

21  any change in our preexisting policy of always waiting

22  for a definitive response from the FBI on a check --

Page 59

1  on a name check before proceeding to adjudication.

2  The decision was that we were comfortable in making

3  that policy change with regards to adjustment cases

4  because, one, it was consistent with policy --

5  preexisting policy that ICE had in removal proceedings

6  where adjustment can also be granted.  Also, because

7  it didn't change the status quo.  A person who is an

8  applicant for permanent residence is already entitled

9  to work authorization, travel authorization and is

10  allowed to remain in the United States while their

11  application is pending.  And because we could, if

12  based on cause, as a result of any final information

13  that we get from the FBI initiate rescission and/or

14  removal proceedings on an adjustment applicant.

15  So we felt that there were sufficient

16  grounds to distinguish an adjustment application from

17  a naturalization application, for example, and proceed

18  absent the FBI's final answer.

19  MS. ONOZAWA:  It's been about an hour.  I

20  suggest we take a break.

21  MR. GHACHEM:  You want to take a break?

22  Sure.

Page 60

1  (Recess taken.)

2  BY MR. GHACHEM:

3  Q   Mr. Aytes, you testified just before the

4  break that there were discussions at CIS in 2008 about

5  whether to extend the February 2008 LPR change to

6  naturalization applications as well; is that correct?

7  A   At the time we were formulating the policy,

8  it wasn't subsequent, at the time we were talking

9  about doing this for adjustment cases of course we

10  talked about other possibilities, including whether it

11  should encompass other applications.

12  Q   And did those other applications include

13  naturalization applications specifically?

14  A   Yes.

15  Q   Did the discussions include any discussion

16  about whether or not CIS is required to await the

17  completion of an FBI name check before adjudicating a

18  naturalization application?

19  MS. ONOZAWA:  I would object to that

20  question as subject to the deliberative process

21  privilege.  To the extent you can answer it

22  without revealing any communications, proposals or

Page 61

1  discussions that form part of the process of

2  formulating a decision, then you may answer it.

3  A   Not to my knowledge, because the agency's

4  position is why would you initiate a name check if

5  you're not going to wait for the answer?  Why would

6  you initiate any kind of background check if you're

7  not going to wait for the answer?

8  Q   Are there any other reasons why the agency

9  takes that position; namely, the position that

10  awaiting completion of an FBI name check is necessary

11  to adjudicate a naturalization application?

12  A   The agency conducts its background checks

13  for specific reasons to determine whether or not the

14  person is eligible for the benefit that they seek.

15  And so given that we conduct the check for that

16  purpose, proceeding to grant a benefit before you have

17  the results of that check, unless that benefit can be

18  readily rescinded, would not make any sense.

19  Q   Are there any other reasons why the agency

20  believes it is not appropriate to adjudicate a

21  naturalization application prior to receiving a

22  definitive response on an FBI name check?

1    A   Just what I've articulated.  We conduct it
2  for cause and we don't believe that -- we never
3  seriously discussed extending this to naturalization
4  because naturalization is a benefit that cannot be
5  readily rescinded.
6    Q   Did the agency require completion of FBI
7  name checks in connection with adjudicating
8  naturalization applications prior to 2002?
9    A   As I said, I don't recall when the agency
10  moved from the posture of initiating the check, and
11  based on information from the FBI that they were
12  completing the process within a given time frame, only
13  waiting for that time frame for a response and
14  assuming that no response was a negative response to
15  moving to a definitive check on the name check.  I can
16  tell you that we made that change with regards to
17  fingerprints back in the mid '90s, around '96.
18    Q   Well, was there ever a time, to your
19  knowledge, when CIS did not await a definitive
20  response on FBI name checks before adjudicating
21  naturalization applications?
22    A   I believe that was the policy in the early

1  '90s and before, but it was predicated on information
2  from the FBI that they were completing these name
3  checks and fingerprint checks within a given period of
4  time.  And so we were free to move forward if we did
5  not hear within that period of time.
6    Q   So is your testimony that it was only in
7  the early 1990s, to your knowledge, that CIS would
8  proceed with adjudications of naturalization
9  applications without awaiting a definitive name check
10  response from the FBI?
11    A   Early '90s and before, yeah.  And I can't
12  tell you when the policy changed to wait for a
13  definitive response.
14    Q   How about 1999?
15    A   Can't --
16    Q   What was the practice in 1999, to the best
17  of your knowledge?
18    MS. ONOZAWA:  I would object to that.
19  These questions are also touching -- running into
20  30(b)(6) topic 7, which relates to the use of the
21  FBI name checks related to immigration benefit
22  applications.

1    MR. GHACHEM:  Well, Tomoko, that's the
2  entire lawsuit.  I mean, topic 4 is decisions
3  related to processing of naturalization
4  applications and that --
5    MS. ONOZAWA:  My concern is that you're
6  reading topic 4 to such an extent that you're --
7  that is encompassing questions in topic 7 which
8  are specifically designated to a different
9  30(b)(6) witness.
10    MR. GHACHEM:  Well, I think I'm following
11  up on testimony that Mr. Aytes has given today,
12  and so I think I'm entitled to ask him about the
13  scope of certain answers that he's given.  And one
14  of the things that he's testified to is that --
15  he's testified, first, that he doesn't know when
16  the 2002 rule changes were first implemented, but
17  he's also testified that in the early 1990s the
18  agency did not await a final name check response
19  prior to adjudicating a naturalization
20  application.  And I'm asking him about other time
21  periods.
22    MS. ONOZAWA:  And I think all this -- it's

1  really straying outside the 30(b)(6) topics for
2  which he's been designated to speak on.
3    A   Let me put it this way:  I told you before
4  I do not recall the exact date or even approximate
5  date when the agency moved to a definitive -- to
6  waiting for a definitive reply from the FBI.
7    I do know that like fingerprints, those
8  changes were made because our understanding was that
9  the FBI was no longer able to provide those responses
10  within a given time frame.  And so we could no longer
11  assume that absent an answer within that time frame
12  that the answer was no record.
13    Q   And were there any other reasons why you
14  implemented that change other than the fact that you
15  could no longer assume that an answer would be given
16  within a certain time frame to a name check request?
17    A   No.  Again, you don't initiate -- you don't
18  conduct a background check, you don't initiate a
19  review unless you're prepared to complete the review.
20    MR. GHACHEM:  I'd like this marked as Aytes
21  Number 4.
22    (Exhibit 4 was marked for identification

Page 66

1    and attached to the deposition transcript.)
2  BY MR. GHACHEM:
3      Q  Mr. Aytes, I'm handing you a document that
4  I'm marking as Aytes Exhibit Number 4.  The Bates
5  number is CIS 00 --
6        (Interruption.)
7        MR. GHACHEM:  I'm about to get into a
8  fairly in-depth inquiry about this.  Do you need
9  to talk to --
10       MS. ONOZAWA:  Yes.
11       MR. GHACHEM:  Let's take a quick break.
12       (Recess taken.)
13  BY MR. GHACHEM:
14     Q  So before the break, Mr. Aytes, I had just
15  handed you a document that is now marked Aytes Exhibit
16  Number 4.  The Bates number on the first page is
17  CIS 006284.  Do you recognize this document?
18     A  Yes, I do.
19     Q  What is it?
20     A  It's a memo that I signed February the 4th,
21  2008, that modified our policy with regards to
22  adjustment applications and the name check.

Page 67

1      Q  Okay.  And is this an accurate copy of that
2  memo?
3      A  Appears to be.
4      Q  Mr. Aytes, before you issued this memo on
5  February 4 -- strike that.
6        The date of this memo is February 4, 2008;
7  is that correct?
8      A  Yes.
9      Q  Before you issued this memo, Mr. Aytes, on
10  February 4, 2008, did CIS engage in any analysis of
11  the impact that the LPR change would have on national
12  security or public safety?
13       MS. ONOZAWA:  And I would direct the
14      witness to answer that to the extent the answer
15      would not reveal any communications protected by
16      the deliberative process privilege.
17     A  Actually I think I've answered that in an
18  earlier response.  The agency said we are going to
19  come in compliance with ICE's preexisting policy in
20  this regard and said we're not changing the national
21  security status quo through this decision because an
22  adjustment applicant already has employment

Page 68

1  authorization, permission to remain in the United
2  States, permission to travel in and out of the United
3  States.  And since adjustment -- since permanent
4  residence is a condition that can be rescinded and can
5  be taken away in removal proceedings that the agency
6  did not feel it was changing the national security
7  status quo relative to our preexisting policy.
8      Q  My question was did the agency engage in
9  any analysis or discussions of the impact of this
10  policy on national security or public safety.
11     A  Only as I've just alluded to.
12     Q  So is the answer that there were
13  discussions of the impact of this policy on national
14  security or public safety or that there were not?
15     A  There were discussions that there were
16  no -- that there was no substantive impact as a result
17  of this policy change.
18     Q  What do you mean by "substantive impact"?
19     A  As -- as I just explained, that it did not
20  change the status quo from a national security
21  perspective.
22     Q  Do you remember when those discussions were

Page 69

1  held?
2      A  In the month or so prior to the issuance of
3  the memo.
4      Q  Are there any documents that reflect those
5  discussions?
6        MS. ONOZAWA:  Again, I would direct the
7      witness not to answer to the extent that it would
8      reveal communications or documents covered by the
9      deliberative process privilege.
10     A  I'm not aware -- the nature of discussions
11  is discussions.  I'm not aware that there was -- were
12  papers written laying out different policy positions
13  on the matter.
14     Q  Were there any e-mails exchanged about that
15  subject?
16     A  Certainly possible.
17     Q  Did you write any e-mails about the
18  implications of this policy change for national
19  security or public safety?
20       MS. ONOZAWA:  Again, I would direct the
21      witness not to answer to the extent that doing so
22      would reveal the nature or the substance of any

1  communications he might have had predating the

2  2008 LPR change.

3      A   Be hard for me to answer that question in

4  the fact that I do send and receive lots and lots of

5  e-mails.  They're an electronic form of discussions.

6  Whether or not I sent or received any e-mails that

7  talked about the national security implications of

8  this policy as opposed to a verbal discussion around

9  the table, it's quite possible.  I can't tell you

10  definitively that I did or that I didn't.

11      Q   Did you confer with the FBI before issuing

12  this memo --

13      A   I did not.

14      Q   -- on February 4, 2008?

15      A   I did not.  Subordinates did.

16      Q   Who were they?

17      A   Greg Smith had ongoing discussions with the

18  FBI.  He was our -- had been appointed to manage

19  issues associated with the name check with the Bureau.

20      Q   Did those discussions relate to this

21  February 4, 2008 memo?

22      A   I don't know if he specifically discussed

1  the possibility or even notified them of the change.

2  He may have.

3      Q   Can you look to the first page of the

4  Michael, Mr. Aytes, please?

5      A   Yes, sir.

6      Q   The second paragraph begins, "USCIS is

7  issuing revised guidance in response to

8  recommendations of the DHS Office of Inspector General

9  regarding the need to align the agency's background

10  and security check policies with those of US

11  Immigration and Customs Enforcement (ICE)."

12      A   Uh-huh.

13      Q   What did you mean when you said

14  "regarding" -- when you wrote in this memo, "regarding

15  the need to align the agency's background and security

16  check policies with those of US Immigration and

17  Customs Enforcement"?

18      A   As I mentioned earlier, adjustment status

19  is a benefit that is adjudicated both by USCIS and in

20  some instances is adjudicated by an immigration judge

21  in removal proceedings.

22      The preexisting ICE policy that the OIG is

1  referencing was, as I mentioned earlier, to initiate

2  the checks, but then to proceed in adjustment

3  applicants because they could rescind that status if

4  it was later deemed necessary and appropriate.

5      Our policy up until this memorandum was not

6  to proceed, but to continue to wait until we got a

7  definitive decision this policy change brought our

8  procedures -- or made them consistent with the

9  procedures that ICE had been using for years.

10      Q   Is it the practice of CIS to align its

11  policies regarding applications for adjustment of LPR

12  status with ICE practices and policies?

13      A   You're adjudicating the same benefit.  And

14  so by and large you at least want to be aware of the

15  procedures that another agency uses in its procedures

16  to adjudicate that benefit.

17      Does it require that you be absolutely

18  aligned?  No, because there are some changes and some

19  differences in the agencies.  But we felt that with

20  respect to adjustment processing that it made sense

21  for us to adopt the ICE practice.

22      Q   So who adjudicates applications for

1  adjustment and LPR status?  Is it ICE or is it CIS or

2  both?

3      A   Both -- it's not ICE.  It's an immigration

4  judge.

5      Q   What is ICE's role, then, in processing of

6  applications?

7      A   ICE handles the associated processing and

8  represents the government before the immigration

9  judge.

10      Q   And what is CIS's role in the processing of

11  adjustment applications?

12      A   CIS handles the entire process, the

13  processing of the application and the decision-making

14  process.

15      When a person applies for adjustment of

16  status before an immigration judge it is in removal

17  proceedings and it is a benefit that is available in

18  some instances in removal proceedings.  Some people

19  may only apply for adjustment in removal proceedings,

20  but the vast majority of adjustment applications are

21  handled by CIS.

22      Q   So do you -- does an applicant have to be

Page 74

1  in removal proceedings in order to apply for
2  adjustment to LPR status?
3      A   Only before an immigration judge.  If the
4  person is already in proceedings, the immigration
5  judge has jurisdiction over the adjustment
6  application, whereas if the person is not in
7  proceedings and is eligible to apply, CIS would have
8  jurisdiction over their application.
9      Q   And would ICE have any role in the
10  processing of the adjustment application where an
11  applicant is not in removal proceedings?
12      A   No.  CIS handles that entire process.
13      Q   So would there be any reason for CIS in
14  those cases to coordinate its policies with ICE?
15      A   Only in the sense that you're adjudicating
16  the same eligibility for the same benefit of permanent
17  residence and so you would desire to have some
18  consistency of practice.  The DHS OIG, you know,
19  pointed out that there was an anomaly with respect to
20  our positions in terms of name checks in adjustment
21  cases.
22      Q   Did this February 4, 2008 memo apply only

Page 75

1  to applications for adjustment to LPR status submitted
2  by persons in removal proceedings?
3      A   This memorandum?
4      Q   This memorandum.
5      A   This memorandum applied to those
6  individuals who are adjustment applicants before CIS.
7  The policy alluded to here that ICE has is the policy
8  with respect to how they and the immigration judges
9  proceed in removal proceedings.
10      Q   Okay.  So the -- so the policy that was
11  implemented on February 4, 2008 is a policy that
12  applies to all applicants for adjustment to LPR status
13  regardless of whether or not they're in removal
14  proceedings or not; is that correct?
15      A   Well, it brought us into a consistent
16  practice with ICE, and so now that is the prevailing
17  practice for all adjustment applicants.
18      Q   Does ICE have any role in the processing or
19  adjudication of naturalization applications?
20      A   No.
21      Q   There are no situations at all in which ICE
22  is involved in the processing or adjudication of a

Page 76

1  naturalization application?
2      A   I'm not aware of any.
3      Q   If you'll look again to Exhibit Number 4,
4  Mr. Aytes, the first page, second paragraph further
5  down, the sentence beginning, "In the context of
6  removal proceedings" -- do you see where I am?
7      A   Yes.
8      Q   It goes on to say, "ICE has determined that
9  FBI fingerprint checks and Interagency Border
10  Inspection Services checks are the required security
11  checks for purposes of the applicable regulations."
12      A   Uh-huh.
13      Q   Do you know why ICE has determined that
14  only fingerprint checks and IBIS checks are the
15  required security checks for purposes of
16  adjustment-to-LPR-status applications?
17      A   I can't answer for ICE as to why they made
18  that policy decision.  But in fact, they also initiate
19  the name check.  Their policy is simply not to wait
20  because they could rescind the status.
21      Q   You said they initiate the name check?
22      A   Yes.

Page 77

1      Q   Do they do that only where an applicant is
2  in removal proceedings?
3      A   That's correct.  That's the next sentence
4  of the memorandum following what you just read.
5      Q   Does CIS have any view as to why ICE
6  determined that fingerprint checks and IBIS checks are
7  the only required security checks for purposes of
8  adjustment-to-LPR-status applications?
9      A   Well, let me clarify.  We're talking to our
10  staff, and so there was a certain level of
11  understanding that we expect of folks in -- the FBI --
12  excuse me, ICE will initiate the IBIS check, the
13  fingerprint check and the name check.  All are
14  required by their procedures.  ICE will require that
15  they have a definitive answer on the IBIS check and
16  the fingerprint check before they proceed to move the
17  case forward in the docket and notify the judge so the
18  judge can make a final decision.
19      They do not wait for a final answer on the
20  FBI name check because, as is described in the last
21  sentence of this memorandum, their position has been
22  that because permanent residence is not permanent

Page 78

1 because it can be readily taken away for cause, that
2 if they were to find any information as a result of
3 the name check that caused them to question the
4 person's eligibility for permanent residence that they
5 could initiate rescission or removal proceedings.
6        That is what the key preexisting
7 distinction was between the two agencies. They said,
8 "We can take this away if necessary." We said, "Well,
9 that may be so, but we're going to wait anyway." The
10 February 4, 2008 memo simply adjusted our procedures
11 in adjustment-of-status applications to come into
12 compliance with their preexisting procedures.
13     Q  Was CIS required to come into compliance
14 with ICE procedures regarding adjustment-to-LPR-status
15 applications?
16     A  No, we were not required to do so. The DHS
17 OIG pointed out the anomaly of the difference in the
18 two agencies' policies in that respect. We made a
19 decision that we were going to modify our policies
20 with regards to adjustment-of-status applications.
21     Q  Can you turn to the second page of the
22 memo, please, Mr. Aytes?

Page 79

1     A  Yes, sir.
2     Q  The paragraph at the top of the page about
3 six lines down, it reads, "Where the application is
4 otherwise approvable and the FBI name check request
5 has been pending for more than 180 days, the
6 adjudicator shall approve the I-485, I-601, I-687 or
7 I-698 and proceed with card issuance," is that
8 correct?
9     A  That's correct.
10     Q  And this is the page that is Bates numbered
11 CIS 006285; is that correct?
12     A  Yes.
13     Q  Why did you decide that 180 days was the
14 appropriate period to wait for an FBI name check
15 request for adjudicating the adjustment-to-LPR-status
16 applications?
17        MS. ONOZAWA: Objection to form. I just
18     disagree with the characterization of "you."
19     Mr. Aytes is speaking on behalf of the agency.
20     Q  Let me rephrase my question, Mr. Aytes, in
21 light of that. Why did CIS decide on February 4, 2008
22 that 180 days was the appropriate time to wait for an

Page 80

1 FBI name check response before proceeding with
2 adjudication of an LPR -- of an adjustment-to-LPR-
3 status application?
4     A  We continued to have some reservations with
5 regards to the ICE policy to initiate the check and
6 then move forward knowing that name checks were taking
7 some time if there was actually a record on the
8 Bureau. We felt that that six-month time frame was a
9 reasonable period to wait before we made a preliminary
10 decision, but that waiting more than six months
11 probably did not make sense given that we could
12 rescind the status.
13     Q  So your testimony is that CIS chose the
14 180-day time period to wait for FBI name check
15 responses before adjudicating applications for
16 adjustment to LPR status because it regarded 180 days
17 as a reasonable period of time to wait; is that
18 correct?
19     A  In the context of adjustment proceedings
20 where we could rescind the status fairly readily for
21 cause.
22     Q  Is the answer yes, then?

Page 81

1     A  Yeah, but I have to clarify because that's
2 the key distinction as to why the agency did not
3 implement this same policy change for naturalization.
4     Q  Okay. So why don't you clarify that, then.
5     A  In the context of adjustment of status,
6 while it's referred to as "permanent residence," it is
7 in fact not permanent. For cause based on either
8 additional information that the agency obtains about
9 your initial eligibility or predicated on actions that
10 occur after you become a permanent resident, the
11 agency can initiate either rescission and/or removal
12 proceedings as appropriate. And it's fairly -- can
13 fairly readily take away your permanent residence and
14 in fact remove you from the United States.
15        Naturalization is very, very different.
16 While there is a theoretical ability to revoke
17 naturalization, it is -- it is and should be so
18 difficult to do so that it is close to impossible.
19 And so if you were to implement the same policy that
20 we implemented for adjustments, what you would be
21 doing is you would be making an absolutely --
22 literally an absolutely final decision that you could

1 not revisit whereas in adjustment cases if we get
2 subsequent information we can do -- and it's fairly
3 routine to be able to review and undo that decision.
4     Q   Let me ask you again about this 180-day
5 period that's referenced in this February 4, 2008
6 letter. You've testified that this 180-day waiting
7 period is reasonable given that it is possible to
8 rescind or revoke an adjustment to LPR status; is that
9 correct?
10    A   Yes.
11    Q   Are there any other reasons why CIS regards
12 the 180-day period -- waiting period as a reasonable
13 one for purposes of applications for adjustment to LPR
14 status?
15    A   No.
16    Q   It's the only reason?
17    A   (Nodding head up and down.)
18    Q   Why did the agency, then, decide that 180
19 days was the appropriate period?
20    A   It's a question of balance, because even in
21 making this policy change there is an associated
22 cost -- we're going to track each and every case that

1 we adjudicate without the FBI's final answer and
2 postaudit those cases until we get the FBI's final
3 answer and then review them.
4     So it was a question as to when is a
5 reasonable break point as to when their responses are
6 coming in in large portion, not for the entire
7 population, but in large portion, and what is a
8 reasonable break point to wait understanding that
9 obligation that we will impose on ourselves to
10 postaudit those cases.
11    Our preexisting policy, if I may --
12    Q   Sure.
13    A   -- was to always wait an adjustment
14 notwithstanding ICE's policy because we were issuing
15 people EADs that were valid for a year, they had
16 ongoing permission to remain in the United States, and
17 we were giving advanced parole documentation. So our
18 sense was there was no magical point in time. Once
19 you agree to come into -- that you want to adopt ICE's
20 position in this respect, it's reasonable to evaluate
21 at what point you want to move forward in time as
22 opposed to continuing to wait. We did not feel it was

1 reasonable to move forward immediately if we were
2 otherwise prepared to adjudicate an application for
3 adjustment.
4     Q   Are there any other reasons why the agency
5 believes that it is not appropriate to apply a 180-day
6 waiting period to applications for naturalization
7 other than the difficulties of revoking naturalization
8 once it's been granted?
9     A   I would say that that was the predominant
10 consideration. There is also, however, the -- how
11 it's perceived by the general public. Naturalization,
12 the granting of citizenship in the United States, is
13 the most important benefit this government can convey.
14 You do not do so unless you are certain. And to adopt
15 a policy that, "Well, we're somewhat certain but still
16 somewhat unsure. We're going to proceed nonetheless,"
17 and then argue for an expanded ability to be able to
18 take that status back from someone we felt was
19 inappropriate, beyond the fact that it was -- we don't
20 have that kind of authority under the current
21 statutory and regulatory constructions.
22    Q   Have any FBI name checks returned

1 derogatory information regarding an applicant for
2 adjustment to LPR status since the time this memo,
3 Exhibit 4, was issued on February 4, 2008?
4     MS. ONOZAWA: I object to that question to
5     the extent it calls for information that is
6     protected by the law enforcement privilege.
7     But you may answer to the extent that you
8     don't reveal that information.
9     A   I don't personally know how many cases
10 where we have initiated a revocation or -- or
11 initiated removal proceedings by issuing a Notice of
12 Intent to Appear.
13    Typically, given the time frames associated
14 with getting a positive response from the FBI, we
15 would be at an early stage of reviewing those cases to
16 decide if removal proceedings were warranted. So it's
17 really too early to determine what that volume is
18 going to be. If we expected that volume would be
19 zero, we would not have implemented the kind of
20 absolutely close controls over these cases until we
21 get the final answer from the FBI.
22    Q   Has CIS move to rescind the LPR status of

Page 86

1 any persons based on derogatory information returned
2 by the FBI since this February 4, 2008 memo was
3 issued?
4     A  I think I just answered that.
5     Q  And can you repeat your answer, then,
6 please?
7     A  My answer was that this procedure was
8 implemented in February.  Given the timelines to get
9 the final FBI response, to review that response and
10 make a decision as to whether or not to initiate
11 removal proceedings, the timelines are such that I
12 would doubt that we have done -- actually issued an
13 NTA in one of those cases.
14     Q  But you're not sure, it's possible that may
15 in fact --
16     A  It's possible.  I can't tell you
17 definitively that we haven't.
18     Q  Have there been any discussions since
19 February 4, 2008 about the effectiveness of this new
20 LPR policy applying a 180-day waiting period to the
21 FBI name checks?
22     MS. ONOZAWA:  I would direct the witness

Page 87

1     not to answer to the extent it calls for
2     information regarding -- predecisional information
3     regarding the efficacy of this policy.
4     A  Other than a lot of support from the
5 private sector and from organizations and individuals
6 who really appreciated this policy change, and other
7 than some concern on the Hill with respect as to
8 whether or not we were even going to entertain the
9 idea of extending this policy to naturalization, no,
10 there has not been -- again, this policy is relatively
11 new.  We have not yet been able to determine the
12 volume of cases in which we're going to have to
13 initiate removal proceedings.  Over time as the FBI
14 continues to reduce their processing times and their
15 associated backlogs, we'll be able to get a clear
16 sense as to how many cases where we will have to,
17 after granting permanent residence, initiate removal
18 proceedings.
19     Q  You said there were discussions between CIS
20 and members of Congress about the possibility of
21 extending --
22     A  There was a hearing.

Page 88

1     Q  Well, let me finish my question, please.
2 Did you testify that there were discussions between
3 CIS and members of Congress about extending the
4 February 2008 LPR change to naturalization
5 applications?
6     MS. ONOZAWA:  Objection, assumes facts in
7     evidence.  You haven't established that Mr. Aytes
8     personally has testified --
9     MR. GHACHEM:  I'm just asking him was that
10     his testimony --
11     A  I probably shouldn't have used the term
12 "discussions."  There was a hearing.  It was not on
13 the name checks.  It was a couple of months ago.  It
14 was on case processing issues.  The issue of our
15 policy with regards to adjustment procedures came up.
16 There were at least one explicit question from the
17 subcommittee with regards to whether or not we were
18 prepared or even willing to consider extending this to
19 naturalization.  And the question was framed -- you
20 can go back to the record -- by Representative King
21 and he was extraordinarily concerned that we might be
22 considering that kind of policy change.

Page 89

1     Q  Did you testify at that hearing?
2     A  Yes, I did.
3     Q  And how did you answer Representative
4 King's concern or question?
5     A  My answer was that the agency had no plans
6 to consider extending that policy to naturalization
7 because we did not have the ability to rescind that
8 status in the way that we did permanent residence.
9     Q  Is it impossible to rescind a
10 naturalization status?
11     MS. ONOZAWA:  Objection, vague, calls for
12     speculation.
13     Q  Let me rephrase the question.  Does CIS
14 have the ability to reverse a naturalization grant?
15     A  It is in theory possible under the law.  It
16 is in practice -- there is an exceedingly high
17 benchmark that the government has to reach in order to
18 be able to rescind naturalization, a far higher
19 benchmark than with regards to permanent residence.
20     Q  Can you tell me what CIS's understanding of
21 that benchmark is?
22     A  Let me put it this way:  From our

Page 90

1 perspective that benchmark is so high it would take an
2 extraordinary case where someone has -- there have
3 been a couple of instances, for example, of people who
4 were reportedly guards in Dachau, Auschwitz, those
5 kinds of places.  And even in those instances where
6 there's been fairly definitive proof it's taken
7 decades to strip an individual of their citizenship.
8 It is an exceedingly lengthy process and the legal
9 benchmarks are extraordinarily high for the government
10 to be able to rescind United States citizenship.
11     Q   Do you have responsibility for supervising
12 CIS denaturalization proceedings?
13     A   Denaturalization proceedings are usually
14 handled by the Department of Justice, if I recall
15 correctly.
16     Q   Does CIS have any role in those
17 proceedings?
18     A   I'm sure we have a tangential role.  I
19 couldn't specify exactly what that role is.
20     Q   Does CIS know what is required to
21 denaturalize a person?
22     A   CIS does.  Could I tell you over the table?

Page 91

1 No.
2     Q   Do you have any ideas about that --
3     A   I think I've described it in a broad sense.
4 Other than that you'd have to go back to the legal
5 experts to -- for that -- for more specificity.
6     Q   What would happen today if the FBI returned
7 derogatory information in response to a name check
8 request from the CIS in connection with an applicant
9 for adjustment to LPR status?
10     A   We're going to evaluate that information
11 and determine whether or not -- determine its
12 relevance to eligibility and whether or not it
13 predates -- the information predates or postdates
14 adjustment -- the grant of adjustment, and whether or
15 not the initiation of removal proceedings are
16 appropriate if we granted adjustment.  If we have not
17 granted adjustment, similarly we're going to go
18 through exactly the same process and the same kind of
19 review to determine its -- the impact of the
20 information on the determination of eligibility and
21 admissibility.
22     Q   Are those the same sorts of discussions

Page 92

1 that would occur if the FBI returns derogatory
2 information in connection with a naturalization
3 application?
4     A   Yeah, we do these name checks for a reason.
5 We do them to search for information relevant to a
6 person's claim of eligibility for benefit.  And so
7 we're going to take that information and we're going
8 to consider its relevance to their claim of
9 eligibility.
10     Q   You testified earlier that naturalization
11 is the most important benefit that the United States
12 Government can provide; is that correct?
13     A   I did.
14     Q   Why do you believe that?
15         MS. ONOZAWA:  Again, I object to the
16 question --
17     A   Let's put that down as personal opinion.
18     Q   Is that your belief or CIS's belief?
19     A   That is my personal belief.
20     Q   Okay.  Why do you believe that?
21     A   We are granting -- CIS grants a broad
22 variety of benefits, everything from extending

Page 93

1 someone's temporary stay in the United States to
2 letting them work here.  We grant important benefits
3 like asylum, refugee status, permanent residence in
4 the United States.  None of those convey the types of
5 rights, privileges and benefits that United States
6 citizenship conveys.  That is the benefit that
7 literally vests someone in this country, makes them
8 equal to every other person in every respect.
9     Q   Where does naturalization stand in terms of
10 priorities --
11     A   That's what I'm talking about,
12 naturalization is -- in terms of -- in terms of
13 importance, from my personal opinion, is that
14 naturalization is the most important benefit that
15 USCIS conveys.
16     Q   I'm asking now about the agency, about CIS.
17 Where does naturalization stand in the hierarchy of
18 priorities at CIS?
19     A   It is a very high priority for CIS.
20     Q   Is it the highest priority for CIS?
21         MS. ONOZAWA:  Objection, vague.
22     Q   You can answer that question.

Page 94

1    A   Is it the highest priority for CIS?  No.
2 There are certain rules and regulations that we have
3 to adhere to with regards to time frames for certain
4 applications.  The processing of a determination --
5 there are people in harm's way who we are adjudicating
6 for refugee benefits, for example.  Can I say that
7 naturalization is more important than the time
8 sensitivity associated with that refugee determination
9 given that situation that that individual is in?  No,
10 I can't.
11       That doesn't mean naturalization isn't an
12 important benefit, but I have to weigh the
13 circumstances that many of our applicants find
14 themselves in.  We have to weigh that a person who
15 applies for adjustment of status is entitled to
16 interim benefits within 90 days if we're not able to
17 process their associated applications, and so that
18 makes us prioritize their associated applications.
19       Other than those things, yes,
20 naturalization is considered, you know, probably the
21 most important benefit in terms of our priorities.
22 And I think we've made that pretty clear through the

Page 95

1 documentation, the strategy that we've laid out, the
2 shifting of resources from adjustment interviews to
3 naturalization interviews in field offices and the
4 other -- the allocations of overtime and the other
5 things that we have done to try and react to the
6 additional volume of applications that we received
7 last year.
8       MR. GHACHEM:  Okay.  I propose that we
9 break for lunch here, Tomoko, if you're okay with
10 that.
11       MS. ONOZAWA:  Okay.
12       (Lunch recess taken.)
13
14
15
16
17
18
19
20
21
22

Page 96

1       AFTERNOON SESSION
2       MR. GHACHEM:  Will you mark this as Aytes
3 5, please?
4       (Exhibit 5 was marked for identification
5 and attached to the deposition transcript.)
6       MS. ONOZAWA:  Sorry, just a question about
7 Aytes 5.  Just again I think this is -- to the
8 extent the questioning is going into any
9 comparative analyses regarding the value of the
10 name check, I would object as that is a topic
11 that's been designated for Greg Smith.
12       MR. GHACHEM:  I think you need to wait,
13 Tomoko, to see what I'm actually going to --
14 you've objected extensively, which, you know, is
15 your right, but you really need to hear my
16 questions before you object to the scope.
17       MS. ONOZAWA:  Fair enough.
18    CONTINUED EXAMINATION OF MICHAEL L. AYTES
19 BY MR. GHACHEM:
20    Q   All right.  So, Mr. Aytes, I'm handing you
21 a document that has been marked as Aytes Exhibit
22 Number 5.  The starting Bates number on the first page

Page 97

1 is CIS 004401; is that correct?
2    A   Yes.
3    Q   And this document is entitled, "FBI Name
4 Check Comparative Analysis," dated August 2, 2006; is
5 that right?
6    A   Yes.
7    Q   Did CIS produce this document?
8    A   Yes.
9    Q   Do you recognize it?
10    A   I've seen it.
11    Q   Okay.  What is your understanding of what
12 this document is about?
13    A   This was just one of a number of attempts
14 to try and look at the name check and look at side by
15 side with other background checks that we conduct to
16 attempt to identify, you know, the incidence of
17 information that we get from the name check as opposed
18 to those other kinds of searches.
19    Q   Are there any other studies comparing the
20 various background checks that CIS requests prior to
21 August 2, 2006 that you are aware of?
22    A   Prior to?

Page 98

1      MS. ONOZAWA:  Again, I -- I have to object.
2  I'm not entirely sure why this isn't outside the
3  scope of his 30(b)(6) -- designated 30(b)(6)
4  testimony.
5      MR. GHACHEM:  Well, it is -- it is
6  apparently outside the scope of Mr. Collette's
7  testimony whether or not there are any comparative
8  analyses of the FBI name check postdating 2003.
9  So you're limiting us in your other deposition.
10     MS. ONOZAWA:  That's not correct.
11  Mr. Smith has expressly been designated for this
12  purpose and his deposition is being taken
13  tomorrow.
14     MR. GHACHEM:  Sorry, Mr. Collette.
15  Mr. Collette.
16     MS. ONOZAWA:  That's correct.  And as I
17  understand it, Mr. Smith was expressly designated
18  to testify as to analyses as to the purpose, use
19  and value of the FBI name checks.
20     MR. GHACHEM:  I'm only asking whether or
21  not they exist.  So I think he can answer that
22  question.

Page 99

1      MS. ONOZAWA:  No, I actually believe that
2  Mr. Smith is the appropriate 30(b)(6) designee for
3  this line of questioning.  And I will refer you to
4  topic 7E, which has been designated CIS -- and
5  there's a reference to CIS 4401 to 4413, which has
6  been marked already as Aytes Exhibit 5.
7      MR. GHACHEM:  All right.  Well, I don't
8  intend to go into the substance of this report.  I
9  do want to ask him whether or not there are other
10  studies that are in existence and that's the
11  extent of my questioning on this topic.
12     MS. ONOZAWA:  And again, I think that's a
13  question that's appropriately directed to
14  Mr. Smith.  To the extent you can relate this to
15  any of the other topics that have been expressly
16  designated for Mr. Aytes -- I just don't see why
17  Mr. Aytes would be the agency representative who
18  would be answering these questions.
19     MR. GHACHEM:  All right.  How about topic
20  number 3, from 2000 to the present day causes of
21  delays and/or backlogs in the processing of
22  naturalization applications, the harm caused by

Page 100

1  such delays, remedial efforts, if any, to address
2  delays and/or backlogs in the processing of
3  naturalization applications, and any analyses
4  performed regarding such delays, backlogs and/or
5  remedial efforts?
6      MS. ONOZAWA:  But this comparative analysis
7  of the FBI name check, I just don't see how it
8  relates to delays, backlogs and/or remedial
9  efforts.
10     MR. GHACHEM:  Well, it's an analysis that
11  is regarding delays, backlogs and/or remedial
12  efforts insofar as it discusses --
13     MS. ONOZAWA:  I disagree.  Again, I insist
14  that --
15     MR. GHACHEM:  Okay.  Let's --
16  BY MR. GHACHEM:
17   Q  I'm going to redirect the line of
18  questioning.  We'll return to this later, Mr. Aytes.
19  This is not productive.
20     Mr. Aytes, do you know whether --
21     MR. GHACHEM:  So are you instructing him
22  not to answer that question.

Page 101

1      MS. ONOZAWA:  What question was that?
2      MR. GHACHEM:  My previous question, which
3  was, "Are there any analyses prior to August 2,
4  2006 of the comparative value of the name check
5  relative to other background checks that you're
6  aware of?"
7      MS. ONOZAWA:  That's correct.  I direct him
8  not to answer.
9  BY MR. GHACHEM:
10   Q  All right.  So, Mr. Aytes, do you know
11  whether the FBI has begun to look at the contents of
12  files relating to applicants with derogatory
13  information who have applied for naturalization as far
14  back as 2003?
15   A  I'm sorry, I don't understand.
16   Q  Is it true that CIS is still awaiting from
17  FBI further information regarding applicants for
18  naturalization who applied as long ago as 2003 and
19  with respect to whom the FBI has indicated that there
20  may be derogatory information?
21   A  At the present time I don't believe that's
22  any longer the case.  The FBI had a plan funded by us

Page 102

1 with money appropriated by Congress for that purpose
2 to reduce and eliminate their backlog. The initial
3 benchmark was to eliminate all cases that were over
4 four years old. They have substantively done that. I
5 think there are a couple of cases where the systems
6 are still being reconciled to make sure that the
7 results feed into our system. Their next benchmark
8 was to complete cases I think by the end of -- I think
9 it was the end of June, all cases over three years
10 old. And again, our data shows that they have
11 substantively met that benchmark. So I don't believe
12 that there are any cases that are older than 2003
13 where we are still waiting a final answer from the
14 Bureau.
15     Q   But there are -- but there are some cases
16 from 2003 where you're awaiting the final answer from
17 the Bureau?
18     A   There are some cases from 2003 -- or there
19 may be from 2003 where they have completed their
20 research and it's being fed into our system, but based
21 on the technology that's used, the tapes that's used,
22 we have to reconcile that on, you know, a case-by-case

Page 103

1 basis. And so I think they're down into a handful of
2 cases where the FBI has completed their work but the
3 results are not yet populated into our system.
4     Q   Is CIS still in the process of reviewing
5 letterhead memoranda from the FBI that summarize the
6 results of name checks that were returned to CIS as
7 far back as 2002?
8     A   We do have results from the FBI. The age
9 of the associated case I can't tell you because our
10 case management systems don't track each case by their
11 age. It's possible that there may be a case from 2002
12 where we have received the FBI's final answer and
13 based on that information have additional work to do
14 before we make a final decision.
15     Q   Are you aware, Mr. Aytes, that in 1985 the
16 FBI and CIS entered into a Memorandum of Understanding
17 regarding the parameters of the name checks that FBI
18 would perform for CIS?
19     A   I'm aware of that.
20     Q   Did CIS and the FBI enter into any other
21 agreements between 1985 and 2002 regarding the
22 parameters of the name check analyses that FBI

Page 104

1 performed for CIS?
2     A   I'm not aware of any.
3     Q   Okay. So the only ones that you're aware
4 of are the 1985 Memorandum of Understanding and -- are
5 there any others besides the 1985 Memorandum of
6 Understanding?
7     A   There was another document that you
8 referenced that alluded to changes in the systems and
9 in the screening and in the search criteria in 2002,
10 and then there have been a more recent MOU that has
11 been signed with the FBI that was part of our
12 releasing additional funds to the Bureau to add the
13 capacity necessary to work off their backlog.
14     Q   What's the date of that last memo that you
15 referred to, the more recent one?
16     A   I don't recall. It was -- I think it was
17 late 2007.
18     MR. GHACHEM: Have you produced that,
19 Tomoko, do you know, that 2007 MOU?
20     MS. ONOZAWA: We may have. I couldn't tell
21 you off the top of my head.
22     MR. GHACHEM: Okay. Could you check and

Page 105

1 see, if that hasn't been produced, whether you
2 could produce that to us?
3     MS. ONOZAWA: It would have to be sometime
4 tomorrow. We've produced 14,000 pages of
5 documents.
6     A   Late 2007, early 2008. It's an MOU between
7 the FBI and CIS that is summarized in the FBI's
8 backlog elimination plan that was provided to the
9 Hill.
10     Q   Does that 2007 Memorandum of Understanding
11 provide for any changes in the 2002 rule changes? Let
12 me rephrase the question. That was slightly
13 confusing.
14     Does that 2007 Memorandum of Understanding
15 between the FBI and CIS have any provisions relating
16 to whether or not CIS must await a definitive response
17 from FBI regarding any name checks that it submitted?
18     A   No, because that wasn't part of -- I don't
19 believe at any point that was part of a stipulation
20 between us and the Bureau. That was a decision made
21 by CIS based on the reasons why we were requesting the
22 name check and other background checks in the first

1 place.

2    Q    Does the 2007 Memorandum of Understanding

3 have any provisions relating to whether or not CIS

4 requires the FBI to search both its main and reference

5 files in response to name check requests from CIS?

6    A    There have been some refinements of the

7 search criteria.  I don't know that those refinements

8 are as broad as you just described.  You have to

9 remember that the FBI databases and their records

10 include a wide variety of things, including EEO

11 complaints about FBI employees, people who have been

12 trained by the FBI.  So, you know, there are things

13 that you want to filter out, records that you don't

14 want to search.  I don't know whether the changes that

15 have been made have been as broad as to go back and

16 eliminate searching reference files in large part or

17 in whole.  Greg could probably answer that off the top

18 of his head, Greg Smith.  I couldn't without going

19 back and looking in the documentation.

20    (Discussion off the record.)

21    MR. GHACHEM:  We have the Memorandum of

22 Understanding.

1    THE WITNESS:  I would have been surprised

2 if you hadn't.

3    MS. ONOZAWA:  What's the date?

4    MR. GHACHEM:  It's attached to an e-mail

5 dated October 16, 2007.  It's CIS Smith.e 02408

6 and 09.

7    MS. ONOZAWA:  Okay.  Thanks.  Can you say

8 the Bates number again?  I'm sorry.

9    MR. GHACHEM:  It is CIS Smith 02408 to

10 02409.

11    MS. ONOZAWA:  Okay.

12    MR. GHACHEM:  I'd like to have this

13 document marked as Aytes Number 6.

14    (Exhibit 6 was marked for identification

15 and attached to the deposition transcript.)

16 BY MR. GHACHEM:

17    Q    Mr. Aytes, I'm handing you a document that

18 is now designated Aytes Exhibit 6.  It has the Bates

19 number beginning CIS 000987; is that correct?

20    A    Yes.

21    Q    Do you recognize this document?

22    A    Not off the top of my head.  I've probably

1 seen it at some point, but I don't recognize it

2 quickly.

3    Q    Do you see that on the first page it says,

4 "Department of Justice," and then below that, "G-325

5 Name Check Business Case Analysis Feasibility Study"?

6    A    Uh-huh.

7    Q    What is a G-325 name check?

8    A    G-325 was a prior process with regards to

9 conducting name checks with the Bureau and with some

10 other agencies, a preexisting paper process.  The

11 G-325 was a biographic form that an individual would

12 fill out, submit with their application, and copies of

13 it would actually be on paper submitted to other

14 agencies to initiate a search.

15    Q    Okay.  So -- so in other words, it's the --

16 it's what we understand as the FBI name check in

17 connection with naturalization applications; is that

18 right?

19    A    Yes.  Iteratively, yes.

20    Q    Is this document, Aytes Exhibit Number 6,

21 an INS study?

22    A    Seems to be.

1    Q    Okay.  Could you take a look at page 1 of

2 the study, which is CIS 000988 Bates number?

3    A    Uh-huh.

4    Q    See at the very bottom of that page,

5 Mr. Aytes, it says, "INS established the name check

6 process to request background information from FBI and

7 CIA"?  Do you see that?

8    A    Uh-huh.

9    Q    And then at the top of page 2 do you see

10 that it reads, "While name checks are not specifically

11 required by Congressional legislation, there are

12 several statutory sources related to INS's

13 responsibility to conduct background investigations"?

14    A    Uh-huh.

15    Q    Can you tell me what your understanding of

16 that sentence is, the sentence beginning, "While name

17 checks are not specifically required"?

18    A    There is no -- my recollection is there is

19 no explicit reference to the types of background

20 checks that we are required to conduct by legislation.

21 We are required to make determinations of eligibility

22 for the specific benefits consistent with the

1 statutory eligibility criteria that Congress

2 established for that particular benefit.

3        And so what they're talking about here is

4 the underlying bases upon which the agency has decided

5 that the name checks are relevant to its determination

6 of eligibility for these applications.

7     Q   Could you turn, please, to page 12 of the

8 study, Mr. Aytes, which is Bates number CIS 000999?

9     A   Uh-huh.

10    Q   Do you see that at the top of this page

11 there is a proposed alternative to the name check

12 proposing that INS eliminate G-325 functionality in

13 current systems?

14    A   Uh-huh.

15    Q   Can you explain to me what that means,

16 eliminate G-325 functionality in current systems?

17    A   What that would mean is that would

18 eliminate the associated tracking mechanisms, because

19 this alternative suggests eliminating the entire name

20 check process.

21    Q   Do you know why INS proposed as an

22 alternative eliminating the name check process in this

1 April 2001 study?

2     A   Let me clarify.  INS, my understanding, did

3 not propose as an alternative.  INS considered a

4 variety of alternatives.  One of the alternatives it

5 considered in this study was whether or not the G-325

6 should be eliminated.

7     Q   On that same page, 12, Mr. Aytes, if you

8 look in the paragraph that's titled "Description," do

9 you see about three lines down that it reads, "First,

10 the INS already garners background information through

11 applicant interviews and the fingerprint check

12 process"?

13    A   Uh-huh.

14    Q   "Thus the elimination of the name check

15 process may not hinder INS from satisfying statutory

16 requirements"?

17    A   Yeah, it discusses the possible arguments

18 for eliminating the name check.  It doesn't make

19 definitive determinations, for example, that that's a

20 fact.  It discusses the rationales for an alternative

21 to potentially eliminate the name check.

22        MS. ONOZAWA:  And again, I would object

1 this the further line of questioning to the extent

2 you're straying into topic 7E, analysis of the

3 value of FBI name checks in adjudicating

4 naturalization applications, as a topic that has

5 been expressly designated for Greg Smith tomorrow.

6        MR. GHACHEM:  Okay.  This is a document

7 that I'd like to have marked as Aytes Exhibit 7

8        (Exhibit 7 was marked for identification

9 and attached to the deposition transcript.)

10 BY MR. GHACHEM:

11    Q   Mr. Aytes, if you'd turn to the first page

12 of this document, it reads at the top, "A blueprint

13 for the New Naturalization Process," and it's dated

14 December 8, 1998.

15    A   Uh-huh.

16        MS. ONOZAWA:  Objection.  You haven't

17 established that Mr. Aytes is actually familiar

18 with this document.

19        MR. GHACHEM:  Well, I will ask him that in

20 just a minute, but I'm just asking if he

21 recognizes the first page.

22    Q   Do you recognize this document, Mr. Aytes?

1     A   We had a number of documents that were

2 generated by PricewaterhouseCoopers.  Again, I'm

3 not -- off the top of my head don't recall this one,

4 but we had PricewaterhouseCoopers do a number of

5 studies relating to possible alternatives for changes

6 in the naturalization process.

7     Q   Okay.  Would you like to take a minute to

8 look through this and see if it refreshes your

9 recollection of this particular Pricewaterhouse study?

10    A   Go ahead and ask your question, then I'll

11 try and catch up.

12    Q   Okay.  Is it your understanding that this

13 study by PricewaterhouseCoopers was part of an effort

14 to remedy delays in the naturalization application

15 processing situation at INS?

16    A   It was actually broader than that.  The

17 agency was looking at how it could reengineer the

18 process to improve the consistency, improve the

19 quality of the decision-making process, customer

20 service surrounding the naturalization process, as

21 well as ideally be able to reduce processing times.

22    Q   Can you turn to page 3 of the document,

Page 114

1  which is CIS 000120?

2      A   Yes.

3      Q   Do you see that at about the middle of the

4  page, the end of the second paragraph there, it

5  states, "Current INS policy specifies that if no FBI

6  response is received after 45 days, the assumption is

7  made that there are no matches"?

8      A   Second paragraph?

9      Q   The end of the second paragraph --

10     A   Oh, okay.

11     Q   -- on page 3.  It's the last sentence

12 there.  "Current INS policy" --

13     A   Uh-huh.  So apparently that policy was in

14 place at that time.

15     Q   Okay.  When you say "that policy," just to

16 clarify, you mean the policy whereby INS did not

17 require completion of an FBI name check prior to

18 adjudicating a naturalization application?

19     A   No, I'm sorry, I wouldn't describe it that

20 way.  What we talked about earlier was that the agency

21 had a policy that understood that the FBI would

22 complete its processing within a given period of time,

Page 115

1  and thus we would receive any record response within

2  that period of time.  And so we were free, receiving

3  no response within that time frame, to proceed

4  assuming that there was no record.  It was -- that was

5  very different than deciding to proceed consciously

6  knowing that the name check was still pending.

7          In essence our understanding up until, you

8  know, a few years ago was that the FBI was keeping up

9  with these cases.  It was very similar to the

10 situation with fingerprints that we had until the mid

11 '90s.  And then when we found out that they were not

12 able to keep up, we had to change our policy, because

13 our policy wasn't just to initiate and then proceed,

14 our policy was that we would get an answer within that

15 time frame of anything that was substantive, and if we

16 didn't get an answer within that time frame our

17 assumption was there was no record.

18     Q   What was the basis of that assumption?

19     A   My understanding, it was based on

20 discussions with the FBI about their time frames at

21 those points in time.

22     Q   Is it possible that after waiting 45 days

Page 116

1  and proceeding with an adjudication of a

2  naturalization application that the FBI would

3  subsequently return derogatory information in response

4  to a CIS name check request?

5      A   It's possible.  I think to the extent to

6  which that happened it would have caused the agency to

7  question its policy.

8      Q   But as of the date of this study, which is

9  December 8, 1998, is it correct to say that it was the

10 policy of INS that it was not required to wait more

11 than 45 days for an FBI name check response prior to

12 proceeding with adjudication of a naturalization

13 application?

14         MS. ONOZAWA:  Objection, vague.

15     A   It was the policy of the agency to assume

16 at the 45-day mark that the FBI was done and that we

17 would have -- if we have received no response that the

18 response was negative.  Because the focus was on

19 tracking those responses that were positive.  It was

20 not that we would move forward based on whether -- you

21 know, not caring whether or not the name check process

22 was completed.  It was based on assuming that

Page 117

1  process had been completed within that time frame.

2      Q   Did the agency consider any risks to

3  national security that were associated with proceeding

4  with adjudication of a naturalization application

5  after 45 days without receiving an FBI response?

6      A   Based on the assumption --

7          MS. ONOZAWA:  Objection.  I object to that

8  question to the extent that it calls for

9  recommendations, proposals and subjective

10 documents that reflect predecisional information.

11         To the extent you can answer, you can.

12     A   With both the fingerprint check and

13 subsequently the name check, the agency, as it

14 realized operational -- the operational situation

15 within the Bureau, moved from a default of assuming

16 that if we didn't get a response -- because this was a

17 paper process largely -- that if we didn't get a

18 response within a time frame that we were free to

19 proceed because their answer was negative, because we

20 only cared about positive responses and we only

21 tracked positive responses, to moving to a definitive

22 tracking of each name check and not moving forward on

1 the case until we got an answer, whether the answer
2 was negative or positive.  Because we were finding
3 that their processing time had elongated and we could
4 no longer rely on assumption that if we didn't hear
5 within a certain time frame that they were done and
6 the answer was negative.
7     Q   Was it CIS's view at the time that the FBI
8 was taking an unreasonable amount of time to return
9 information in response to a name check request at
10 this time, 1998?
11    A   I don't believe at this time.  Again, my
12 understanding of the discussions that were -- again,
13 it's my understanding because I wasn't really involved
14 in this at the time -- was that, you know, the
15 decision to move to a definitive response was an
16 inventory issue to, one, make sure the positive
17 responses were interfiled and, two, because we were
18 starting to question whether the FBI's processing time
19 would give us answers within the specified period.
20    Q   Can you turn to page 5, please, of this
21 document, Mr. Aytes?
22    A   Uh-huh.

1     Q   Do you see under the paragraph that's
2 entitled "System Capabilities" that it states,
3 "Recently plans were made to give CLAIMS4 the
4 capability to read FBI response tapes and note in each
5 applicant's record if his or her response is an NR or
6 IP"?
7     A   Uh-huh.
8     Q   What is an NR or an IP?
9     A   NR is no record.  IP, I believe, stands for
10 indices popular, which means that they may have
11 record.
12    Q   Okay.  The paragraph, then, continues,
13 "While this is a considerable first step, it does not
14 address the ultimate plan of mandating a definitive
15 response prior to interview."  Do you see that it says
16 that?
17    A   Uh-huh.
18    Q   Did CIS have at this time an ultimate plan
19 of mandating a definitive response prior to
20 naturalization interviews?
21    A   I'd have to go --
22        MS. ONOZAWA:  I object to the question to

1 the extent that it calls for a plan that has not
2 been implemented.
3     A   I'd have to go back and look at -- you
4 know, again, this was a consultant's set of
5 recommendations, that they were looking at a variety
6 of things for us.  There may have been within one of
7 those documents an overarching plan that would have
8 implemented that change.  Certainly we implemented
9 that change with respect to naturalization in May of
10 2006.
11    Q   When you say "that change" what do you
12 mean?
13    A   Just what it says here, mandating a
14 definitive response prior to interview.
15    Q   Oh, prior to interview, yes.
16        (Exhibit 8 was marked for identification
17    and attached to the deposition transcript.)
18 BY MR. GHACHEM:
19    Q   Mr. Aytes, I'm handing you a document
20 that's marked as Aytes Exhibit 8.  Do you recognize
21 this document?
22    A   Yes, I do.

1     Q   What is this document?
2     A   This is the memo I was just alluding to
3 where we implemented a change in scheduling to not
4 schedule a naturalization case for an interview until
5 we had the final answer from the FBI.
6     Q   Did you draft -- did you draft this
7 memorandum?
8     A   I signed the memorandum.  I may have
9 contributed to the drafting of the memorandum.  I
10 don't know that I wrote the whole thing myself.
11    Q   Who would have written it -- or who did
12 write it?
13    A   Just like any kind of document that goes
14 through a large organization, there are a lot of folks
15 who contribute to it.  Who the original drafter was I
16 couldn't tell you.  It might have been me.  There are
17 times when I will draft something like this myself.
18 It may have been someone in our policy group in
19 naturalization field operations.  Would have been done
20 in consort with our folks in counsel and gone through
21 a whole review process before it was issued.
22    Q   Am I correct that this memo announced a new

1 requirement that CIS would not schedule naturalization

2 interviews prior to receiving a definitive result on

3 the FBI name check?

4     A   On naturalization cases, yes.

5     Q   Okay.  Do you see in the first paragraph of

6 the letter, Mr. Aytes, that it reads about four lines

7 down, "For purposes of judicial economy, we will

8 promptly cease even to schedule any naturalization

9 interviews until all background checks have been

10 completed in a particular case"?

11     A   Uh-huh.

12     Q   Why did CIS announce that it would cease

13 even to schedule any naturalization interviews until

14 all background checks have been completed in a

15 particular case?

16     A   We made this decision -- we had previously

17 had substantial backlogs.  Backlogs in naturalization

18 are not rare, even though the agency up until the last

19 few years, hasn't had even goals that were set in

20 terms of processing times.

21     As we were successful in our backlog

22 elimination effort to significantly reduce our backlog

1 of naturalization cases, we were, by definition,

2 getting the cases more quickly.  The greater speed

3 with which we were processing cases was creating a

4 greater disconnect with the FBI's processing times.

5 And so it was creating a greater risk that we would

6 conduct an interview not knowing what the FBI might

7 have had in its databases and creating then the

8 greater risk that someone would then argue under the

9 statute that if 120 had lapsed after our interview

10 that a court should assume jurisdiction of the case.

11     Q   Are there any other reasons why CIS

12 announced in April of 2006 that it would promptly

13 cease even to schedule any naturalization interviews

14 until all background checks were completed in a

15 particular case?

16     A   Not that I can recall.  And we took care to

17 let our field leadership and employees know why we

18 were making this change in this memo.

19     MR. GHACHEM:  Can we take a quick break,

20   Tomoko, about five minutes?

21     MS. ONOZAWA:  Sure.

22     MR. GHACHEM:  Thanks.

1     (Discussion off the record.)

2 BY MR. GHACHEM:

3     Q   Mr. Aytes, are you familiar with the term

4 "CLAIMS4"?

5     A   Yes.  CLAIMS4 is a case processing system.

6     Q   Is that a computer system?

7     A   Yes.

8     Q   Is it -- is it software that is used on CIS

9 computer systems?

10     A   Yes, it is.

11     Q   What kinds of applications is it used for?

12     A   Primarily naturalization.

13     Q   Any others?

14     A   I think it supports the processing of a

15 couple of other citizenship-related applications.

16     Q   Does it support adjustment-to-LPR-status

17 applications?

18     A   No, it does not.

19     Q   What does CIS do when it receives a

20 naturalization application that is defective in some

21 way or missing information?

22     A   Depends on the nature of the defect.  We

1 have certain standards for accepting an application.

2 Has to be completed, for example, has to be signed,

3 has to have the proper fee or a request for a fee

4 waiver.  If it meets those basic criteria, it's

5 receipted and then we'll deal with any substantive

6 questions and issues through the review of the

7 application, potentially through a request for

8 evidence or information, or -- that's done either

9 prior to the interview or at or subsequent to an

10 interview.

11     Q   If an application is missing the required

12 fee, the check in payment of the application fee,

13 would that fact be registered on CLAIMS4?

14     A   I believe so, just as it is in CLAIMS3,

15 which is the case processing system for most other

16 applications.  We track -- I believe the system tracks

17 rejections as well as receipted cases.

18     Q   If an applicant submits an application with

19 a check that later bounces, would that fact be

20 registered on CLAIMS4?

21     A   I believe so, but that's done after the

22 fact because the check bounces after we've receipted

Page 126

1  the application. And so our action has to be
2  different than -- it's not a typical rejection. We
3  have to go back and ask the person to make good the
4  check plus the penalty fee.
5      Q  And after the applicant -- does CIS require
6  the applicant to submit a new check when the first
7  check has bounced?
8      A  Yes. And I think that there are some other
9  conditions with -- if it's a check.
10     Q  Okay. And that information -- when I say
11  "that information" I mean the information that the
12  check has bounced the first time -- that information
13  will be reflected on the CLAIMS4 system for that
14  applicant?
15     A  I believe so. That's my own understanding.
16     Q  If an applicant submits an N-400
17  application that is missing answers to certain
18  questions, will that information be reflected on the
19  CLAIMS4 system for that applicant?
20     A  Which is missing, you mean?
21     Q  Will the CLAIMS4 system tell you that a
22  particular application was missing answers to certain

Page 127

1  questions on the N-400 application?
2      A  No, because data entry is not that
3  exhaustive. It doesn't enter every piece of data that
4  the applicant submitted with the application. So
5  typically that'll be caught manually as the
6  application is reviewed.
7      Q  And is it caught manually as the -- is the
8  absence of certain answers to questions on the N-400
9  form caught manually by CIS staff?
10     A  Yes, and dealt with either prior to the
11  interview or during the interview with the applicant.
12     Q  And when CIS staff notice that answers to
13  certain questions on the N-400 form are missing, do
14  they register that fact on the CLAIMS4 system?
15     A  I don't believe so. Don't know.
16     Q  So how, then, does CIS notify applicants
17  that their applications for naturalization are
18  incomplete when those applications are missing --
19     A  You mean after receipt?
20     Q  After receipt, yes.
21     A  One, we may do it across the table in an
22  interview, or we may do it through a notice that we

Page 128

1  send the applicant. And that's one of the reasons why
2  we attempt to look at the application to make sure
3  that, you know, the basic information is there,
4  because it becomes a little bit more problematic in a
5  mail process to communicate with someone, "You didn't
6  answer this question. We need the answer to that
7  question," or, you know, the associated information.
8  So in naturalization instances we interview most of
9  those folks. Most of those issues are dealt with in
10  the interview.
11     Q  So is it correct, then, to say that CIS
12  does not require answers to every question on the
13  N-400 form before it will schedule an interview with a
14  naturalization applicant?
15     A  I believe so.
16     Q  Are there certain questions on the N-400
17  form that absolutely must be answered prior to an
18  applicant's receiving an interview?
19     A  I'm sorry, I can't tell you that. I don't
20  know. I'd have to go back and look at the NQP and the
21  associated procedures with respect to naturalization.
22     Q  Is it true that CIS will sometimes grant a

Page 129

1  naturalization application even though there may be
2  some answers missing on the N-400 form?
3      A  We would have verbally confirmed the
4  appropriate answers to that application during -- or
5  that question in the context of the interview.
6      Q  When does CIS schedule the biometrics
7  appointment for a naturalization applicant?
8      A  That is triggered after the receipt of the
9  application and by the receipt of the application.
10     Q  What happens if a naturalization applicant
11  does not appear at the biometrics appointment?
12     A  It could be deemed abandonment of their
13  application. We may send them a second notice or they
14  may have communicated with us and asked that their
15  case be rescheduled.
16     Q  If an naturalization applicant misses a
17  biometrics appointment, will that fact be registered
18  on the CLAIMS4 system?
19     A  I believe that that is registered. Again,
20  we'd have to ask someone who uses the system daily
21  those kinds of questions.
22     Q  Other than submitting the N-400 application

Page 130

1 and showing up for the biometrics appointment, is
2 there anything else that a naturalization applicant
3 must do prior to the interview at the field office
4 level?
5     A   If we send them a request for information
6 or for supporting documentation prior to the
7 interview, then they'll have to submit that
8 documentation prior to the interview.
9     Q   Anything else that you might require of an
10 applicant other than specific requests for
11 information?
12    A   Typically no.
13    Q   What is the current average processing time
14 for a naturalization application at CIS?
15    A   Nationally?
16    Q   Nationally?
17    A   Nationally speaking of averages the gross
18 processing time, I think, as of the end of May was
19 about 10.9 months.
20    Q   Do you know what the average time is
21 currently to the New York field office to process
22 N-400s?

Page 131

1     A   Not off the top of my head.  I do track our
2 largest offices and their performance with respect to
3 naturalization, but I'd have to go back and look at my
4 charts.
5     Q   Do you have a belief as to whether the
6 New York average time is greater than ten months or
7 less than ten months?
8     A   I think that we projected that New York
9 would be above ten months at the end of the year
10 because of the surge of applications that we received
11 last year was not felt evenly at every office across
12 the country.
13    Q   Does CIS today have a stipulated processing
14 time for adjudicating a naturalization application?
15    A   Stipulated in what way?
16    Q   Is it specified -- does CIS specify on any
17 documents that a naturalization application should be
18 adjudicated within a certain period of time?
19    A   We have goals.  We do not have
20 stipulations.
21    Q   And what is the current goal for processing
22 of an N-400 -- for adjudication, sorry, of an N-400?

Page 132

1     A   The goal that we committed ourselves to in
2 the fee rule when we implemented the fee rule last
3 year, but which was before we experienced the surge in
4 naturalization applications, was that we would reduce
5 our processing time by the end of FY 2008 from the
6 previous processing time of about seven months to a
7 goal of five months on average.
8     Q   Is that a national goal?
9     A   Yes.
10    Q   Or is it -- or does that goal -- does that
11 goal -- does CIS have different goals depending on
12 what region is involved --
13    A   No.
14    Q   -- right now?
15    A   No.  Offices may have greater or less
16 success based on the surge of applications that they
17 received in able to achieve that goal, but we do not
18 have disparate goals for naturalization processing.
19    Q   But why does -- why has CIS determined that
20 five months is its goal, its targeted time frame for
21 adjudicating a naturalization application?
22    A   That was part of the commitment that we

Page 133

1 made in terms of the fee rule, that we should be able
2 to reduce processing times, everything else being
3 equal, substantially below what the time frames
4 previously had been.  And so we set a goal and
5 articulated a goal of five months --
6     Q   And why was --
7     A   -- as a benchmark.  Why --
8     Q   Why was the number five chosen?
9     A   It was not an abstract.  It was not done,
10 you know, calculating each step of the process.  It
11 was done as a sense of what we could improve relative
12 to the previous seven-month benchmark.
13    Q   Do you have a view as to what -- as to a
14 reasonable time frame for adjudicating a
15 naturalization application?
16        MS. ONOZAWA:  Objection.  We're not here to
17    explore Mr. Aytes' personal views on what's
18    reasonable.  He speaks on behalf of the agency.
19    Q   You may answer that question.
20    A   My sense is that five months is
21 significantly faster than -- and I've asked this
22 question of my staff, to go back and take a look at it

Page 134

1 because I'm interested in the answer. My own
2 experience in over 30 years with this agency is that
3 five months is far faster than has typically been the
4 case with regards to processing naturalization
5 applications.
6          Would I like to be able to reduce that time
7 frame? Certainly. But I think five months -- my
8 personal opinion, five months is a reasonable time
9 frame given the level of analysis that goes into
10 granting United States citizenship.
11     Q   Does this five-month goal that CIS has
12 right now include cases that are now pending at the
13 FBI for name checks?
14     A   Currently it does not because the way that
15 we are -- told you earlier that our case management
16 systems today are not robust enough to be able to
17 track the actual chronological or processing age of
18 each individual case and tell us how many are older
19 than a certain age. So we have to use statistics and
20 statistical analysis to calculate our processing
21 times.
22          We calculate a gross time frame, which is

Page 135

1 the entire inventory of casework, and we calculate a
2 net time frame which factors out certain activities
3 that are beyond the control of the agency. One of
4 those activities that is currently not counted as part
5 of the net processing time, which is what our goals
6 were set against, is the volume of cases where we're
7 waiting for a final response from the FBI. But that's
8 only one of the categories.
9     Q   When you say "one of the categories," one
10 of the categories that are excluded from the --
11     A   Net.
12     Q   -- net processing time?
13     A   Processing time.
14     Q   Yeah. And when you stated earlier that ten
15 months is the average national -- ten months is the
16 national average time it takes right now to adjudicate
17 a naturalization application, does that figure of ten
18 months also include cases that are presently pending
19 at the FBI for name checks?
20     A   Well, the answer is not markedly different.
21 I believe the gross processing time for naturalization
22 applications right now is about 10.9 nationally and

Page 136

1 the net processing time backing out, anything that is
2 in active suspense is 10.4, 10.5, in that range.
3     Q   Mr. Aytes, have you ever instructed CIS or
4 INS staff to adjudicate an immigration benefit
5 application without waiting for a definitive response
6 from the FBI on a fingerprint check?
7     A   The policy of the agency up until the mid
8 '90s is we did not wait for a definitive response on a
9 fingerprint check. Like the name check, at that time
10 in the mid '90s we focused on positive responses and
11 made the assumption that no response was a negative
12 response. We changed that policy in the mid '90s,
13 '96, '97, as we realized that the FBI was no longer
14 able to meet its -- the time frames.
15     Q   Have you ever instructed CIS or INS staff
16 to proceed with the adjudication of a naturalization
17 application without waiting for a completed name check
18 from the FBI?
19     A   Yes, if the case is otherwise deniable.
20     Q   And why would a case be otherwise deniable?
21     A   It may be ineligible under a variety of
22 grounds that are apparent from the face of the

Page 137

1 application and the other record that we have before
2 us.
3     Q   So if CIS received derogatory information
4 derived from an IBIS check and -- but had not yet
5 received a complete FBI name check, the current policy
6 is to proceed with adjudication?
7     A   Correct, because we're not granting the
8 benefit.
9     Q   Does CIS ever tell or instruct the FBI that
10 it should stop working on a name check in connection
11 with a naturalization application?
12     A   No. Even in those cases where we --
13 adjustment or naturalization where based on other
14 information we deny eligibility, we do not interrupt
15 the flow of the name check. It continues.
16     Q   Has CIS ever considered whether delays in
17 the FBI name check process could be reduced by
18 informing the FBI that a pending name check request --
19 that the subject of a pending name check request has
20 already been denied naturalization?
21          MS. ONOZAWA: I object to the question to
22 the extent the word "considered" is seeking

Page 138

1  information protected by the deliberative process
2  privilege.
3      A  Put it this way:  We've tried to look at
4  just about every possibility as a way of improving
5  this process and reducing time frames, both our own as
6  well as the Bureau's.  The amount of interruption that
7  the kind of change that you just described would cause
8  in the process to go and pull a particular case out of
9  the FBI's inventory from our sense would probably cost
10  more than it would save.
11     Q  Meaning that it would cost the agency --
12     A  In terms of the labor -- no, in terms of
13  labor hours that the FBI would have to invest in that
14  process to go and pull that individual case, take it
15  out of their process as no longer pending for reasons
16  other than the fact that they've given us a final
17  response.
18     Q  Wouldn't you simply have to give the FBI
19  the A-file number and tell them, you know, stop
20  further work on that A-file number, or is there more
21  to it?
22     A  There would be a lot more to it when you're

Page 139

1  talking about the volumes at which we deal.
2      Q  Does the FBI associate A-file numbers with
3  its name check requests?
4      A  I believe we provide that as part of the
5  information, the index information that we give the
6  FBI.
7          MR. GHACHEM:  Okay.  Tomoko, I have
8      about -- I'm roughly guessing 45 minutes more,
9      maybe an hour of further questioning.
10          MS. ONOZAWA:  Okay.
11          MR. GHACHEM:  So I wonder if we could just
12      take a quick break and then go into what I
13      envision will be our final -- our final period of
14      questioning.
15          MS. ONOZAWA:  Okay.
16          MR. GHACHEM:  Is that all right with you?
17          MS. ONOZAWA:  Just to make something
18      clear -- I was told during one of the breaks that
19      someone -- a colleague of yours might be asking
20      Mr. Aytes some questions as well or --
21          MR. GHACHEM:  I don't know about that.
22      I'll try and find out during this break.  I don't

Page 140

1      know about that.
2          MS. ONOZAWA:  Okay.  But that's fine.
3          MR. GHACHEM:  Okay.  Let's break for 10 to
4      15 minutes -- or just 10 minutes if that's fine
5      with you.
6          (Recess taken.)
7  BY MR. GHACHEM:
8      Q  Okay.  Mr. Aytes, we spoke before the break
9  about a 2007 Memorandum of Understanding between the
10  FBI and CIS.  Do you recall that --
11     A  Yes.
12     Q  -- exchange?
13     Am I correct that that 2007 Memorandum of
14  Understanding proposed eliminating certain FBI file
15  classifications from the name check process, but did
16  not propose eliminating the name check itself; is that
17  right?
18     A  That's correct.
19     Q  And what does that entail or involve, that
20  the FBI would eliminate certain file classifications
21  in doing its name checks?
22          MS. ONOZAWA:  I would direct the witness

Page 141

1      not to answer to the extent that that would
2      involve disclosing information designated as law
3      enforcement privileged.
4      A  I won't go into that.  Thank you.  There
5  are some categories, I alluded to them earlier.  FBI
6  has a database of people it's trained.  There's no
7  need for them to search that database with respect to
8  our applications.  It won't have any effect on
9  eligibility.
10     It has databases of EEO complaints that
11  were filed against FBI employees.  By definition, FBI
12  employees, they're required to be US citizens.  It's
13  not pertinent to our adjudication.  So we're trying to
14  whittle down as to what's relevant to our adjudication
15  their search criteria.
16     Q  Are there any file classifications that
17  were eliminated that did not have to do with FBI
18  employees?
19     A  Yes, there were some.  Again, looking at
20  the nature of their file classification system and
21  what kind of information it contained and what was
22  relevant to our adjudications.

Page 142

1 Q Did CIS ever undertake a study of the risks
2 to national security or public safety that would be
3 involved in eliminating certain file classifications
4 from the FBI name check?
5      MS. ONOZAWA: I would --
6 A Additional file classifications?
7 Q I think your attorney wants to instruct
8 you.
9      MS. ONOZAWA: I was just directing the
10 witness not to answer to the extent that it would
11 disclose analyses or studies or proposals subject
12 to the deliberative process privilege.
13      THE WITNESS: Thanks.
14 A We have -- categories that were
15 excluded were excluded based on an agreement between
16 the FBI and CIS based on what was relevant to our
17 adjudication and what kinds of data might be redundant
18 to information that we're able to obtain through the
19 other background checks that we conduct on an
20 individual. Have we conducted a study as to what the
21 vulnerability would be if we were to eliminate the
22 name checks entirely? No, we have not done that

Page 143

1 because we know by definition that we only are able to
2 get information about active investigations through
3 the name check. And knowing that answers that
4 question before we ask it.
5 Q Mr. Aytes, also before the break you
6 testified that CIS has a current goal of five months
7 for the adjudication of naturalization applications.
8 Do you remember that?
9 A Yes, on average.
10 Q Is the agency currently meeting that goal
11 for N-400 applications?
12 A No. We set that goal -- that goal was for
13 the end of this year and we set that goal before we
14 experienced the large increase in demand that we
15 received last summer. It is still our goal, but we're
16 going to have to work through that surge of
17 applications in order to get to it.
18      MR. GHACHEM: I'd like to have this marked
19 as Aytes Exhibit Number 9.
20      (Exhibit 9 was marked for identification
21 and attached to the deposition transcript.)
22 BY MR. GHACHEM:

Page 144

1 Q Mr. Aytes, I'm handing you a document
2 that's now marked Aytes Exhibit 9. This document is
3 entitled "FY," fiscal year, "08/09 Production Plan
4 Domestic Operations." And the Bates number is
5 CIS Neufeld 0045. Do you recognize this document?
6 A Yes, I do.
7 Q What is this document?
8 A This was looking at how we would -- as we
9 were going through the process of developing a plan to
10 respond to the surge in applications that we received,
11 what would be necessary if we were to try and meet
12 those targets in the original time that we stipulated
13 in the fee rule by end of FY 08 or alternatives.
14 Q Do you see under -- in the middle of the
15 page just below the numerical chart, Mr. Aytes, that
16 it says, "Even factoring in efficiency gains and
17 overtime as described below we have a shortfall of
18 more than 3,000 FTEs between the currently authorized
19 FY 08 staffing levels and what would be required to
20 meet the FY 08 targets"?
21 A Uh-huh.
22 Q "It is not feasible to grow the agency by

Page 145

1 that amount in such a short period of time." Do
2 the -- does the joint business plan between the FBI
3 and CIS that was announced in April of 2008 -- was
4 that plan designed to address the staffing issues that
5 are described in this document here, Aytes Exhibit 9?
6 A No. Those are two related but distinct
7 issues.
8 Q Is it fair to say on the basis of this
9 document, Mr. Aytes, Aytes Exhibit Number 9, that CIS
10 is unlikely to meet its goal of five months average
11 processing time for the adjudication of naturalization
12 applications this year?
13 A We have told folks point-blank that we do
14 not expect with the demand doubling and so much of
15 that doubling having occurred in June and July,
16 460,000 applications for naturalization received in
17 the month of July when an average month's receipts is
18 about -- ranges from 50 to 75,000, that the agency,
19 frankly, does not have unlimited capacity and, as a
20 result, is going to have to react and grow the
21 additional capacity necessary to do that volume of
22 work. We will not be at five months at the end of

Page 146

1 this year. We have made that clear to folks and
2 posted processing times where our current projections
3 whether have us at the end of the year.
4    Q  So does CIS forecast that by the end of
5 2008 it will be adjudicating N-400 applications on
6 average within five months?
7    A  No.
8    Q  Does CIS have a forecast of when it will be
9 able to process on average N-400 applications within
10 five months?
11   A  Yes. By the middle of 2010 we'll have
12 worked through that entire surge. That is our
13 forecast. We are ahead of our production plans at
14 this point, but that is our forecast.
15       MR. GHACHEM: May I have this marked as
16 Aytes Exhibit 10, please?
17       THE WITNESS: Just 10?
18       (Exhibit 10 was marked for identification
19   and attached to the deposition transcript.)
20 BY MR. GHACHEM:
21   Q  Mr. Aytes, I'm handing you a document
22 marked as Aytes Exhibit 10. I obviously don't expect

Page 147

1 you to go through this all right now, but do you
2 recognize this document?
3    A  Was there a cover at one point?
4    Q  There is. If I tell you that this is a
5 chapter from the 1999 DOJ OIG report on the --
6    A  On CUSA.
7    Q  -- on CUSA, would you believe me?
8    A  I would believe you.
9    Q  It's actually a 2000 report. I'm sorry, I
10 stand corrected. Is that your recollection that in
11 the year 2000 DOJ -- the DOJ's Office of Inspector
12 General issued a report on the so-called "Citizenship
13 USA program"?
14   A  Yes.
15   Q  And does this document, Aytes Exhibit
16 Number 10, represent a section of that report?
17   A  I'll take your word for the latter, but
18 yes, there was a report that was issued in '99-2000.
19   Q  Do you have any reason to believe this is
20 not a section --
21   A  Nope, no reason.
22   Q  -- from that report?

Page 148

1    Okay. And you see on the first page,
2 CIS 000585, that this appears to be a section of the
3 report surveying the criminal history checking
4 procedures --
5    A  Yes, sir.
6    Q  -- of CIS? Okay. Could I ask you to turn
7 to page 96 of this report, please, Mr. Aytes?
8    A  Okay.
9    Q  Under heading C there do you see it reads,
10 "Despite indications of fingerprint processing
11 shortcomings, INS did not delay the adjudication of
12 the 85,000 cases"?
13   A  Yes.
14   Q  Could you just take a quick look at the
15 paragraph -- quick read through the paragraph below
16 that and --
17   A  Oh, I remember that paragraph.
18   Q  Okay. And tell me what is your
19 understanding of what this understanding is about?
20   A  This had to do with fingerprint cards
21 themselves and the submission of fingerprint cards at
22 the preliminary stage of processing of applications to

Page 149

1 the FBI to conduct a fingerprint check.
2    Q  Okay. Do you see at the bottom of this --
3 of this page here it reads, the bottom three lines,
4 "Because of this focus on production, Aytes never
5 reconsidered his decision to move forward with the
6 adjudication of the 85,000 cases despite the findings
7 that all of the fingerprint checks had not been
8 completed"?
9    A  Wouldn't necessarily agree with their
10 conclusion, but --
11   Q  I'll ask you about --
12   A  -- yeah.
13   Q  I'll ask you about that in just a minute.
14       So according to this report, you made a
15 decision to move forward with the adjudication of
16 85,000 naturalization cases without waiting for
17 completion of FBI fingerprint checks.
18   A  We went forward with the processing and
19 scheduling of interviews for those cases. That was --
20 the issue at that point was whether the service center
21 had receipted the case, whether or not the fingerprint
22 cards had gone in timely, whether or not the

1 fingerprint -- fingerprint evaluation process was
2 ongoing, and whether or not that freed us to go ahead
3 and schedule the cases for interview.
4     Q   The report here says that -- or suggests
5 that you actually proceeded to allow the adjudication
6 of the 85,000 cases.  Is the report incorrect in that
7 respect?
8     A   Adjudication can be used in a broad
9 framework.  Many times it's used to refer to the
10 entire process, not simply the decision itself.  And I
11 believe in this context that's the ways that that's
12 being used.
13     Q   Okay.  So is it your testimony that in fact
14 you did not permit these 85,000 cases to proceed to
15 final adjudication --
16     A   We -- I permitted them to move forward in
17 the process and be scheduled for an interview.  Now,
18 the way the process works -- or worked at that time,
19 since it was an assumption that if we did not hear
20 back from the FBI within a given period of time that
21 the response was no record, if in fact the fingerprint
22 cards had never been submitted to the FBI, then yes,

1 then that would have meant that those cases would have
2 been potentially adjudicated absent the FBI name
3 check -- or the FBI fingerprint check being conducted.
4     Q   Okay.  But if the -- if the fingerprint
5 check request had actually been submitted to the FBI,
6 none of those 85,000 cases would have been permitted
7 to proceed to final adjudication --
8     A   If they --
9     Q   -- without the results being returned?
10     A   At this time in the period of CUSA, the
11 process for fingerprints was similar to the process
12 that continued for some period of time after that for
13 name checks.  Process was you submit it to the FBI,
14 you wait a presumptive period and then you are free to
15 move forward based on the conclusion that the FBI has
16 completed their processing and the answer is no
17 record.  The FBI fed us positive records at that time.
18 They didn't give us an answer on every case.
19     Q   What was the -- what was the presumptive
20 period during which --
21     A   I don't recall what the presumptive period
22 was.  I'm sorry.

1     Q   Could it have been -- well, would 60 days
2 sound like --
3     A   Well, that's what it references at the top
4 of the page that you just referenced.
5     Q   If you'd turn --
6     A   Yeah, top of page 97.
7     Q   Okay.  So 97 -- on page 97 is indicates
8 that the presumptive waiting period was 60 days?
9     A   Uh-huh.
10     Q   Does that refresh your memory of what CIS's
11 practice was at the time of this report?
12     A   For fingerprint cards --
13     Q   Fingerprint checks?
14     A   -- yes, was to wait 60 days.  We focused
15 on -- we only got responses on the positive hits, and
16 not on negatives.  And so at the end of 60 days we
17 were free to move forward concluding that the FBI had
18 completed its processing and it was a no record.
19     Q   And did INS have the same 60-day
20 presumptive waiting period for naturalization
21 applications?
22     A   The same 60-day period was the period for

1 fingerprint checks across the board.
2     Q   Okay.  So in other words, for all
3 immigration benefit applications?
4     A   Yes.  Yeah.  The conclusion was that the
5 FBI was done and that the answer was negative if we
6 did not hear a positive response within 60 days.
7     Q   Will you turn to page 93 of the report?  Do
8 you see at the bottom of that page the reporter refers
9 to an automated sweep to change N-400 data?
10     A   Yes.
11     Q   Can you tell me what that refers to, an
12 automated sweep to change N-400 data?
13     A   My recollection after more than ten years
14 was that the service center had keyed in a volume --
15 85,000 naturalization applications and discovered
16 after the fact that they had not -- the service
17 centers were new to receiving these applications.
18 That was part of the transition that we implemented to
19 deal with the production challenges of CUSA.  The
20 center did not indicate in one field that the
21 fingerprint card had been submitted.  Now, that would
22 tell the system that process couldn't continue because

Page 154

1  there was a -- the system was designed in such a way
2  that unless it knew that it had been submitted on a
3  given date it never knew when the 60-day clock would
4  lapse.
5        We discovered that error in Vermont -- I
6  think it was Vermont -- that they had not done that.
7  We did some sampling.  Found that in fact -- we did a
8  small sample -- that cases were reaching the FBI.
9  While the sample was not definitive that every case
10 had reached the FBI, it told us that the process had
11 been working as designed and the lapse was as had been
12 reported; not that the fingerprint cards were not
13 submitted, but that they simply hadn't appropriately
14 recorded in the system.  So we went into the system on
15 those cases and corrected the database to reflect that
16 those cards had been submitted to the FBI.
17    Q  And the purpose of doing that was to ensure
18 that the 60-day presumptive waiting period would be
19 enforced and that applications would not be waiting
20 longer than necessary; is that correct?
21    A  Yes, that those applications individually
22 wouldn't be waiting longer for -- than necessary, if

Page 155

1  in fact the fingerprint cards had been submitted as
2  the service center had represented.
3     Q  Were there any risks to national security
4  or public safety involved in proceeding with
5  adjudication of a naturalization application once the
6  presumptive 60-day waiting period was over?
7     A  As we realized that the FBI was not able to
8  keep up with the 60-day time frame, that's why we
9  altered the process substantially and as part of those
10 changes went to requiring a negative as well as a
11 positive response and waiting for that response before
12 we moved forward.  We did not then, and do not now,
13 simply initiate background checks to initiate them.
14 We initiate them to complete them and get the
15 pertinent information that's relevant to our
16 adjudication.
17    Q  Mr. Aytes, I want to direct your attention
18 to a subject that we discussed earlier this morning;
19 namely, the 2002 rule changes.  Am I correct that in
20 2002 INS naturalized an applicant who was later
21 discovered on the basis of information derived from an
22 FBI name check to have been affiliated or associated

Page 156

1  with a terrorist organization?
2        MS. ONOZAWA:  Object as asked and answered,
3  and this is also outside the scope of his 30(b)(6)
4  deposition.
5        MR. GHACHEM:  Well, Mr. Collette, it is my
6  understanding, has testified today that Mr. Aytes
7  is one of the people at CIS with knowledge of this
8  subject and that he, Mr. Collette, is not.  So if
9  that's what the testimony is and these are the two
10 individuals that you've designated to talk about
11 these two topics, it seems to me that your agency
12 is telling us that Mr. Aytes is a person who can
13 speak about this topic.
14        MS. ONOZAWA:  May I speak to Mr. Aytes?
15        MR. GHACHEM:  You may, yeah.  You may,
16 sure, yeah.
17        (Recess taken.)
18        MR. GHACHEM:  Let's go back on the record
19 now, please.
20 BY MR. GHACHEM:
21    Q  Mr. Aytes, is it true that the INS
22 naturalized a person in 2002 whom the FBI later

Page 157

1  returned information about suggesting that the
2  individual was affiliated with or associated with a
3  terrorist organization?
4     A  I don't know whether or not that additional
5  information came as a result of the name check or came
6  through other channels, but yes, we found out that
7  there was a -- that specific individual where there
8  was information in the FBI's databases relative to our
9  adjudication that we had not received through the name
10 check response.
11    Q  Did you ever receive information that would
12 have provided grounds to denaturalize this individual?
13       MS. ONOZAWA:  Objection.  This is outside
14    the scope of his 30(b)(6) deposition.
15    A  I couldn't answer that question.  I don't
16 know the specifics of that case.
17    Q  Did you ever receive information from the
18 FBI indicating that this person had a criminal
19 history?
20       MS. ONOZAWA:  Objection, outside of scope
21    of his 30(b)(6) deposition.
22    A  Again, I don't know the specifics of that

Page 158

1  case.  What was more important to us is what that
2  illustrated to us about the process than the relevance
3  to that -- while each case is important -- than the
4  relevance to that particular application.
5     Q   Mr. Aytes, would you agree that the 2002
6  rule changes that we discussed earlier caused the
7  agency to have to delay the processing of N-400
8  applications?
9     A   It affected the processing of many N-400
10  applications, yes.
11    Q   What was the extent of the delays that it
12  caused for processing N-400 applications?
13    A   I don't know the specifics because the
14  agency didn't track processing times in the way that
15  it does now.  It did -- given the sheer volume of
16  checks that were reconducted, it did affect some cases
17  significantly.
18       MR. GHACHEM:  I'd like to have this marked
19  as Aytes Exhibit 11.
20       (Exhibit 11 was marked for identification
21  and attached to the deposition transcript.)
22  BY MR. GHACHEM:

Page 159

1     Q   Mr. Aytes, I'm handing you a document
2  that's marked Aytes Exhibit 11.  This is -- it says
3  it's a Westlaw document that at the top is entitled
4  "8 CFR 335.2."  Are you familiar with this document?
5     A   I'm familiar with 8 CFR 335.2.
6     Q   What is that?
7     A   That's one of the regulations that sets
8  parameters for the processing of naturalization
9  applications.
10    Q   Could you read Section B of this -- of this
11  regulation 335.2 Section B?
12    A   "Section B, Completion of criminal
13  background checks before examination.  The service
14  will notify applicants for naturalization to appear
15  before a service officer for initial examination on
16  their naturalization application only after the
17  service has received a definitive response from the
18  Federal Bureau of Investigation that a full criminal
19  background check on an applicant has been completed.
20  Definitive response that has a full criminal
21  background check on an applicant has been completed
22  includes" -- should I continue?

Page 160

1     Q   Yeah, just 1, 2 and 3, please.
2       MS. ONOZAWA:  I think the statute speaks
3  for itself.  You don't have to have the witness
4  read it out loud.
5     A   That's right, but I don't mind.  "One,
6  Confirmation from the Federal Bureau of Investigation
7  that an applicant does not have an administrative or a
8  criminal record; two, confirmation from the Federal
9  Bureau of Investigation that an applicant has an
10  administrative or criminal record; or three,
11  confirmation from the Federal Bureau of Investigation
12  that two properly prepared fingerprint cards, Form
13  FD258, have been determined unclassified for the
14  purpose of conducting a criminal background check and
15  have been rejected."
16    Q   Do you know when the agency promulgated
17  this regulation?
18    A   No, I do not, sir.
19    Q   Do you know if it was in force in 2002?
20    A   I believe it continues to be in force.
21    Q   My question was --
22    A   Yes.

Page 161

1     Q   -- do you know whether it was in force in
2  2002.
3     A   I believe it was.
4     Q   What about 2001?
5     A   I believe it was.
6     Q   What about 1999?
7     A   I believe it was.
8     Q   Okay.  Do you know whether the agency
9  provided notice and opportunity for the comment -- for
10  the public to comment on this regulation before it was
11  implemented?
12    A   I can assume that that was done.  I do
13  not -- I cannot definitively tell you myself that it
14  was.  I'm not even sure when that regulation itself
15  was promulgated.
16    Q   Do you know whether the agency, CIS, ever
17  considered providing the public with an opportunity to
18  comment on the 2002 rule changes?
19       MS. ONOZAWA:  Objection to the extent that
20  it calls for information protected by the
21  deliberative process privilege.
22    A   I think the 2002 rule changes more than

1 anything reiterated the -- and established certain
2 procedures for managing compliance with this section
3 of regulation.
4    Q   When you say "this section," meaning
5 Section 335.2?
6    A   335.2.
7    Q   So the answer -- what's the answer to the
8 question, then, whether or not the agency considered
9 providing the public with an opportunity to comment on
10 the 2002 rule changes?
11    A   I'm not aware that the agency discussed
12 whether or not it was appropriate or required to seek
13 public comment on an administrative change of that
14 nature.
15    Q   When I use the phrase "2002 rule changes,"
16 do you understand that I mean the requirement that FBI
17 search both the main and reference files in connection
18 with a name check as well as the requirement that the
19 CIS await a definitive response from the FBI before
20 adjudicating an N-400 --
21    A   Correct.
22    Q   -- application?

1         Did CIS study whether or not those changes,
2 the 2002 rule changes, had a financial impact on the
3 agency's operations?
4         MS. ONOZAWA:  Again, I object to the
5    question to the extent that it calls for
6    information protected by the deliberative process
7    privilege.
8    A   I believe  -- while the agency is always
9 cognizant of the impact on costs and revenue, I
10 believe the 2002 decision was made based on the need
11 for consistency with the regulation as cited and with
12 the statute and the eligibility criteria for
13 naturalization.
14    Q   Has the agency received comments from
15 members of the public about the 2002 rule changes?
16    A   About the changes that were made not
17 through regulation?
18    Q   About -- yes, about the changes that are
19 reflected in the December 2002 letter that we reviewed
20 earlier.
21    A   We have received individual case inquiries
22 and complaints.  I personally don't know of anything

1 that I would categorize as specifically contesting the
2 changes that you have summarized as "the 2002
3 changes."
4    Q   Have the 2002 rule changes had a
5 significant impact on the agency's ability to
6 adjudicate N-400 applications?
7    A   Individually, not collectively.
8    Q   What do you mean by, "individually, but not
9 collectively"?
10    A   It's had some -- it's had significant
11 impact on individual applications where there appears
12 to be information relevant to the case in the FBI's
13 system, which then causes us to wait for an answer.
14 Given that the vast majority of FBI responses come
15 back relatively quickly, it does not cause a
16 significant systemic delay in the processing of
17 applications.
18    Q   Do you know if anyone else in the agency
19 would have information about whether or not the agency
20 considered providing the public with an opportunity to
21 comment on the 2002 rule changes?
22    A   Have to go back and talk to the folks that

1 were in leadership positions in INS at that point in
2 time.
3    Q   Who would they be?
4    A   Doris Meisner was the -- no, Doris wasn't
5 the commissioner then.  Who was the commissioner in
6 2002?  Ziglar?  Commissioner Ziglar?  You'd have to go
7 back -- I'm sure we could provide you with a list of
8 folks who were in leadership positions.  You have
9 named some of them from the documents you've shown me,
10 folks like Johnny Williams.
11    Q   What about individuals within the
12 regulatory unit that you described to me earlier
13 today?  Would they know about this?
14    A   The regulatory unit was very, very
15 different in 2002 than it is today.
16    Q   Would they know about whether or not the
17 agency would have considered giving the public an
18 opportunity to comment on the 2002 rule changes?
19    A   They might, but I doubt it because I doubt
20 that there was any substantive conversation in that
21 respect.  The agency conducts a number of background
22 checks on a number of different types of applications

Page 166

1 consistent with the eligibility criteria established
2 by statute and preexisting regulation. And the agency
3 has never made it a practice to go out and divulge and
4 seek public comment on the parameters that it sets for
5 the background checks that it conducts necessary to
6 make those eligibility determinations.
7     Q   Did the agency feel that it was necessary
8 to provide the public with an opportunity to comment
9 on Exhibit 11, Section 335.2, when it was proposed?
10     MS. ONOZAWA:  Objection to the extent it
11   calls for information protected by the
12   deliberative process privilege and that it calls
13   for a legal conclusion.
14     You may answer.
15     A   I said earlier I do not know. I don't know
16 when this regulation was promulgated. I don't know if
17 it was a final rule as opposed to a proposed rule.  If
18 it was final, it would have been interim final. You
19 know, regulations are done with a stipulated comment
20 process. So I'm sure that there were comments with
21 regards to the fact that we were conducting some form
22 of background checks with the FBI as part of our

Page 167

1 adjudication of naturalization applications.
2     Q   Mr. Aytes, could you take a look again at
3 Aytes Exhibit Number 10, which is the chapter from the
4 1990 -- the 2000, I'm sorry, OIG report?
5     A   Yes, sir.
6     Q   Could you refer to pages 149 to 150?  Do
7 you see at the top of page 149 that it reads, "INS
8 considers the value of the biocheck process"?
9     A   Uh-huh.
10     Q   If you'd turn to the next page, page 150,
11 in the top paragraph there about three lines down it
12 says, "Associate Commissioner Crocetti wrote to the
13 FBI on April 30 that INS questioned the value of such
14 checks," meaning the bio checks, "and asked whether
15 the FBI believed such checks were necessary. The
16 FBI's May 14 response referred Crocetti back to its
17 own regulations?
18     A   Yes.
19     Q   Can you tell me what that letter by
20 Associate Commissioner Crocetti was about?
21     MS. ONOZAWA:  Objection, foundation. You
22   haven't established that he's aware of this

Page 168

1   letter --
2     Q   Are you aware that Associate Commissioner
3 Crocetti wrote a letter to the FBI on April 30 -- it
4 looks like 1995 from the previous page?
5     A   Take your word for it. I know there were
6 discussions about that time with the FBI about the
7 value of name checks relative to other kinds of
8 background checks that were being conducted.
9     Q   And did Associate Commissioner Crocetti
10 participate in those discussions?
11     A   He at least participated to the extent to
12 which he signed the letter. I believe he participated
13 in some of those discussions.
14     Q   Have you ever seen the April 30 letter
15 that's referred to at the top of page 150 of
16 Exhibit 10?
17     A   I couldn't honestly tell you whether I've
18 ever seen that letter from 12 years ago. I might have
19 and I might not have. Any answer I gave you is a
20 50/50 chance of being wrong.
21     MR. GHACHEM:  Tomoko, can you provide us
22   with a copy of this Crocetti April 30 letter?

Page 169

1     MS. ONOZAWA:  To the extent it's readily
2   available, relevant, not subject to privilege,
3   we'll undertake a search for it and produce it.
4     MR. GHACHEM:  Thank you.
5     Q   Mr. Aytes, is the FBI name check the only
6 kind of background check that will reveal information
7 about active investigations about a particular
8 naturalization applicant?
9     A   That is my --
10     MS. ONOZAWA:  I object to that question
11   again we're straying into topics that are
12   designated for Mr. Smith.
13     A   My understanding --
14     MS. ONOZAWA:  I would direct you not to
15   answer.
16     THE WITNESS:  Okay. Okay.
17     Q   Mr. Aytes, the 2007 Memorandum of
18 Understanding that the FBI entered into with CIS --
19 strike that, please.
20     MR. GHACHEM:  I'd like to have this marked
21   as Aytes Exhibit 12.
22     (Exhibit 12 was marked for identification

Page 170

1    and attached to the deposition transcript.) 12.
2  BY MR. GHACHEM:
3      Q  Mr. Aytes, I'm handing you a document that
4  is marked Exhibit 12.  The beginning Bates number is
5  Yakub, Y-A-K-U-B, 005460.  Do you recognize this
6  document?
7      A  Seen the logo and I've heard the title.  So
8  I'll say yes.
9      Q  Can you tell me what this document is?
10     A  Kind of hard to do from what I see in front
11 of me.  It appears to be a paper that talks in some
12 respects about the IBIS system and the things that it
13 does and its use with respect to the adjudications
14 process.
15     Q  When you say it's hard to do, are you
16 referring to the fact that there are -- a lot of the
17 sections have been redacted from this report?
18     A  Uh-huh.
19     Q  Do you have any reason to believe that this
20 is not an accurate copy of the -- of the issues paper?
21     A  No.
22     Q  Can you turn to page 3, which is Bates

Page 171

1  number YAKUB 005462?
2      A  Uh-huh.
3      Q  Do you see at the bottom of the page the
4  text reads, "Since May 2002 the IBIS program has
5  produced the following successes:  Field offices have
6  referred over 300 cases to the national security unit
7  for investigation relating to possible terrorist links
8  and are threats to national security"?
9      A  Uh-huh.
10     Q  Does the IBIS program tell CIS whether or
11 not there is an active investigation underway
12 regarding any naturalization applicant?
13     A  About certain types of active
14 investigations only.
15     Q  What types -- I'm sorry.  Go ahead.
16     A  Those relating to certain national security
17 issues.  It does not give us access to other
18 information about active investigations.
19     Q  Where would you get that other information
20 from?
21     A  FBI name check.
22     Q  Would the FBI name check give you the

Page 172

1  information about active investigations that the IBIS
2  check gives you?
3          MS. ONOZAWA:  I object to the question to
4      the extent it relates to topic 7, the purpose, use
5      and value of the FBI name checks related to
6      immigration benefit applications.
7          MR. GHACHEM:  I'd like to have this marked
8      as Aytes Exhibit 13.
9          (Exhibit 13 was marked for identification
10     and attached to the deposition transcript.)
11 BY MR. GHACHEM:
12     Q  Mr. Aytes, I'm now handing you a document
13 marked as Aytes Exhibit 13.  The Bates number on this
14 document, first page, is CIS Smith 002.  Do you
15 recognize this document.
16     A  I recall this e-mail.
17     Q  Is this an e-mail?
18     A  This is an e-mail.
19     Q  I'm sorry, I think I'm missing the cover
20 page of your --
21         (Discussion off the record.)
22     Q  Mr. Aytes, do you have any more information

Page 173

1  about the impact of the 2002 rule changes on the
2  processing of naturalization applications that you
3  haven't already shared with me today?
4      A  No.  I've said it affects discretely, you
5  know, individual applications where we have to wait
6  for the FBI's final answer.  We have quantitatively
7  tracked the volume of applications that are in
8  suspense over the last couple of years.  We're waiting
9  for the FBI's final answer.
10         Of course that doesn't tell us how old
11 those individual cases are.  And with the exception of
12 those few naturalization applications that -- where
13 we're still waiting for an answer where we conducted
14 our interview before May of 2006, because those are
15 now in active suspense postinterview, I think I've
16 shared with you what I know about the impact.
17     Q  Do you have any more information about the
18 February 2008 change in the procedures for
19 applications for adjustment to LPR status that you
20 haven't already shared with me?
21     A  No.
22     Q  Mr. Aytes, is it true that in July of 2007

1 CIS increased the fee for naturalization applications
2 from $330 to $595?
3    A  I believe that's the number.
4    Q  When was the last time that CIS had
5 increased the naturalization application fee prior to
6 July 2007, do you know?
7    A  I'm sorry, I don't recall the date.  It had
8 been several years.
9    Q  Why did CIS increase the fee in July 2007
10 for N-400 applications?
11    A  It increased the fee as it did a fee study
12 across all of its applications, because we are a
13 fee-funded agency, to set fees at levels that
14 recovered our costs of processing those applications.
15 We had been receiving subsidies from Congress for
16 several years designed to eliminate our backlog caused
17 in large part because we -- our fees did not provide
18 sufficient revenue for us to have the capacity
19 necessary to process those applications timely.
20    Q  And did that include -- was the July 2007
21 fee also inadequate to cover the costs of processing
22 N-400 applications?

1    A  No, we believe the July 2007 fee is set
2 based on the costs -- the average cost of processing a
3 naturalization application.
4    Q  I'm sorry, I misspoke in my question.  I
5 meant to ask was the fee that was in place prior to
6 July 2007, namely $330, was that adequate to cover the
7 costs of N-400 applications --
8    A  Not -- it was at the time that that fee was
9 set based on the narrow things that we covered through
10 fees.  We did the fee study because it, as well as our
11 other fees, no longer recovered our costs.
12    Q  Was the agency aware that there would be a
13 surge in naturalization applications in the weeks
14 preceding the July 2007 fee increase?
15    A  We anticipated a surge across most
16 applications.  History told us that there would be a
17 surge for most applications.  We in fact saw a surge
18 of about 16 to 17 percent in application volume.  We
19 were also cognizant of the campaigns that independent
20 organizations were conducting to stimulate demand in
21 naturalization and were following its impact on the
22 volume that we were receiving.

1    So yes, we were aware and anticipated a
2 surge and in fact did two reprogrammings, budgetary
3 adjustments, with Congress to use additional revenue
4 that was coming in as volume was going up to target
5 that for additional overtime and other expenses
6 necessary to process those cases.
7    Q  Were there discussions within CIS about the
8 predicted surge?
9    MS. ONOZAWA:  I object to that question to
10    the extent it calls for information protected by
11    the deliberative process privilege.
12    A  There were discussions about what we saw
13 happening, what we expected to happen with
14 naturalization volume.  We certainly anticipated that
15 we might reach close to a million applications, which
16 is what many of the independent organizations had set
17 as a goal in terms of generating those naturalization
18 applications.  Did we anticipate 465,000 applications
19 in the month of July, which is about eight months
20 worth of typical receipts?  No, because we had never
21 historically seen that.
22    Q  You refer to independent organizations.

1 What organizations are those?
2    A  Organizations like NALEO that were out
3 there with -- with campaigns.
4    Q  These are private groups that --
5    A  Yes.
6    Q  -- advocate on behalf of immigrants?
7    A  On behalf of their constituencies and on
8 behalf of immigrants in general.
9    Q  Can you tell me what steps CIS took to
10 accommodate the surge that it anticipated in response
11 to the July 2007 fee increase?
12    A  We allotted a significant amount through
13 these reprogrammings, additional overtime, for
14 example.  We increased the capacity of our biometric
15 collection operations.  We were at that time
16 recompeting the contract for mail file and data entry
17 operations to support intake functions at the service
18 centers.  And so we structured that in a way so that
19 there would be greater flexibility prospectively to
20 deal with surges.  We took a number of steps.
21    We overall anticipated that the resources
22 that we were planning on adding based on the fee rule

Page 178

1  would help us deal with the surge over a reasonable
2  period of time because we anticipated that the surge
3  that we would see in June and July, that million that
4  we would get that year, according to estimates, some
5  of that would be people who would file early to take
6  advantage of the fee -- the opportunity to file before
7  the fee increase. And so that there would be a
8  corresponding -- not equivalent, but, you know, some
9  drop in demand once the fee rule was implemented for a
10 couple of months. So we felt all things considered
11 that the preexisting plans plus some of the types of
12 things I've talked about with additional overtime
13 would allow us over the course of the year to still
14 meet our goals. And then we got hit with 460,000
15 applications.
16    Q   Did you anticipate 460,000 additional
17 applications?
18    A   Nope. There's nothing that would have led
19 us to believe that naturalization application volume
20 would have increased eightfold.
21    Q   What amount of increase did you anticipate?
22    A   We expected that -- you know, the

Page 179

1  organizations were telling us they thought that they
2  could -- that their goal was a million. We were
3  tracking receipts over the course of the year. It
4  looked like getting to a million or slightly higher
5  was very reasonable.
6     Q   Over the course of the year?
7     A   Over the course of the year.
8     Q   2007?
9     A   But we were watching it each -- each month
10 and in fact we got to a million the end of June. The
11 problem was July.
12    Q   Which -- and in July there were 460,000?
13    A   460,000 naturalization applications filed
14 in a single month.
15    Q   How many new applications did you
16 anticipate in that month, July?
17    A   In June I think we received something like
18 150,000, which was a fairly startling number. Again,
19 you would expect that in a normal month we would
20 receive between -- because there is some ebb and flow
21 to naturalization over the course of a year. While
22 it's not seasonal, it just does seem to work out that

Page 180

1  way -- between 50 and 75,000 in an average month.
2     Q   Okay. What was the time frame for the
3  steps that you just described that CIS undertook to
4  accommodate the anticipated surge?
5     A   Some of those steps like the additional
6  overtime, the two reprogrammings that we did were done
7  before the end of the fiscal year. Other steps like
8  the introduction of the surge plan which called for
9  even for additional hiring above and beyond the fee
10 rule to take the -- over $400 million in additional
11 revenue that we received through these additional
12 applications and to invest that back in the necessary
13 capacity to do the work; additional overtime,
14 additional staffing, some other very discrete targeted
15 investments.
16    That was done over the course of the fall
17 as we really started to get a better sense of what the
18 true volume was. Because we didn't just see -- when
19 we saw a 16 to 17 percent increase in general
20 application volume just in those two months before the
21 new fees took effect, we had two things going on at
22 the same time. One was a surge in naturalization and

Page 181

1  the other was the Department of State opened the
2  unique opportunity in July through its visa bulletin
3  to allow persons to apply for permanent residence
4  based on employment-based eligibility, which generated
5  300,000 applications for permanent residence and an
6  associated 500,000 additional applications for other
7  benefits. So it took us a while to even understand
8  and truly quantify the volume of applications that we
9  were getting because we had so many coming in the
10 door.
11    Q   You testified that the Department of State
12 implemented a policy change that permitted 300,000 new
13 applications for adjustment to LPR status in July
14 2007; is that correct?
15    A   Yeah, through the visa bulletin.
16    Q   Were those new applications a factor in
17 your decision, that is CIS's decision, in February
18 2008 to change the LPR policy?
19    A   No, it was not, because while we had to
20 take those applications in because we used the visa
21 bulletin to gauge whether someone is eligible to file
22 the application, we still can't complete the

1 application until there is an actual individual visa
2 number available for each case.
3       The law limits how many people can
4 immigrate to this country a year in these employment
5 categories, and so it can only allot -- the State
6 Department can only allot a certain number of visas in
7 each quarter.  And so even if I had the capability to
8 process all 300,000 this year, I couldn't approve
9 them.  So it would be of no relevance at all to
10 implement the policy in February of 2008 to those
11 300,000 applications.
12    Q   So you were aware of a potential 300,000
13 new applications for adjustment to LPR status, but
14 they played no role in the February 2008 policy
15 change?
16    A   Right.  We can only issue -- I think in
17 2008 the limit is about 160,000 employment-based visas
18 are available.  The State Department uses some of
19 those for immigrant visas for people overseas.  It's
20 going to take many years.
21       The interesting anomaly behind that July
22 visa bulletin -- I said it gave people a unique

1 opportunity to apply.  Many of those people, while
2 they were eligible to apply because the visa bulletin
3 said anyone who had eligibility could file, the
4 reality based on the limitations of the law of how
5 many people can be granted permanent residence a year
6 in these discrete categories -- and there are limits
7 also by country.  Some of these individuals'
8 applications for permanent residence will remain
9 pending for many years.  I may -- we may be done with
10 them.  We may be ready to approve them, but we cannot
11 execute that approval until a visa number is available
12 to that individual application.  So the February 2008
13 policy change really does not affect those
14 applications at all.
15       MR. GHACHEM:  I'd like to have this marked
16 as Aytes Exhibit 14.
17       (Exhibit 14 was marked for identification
18 and attached to the deposition transcript.)
19 BY MR. GHACHEM:
20    Q   Mr. Aytes, I'm handing you -- I have handed
21 you a document that is now marked as Aytes Exhibit 14.
22 The Bates number at the bottom of the page is -- of

1 the first page is CIS Smith 002; is that correct?
2    A   Yes.
3    Q   Okay.  Do you recognize this document?
4    A   I recall this document, yes, sir.
5    Q   What is this document?
6    A   This was simply a brief side-by-side that
7 described the three basic kinds of searches that --
8 background check searches that USCIS conducts, the
9 TECS/IBIS check, the FBI name check and the FBI
10 fingerprint check, and then goes into some detail with
11 respect to the current -- or the then-current
12 situation with regards to FBI name check processing.
13 And then on page 2 some discussions of possible steps
14 to work with the FBI to improve their ability to
15 process and work through the backlog of name checks.
16    Q   When was this document created?
17    A   That I don't recall.  I'm sorry.  And I
18 don't see it on the face of the document anywhere.
19    Q   Is it a recent document?
20    A   I'm guessing last summer.
21    Q   You believe you saw this last summer?
22    A   I'd say about a year old.

1    Q   It's about a year old?
2    A   I mean, there is a -- under "Status" on
3 page 1, you know, there is in fact a reference by June
4 2007, 13 months later, the number older than six
5 months.  So there was some reference point.  I don't
6 know that they would have picked June 2007 if they
7 were doing this paper months thereafter and certainly
8 they couldn't have done it earlier than that.
9    Q   Do you know who produced this document?
10       MS. ONOZAWA:  I would note that the Bates
11 number is stamped CIS_Smith 0033.  So it would be
12 from the files of Greg Smith.
13       MR. GHACHEM:  So would you stipulate, then,
14 that this has been created by Greg Smith?
15       MS. ONOZAWA:  I can't stipulate to that,
16 but I can stipulate that it was in the files of
17 Greg Smith and it was produced in accordance with
18 this litigation.
19       MR. GHACHEM:  Okay.  So could you please
20 read back, madam reporter, my last question to the
21 witness?
22       (Record read.)

Page 186

1    A  Not specifically.  Documents like this
2  usually have many hands.
3    Q  Can you turn to page 2 of the document,
4  Mr. Aytes?  Do you see under bullet point number 2
5  that it reads, "USCIS also proposes to immediately
6  modify its internal procedures with respect to how
7  long it waits for the FBI search"?
8    A  So I guess it was a little later than June.
9  Yes.
10    Q  Why would you say it was a little later
11  than June?
12    A  Because that decision to make that change
13  on adjustment processing was not made, nor considered,
14  last June.
15    Q  Can you look further down, Mr. Aytes, to
16  bullet point number 5, please, which states,
17  "Predicated on these changes the infusion of funds
18  recently appropriated for the FBI name check backlog
19  and the FBI's fee increase, USCIS will formally notify
20  the FBI that we will rely on their delivering results
21  timely so that relevant information is available
22  quickly.  And thus effective in six months USCIS will

Page 187

1  wait no longer than six months on any case for the FBI
2  to finish its records check, including naturalization
3  cases"?
4    A  Uh-huh.  That was a proposal --
5    Q  I haven't asked you a question yet.  I'm
6  sorry.
7      Is it true that CIS has proposed not to
8  wait longer than six months for the FBI to finish a
9  name check with respect to naturalization
10  applications?
11    A  CIS considered whether or not that was a
12  viable alternative.  It was a proposal that was laid
13  out in this paper.  CIS since finalized an MOU with
14  the FBI that recognized that the FBI was going to have
15  to work through its backlog.  In working through its
16  backlog jointly we set goals for the FBI that were far
17  more aggressive than six months.
18    Q  Has CIS formally notified the FBI that it
19  will wait no longer than six months for the FBI to
20  finish its records check, including for naturalization
21  cases?
22    A  No, it has not.  That was a proposal, you

Page 188

1  know, laid out in the body of this.  It was not a
2  proposal that was implemented by the agency.  As I
3  said, instead we continued discussions with the FBI
4  that led to an MOU that led to a plan to work off
5  their backlog and lead to far more aggressive
6  processing times than six months.
7    Q  What's the date of the MOU that you just
8  referred to?
9    A  We went through that earlier, I thought.
10  We got a copy of it.  It's late 2007 I thought was the
11  date that you all referenced.
12    Q  What else can you tell me, Mr. Aytes, about
13  this statement under bullet point 5 regarding the
14  proposal to tell the FBI that CIS will wait no more
15  than six months for it to finish its records check,
16  including naturalization cases?
17    A  It was one option that was considered as a
18  way of getting the FBI's attention to the problem of
19  delays in the FBI name check issue.  It was -- you
20  know, like many organizations, we will think about
21  many things and lay out many possible proposals and
22  then distill through that those that make the most

Page 189

1  sense in terms of reaching our objectives.
2    Q  Is CIS still considering whether to wait
3  longer than six months for the FBI to finish its
4  record check in naturalization cases?
5      MS. ONOZAWA:  I object to the question to
6    the extent it relates to deliberations or
7    communications prior to when a decision has been
8    made.
9    A  CIS is operating predicated on the MOU that
10  we have with the FBI that calls for them to meet
11  certain targets with respect to processing oldest
12  cases and then reach a target of, I believe, by next
13  summer a 30-day processing time in 98 percent of
14  cases.
15    Q  Is there anyone else at CIS who would have
16  information about this document?
17    A  Came from Greg's files.  I'm sure you could
18  ask him about it when you depose him.
19    Q  Besides Mr. Smith.
20    A  There were a lot of folks -- you know, a
21  document like this has many hands.  I'm sure I
22  contributed in some respects to various drafts of

1 this. But again, it was just a paper that laid out
2 possible alternatives.
3    Q   Did you contribute in particular to bullet
4 point 5 on page 2?
5    A   I couldn't tell you. It was certainly --
6 there were discussions last year given the situation
7 at to, if we were unable to get the FBI's attention
8 and a reasonable solution to the problem, what other
9 steps we might be forced to take in order to resolve
10 the issue. Luckily it didn't come to those kinds of
11 considerations. We were able to work out a very
12 positive partnership with the FBI to solve the
13 problem.
14    Q   You're referring to the April 2008 joint
15 plan?
16    A   I'm -- yes.
17    Q   Do you have any other information,
18 Mr. Aytes, about the July 2007 fee increase and the
19 related surge in naturalization applications that you
20 haven't shared with me yet?
21    A   Only a little perspective. We currently as
22 of the end of May have 815,000 naturalization

1 applications pending. We received about 340,000 so
2 far this year. We've worked through the vast majority
3 of the applications we received last year. If it
4 wasn't for -- let's say I had gotten 100,000 in July
5 instead of 460,000, which is still high. You know,
6 these organizations, the goals they set were 33
7 percent above typical demand for naturalization in a
8 year. If I had gotten 100,000 instead of 460,000,
9 that 850,000 becomes 450,000 total pending. That's
10 only about -- that takes you back to about August of
11 last year.
12       The surge -- it was the scale of the surge
13 that has significantly affected processing times. If
14 we had received applications at a far more typical
15 volume level, by the end of this year we would not
16 have a backlog in naturalization. We will have a
17 backlog, relatively small compared to the 1.4 million
18 that we received, but that is directly as a result of
19 the sheer volume of demand that was filed last year.
20    Q   Are you familiar with the term "backlog
21 cycle"?
22    A   Uh-huh.

1    Q   What does that refer to?
2    A   In our terminology it's the way that you
3 calculate a backlog. That's the way we use that term.
4    Q   What do you mean by, "the way you calculate
5 a backlog"?
6    A   The way that you calculate how cases move
7 into the backlog.
8    Q   Does it have any other meaning?
9    A   I'm sure it has other meanings in other
10 contexts.
11       MR. GHACHEM: I don't have any further
12    questions.
13       MS. ONOZAWA: Okay. Can we take a break?
14       MR. GHACHEM: Sure.
15       (Recess taken.)
16       EXAMINATION OF MICHAEL L. AYTES
17 BY MS. ONOZAWA:
18    Q   Mr. Aytes, I just have a few follow-up
19 questions.
20       You testified earlier about the surge in
21 July 2007 in naturalization applications, correct?
22    A   Yes.

1    Q   And you testified that there was a plan
2 implemented afterwards between the CIS and FBI in
3 response to the surge, correct?
4    A   There was a CIS plan to deal with the surge
5 that was separate and apart from the MOU entered into
6 with the FBI to resolve the FBI's processing of name
7 checks.
8    Q   Okay. And this plan, when was that -- when
9 was that issued or when was that made final?
10    A   The surge plan was completed in the fall.
11 We were implementing it at the time. The plan itself
12 had to go to the Hill because we were proposing to
13 take -- I believe it was around $460 million in
14 additional revenue that we had received with the
15 additional volume of applications and invest it in
16 acquiring the capacity necessary to do the work. And
17 at that magnitude I believe it required notification
18 and approval by the Hill.
19    Q   Okay. And when was this plan submitted to
20 the Hill or Congress?
21    A   I believe it was submitted probably either
22 very late in 2007 or very early 2008. We were

Page 194

1  implementing it while we were finalizing the plan
2  because we were early enough in the year to be able to
3  make adjustments if necessary if Congress had concerns
4  or issues.
5      Q   Okay.  And has Congress ever communicated
6  to the agency over the last five years any mandate
7  that naturalization applications had to be completed
8  within a specific time frame?
9      A   With backlog elimination the -- that plan
10 that went from about 2003 through 2006 where Congress
11 provided about $500 million in subsidies to supplement
12 the fee revenue because the fees simply were not
13 keeping up with our costs, that was all predicated on
14 a seven-month processing time for naturalization.
15     Subsequently Congress was advised through
16 the surge plan and through various hearings where we
17 were with respect to the surge and that our goal with
18 the fee rule was to move to five months and that our
19 plan was still to move to five months after we worked
20 through the surge of applications that we received.
21     MS. ONOZAWA:  All right.  Thank you.  I
22 have no further questions.

Page 195

1      EXAMINATION OF MICHAEL L. AYTES
2  BY MR. GHACHEM:
3      Q   Just one brief question, Mr. Aytes.  You
4  stated -- you stated that Congress provided funding --
5  extra funding to CIS in connection with the surge --
6      A   With the -- excuse me, with the preexisting
7  backlog elimination plan.  That funding ended at the
8  end of FY 2006.
9      Q   And you stated that that funding was
10 predicated upon a seven-month average processing time
11 for naturalization applications?
12     A   Yes, as we calculate processing times.
13     Q   For what period -- over what period of time
14 was that average processing time contemplated?
15     A   That was the goal we were supposed to get
16 to.  That was our target.  Processing times were
17 significantly higher than that as they worked, you
18 know, through.  The agency had substantial backlogs at
19 its inception.  And Congress, recognizing that and
20 recognizing that the revenue stream based on our fee
21 structure was part of that, provided that subsidy
22 temporarily over a course of a couple of years.

Page 196

1      The disconnect was that that funding lapsed
2  at the end of 2006.  That was always the preexisting
3  plan.  The agency should have had a fee rule --
4  modified fee rule in place by the time that funding
5  lapsed instead of waiting until July the following
6  year.
7      Q   Did Congress also prescribe the
8  five-month --
9      A   No.
10     Q   -- processing time that you referred to
11 earlier?
12     A   Those were goals that we set and told
13 Congress of and then told them of our plans as to how
14 we would still get to that as we worked through the
15 surge.
16     Q   And did CIS achieve a seven-month average
17 processing time for N-400 applications --
18     A   At the end of backlog elimination, yes, we
19 did.
20     Q   When was that?
21     A   2006 -- well -- yeah, 2006.  The summer of
22 2006 we had no backlog of naturalization applications

Page 197

1  nationally.
2      Q   And at any point since that time has CIS
3  had a seven-month average processing time --
4      A   We were able to maintain that until we
5  started to see the surge in applications last summer.
6      MR. GHACHEM:  Thank you.  No further
7  questions.
8      MS. ONOZAWA:  I have nothing further.
9      MR. GHACHEM:  Thank you very much,
10 Mr. Aytes, for appearing today.
11     THE WITNESS:  My pleasure.
12     (Signature having not been waived, the
13 deposition of Michael L. Aytes, ended at 3:35
14 p.m.)
15
16
17
18
19
20
21
22

Page 198

1      ACKNOWLEDGMENT OF DEPONENT

2  I, Michael L. Aytes, do hereby acknowledge that I

3  have read and examined the foregoing testimony, and

4  the same is a true, correct and complete transcription

5  of the testimony given by me and any corrections

6  appear on the attached Errata sheet signed by me.

7

8  _____  _____

9    (DATE)           (SIGNATURE)

10

11

12

13

14

15

16

17

18

19

20

21

22

---

Page 199

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2  I, Rebecca L. Stonerock, Registered Professional

3  Reporter, the officer before whom the foregoing

4  proceedings were taken, do hereby certify that the

5  foregoing transcript is a true and correct record of

6  the proceedings; that said proceedings were taken by

7  me stenographically and thereafter reduced to

8  typewriting under my supervision; and that I am

9  neither counsel for, related to, nor employed by any

10  of the parties to this case and have no interest,

11  financial or otherwise, in its outcome.

12    IN WITNESS WHEREOF, I have hereunto set my hand

13  and affixed my notarial seal this 1st day of July,

14  2008.

15  My commission expires:

16  October 14, 2012

17

18

19  _____

20  NOTARY PUBLIC IN AND FOR

21  THE DISTRICT OF COLUMBIA

22

---

Page 200

1      E R R A T A   S H E E T

2  IN RE:  VIRGINIA MILANES v MICHAEL CHERTOFF

3  RETURN BY: _____

4  PAGE  LINE  CORRECTION AND REASON

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22    (DATE)       (SIGNATURE)

---

Page 201

1      E R R A T A   S H E E T (Continued)

2  IN RE:  VIRGINIA MILANES v MICHAEL CHERTOFF

3  RETURN BY: _____

4  PAGE  LINE  CORRECTION AND REASON

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22    (DATE)       (SIGNATURE)

1

 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF NEW YORK

 3

 4    - - - - - - - - - - - - x

 5    VIRGINIA MILANES, et al., :

 6          Plaintiffs,       :

 7       vs.                  : Case No:

 8    MICHAEL CHERTOFF, et al., : 08 Civ. 2354 (LMM)

 9          Defendants.       :

10    - - - - - - - - - - - - x

11

12              Corporate Deposition of

13           FEDERAL BUREAU OF INVESTIGATION

14        By and through its corporate designee,

15                MICHAEL CANNON

16               Washington, D.C.

17             Thursday, June 26, 2008

18                  10:43 a.m.

19

20    Job No.:  25501375

21    Pages:  1 - 211

22    Reporting by:  Sarah M. Bickel

Page 2

1    Corporate Deposition of Federal Bureau of
2 Investigation, by and through its corporate designee
3 MICHAEL CANNON, taken at the offices of:
4
5    Weil, Gotshal & Manges, LLP
6    1300 Eye Street, Northwest
7    Suite 900
8    Washington, D.C.  20005
9    (202) 682-7000
10
11
12
13
14
15
16
17    Pursuant to agreement, before Sarah M.
18 Bickel, Court Reporter and Notary Public in and for
19 the District of Columbia.
20
21
22

Page 4

1    A P P E A R A N C E S   C O N T I N U E D
2 ON BEHALF OF THE DEFENDANTS (continued):
3    HENRY R. FELIX, ESQUIRE
4    DAVID M. SAMONDS, ESQUIRE
5    Federal Bureau of Investigation
6    Office of the General Counsel
7    935 Pennsylvania Avenue, Northwest
8    Room PA-400
9    Washington, D.C. 20535
10    (202) 220-9328
11
12
13
14
15
16
17
18
19
20
21
22

Page 3

1    A P P E A R A N C E S
2 ON BEHALF OF THE PLAINTIFFS:
3    JACKSON CHIN, ESQUIRE
4    ALAN LEVINE, ESQUIRE
5    Puerto Rican Legal Defense and
6    Education Fund, Inc.
7    99 Hudson Street
8    14th Floor
9    New York, New York 10013
10    (212) 739-7572
11
12
13 ON BEHALF OF THE DEFENDANTS:
14    KIRTI VAIDYA REDDY, ESQUIRE
15    U.S. Department of Justice
16    U.S. Attorney's Office
17    Southern District of New York
18    86 Chambers Street
19    New York, New York 10007
20    (212) 637-2751
21
22

Page 5

1    C O N T E N T S
2 EXAMINATION OF MICHAEL CANNON    PAGE
3    By Mr. Chin    6
4
5    E X H I B I T S
6    (Attached to the Transcript)
7 DEPOSITION EXHIBIT    PAGE
8 FBI 1    Declaration of Michael A. Cannon    13
9 FBI 2    2/27/08 E-mail    33
10 FBI 3    4/2/08 News Release    39
11 FBI 4    March 2008 Business Plan    39
12 FBI 5    4/1/08 E-mail    45
13 FBI 6    5/5/08 E-mail    64
14 FBI 7    Document    80
15 FBI 8    Document    98
16 FBI 9    12/13/02 Electronic Communication    112
17 FBI 10    1/24/08 Memorandum    185
18
19
20    (FBI Exhibits 2, 5, 6, and 10 are marked
21 confidential and bound separately.)
22

Page 6

1        P R O C E E D I N G S
2            MICHAEL CANNON
3    having been first duly sworn, testified as follows:
4        EXAMINATION BY COUNSEL FOR PLAINTIFFS
5        BY MR. CHIN:
6        Q  Good morning, Mr. Cannon.  My name is
7    Jackson Chin.  I'm one of the Plaintiffs for -- I'm
8    one of the counsel for Plaintiffs in this case,
9    Milanes versus Chertoff.  My co-counsel, Alan Levine,
10   is here.  Thank you for coming today.
11           I just wanted to start with a few basic
12   instructions, and I'm sure you've heard this before
13   but just to go through them quickly with you.  You
14   understand you're under oath?
15       A  Yes.
16       Q  That's right.  The other thing is you must
17   not nod your head or you must articulate a "yes,"
18   "no," or "I don't know" so that the transcriber is
19   reflecting your answers.  If you don't know the
20   answer, of course, I would expect you to say "I don't
21   know" or "I don't understand your question, please
22   repeat it."  If you wish to take a break, let me know

Page 7

1    and we will try to accommodate you.
2            Also, of course, we're looking for your
3    truthful and honest testimony.  Any answers that you
4    can render, to the best of your knowledge, would be
5    greatly appreciated.
6            Now, are you on any medication currently
7    that might affect your ability to comprehend these
8    proceedings and to respond?
9        A  No, I'm not.
10       Q  Are you represented by counsel?
11       A  Yes, I am.
12       Q  And who would that be?
13       MS. REDDY:  Kirti Reddy with the U.S.
14   Attorney's Office in the Southern District of New
15   York and also --
16       MR. FELIX:  Henry Felix with the FBI.
17       MR. SAMONDS:  David Samonds, FBI.
18       MR. LEVINE:  You're all representing the
19   witness as well?
20       MR. FELIX:  We're representing the FBI in
21   our official capacity, yes.
22       MS. REDDY:  For the Milanes case, I'm the

Page 8

1    named representative on the case.
2        MR. LEVINE:  You're the attorney for
3    Mr. Cannon?
4        MS. REDDY:  On the record, yes.
5        BY MR. CHIN:
6        Q  I just want to indicate that if you want
7    to consult with counsel, please do so but not while a
8    question is pending.  Do you understand?
9        A  I do understand.  So if there's a question
10   that I'm not sure about, though -- I do have a
11   question, if my answer may borderline some issues
12   such as law-enforcement sensitive, are we saying that
13   I cannot stop and consult with counsel before that?
14       A  I would say that you cannot invoke that
15   privilege.  Your counsel will do that and then
16   instruct you not to answer.
17       MS. REDDY:  But if you're not sure if
18   revealing some privileged materials -- your answer
19   would reveal privileged materials, then you can
20   consult me.
21       MR. LEVINE:  You can consult with regard
22   to the assertion of the privilege.

Page 9

1        MS. REDDY:  Yes.
2        THE WITNESS:  Okay.
3        BY MR. CHIN:
4        Q  Before coming to today's deposition, did
5    you meet or speak with anyone in preparation?
6        A  Yes, I did.
7        Q  Who would that have been?
8        A  I spoke with my boss, Assistant Director
9    Bill Hooton.
10       Q  Yes.
11       A  I spoke with Section Chief Dave Hardy.  I
12   spoke with my Assistant Section Chief, Jim Jaye.  I
13   spoke with one of my employees, Mark Vaughn.
14       Q  Could you elaborate as to what you mean by
15   one of your employees?  Is he within the National
16   Name Check Program?
17       A  Yes, Mark Vaughn is within the National
18   Name Check Program section.
19       Q  Is he within one of the dissemination
20   units or --
21       A  Yes, he is.  He works in the Name Check
22   Program oversees in one of the dissemination

Page 10

1  components of the Name Check Program.

2      Q  Thank you.

3      A  And I met with my counsel yesterday.

4      Q  That's Ms. Reddy?

5      A  Ms. Reddy and the other two gentlemen

6  here.

7      Q  Is there anyone else you conferred with?

8  Did you speak with anyone at the director's office or

9  his representative?

10      A  No, I did not.

11      Q  In reference to the 30(b)(6) notice, we

12  did want to have information from the agency which

13  presumably would be information not necessarily

14  accessible or, you know, at Mr. Cannon's level.  So I

15  ask that question because I think -- so far you've

16  given me the officials of people who are within the

17  Records Management Division that you have your

18  section under.  But it appears you haven't asked for

19  information from anyone above or beyond that

20  division; is that correct?

21      A  In preparation for this deposition?

22      Q  Uh-huh.

Page 11

1      A  I would say that is correct.

2      Q  Let me ask you, did you review any

3  materials in preparation for today's deposition?

4      A  Yes, I did.

5      Q  What type of materials were they?

6      A  I reviewed my declaration in the Milanes

7  case.

8      Q  Yes.

9      A  I reviewed the FBI's response to the DOJ

10  OIG report.

11      Q  I'm sorry.  The DOJ, was that the recent

12  audit?

13      A  The audit report, yes.  Department of

14  Justice --

15      Q  The Inspector General?

16      A  -- Office of Inspector General, OIG

17  report.  I reviewed our responses to the OIG report.

18  I reviewed the documentation which laid out the

19  things I would be responsible for today in the

20  deposition, the 30(b)(6) and those issues to make

21  sure that I understood or had a really good idea of

22  the topics that were going to be discussed today.

Page 12

1      Q  Okay.  Did you review any previous

2  deposition testimony that you may have given?

3      A  In Yakubova?  I did not go back and review

4  the transcript of Yakubova.  I did not do that.

5      Q  All right.

6      A  I also reviewed -- I believe it was a

7  supplemental -- interrogatories that were submitted

8  in this case that I was not required to sign off on.

9  So I had not seen them prior to this case.  I'm

10  trying to think if there's anything else I reviewed.

11      Q  Well, one of the areas that I would like

12  to discuss with you would be the March 2008 business

13  plan.

14      A  Okay.  I reviewed our business plan.  I

15  also reviewed an EC, electronic communication,

16  dealing with the resubmission of the name checks for

17  USCIS.

18      Q  That would have been back in 2002?

19      A  2002, I believe, yes, sir.  I reviewed

20  that also.

21      Q  Great.  Let me also ask you -- now, have

22  you been deposed again or a time subsequent to the

Page 13

1  Yakubova deposition in any other litigation related

2  to the National Name Check Program and delays?

3      A  No, I have not.

4      Q  So this would be your second deposition,

5  correct, the one after the Yakubova deposition that

6  you gave in January?

7      A  Relating to the Name Check Program?

8      Q  Yes, that's right.

9      A  Yes, sir, that is correct.

10      Q  Thank you.  Let me ask you --

11      MR. CHIN:  I'm going to have your

12  declaration marked in evidence -- I'm sorry, marked

13  as Exhibit 1, please.

14      (FBI Exhibit 1 was marked for

15  identification and attached to the deposition

16  transcript.)

17      MS. REDDY:  I just want to make a

18  correction.  The Yakubova deposition was in December,

19  not January.

20      MR. CHIN:  Thank you very much for

21  correcting me.  I mistook it from the Hardy

22  deposition date.  That's correct.  Thank you.

Page 14

1       BY MR. CHIN:

2       Q  Let me ask you, Mr. Hardy --

3       A  Mr. Cannon.

4       Q  I'm so sorry, Mr. Cannon.  That's right.

5  I want to go over some of the -- take a look, sir, at

6  your declaration, paragraphs 25 through 29.  That

7  would be on page 11 through 12.  You identify a

8  number of causes of delays in the name check

9  processing.

10      A  Yes.

11      Q  Is that right?

12      A  Yes.  In looking at page 11, paragraph 25,

13 it -- the first sentence indicates that the paragraph

14 addresses numerous factors contributed to the delays

15 in the processing of name check requests.

16      Q  Yes.  So my question to you, sir, can you

17 identify any other sources of delay that you didn't

18 include in the declaration?

19      A  Please give me a moment to read the

20 paragraph.

21      Q  Sure.  Please go ahead.

22      A  For the record, paragraph 25 is just one

Page 15

1  component of the delays.  So I'm going to continue to

2  read the remaining paragraphs.

3       Q  Sure.

4       A  I've read paragraphs 25 through 29.  In

5  thinking through other possibilities, other things

6  that may cause delays, there are a few that come to

7  mind which weren't listed here (indicating).

8       Q  Can you tell us what those are?

9       A  One would be if, for some reason, our

10 system, the Name Check Program went offline or we had

11 problems with the computer systems within the FBI

12 within the Name Check Program, that may cause a delay

13 or the inability of my folks to process.

14      Q  Right.  Is that the mainframe, the NCP, is

15 that what you're referring to?

16      A  The Name Check Program is the mainframe.

17 Also there is what's called the Name Check

18 Dissemination Database, NCDD, which from time to time

19 would have some sort of a functioning error or a

20 glitch in the way that it is processing information.

21 So that would cause also a delay.

22      Q  How substantial would that delay be, if

Page 16

1  you know?  Would it be months, days?

2       A  No.  Normally, within hours, because if

3  something happens, it is brought to the attention of

4  our Information Technology, IT folks.

5       Q  Right, the crackpot people -- crackshot --

6  go right ahead.

7       A  I'm sorry?

8       Q  Go right ahead.  What other delay factors

9  can you think of besides that?

10      A  One thing, which is related to the

11 accessibility of an FBI record in paragraph 28, if

12 it's a paper record -- it talks about here, it may

13 not be located locally, so we would have to reach out

14 for it.  But if it's a paper record on an open

15 investigation or if we obtain a -- what we call a

16 hit, which is a match to a record which is an open

17 investigation, it requires coordination with the FBI

18 case agents regarding what information, if any at

19 all, we can release.  So that would not cause a delay

20 per se, but would take additional time as far as

21 processing that name check.

22      Q  And just to clarify, when you say "FBI

Page 17

1  case agents," are you specifically talking about

2  those in the field offices or at headquarters as

3  well?

4       A  Mostly at field offices.  I'm trying to

5  think of if there would be instances at headquarters

6  where we may have to go through headquarters to get

7  the ability to perhaps release some information.

8  It's possible, but it's mostly in the field.

9       Q  And when you say that there's a hit, a

10 match, I assume, if I'm correct, that this would be

11 to reach out to the case agent to then confirm

12 whether the hit is, in fact, serious or derogatory

13 or -- is that the process?

14      A  It may be all of the above.  It could be

15 maybe to find out more about the case.

16      Q  Or just to retrieve the record?

17      A  To retrieve the record, if we're allowed

18 to do that.  If it's pending, certainly we will

19 discuss the information with the field agent because

20 it could be law-enforcement sensitive, the providing

21 of information may be to the point where we, in the

22 Name Check Program, don't want to do anything that's

Page 18

1  going to jeopardize an investigation.  So we want to
2  make sure that we work in concert with our
3  operational folks.
4      Q  So, Mr. Cannon --
5      A  Hang on.  You had one more point.  I'm
6  trying to remember what it was because you asked the
7  question.  I'm sorry, it slipped my mind.  If I
8  recall it, I'll bring it up.
9      Q  That's fine.  Just one follow-up question.
10 If you have an open investigation on a suspect or an
11 individual, a particular named individual, would that
12 not be found through your universal index or through
13 your electronic database?  Would that not tell you
14 that --
15     MS. REDDY:  Objection.  He didn't finish
16 the question, and it was going to be a compound
17 question.
18     MR. CHIN:  So should I restate --
19     MR. LEVINE:  You can answer, if you
20 understand it.
21     THE WITNESS:  Ask the question again,
22 please.  Let me make sure I understand what you're

Page 19

1  asking.
2      BY MR. CHIN:
3      Q  Sure.  If there is an open investigation
4  by the FBI on an individual, wouldn't that
5  information be captured through the universal index,
6  which I believe is an electronic set of database of
7  your information?
8      MS. REDDY:  Objection.
9      MR. CHIN:  What's the reason?
10     MR. LEVINE:  You can go ahead and answer.
11 She's just noting an objection.
12     MS. REDDY:  If you understand, you can
13 answer.
14     THE WITNESS:  Yes, UNI is an index of
15 names.  The status of a case, whether it's open or
16 closed, is found in ACS in ECM, Electronic Case
17 Management.  Also, in my declaration is three
18 components, UNI, Electronic Case Management -- no,
19 Individual Case Management, I believe, and Electronic
20 Case File.  So the combination of those
21 three -- Investigative Case Management, I'm sorry,
22 tells you the status of a case.  But regardless, if

Page 20

1  we have a pending investigation, we must reach out to
2  the field agents to see if -- what, if anything, we
3  can release.
4      Also, what it allows us to do is -- in
5  talking with the field agents, we can confirm that
6  this name checker we have is actually the person
7  named in the case.  There's a possibility it might
8  not be.  That was the other point that I wanted to
9  make.
10     BY MR. CHIN:
11     Q  I was just trying to simply understand
12 whether through an electronic database or through
13 some electronic -- whether it's the automatic case
14 support system or a different system within FBI,
15 whether the name checks process, which I believe goes
16 through batch processing and a number of other
17 phases, whether the electronic processes would help
18 you know automatically that an open investigation
19 was --
20     MS. REDDY:  Objection.
21     (Simultaneous conversation.)
22     THE WITNESS:  Yes.  My understanding is,

Page 21

1  by looking at what's in the Name Check Program under
2  ACS, you can tell if a case is open or pending, which
3  will allow my folks to reach out to the case agents.
4      BY MR. CHIN:
5      Q  To then further get the file and to figure
6  out what the nature of that open investigation is; is
7  that correct?
8      MS. REDDY:  Objection.  Is it to
9  get -- it's a compound question.  To get the file or
10 to figure out --
11     BY MR. CHIN:
12     Q  Well, to determine the nature of the open
13 investigation.
14     MS. REDDY:  Is that the question?
15     MR. CHIN:  That's my question.
16     THE WITNESS:  If the case is uploaded in
17 ECF, electronically available, my folks should be
18 able to see what type of investigation it is.  If it
19 is pending and open, we will still coordinate with
20 the case agents before any information is released.
21     BY MR. CHIN:
22     Q  Let me return to this topic a little

Page 22

1 later. I'll ask you some additional questions.

2       Now, if you had additional resources and

3 they had been allocated in the past to the Name Check

4 Program, would there now be less of a name check

5 backlog?

6       MS. REDDY: Objection.

7       BY MR. CHIN:

8       Q You can answer. Please answer.

9       A As I understand the question, if I had had

10 additional resources in the past -- define resources

11 for me, if you would, please.

12       Q Well, maybe you can help define what

13 resources might be. If they had been allocated,

14 meaning there were commitments to such resources in

15 the past, however you define resources, would we have

16 far less of a name check backlog?

17       MS. REDDY: Again, I'll object for the

18 same reason.

19       THE WITNESS: We would, in my opinion,

20 have most likely fewer name checks pending than we

21 would now, if I had had resources earlier than I've

22 recently been able to obtain resources over the past

Page 23

1 number of years.

2       BY MR. CHIN:

3       Q And tell me what you believe what

4 resources those would be, in general terms, that

5 would have helped that -- if that had been allocated

6 in the past. We were talking about what we think are

7 resources. Can you just identify what you think are

8 the key resources?

9       A Mostly because the Name Check Program was

10 designed as a paper-based manual program, the

11 resources that would have made the greatest impact on

12 pending cases would have been additional personnel.

13       Q If additional resources had been allocated

14 in the past to the program, would there now be a

15 shorter average processing time?

16       MS. REDDY: Objection.

17       BY MR. CHIN:

18       Q Please answer that.

19       A That, in my opinion, most likely, yes,

20 would be the case, taking into consideration it would

21 not have changed the processing time going through

22 the batch phase because that's the electronic

Page 24

1 automated portion of the Name Check Program. It

2 would have made the most difference in the

3 dissemination phase, which is where you have folks

4 that actually have to review the reports and come to

5 conclusions.

6       Q Those are the analysts, correct?

7       A Yes, those are folks that analyze the

8 information. We call them research analysts.

9       Q I'm sorry.

10       A They analyze the information in the

11 reports -- or in the FBI files.

12       Q In the Yakubova deposition, you said that

13 there would be a number of contractors on board by

14 January of 2008. In the March 2008 business plan,

15 you were expecting additional contractors to be on

16 board by the end of March 2008. Has that occurred?

17       MS. REDDY: Objection, compound question

18 which was --

19       MR. CHIN: I was simply saying that, you

20 know -- there's just one question on the table.

21       BY MR. CHIN:

22       Q Based on the March 2008 business plan,

Page 25

1 there was an expectation of adding some contractors

2 to the program by March 2008. Has that occurred?

3       A Yes.

4       Q How many people, if you know, have been

5 added to your program?

6       A Are you referring to contractors or FBI

7 personnel working --

8       Q Both.

9       A Are you also referring to folks that are

10 allocated strictly to the USCIS portion of the

11 National Name Check Program?

12       Q If you want to break it down that way, we

13 can certainly do it that way.

14       A The reason I say that is because the

15 business plan -- if we're talking just about the

16 business plan, the business plan was focused only on

17 USCIS. So if I can limit my answer to that, if that

18 would be acceptable.

19       Q Sure.

20       A For USCIS, right now, the last I recall,

21 there are approximately 55 FBI personnel and about

22 273 contractors dedicated to processing USCIS name

Page 26

1  checks.  Bear in mind, these are approximations,
2  mostly on the contracting side due to the fact that
3  on occasion a contractor will go -- leave and go to
4  another job.  In other words, he'll resign from
5  employment of a contractor or there may be issues
6  where they're not meeting metrics and we have to
7  replace them, things of that nature.  So these are
8  approximations.
9      Q  But when you give me 55 and the 273, are
10  you talking about new hires?
11      A  No, total.
12      Q  Well, I was really asking about the
13  additional new hires that were scheduled for March of
14  2000 --
15      A  I would have to go back -- off the top of
16  my head, I don't recall how many I had in December,
17  January.  We've had contractors that came on board in
18  the March time frame, additional contractors, that is
19  correct.
20      Q  Now, your plan also indicates that another
21  group of new contractors would also be scheduled for
22  the end of June of this year.  Do you have a sense of

Page 27

1  how many of those have been hired?
2      A  Part of those would have been included in
3  the 273 because as soon as we can -- the goal in the
4  business plan was by this date, we would have them on
5  board.  But we do our best to get them on board as
6  soon as possible.  So some of those would have been
7  part of the 273 that came on.  As I recall, we've had
8  some contractors come on board within the last three
9  weeks.
10      Q  Do you have a general sense of how many
11  numbers or how close you are in meeting those
12  targets?
13      A  The business plan calls for 290
14  contractors, I believe, total for USCIS.  We're
15  within, I would guess, about 10 or 15 of that, but I
16  don't have a sense now if any more came on yesterday.
17      Q  Let me ask you, do you recall in your
18  deposition in the Yakubova case, you stated that the
19  law restricts the FBI from hiring its own staff and
20  that's why they needed to hire contractors.  Do you
21  know what law you were referring to?
22      A  That would be, as I recall, the limitation

Page 28

1  that we had set on our -- what we call FSC, Funding
2  Staffing Level.  Each component within the bureau has
3  a limitation on the people that it can hire.  There
4  are limitations on how many people come to work for a
5  government organization.
6      Q  But do you happen to know the specific law
7  or statute that you believe creates such a limitation
8  in hiring at the FBI?  If you don't know, you can
9  simply say you don't know.
10      A  I don't know.  My understanding is it's an
11  appropriations issue which is government wide on how
12  the government limits or sets the number of people
13  that work for it.
14      Q  Do I take that to mean that if you receive
15  more appropriations, then you could hire more FSL
16  full-time staff at the FBI?
17      A  The number of folks handled -- hired by
18  the FBI in general, and certainly that is something
19  that's outside of my area, but each year we submit a
20  budget request, the budget request includes request
21  for additional FSL.  The FBI, in general, does that,
22  and that would include -- yeah, request for FSL,

Page 29

1  which would have to be approved on a yearly budget
2  basis.
3      Q  Not to put words in your mouth, but it
4  sounds like if the budgeting process at FBI were to
5  propose the funding for more full-time staff, that if
6  they put that in, then presumably if they receive the
7  funding, you could then hire?
8      MS. REDDY:  Objection.  He's not here as a
9  legal expert or a lawyer.  He doesn't know the law.
10  He already indicated that he's not --
11      MR. CHIN:  I'll move on.  That's fine.
12      BY MR. CHIN:
13      Q  Let me ask you, Mr. Cannon, about the
14  bucket system that was something I read about in some
15  of the discovery.
16      A  Are we moving away from my declaration at
17  this point in time?
18      Q  We kind of weave in and out, but yes.
19      A  Okay.
20      Q  Let me ask you.  This bucket system, I
21  believe, started in late 2007; is that correct?
22      A  That is correct.

Page 30

1    Q  And how does it function currently in
2  2008?  If you could just give us a summary of what
3  the concept and the practice of the bucket system is.
4    A  Sure.
5    Q  Thank you.
6    A  The bucket system essentially is a system
7  set up through the Name Check Dissemination Database,
8  NCDD.  What that does, it limits the ability of an
9  employee to choose a name check.  We -- our goal is
10  to do first in, first out.  And as you have read in
11  the business plan, we have certain milestones that we
12  are meeting based upon the age of a name check.
13    So, for instance, we are -- just finished
14  working on name checks over three years old.  So what
15  happens is when an employee goes to obtain a name
16  check and it's assigned through NCDD, they are
17  limited in the age of a name check that they can
18  choose.  In other words, that bucket's a
19  three-year-old bucket, so all the name checks coming
20  out of that -- that they can choose are three years
21  old.
22    Q  Yes.

Page 31

1    A  According to the system, they should have
2  the next oldest one first.  What this does is it
3  focuses the employee on working on name checks that
4  are of the age that we're working on, and it
5  also -- what it would prevent is if I was an employee
6  that had 10 out of 2003 or 2000 -- that were three
7  years old and they were complicated and I wanted to
8  do easier ones, to choose newer ones which may be
9  easier.  So what it was -- is is a way for us to
10  focus the work that my employees in the Name Check
11  Program do in the dissemination phase to allow us to
12  focus our resources to meet the milestones as laid
13  out in the business plan.
14    Q  So conceptionally, the bucket system is to
15  try to, if I understand what you just said,
16  prioritize the oldest cases and to get those properly
17  assigned and worked on?
18    A  The bucket system is a way in which we
19  assign cases and set priorities and as far as the
20  class of cases that we're working on.
21    Q  Is the bucket system applied across the
22  board or is it --

Page 32

1    MS. REDDY:  Objection -- sorry, finish
2  your question.
3    BY MR. CHIN:
4    Q  Is it applied across the board throughout
5  the dissemination phase or -- maybe the right way of
6  asking it is, how many people are affected by the
7  bucket system, how many employees?  If you know.
8    A  The number of employees, I couldn't tell
9  you how many employees.  The bucket system is used in
10  parsing out work to additional customers -- other
11  customers within the Name Check Program.
12    Q  Have you come across any difficulties in
13  having the bucket system, in fact, work the way you
14  want it to work or as you've just explained it?
15    A  Occasionally, we'll have difficulties with
16  NCDD.  I mentioned earlier that there may be delays
17  in processing name checks if NCDD drops offline or
18  there may be a glitch in the system.  Occasionally,
19  there will be an issue with NCDD.  Someone may be
20  able to choose a name which is not in the right
21  bucket.  And we review the work being processed, and
22  we identify that quickly and go to resolve those

Page 33

1  types of issues.  But generally speaking, it's
2  working the way it's set up to work.
3    Q  And this was started in late 2007,
4  correct?
5    A  That is correct.
6    MR. CHIN:  I'd like this marked as the
7  next exhibit.
8    (FBI Exhibit 2 was marked for
9  identification and attached to the deposition
10  transcript.)
11    BY MR. CHIN:
12    Q  Would you please read this to yourself.
13    Do you recognize this particular e-mail?
14    A  Yes.
15    Q  Can you explain what the comment there is
16  about cherry picking and this is -- I guess this is
17  in reference to the bucket system?
18    A  Cherry picking is what I mentioned earlier
19  where someone would be able to choose an easier case.
20    Q  Which they're not supposed to do?
21    A  Which, one, they're not supposed to do,
22  and two, it may be a case that's outside the age of

1 the cases they're working on, say, cases over two
2 years old or cases over three years old, things of
3 that nature.
4    Q I assume there are multiple buckets; is
5 that right?
6    A Name checks would be parsed in different
7 buckets depending upon the age, but they would only
8 have access to a certain bucket.
9    Q So, as you see, your e-mail was dated in
10 February of this year; is that correct?
11    A That's correct.
12    Q Once you became aware of this
13 cherry-picking problem, what did you do about it, if
14 anything?
15    A We looked at NCDD to figure out why folks
16 were able to pick cases that they weren't allowed to
17 work on. Again, I mentioned earlier that
18 occasionally we will get an indication that someone
19 is working on a case that they weren't supposed to be
20 working on or wasn't assigned. And we have to figure
21 out why that's the case, why that person would have
22 access to the case, because what it's doing is not

1 allowing them to focus their resources where we need
2 to focus them.
3    Q Does that mean that the individual in the
4 dissemination phase is trying to take an assignment
5 that is not his or hers, in other words, going beyond
6 the bucket system or going beyond the assignment of
7 the oldest cases?
8    A Not necessarily. For some reason, NCDD
9 may have assigned this person --
10    Q NCDD is a software --
11    A The Name Check Dissemination Database.
12    Q It's a database, that's right.
13    A It's a oracle-based system they go to and
14 can get name checks assigned. I don't know for sure,
15 but it may be possible to assign them this case in
16 error. If that's the case, we would have to go back
17 and find out why --
18    Q I'm sorry, but it seems the e-mail is
19 suggesting human error or human decision making and
20 not so much a machine glitch. Is that a correct way
21 of looking at this issue? Is it a failure to
22 supervise that is the problem?

1    MS. REDDY: Objection.
2    THE WITNESS: A failure to supervise -- I
3 don't think that's the case and I think probably
4 mischaracterizes it.
5    MS. REDDY: Which question do you want on
6 the table?
7    MR. CHIN: I'm trying to have Mr. Cannon
8 explain that it's beyond just the machine forces
9 where a case that is being, you know, a name check
10 case or assignment within the bucket system, how it
11 is possible for someone to pick and choose. In this
12 instance, what I believe cherry picking --
13    THE WITNESS: Cherry picking does mean
14 picking and choosing, that's correct.
15    BY MR. CHIN:
16    Q And that would be on contravention to the
17 general purpose of the bucket system?
18    A As I recall your question a few moments
19 ago --
20    MS. REDDY: I guess the issue --
21    THE WITNESS: Let me --
22    MS. REDDY: I guess we need to figure out

1 which question he wants an answer to. There were a
2 couple of questions that were posed, and we need
3 to --
4    MR. LEVINE: The question that he's
5 recalling is whether or not there's a person involved
6 as opposed to a machine, a human, right?
7    THE WITNESS: That is not correct. The
8 question -- we might need to read it back. The
9 question you had posed, as I understood it, was --
10    MS. REDDY: Objection.
11    Let's let them ask the questions.
12    THE WITNESS: Okay.
13    MR. CHIN: Let me see if I can clarify,
14 and then I will move on.
15    BY MR. CHIN:
16    Q I think the question is whether a person
17 who is supposed to be taking on cases from the
18 buckets which indicate the oldest cases for a
19 particular year, periods of years, whether that
20 person is being assigned that set of bucket cases or
21 has the option and choice to ignore those cases in
22 that bucket and seek more recent cases, for example.

Page 38

1 And therefore, it's an issue of who is making that
2 choice, who is evading the bucket system itself.
3        MS. REDDY:  Objection.
4        BY MR. CHIN:
5        Q  Do you understand the question?
6        A  Please just repeat it so I make sure I
7 answer what you're asking.
8        Q  I think you said it was a machine
9 issue -- I thought you said the NCDD database was
10 where you thought the problem resided, and that
11 somehow you were trying to find out how that case
12 came to the attention of this person who was cherry
13 picking?
14        A  I said it's possible for that to happen.
15        Q  I see.  Okay.  Is it also possible for the
16 person to cherry pick on his own without the
17 machine's aid?
18        A  In the past, that has been the case, yes.
19        Q  So in this situation with the e-mail in
20 February, do we know whether the follow up led you to
21 discover what the actual problem was?
22        A  Without having the first part of the

Page 39

1 e-mail, I'm not specifically sure what the issue may
2 have been.
3        Q  Is it because it's redacted?
4        A  It is redacted.
5        Q  I will move on.  Thank you for your
6 answer.
7        MR. CHIN:  Can we please mark Exhibit 3.
8        (FBI Exhibits 3 - 4 were marked for
9 identification and attached to the deposition
10 transcript.)
11        BY MR. CHIN:
12        Q  Mr. Cannon, I've just served you copies of
13 exhibits marked.  These exhibits are the March 2008
14 FBI USCIS National Name Check Program Business Plan.
15 And I believe you said you were familiar with it
16 earlier?
17        A  Yes, I am.
18        Q  And then the other exhibit is a one page
19 USCIS news release dated April 2nd, 2008.
20        MR. LEVINE:  Are these both Exhibit 2?
21        MR. CHIN:  No, they're 2 and 3.
22        THE COURT REPORTER:  No, 3 and 4.

Page 40

1        BY MR. CHIN:
2        Q  You're familiar with the details of the
3 business plan, sir; is that correct?
4        A  Yes, I am.
5        Q  Are you involved with helping to shape the
6 plan itself?
7        A  Yes, I was.
8        Q  In what way were you involved?
9        A  Developed the initial draft of the plan,
10 the format.
11        Q  How else were you involved?
12        A  I drafted a lot of what is in the plan
13 regarding the various sections.
14        Q  Was anyone else at the FBI involved with
15 the drafting of the business plan?
16        A  Yes.
17        Q  Who would those individuals be?
18        A  My boss, Assistant Director Bill Hooton;
19 our divisions operation manager, Andy Scott or Glen
20 A. Scott; my assistant section chief, Jim Jaye.  I'm
21 trying to think -- those were the major players on
22 the development of the business plan.

Page 41

1        Q  Okay.  Was there anyone at a much higher
2 level that was involved with the details of the plan
3 as well?
4        A  No.  The plan was developed by --
5        Q  By your section?
6        A  My section and the Records Management
7 Division, which is the division that my section is
8 in.
9        Q  Fine.  Thank you.  Now, who else at the
10 USCIS or in Homeland Security was involved, if you
11 know?
12        A  We provided drafts of the plan to USCIS.
13        Q  Who at USCIS?
14        A  I provided drafts to Mr. Greg Smith.
15        Q  And just for the record, who is Greg
16 Smith?
17        A  Mr. Gregory Smith is what I consider to be
18 my counterpart at USCIS.  I forget -- I apologize, I
19 do forget his official title.
20        Q  That's fine.  We can find it.  Was there
21 anyone else at the USCIS that you had contact with on
22 this plan?

Page 42

1     A  Patrick Lyden is a contractor that works
2  for USCIS.
3     Q  And why would he be involved?
4     MS. REDDY:  Objection.
5     MR. LEVINE:  Go ahead.
6     THE WITNESS:  One of the components in
7  developing the plan was to figure out or estimate --
8     MS. REDDY:  Objection. He's here to
9  answer questions on behalf of the FBI.  As to why CIS
10  personnel would be involved in the drafting of the
11  plan is beyond the scope of what he's here to answer.
12  He's here to answer questions on --
13     MR. CHIN:  I disagree with that because
14  obviously he was -- Mr. Cannon was very critical in
15  devising the details of the plan.  If he needed to
16  discuss this with another agency and, of course, this
17  plan involves another agency, then it's certainly
18  relevant to what I'm trying to understand in terms of
19  who -- what actors were involved with the specific
20  details and issues and benchmarks, et cetera, of this
21  plan.
22     MS. REDDY:  Okay.

Page 43

1     You can answer.
2     THE WITNESS:  Answer?
3     BY MR. CHIN:
4     Q  Yes.  There was a question about Patrick
5  Lyden, the USCIS contractor, and why you needed to
6  discuss the plans or the drafting of the plans with
7  him.
8     A  Mr. Lyden deals a lot with the
9  numbers -- when I say "numbers," numbers of name
10  checks that are submitted to the FBI.  He was
11  instrumental in providing us information regarding
12  the estimate of how many name checks we were to
13  expect in the future.
14     Q  Is he the person who would supervise the
15  contractors, the USCIS contractors that processed the
16  name checks?  Is that why he would know this
17  particular set of information you wanted from him?
18     A  I have no idea if he supervises anybody.
19     Q  All right.  That's fine.  Let me ask you,
20  sir, was this business plan a new plan or had it
21  already been developing in the summer of 2007 or late
22  2007?

Page 44

1     A  The plan itself was a new plan that we
2  pulled together in early 2008.
3     Q  All right.  Now, when did the plan
4  commence in implementation?
5     A  The plan, I believe, was signed in either
6  March or April time frame.  We, however, had been
7  working toward these metrics before that.
8     Q  I mean, I understand from looking at the
9  face of the document itself, it's indicating
10  March 2008, correct?
11     A  Uh-huh.
12     Q  So are you saying that this is the only
13  plan -- this is the plan, the only business plan in
14  existence at the time, and that was what was executed
15  in March of 2008 by the officials from USCIS as well
16  as the FBI?
17     A  I am not sure I understand your question
18  as far as is this the only business plan.
19     Q  Okay.
20     A  I don't understand the question.
21     Q  That's fine.
22     MR. CHIN:  Let me -- would you please mark

Page 45

1  this as an exhibit, please.
2     (FBI Exhibit 5 was marked for
3  identification and attached to the deposition
4  transcript.)
5     BY MR. CHIN:
6     Q  Mr. Cannon, do you recognize this
7  document?
8     A  Yes, I do.
9     Q  What is it?
10     A  This document is an e-mail from me to
11  Mr. Tim Murphy who's our Associate Deputy Director of
12  the Bureau.
13     Q  Right.  And it's dated?
14     A  Hang on.
15     Q  Sure.  Do you need glasses?
16     A  No, I don't.  I just need to find it on
17  here.  Looks like it's dated Tuesday, April 1st,
18  2008.
19     Q  Now, let me draw your attention to your
20  first line.  You can read it to yourself.  It seems
21  to suggest that there is a latest version of our
22  business plan.  Does that mean to say that you have

Page 46

1 other versions of the business plan?

2     A  We had drafts of the business plan, that

3 is correct.

4     Q  But the business plan that I put into the

5 record earlier was marked -- I'm sorry, it was dated

6 or labelled March 2008 and then it, of course, had

7 the signature page.  So why the discrepancy, if any,

8 in terms of the timing of the versions or the timing

9 of the business plan report?

10     MS. REDDY:  Objection.  I don't

11 believe -- foundation.  I don't believe he's --

12     BY MR. CHIN:

13     Q  Let me show you, sir --

14     MR. LEVINE:  If he understands the

15 question, he can answer.

16     BY MR. CHIN:

17     Q  Sir, you have a copy of the business plan

18 that was put in -- was marked earlier.  You'll see on

19 the front page, in the lower right-hand corner,

20 there's a month and a year, correct?

21     A  Yes, sir.

22     Q  What is it?

Page 47

1     A  March 2008.

2     Q  Do you see in that document any other date

3 which would suggest that it did not -- or that it was

4 created sometime other than March 2008?

5     A  I do not see any date in here that would

6 indicate otherwise.

7     Q  Can you turn to the signature page?  Do

8 you see anything there that would indicate

9 anything -- any time or date indicated there?

10     A  No, sir, I do not.

11     Q  Going back to the e-mail that we were just

12 looking at, sir.  You see this reference to this

13 latest version of our business plan.  How would you

14 explain that reference in this e-mail?

15     A  Answer the question?

16     MS. REDDY:  If you understand it.

17     THE WITNESS:  Oh, I understand.

18     BY MR. CHIN:

19     Q  Okay.

20     A  The business plan we developed with USCIS

21 and submitted to them for their review and signature.

22     Q  Yes.

Page 48

1     A  It look some time for them to be able to

2 sign off on it.

3     Q  And when you say "some time," how much

4 time?

5     A  As I recall, weeks.  Maybe a week or two.

6     Q  Do you recall when you submitted the plan

7 for them to --

8     A  As I recall, it was about in the March

9 time frame.  For us to go back and change everything

10 regarding -- as of March 5th -- on page 1 of the

11 business plan, as of March 5th, 2008, we received

12 this number name checks completed, this number

13 processed, and this number -- those are details which

14 gave an indication of a point in time in March.  For

15 us to every single time we went back with a draft, to

16 change that is cumbersome and, in my review, was not

17 significant as far as the purpose of the plan.

18     The purpose of the plan was to give a

19 status of where we were at a point in time and a way

20 forward, which is what the plan does.  So we

21 submitted it and went back and forth with USCIS.

22 They had to -- you have to talk to them through their

Page 49

1 own internal channels, what they had to go through as

2 far as being able to sign the plan.  But that would

3 be the discrepancy in why it was dated in March.  And

4 then I'm going to my associate deputy director in

5 April for -- with the latest version of the plan.

6     It's not efficient from a management

7 perspective for us to change the details of this on a

8 daily basis.  So what the March 2008 did, it shows

9 that in March 2008, at a point in time, this was the

10 basis of the plan which we were going forward on,

11 which is supported by the data in the plan dated in

12 March 2008.

13     Q  Going to your -- going back to your e-mail

14 of April 1st.  I see here an attachment identified as

15 USCIS spend plan, attachment two.  We never obtained

16 that document.  What does that document describe or

17 do, if you know?

18     A  Yes, I know.

19     Q  Can you tell us what you know?

20     A  Yes.  The business plan is predicated upon

21 a number of things that have to come together.  One

22 of those is the transfer of money or funds from USCIS

Page 50

1  to the FBI. Those funds are appropriated by Congress
2  to USCIS to reduce the FBI backlog. As a requirement
3  for the release of the money, USCIS had to put
4  forward a spend plan. So the office management
5  budget and the folks in Congress who oversee -- and I
6  don't know who they were, would, based on the spend
7  plan, approve the money going to the FBI.
8      Q  All right. And would this spend plan
9  indicate when monies should be released, how much
10 money should be released during the course of how
11 much time it must be released to the FBI?
12     A  The spend plan --
13        MS. REDDY: Objection, form.
14        THE WITNESS: Can we take the questions
15 one at a time, please?
16        BY MR. CHIN:
17     Q  Sure. The spend plan, did it state the
18 amount of money that needed to be released to the FBI
19 by giving deadlines?
20     A  Yes.
21     Q  And did the spend plan articulate the
22 numbers of people and staff and resources that would

Page 51

1  need to be hired within time frames?
2      A  Yes.
3      Q  Would there be, in that spend plan, any
4  so-called -- well, contingency set of factors which
5  would allow them not to spend or distribute the funds
6  as articulated, in other words, an alternative scheme
7  of distribution of funds to the FBI?
8      A  No.
9      Q  Was there any wiggle room on how the money
10 would be spent and how it would be distributed in a
11 timely manner?
12     A  Not to my knowledge.
13        Can I take a break and talk to my counsel
14 for a moment? Is that possible?
15        MR. CHIN: Sure. Let's take a break.
16        (Brief recess.)
17        BY MR. CHIN:
18     Q  Mr. Cannon, I'd like you to take a look at
19 the business plan and turn to page 4.
20     A  Okay.
21     Q  You'll see that there is a graphic there.
22 Can you tell me what that is?

Page 52

1      A  The graphic in the business plan is there
2  to indicate the milestones of which the business plan
3  is designed to lay out, milestones being points in
4  time where the FBI will complete or project to
5  complete the name checks that are of a certain age.
6      Q  Okay. Let me also point to the exhibit
7  which was the USCIS news release. Take a look at the
8  bottom of the page where it indicates target
9  milestones. You'll see there a chart with completion
10 goal and category, correct?
11     A  Yes, I do see that.
12     Q  Now, let me ask you, has the FBI met
13 milestone number one, and that is to process all the
14 three-year pending name checks by May of 2008?
15     A  Milestone number one -- you're referring
16 to the first milestone in the news release dated
17 April 2nd, 2008.
18     Q  Yes.
19     A  The first milestone in the business plan
20 was to complete everything over four years by the end
21 of March 2008.
22     Q  Let's talk about the very first milestone,

Page 53

1  which was -- I withdraw that question.
2         Let's look back at the page for graphic,
3  which indicates the milestones. Did the FBI complete
4  the cases that have been pending for over four years
5  on March of 2008?
6      A  Yes.
7      Q  Now, would that also include the pending
8  CIS name check requests from the rerun submission?
9         MS. REDDY: Objection. I think we should
10 define "rerun" at this point to clarify.
11        BY MR. CHIN:
12     Q  Mr. Cannon, do you know what I mean by the
13 "rerun submission" that was submitted by the CIS to
14 the program in late, I believe, November, December of
15 2002, the 2.7 million cases?
16     A  Yes, sir. I am familiar with that rerun.
17     Q  So that's the rerun I'm referring to.
18        MR. LEVINE: Oops. Forgot that one.
19        BY MR. CHIN:
20     Q  Do you know whether this milestone would
21 include those very same cases found in the rerun
22 submission?

Page 54

1    A  Yes.  It should have included the
2  cases -- included the cases that were resubmitted in
3  the rerun.
4    Q  Okay.  So you're saying that that has all
5  been completely finished and the processing is done
6  for all of those reruns?
7    A  Yes, sir.
8    Q  All the pending CIS requests four years
9  and older?
10    A  Yes.  Our records show that that is the
11  case.
12    Q  So milestone number one you say is done.
13  Now, looking at milestone number two, those are the
14  cases that have been pending that are three years or
15  older.  They would have been finished by May of 2008.
16  Have those been completed?
17    A  Yes, sir.  The FBI records indicate that
18  those were completed.  When I say "records," I'm
19  talking about our computer system that we use to
20  track cases in the Name Check Program, which is
21  always, with our computer system, possibility for
22  error here and there.  But as far as I understand it,

Page 55

1  looking at our system, it indicated that we have
2  completed those cases.
3    Q  Thank you.  Let me also ask you, the
4  milestone -- the two-year milestone established for
5  this July, do you believe that you will be able to
6  complete the processing of all those pending cases?
7  Given we're now kind of near the end of the month,
8  but do you believe that that will also be reached?
9    MS. REDDY:  Objection, calls for
10  speculation.
11    BY MR. CHIN:
12    Q  Did you understand my question?
13    A  I understood your question, yes, sir.
14    Q  Would you answer it, please, to the extent
15  that you can?
16    A  The FBI National Name Check Program is on
17  track to meet that milestone.
18    Q  If the FBI is so far meeting these
19  milestones that are indicated in the business plan,
20  based on the resources and all the other -- all the
21  details in the business plan that are stated, can you
22  tell me why you are using, I think, the system or a

Page 56

1  company called Mitre, M-I-T-R-E?  My understanding is
2  that that is a contractor or someone which will be
3  testing a new name check system.  Are you familiar
4  with that?
5    MS. REDDY:  Objection.
6    BY MR. CHIN:
7    Q  Are you familiar with the fact that Mitre
8  has been asked to look into the name check system or
9  program?  Does that name ring a bell at all?
10    A  I know who Mitre is.
11    Q  Yes.
12    A  I know they are an organization that
13  provides services to the government.
14    Q  But you don't have specific
15  knowledge -- or do you have any knowledge about
16  Mitre's involvement in evaluating or making some
17  assessment on the Name Check Program?  If you don't
18  know, then that's fine.
19    MS. REDDY:  Objection as to time frame.
20    What time frame are we referring to?
21    MR. CHIN:  I'm talking about the -- give
22  me one second.  Let me see if I can identify a time

Page 57

1  frame.
2    I'm going to withdraw that question
3  or -- let me ask it in general.
4    BY MR. CHIN:
5    Q  Do you know of any other consultant that
6  the Name Check Program has hired or FBI has hired to
7  evaluate the ways in which the Name Check Program and
8  its processes will be improved going forward?
9    A  Yes.  That is laid out in the business
10  plan as some of the things that we are doing.
11    Q  Let me ask you, sir, have there been any
12  operational changes made to the business plan?
13    A  Can you define "operational changes to the
14  business plan," please?
15    Q  Actually, I think I'm quoting from your
16  declaration -- no, I'm sorry.  Let me go to the
17  business plan itself, because I think there's
18  language that suggests that there is -- one second
19  here.
20    Let me withdraw the question for the
21  moment and maybe revisit it later when I identify
22  where that reference comes from.

Page 58

1    A  Okay.

2    Q  Let me also ask you -- I had raised some
3  questions earlier.  As far as the business plan, is
4  there any subsequent business plan or version of the
5  plan other than what we see before us, as far as you
6  know?  This was produced by your counsel.

7    A  For the record, we're looking at document
8  CIS006289 dated March 2008.

9    MS. REDDY:  Can we have the tabbed exhibit
10  one?  Thank you.

11    THE WITNESS:  For the record, this is
12  FBI -- looks like Exhibit 4.

13    There is a version of the business plan
14  that we have in place which includes information that
15  was deemed not suitable for public distribution.  So
16  yes.

17    BY MR. CHIN:

18    Q  So you're saying that there is another
19  version of the business plan.  Was that developed
20  after this plan was released to the public, the March
21  2008 plan?

22    A  No.

Page 59

1    Q  And when you say that there is another
2  version of the plan that is not deemed appropriate
3  for release, what makes that plan or what in that
4  plan is considered not releasable to the public?  In
5  general, what can you tell me about that plan?  Do
6  you know about that plan?

7    A  Yes, I do know about that plan.

8    Q  Did you help write that plan?

9    A  Yes, I did help write that plan.

10    Q  What about that other plan that I don't
11  have in front of me is different from this plan?  If
12  you can just explain that.

13    A  There are some areas in the business plan
14  which was not released that we believe, based upon
15  some of the sensitivity of the information that we
16  share back and forth with our customer USCIS, was not
17  applicable or useful for public dissemination.

18    Q  Am I understanding you to say that you're
19  withholding certain information from the customer
20  because it wasn't relevant or --

21    A  No, sir, I'm not.  USCIS signed that
22  version of business plan.  So we did not withhold

Page 60

1  anything from our customer whatsoever.

2    Q  Did USCIS also have access to this other
3  version that we are talking about?

4    A  Yes.

5    Q  So they also have that other version which
6  has areas which are not disclosed to the public,
7  correct?

8    A  Yes.

9    Q  What is the nature of those areas, if you
10  can help us understand --

11    MR. LEVINE:  One second.

12    (Discussion off the record.)

13    BY MR. CHIN:

14    Q  Mr. Cannon, I understand there is an
15  existence of another business plan --

16    A  Yes, sir, that is correct.

17    Q  -- with confidential or otherwise
18  undisclosable sections; is that correct?

19    A  That is correct.

20    Q  When was that completed, if you recall?

21    A  It was completed before this business plan
22  was put into place.

Page 61

1    MR. CHIN:  Okay.  And we were just off the
2  record, but I understand, Ms. Kirti, that that
3  particular plan was produced to the plaintiffs; is
4  that correct?

5    MS. REDDY:  That's correct.

6    MR. CHIN:  We can do that later, but I
7  would like to have the Bates numbers --

8    MS. REDDY:  You're questioning me.  Yes.

9    MR. CHIN:  I'm going to move on.

10    BY MR. CHIN:

11    Q  Going back to this business plan that is
12  for the public that we have in front of us, please
13  turn to page 11.  I want you to help me -- I'm sorry,
14  not 11.  It's page 12.  Direct you to the two charts
15  there, sir.  Do you recognize the charts?

16    A  Yes.  I do recognize the charts on page 12
17  of the business plan before us, yes, sir.

18    Q  Can you explain, please, quickly this 29K
19  reference naturalization name checks.  Does that mean
20  anything, 29K?

21    A  Yes, sir, it does.

22    Q  What does it mean?

1    A  In looking, for the record, on page 12,
2 the top chart is titled 29K Naturalization Name
3 Checks, yes, sir.
4    Q  What does the 29K refer to or represent?
5    A  That was the approximate number at the
6 time the business plan was developed -- the chart was
7 developed of the naturalization name checks that were
8 pending with the FBI that were older -- had been
9 pending older than May 1st, 2006.
10    Q  And then -- so this is the chart that I
11 assume reflects the first benchmark of May 2008; is
12 that correct?
13    A  This particular chart is not in -- which
14 benchmark are you referring to?
15    Q  Right.  The benchmark that is in the model
16 predictions on page 4, which indicate that three
17 years or longer that those cases will be completed by
18 May 2008.  Is there a relationship between that and
19 this?
20    A  That particular chart was not indicated on
21 the -- the chart on page 12, the Naturalization Name
22 Checks, was a subcomponent of the work we were doing

1 in addition to completing the name checks greater
2 than three years and older.  If you look on page 4,
3 you'll see the diagram which indicates the
4 milestones, and that was not included on that
5 diagram.
6    Q  But I understand -- page 4 milestones does
7 all refer to USCIS pending cases, correct?
8    A  They refer to pending name checks
9 submitted by USCIS.
10    Q  That's correct?
11    A  Yes, sir.
12    Q  Here, if you look at the same chart on
13 page 12, there is something that refers to the fact
14 that there are 29,800 naturalization name checks
15 older than May 1 of 2006.  Have those all been
16 completed by May 2008?
17    A  Yes, sir.
18    Q  And the same question for you, sir, with
19 respect to the chart -- I am going to introduce a
20 different exhibit for us to look at, which I think
21 corresponds to what we were just looking at
22 ourselves.

1        MR. CHIN:  Can we have this marked,
2 please.
3        (FBI Exhibit 6 was marked for
4 identification and attached to the deposition
5 transcript.)
6        BY MR. CHIN:
7    Q  Sir, do you recognize this document?
8    A  Yes, I do recognize the document in front
9 of me.
10    Q  It's an e-mail from your subordinate,
11 Mr. James Jaye, to a number of people, including
12 yourself, correct?
13    A  That is correct.
14    Q  And it was dated May 5th of this year?
15    A  That's correct.
16    Q  Apparently has a number -- two charts that
17 are part of this e-mail.  Now, I'm looking at this
18 chart and I --
19    A  I'm assuming that the second page I'm
20 looking at, page 2, is part of the e-mail in page 1?
21    Q  Well, it is Bates-stamped consecutively,
22 so I'm believing that is part of the same e-mail.

1    A  Okay.
2    Q  Have you had a chance to look at it?
3    A  Yes, sir, I have.
4    Q  Tell me, it says USCIS -- the first chart
5 on the first e-mail, USCIS Naturalization Project
6 29K.
7    A  Yes, sir.
8    Q  That's the same reference what we saw
9 earlier in that business plan?
10    A  Yes, sir.
11    Q  Indicates here 1,371 naturalization
12 project cases remaining, correct?
13    A  Yes, sir.
14    Q  And then at the very bottom, you'll see
15 three plus year project, 821 remaining of --
16    A  Yes, sir.
17    Q  What does that mean?
18    A  The three year project, that goes to the
19 next page.  USCIS three year plus project.
20    Q  But it does indicate 821 cases have not
21 been closed and are remaining open; is that correct?
22    A  As of May 5th, 2008.

Page 66

1    Q I see. So this May -- I'm sorry, the May
2 benchmark that was indicated in the USCIS release --
3        MS. REDDY: Exhibit 3?
4        BY MR. CHIN:
5    Q That's right. It says, "May 2008, process
6 all name checks pending more than three years."
7 Would it appear that you have not been able to
8 complete that task?
9        MS. REDDY: Objection.
10       THE WITNESS: The benchmark on the
11 milestones in the business plan is at the end of
12 May 2008, all name checks over three years old will
13 be completed. The date of this e-mail is May 5th.
14       BY MR. CHIN:
15   Q And so therefore, there should be a report
16 May 30th or thereafter which should reflect that the
17 cases that -- as of this date, May 5th, would have
18 all been cleared and completed. Is that what you're
19 saying? This metric, as reflected here on May 5th
20 regarding the cases or name check requests that are
21 pending for more than three years, 821 remaining, are
22 you saying that by the end of that May period there

Page 67

1 should have been zero?
2    A At the end of May, all of those
3 remaining -- the 821 remaining that were aged over
4 three years plus at the end of May were completed.
5    Q I'm going to move on. I just wanted to
6 understand what the chart signified.
7        You know what, I have another question.
8 I'm so sorry. Back to the chart. On the second
9 page, there is the -- we see two lines on this chart,
10 USCIS three year plus project. On the bottom, you
11 have in the legend pending required daily, and then
12 the other one actual pending daily. What does that
13 mean in terms of understanding the chart here?
14   A If you look at the chart, that is a chart
15 that we use to gauge our progress in meeting the
16 milestones. You will note that the chart for three
17 year plus project, the chart ends on May 21st, 2008.
18 The milestone ended at the end of May. So what we do
19 as effective managers, we like to think, is we gauge
20 our process, and we also set goals inhouse that are
21 more aggressive than the milestones so we can make
22 sure we're in a position to meet our milestones.

Page 68

1        The longest line you see, because this is
2 in black and white, is the pending required daily to
3 reach our milestones of getting rid of the three year
4 plus project by May 21st, 2008. And the actual
5 pending daily is the line below that.
6    Q Which is the 821 --
7    A Which is the 821. So you can see from
8 that that we were well ahead of schedule and below
9 what it was going to take for us to reach our
10 internal goal of May 21st, 2008, which allows us to
11 make any adjustments we need to as managers to
12 process and be where we need to be as far as the
13 milestones are concerned.
14   Q Thank you, sir. Now, let me ask you also,
15 on the business plan at page 4 --
16   A This is FBI Exhibit 4?
17   Q That's correct. I believe that is where
18 the reference we were looking at before. It states
19 that "operational adjustments required to meet
20 projected goals." In essence, if you would read that
21 particular paragraph. Do you see that?
22   A Yes, sir. Please give me a moment to

Page 69

1 read.
2    Q Yes, please do.
3    A Okay.
4    Q So the question is, what do we mean here
5 by operational adjustments that would require you to
6 report those to the executive management?
7    A If we had to make any adjustments from an
8 operational perspective, whether that be obtaining
9 additional contractors to work on it, to work on the
10 pending name checks to make sure that we met the
11 goal, things of that nature that would affect our
12 ability to meet the milestone. Which is why, going
13 back to Exhibit 6, you can see we track where we are
14 on a routine basis to make sure that if there are any
15 issues that indicate that we are not on track of
16 where we need to be, we can dig down and find out
17 what those issues may be.
18   Q And you have not reported -- there has
19 been no need to report any adjustments; is that what
20 you --
21   A Not that I recall, no, sir.
22   Q If you had to report these operational

1 adjustments, who would you speak to in executive
2 management?
3     A  Greg Smith.  Mr. Gregory Smith.
4     Q  That's at USCIS?
5     A  At USCIS.
6     Q  When we say "executive management," who
7 are we referring to here in this business plan?
8     A  To USCIS executive management.  I would
9 speak to Greg Smith.
10     Q  And who else?
11     A  And -- more than likely I would just speak
12 to Greg Smith, and he would raise it to his
13 management, I assume, on their part.
14     Q  Would you not have any executive
15 management on the FBI side that you would have to
16 alert or communicate with?
17     A  I would communicate this to my boss.
18     Q  Mr. Hooton?
19     A  Mr. Hooton, and he would more than likely
20 indicate it to Associate Deputy Director Tim Murphy
21 who signed the business plan.
22     Q  Thank you.  Let me also ask you, sir, what

1 operational adjustments would you have the capacity
2 to make?
3     MS. REDDY:  Objection.
4     BY MR. CHIN:
5     Q  Do you understand my question?
6     A  Yes.
7     Q  Okay.  Can you please answer?
8     A  Obtaining additional contractors or
9 putting more contractors on the process.
10     Q  I understand -- is it true you have an
11 open contract for contractors -- I'm sorry.  So you
12 have the authority to add additional contractors; is
13 that correct?
14     A  We have the ability to obtain additional
15 contractors, yes, that is correct.
16     Q  And so how many more contractors can you
17 possibly add in this adjustment if you had to?
18     MS. REDDY:  Objection, speculative.
19     BY MR. CHIN:
20     Q  Well, is there any limit to what type of
21 operational adjustment that you can make with respect
22 to adding new contractors?

1     A  Yes.
2     Q  What would that limit be?
3     A  Limit is logistics regarding the space
4 that we have where our contractor's located.
5     Q  Any other types of operational adjustments
6 that you have the capacity to make in order to meet
7 your goals?
8     MS. REDDY:  Object to form.
9     BY MR. CHIN:
10     Q  I'll rephrase the question.  Let me ask
11 you -- do you understand my question?
12     A  Please rephrase it.
13     Q  Okay.  You were saying that you have the
14 capacity to make operational adjustments to make your
15 goals and your targets.  I believe I had asked
16 whether there was any limit to the number of
17 contractors you can bring on board --
18     A  Yes.
19     Q  -- and then you answered it.  Then my
20 question was, were there any other kinds of resources
21 that you could also engage and make that necessary
22 adjustment if needed?

1     MS. REDDY:  Object.  It's an
2 incomplete --
3     BY MR. CHIN:
4     Q  I'm asking besides contractors, what else
5 can you do to meet your operational needs?
6     MS. REDDY:  Are you referring to a
7 specific time frame?
8     MR. CHIN:  I'm asking him, you know, in
9 general, because he -- in this business plan, we're
10 talking about operational adjustments, and he's
11 already testified to the circumstance where they
12 might be needed in terms of --
13     THE WITNESS:  No, sir, there is no
14 circumstance presently where they are needed.
15     BY MR. CHIN:
16     Q  Right.  But you were just indicating that
17 if you found that you needed to add more inputs or
18 bring on adjustments to the operation in order for
19 you to meet certain benchmarks and goals, one way
20 would be to add or hire more contractors.  I'm
21 asking, are there any other ways?
22     MS. REDDY:  Objection.  Again, it calls

Page 74

1  for speculation.  We don't know what issue you might
2  be referring to --
3        MR. CHIN:  All right.
4        BY MR. CHIN:
5      Q  For example, automation, is that an area
6  that one can look to to help you meet your
7  operational goals and adjustments if you had to?
8      A  Operation -- I'm sorry, automation is
9  something that we are looking at as far as improving
10  the system and improving the way in which we process
11  name checks, developing -- scan the records, make
12  them electronically available.  These are things
13  we're doing in parallel with the current system.  If
14  and when we make breakthroughs, certainly in the IT
15  arena, then we will implement them and we will advise
16  USCIS of any new processes that we implement to help
17  us reach our goal.
18      Q  Thank you.  Let me ask this question.  If
19  you wanted to adjust the milestones, would you add
20  more contractors?
21      A  Right now the milestones are set in
22  concrete.

Page 75

1        Are you asking me if I wanted to move the
2  milestones to the left, in other words, get them done
3  quicker, would I add more contractors?  Is that your
4  question?
5        MR. LEVINE:  Or could you.
6        BY MR. CHIN:
7      Q  Yes.  And could you?
8      A  The answer is really no.
9      Q  Why not?
10      A  Because at this point in time -- a couple
11  things.  Logistically, we're close to being maxed out
12  as far as contractors, we're running multiple shifts
13  in my Winchester, Virginia facility.  We have
14  contractors also located in the Washington, D.C.
15  facility.  We also have other customers that we
16  service which also have contractors.  So it's
17  limitation of space.
18        The milestones were developed, in
19  accordance with USCIS, in an agreement to say these
20  are the milestones that we want to meet.  We think
21  it's aggressive, doable, reachable, reasonable, and
22  they agreed with us.  We went before Congress,

Page 76

1  congressional committees, and said this is what we're
2  doing and everyone was in agreement.  USCIS and the
3  FBI certainly were in agreement because of the signed
4  business plan.  The Office of Management and Budget
5  looked at this information.
6      Q  Let me ask you this way.  Is there a
7  capacity to add more space?  Does this appropriation
8  or this money in the business plan account for the
9  need for more space so that you have more contractors
10  who can function and work?
11      A  If you look at page 9 of the business
12  plan --
13      Q  Yes.
14      A  -- which lays out how the 15 million
15  dollars is going to be spent, it doesn't go into
16  acquiring more space, physical space for contractors
17  to go into.
18      Q  That's total investments from the USCIS.
19  I understand in this business plan that the FBI was
20  chipping in funds as well in order to --
21      A  Yes, sir.
22      Q  -- meet these goals?

Page 77

1      A  Yes, sir.
2      Q  So we're only looking at page 9, which is
3  only the CIS end of the funding picture.  Are we
4  saying that there is no money if you needed to get
5  more space in order to expand your facilities --
6        MS. REDDY:  Objection.
7        THE WITNESS:  That's a completely
8  different issue.
9        (Simultaneous conversation.)
10        THE WITNESS:  -- name check, and I
11  couldn't answer that.
12        BY MR. CHIN:
13      Q  In other words, the capacity to increase
14  your space needs, that is something that you can't
15  answer; is that what you're saying?
16        MS. REDDY:  Objection as to context.
17        BY MR. CHIN:
18      Q  Let me say it this way.  If you requested
19  more space to your superiors at the FBI, would they
20  be able to provide the funding for the new space or
21  the additional space in order to accommodate the new
22  hires for whatever operational adjustment needs that

Page 78

1  you would articulate?
2      A  The acquisition of space, for the record,
3  is the management division, is handled by -- or the
4  use of space is handled outside our division through
5  facilities, component of the FBI.  I can't answer
6  that question.
7      Q  I understand you're going to have to ask
8  someone in your FBI agency for that money for space,
9  I assume; is that what you're saying?
10     A  No.  How we obtain more space --
11     Q  Withdraw that question.  In the thinking
12 through of this business plan, was there not any
13 specific thought that you would need to factor in
14 additional space and how to go about getting it?
15     A  Our business plan was developed based upon
16 the resources that we had in place, the space that we
17 had available, the maximum amount of contractors we
18 believed we could fit in that space and work in
19 multiple shifts to maximize the efficiency of the
20 work that we're doing.
21     Q  Okay.
22     A  Again, that's why the milestones are set

Page 79

1  into place, and that's why we had USCIS agree to it.
2      Q  Has CIS notified the FBI or yourself or
3  anyone about not wanting to wait longer than six
4  months for the completion of the name checks?
5      MS. REDDY:  Objection.
6      BY MR. CHIN:
7      Q  Do you understand my question, sir?
8      A  Please restate it.  I'm just trying
9  to -- no, I don't.
10     MR. CHIN:  Can you restate the question?
11     THE COURT REPORTER:  Do you want to
12 restate it or reread it?
13     THE WITNESS:  Can you please restate the
14 question?
15     MR. CHIN:  I'll restate the question.
16     BY MR. CHIN:
17     Q  Has anyone at CIS ever discussed with you
18 or your superiors or FBI that they would want to have
19 the processing of name check requests from CIS
20 completed within a six-month time frame or deadline?
21     MS. REDDY:  Objection, form.
22     BY MR. CHIN:

Page 80

1      Q  Do you understand the question?
2      A  No, because the business plan gets the
3  name checks done in less than six months.  So I'm not
4  sure I understand.
5      Q  Well, let me identify a document for you
6  to look at.
7      MR. CHIN:  Would you mind marking this,
8  please.
9      (FBI Exhibit 7 was marked for
10 identification and attached to the deposition
11 transcript.)
12     BY MR. CHIN:
13     Q  Mr. Cannon, I want to draw your attention
14 down to the second page.
15     A  For the record, I am looking at Exhibit 7.
16     Q  Yeah.  This is a document that was
17 produced for the CIS --
18     A  Produced for or by CIS?
19     Q  By CIS.
20     A  Okay.
21     Q  What I would like for you to do is to look
22 at the second page, which has a bullet point.  Number

Page 81

1  two, I believe, is where -- if you could read that to
2  yourself.
3      Do you see there it says, "Effective
4  immediately for adjustment of status to permanent
5  residents" -- I'm sorry, not that one.  The sentence
6  below, "The USCIS processing time goal for these
7  applications is currently six months.  The goal for
8  fiscal year '08 is four months, and the goal for
9  fiscal year '09 is three months."
10     Is that something you have discussed with
11 the CIS about this representation on this document?
12     A  What is the date of this document?
13     Q  Well, we don't know.  We believe the
14 document is sometime probably February or March or
15 April of 2008, but we don't have a date to this
16 document.  We're asking whether you have -- have you
17 had any discussions or has this ever come up, brought
18 to your attention about these particular goals?
19     MS. REDDY:  You mean ever?
20     MR. CHIN:  These are recent -- this is a
21 document that's quite recent.
22     THE WITNESS:  These are --

Page 82

1      MS. REDDY:  Objection.  I'm sorry.
2  Clarification, is your question whether this was
3  ever -- I'm not sure what time frame your question
4  relates to.
5      MR. CHIN:  Ever, yes.
6      THE WITNESS:  I don't understand, on
7  page 2, in looking at the bullet two, it says, "USCIS
8  also proposes to immediately modify its internal
9  procedures with respect to how long it waits for the
10  FBI's search."  Then it says, "Effective immediately,
11  for adjustment of status to permanent residents,
12  unless the applicant is from one of the designated
13  Special Interest Countries, USCIS will no longer wait
14  beyond its goal processing time for the FBI's report.
15  The USCIS processing time goal for these applications
16  is currently six months."
17      I don't know if they're talking about
18  processing an application or if that's talking about
19  the receipt of a name check.  It's unclear.  I can't
20  comment on it.
21      BY MR. CHIN:
22      Q  Fair enough.  If it's not something you're

Page 83

1  aware of?
2      A  Sorry.
3      Q  That's quite all right.  But irrespective
4  of this document, has the concept of closing out or
5  finishing the processing of name check requests from
6  the USCIS for a target of six months completion, has
7  that ever been discussed?
8      A  The goal of six months has been used in
9  the past by CIS to, in my understanding, determine
10  how they view a backlog.  In other words, anything
11  over six months would be considered a backlog.
12      Q  When did they first indicate that
13  definition of a backlog of six months pending?
14      A  That number has been used within the last
15  year and a half or two years.
16      Q  Who communicated that to you, if you
17  recall?
18      A  Janice Spasato, who's no longer with the
19  USCIS, and I believe Greg Smith and I have also
20  discussed it.  Again, as far as the FBI is concerned,
21  our goals are laid out in our business plan.
22      Additionally, I have to ask you, is that a

Page 84

1  goal with all CIS name checks or the document we were
2  just looking at in FBI Exhibit 7 was specific to
3  adjustment of status name checks?
4      Q  I am not clear myself.  That's why I'm
5  asking if you know of anything related to this policy
6  or --
7      A  No, sir.
8      Q  Thank you.  Let me ask you, sir, moving
9  on, in your declaration, you said -- you explain of
10  the nature of the FBI and universal index, the main
11  and reference files in your declaration on page -- at
12  paragraphs 5, 6 and 11.
13      A  We're talking about -- I don't have the
14  exhibit number for the declaration.  It is FBI
15  Exhibit 1.
16      Q  So 5, 6 and 11 is where you broadly lay
17  out the definition or explanation for the universal
18  database, the main and reference files, correct?
19      A  Please give me a chance to take a quick
20  look at these again.
21      Q  Certainly.
22      A  Paragraph 5 on page 2, paragraph 6 on page

Page 85

1  3, and paragraph 11 on page 5 do describe the
2  universal indices and universal index used by the
3  bureau, yes, sir.
4      Q  Let me ask you, do these databases contain
5  noncriminal information and data?
6      A  Yes.
7      Q  And could you --
8      A  If I could direct you to page 2.  It says,
9  "the Central Records System contains the FBI's
10  administrative, personnel, and investigative files."
11      Q  Let me ask you about that.  When you
12  indicate administrative files within the central
13  record system, what type -- could you give us some
14  examples of the kind of files are regarded
15  as -- which would be regarded as administrative
16  files?
17      A  Files where it was documented where you
18  had a group of people coming to visit the FBI, so
19  there's a list of people that visited on a day.  That
20  may be indexed into a file.
21      Q  You mean like a guest list or a tourist
22  that comes to do the tour?

Page 86

1    A  Yes.  Maybe not the tour, but a list
2 created for a particular reason that would be
3 administrative in nature.
4        Q  All right.
5        A  Not necessarily investigative case.  There
6 would be files perhaps maybe dealing with budget
7 requests.  Administrative within the Bureau, the
8 internal workings of the Bureau.
9        Q  So these administrative files are --
10       A  They're uploaded into ACS.
11       Q  Would the administrative files and
12 information also include information outside of FBI
13 or originating from outside the FBI?
14       A  I don't know.
15       Q  Would they, for example, include files
16 from other federal agencies?
17       MS. REDDY:  He just -- objection.  He just
18 answered the question.
19       BY MR. CHIN:
20       Q  So you're saying you don't know exactly
21 what these administrative files contain or what type
22 of files or the kind of information that these files

Page 87

1 would reflect, is that --
2        A  No, sir.  I'm saying I don't know if
3 administrative files would contain information that
4 came from outside the FBI.
5        Q  Okay.  So as far as you know, you believe
6 that these administrative files are all FBI generated
7 from -- relating to the internal -- the things that
8 happen within the FBI?  For example, you mentioned
9 guests that come visit, budgets that are
10 requested --
11       A  The administrative files, to my
12 understanding, are generated in accordance with the
13 daily workings of the FBI.
14       Q  Sure.  Would a CIS name check that's
15 submitted have any -- would there be any bearing to
16 these administrative files, in your experience, with
17 a name check request from the CIS?  Do you understand
18 the question?
19       A  I'm not sure I understand the question,
20 sir.
21       Q  Would there be any likelihood that a hit
22 or positive ident [sic] would result from an

Page 88

1 administrative file at the FBI database in the NCP
2 program for a CIS applicant or name request?
3        A  If a name in the administrative file was
4 indexed into UNI and if that same name was submitted
5 as a name check request for USCIS, then it would be a
6 hit.
7        Q  Would your noncriminal files collect
8 health information on individuals, like if they're a
9 risk to the public health or something?
10       A  I don't know the answer to that question.
11 When you're talking noncriminal --
12       Q  I'm trying to figure out what would be
13 regarded as information you guys would collect in the
14 NNCP which have nothing to do with criminal, you
15 know, rap sheet or conviction --
16       A  We don't collect information in NCP, Name
17 Check Program.  Name Check Program is just a program
18 that is used to process name checks.  The ACS is
19 where the files reside.
20       Q  So the ACS where the files reside, is that
21 chiefly what the NNCP resorts to and uses to do the
22 searching and --

Page 89

1        A  NCP searches the universal index UNI,
2 which is -- as explained on page four of my
3 declaration, the ACS consists of three applications,
4 Investigative Case Management, Electronic Case File,
5 and UNI.
6        Q  Let me ask you, sir, does the National
7 Name Check Program have access to the NCIC terminals
8 or information in that database?
9        A  The Name Check Program --
10       Q  Your personnel.
11       A  My personnel -- some of my personnel do
12 have access to an NCIC terminal, yes, that is
13 correct.
14       Q  And is that terminal on-site in your
15 facility?
16       A  Yes.
17       Q  Does the National Name Check Program have
18 access to many different databases?
19       A  No.
20       Q  So just the Automatic Case Support
21 Database pretty much?
22       A  The National Name Check Program, the

Page 90

1  purpose is to provide information to the customers
2  based upon the FBI files.
3      Q  Right.
4      A  And the files within the FBI.
5      Q  Okay.  Now, tell me, what criteria are
6  used to open up a main file on a person?
7      A  A main file?  As explained to page 3, a
8  main entry is the subject of an investigation.
9  That's the main entry.
10     Q  And --
11     A  So if I robbed a bank and that was a
12 subject investigation, a file would be opened up and
13 I would be the subject.  I would be the main entry in
14 that file.
15     Q  If you were a witness to a crime, would
16 that also result in a main file reference -- main
17 file being opened up on you?
18     A  A witness, a collaborator, as explained in
19 my declaration, would be what we term as a reference.
20 It would be referenced in my file of the
21 investigation and maybe indexed into UNI.
22     Q  So what criteria would cause someone to be

Page 91

1  found in a reference index?
2      A  As on page 5, paragraph 10, the decision
3  is discretionary, made by the special agent.  If it
4  is a name which they want to index, they'll be able
5  to retrieve the information later on down the road,
6  and it would be up to them to index the name --
7      Q  So then --
8      A  -- as a reference.  In addition to, as I
9  said earlier, an administrative record where you have
10 a list of people that came, they would be listed in
11 that record.  They wouldn't be -- they would not be a
12 main record, but they would be references in that
13 record.
14     Q  Do you know if there are any criteria or
15 some standards with respect to when a file would be
16 real quickly opened up or put into a reference file
17 or index?  When you say -- yeah, that's my question.
18 Do you know --
19     A  Can you repeat the question again, sir,
20 please?
21     Q  Do you know if there are standards or
22 specific criteria that would be applied by the FBI

Page 92

1  agent or whomever in opening up a reference file or
2  creating a reference index?
3      A  My understanding, when they go through
4  training, they are given guidance on how to open up a
5  file, when to open up a file, the criteria that would
6  be raised to the level to open up an investigation
7  file, things of that nature.
8      Q  But do you yourself know what that
9  training or criteria used --
10     A  I have not been trained in that area.
11     Q  Okay.  But in the course of your work and
12 in terms of the millions of name checks that have
13 come through your program, are you familiar at all
14 with some of the reference check information that may
15 come across your desk?
16     A  Well, the information that comes across my
17 desk -- because I don't process the name checks, but
18 my folks that do the analysis, as mentioned in the
19 declaration, people would be referenced because they
20 were a witness or maybe a co-conspirator.  There are
21 various reasons why an agent would index a name.
22     Q  Have you had a hand in the development of

Page 93

1  the training curriculum in the program?
2      MS. REDDY:  Objection, vague.
3      What training are you --
4      BY MR. CHIN:
5      Q  I'm sorry.  Training of your new employees
6  in performing their duties in the Name Check Program?
7  In other words, when they perform their duties in
8  accessing the information, doing the actual name
9  checks, doing the file searches, the
10 dissemination --
11     A  In the past, I reviewed the curriculum
12 from time to time as it was developed and being
13 developed.
14     Q  Let me ask you again, if someone were a
15 threat to the public safety or the national security,
16 would the FBI open up a file on such a person?
17     MS. REDDY:  Objection.
18     BY MR. CHIN:
19     Q  Do you understand my question?
20     MS. REDDY:  Calls for speculation.
21     MR. CHIN:  It's actually asking if he
22 knows or he doesn't know.

1    MS. REDDY: Okay.

2    THE WITNESS: That's too broad of a

3 question for me to answer. Just because someone is a

4 threat doesn't mean they're maybe even known to the

5 FBI. So I don't know the answer to that question. I

6 can't answer it.

7    BY MR. CHIN:

8    Q  Let me ask you, are you familiar with

9 letterhead memorandum?

10   A  Yes, sir.

11   Q  What type of information is communicated

12 in the letterhead memorandum? That would be, I

13 guess, a report that goes to your customers?

14   A  Yes, sir. A letterhead memorandum is also

15 called an LHM. It is generated by my staff to

16 provide information to the customers. It could be no

17 more than something that forwards information with

18 attached copies of files. It could summarize

19 information, the majority of which can't be released

20 but can be summarized. It could refer a customer to

21 another agency. We may have information in our files

22 that was generated by another agency. We don't -- it

1 doesn't belong to us so we don't have the authority

2 to release it, but we will refer the customer to the

3 other agency to obtain the information. So for me,

4 there are different things that could be put in an

5 LHM.

6    Q  You mentioned the fact that there may be

7 information that you could not release but that would

8 in some way provide in a general manner, correct?

9    A  That's correct.

10   Q  Could you explain to me more specifically

11 what context or what situation would prevent you from

12 disclosing that type of information?

13   A  If we had some detailed information on a

14 subject that was to the level where the details,

15 names, dates, things of that nature could not be

16 released because they were law-enforcement sensitive

17 or classified. However, if we were able to receive

18 approval from the case agent to summarize

19 saying -- in this particular case, I'll use myself as

20 an example, Mike Cannon. Mike Cannon is under

21 investigation for, you know, counterterrorism or

22 violation, things of that -- without laying out the

1 specifics of what's in it.

2    Q  Right. Let me ask you, would there be

3 more -- as another situation, would there be a

4 situation where he is known to have associations or

5 social relations with organizations that are being

6 watched or, I guess, targets of interests, so to

7 speak? Would that be --

8    MS. REDDY: Objection.

9    THE WITNESS: Can you explain the question

10 again?

11   BY MR. CHIN:

12   Q  Well, short of being a terrorist, are

13 there situations where a person is, in fact, found

14 through the name search program and that a letterhead

15 memorandum is being created but that, as you were

16 saying earlier, you can't really spell out a lot of

17 specifics? What other situation, short of being a

18 terrorist, are we speaking of?

19   A  Well, it's possible that we could provide

20 information saying this person's been associated with

21 other types of organizations that are deemed --

22   Q  Risky?

1    A  Risky would be a good way to put it.

2    Q  Okay. Now, with that --

3    A  I don't know how much detail I can go into

4 here in the deposition on the record. That's all.

5    Q  Well, for example, that letterhead

6 memorandum would then go back to CIS, correct?

7    A  Yes, sir, that is correct.

8    Q  And then they would have to determine how

9 to interpret that generalized information?

10   A  The customer -- USCIS and all of our

11 customers are responsible for making any sort of

12 adjudications for the granting of benefits, or

13 whatever they do, in association with sending the

14 name check request to us. The FBI makes no

15 determinations on whether or not a benefit should be

16 granted to anyone or the person is a bad person or

17 shouldn't be let into the country, things of that

18 nature. We don't adjudicate it all.

19   Q  Yes, I understand that. Let me ask you

20 about the issue or the question I have about what is

21 a search, a name search, name check search that

22 produces derogatory information or data. Can you

1 tell me what is considered derogatory?

2     A  Derogatory could be association with a
3 terrorist group, could be a person who robbed a bank.
4 It could be associated with drugs.

5     Q  When you say "associated with drugs," you
6 mean convicted --

7     A  Convicted of running drugs or associated
8 with members of a drug gang, things of that nature.

9     Q  So short of a conviction, they can also be
10 referenced?

11     A  Sure.  Short of a conviction, yes, someone
12 could also be referenced with derogatory information,
13 if their association was somewhat of a derogatory
14 manner, so to speak.

15     Q  Is there a standard that describes what
16 derogatory information is or is not?

17     A  There is guidance in -- I believe there's
18 guidance in the training manuals that we develop, but
19 I don't have it in front of me.

20     MR. CHIN:  May I have this marked, please.

21     (FBI Exhibit 8 was marked for
22 identification and attached to the deposition

1 transcript.)

2     BY MR. CHIN:

3     Q  I'm producing to you, sir, two pages.

4     A  Okay.

5     Q  I believe this comes from -- first of all,
6 do you recognize this exhibit, this document?

7     A  What I'm looking at is labelled FBI
8 Exhibit 8.  It's sensitive but unclassified.  It's
9 two pages, page 24 and page 73.

10     Q  I'll be asking you some questions about
11 page 24, actually.

12     A  Okay.  Page 24.

13     Q  Do you recognize that page?

14     A  Yes, I do.  It looks like it was taken
15 from some guidance that we provide folks in training
16 for processing name checks.

17     Q  Right.  Do you believe this to be still
18 current information used for training purposes, if
19 you know?

20     A  As far as I know, it is.  There may have
21 been changes that I'm not aware of.  Again, on a
22 daily basis, I'm not involved in the update of

1 training materials.

2     Q  Fine.  You see here it indicates the term
3 derogatory, and there are three or four examples
4 indicated.  Would there be any other examples that
5 you know of that would fit under this term
6 "derogatory," as far as you know?

7     A  For the record, derogatory says, "Drugs,
8 terrorist activities, unlawful flight to avoid
9 prosecution, criminal offenses."  Not that I can
10 think of.  These are fairly broad areas.

11     Q  Then the -- sort of looking further down.
12 You have a heading masters -- I mean, Matters of
13 Opinion, MOPs.  And it lists two examples, I think,
14 more than one traffic ticket, witnessed a robbery.

15     A  Document says "Matters of Opinion."

16     Q  Would they also be considered derogatory
17 information?

18     A  According to this slide, it is not under
19 the derogatory category.

20     Q  But in your personal knowledge, do you
21 believe that to include the derogatory definition,
22 these examples?

1     A  Since I don't process name checks on a
2 routine basis, I really couldn't provide an opinion
3 on whether or not it would be considered derogatory.

4     Q  Have you ever heard the term "Matters of
5 Opinion"?

6     A  Yes.

7     Q  What does it mean?

8     A  Opinion on whether or not it would rise to
9 the level of reporting to the customers.

10     Q  The question is, what standards or
11 criteria exist for such an individual to make that
12 determination as to whether this Matter of Opinion
13 rises to that level?

14     A  Keep in mind, these are generic training
15 materials.  Each customer can differ on what it
16 considers to be information that it needs.  We have
17 had USCIS come out and train our folks in particular
18 on things it is looking for as far as information it
19 needs to make an adjudication.  This is very general
20 in nature, and I don't have access to that.  That
21 would be spelled out more so probably in those
22 materials.

Page 102

1    Q  Would it be fair to say, if you know, that
2  what is considered derogatory depends on what the
3  customer is concerned about or looking for?
4    A  No.  Derogatory -- no, I can't say that.
5  That would change from customer to customer.
6    Q  From the FBI Name Check Program --
7    A  From the FBI Name Check Program, right.
8  What I'm saying is what is reported to a customer, in
9  addition to derogatory information, can change from
10  customer to customer on what they need.  And USCIS
11  has provided training to my staff and also provided
12  input as afar as training materials on what's
13  derogatory.
14    Q  Let me ask another question then.  Would a
15  letterhead memo be issued or be needed to report to
16  the customer that a person has more than one traffic
17  ticket, for example?
18    A  It could.
19    Q  Is it done, to your knowledge?
20    A  More than one traffic ticket?  Are you
21  asking if more than one traffic ticket is reported?
22    Q  Yes.

Page 103

1    A  I don't know.
2    Q  Or has witnessed a robbery, would that be
3  sufficient basis for issuing a letterhead memorandum
4  to the customer?
5    MS. REDDY:  Objection.
6    Are you referring to CIS or --
7    MR. CHIN:  Yes.
8    THE WITNESS:  If that type of information
9  is information that is wanted by USCIS, then it could
10  be conveyed to USCIS in a letterhead memorandum.
11    BY MR. CHIN:
12    Q  Do you know, in fact, that is the
13  information that CIS wants?
14    A  I do not know that.
15    Q  Who would know that?
16    A  Folks on my staff would know that.
17    Q  Who particularly would know that?
18    A  My unit chief, Gabriel Ford.
19    Q  Who?
20    A  Gabriel Ford, my unit chief.
21    Q  How long has Mr. Ford been with the
22  program?

Page 104

1    A  For about a year and a half, I believe.
2    Q  Does he conduct some of the trainings of
3  the new hires?
4    A  No.  He is the unit chief that is over the
5  folks that do the training of the new hires.
6    Q  So who would have trained Mr. Ford?  He's
7  only been there a year and a half.
8    A  He's had hands-on experience processing
9  name checks.  The folks that are under him would have
10  provided him guidance on how they do their work.  He
11  also is in -- one of the folks that deal with USCIS
12  as far as information going back and forth, as far as
13  operational adjustments, things of that nature, on
14  his level.
15    Q  Did you speak to Mr. Ford in preparation
16  for today's deposition?
17    A  Not in preparation for today's deposition,
18  no, sir.
19    Q  Now, USCIS is one of the many customers
20  that the National Name Check Program serves; is that
21  right?
22    A  That is correct.

Page 105

1    Q  Now, do some of your customers require
2  only checks in the main file and not in the reference
3  files?
4    A  No.  The National Name Check Program does
5  name checks for our customers, searches UNI, mains,
6  and references for all the customers.
7    Q  I'm sorry.  That says to me -- I didn't
8  hear correctly.  You're saying including reference
9  checks?
10    MS. REDDY:  Objection.  Can you --
11    BY MR. CHIN:
12    Q  All customers get main checks, UNI checks
13  and reference checks?
14    A  No.  There's a -- you've misstated the
15  checks.
16    Q  You said it so quickly, I didn't catch it.
17  My apologies.
18    My question initially was, do all or do
19  some of your customers not require more than just a
20  main file check?
21    A  No.
22    Q  So presumably, when they ask for their

1 name checks to be processed, you automatically
2 process them through every single -- from the
3 universal to the main files and then to the reference
4 files; is that what you're saying?
5     A  All name checks are processed the same, an
6 initial batch run that checks the universal index,
7 universal indices, and those names in UNI can be
8 associated as a main entry on a file or a reference
9 entry on the file.  So it's the same across the board
10 for all the customers.
11     Q  If the NFL (phonetic) submitted a special
12 request for their name checks to get through, you
13 know, and it's probably within a very short time
14 frame, would they also be subject to that type of
15 name check process, including reference file checks?
16     A  Yes, sir.
17     Q  Would there be any -- in your experience
18 or to your knowledge, have any of those checks ever
19 required a year or two or more in terms of trying to
20 get the reference checks processed?
21     A  I don't know.
22     Q  Let me ask you, sir, are you aware of any

1 instance when the name check search of the reference
2 files was the sole source of derogatory information?
3     A  I recall it was alluded to in the EC back
4 in 2002.
5     Q  When you say the EC, what do you mean by
6 that?
7     A  Electronic communication in 2002, which I
8 reviewed in preparation for my deposition, which
9 talked about the resubmission of the name checks.  In
10 that EC, they talked about derogatory information
11 being listed in a reference file.
12     Q  Are you familiar with an internal FBI memo
13 that went to the director in December of 2002?
14     A  I believe that is -- without having it in
15 front of me, that sounds like that is --
16     Q  So that's not an EC.  It's not an
17 electronic communication, it's actually a separate
18 paper memo that --
19     A  I believe it's an electronic
20 communication.
21     Q  Perhaps it's both.
22     A  Okay.

1     Q  You're familiar with the EC?
2     A  I'm familiar with the EC.
3     Q  But I may have to show you the actual
4 report or memo itself.  So you're aware of that
5 instance in 2002.  Are you aware of any other
6 instances?
7     A  I'm not aware of any instance where I
8 personally saw derogatory information being passed
9 solely as a reference file, solely as a reference to
10 the name check.
11     Q  Do you know whether a name check reference
12 file has ever resulted in the denial of an
13 immigration benefit, including naturalization?
14     A  That is something for USCIS to answer.  I
15 do not know.  Again, USCIS are the ones that would
16 grant the benefits or deny the benefits.  We have
17 nothing to do with that.
18     Q  If this type of derogatory information
19 comes up as in --
20     MS. REDDY:  Can we take a break before we
21 continue?
22     MR. CHIN:  Sure.

1     (Discussion off the record.)
2     BY MR. CHIN:
3     Q  I'm trying to ask whether or not you are
4 aware of any kind of a very serious situation where a
5 name check from the reference file investigation has
6 led to, you know, this information being so serious
7 and derogatory that it had to be reported to someone
8 higher up in the food chain in law enforcement, for
9 example?
10     MS. REDDY:  Objection.
11     THE WITNESS:  I have no idea what you're
12 asking me.
13     BY MR. CHIN:
14     Q  Give me one second.  You are aware of the
15 EC communication regarding the 2002 incident.  I was
16 trying to figure out if you knew of any other
17 incidents.  Is it fair to say you don't know?
18     MS. REDDY:  Objection.
19     I'm not sure what the question was.
20     BY MR. CHIN:
21     Q  Do you understand my question, Mr. Cannon?
22     A  No, sir, not completely.  Sorry.

1    Q  I had originally asked -- the question was
2  whether the name check process through reference
3  files is ever -- as a sole search, has it ever led to
4  derogatory information, and your response was that
5  you understood that in 2002 there was such an
6  instance -- you were not there, you were not employed
7  yet, but you've seen it in preparation for this
8  deposition --
9    A  Yes, sir.
10    Q  I'm just simply asking, do you know, in
11  your experience working there as the head of the
12  program, have you seen any other similar
13  instances --
14    A  I have not physically seen any other
15  instances.
16    Q  Have you heard of similar instances?
17    A  I understand the derogatory information
18  based on reference files this past two customers.
19  That's about all I know.
20    Q  I'm sorry?
21    A  That's about all I can say on that point.
22    Q  That's fine.

1      MR. CHIN:  Shall we take a break for
2  lunch?
3      MS. REDDY:  Yes.
4
5      (Whereupon, at 1:12 p.m., the deposition
6  was recessed to reconvene at 1:45 p.m. that same
7  day.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

1      AFTERNOON SESSION
2      (1:54 p.m.)
3  Whereupon,
4      MICHAEL CANNON
5  having been previously duly sworn, was further
6  examined and testified as follows:
7    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
8      BY MR. CHIN:
9    Q  Mr. Cannon, just to follow up with a few
10  other questions on that topic we were on before.
11    A  Could you please refresh my memory on what
12  the topic was, please?  Thank you.
13    Q  I was asking about the type of derogatory
14  information that might arise comparable to the 2002
15  incident that you referred to, not we understand to
16  mean the -- can you explain what you know about that
17  incident?  Lay that down in the foundation.
18    A  Sure.
19    Q  Would it help if I -- let me show this
20  document to you.
21      (FBI Exhibit 9 was marked for
22  identification and attached to the deposition

1  transcript.)
2      BY MR. CHIN:
3    Q  Mr. Cannon, please take a look at this
4  document.  Do you recognize it or has someone shown
5  this to you?  It's dated December 13th, 2002.
6    A  For the record, I'm looking at FBI
7  Exhibit 9, which was a memorandum -- we call it an
8  EC, electronic communication.
9    Q  Oh, this is what an EC is?
10    A  It's uploaded.
11    Q  EC meaning electronic communication, as
12  you were saying before?
13    A  Electronic communication.  Dated December
14  13th, 2002.  I am familiar with it, yes, sir.
15    Q  And that was drafted by someone you know?
16    A  Robert Garrity.
17    Q  Is he currently in the Records Management
18  Division?
19    A  No, he's not.
20    Q  Oh, he's not?
21    A  No.
22    Q  Where did he go?

Page 114

1    A He left and went to a position in the
2 field. A position in the field. He's an agent.
3    Q But he's still within the FBI, as far as
4 you know?
5    A Yes, sir.
6    Q Do you know when he left, what year?
7    A It was before I got to Records Management.
8    Q So that would --
9    A And I arrived in 2005. He left Records
10 Management Division prior to that.
11    Q Thank you for clarifying that.
12       So this document, you have looked at it
13 before?
14    A Yes, sir.
15    Q And can I turn you to the second page, ask
16 you to look at the second page. You'll note in the
17 middle subheading, it's Missed Name check?
18    A Yes, sir.
19    Q So earlier when you were talking about the
20 2002 name check that caused a lot of concern, would
21 that have been this particular case that you were
22 referring to?

Page 115

1    A Yes, sir.
2    Q What do you know about this particular
3 individual that apparently was not found in the NCCP
4 initial check? Do you know anything more?
5    A I remember talking to him -- no, I never
6 had a conversation with this gentleman. I discussed
7 this with Dave Hardy, who had the program before me.
8 I don't specifically recall the type of information
9 that we had on this person, but apparently, according
10 to the CC, there was information in a reference
11 concerning the individual which was of concern that
12 was not -- apparently not found, according to the EC.
13    Q Right. If you know, speaking on behalf of
14 the agency, do we know -- or do you know rather,
15 whether this individual was ever arrested, prosecuted
16 or denied naturalization or --
17    A I'm sorry. I don't know. You'd have to
18 go to USCIS or INS to find the actual result of the
19 adjudication of --
20    Q Is it the position of the FBI that there
21 was no follow-up communication regarding this
22 individual's fate?

Page 116

1    A No, I'm sorry. There was follow-up
2 communication. Forgive me. I did not discuss that
3 particular item with Mr. Hardy. I cannot tell you
4 the final result of this individual.
5    Q Has there been anything similar or
6 comparable after 2002, in your experience at the
7 National Name Check Program, where a check found an
8 individual or suspect of this caliber of national
9 security threat or potential national security risk,
10 let's say?
11       MS. REDDY: Objection for form.
12       BY MR. CHIN:
13    Q Have you -- during the course of your
14 employment, have you any knowledge of anyone that the
15 Name Checks Program has identified that would be
16 similar to the national security risk that this
17 individual seemed to have raised as a question?
18    A I don't, but I do not get involved in the
19 results of -- once a name check leaves the Bureau,
20 it's up to USCIS. If they choose to make a
21 determination based on our information or whatever,
22 that's their determination.

Page 117

1    Q I'm still looking at what happens within
2 the FBI as, you know, in terms of who, if upon
3 getting this information, who would get it and who
4 would report it and to whom would it go to if this
5 were to arise?
6       So in other words, someone on your staff,
7 an analyst, presumably, if they come up against this
8 derogatory information through the reference checks,
9 they would, I assume -- or correct me, they would
10 either issue a letterhead memorandum or they would
11 contact someone of responsibility within your
12 program; is that correct?
13    A Can you explain what you mean contact
14 someone of responsibility of my program?
15    Q If the issue is how to communicate some
16 information of urgency or importance, how would that
17 be done?
18    A The name check analyst that reviews
19 information would report the results to USCIS, the
20 results could be derogatory. It could not be -- rise
21 to the level of derogatory, but nonetheless, the
22 results would be reported, as far as the routine

Page 118

1  process with the reporting information to USCIS.

2      Q  So in other words, I understand you're

3  saying you don't get involved with the results you're

4  saying, correct?

5      A  We do not -- once the information leaves

6  the National Name Check Program and goes to the

7  customer, my involvement regarding that particular

8  name check, my section's involvement, the National

9  Name Check Program, is complete, unless they feel

10  they need additional information or additional data

11  and they come back to us.  But other than that,

12  we --

13      Q  But have there been -- for example, a very

14  serious piece of information that was derogatory and

15  that came to the attention of your analyst and/or the

16  supervisors, what would they do with that information

17  do you think?

18      MS. REDDY:  Objection.

19      BY MR. CHIN:

20      Q  In other words, if there was a national

21  security risk identified, what would be the proper

22  procedure within the National Name Check Program, if

Page 119

1  you know?

2      A  The information would be provided to

3  USCIS.

4      Q  To the customer?

5      A  To the customer, that is correct.

6      Q  Would that information go to anyone else

7  besides the customer?

8      A  If the information -- if it required us to

9  reach out to a case agent, then we would do that, if

10  it was a pending case.  The information derogatory

11  would come from the FBI files, which would mean they

12  would be investigative files which would mean the

13  operational component of the FBI would already be

14  working on whatever issue would be existing.

15      Q  Help me understand what you just said.

16  Would you be saying that if there was, in fact, an

17  open investigation that a field agent or a FBI case

18  agent was working on, that there would be already

19  some other information that could be obtained through

20  some other database or --

21      A  No, sir, that's not what I'm saying.

22      Q  What did you say?

Page 120

1      MR. CHIN:  Could we have his answer

2  repeated?

3      (The reporter read the requested portion

4  of the record.)

5      THE WITNESS:  If derogatory information is

6  discovered in the analysis of the files, that

7  information is provided to USCIS as a customer.

8      BY MR. CHIN:

9      Q  At the end of the process?

10      A  At the end of the process, that is

11  correct.  We provide our final result to USCIS.

12      Q  I understand that completely.  I'm not

13  really talking about the transfer point of

14  information between Name Check Program and CIS.  I'm

15  still looking at what happens within the Name Check

16  Program itself and/or the agency, the FBI itself.

17      A  The purpose of the Name Check Program is

18  to not alert components of the Bureau on information

19  that they already have, because the information is

20  derived from the Bureau itself.

21      Q  I see.  It's starting to make more sense.

22      A  Okay.

Page 121

1      Q  Let me see if I have another follow-up to

2  that question.

3      If there is derogatory information

4  disclosed -- or discovered, rather, that rises to the

5  level of a national security risk, that information

6  should already exist with the FBI through some other

7  division and through some other process outside of

8  the National Name Check Program; is that correct?

9      A  Well, the other division -- what I'm

10  referencing is the other division or operational

11  component are the ones that actually opened up the

12  investigation which created the file and the name,

13  which was indexed into Universal Indices which were

14  then discovered when the National Name Check Program

15  did the search on the name.

16      Q  But we don't know of any specific examples

17  after 2002 where such a person who was -- such a

18  person's name is searched through the reference files

19  and it turned out they were a national security risk;

20  is that correct?

21      A  I specifically don't get involved in that

22  portion of it.  My folks review files that relate to

Page 122

1 counterterrorism, counterintelligence, criminal
2 files, and information that is derogatory and
3 pertinent in those types of files are provided to
4 USCIS. It's quite possible the only thing we had is
5 a reference file, that's quite possible, but I don't
6 keep track of each name check as far as that --
7    Q  Is there any internal audit that takes
8 place on the usefulness -- or rather, the performance
9 of the National Name Check Program with respect to
10 identifying or detecting individuals that might have
11 national security risk potential?
12    MS. REDDY:  Objection.
13    BY MR. CHIN:
14    Q  Do you understand the question?
15    MS. REDDY:  A number of terms in there
16 were vague.  Performance, national security
17 potential --
18    MR. CHIN:  Let me ask Mr. Cannon.
19    BY MR. CHIN:
20    Q  Do you understand what I was asking?
21    A  I'm not sure I understand what you're
22 asking.

Page 123

1    Q  The National Name Check Program has been
2 in existence for -- I guess it's been ten years,
3 correct, at least?
4    A  Over that.  The Bureau check and name
5 checks goes back to -- it was in my declaration, back
6 to the Eisenhower administration.
7    Q  Now, you've been the head of the program
8 since, I believe, March or the middle of 2005?
9    A  March 2005, yes, sir.
10    Q  So if there had been an agency decision to
11 make some kind of an audit or internal evaluation of
12 how your program was able to find persons of great
13 interest whose derogatory information is being
14 discovered through this process, would you know about
15 it or --
16    A  I would know about that, yes, sir.  I
17 would know about it.
18    Q  So, in other words, do you know if that's
19 ever been done?
20    A  If you're asking have they -- has the
21 Bureau ever --
22    Q  Initiated such an audit or assessment.

Page 124

1    A  To see if there are folks with which we
2 have derogatory information that are a national
3 threat; is that what you're asking?
4    Q  Public security, national security, public
5 safety threat.
6    A  No.  We provide the information to the
7 customer, and it could be derogatory in the area of
8 counterintelligence, counterterrorism, criminal.  No,
9 sir, we never produced such a -- such a study has
10 never been done.
11    Q  Have you or the FBI agency had any
12 discussions with Homeland Security or USCIS about
13 implementing a risk-based process to reduce the
14 backlog, for example?
15    A  Can you define what "risk-based" means?
16    Q  Well, I am not, of course, the expert on
17 risk-based, but that's sort of where I understand
18 that that is sort of a term used when -- it certainly
19 has come up with some of the, I believe, assessments
20 that the agency has had in the past in reports.  And
21 maybe congressmen have asked about it, and certainly
22 the Ombudsman has said that there should be some way

Page 125

1 to develop a risk-based approach to implementing or,
2 rather, doing the name checks in your program.
3    A  Risk-based, what particularly are you
4 referring to?
5    Q  Are you familiar with the Ombudsman
6 report --
7    A  I did read the Ombudsman report.
8    Q  I believe in the last two years they've
9 been recommending that the FBI and the Name Checks
10 Program conduct some sort of approach that would
11 evaluate and incorporate risk-based approaches to the
12 work, and that would hopefully, in fact,
13 significantly reduce the backlogs.  I believe that's
14 the proposal, if I'm not mischaracterizing it.
15    Do you recall reading about it or hearing
16 about the Ombudsman referring to that recommendation?
17    A  That sounds familiar.
18    Q  Was that discussed at your level at all
19 when that recommendation came out?
20    A  First of all, the Ombudsman report wasn't
21 a recommendation to the FBI.  I remember reading the
22 report when it came out.  As far as risk-based, that

Page 126

1 was the basis of some of the filters that we've
2 looked at as far as reducing the workload with the
3 files with USCIS.
4      Q  And you're talking about the mega filter
5 and super filter?
6      A  Yes, sir, that's correct.
7      Q  And those were filters or programs that
8 were put into place in what year?
9      A  The mega filter was in the fall of last
10 year, and the super filter, if I recall, maybe mid
11 part of last year.  We're talking 2007.
12      Q  Correct me if I'm wrong.  I understand
13 that the filtering is some sort of technological way
14 of eliminating certain classifications of records or
15 files from the batch process; is that correct?
16      A  From the --
17      Q  The initial batch electronic process.
18      A  The mega filter, yes, was designed to
19 eliminate files that would not need to be looked at
20 beyond the batch process.  And the super filter, when
21 it was originally designed, was something that was
22 used in NCDD, National Name Check Dissemination

Page 127

1 Database, which means it would have been at the point
2 after the batch process where those would have been
3 looked at.  But in both cases, they were designed to
4 help alleviate the load or the requirements of the
5 analyst as far as having to go through material.
6      Q  And just to educate me a little bit, the
7 kinds of -- the classifications of files which are
8 now eliminated from the USCIS name check requests,
9 would those -- can you help me understand what type
10 of information would now be excluded from that
11 search?
12      MS. REDDY:  Objection.  The answer would
13 require information that's protected under the law
14 enforcement privilege.
15      MR. LEVINE:  What was the question again?
16 Can you read it back, please?
17      (The reporter read the requested portion
18 of the record.)
19      BY MR. CHIN:
20      Q  Meaning the mega filter that you were just
21 talking about.
22      A  Yes, sir.

Page 128

1      Q  Do you know what types of files are now no
2 longer needed in terms of searching, you know, under
3 the customer's request the name searches that are
4 supplied?
5      MS. REDDY:  I'm objecting and asking him
6 not to answer.
7      MR. FELIX:  Actually, he can answer that
8 one, whether he knows or not.
9      MS. REDDY:  Okay.
10      THE WITNESS:  Yes.  I know the type of
11 files.
12      BY MR. CHIN:
13      Q  Can you tell us what type of files --
14      MS. REDDY:  Objection.  Under the law
15 enforcement privilege, I'm instructing the witness
16 not to answer.
17      MR. LEVINE:  What's the problem with the
18 question?
19      MS. REDDY:  It would reveal information as
20 to the types of materials that would be -- they would
21 look at or not look at, which is privileged
22 under -- it would put law enforcement methods or

Page 129

1 procedures at risk by revealing that information.
2      MR. LEVINE:  How?
3      MS. REDDY:  By explaining what files are
4 looked at and what files are not looked at when
5 deciding -- when deciding what they're going to look
6 at.
7      MR. LEVINE:  All we're asking about are
8 files looked at in connection with the name check
9 done for USCIS.
10      MS. REDDY:  Correct.
11      MR. LEVINE:  And that's the subject matter
12 of this lawsuit.  It seems to me that it's clear that
13 it's central to the lawsuit.  And unless there's some
14 way in which this is going to impair the functioning
15 of the Bureau, the law enforcement privilege doesn't
16 prevail.
17      MS. REDDY:  By revealing which categories
18 of files they look at or do not look at would impair
19 the functions of the Bureau.
20      MR. LEVINE:  How?  I think your burden to
21 justify the privilege, given the importance of the
22 issue to the lawsuit, is a strong one, so that you

Page 130

1 have to talk about some specific harm and how that
2 harm would befall the Bureau, seems to me, doesn't
3 make sense at all.
4         MR. FELIX:  We'll take it under
5 advisement, but the witness is instructed not to
6 answer.  That's where we stand.
7         MR. LEVINE:  If we have to call the
8 magistrate on it, perhaps we do.  But before we get
9 to that point, are we talking about an abstraction or
10 something really specific that is, yes, it says
11 something about how the FBI functions, but that's not
12 the law enforcement privilege.  The law enforcement
13 privilege requires a showing of some specific harm to
14 the FBI, and I don't quite understand how you think
15 that harm would occur.
16        MR. FELIX:  If I may?
17        MR. LEVINE:  Sure.
18        MR. FELIX:  To the extent we reveal the
19 criteria in the case files that are reviewed in
20 connection with our name check process, review and
21 not review, disclosure of that information would
22 interfere with our process and enable individuals to

Page 131

1 perhaps gain the system and find ways to circumvent
2 the name check process.  That's the basis for the
3 instruction.
4         MR. LEVINE:  Sounds pretty abstract to me.
5 Well, when we take a break, let's you and I talk
6 about it, and if we have to, we'll take it up with
7 the magistrate.
8         MR. CHIN:  Okay.
9         BY MR. CHIN:
10        Q   Mr. Cannon, by implementing the super
11 filter and mega filter program, has that helped
12 reduce the backlog of the USCIS pending name checks?
13        A   It has helped reduce the workload
14 associated with processing name checks.
15        Q   And those filters apply to both the new
16 incoming requests as well as the pending backlog
17 requests?
18        A   That is correct.
19        Q   Are there any problems with those -- with
20 the functioning of those two programs or those two
21 filters, as far as you know?
22        A   No, not as far as I know.

Page 132

1         Q   Or in the application and use of those
2 filters by staff?
3         A   No.
4         Q   Let me --
5         A   Let me rephrase that.  There have been
6 instances where -- actually, let me think this
7 through, where some of the folks have indicated that
8 our analysts have indicated, in their mind, that some
9 of the name checks were filtered out and, in their
10 mind, shouldn't have been filtered out, based on
11 their opinion.  However, we provided the
12 information -- that information to CIS, and they have
13 looked at it to ensure that the information that was
14 not provided was something that wouldn't have been
15 crucial to the adjudication of a name check.
16        Q   So are you stating that there's some
17 disagreement among some of your analysts as to what
18 is or is not considered derogatory information that
19 the customer, the USCIS should have or not have?
20        A   In their opinion, the
21 information was something CIS should have.  CIS has
22 looked at the information and has said we understand

Page 133

1 this was what was not submitted.  And through quality
2 control checks that we've done, they understand the
3 type of information is not being provided.
4         Q   Just to explain what you mean by "quality
5 control checks" --
6         A   Our folks -- we've looked at it and have
7 gone back to USCIS and said, essentially, based upon
8 the filter, this type of information was not provided
9 to you.  And part of a process to, where if we need
10 to readjust the files that are being eliminated, we
11 can do that.
12        Q   Is it correct to say that the decision to
13 use the filters was reached by both the FBI and the
14 CIS in terms of processing USCIS name check requests?
15        A   Yes.
16        Q   And are they made aware of this somewhat
17 internal dissension among some of the analysts in
18 terms of their disagreement about whether certain
19 files should indeed be looked at and not ignored?
20        MS. REDDY:  Objection.
21        BY MR. CHIN:
22        Q   Do you understand the question,

Page 134

1  Mr. Cannon?

2      A  Yes.

3      Q  Can you answer?

4      A  A particular objection from a particular

5  analyst would not be individually referred to USCIS.

6  What we do is we've taken the information again that

7  was not provided to USCIS and -- through the normal

8  process, and said these are the type of things that

9  you are now receiving from us.  And they make a

10  determination based on whether or not they need that

11  type of information to make adjudication on a

12  particular name check.

13      Q  How is that communicated with your

14  counterparts at the CIS?  Is that through some sort

15  of electronic communication or a letterhead

16  memorandum or some other --

17      A  I provided a memorandum with an attachment

18  to USCIS.

19      Q  Let me ask you, sir, are you familiar with

20  the statement that is made by the Office of Inspector

21  General that the FBI has reported to them that every

22  terrorism record is already digitized?  Do you know

Page 135

1  about that?

2      A  I'm familiar with that statement.

3      Q  Yes?

4      A  Yes.

5      Q  Is it true?

6      A  From my vantage point, no.

7      Q  That's interesting.  What do you mean by

8  that?

9      A  We have files that would be terrorist

10  files, counterterrorist files, counterintelligence,

11  to my knowledge, that may still exist in paper form.

12      Q  And the paper files, would they be the

13  ones that were created before 1995 or --

14      A  The majority of which would have been

15  created before 1995.

16      Q  But I understand that many of those files

17  are becoming scanned and -- is that not true?

18      A  The files are being scanned as they're

19  needed for the National Name Check Program, files are

20  being pulled and scanned.

21      Q  Right.

22      A  And we're creating an electronic database

Page 136

1  to where my analysts have the information

2  electronically.

3      Q  Are you saying that the scanned files that

4  are now part of your database, are they also

5  accessible by other personnel at the FBI who would be

6  concerned or interested in counterterrorism or some

7  other types of focus?

8      A  The files are scanned and put in what we

9  call the T-drive, and the T-drive is accessible to

10  the Name Check Program and folks in the FOIPA

11  component of Records Management Division, Freedom of

12  Information and Privacy Act.  They have access to our

13  T-drive.  It's kind of the same system that we use

14  for the files.

15      Q  So you're saying that the T-drive, in all

16  those scanned documents that you have within your

17  department, still fall within the Records Management

18  Division in terms of access?

19      A  Yes.

20      Q  Does that mean to say that your other

21  divisions don't have access to the T-drive?

22      A  Other divisions within the FBI, to my

Page 137

1  knowledge, don't have access to the T-drive.

2      Q  Do not?

3      A  That is correct.

4      Q  So when I originally stated the premise

5  that the Inspector General reported what the FBI told

6  them, that terrorism files were all digitized, do you

7  disagree with that assessment?

8      A  I do not know the basis of that statement

9  that was made to the Inspector General.  It wasn't

10  made by the Records Management Division.

11      Q  Can you think of a reason why such a

12  statement would be made?

13          MS. REDDY:  Objection.

14          BY MR. CHIN:

15      Q  In terms of the -- is there a plan in the

16  National Name Checks Program to indeed digitize all

17  of your records?

18      A  That is the function of the Central

19  Records Complex, the CRC, which is mentioned in some

20  of the materials that you have --

21      Q  Yes.

22      A  -- where eventually all of the nonpending

Page 138

1  files would be pulled to one location within the area
2  which would be in -- near Winchester, Virginia
3  where --
4      Q  You're talking about the Centralized
5  Records Complex?
6      A  Yes, sir.
7      Q  The complex which is supposedly, I guess,
8  established in 2010 or 2012?
9      A  The end of 2010, I believe.
10      Q  Maybe later?
11      A  Maybe after that is when the first folks
12  would be slated to move in.  There's no need to
13  digitize all the records at the FBI simply because
14  there's no need to.
15      Q  Why do you say that?  Because I thought
16  the manual search of paper records was a very
17  important reason for the delays in the name checks
18  program for many years?
19      A  It is.  So what we do is under the CRC, we
20  would identify the types of records that would be
21  more likely to be requested and useful and have those
22  scanned.  That would be what we consider to be our

Page 139

1  popular file.  Then an unpopular file, which would be
2  records that -- the chances are they wouldn't be
3  scanned, which would be put on a shelf, and if
4  needed, would be retrieved.  Because some of those
5  files eventually will age out, they will be archived
6  in St. Louis.
7      So to spend the millions of dollars that
8  it would take to do something like that and the
9  amount of time it would take, which would be beyond,
10  I think, my lifetime, would be something that's not
11  feasible.
12      Q  Now, I understand that the scanning of
13  your documents are going into a T-drive, which
14  apparently is not integrated with the entire FBI
15  agency itself and other departments?
16      A  Right now that's correct.
17      Q  Do you have a deadline or a goal as to
18  when those files will be indeed completely scanned,
19  the ones that you deem to be relevant and useful?
20      A  No, because that would be the purpose of
21  the Central Records Complex.
22      Q  Would that be years in the making?

Page 140

1      A  I can't answer that.  I don't know.
2      Q  But that's slowly going on, the
3  scanning --
4      A  Yes, sir.
5      MR. CHIN:  Can I have a moment?  We'll go
6  off the record.
7      (Off the record.)
8  BY MR. CHIN:
9      Q  Mr. Cannon, have you or the FBI -- so
10  going back to my original question.  Have you or the
11  FBI had any discussions with the CIS or Homeland
12  Security about a risk-based process?  And, of course,
13  you asked me the question what do we mean by
14  risk-based.  But just based on what we understand of
15  the question -- and I'm not in a position to define
16  what it means by risk-based, but the concept you're
17  certainly fully aware of from our previous question
18  and answers.  So have you or have you not or has your
19  agency talked about this approach?
20      A  Yes.
21      Q  You have, okay.  When did those
22  discussions take place, as far as you know?

Page 141

1      A  Those were last year, in 2007, the results
2  of which were the super filter and then eventually
3  the mega filter in the fall of last year.
4      Q  Will there be any further changes to your
5  program on that risk-based approach, or is it the
6  primary filters that would address that issue?
7      MS. REDDY:  Objection.
8      THE WITNESS:  I'm not sure I understand
9  your question.
10      BY MR. CHIN:
11      Q  Let me break it down.  You just indicated
12  that the two agencies have discussed the idea of a
13  risk-based approach or process to reduce the backlog.
14      A  Yes, sir.
15      Q  Presumably that would also be to address
16  the incoming requests as well?
17      A  Yes, sir.
18      Q  New requests, right?
19      A  Yes, sir.
20      Q  And you answered me and said that we
21  agreed to implement the super filters and the mega
22  filters.  And I'm asking, are there any other steps,

Page 142

1 as far as you know, in that understanding that the
2 two agencies have now reached?
3      A  Regarding the filters, we are, again,
4 always looking to see if there are categories which
5 need to be perhaps maybe added or taken away as far
6 as the filtering concept is concerned.
7      Q  And did USCIS request that conversation or
8 how was that initiated, if you know?
9           MS. REDDY:  Objection, that goes to the
10 deliberative process privilege.  That answer would be
11 protected.
12           MR. CHIN:  I'm simply asking which agency
13 invited the other to discuss this risk-based
14 approach.
15           MS. REDDY:  Okay.
16           You can answer.
17           BY MR. CHIN:
18      Q  If you understand the question.
19      A  We work so closely with USCIS, I'm
20 reserved to say it was completely our idea or their
21 idea.  We always are looking together as partners on
22 ways in which are streamline the process.

Page 143

1      Q  Was that risk-based approach discussion
2 commenced in late 2007?
3      A  It would have been -- it was the
4 premise -- initial premise to the super filter, so
5 that would have been earlier in 2007.  Early 2007.
6      Q  Did that discussion require that you
7 obtain the go-ahead from any higher authorities at
8 the FBI?  In other words, did you have to get
9 approval from a superior on this new risk-based
10 approach or, in this example that you gave, the
11 implementation of filters?
12      A  With the super filter, my boss, Bill
13 Hooton, Assistant Director of Records Management,
14 would have gone to his boss, the Associate Deputy
15 Director of the Bureau, and what we were doing and
16 how we were proceeding.  The mega filter was decided
17 at a very high level --
18      Q  And how high a level would that be?
19      A  It would be the folks that were the
20 signatories to the MOU.
21      Q  The Memorandum of Understanding?
22      A  Yeah, I'm sorry.  Yes, Memorandum of

Page 144

1 Understanding, which implemented the mega filter.
2      Q  And that was also in late 2007, right?
3      A  Yes, sir, that is correct.
4      Q  I imagine there are a number of meetings
5 leading up to that Memorandum of Understanding,
6 correct?
7      A  There were some meetings that took place.
8      Q  Would that have been with Mr. Smith, for
9 example, at the USCIS?
10      A  No.  The mega filter meetings initially
11 took place at a very high level, Deputy Director
12 Jackson of DHS.  I believe Jock Scharfen, who's now
13 the acting director of the USCIS, the FBI's Deputy
14 Director, John Pistole, and my boss, Assistant
15 Director Bill Hooton was also at the meeting.
16      Q  So that resulted in the Memo of
17 Understanding that you --
18      A  That started the ball rolling on the
19 Memorandum of Understanding, yes, sir.
20      Q  Would that also have included a discussion
21 or a decision made about how those moves would be
22 financed by which agency, if you know?

Page 145

1      A  I'm trying to understand the genesis of
2 the question as far as financing the filter.
3      Q  I guess these filters and the -- well, you
4 tell me.  Were they free or did they involve a cost?
5      A  They were developed -- the actual filter
6 process was developed by our Information Technology
7 Operations Division, ITOD, as far as we would present
8 them with the parameters and they would write the
9 code to adjust the search in the Name Check Program.
10      Q  Let me ask you, sir, are you aware
11 of -- are you aware of a study being conducted or an
12 assessment being conducted within your agency --
13      A  When you say "agency," you mean the FBI or
14 Records Management Division?
15      Q  I mean FBI.
16      A  Okay.
17      Q  It would include your division as well, of
18 course.  The question is whether or not you are aware
19 of some process by which the -- there's an
20 examination of the impact or the possible effects of
21 eliminating the FBI reference checks in the course of
22 doing your name checks for the USCIS.  Are you

Page 146

1 familiar with that?  Do you understand my question?
2      MS. REDDY:  Objection.
3      MR. CHIN:  Meaning?
4      MS. REDDY:  For form.
5      BY MR. CHIN:
6      Q Let me restate that -- do you understand
7 my question?  I can rephrase it.
8      A I want to say I think I do, but please
9 rephrase it so I make sure I understand it.
10      MS. REDDY:  And if you can, please clarify
11 the time frame as well.
12      MR. CHIN:  Well, there is no specific time
13 frame, but I am asking whether he has any knowledge
14 or awareness of some discussion or some evaluation
15 going on, let's say, in the last year or currently,
16 into the possibility of eliminating the entire
17 reference checks process affiliated to the name
18 checks process --
19      THE WITNESS:  I'm not aware of any
20 discussions within the FBI or studies that would go
21 to that.
22      BY MR. CHIN:

Page 147

1      Q I apologize, I must have misplaced the
2 document, but this is referenced in a memo from FBI,
3 Mr. Hooton to Mr. Jonathan Scharfen at the USCIS, and
4 it's January of '08, which is quite recent.  I
5 understood from that memo that there was some sort of
6 technological or other evaluation that was taking
7 place on that very issue.  So if you don't understand
8 it or know it, that's fine.  But as the
9 representative of the agency, I wonder whether that's
10 something you can find out for us.
11      MS. REDDY:  He just answered the question,
12 Counsel.
13      MR. CHIN:  As to his personal knowledge,
14 but as a 30(b)(6) representative.
15      MS. REDDY:  And the document that you're
16 referring to?
17      MR. CHIN:  Would you like me to give you
18 the Bates-stamped number?
19      MS. REDDY:  But you can't show it to the
20 witness?  You're asking him --
21      MR. CHIN:  I'm asking him about whether
22 he's aware of the basic --

Page 148

1      MS. REDDY:  So we're not talking about the
2 document that you're --
3      MR. CHIN:  No, but that's where it seems
4 to come out of.
5      MR. LEVINE:  He was asked if he knows
6 about a memo from Hooton to Scharfen.
7      THE WITNESS:  I was not asked that
8 question, sir.
9      MR. LEVINE:  Pardon?
10      THE WITNESS:  I was not asked such a
11 question.
12      MR. LEVINE:  Do you?
13      BY MR. CHIN:
14      Q I'll ask you that question.  Do you know
15 about such a memo from Mr. Hooton to Mr. Scharfen
16 about this very proposal for this evaluation?
17      A There are memorandums from Mr. Hooton and
18 Mr. Scharfen that cover what we've done on the Name
19 Check Program or proposing to do some of the things
20 that we're looking at.  I don't recall an analysis
21 that we have done, the analysis the Bureau has done
22 which would result in the elimination of all USCIS

Page 149

1 references.  In other words, going back to checking
2 just main files only, that would be something that
3 the customer would have to agree to.
4      Q And I'm sorry, I don't have the document,
5 but my understanding is that it would be -- the
6 evaluation of -- I'm not saying it's an evaluation
7 that's completed, it's not.  I don't know that.  But
8 it would involve eliminating the reference checks
9 with the exception of national security checks,
10 whatever that means.  Do you know about such a report
11 or activity that is being conducted within your
12 division or at the FBI?
13      A There may be a law-enforcement sensitive
14 issue involved with that.  I'd like to take time and
15 talk to counsel about it.
16      MR. LEVINE:  We have the document.  We
17 don't have it here, we have it in New York.  Maybe we
18 can get it faxed, unless you have it with you and I
19 can give you a number for it.  Do you want to see if
20 you have it?
21      MS. REDDY:  Sure.
22      MR. LEVINE:  It's FBI1108 to -- 1105 to

Page 150

1 1108.

2          MR. CHIN:  And it specifically references
3 that page 1107.

4          MS. REDDY:  Can we take a break?

5          MR. CHIN:  Sure.

6          (Off the record.)

7          MR. CHIN:  We've just agreed that we will
8 be obtaining that FBI memo in a few moments, and then
9 we can resume questioning on that subject matter.
10 I'm going to move forward and ask some additional
11 questions.

12          BY MR. CHIN:

13     Q  Concerning the 2008 policy that was
14 implemented and announced by the USCIS with respect
15 to processing adjustment of status applications for
16 lawful permanent residency, do you know about that
17 policy?

18     A  I am familiar with the policy, yes, sir.

19     Q  What is your understanding of that policy?

20     A  My understanding of that policy is that
21 they will not wait for the results of an FBI name
22 check.  After a certain period of time, they will go

Page 151

1 ahead and process the application and, if needed,
2 adjust after the receipt of the FBI name check.

3     Q  That's correct.  Did that policy arise in
4 consultation with the FBI?

5     A  No.

6     Q  Does that policy in any way affect the
7 running of the National Name Check Program with
8 respect to USCIS name check requests?

9     A  No.

10     Q  Would it affect the prioritizing of any of
11 those name check requests?

12     A  No.  The only way a name check priority is
13 decided is at the specific request of a customer, in
14 this case, USCIS, if they wanted to expedite a
15 particular name check.  Also, unless it was agreed
16 upon, such as you saw in the business plan, the
17 29,000 naturalization cases, those types were agreed
18 to at that point in time.  In all cases,
19 prioritization is at the request of the customer.

20     Q  The name checks submitted on behalf of
21 applicants for lawful permanent residency --

22     A  Would this be the same thing as adjustment

Page 152

1 status --

2     Q  Yes, it is.  The same, exactly.  Would
3 that process continue -- regardless of the decision
4 by CIS to approve, would those name checks continue
5 through the course of a reference check, if
6 necessary?

7     A  Yes, sir.

8     Q  And those could indeed take a lot of time
9 from your analyst staff or from your dissemination
10 staff or other staff; is that correct?

11     A  It would depend upon the number of name
12 checks that came in, the number of hits that were on
13 a particular name check.  There's no way to figure
14 out if it would take a lot of time.

15     Q  Let me ask you about the 2002 policy and
16 decision by the FBI to expand the name check process
17 to include reference files.  Plaintiff's Exhibit 9, I
18 understand you've looked at it?

19     A  Yes, sir.

20     Q  Do you know how that policy came into
21 being, the decision to expand name checks beyond the
22 main files?

Page 153

1     A  The policy was a result of the facts laid
2 out in this EC dated December 13th, 2002.

3     Q  And that is that the agency decided we now
4 must require all name check requests to go through,
5 not just the main files, but also --

6     A  The reference files.

7     Q  -- reference file checks as well?

8     A  Checking for mains and references, that is
9 correct, sir.

10     Q  And what was the goal in expanding those
11 name checks to include reference files?

12     A  To ensure that some pertinent information
13 that would be needed by USCIS in adjudicating the
14 applications -- at that point in time, it was the
15 INS, Immigration and Naturalization Service.  To
16 ensure that -- considering this was a post-9/11
17 environment, ensuring that some crucial information
18 would not be overlooked.

19     Q  When you refer to the 9/11 environment,
20 are you thinking that there was a lot of
21 finger-pointing going on at the time?

22          MS. REDDY:  Objection.

Page 154

1      BY MR. CHIN:

2      Q  What do you mean by the "post-9/11

3  environment" you just answered?  How would you

4  explain that phrase that you just used?

5      A  Give me a moment, please.

6      Q  Sure, sure.

7      A  Okay.  On page 2, it says in the EC, under

8  FBI and SMOU, so this is a Risk Management issue, the

9  last sentence -- second to last sentence, "The

10  factors of which, of course, change after September

11  11th."

12      Q  Do you know who at the FBI would have

13  approved this decision?

14      A  The decision to go ahead and redo -- go

15  ahead and check main files and reference files?

16      Q  Yes, that's correct.  If you know.

17      A  According to the EC, the FBI went ahead

18  and did that on its own.

19      Q  As the 30(b)(6) designee, do you know

20  whether an assessment was made contemporaneously with

21  that decision to expand the name check process to

22  include reference files?

Page 155

1      MS. REDDY:  Objection.  The assessment as

2  to?

3      MR. CHIN:  The assessment as to whether it

4  could be done and whether it required more resources.

5      BY MR. CHIN:

6      Q  For example, whether it would be

7  implementable or something that could be done with

8  the given resources of the department of the National

9  Name Check Program at the time.

10      A  Give me a moment.  I heard your question.

11      Q  Sure.

12      A  On page 2 of the EC, under missed name

13  check certification, the second paragraph.  The last

14  sentence, "Not waiting for INS response, NNCP

15  immediately modified the search criteria to cover

16  around-the-clock phonetic searches and main cross

17  reference hits."

18      Q  Yes, I see that.  Wasn't it your

19  testimony, Mr. Cannon, that the customer is right and

20  that the customer would be the determinant in

21  deciding what types of checks they would want from

22  your program?

Page 156

1      A  Yes, sir, that is correct.  Generally

2  speaking, that is the case which is, I think, evident

3  of the MUO, which is on page 2 at the top. "Pursuant

4  to an MOU executed on January 15th, defined the

5  searching requirements agreed to between the

6  agencies."  At that point in time, the customer,

7  USCIS, indicated they were willing to do the main

8  file checks.

9      Q  But I understand from this memo -- and

10  correct me if I'm not characterizing it properly, but

11  from what I understand of the memo, the FBI had

12  already initiated that change in December prior to

13  the MOU being signed in mid January --

14      A  I'm sorry, the January MOU -- the January

15  15th, 1985 MOU --

16      Q  I'm sorry, that's right.

17      A  -- had established that they were only

18  going to do main files.

19      Q  Right.

20      A  And then it looks at if, in this case at

21  this point in time, the FBI modified the search

22  criteria to cover around-the-clock phonetic searches

Page 157

1  and main and cross reference hits.

2      Q  Without waiting for the USCIS or INS?

3      A  According to this ECS, that is correct.

4      Q  You can also -- if I may ask you to look

5  over at page 4.  It talks about the 2.2 million names

6  that are being reprocessed.  We understand that to be

7  called the resubmission or rerun?

8      A  Yes, sir.

9      Q  And I've seen figures where it's 2.7

10  million as well?

11      A  Yes, sir.

12      Q  So is it more correct to say it was a

13  2.7 million --

14      A  My understanding was it was eventually

15  2.7 million.

16      Q  Right.  Under the heading Recommend Fee

17  Sharing, I will read to you, "The NNCP has already

18  received the tapes with the 2.2 million names and has

19  begun the process of rechecking these names,

20  processing the tapes will delay more recent INS

21  submissions, but they have accepted this likelihood."

22      So at the point of agreeing to reprocess

Page 158

1 2.2 million and then soon to be 2.5 million --

2     A 2.7 million is the figure that we used,

3 sir.

4     Q Right. There was no increase in staff

5 resources; is that correct?

6     A Yes, sir. To my knowledge, that is

7 correct.

8     Q As a result of that, would it be correct

9 to say that that made a substantial or a very

10 important contribution to the delays of name check

11 processing from that point on?

12     MS. REDDY: Objection.

13     MR. CHIN: Because?

14     MS. REDDY: The term "substantial" --

15     MR. CHIN: All right.

16     MS. REDDY: And also --

17     MR. CHIN: Let's ask Mr. Cannon -- I'll

18 withdraw substantial --

19     MS. REDDY: -- and as to time frame as

20 well.

21     BY MR. CHIN:

22     Q Let me ask, Mr. Cannon, do you understand

Page 159

1 the gist of my question? I don't think it's too

2 complicated.

3         Didn't that make a big impact, that

4 2.5 million, right, that came in through the process,

5 didn't that really create a mountain of work for the

6 staff?

7     A Yes. The 2.7 million resubmission was

8 what we considered to be the genesis of the beginning

9 of the backlog of USCIS pending name checks.

10     Q Now, I'm not sure you're familiar with

11 what Mr. Hardy has said in testimony, but he takes

12 the position that it didn't really make a big

13 difference.

14     MS. REDDY: Objection.

15     Context? What testimony are you --

16     MR. CHIN: Sorry, I withdraw that.

17     BY MR. CHIN:

18     Q Are you familiar with Mr. Hardy's position

19 on that submission of the 2.7 million and whether

20 that had any adverse impact on the processing time

21 and the -- processing time of name checks?

22     A I have not read Mr. Hardy's testimony, so

Page 160

1 I do not know specifically how he addressed the

2 specific question.

3     Q Sure. Have you, in conversation as

4 professional, asked him in general about that

5 important event?

6     A I've discussed this event numerous times

7 with Mr. Hardy regarding the resubmission of the name

8 checks. And the resubmission of the name checks

9 undoubtedly created an immediate backlog of over

10 440,000 name checks, which I believe is also in my

11 declaration.

12     Q USCIS --

13     A Yes, sir, the resubmission of the USCIS

14 name checks of 2.7 million, which created the initial

15 backlog.

16     Q But in the course of your discussing the

17 program that you supervise now and in preparation for

18 the deposition that you are here before, did you ever

19 confirm with him that indeed that rerun submission

20 was a very important and had caused -- contributed

21 adversely to the processing of name checks?

22     A We've had conversations in the past, yes,

Page 161

1 sir, discussing the result or the impact that the

2 rerun had on the National Name Check Program.

3     Q In a very simple fashion, can you tell me

4 what his thoughts were or his position was when he

5 conferred with you about the resubmission of 2.7

6 million files?

7     A My understanding of the conversation with

8 Mr. Hardy is that the backlog was -- the backlog we

9 dealt with for -- the backlog that was in existence

10 when I came to the FBI in March of 2005 of USCIS name

11 checks was created by the resubmission of the

12 2.7 million name checks.

13     Q When you came into the picture, as I

14 understand, the unit was spun off into its own

15 section, and you became the section chief in 2005 --

16     A Mr. Hardy was the section chief of both

17 sections --

18     Q Yes, acting.

19     A And when I came in, I became the section

20 chief of the National Name Check Program, yes, sir.

21     Q Did you understand that you did not have

22 the staff and resources to address that inheritance

Page 162

1 of whatever several -- 2.7 million or whatever and
2 the other name check requests that continued to come
3 into your program?
4     A When I initially walked in the door and
5 took the job, no, I did not --
6     Q But at some point thereafter, you
7 recognize that there was a serious crisis; isn't that
8 correct?
9         MS. REDDY: Objection.
10        BY MR. CHIN:
11    Q Do you understand my question?
12    A I understand your question.
13    Q Can you answer that?
14    A When I came in and took over the program,
15 through examination of the program and discussions
16 with Mr. Hardy, I did recognize that there was a
17 large number of USCIS name checks that were pending
18 and that we needed to come to some strategies to
19 address these name checks.
20    Q Well, it's my understanding that, of
21 course, the backlog wasn't just limited to the CIS
22 request, that it also impacted your other customers

Page 163

1 as well; isn't that true?
2     A The backlog would -- a backlog would
3 effect the customer, USCIS, and if they took folks
4 off of one customer to work on another customer's
5 backlog, it would certainly affect the other
6 customer, too.
7     Q And at that time, was there also a
8 principle of first in and first served in terms of
9 customer requests from all the various customers?
10    A With the exception of if a customer
11 requested an expedite, then that was the approach
12 that we were supposed to be taking, that is correct.
13    Q Does that mean that the USCIS -- and this
14 is just -- not specific dates, but on -- I think it
15 was in December, I believe, that they submitted these
16 tapes with all the 2.2 million and then subsequent
17 other tapes to the name checks program. So they
18 submitted these tapes with, let's say, the
19 2.2 million people on December 20th. Would those
20 people on December 20th be treated as if they were in
21 the same line with all other customers submitting
22 their requests for name checks on December 20th as

Page 164

1 well, and that the customer request that come after
2 December 20th follow behind that queue?
3     A No.
4     Q No?
5     A The names were submitted over a five-week
6 period from December 2002 to January of 2003.
7     Q Okay.
8     A Another customer, say my larger customer,
9 USCIS and OPM, have folks specifically assigned to
10 work those name checks. So if I was working on an
11 OPM name check per se or that was my desk -- because
12 USCIS got some -- a rerun that came in, say, on a
13 given date, it wouldn't affect -- if I continued to
14 work on the OPM desk, it would not affect how I chose
15 to work on the OPM desk. In other words, a name
16 check submitted by OPM or any other customer falls on
17 another desk affected the folks that were working on
18 the -- at that point in time, the INS desk, which
19 subsequently was the USCIS desk, and any folks that
20 may have been taken off of any other desks to help
21 handle it.
22    Q Just to clarify for my information, in the

Page 165

1 year 2002 or early 2003, are you aware or are you
2 saying that OPM had a special desk or it had sent
3 their own staff there to help with processing their
4 name check requests?
5     A No, sir. I'm saying we had folks at the
6 FBI that were specifically assigned to work OPM name
7 checks.
8         MS. REDDY: Do you mind if we take a quick
9 break?
10        MR. CHIN: Sure.
11        (Brief recess.)
12        MR. CHIN: Can you read back the last
13 question and answer?
14        (The reporter read the requested portion
15 of the record.)
16        BY MR. CHIN:
17    Q So therefore, there was also another desk
18 that handled the USCIS name check requests; is that
19 how I understand the structure at the time?
20    A Yes.
21    Q Would you happen to know whether the
22 staffing levels for the USCIS desk, how they

1 increased over time from when you got there, if you
2 know?
3     A  They have increased over time since I got
4 there to the present, present day.  I can't
5 specifically tell you on what month of what year the
6 certain levels were.
7     Q  That's fine.  Would it be fair to say that
8 those levels went up and down in terms of staffing
9 levels?
10     A  I think that would probably be correct,
11 because we had quite a few folks that had left the
12 Bureau --
13     Q  And do you recall whether the leaving of
14 those particular staff added to the delays in
15 processing the USCIS name check requests?
16     A  I don't recall.
17     Q  Would it have contributed to delays in
18 processing?
19     A  It could have, yes.
20     Q  And do you remember what year that staff
21 reduction took place?
22     A  Over a period of years.

1     Q  Beginning from when to when?
2     A  When I came on board in 2005 to 2007.
3     Q  I'm going to ask you about -- in terms of
4 the FBI's resources, is it your understanding that
5 your staff and the FBI's staff and resources have
6 been involved with handling -- with litigation and
7 individual FOIA requests all related to the
8 processing delays and name requests?
9     MS. REDDY:  Objection, form.
10     BY MR. CHIN:
11     Q  Do you understand -- is it true that your
12 staff resources within the Name Check Program or
13 within the Records Management Division, for example,
14 are very involved with, I guess, addressing FOIA
15 requests that come in the door related to processing
16 delays and name checks; do you know that?
17     A  The FOIPA section --
18     Q  Can you tell me --
19     A  Freedom of Information and Privacy Act
20 section handles the Freedom of Information Act
21 requests that come in the door.
22     Q  And that's within Mr. Hardy's current

1 section?
2     A  That is correct.
3     Q  And in your section, do you also have
4 staff that are handling name check requests,
5 presumably some of those name check requests, are
6 they being expedited because of litigation, do you
7 know?
8     A  Our policy -- the Bureau's policy is not
9 to expedite based on litigation.  An expedite is done
10 at the request of the customer, USCIS.  On what basis
11 they decide to expedite a particular name check is
12 their call.
13     Q  Well, have you had any discussions with
14 any of your counterparts at the USCIS where you were
15 told or informed we really need to move out some of
16 these name checks, particular name check cases, we
17 need to do so because we're under the gun, under
18 pressure because of a lawsuit or a motion
19 for -- thank you very much.
20     A  I believe I've had some conversations
21 with -- well, I have had some conversations with CIS
22 regarding just the level of work that they are going

1 through due to the litigation.  I don't recall
2 specifically -- I do not recall specific
3 conversations regarding a particular name check due
4 to litigation.
5     Q  Well, the general conversation that you
6 just referred to, when did that take place?
7     A  With Greg Smith over a period of the past
8 year or so.
9     Q  In 2007?
10     A  2007, 2008.
11     Q  But before that, there was no such similar
12 conversation about -- from any of the other CIS
13 officials?
14     A  Regarding litigation?
15     Q  Well, regarding the need to get name check
16 processing really done quicker or in some way address
17 the delays as a result of litigation.  Has
18 anyone -- I'm sorry.
19     A  As I recall, litigation was or used to be
20 one of the factors they considered in expediting, but
21 that was something they decided, not the Bureau.
22     Q  At the FBI, we have sued your agency and

Page 170

1 so, presumably, there are resources being expended by
2 your agency in defending litigation related to
3 naturalization delays; is that correct?
4     A  Yes, that is correct.
5     Q  So would it be fair to say that the Office
6 of General Counsel might speak to your boss or speak
7 to you, we have this particular litigation, what can
8 you find out for us about these specific individuals?
9 Does that occur?
10     MS. REDDY:  Objection.  I think that might
11 be protected under the attorney-client privilege what
12 his counsel is going to him about pending litigation.
13     MR. CHIN:  Not the specifics of the
14 conversation.
15     BY MR. CHIN:
16     Q  The fact that -- maybe not the Office of
17 General Counsel, but some other unit or division at
18 the FBI communicating to you that there is this need
19 to deal with a litigation related to name checks.
20 Has that happened, those kinds of conversations?
21     A  The only conversations I've had regarding
22 name check litigation specifically is with the Office

Page 171

1 of General Counsel representatives, outside of the
2 name check section.
3     Q  Right.  Let me ask you then, with
4 specific -- I think that there was a report, and I
5 can't at this very moment identify it, but I believe
6 there has been some assessment or some kind of
7 report -- I'm just asking if you know of its
8 existence, but this report would contain information
9 about the man-hours of staffing from the FBI that is
10 being deployed in addressing litigation regarding
11 naturalization lawsuits.  Do you know of such a
12 report or such information?
13     A  Yes.
14     Q  Where would that be found?
15     A  As I recall, that was a question that was
16 raised in what we call a question for the record, a
17 QFR, from a congressional person or committee.
18     Q  And do you recall when that QFR was sent
19 to you requesting information?
20     A  I did not provide the information
21 regarding the man-hours in support of litigation.
22     Q  Okay.  But someone did from your agency?

Page 172

1     A  That was referred to the Office of General
2 Counsel within the Bureau to provide that
3 information.
4     Q  I see.  Wouldn't that office have asked
5 you, well, tell me, can you give me an estimate or a
6 number of how many of the staff that you have in your
7 program, how many of them are involved with this
8 particular task or -- would that ever have occurred
9 where the data that was needed for a response to the
10 congressional request, would that have involved you
11 at all?
12     A  Some of the QFRs dealt with the specifics
13 of the Name Check Program itself.  The questions
14 pertaining to litigation were referred to the Office
15 of General Counsel.
16     Q  Now, your plaintiffs in this litigation,
17 we have five out of six of our named plaintiffs now
18 who have been adjudicated by the USCIS.  Did you
19 review or did any of your staff review any of the
20 A-files of the named plaintiffs in this action?
21     MS. REDDY:  Sorry, do we -- we might need
22 to define A-files for Mr. Cannon.

Page 173

1     BY MR. CHIN:
2     Q  Do you understand the term A-files?
3     MS. REDDY:  I'm not sure --
4     BY MR. CHIN:
5     Q  Have you heard the term A-files?
6     A  Yes.
7     Q  What do you understand that to mean?
8     A  It's an alien registration number given to
9 someone applying for benefits that is assigned by the
10 USCIS.
11     Q  Right.  And I understand the A-files are
12 the entire record that is kept on that particular
13 individual and not just the number itself, but the
14 file of all the records that relate to that
15 individual.
16     A  That would be a record kept by USCIS?
17     Q  Yes, ordinarily.  And then the question I
18 have is, have those files ever been shared with your
19 office?
20     A  Not to my knowledge, no.
21     Q  Did you or anyone in your section review
22 the name check files of our plaintiffs in the last

Page 174

1 year?

2    A  If the name check request for your
3 plaintiffs resulted in hits on FBI files that
4 required someone to look at and analyze, the answer
5 would be yes.

6    Q  But you do not know specifically
7 whether -- let me withdraw that.

8       Let me ask you, do you know if any of the
9 name checks or background checks for the named
10 plaintiffs were handled on an expedited basis?

11    A  I don't recall the specific plaintiffs in
12 your case.  I do not recall, no.

13    Q  If an expedited request was made by USCIS
14 regarding our named plaintiffs, who would that
15 request go to on your staff or to you?

16    A  The request goes to my staff.

17    Q  Anyone in particular?

18    A  Debbie Pecynski.

19    Q  What is Ms. Pecynski's title or what
20 exactly does she do?

21    A  She's a team lead on the USCIS desk.  She
22 is currently responsible for organizing the expedites

Page 175

1 for USCIS.

2    Q  Has Ms. Pecynski been involved as the team
3 lead for the CIS desk for some time now?

4    A  She's handled the USCIS expedites for some
5 time, that's correct.

6    Q  Do you have a sense of how long she's been
7 on that --

8    A  Over a year.

9    Q  So in other words, she may know, you don't
10 know; is that correct?

11    MS. REDDY:  I'm sorry, can we clarify the
12 question?

13    MR. CHIN:  Yes.  I'm sorry, I was talking
14 about whether expedites were requested for the name
15 checks for our named plaintiffs, and I believe
16 Mr. Cannon's saying he didn't know, but handling the
17 expedites was being done by Ms. Pecynski.

18    BY MR. CHIN:

19    Q  Is that correct?

20    A  That's correct.

21    Q  Has Ms. Pecynski come to you about any
22 particular specific requests from the USCIS that

Page 176

1 would have required your attention?

2    A  From time to time, Ms. Pecynski may raise
3 an issue regarding an issue associated with an
4 expedited request to me, yes.

5    Q  What circumstance would that be where she
6 would call upon you?

7    A  Occasionally, it may be -- we limit USCIS
8 to a hundred expedites a week and say, hey, they're
9 going over their limit, they submitted, 115, 120,
10 things of that nature.

11    Q  Would you be asked to waive that limit for
12 the USCIS?

13    A  No.  I would say that 15 applies to the
14 next 100.

15    Q  And is it true that the policy is 100
16 requests for expedites per week?

17    A  Yes, sir.

18    Q  And has USCIS made efforts to ask for
19 expedites beyond that limit on a regular basis?

20    A  To my knowledge, no, not on a regular
21 basis.

22    Q  I think I'm winding down.  I'm still

Page 177

1 waiting for something.

2       Something that we talked about earlier
3 today, and that was the question of getting more
4 resources and being able to reduce the backload of
5 the CIS pending cases.  You said that space was a
6 limitation, correct?

7    A  Logistics was a limitation to -- it was
8 one of -- one of a couple limitations, as far as
9 bringing more folks on board.

10    Q  Let me ask you, though, whether or not if
11 the funding that you have received through the CIS
12 and through your fee schedule for customer fees,
13 whether that would afford the agency the ability to
14 lease more space if needed?

15    MS. REDDY:  Objection.  Again, it's a
16 hypothetical.  He's here as a fact witness.  He's
17 not -- he said there's a different division that
18 obtains the location --

19    MR. LEVINE:  You have an objection as to
20 form.

21    MS. REDDY:  Yes.

22    MR. LEVINE:  Okay.

Page 178

1    You can answer.
2    THE WITNESS:  Please restate the question.
3    BY MR. CHIN:
4    Q  Sure.  Is it possible that the leasing of
5  additional space for your program is permissible
6  under the business plan?
7    A  The business plan has no bearing upon us
8  leasing additional space.
9    Q  Okay.  So there's a certain amount of
10  discretion, beyond what's on the paper and the
11  details of the business plan, which allow you to deal
12  with the issue of space, for example?  If you need
13  more resources, if you need more space, is that not
14  something you can make some decisions about --
15    MS. REDDY:  Object to the form --
16    (Simultaneous conversation.)
17    BY MR. CHIN:
18    Q  -- to make some requests for, to request
19  more space?
20    MS. REDDY:  Objection as to form.
21    THE WITNESS:  I'm sorry, I --
22    BY MR. CHIN:

Page 179

1    Q  Me too.  The end of the day.
2    I was simply trying to figure out whether
3  you could -- if you had to get more space, whether
4  that is a possible thing to do within your authority
5  to ask for that space?
6    A  I could always ask for additional space.
7  Whether or not -- I could always ask for additional
8  space.
9    Q  If you decided that the operational
10  adjustment to the plan necessitated such an
11  additional resource, would you make that type of a
12  proposal or request?
13    A  If I decided that that type of course of
14  action was needed in order to meet the milestones,
15  then I would pursue that course of action.
16    Q  Speaking about the milestones, at what
17  point, in your mind, if you are not reaching a given
18  milestone, would you feel that that would justify
19  such a request for more space and more contractors?
20    MS. REDDY:  Objection.
21    MR. CHIN:  Because?
22    MS. REDDY:  To form and --

Page 180

1    MR. CHIN:  Let's just do --
2    MS. REDDY:  He can answer.
3    BY MR. CHIN:
4    Q  Just answer it, if you understand my
5  question.
6    A  Pursuant to the FBI Exhibit 6, the charts
7  which were associated with an e-mail from Jim Jaye on
8  May 5th, 2008, that's an example of how we track on a
9  routine daily basis of where we are as far as meeting
10  the milestones.  If the curve starts to flatten out,
11  so to speak, in other words, it exceeds where we
12  think we need to be, then we look at perhaps the
13  reasons for that, whatever those reasons may be.  The
14  business plan was developed utilizing a model we
15  procured which would, based upon incoming amount of
16  name checks, based upon processing rates, historical
17  contractor processing rates over a given period of
18  time to figure out what our capabilities were.  And
19  those were the bases for the milestones.  We look at
20  that on a daily basis to see if we're on course or if
21  we need to take some actions.
22    Q  What if we wanted to increase the

Page 181

1  processing rate, what would you imagine you could do?
2    MS. REDDY:  Objection.
3    BY MR. CHIN:
4    Q  Do you understand my question?
5    A  I understand your question, yes.
6    Q  Do you have an answer or do you want me to
7  rephrase it?
8    A  No.  I'm okay with it.  The purpose of the
9  business plan, as it says in the first part, was to
10  establish where we were, where we want to be, and how
11  to get there.  And it was developed based upon the
12  number of resources we had, the number of resources
13  we figured we could obtain with the additional
14  funding from USCIS, and the number of resources we
15  had on board and the number of resources we could
16  finance within the FBI to establish milestones that,
17  again, were aggressive but achievable and reachable
18  and everyone would agree to those milestones.
19    And the reason we have it signed by both
20  agencies is because this is what we have in place,
21  this is how we're going forward, which would
22  alleviate folks coming to us saying, well, what if

Page 182

1 you had this, could you do this, what about another
2 five million more, could you do this.  That way we're
3 allowed to focus operationally up on processing name
4 checks.  We're always looking for ways to increase
5 the ability to process or to increase the processing
6 rate of name checks.  We're working in parallel with
7 improving our IT systems.  We're working to scan our
8 records to create an electronic system of records,
9 you know.  We're test bedding a software that will
10 hopefully automate a lot of the manual stuff that my
11 folks do.  Those, in and of themselves, will over a
12 period of time increase processing rates.
13        The caliber of people that we're hiring
14 are very, very good, and some of those have really
15 impressed us with their ability to catch on and are
16 processing at a much higher rate than we originally
17 thought.  So those are the things that we do and look
18 at to increase our ability to meet the milestones,
19 one of which is the processing rate.
20     Q  Let me ask you, has the agency hired a
21 professional software engineer -- or I think it was
22 recommended that the National Name Checks Program

Page 183

1 procure either a consultant or someone at a level
2 which had -- of understanding in terms of mastery
3 over software and technological issues for your
4 program --
5     A  When you say "recommended," can you
6 elaborate who recommended it and when it was
7 recommended?
8     Q  I think it's been recommended over the
9 course of the years in different audits, but I
10 believe the most recent -- I'm referencing something
11 I think I read in the Office of Inspector General's
12 report, which -- or rather -- yes, I think I read it.
13        But the ultimate question is, have you
14 procured such a professional to help lead the program
15 on the automation needs?
16     A  The FBI or the National Name Check Program
17 has procured an IT specialist that is on board now
18 with us under contract, which has examined our system
19 as working closely with our information technology
20 operations division on -- and our information
21 technology branch on improving our system.  She came
22 in, examined our system.  She has a really good

Page 184

1 understanding of what our system does, what our needs
2 are, and where we're going, and she is assisting in
3 that manner.  And we've also had additional
4 assistance for our Information Technology Branch
5 within the Bureau to focus on IT.
6     Q  Has this individual provided any
7 assessment or reports to your office?
8     A  She works for my Assistant Section Chief,
9 Jim Jaye, and she has provided, over the course of
10 being there, information on what she has found and
11 has worked with our IT development folks as far
12 as -- as recommendations.  I have not physically seen
13 a particular report that she --
14     Q  But are you aware of such a report or
15 reports that are being delivered to your agency?
16     A  She is working on examining the process.
17 I am not aware of a particular formal report that she
18 has produced.
19     Q  Thank you.
20        MR. CHIN:  Can we go off the record for
21 just one moment, please.
22        (Off the record.)

Page 185

1        (FBI Exhibit 10 was marked for
2 identification and attached to the deposition
3 transcript.)
4 BY MR. CHIN:
5     Q  We've marked into evidence Plaintiffs'
6 Exhibit 10, which is a memorandum dated
7 January 24th, 2008 from your boss, William Hooton, to
8 Jonathan Scharfen, who was at that point the deputy
9 director of USCIS.  Subject:  Update on National Name
10 Check Program.
11     A  Yes, sir.
12     Q  I want to direct your attention,
13 Mr. Cannon, to Bates stamp FBI1107, which is the
14 third page.  And paragraph, in particular, that I
15 wanted you to review is the third bulleted item.
16     A  Yes, sir.
17     Q  I want -- I had earlier quoted from the
18 second sentence which says, "FBI information
19 technology personnel are currently running reports to
20 examine the effect of eliminating FBI file reference
21 checks with the exception of national security checks
22 during the name check process.  The results of the

Page 186

1 reports will be provided to USCIS management in order
2 to assist in a joint risk analysis regarding this
3 approach."
4      A  Yes, sir.
5      Q  So you are familiar with these reports
6 that are being run?
7      A  Yes, sir, I am.
8      MR. LEVINE:  Has this been marked as an
9 exhibit?
10      THE WITNESS:  Yes, sir.  Exhibit 10.
11      BY MR. CHIN:
12      Q  What can you tell me about those reports
13 in efforts to consider the possibility of eliminating
14 file reference checks.
15      A  What we do before making any adjustments
16 to the filters is run a check or have ITOD run to see
17 what effect it would have as far as eliminating this
18 field of file classifications or whatever -- whatever
19 field we determine it to be.  What that does is it
20 will give you the results of things that are
21 currently in the system, how many will drop out, and
22 that helps form the basis of a risk analysis.  If the

Page 187

1 effect would be to drop out 200 files -- if the
2 effect would be to where 200 name checks will drop
3 off after implementing this type of approach, then
4 that would be weighed with what would be the
5 possibility of the risk associated with that.  If the
6 effect would be to drop off a larger number, then our
7 risk analysis would have to be done by USCIS.
8      Q  So this is part of the risk-based approach
9 that we were -- I was asking about earlier?
10      A  Yes, sir, which is all part of the
11 filtering process, as I mentioned earlier.  We're
12 continuing to review and update the filtering
13 process.
14      Q  And am I understanding that the filtering
15 process is essentially an electronic process -- or
16 one of the filters is?
17      A  Yes.  The mega filter is one that is set
18 up to run in the batch process.
19      Q  And that's the first stage of the --
20      A  Yes, sir.
21      Q  So am I understanding that they are here
22 contemplating the possibility or the risk assessment

Page 188

1 of getting rid of reference file checks, except for
2 the one key check it seems, going forward?  Is that
3 what I understand this to say?
4      A  That is one of the options that was being
5 looked at, yes.
6      Q  Did you participate in those discussions
7 about this option?
8      A  As far as --
9      Q  Getting rid of the whole reference check
10 search?
11      A  You have stated that this is a result of
12 getting rid of all reference checks.
13      Q  For USCIS.
14      A  That's not what this says.
15      Q  I'm sorry.  This is a memo from your boss
16 to USCIS.  If you want to correct me, that's fine.  I
17 wasn't sure if this was in reference to addressing a
18 concern that was raised by USCIS or not.
19      Are you telling me then this is, across
20 the board, all customers?
21      A  No, sir.  No, sir.  The effect of
22 eliminating FBI file reference checks, with the

Page 189

1 exception of national security checks -- in other
2 words, there are a group of reference checks that
3 would still be performed for USCIS.  So the result
4 would not be to eliminate all reference checks for
5 USCIS.  That's what I'm saying.
6      Earlier you had indicated the study to
7 "all reference checks."  No, that's not what this is.
8 Again, what this is is looking at are there ways in
9 which we can adjust the filters to more so
10 streamline --
11      Q  To narrow the search basically?
12      A  Yes, sir.
13      Q  Sounds to me like a great idea.  Why
14 wasn't that considered much earlier?
15      MS. REDDY:  Objection to form.
16      THE WITNESS:  Define "much earlier."
17      BY MR. CHIN:
18      Q  Okay.  Maybe three years ago, two years
19 ago, five years ago.  That's earlier, I think.
20      A  Well, it was looked at -- considered in
21 the first part, looking at reducing the files to
22 review in the early part of 2007, which was -- the

Page 190

1 result initially was a super filter. So this type of
2 approach was being looked at at that point in time.
3 Again, we are very cautious as far as how we approach
4 the filtering process because what we don't want to
5 do, obviously, is filter out things that are going to
6 be essential for national security.
7    Q Have you completed the response? I'll ask
8 you the next question.
9    A To the question? Yes, sir.
10    Q Okay. The exception referred to here,
11 national security checks, do I understand that to be
12 an electronic set of checks or is that, in fact, part
13 of the reference files manual search process?
14    A National security checks, what that refers
15 to is categories of files which would contain
16 information that would affect national security.
17    Q But that would be electronically
18 identified?
19    A I'm not sure I understand the question,
20 sir. I'm sorry.
21    Q I'm thinking this is part of the batch
22 process, correct, in the very first phase; is that

Page 191

1 correct?
2    A That's correct.
3    Q Where the filter this refers to is
4 applied. And so this issue of not excluding the
5 national security checks, does that refer to the
6 files that are being filtered out or not filtered out
7 electronically?
8    A Yes.
9    Q So in other words, through the batch
10 process, there should be a way to electronically
11 identify national security risks, correct?
12    MS. REDDY: Objection to form.
13    BY MR. CHIN:
14    Q Did you understand my question?
15    A I think I did, but please restate it. I
16 want to make sure I give you the right answer.
17    Q Sure. The batch process, which is the
18 beginning point, if I understand it, it's where you
19 have the electronic files and tapes with all the
20 various names and then that gets uploaded into your
21 UNI database or what have you, the mainframe. When
22 they do that --

Page 192

1    A No, sir.
2    Q No?
3    A No, sir.
4    Q Okay. Then I have misunderstood. When
5 would this national security check occur and how --
6    A The batch process is the electronic check
7 with the UNI database.
8    Q Okay.
9    A The index of the names.
10    Q Right.
11    A The files could be, again, under ACS,
12 could be available Electronic Case File or in
13 paper-based forms or things like that. But the batch
14 process is a check of UNI.
15    Q So when does this national security check
16 process occur?
17    A It would be right -- it would be -- as the
18 files are identified in UNI -- as names in UNI are
19 associated with files. In other words, a name is run
20 in UNI on Michael Cannon, there's five hits on five
21 files. What the filtering process does, it
22 identifies categories of files that would be filtered

Page 193

1 out. In other words, those files would be designated
2 as files that would be filtered out.
3    Q And by filtering out, we're talking about
4 a mechanical automatic process?
5    A It would be an automatic process to where
6 an analyst would get a list or look at a name check
7 on Mike Cannon with, say, five files, five hits
8 associated with five files, and the files that would
9 be filtered out would be flagged as files that would
10 be filtered out, which would mean the analyst would
11 not be required to pursue information in those files.
12    Q In terms of -- let's just say that there's
13 a file of poker champion winners for the last
14 20 years -- maybe more realistic.
15    Can you give me a file that would not be a
16 national security type file?
17    MS. REDDY: Objection.
18    MR. CHIN: Let me ask it differently.
19    BY MR. CHIN:
20    Q The national security checks, I
21 understand, would contain certain classifications of
22 files; is that correct?

Page 194

1    A  Yes.

2    Q  And then other classifications of files
3  are being weeded on a risk-based approach?

4    A  Yes.

5    Q  Because there's a determination that they
6  won't capture anything of worth --

7    A  That is correct.

8    Q  -- for the process?  Did that require an
9  assessment report of some sort?

10    A  I'm not sure I understand that question,
11  sir.

12    Q  To make a determination as to what files
13  are not worth keeping and what files should remain in
14  the filter, so to speak, was there some study that
15  occurred -- some analysis that occurred to inform you
16  about that?

17    A  With the super filter, we met with USCIS
18  routinely and went over specific files and
19  classifications to ensure CIS understood what the
20  file consisted of.  In other words, a hit on this
21  file would result in this type of information.  If
22  this file was filtered out, this particular file,

Page 195

1  type of classification, then this is the type of
2  information CIS would not be getting.  And working
3  with CIS, could they make a determination whether or
4  not this information was needed for an adjudication
5  routinely for their name checks.

6    Q  Are you aware of the Office of Inspector
7  General's report that I alluded to earlier, which
8  appears to say that you have a filter -- and maybe
9  not this particular filter, but you have some search
10  tools that result in a higher level of false
11  positives and false negatives when you're doing the
12  name matching.  Are you familiar with that criticism?

13    A  Yes, sir.

14    Q  Do you believe it's accurate?

15    A  That is the criticism regarding the
16  algorithm that is used in the name check process.
17  There has not been a specific study, as the Inspector
18  General's Office pointed out, to determine whether or
19  not -- the Bureau has not performed a study on the
20  algorithm to determine whether or not there is a high
21  level of false positives and false negatives.  There
22  are --

Page 196

1    Q  There appear to be academic reports
2  about -- I seem to remember some citations in that
3  Inspector General's Report about the algorithm
4  problem.

5    A  Yes, sir.

6    MS. REDDY:  Is that a question?

7    BY MR. CHIN:

8    Q  I'm sorry.  Are you familiar with those
9  reports?

10    A  Yes, I am familiar with the reference to
11  those reports.

12    Q  But you have not consulted the actual
13  reports?

14    A  I've read the actual reports, yes.

15    Q  And what do you make of those reports?

16    A  The reports were an analysis of the
17  Soundex algorithm, which is the algorithm that was
18  used by the FBI in its Name Check Program.

19    Q  That is also currently being used by
20  the --

21    A  That's correct.

22    Q  I understand that -- is it your

Page 197

1  understanding that the Soundex tool or program is
2  based on an algorithm from the 1900s?  Is that your
3  understanding, the reports or --

4    A  1900 or 1999?

5    Q  I'm not clear.

6    A  My understanding, the Soundex technology
7  is older technology.

8    Q  Is old technology?

9    A  Older technology.  Our Information
10  Technology Branch is looking at that in accordance
11  with the recommendations made by the Inspector
12  General.  I'm not an IT expert, so I can't comment on
13  the studies in a professional manner.

14    Q  If it were determined that, you know, you
15  received information that that Soundex technology has
16  got to go, it's just old and antiquated and it's just
17  contributing to the delays or the processing -- the
18  higher level of false negatives or false positives,
19  would that be something that would cause you to make
20  a request to get rid of the Soundex and get something
21  else in its place?

22    MS. REDDY:  Objection to form.

Page 198

1      BY MR. CHIN:
2      Q  If you understand the question, you can
3  answer.
4      A  I do understand the question.  Our
5  Information Technology Branch, folks in concert with
6  the Records and Management Division, Business
7  Operations Supporting Unit, and my name check folks
8  are looking at algorithm and possible options to
9  replace the algorithm.  That is an ongoing process.
10      Q  As far as you know, is there any
11  off-the-shelf, so to speak, software or tool that
12  could be used?
13      A  As far as the algorithm, I do not know.
14      MR. CHIN:  I think that I'm nearing -- I
15  may have one last question to ask you.  Bear with me.
16      BY MR. CHIN:
17      Q  Are there any vacancies currently on your
18  full-time staff in the Name Check Program that handle
19  the CIS requests?
20      A  Yes, sir.
21      Q  How many vacancies?
22      A  Approximately 20.  Maybe 20 or 25.

Page 199

1      Q  And the total number, as far as you know,
2  in terms of the current staffing levels at your
3  program dealing with the USCIS checks?
4      A  55 FBI personnel.
5      Q  Full-time?
6      A  Full-time personnel, approximately 273 or
7  275 contractors approximate -- again, contractors can
8  come and go on a daily basis, and USCIS will end up
9  with 290 total.
10      Q  And these are all working on the USCIS
11  name checks?
12      A  Yes, sir, that is correct.
13      Q  And I take it -- would there be a shortage
14  of analysts then that are handling the USCIS desk or
15  the files?
16      A  A shortage in that we -- I, my section,
17  recently got approval to increase our staffing
18  levels.  So I'm now able to hire more people.  So
19  when I was able to increase my staffing levels, I had
20  some vacancies I could now fill within the USCIS
21  desk.
22      Q  And when was that approval given?

Page 200

1      A  Within the last two months or so.  Two or
2  three months.
3      Q  Would that be a departure or something
4  different from what the business plan calls for?
5      A  The business plan actually references it.
6      Q  Why would you have to receive approval two
7  months ago for that?
8      A  Because my FSL, my funding staffing level,
9  even though it was reimbursable, was set at a
10  particular number, which was 124.  It's now been
11  increased to 205.  So now that allows me to hire the
12  people and bring them on board.
13      Q  And these are for the overall processing
14  of name checks, not just limited to those processing
15  CIS --
16      A  That is correct.  The 205 is my entire
17  section of FSL.
18      Q  I think my last question to you, sir,
19  is -- take a look at the business plan once again, if
20  you can.  I want you to take a look at the
21  second -- the signatory page, I believe it's on
22  page 2.  I believe it's in the first full paragraph,

Page 201

1  and it says, "Because the steps required to meet
2  these goals require commitment from both the FBI and
3  USCIS, the FBI's Records Management Division National
4  Name Check Program is seeking executive management
5  concurrence with the plan from the FBI and the
6  USCIS."  Do you see that?
7      A  Yes, sir, I do.
8      Q  What does that mean, getting or needing
9  concurrence from the executive management of both
10  agencies?
11      A  Give me one second, please.
12      Q  Sure.
13      A  What that means is, as laid out in the
14  business plan, to meet our goals, certain things had
15  to happen.  One was the additional 15 million dollars
16  coming in from USCIS.  We had to get a commitment
17  from them that the money was going to be transferred
18  to us so it could use it as laid out in the business
19  plan.
20      (Simultaneous conversation.)
21      BY MR. CHIN:
22      Q  That was the spending plan, right?

Page 202

1    A  We had to get a commitment from CIS
2  signing this that the money was going to be coming
3  our way.  We also had to get approval at the higher
4  level that these milestones are sufficient.  In other
5  words, yes, FBI, we agree, we're alongside of you,
6  but these are good milestone.  They're aggressive,
7  they're reachable.  We agree from the top down as
8  your customer that this is the route we want to go.
9        With the Bureau, we had to make sure that
10  Associate Deputy Director Tim Murphy signed it, which
11  would mean if I have any problems, funding in my
12  staff, as far as the increase in reimbursables, if
13  folks get hung up in the background process of the
14  Bureau, we can go to him and he can say, okay, this
15  portion of the Bureau, you guys need to do what you
16  need to do to address the name check section so they
17  can get these people on board so they can get to
18  where they are a steady state.
19        Our finance folks within the Bureau are
20  involved in handling the transfer of money from the
21  FBI -- I mean, from the USCIS to the FBI.  They
22  needed to make sure that once the money was

Page 203

1  transferred, it was expeditiously put into our
2  accounts where we could spend it.  We have
3  contractors that work for us.  My section doesn't
4  handle contract law or contracts per se, that's
5  handled by the contract portion of our finance
6  division.  They have to be on board that, yes, this
7  is a priority.  We understand these contractors are
8  out here.  We will push the contracting companies to
9  produce contractors in accordance with your plan.
10        Point is, there are a lot of things that
11  have to come to fruition outside the Name Check
12  Program section and the Records Management Division
13  for this to work.  So essentially, it was making sure
14  everyone was on board.  And by the signatures of the
15  folks at this level, it ensures that they understand
16  what our needs are and that they're willing to say,
17  yes, we're with you and we'll go forth.
18    Q  So prior to this being executed, would it
19  be fair to say that there was not that concurrence
20  that was the kind of commitment that was needed in
21  order for your program to succeed and to reach its
22  performance goals?

Page 204

1    A  No.  I don't think that that would be a
2  fair statement because the Bureau has been supportive
3  of what we've needed in the past.
4    Q  I do understand that you testified in your
5  prior deposition that you had made one or two
6  requests for hiring new staff, but that was turned
7  down?
8    A  Yes, sir, that is correct.
9    Q  In two successive years.  So knowing what
10  you experienced in those two years, would this -- I
11  mean, would you say that there was a lack of -- I
12  guess the question is lack of focus or coordination?
13    A  No.  I can't say that, based upon the
14  facts you just stated.  We submit our requests, as
15  does all the other components of the Bureau, and the
16  Bureau has a balancing test across the board to make
17  decisions that it deems in the Bureau's interests
18  overall.  I wouldn't say that, no, sir.
19        MR. CHIN:  I think I have no other
20  questions.
21        Do you have any?
22        MR. LEVINE:  No.

Page 205

1        MR. CHIN:  I want to thank you all for
2  coming today and, Mr. Cannon, for taking your
3  valuable time from the important work that you are
4  doing at the Bureau.
5        THE WITNESS:  Thank you, sir.
6        MR. CHIN:  And I appreciate very much the
7  forthright responses you have given to me.
8        Ms. Reddy, I reserve, of course, the
9  opportunity to maybe ask that someone from the
10  Bureau, if it's necessary, to return for a second
11  deposition.  Maybe it wouldn't be Mr. Cannon, but I
12  know that there are a lot of documents that were just
13  recently supplied by your office just yesterday.  So
14  I think that was an understanding that we had
15  negotiated by letter that there may be a possibility
16  that some of the 30(b)(6) topics might need be to
17  answered.  But at this point, I'm not sure that's the
18  case.  I just wanted to apprize you of that
19  reservation.
20        MS. REDDY:  And you knew that we would
21  object to that.  We had informed you of an
22  alternative date in order to give you the opportunity

Page 206

1 to review those documents prior to the deposition,
2 and you understood that and insisted on the
3 deposition today. If the need arises, we can address
4 that more fully later.
5       MR. CHIN: Okay. Thank you very much.
6       MS. REDDY: Can we take a short break
7 before we --
8       MR. CHIN: Conclude?
9       MS. REDDY: Yes.
10      MR. CHIN: Okay. Let's go off the record.
11      (Off the record.)
12      MS. REDDY: We have no questions.
13      (Off the record.)
14      MR. CHIN: We're simply finishing up,
15 indicating for the record which exhibits are subject
16 to protective order and, therefore, must be treated
17 under seal. Exhibit 10 -- I'm sorry it's not going
18 in order here, Exhibit 10, Exhibit 6 --
19      MS. REDDY: Can you just identify those as
20 you read them just for myself?
21      MR. CHIN: Sure. Exhibit 10 is the
22 January memo FBI1105, et cetera, through 1108. FBI

Page 207

1 Exhibit 6 starts at FBI CannonE1220 through 221. FBI
2 Exhibit 2, which is FBI Cannon E1232. It's the
3 February 27th, 2008 e-mail from Michael Cannon to
4 unknown. And we have FBI Exhibit 5, which is FBI
5 Cannon E1141, which is also an e-mail from Cannon
6 dated April 1st, 2008 to Timothy Murphy.
7       That's all I have.
8       (Signature having not been waived, the
9 deposition of MICHAEL CANNON concluded at
10 4:34 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 208

1       ACKNOWLEDGEMENT OF DEPONENT
2       I, MICHAEL CANNON, do hereby acknowledge that
3 I have read and examined the foregoing testimony, and
4 the same is a true, correct, and complete
5 transcription of the testimony given by me and any
6 corrections appear on the attached Errata sheet
7 signed by me.
8
9
10
11 _____   _____
12  (DATE)              (SIGNATURE)
13
14
15
16
17
18
19
20
21
22

Page 209

1  CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2       I, Sarah M. Bickel, commissioned as Sarah
3 Marie Harple, the officer before whom the foregoing
4 proceedings were taken, do hereby certify that the
5 foregoing transcript is a true and correct record of
6 the proceedings; that said proceedings were taken by
7 me stenographically and thereafter reduced to
8 typewriting under my supervision; and that I am
9 neither counsel for, related to, nor employed by any
10 of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 27th day of
14 June, 2008.
15
16 My commission expires:
17 August 31, 2009
18
19
20 _____
21 NOTARY PUBLIC IN AND FOR THE
22 DISTRICT OF COLUMBIA

Page 210

1    E R R A T A   S H E E T

2    IN RE:  Milanes, et al.  V. Chertoff, et al.

3  RETURN BY:_____

4  PAGE        LINE        CORRECTION AND REASON

5  ____        ____        _____

6  ____        ____        _____

7  ____        ____        _____

8  ____        ____        _____

9  ____        ____        _____

10 ____        ____        _____

11 ____        ____        _____

12 ____        ____        _____

13 ____        ____        _____

14 ____        ____        _____

15 ____        ____        _____

16 ____        ____        _____

17 ____        ____        _____

18 ____        ____        _____

19 ____        ____        _____

20 ____        ____        _____

21 _____        _____

22 (DATE)              (SIGNATURE)

Page 211

1    E R R A T A   S H E E T   C O N T I N U E D

2    IN RE:  Milanes, et al.  V. Chertoff, et al.

3  RETURN BY:_____

4  PAGE        LINE        CORRECTION AND REASON

5  ____        ____        _____

6  ____        ____        _____

7  ____        ____        _____

8  ____        ____        _____

9  ____        ____        _____

10 ____        ____        _____

11 ____        ____        _____

12 ____        ____        _____

13 ____        ____        _____

14 ____        ____        _____

15 ____        ____        _____

16 ____        ____        _____

17 ____        ____        _____

18 ____        ____        _____

19 ____        ____        _____

20 ____        ____        _____

21 _____        _____

22 (DATE)              (SIGNATURE)

# EXHIBIT C

29

1    provides that provided no other derogatory

2    information exists from any other name check or

3    biometric check source and provided that the case is

4    otherwise approvable, the case may be taken to

5    adjudicated conclusion and approved subject to

6    rescission or revocation at a later date if adverse

7    information is subsequently discovered through the

8    name check process.

9          MR. YALEN:  I'm going to object -- or ask

10   you to stop at this point.

11         THE WITNESS:  Yeah.

12         MR. YALEN:  The question of the 2008 change

13   to the LPR policy is topic No. 9, not topic No. 10,

14   and that has been or should have been addressed with

15   Mr. Aytes.  So that's outside the scope of

16   discussion today.

17   BY MR. PARKIN:

18      Q    Okay.  Mr. Smith, you mentioned the May

19   2008 target milestone that's mentioned in the news

20   release.

21      A    Mm-hmm.

22      Q    Has that milestone been met?

DEPOSITION OF GREGORY B. SMITH - 7/2/08
**CONFIDENTIAL PORTION REDACTED**

30

1      A      It has been substantially met.

2      Q      And what do you mean by substantially?

3      A      There are a handful of outlier cases that

4  reflected as closed in one system and not closed in

5  another system, and those are in the process of

6  being reconciled presently.

7      Q      And by a handful, could you just give an

8  approximation?

9      A      Oh, we're -- we're talking 40, 50 cases

10  total, and that includes a wide variety of different

11  types of cases.

12      MR. YALEN:  Meaning naturalization plus

13  other?

14      MR. PARKIN:  Plus other.  Plus other.

15  BY MR. PARKIN:

16      Q      Thanks.

17      A      Plus waiver cases and in some -- I'll give

18  you an example.  In -- in one -- two cases one is

19  reflected as closed back in 2004 in FBI records and

20  it was not reflected as closed in -- in 2004 or

21  subsequently in USCIS systems, and so we're going --

22  we've just completed the first step of a

DEPOSITION OF GREGORY B. SMITH - 7/2/08
**CONFIDENTIAL PORTION REDACTED**

33

1    to beat some target dates.  In which case, we would

2    shift the time line to make the end state goal more

3    readily achieved or earlier achieved.

4        Q    And do you know whether FBI is on pace to

5    meet the June 2009 goal as of today?

6        A    They are.

7        Q    How do you know?

8        A    I track their numbers on a biweekly basis

9    and get a complete report of where they are.  I also

10   track the numbers that are retained within the USCIS

11   system of records, which is FBI QUERY, and I look at

12   what the two number sets are for the same time

13   periods, and on the basis of that I can calculate

14   whether or not we're on target.

15       MR. YALEN:  So we're clear on terms, the

16   plaintiffs are familiar with the FBI QUERY is linked

17   to the data contained in CLAIMS 4 or accessed

18   through CLAIMS 4; is that right?

19       THE WITNESS:  For citizenship, yes.

20   BY MR. PARKIN:

21       Q    Okay, thank you.

22       MR. YALEN:  That's all capitals,

DEPOSITION OF GREGORY B. SMITH - 7/2/08
**CONFIDENTIAL PORTION REDACTED**

121

1    decisions, that will obviously involve FBI data and

2    agreement in access to that data by the contractor

3    so, yes, to that extent.

4         Q    And has CIS conducted a study of the

5    utility of the name check since 2002?

6              MR. YALEN:  Objection, vague.

7              THE WITNESS:  CIS has been repeatedly

8    undertaking snapshot assessments of where we're

9    getting lead information, derogatory information on

10   applicants, and the FBI name check is one of the

11   fundamental sources.  It's a source that isn't

12   repeated in other places between 40 and 80 percent

13   of the time depending on the snapshot taken over

14   the -- over the five or six snapshots that have been

15   taken.  It's a unique source of information.

16   BY MR. PARKIN:

17        Q    Do you know if those snapshots have been

18   produced in this litigation?

19             MR. YALEN:  We've produced to you those

20   that we're aware of.  I believe by snapshots,

21   Mr. Smith may be referring to some of the things

22   we've looked at this morning, some of the materials

# EXHIBIT D

1                          P. Khatri

2          A.    Yes, in July, late July of 2003.

3          Q.    And you left that employment in February?

4          A.    February 29th was my last day.  I guess,

5    from a record standpoint, I think March 1st was

6    technically the last day, which was a Saturday, which

7    was the end of the --

8          Q.    Pay period?

9          A.    -- pay period.

10          Q.    In 2008?

11          A.    Yes.

12          Q.    Other than your time as CIS Ombudsman,

13    have you ever worked for the government, the federal

14    government?

15          A.    No.  Other than in a -- I guess I had at

16    one point a civil -- what do you call it?  There was

17    an advisory board on immigration-related employment

18    practices.  I believe that was state, though.  But it

19    was connected to the federal thing when it first came

20    up.  I was on an advisory board.  I can't recall

21    exactly what the name was.

22          Q.    When was that approximately?

23          A.    It was sometime in the late '80s, I

24    believe.  But that was just -- it wasn't a formal.  It

25    was more of being on an advisory board.  I attended a



**Tankoos Reporting**

516.741.5235    212.349.9692    888.242.DEPO(3376)
Toll Free Fax: 800.337.6769
www.tankoos.com

142 Willis Avenue
Mineola, NY 11501

305 Madison Avenue
New York, NY 10165