UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VIRGINIA MILANES, OMAR MIGUEL FARFAN,
MANUEL ALBERTO MARTINEZ, ANDRES
GIOVANNY SANCHEZ, NANCY CASTRO, and
MARGOTH PEREZ DE CHALAMPA, on behalf of
themselves and all other similarly situated individuals,

              Plaintiffs,

    -against-

MICHAEL CHERTOFF, in his official capacity as
Secretary of the Department of Homeland Security,
EMILIO GONZALEZ, in his official capacity as
Director of the United States Citizenship and
Immigration Services, ANDREA QUARANTILLO,
in her official capacity as District Director of the
New York City District of the United States
Citizenship and Immigration Services,
MICHAEL B. MUKASEY, in his official capacity as
Attorney General of the United States, and
ROBERT S. MUELLER, III, in his official capacity as
Director of the Federal Bureau of Investigation,

              Defendants.
-------------------------------------------------------------------X

08 CV 2354

(ECF CASE)

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTIONS FOR PRELIMINARY INJUNCTION, CLASS CERTIFICATION AND EXPEDITED DISCOVERY

    Plaintiffs Virginia Milanes, Omar Miguel Farfan, Manuel Alberto Martinez,

Andres Giovanny Sanchez, Nancy Castro, and Margoth Perez de Chalampa, on behalf of

themselves and all other similarly situated individuals, submit this memorandum of law

in support of their motions for a preliminary injunction, class certification and expedited

discovery.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATUTORY AND REGULATORY SCHEME ........................................ 3

I.    The Immigration And Nationality Act ........................................... 3

II.    The Administrative Procedure Act ............................................... 4

STATEMENT OF FACTS ..................................................................... 5

I.    Named Plaintiffs .......................................................................... 5

II.    The Naturalization Application Process ....................................... 6

    A.    Criminal Background Checks ............................................. 7

    B.    IBIS/TECS Checks Are Instituted In 2002 ........................ 8

    C.    The FBI Name Check Requirement Changed In 2002 ........ 8

    D.    The 2007 Increase In Naturalization Application Fees......... 12

ARGUMENT ...................................................................................... 14

I.    Plaintiffs Are Entitled To A Preliminary Injunction...................... 14

    A.    Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief ...................... 14

        1.    Injunctive relief is necessary to avoid massive disenfranchisement........ 15

        2.    Injunctive relief is necessary to avoid widespread deprivation of unique citizenship benefits....................... 16

    B.    Plaintiffs Are Likely To Prevail On The Merits Of Their Claims ...................... 19

        1.    Plaintiffs are likely to prevail on the merits of their claims that Defendants are violating the APA and the INA by requiring the completion of an FBI name check before adjudicating the naturalization applications of Plaintiffs .................. 19

            a.    The FBI name check may not be used to withhold or delay action on Plaintiffs' naturalization applications because USCIS failed to comply with section 553 of the APA when implementing the new name check requirement ....................... 21

                (i)    USCIS was required to provide notice of, and an opportunity to comment on, the 2002 Rule because it was a "legislative" not "interpretative" rule ................ 21

                (ii)    There is no "adequate legislative basis" supporting implementation of the 2002 Rule.................... 22

                (iii)    The 2002 Rule effectively amended the prior legislative rule................................................. 26

        2.    Defendants have "unreasonably delayed" adjudication of the naturalization applications of Plaintiffs in violation of the APA............. 28

## TABLE OF CONTENTS
### (continued)

**Page**

|   |   |   |   |
|---|---|---|---|
|   | 3. | USCIS has "unlawfully withheld" adjudication of the proposed sub-class members' naturalization applications in violation of 8 U.S.C. § 1447(b) and 8 C.F.R. § 335.3 and 5 U.S.C. § 555(b) | 32 |
|   | 4. | FBI has unreasonably delayed completion of FBI name checks for naturalization applicants | 34 |
| C. | | The Balance Of Hardships Tips Decidedly In Plaintiffs' Favor | 35 |
| II. | | The Proposed Class And Sub-class Should Be Certified | 38 |
| A. | | The Proposed Class And Sub-class Satisfy The Requirements Of Rule 23(a) | 38 |
|   | 1. | The class and sub-class are so numerous that joinder of all class and sub-class members is impracticable | 39 |
|   | 2. | There are questions of law and fact common to the class and sub-class | 41 |
|   | 3. | The claims of the named plaintiffs are typical of the claims of the members of the proposed class and sub-class | 43 |
|   | 4. | The named plaintiffs will fairly and adequately protect the interests of the members of the proposed class and sub-class | 46 |
| B. | | The Class And Sub-class Satisfy The Requirements Of Rule 23(b)(2) | 47 |
| C. | | Plaintiffs Are Entitled To Discovery On Class Certification | 48 |
| III. | | Plaintiffs Are Entitled To Expedited Discovery Related To The Preliminary Injunction Motion | 49 |
| CONCLUSION | | | 50 |

# TABLE OF AUTHORITIES

## FEDERAL CASES

Al-Farisi v. Mueller, 492 F. Supp. 2d 335 (S.D.N.Y. 2007) ..............................................33

Alhamedi v. Gonzales, No. 07 Civ. 2541 (JGK), 2007 WL 1573935 (S.D.N.Y. May 30, 2007)..........................................................................................18, 34

Alkeylani v. Department of Homeland Sec., 514 F. Supp. 2d 258 (D. Conn. 2007) ........30

Alomari v. Keisler, No. 07 Civ. 628 (RMB), 2007 WL 3255004 (S.D.N.Y. Nov. 1, 2007) ..................................................................................................................33

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997) ..........................................39, 47

American Mining Congress v. Mine Safety & Health Administration, 995 F.2d 1106 (D.C. Cir. 1993) ......................................................................................22

Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52 (2d Cir. 2000) ...............46

Biodiversity Legal Foundation v. Badgley, 309 F.3d 1166 (9th Cir. 2002).....................32

Blaser v. Bessemer Trust Co., No. 01 Civ. 11599, 2002 WL 31359015 (S.D.N.Y. Oct. 21, 2002) ....................................................................................................26

Bondarenko v. Chertoff, No. 07-mc-0002, 2007 WL 2693642 (W.D.N.Y. Sept. 11, 2007) ..........................................................................................................29

Borromeo Escaler v. USCIS, No. 03 Civ. 8418 (BSJ), 2007 WL 1975485 (S.D.N.Y. July 6, 2007) ......................................................................................33

Brock v. Pierce County, 476 U.S. 253 (1986) ...................................................................28

Brown v. Giuliani, 158 F.R.D. 251 (E.D.N.Y. 1994)...........................................43, 45, 46

Caminetti v. United States, 242 U.S. 470 (1917)................................................................25

Campos v. INS, 70 F. Supp. 2d 1296 (S.D. Fla. 1998)................................................15, 35

Capital Real Estate Investors Tax Exempt Fund Ltd. Partnership v. Schwartzberg, 917 F. Supp. 1050 (S.D.N.Y. 1996)..................................................................35

Comer v. Cisneros, 37 F.3d 775 (2d Cir. 1994).................................................................47

Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473 (2d Cir. 1995) ..................35

Cortigiano v. Oceanview Manor Home for Adults, 227 F.R.D. 194 (E.D.N.Y. 2005) ........................................................................................................44

Dabone v. Thornburgh, 734 F. Supp. 195 (E.D. Pa. 1990)................................36

Daraji v. Monica, No. 07-1749, 2008 WL 183643 (E.D. Pa. Jan. 18, 2008)...................31

Eldeeb v. Chertoff, No. 8:07-CV-236-T-17EAJ, 2007 WL. 2209231 (M.D. Fla. July 30, 2007)........................................................................................29

Escalera v. New York City Housing Authority, 425 F.2d 853 (2d Cir. 1970) .................41

Folsom v. Blum, 87 F.R.D. 443 (S.D.N.Y. 1980) ........................................................40, 41

Forest Guardians v. Babbitt, 164 F.3d 1261 (10th Cir. 1998) ...............................32, 33, 34

Garcia v. Teitler, 443 F.3d 202 (2d Cir. 2006) ..................................................25

German v. Federal Home Loan Mortgage. Corp., 885 F. Supp. 537 (S.D.N.Y. 1995) ........................................................................................................39, 40

Green Party of New York State v. New York State Board of Elections, 389 F.3d 411 (2d Cir. 2004)..............................................................................35

Gulino v. Board of Education of City Sch. District of New York, 201 F.R.D. 326 (S.D.N.Y. 2001)....................................................................................44

Haskins v. Stanton, 794 F.2d 1273 (7th Cir. 1986) ....................................................35, 36

Health Insurance Association of America, Inc. v. Shalala, 23 F.3d 412 (D.C. Cir. 1994) ........................................................................................................22

Heerwagen  v. Clear Channel Commc'ns, 435 F.3d 219 (2d Cir. 2006) ..........................49

In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir. 1992) ......................46

Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438 (2d Cir. 1977)...................35

Kamean v. Local 363, 109 F.R.D. 391 (S.D.N.Y. 1986)....................................................43

Kim v. Ashcroft, 340 F. Supp. 2d 384 (S.D.N.Y. 2004) ........................................28, 29, 32

Latino Officers Association of New York v. City of New York, 209 F.R.D. 79 (S.D.N.Y. 2002)....................................................................................45

Liang v. Attorney General of United States, No. C-07-2349 CW, 2007 WL 3225441 (N. D. Cal. Oct. 30, 2007)............................................................29

Lovely H. v. Eggleston, 235 F.R.D. 248 (S.D.N.Y. 2006)................................................47

Marisol A. v. Giuliani, 126 F.3d 372 (2d Cir. 1997) ........................................41, 43, 45, 46

Mocanu v. Mueller, No. 07-445, 2008 WL 154606 (E.D. Pa. Jan. 11, 2008)..................48

Mocanu v. Mueller, No. 07-445, 2008 WL 238443 (E.D. Pa. Jan. 25, 2008)..................48

Mocanu v. Mueller, No. 07-445, 2008 WL 372459 (E.D. Pa. Feb. 8, 2008) ........... passim

NAACP v. Town of E. Haven, 70 F.3d 219 (2d Cir. 1995) ..............................................14

Natural Resources Defense Council v. Fox, 93 F. Supp. 2d 531 (S.D.N.Y. 2000)...........31

Natural Resources Defense Council v. Abraham, 355 F.3d 179 (2d Cir. 2004) ..............22

Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004)......................................28, 29

Norwalk CORE v. Norwalk Redev. Agency, 395 F.2d 920 (2d Cir. 1968) .....................41

Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340 (1978)................................................49

Perales v. Sullivan, 948 F.2d 1348 (2d Cir. 1991)............................................................27

Port Authority Police Benevolent Association v. Port Authority of N.Y. & N.J., 698 F.2d 150 (2d Cir. 1983)........................................................................41

Reddy v. Commodity Futures Trading Commission, 191 F.3d 109 (2d Cir. 1999)..........30

Reynolds v. Giuliani, 118 F. Supp. 2d 352 (S.D.N.Y. 2000) .....................................40, 41

Robidoux v. Celani, 987 F.2d 931 (2d Cir. 1993) ..........................................39, 40, 41, 44

Robinson v. Metropolitan-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001) ..............................................................................................44, 47

Shapiro v. Cadman Towers, Inc., 51 F.3d 328 (2d Cir. 1995)..........................................14

Sirota v. Solitron Devices, Inc., 673 F.2d 566 (2d Cir. 1982) ..........................................39

Standard Investment Chartered, Inc. v. National Association of Securities Dealers, Inc., No. 07 Civ. 22014, 2007 WL 1121734 (S.D.N.Y. Apr. 11, 2007) ......................................................................................................................50

v

Sweet v. Shearhan, 235 F.3d 80 (2d Cir. 2000)....................................................................22

Tang v. Chertoff, 493 F. Supp. 2d 148 (D. Mass. 2007) .....................................................31

Telecommunications Research and Action Center v. FCC, 750 F.2d 70 (D.C. Cir.1984) ..........................................................................................................................31

Time Warner Cable of New York City v. Bloomberg L.P., 118 F.3d 917 (2d Cir. 1997) ..................................................................................................................................14

Truax v. Raich, 239 U.S. 33 (1915)......................................................................................17

Tummino v. Von Eschenbach, 427 F. Supp. 2d 212 (E.D.N.Y. 2006)..............................31

Tunick v. Safir, 209 F.3d 67 (2d Cir. 2000) .......................................................................14

Walji v. Gonzales, 500 F.3d 432 (5th Cir. 2007)................................................................33

White v. Shalala, 7 F.3d 296 (2d Cir. 1993) .......................................................................22

Withrow v. Concannon, 942 F.2d 1385 (9th Cir. 1991)......................................................35

Yu v. Brown, 36 F. Supp. 2d 922 (D.N.M. 1999) ..............................................................29

Zagrebelny v. Frazier, No. 07-1682 (PAM), 2008 WL. 624072 (D. Minn. Mar. 4, 2008) ..........................................................................................................................17, 18

Zaranska v. U.S. Department of Homeland Sec., 400 F. Supp. 2d 500 (E.D.N.Y. 2005) ..................................................................................................................................18

Zhu v. Chertoff, 525 F. Supp. 2d 1098 (W.D. Mo. 2007) ..................................................32

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 551.................................................................................................................5, 21

5 U.S.C. § 552...................................................................................................................27

5 U.S.C. § 553 ............................................................................................................. passim

5 U.S.C. § 555.............................................................................................................. passim

5 U.S.C. § 706.............................................................................................................. passim

6 U.S.C. § 271...................................................................................................................3

8 U.S.C. § 1103 ........................................................................................3

8 U.S.C. § 1421 ........................................................................................3

8 U.S.C. § 1423 ........................................................................................3

8 U.S.C. § 1427 ........................................................................................3

8 U.S.C. § 1445 ........................................................................................3

8 U.S.C. § 1446 ...................................................................................3, 29

8 U.S.C. § 1447 ................................................................................. passim

8 U.S.C. § 1451 ......................................................................................37

8 U.S.C. § 1571 ...................................................................................4, 31

8 U.S.C. § 1572 ...................................................................................4, 31

8 U.S.C. § 1573 ...................................................................................4, 31

8 C.F.R. § 100.2 ......................................................................................3

8 C.F.R. § 310.5 ......................................................................................4

8 C.F.R. § 316.4 ...................................................................................3, 25

8 C.F.R. §§ 334.1, 334.2 .........................................................................3

8 C.F.R. §§ 335.2, 335.3 ................................................................... passim

28 C.F.R. § 0.105 ....................................................................................3

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs seek declaratory and preliminary injunctive relief to prevent Defendants Michael Chertoff, Emilio Gonzalez, Andrea Quarantillo, Michael B. Mukasey, and Robert S. Mueller, III (collectively, the "Defendants") from denying thousands of qualified naturalization applicants the opportunity to vote in the 2008 election.  The Immigration and Nationality Act ("INA"), and its implementing regulations, require USCIS to adjudicate applications within 120 days of the naturalization applicant's examination; and Congress, the President, and the United States Citizenship and Immigration Service ("USCIS") itself are in agreement that naturalization applications should be adjudicated within six months from start to finish.  Yet there may be over 100,000 applicants served by the New York District Office with cases pending longer than six months – the proposed class in this action – with USCIS reporting in January that it will take up to eighteen months to process them.  Some naturalization applications submitted to USCIS <u>over six years ago</u> are still awaiting final adjudication.

Plaintiffs are entitled to preliminary injunctive relief because (1) Defendants' failure to act on the naturalization applications of Plaintiffs and the class is causing irreparable harm; (2) Plaintiffs are likely to succeed on the merits of their claims; and (3) the balance of hardships tips decidedly in Plaintiffs' favor.

First, as a result of Defendants' failure to adjudicate Plaintiffs' naturalization applications, Plaintiffs continue to be denied all the unique benefits of citizenship, including the right to vote, even though they applied for citizenship early enough to have a reasonable expectation of being able to vote in this year's Presidential election.  The denial of the right to vote is irreparable injury <u>per</u> <u>se</u>.

Second, Plaintiffs are likely to prevail on the merits of their claims that Defendants are unlawfully withholding and/or unreasonably delaying agency action affecting Plaintiffs' naturalization applications in violation of sections 555(b) and 706(1) of the Administrative Procedures Act ("APA"), which require government agencies to conclude matters presented to them within a "reasonable time" and grant courts the power to compel agency action unlawfully withheld or unreasonably delayed.   Plaintiffs are similarly likely to prevail on the merits of their claims that Defendants violated section 553 of the APA by implementing a new rule in 2002 which required for the first time both (a) the completion of an FBI name check prior to adjudicating naturalization applications and (b) a vastly expanded FBI name check (the "2002 Rule"), without providing notice of and an opportunity to comment on the new rule.  The 2002 Rule has resulted in unlawful and unreasonable delays, consisting in some cases of up to five years or more.   These delays are not excused by national security concerns: all naturalization applicants were already subjected to a full criminal background check when they were granted lawful permanent residency status, and have typically resided in the country for at least five years.  Indeed, all naturalization applicants reside in this country legally, and any purported "concerns" posed thereby are identical whether or not they are naturalized.

Third, the balance of hardships tips decidedly in Plaintiffs' favor because the hardship suffered by Plaintiffs and thousands of members of the proposed class far outweighs the burden on Defendants of injunctive relief requiring Defendants to fulfill their statutory and regulatory duties and to cease their unlawful practices.

Accordingly, Plaintiffs seek: (1) certification of a class and sub-class of naturalization applicants described more fully below; (2) a preliminary injunction ordering all Defendants to take all steps necessary to adjudicate the naturalization applications of all members of the class

who filed applications for naturalization more than 180 days prior to April 3, 2008 (the "preliminary injunction group"), and to naturalize those who are found eligible for naturalization in time to register to vote in the November 2008 election, but no later than September 22, 2008; and, if necessary to achieve this goal, directing USCIS Defendants to adjudicate the applications of the preliminary injunction group without waiting for completion of FBI name checks; and (3) expedited discovery.

## STATUTORY AND REGULATORY SCHEME

### I.    The Immigration And Nationality Act

The authority to naturalize persons as citizens of the United States ("U.S.") has been delegated to the United States Citizenship and Immigration Services ("USCIS") within the Department of Homeland Security ("DHS").  6 U.S.C. § 271(b); 8 U.S.C. §§ 1103(a), 1421(a); 8 C.F.R. § 100.2(a); 28 C.F.R. § 0.105.  Under the Immigration and Nationality Act ("INA"), lawful permanent residents ("LPRs") of the U.S. may submit applications to USCIS to become U.S. citizens.  8 U.S.C. § 1445(a)-(b); 8 C.F.R. §§ 316.4, 334.1, 334.2.  The applicant must meet certain statutory requirements, including a sufficient period of residence and physical presence in the U.S., good moral character, and an understanding of the English language and the history and government of the U.S.  8 U.S.C. §§ 1423, 1427(a),(e).  A USCIS immigration officer conducts an in-person examination of the applicant to determine, inter alia, if the applicant satisfies the English and civics requirements.  8 U.S.C. § 1446(a)-(d); 8 C.F.R. §§ 335.2, 332.1.  Upon completion of the initial examination, "[t]he [immigration] officer shall grant the application if the applicant has complied with all requirements for naturalization."  8 C.F.R. § 335.3(a).  "A decision to grant or deny the application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization."  Id.

Congress has made clear its intention that naturalization applications be completed within a reasonable time (with no unreasonable government delay).  First, section 1571 of title 8 states that "[i]t is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application."  8 U.S.C. § 1571(b).  A naturalization application is an "immigration benefit application."  8 U.S.C. § 1572.  Moreover, the President of the United States likewise concurs that immigration applications should be completed in six months from start to finish.  (Sant'Ambrogio Decl. Exs. A and B.)  Indeed, even Defendant USCIS has admitted that naturalization application should be completed in six months.  (Id. Ex. C.)

Second, if USCIS fails to make a determination on a naturalization application within 120 days of an initial examination, as required by 8 C.F.R. § 335.3(a), the applicant has a statutory right to seek judicial review in the district court in which the applicant resides.  8 U.S.C. § 1447(b); 8 C.F.R. § 310.5.  "Such court has jurisdiction over the matter and may either determine the matter or remand the matter, with appropriate instructions, to the Service to determine the matter."  8 U.S.C. § 1447(b).

Finally, Congress directed the Attorney General to:  (1) "reduce the backlog in the processing of immigration benefit applications, with the objective of the total elimination of the backlog" by one year after November 25, 2002; and (2) "make such other improvements . . . as may be necessary to ensure that a backlog does not develop after such date."  8 U.S.C. § 1573.

## II.    The Administrative Procedure Act

Agencies must conclude matters presented to them "within a reasonable time."  5 U.S.C. § 555(b).  When an agency fails to conclude a matter presented to it within a reasonable time, the judiciary may "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  "Agency action" is defined by the APA as "the whole or part of an agency rule, order,

4

license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).

Administrative agencies are further required to provide a notice-and-comment period prior to

implementing substantive legislative rules, including rules that depart from prior policy and

practice and have a substantial adverse effect upon a large number of parties.  5 U.S.C. § 553.

### STATEMENT OF FACTS

**I.    Named Plaintiffs**

Plaintiffs have each submitted naturalization applications to USCIS over 180 days ago

and all await adjudication.  (Milanes Decl. ¶¶ 4, 6; Farfan Decl. ¶¶ 2, 4, 8; Martinez Decl. ¶¶ 6,

9, 16; Sanchez Decl. ¶¶ 5, 13; Castro Decl. ¶ 5; Chalampa Decl. ¶ 3.)  Plaintiffs Milanes, Farfan,

Martinez and Sanchez have repeatedly contacted USCIS to inquire about the status of their

respective applications.  Each has been told that his/her case was still awaiting security checks.

(Milanes Decl. ¶¶ 7-10; Farfan Decl. ¶ 12; Martinez Decl. ¶¶ 10-11; Sanchez Decl. ¶¶ 9-10.)

Virginia Milanes became an LPR in June 2003.  (Milanes Decl. ¶ 2.)  Milanes continues

to be substantially injured by USCIS's delay.  She wants to be a U.S. citizen in order to be able

to vote in the 2008 presidential elections and to share the privileges of U.S. citizenship already

enjoyed by her husband, son, and several grandchildren.  (Id. ¶¶ 12, 13.)  She does not travel

abroad for fear of missing the notice of her citizenship interview, and thus has missed the

funerals of several close family members abroad.  (Id. ¶ 14.)

Omar Miguel Farfan became an LPR in March 1993.  (Farfan Decl. ¶ 2.)  He served in

the U.S. Navy and was honorably discharged as a decorated veteran.  (Id. ¶ 6.)  His citizenship

interview was on August 9, 2005.  (Id. ¶ 10.)  Farfan continues to be substantially injured by

USCIS's delay.  He wants to be a U.S. citizen in order to participate in the civic affairs of the

country he has faithfully served and to be able to register and vote in the upcoming 2008

presidential elections.  (<u>Id.</u> ¶ 20.)  He has been interested in law enforcement and other positions in the federal government but cannot apply since he is not a U.S. citizen.  (<u>Id.</u> ¶ 21).

     <u>Manuel Alberto Martinez</u> became an LPR in April 2001. (Martinez Decl. ¶ 2.)  His citizenship examination was on May 10, 2006.  (<u>Id.</u> ¶ 9.)  He wants to participate in the civic affairs of his adopted country, vote in the upcoming presidential elections, and file an immediate relative petition to sponsor his elderly mother to live with him in the U.S. (<u>Id.</u> ¶¶ 14, 15.)

     <u>Andres Giovanny Sanchez</u> became an LPR in November 1999.  (Sanchez Decl. ¶ 2.)  He attended his naturalization examination on October 13, 2005.  (<u>Id.</u>. ¶¶ 5-8.)  Sanchez is prejudiced by the continuing delays.  He wants to vote in the 2008 presidential election and sponsor his wife and son as immediate relatives once he has received citizenship. (<u>Id.</u> ¶¶ 3, 12.)

     <u>Nancy Castro</u> became an LPR in January 1983.  (Castro Decl. ¶ 2.)  She is 62 years old. After a naturalization interview was set for August 7, 2007, USCIS notified her that the interview was cancelled "due to unforeseen circumstances."  (<u>Id.</u> ¶¶ 7, 8.)  After this action was filed, she received notice that her naturalization interview will be held on April 7, 2008.  (<u>Id.</u> ¶ 11.)  She continues to be injured by USCIS's delays.  She wants to gain her right to vote.  (<u>Id.</u> ¶ 15.)  Her husband, two children, and four grandchildren are already citizens.  (<u>Id.</u> ¶ 14.)

     <u>Margoth Perez de Chalampa</u>, became an LPR in July 2002.  (Chalampa Decl. ¶ 2.)  Ms Chalampa filed her naturalization application on July 26, 2007.  (<u>Id.</u> ¶ 3.)  Chalampa wants to vote in the upcoming 2008 presidential elections.  (<u>Id.</u> ¶ 10.)  She also would like to obtain a better-paying government job, but these positions require U.S. citizenship. (<u>Id.</u> ¶¶ 11, 12.)

## II.    The Naturalization Application Process

     As noted earlier, all LPRs which apply for naturalization reside in this country legally, by virtue of their successful application for lawful permanent residency (and the requisite full criminal background checks in that process).  LPRs residing in the counties served by the New

York City District Office of USCIS submit their naturalization applications to the Vermont Service Center ("VSC"), where the data from their applications is entered into USCIS's computer system. (Sant'Ambrogio Decl. Ex. D at 18:13-17; Ex. E ¶ 4.) USCIS then mails the applicant a notice of receipt, pulls the applicant's existing immigration record ("A-File"), and initiates three checks: a criminal background check (fingerprint check); a check of the records of the U.S. Customs and Border Protection's Treasury Enforcement Communications System ("TECS"), formerly known as the Interagency Border Inspection Systems ("IBIS"); and an FBI name check. (Id. Ex. D at 18:11-17; 21:5-23; 24:3-25:9.)

### A. Criminal Background Checks

USCIS initiates a criminal background check by capturing the applicant's fingerprints at an Application Support Center ("ASC"), and forwarding them to Federal Bureau of Investigation ("FBI"). (Id. Ex. D at 21:8-18.) FBI then determines whether it has any records that match the fingerprints, including records of criminal convictions, arrests or charges without disposition, and immigration violations. (Id. Ex. D at 30:7-9; 31:2-5; 31:8-22; Ex. F at 2.) If FBI finds a match, known as an "Ident," the information and any associated file is forwarded to USCIS. (Id. Ex. D at 31:16-22.) A USCIS adjudicator reviews the information to determine whether the applicant is ineligible for naturalization. (Id. at 44:19-45:10.)

Since 1998, Congress has required that the criminal background check be conducted on each applicant for citizenship before USCIS adjudicates the application. The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, Pub. L. No. 105-119, § 1446, 11 Stat. 2440, 2448-49 (1997) ("Appropriations Act of 1998"); 8 C.F.R. § 335.2(b). Pursuant to 8 C.F.R. § 335.2, which USCIS's predecessor agency, Immigration and Naturalization Service ("INS"), promulgated in 1998 pursuant to Congressional mandate, an initial examination on the naturalization application will be conducted only after

7

USCIS "has received a definitive response from [FBI] that a full criminal background check of an applicant has been completed." If FBI cannot provide a definitive response, FBI must confirm that "an applicant's fingerprints cannot be classified for purposes of conducting a criminal background check, despite the FBI's receipt of two properly prepared fingerprint cards." 63 Fed. Reg. 12,982-83, 12,987. The procedure for performing FBI fingerprint checks has not changed since 2001. (Sant'Ambrogio Decl. Ex. G, Response No. 3.)

**B.    IBIS/TECS Checks Are Instituted In 2002**

In 2002, USCIS also for the first time began conducting a check of the records of the IBIS/TECS, in connection with every naturalization application. (Id.) IBIS/TECS is a collection of data from more than twenty federal agencies that includes a check of the following National Crime Information Center ("NCIC") databases: Wants and Warrants; Missing Persons; Violent Gangs and Terrorists; Protection Order File, Registered Sexual Offender; Secret Service Presidential Protection, Foreign Fugitives; Deported Felons; and Supervised Release File. (Id. Ex. G, Response No. 20.) Positive responses to an IBIS/TECS query are typically returned to USCIS within twenty-four hours. (Id. Ex. D at 51:3-19.)

**C.    The FBI Name Check Requirement Changed In 2002**

Prior to December 2002, USCIS had requested FBI name checks, but it had not required a definitive response before adjudicating the application if no derogatory information was received within sixty days. (Id. Ex. G, Response No. 3.) In December 2002, USCIS adopted a new policy of requiring the completion of an FBI name check before adjudicating any naturalization application. (Id.)

At the same time this new requirement was instituted, USCIS and FBI dramatically altered the scope of the FBI name check by including a review of FBI's reference index. Before December 2002, FBI checked whether an applicant was included in FBI's main file index, which

8

lists anyone who is the subject of an FBI main file, such as the target of an FBI investigation. But in December 2002, FBI also began to check its reference index, which lists individuals who are not the subject of an FBI investigation but merely referenced in some other FBI file, perhaps for a myriad of benign reasons.  (Id. Ex. I, at FBI0000621-22; Ex. J ¶¶ 24-25; Ex. K ¶ 11.)  For example, the applicant may be the witness to a crime, may have reported suspicious activity to FBI, or may even be the victim of a crime.  (Id. Ex. K ¶ 11.)  This policy change dramatically increased the number of files that needed to be reviewed to complete a name check.  USCIS did not publish a proposed rule or provide a comment period before adopting this "new policy," as the Director of USCIS himself admits.  (Id. Ex. G, Response No. 3.)  Mocanu v. Mueller, Nos. 07-0445, 07-0971, 07-3223, 07-2718, 07-2859, 08-195, 2008 WL 372459, at *20 (E.D. Pa. Feb. 8, 2008).

Pursuant to the new policy, USCIS submits an applicant's name, social security number, and date of birth to FBI's National Name Check Program ("NNCP"), which checks the applicant's name against FBI's Central Records System.  (Sant'Ambrogio Decl. Ex. K ¶ 11; Ex. L ¶ 6.)  FBI's Central Records System contains FBI's administrative, personnel, and investigative files.  (Id. Ex. L ¶ 6.)

FBI searches applicants' names against its records using a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on.  (Id. Ex. U, at 2-3.)  FBI also searches the names phonetically and retrieves similar spelling variations.  (Id.)  If there is a "hit" with a name in an FBI record, the system has found a possible match with the name being checked in the initial electronic search.  Then, an FBI analyst must perform a manual review to determine whether the applicant may be the subject of or referenced in an FBI file.  The file may be located among the

9

various FBI offices throughout the U.S. (<u>Id.</u> Ex. K ¶ 25.) Approximately ten percent of applicants are identified as "possibly being the subject of [or referenced in] an FBI record." (<u>Id.</u> Ex. K ¶¶ 14-15; Ex. L ¶¶ 11-12.)

Any FBI records potentially related to an applicant are retrieved and reviewed. If there is no electronic record, the existing paper record is retrieved. Once the records are retrieved, the information is reviewed for potentially derogatory information. "<u>Less than 1 percent of the requests are identified with a file containing possible derogatory information.</u>" (<u>Id.</u> Ex. L ¶ 15 (emphasis added).) But FBI does not know whether these files in fact contain derogatory information until an analyst actually opens the files and reviews their contents. (<u>Id.</u>) Thus, the actual percentage of files containing derogatory information is much less than one percent.

Neither USCIS nor FBI has ever attempted to assess the value of the name check procedures instituted in 2002 or their impact on the processing of naturalization applications. (<u>Id.</u> Ex. H, at 62:24-65:13.) Defendants justified the institution of the new policy based solely on a single anecdotal account of the subject of a foreign intelligence investigation who was included on the reference index but not the main file index. (<u>Id.</u> Ex. H, at 62:24-65:13; Ex. I, at FBI000621.) Defendants have never disclosed, despite repeated requests, whether the applicant would in fact have been denied citizenship based on the information available through the reference index or whether USCIS ever attempted to denaturalize him.

To this day, neither USCIS nor FBI has ever demonstrated whether there is any actionable information available through the FBI name check that is not available from the FBI fingerprint or IBIS/TECS checks conducted for every naturalization applicant. (<u>Id.</u> Ex. H, at 155:24-156:2; 159:8-160:10.) Defendants do not know (1) how many, if any, naturalization applications have been denied based on information obtained exclusively by means of the FBI

name checks or (2) how many, if any, applicants have had their permanent residency revoked due to the FBI name checks.  (Id.)

The USCIS Ombudsman has repeatedly questioned whether the FBI name check process "has added any additional value over the security process already in place" and has concluded that "most, if not all, of the problem cases which would result in an eventual denial of benefits also can be revealed by the other more efficient, automated criminal and security checks that USCIS initiates."  (Id. Ex. M, at 41.)  Moreover, USCIS itself admits that it is "unlikely" that the name check would ever "reveal actionable information" that would permit the DHS to detain and remove a LPR.  (Id. Ex. N, at 2.)  Consequently, since February 4, 2008, USCIS no longer waits for completion of an FBI name check before adjudicating otherwise approvable applications for temporary or permanent residency if the name check has been pending for more than 180 days.  (Id.)

USCIS, however, continues to require that an FBI name check be completed prior to adjudicating an LPR's application for naturalization.  (Id.)  As a result, the 2002 Rule has delayed the adjudication of hundreds of thousands of naturalization applications over the past five years.  In January 2008, FBI reported that of 307,675 pending USCIS name checks, 138,196 have been held up at FBI for more than six months, 97,397 have been pending for more than one year, and 45,820 have been stalled at FBI for more than two years.  (Id. Ex. O.)  Indeed, FBI is still working on some name check requests submitted more than five years ago.  (Id. Ex. P, at 102:15-20; Ex. J ¶ 25.)  The USCIS Ombudsman has concluded that "FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits."  (Id. Ex. M, at 37.)

Incontrovertibly, the delays at FBI are not caused by any national security or public safety concerns raised by LPRs applying for naturalization, each of whom currently resides in the United States legally; thus, any purported "concerns" posed by LPRs are identical whether or not they are naturalized. FBI has not even begun to look at the contents of files related to many applicants with "possible derogatory information" who applied for naturalization as long ago as 2003. (Id. Ex. P, at 106:20-107:3; 150:22-151:5.) Thus, the delays cannot be blamed on the complexity of any issues raised by the content of particular applicants' files, because many of those files have not yet even been opened by FBI.

USCIS's review of the results of FBI name checks cause major additional delays in the adjudication of naturalization applications. If FBI has information about an applicant in its files, FBI may send USCIS a letterhead memorandum ("LHM") summarizing the results of the name check. (Id. Ex. H, at 104:3-17.) USCIS is still in the process of reviewing LHMs related to name checks that FBI returned to USCIS in 2002. (Id. Ex. H, at 115:18-117:1; 121:14-22; 126:18-127:3.)

**D.    The 2007 Increase In Naturalization Application Fees**

In July 2007, USCIS increased the fee it charges for the processing of naturalization applications by approximately eighty percent, from $330 to $595. 72 Fed. Reg. 29,851, 29,861 (May 30, 2007). The last time USCIS conducted a comprehensive review of the adequacy of the naturalization application fee was in 1998. Id. at 29,852. Consequently, the fee charged by USCIS for naturalization applications prior to July 2007 was not adequate to cover the costs of processing the applications, contributing to the widespread delays. Id.

When USCIS raised the naturalization application fee in 2007, it failed to take reasonable steps to accommodate the inevitable surge in naturalization applications prior to the fee increase, even though prior experience indicated and many immigration advocates warned that such a

surge would occur. USCIS did not even discuss the predicted surge or its impact in its response to public comments on the proposed increase in fees. <u>Id.</u> at 29,861-65. In July 2007, USCIS received in excess of 3 million applications and petitions for immigration benefits, compared to 1.8 million received in the same period the previous year. (Sant'Ambrogio Decl. Ex. Q, at 2-3.)

Consequently, the backlog in naturalization applications has grown dramatically. USCIS reported in January 2008 that the number of naturalization applications awaiting adjudication nationwide had reached 1,051,186, an eighty-nine percent increase over the prior year, and that naturalization applications filed after June 1, 2007 would take approximately eighteen months to process. (<u>Id.</u> Ex. Q at 6; Ex. R.) The New York District Office alone, which adjudicates approximately fourteen percent of the nation's naturalization applications, likely has more than 100,000 naturalization applications pending. (<u>Id.</u> Exs. E and S.) Moreover, Defendant Gonzalez has predicted that "[t]his surge will have a serious impact on application processing times for the next couple of years." (<u>Id.</u> Ex. Q, at 6.)

There is no end in sight for the limbo in which these would-be citizens are caught if USCIS and FBI are left to their own devices. USCIS has no plans to reduce the average processing times to six months before the third quarter of Fiscal Year 2010. (<u>Id.</u>) USCIS also has no plans to eliminate the backlog of applicants waiting to become citizens, including LPRs who applied for citizenship in 2002. (<u>Id.</u> Ex. D, at 164:20-166:6, 201:12-19.) Meanwhile, hundreds of thousands of naturalization applications are stalled at FBI, held up by an illegal name check process that does nothing to enhance national security or public safety. (<u>Id.</u> Ex. O.)

Without the Court's intervention, thousands of naturalization applicants who have been waiting patiently for more than six months for a decision on their application will be denied the

right to vote in the 2008 election.  Such a denial caused by the Defendants' failure to act will kill the dreams of these law-abiding, rule-following, would-be Americans.

## ARGUMENT

### I.    Plaintiffs Are Entitled To A Preliminary Injunction

Plaintiffs and members of the proposed class and sub-class (collectively, the "Plaintiffs") are entitled to a preliminary injunction as described in the Order to Show Cause, filed concurrently herewith.

A party seeking preliminary injunctive relief must show: (1) a threat of irreparable injury; (2) either a probability of success on the merits or sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation; and (3) a balance of hardships tipping decidedly in their favor.  Tunick v. Safir, 209 F.3d 67, 70 (2d Cir. 2000); Time Warner Cable of New York City v. Bloomberg L.P., 118 F.3d 917, 923 (2d Cir. 1997).   Plaintiffs easily satisfy these criteria.

### A.    Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief

Irreparable harm is "the most important prerequisite for the issuance of a preliminary injunction." NAACP v. Town of E. Haven, 70 F.3d 219, 224 (2d Cir. 1995).  "[T]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995) (internal quotation marks and citation omitted).

Plaintiffs are suffering and will continue to suffer irreparable harm absent preliminary injunctive relief because they are being unlawfully deprived of the unique benefits of citizenship. Absent injunctive relief, thousands of members of the proposed class will be deprived of the opportunity to vote in the November 2008 election, even though they applied for citizenship early enough to have a more than reasonable expectation of being able to vote.

Moreover, there is a wide range of harms inflicted upon naturalization applicants whose applications are not adjudicated in a timely manner, as Congress has recognized.  The House of Representatives has noted that delays in naturalization "affects employment opportunities, travel plans, and conferring of immigration benefits on relatives, and <u>most importantly, deprives these individuals of their right to vote</u>."  H.R. Rep. No. 101-187, at 8 (1989) (emphasis added).  Defendants' unlawful policies and practices are inflicting these same irreparable harms on Plaintiffs.

### 1.    Injunctive relief is necessary to avoid massive disenfranchisement.

Plaintiffs seek preliminary injunctive relief to avoid the disenfranchisement of thousands of potential new American voters who wish to vote in the November 2008 election.  In this regard, "[t]he law is well established that the denial of the opportunity to vote is irreparable injury per se."  <u>Campos v. INS</u>, 70 F. Supp. 2d 1296, 1309 (S.D. Fla. 1998) (citations omitted).  In <u>Campos</u>, a class of naturalization applicants brought an action against INS, Defendant USCIS's predecessor agency, challenging INS practices concerning the agency's evaluation of requests for medical waivers of the English language and civics components of the naturalization exam.  The Court agreed with plaintiffs that if a preliminary injunction were not granted, they would be irreparably harmed in that they would "lose the opportunity to vote, receive benefits, or otherwise fully participate in our democracy as United States citizens."  <u>Id.</u> at 1309.  The court held that "plaintiffs have demonstrated irreparable injury" because "the opportunity to vote is irreparable injury per se."  <u>Id.</u> at 1309-10.

Similarly, Defendants' failure to adjudicate the naturalization applications of the Plaintiffs is depriving them of the right to vote in this year's election, and resulting in irreparable harm on a massive scale.  The number of naturalization applications awaiting adjudication nationwide has now surpassed one million and applications filed after June 1, 2007 will take

15

approximately 14-16 months to process.  There are likely more than 100,000 naturalization

applications awaiting adjudication in the New York District Office of the USCIS.

(Sant'Ambrogio Decl. Exs. E and S.)   Moreover, some proposed class members have been

waiting since 2002 for USCIS to adjudicate their applications.  (Id. Ex. H at 115:18-117:1;

121:14-22; 126:18-127:3; Ex. J, ¶ 25; Ex. P at 102:15-20.)  These applicants have already missed

the opportunity to vote in two national elections; they should not be denied the opportunity to

vote in a third election.

      Like many of their fellow lawful permanent residents who seek to become citizens,

Plaintiffs care deeply about the important issues being debated this year on the national and local

electoral stage, including, but not limited to, those surrounding immigration and immigration

reform.  Strongly motivated by these concerns, hundreds of thousands of lawful permanent

residents have applied for naturalization in the last two years so that they may vote in this year's

upcoming presidential election.  Their path to citizenship has been blocked by USCIS's failure to

review and act upon their applications in a timely manner.

      By its own admission, USCIS has no plans to reduce the processing times to six months

before the third quarter of Fiscal Year 2010.  (Id. Ex. Q at 6.)  Thus, absent preliminary

injunctive relief, Defendants will disenfranchise thousands of potential American voters who

applied for naturalization over six months ago.  "It is not enough to tell these people, who work

hard and play by the rules:  sorry, maybe next election."  (Id. Ex. T, at 3.)

      **2.      Injunctive relief is necessary to avoid widespread deprivation of
unique citizenship benefits.**

      Defendants' unlawful policies and practices deny Plaintiffs and proposed class members

the peace of mind that comes with citizenship.  While waiting for months, and in many cases

years, for a decision on their naturalization applications, Plaintiffs have "lived with the resulting

16

uncertainty in their personal and professional lives, and immeasurable impact on their families."
Mocanu v. Mueller, No. 07-0445, 2008 WL 372459, at *12 (E.D. Pa. Feb. 8, 2008). Plaintiffs
carry with them a daily anxiety about when their paperwork will be processed or whether they
can do more than what is required of them. Many contact their local elected officials hoping that
an inquiry or investigation into their application status can be made. (Milanes Decl. ¶¶ 7, 10;
Farfan Decl. ¶¶ 8, 19; Sanchez Decl. ¶ 11.) Many attempt on their own to check in with USCIS
regularly. (Farfan Decl. ¶¶ 13, 16; Sanchez Decl. ¶¶ 9, 10; Castro Decl. ¶ 10; Martinez Decl. ¶¶
10, 11.) Despite their efforts, Plaintiffs are told only that their applications are pending.
(Milanes Decl. ¶ 7; Farfan Decl. ¶¶ 3, 15, 16; Sanchez Decl. ¶¶ 9, 10; Martinez Decl. ¶ 10.)

Plaintiffs and the class also are harmed because they are unable to travel with the
assurance of citizenship status. See H.R. Rep. No. 101-187, at 8 (1989); see also Zagrebelny v.
Frazier, No. 07-1682 (PAM), 2008 WL 624072, at *7 (D. Minn. Mar. 4, 2008). For example,
Plaintiff Milanes missed the funerals of her close family members in the Dominican Republic for
fear of missing an interview with USCIS. (Milanes Decl. ¶ 14.)

Many Plaintiffs and class members are further harmed because Defendant USCIS's
failure to adjudicate their naturalization applications has limited their employment opportunities.
See H.R. Rep. No. 101-187, at 8. "[T]he right to work for a living in the common occupations of
the community is of the very essence of the personal freedom and opportunity." Truax v. Raich,
239 U.S. 33, 41 (1915) (citations omitted); see also Zagrebelny, 2008 WL 624072, at *7 (delayed
naturalization applicants' inability to obtain government jobs is "substantial" harm). For
example, Plaintiff Farfan, a veteran of the U.S. Navy, has not been able to apply for a job he
desires in a major government agency for which citizenship status is required. (Farfan Decl.
¶ 21.) Plaintiff Perez De Chalampa, who has a medical degree from Bolivia and who currently

works as a Health Care Coordinator for a Head Start program, also wants to apply for higher

paying positions available only to citizens.  (De Chalampa Decl. ¶ 8.)

Defendants' unlawful delays also injure Plaintiffs and class members who desperately

want to sponsor family members living in their home country.  (Martinez Decl. ¶ 15; Sanchez

Decl.¶ 3.); H.R. Rep. No. 101-187, at 8; Zagrebelny, 2008 WL 624072, at *7 (delayed

naturalization applicants' inability to petition for family members to join them in the United

States or to obtain citizenship for children born abroad is "substantial" harm).  Although LPRs

may sponsor some family members (but not parents), the process is considerably quicker for

citizens.  This is of particular concern for those with ailing or elderly parents or spouses and/or

children whom they would like to sponsor.  It also harms families of mixed-status households

living in the United States.  For example, an LPR parent who wishes to petition to adjust the

status of a non-citizen child in order to allow the child to remain in the United States is unable to

do so if the child "ages out" of immediate relative status while the parent's application for

citizenship is delayed.  See Alhamedi v. Gonzales, No. 07 Civ. 2541 (JGK), 2007 WL 1573935,

at *2 (S.D.N.Y. May 30, 2007).

Congress enacted 8 U.S.C. § 1447(b) to streamline the naturalization application process

and avoid delays that result in the injuries described above.  See Zaranska v. U.S. Dep't of

Homeland Sec., 400 F. Supp. 2d 500, 510-11 (E.D.N.Y. 2005); see generally Nancy Morawetz,

Citizenship and the Courts, 2007 U. Chi. Legal F. 447, 453-54 (2007).  As recognized by

Congress, "[n]aturalization is an act of great personal consequence to American Immigrants,

involving major reorganizations in their sense of identity and offering a new beginning for

many" and "citizenship is the most valued governmental benefit of this land."  Zaranska, 400 F.

Supp. 2d at 510-11 (quoting H.R. Rep. No. 101-187, at 11, 14 (1989)).

18

Accordingly, Plaintiffs have shown that absent the requested injunctive relief, thousands of would-be citizens who applied for naturalization more than six months ago will suffer irreparable injury as a result of Defendants' unlawful policies and practices.

**B.    Plaintiffs Are Likely To Prevail On The Merits Of Their Claims**

**1.    Plaintiffs are likely to prevail on the merits of their claims that Defendants are violating the APA and the INA by requiring the completion of an FBI name check before adjudicating the naturalization applications of Plaintiffs.**

In 2002, USCIS implemented an entirely new requirement for the naturalization process: the completion of an FBI name check prior to final adjudication of naturalization applications. At the same time that USCIS instituted this new requirement, USCIS and FBI dramatically expanded the scope of the FBI name check to include a review of not just files specifically about the applicant ("main files") but also of any FBI files containing a reference to the applicant ("reference files"), the effect of which was to require review of many more non-criminal files. ("2002 Rule"). Prior to 2002, USCIS requested FBI name checks, but it did not condition adjudication of a naturalization application upon receipt of a definitive response from FBI. If no derogatory information was received in response to the FBI name check request within 60 days, USCIS would simply proceed with adjudication of the naturalization application (the "Pre-2002 Rule"). (Sant'Ambrogio Decl. Ex. G, Response No. 3.)

The new 2002 Rule worked a significant substantive change in how USCIS processes naturalization applications. Under basic principles of administrative law, such a significant substantive change must be authorized either by Congress or by a federal agency after the agency gives notice and an opportunity for comment. See 5 U.S.C. § 553. But USCIS did not provide any notice or opportunity for comment before implementing the new 2002 Rule.

19

Moreover, USCIS's compliance with the additional requirements imposed by the 2002 Rule has significantly increased the already lengthy delay of adjudication of Plaintiffs' naturalization applications. Indeed, the majority of Plaintiffs' naturalization applications have now been pending for several years – by any measure, an unreasonable delay that violates the reasonable time requirement of sections 555(b) and 706(1) of the APA. Furthermore, as noted above in the statement of facts, a few hundred thousand name checks await processing at FBI, approximately 150,000 of which have been pending at FBI for over a year.

Plaintiffs are likely to succeed on the merits of their claim that the implementation of the 2002 Rule violated the notice and comment requirements of the APA. The decision in Mocanu v. Mueller, 2008 WL 372459 at *8, in which naturalization applicants brought identical claims against the same defendants as in the case at bar, is directly on point. As in this case, the Mocanu plaintiffs alleged that USCIS violated section 553 of the APA by implementing the 2002 Rule without providing notice and an opportunity to comment, and unreasonably delayed adjudication of plaintiffs' naturalization applications in violation of Sections 555(b) and 706(1) of the APA. The Mocanu Court's decision warrants particular consideration given that it is the only court to have fully analyzed the merits of Plaintiffs' claim that USCIS's implementation of the 2002 Rule violated section 553 of the APA and the only court to have done so with the benefit of a full factual record. This Court should follow the well-reasoned decision of the Mocanu Court which, after an extensive analysis, held that USCIS's implementation and use of the 2002 Rule violated section 553 of the APA, and that USCIS had unreasonably delayed the adjudication of Plaintiffs' naturalization applications in violation of sections 555(b) and 706(1) of the APA. Accordingly, this Court should enjoin USCIS from continuing to withhold action on Plaintiffs' naturalization applications due to their pending FBI name checks.

          a.      **The FBI name check may not be used to withhold or delay action on Plaintiffs' naturalization applications because USCIS failed to comply with section 553 of the APA when implementing the new name check requirement.**

Under section 553, federal agencies are required to provide "general notice of proposed rule making" and "to give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c). A rule is defined as "an agency statement of general or particular applicability and future effect designed to implement . . . law or policy." 5 U.S.C. § 551(4). There are only two exceptions that exempt a federal agency from complying with the publication and notice and comment requirements of section 553 when implementing a rule. First, "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). But USCIS did not publish a "good cause" statement that would exempt it from the notice-and-comment requirement.[1] Second, "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" are exempted from compliance with section 553. 5 U.S.C. § 553(b)(A). But as discussed below, the new 2002 policy is a "legislative" not an "interpretive rule."

          (i)      **USCIS was required to provide notice of, and an opportunity to comment on, the 2002 Rule because it was a "legislative" not "interpretative" rule.**

The Second Circuit has explicitly held that the exceptions to the notice and comment requirements described above "should be narrowly construed and only reluctantly

_____

[1] The procedural protections afforded by section 553 are particularly warranted in cases such as this, where the proposed rule adversely impacts the lives and civil rights of thousands of people.

countenanced." <u>Natural Res. Def. Council v. Abraham</u>, 355 F.3d 179, 204 (2d Cir. 2004)

(internal quotation marks and citation omitted).  In deciding whether a rule is interpretative or

legislative, and thus subject to section 553, the "central question is essentially whether an agency

is exercising its rule-making power to clarify an existing statute or regulation, or to create new

law, rights, or duties."  <u>White v. Shalala</u>, 7 F.3d 296, 303 (2d Cir. 1993).  In <u>Sweet v. Shearhan</u>,

235 F.3d 80, 91 (2d Cir. 2000), the Second Circuit adopted the D.C. Circuit test in <u>American </u>

<u>Mining Congress v. Mine Safety & Health Administration</u>,[2] 995 F.2d 1106, 1112 (D.C. Cir.

1993) ("<u>AMC</u>"), to determine whether a rule was interpretative or legislative.  The <u>AMC</u> court

held that a rule was legislative if it had

> legal effect, which . . . [could be] ascertained by asking (1) whether
> in the absence of the rule there would not be an adequate
> legislative basis for enforcement action or other agency action to
> confer benefits or ensure the performance of duties, (2) whether
> the agency has published the rule in the Code of Federal
> Regulations, (3) whether the agency has explicitly invoked its
> general legislative authority, or (4) whether the rule effectively
> amends a prior legislative rule. If the answer to any of these
> questions is affirmative, we have a legislative, not an interpretive
> rule.

<u>Id.</u>  USCIS's decision to implement the 2002 Rule falls squarely within two of the <u>AMC</u>

classifications:  (1) USCIS had no adequate legislative basis for the 2002 Rule; and (2) the 2002

Rule effectively amended the prior legislative rule, 8 C.F.R. § 335.2.

(ii)    **There is no "adequate legislative basis" supporting
implementation of the 2002 Rule**

There is no statutory or regulatory authority for USCIS to require the completion of FBI

name checks, including a review of FBI's reference index, prior to adjudicating naturalization

applications.  The United States Code does not require the completion of an FBI name check

---

[2] The D.C. Circuit modified the <u>AMC</u> holding in <u>Health Insurance Association of America, Inc. </u>
<u>v. Shalala</u>, 23 F.3d 412 (D.C. Cir. 1994); however, this case addressed one of the four factors not
relevant here.

prior to naturalization.  Indeed, Congress has never authorized or even <u>referred</u> to an FBI name check in the context of the naturalization process.

Defendants' position appears to be that the FBI name check is authorized by the Congressional mandate that a "full criminal background check" be completed prior to adjudication.  <u>See</u> The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, Pub. L. No. 105-119, § 1446, 11 Stat. 2440, 2448-49 (1997) ("Appropriations Act of 1998").  For the following reasons, however, the "full criminal background check" mandated by Congress is an FBI fingerprint check, not an FBI name check.

First, the plain language of the statute authorizing the FBI background checks itself refers repeatedly to fingerprints.  Thus the legislation prohibits the (former) INS from accepting, "for purposes of conducting criminal background checks . . . any FD-258 fingerprint card" other than one prepared by or received from the INS.  111 Stat. 2440, 2448.  One of the narrow exceptions to this rule allows U.S. consular and military offices abroad "to perform fingerprinting services to prepare FD-258 fingerprint cards for applicants residing abroad applying for immigration benefits."  <u>Id.</u>  Furthermore, the statute provides that "agencies may collect and retain a fee for fingerprinting services."  <u>Id.</u>

Second, the plain language of 8 C.F.R. § 335.2, the regulation promulgated by USCIS in 1998 pursuant to the Congressional mandate, makes clear that a "full criminal background check" and an FBI fingerprint check are synonymous.  Section 335.2 defines a "full criminal background check" as follows:

> (b) …. A definitive response that a full criminal background check on an applicant has been completed includes:
>
> (1) Confirmation from the Federal Bureau of Investigation that an applicant does not have an administrative or a criminal record;

(2) Confirmation from the Federal Bureau of Investigation that an applicant has an administrative or a criminal record; <u>or</u>

(3) Confirmation from the Federal Bureau of Investigation that <u>two properly prepared fingerprint cards</u> (Form FD-258) <u>have been determined unclassifiable for the purpose of conducting a criminal background check</u> and have been rejected.

8 C.F.R. § 335.2 (emphasis added). It is clear from subsection (b)(3) and the preceding "or" that the administrative or criminal record referred to in subsections (b)(1) and (b)(2) is a record checked by means of an applicant's fingerprints. <u>See, e.g.</u>, <u>Mocanu</u>, 2008 WL 372459, at *8 ("Nor does the record show why the agency did not use the normal meaning of the 'criminal background check,' which would mean, in common parlance, whether the person had been arrested or convicted, i.e. a 'rap sheet,' which is essentially what Mr. Neufeld described in his testimony as encompassed within the term 'fingerprint check.'"). USCIS obtains fingerprint samples from every naturalization applicant and forwards them to FBI for the purposes of determining whether the applicant has any criminal convictions, arrests or charges, or immigration violations. (Sant'Ambrogio Decl. Ex. D at 30:7-9; 31:2-5, 8-22; Ex. F at 2.) Notably, section 335.2 does <u>not</u> contemplate an FBI "name check," which searches for an applicant's name among FBI's administrative, personnel, and investigative files. (<u>Id</u> Ex. L, ¶ 6.) Put simply, an FBI name check delves into areas far beyond an applicant's <u>criminal</u> history and cannot be considered a "<u>criminal</u> background check." <u>See</u> Application Procedures and Criteria for Approval of Nonprofit Budget and Credit Counseling Agencies by United States Trustees, 73 Fed. Reg. 6062-01, 6065 (Feb. 1, 2008) (to be codified at 28 C.F.R. pt. 58) ("The term 'criminal background check' means a report generated by the Federal Bureau of Investigation disclosing the entire criminal history record, if any, of the counselor for whom the criminal background check is sought.")

Second, in promulgating 8 C.F.R. § 335.2, USCIS's predecessor agency, INS, described it as "amend[ing] the [INS] regulations relating to fingerprinting applicants and petitioners for benefits under the [INA]." 63 Fed. Reg. 12,979, 12,979 (Mar. 17, 1998). Indeed, USCIS has repeatedly referred to the "criminal background check" as an FBI fingerprint check. See Waiving the Fingerprinting Requirement for Certain Disabled Naturalization Applicants, 69 Fed. Reg. 37552-01, 37553 (June 28, 2004) (codified at 8 C.F.R. §§ 316.4, 335.2) (stating that the purpose of the fingerprint check is to conduct a criminal background check: "Currently, all naturalization applicants . . . are required to be fingerprinted . . . for the purpose of conducting criminal background checks by the Federal Bureau of Investigation. . . .") (emphasis added); 65 Fed. Reg. 46,741-01 (July 31, 2000) (announcing its fingerprint records system: "Individuals who have filed application or petitions for benefits under the Immigration and Nationality Act . . . are required to submit fingerprints in order for a criminal background check to be conducted by the Federal Bureau of Investigation [FBI].") (emphasis added).

Third, as discussed above, USCIS did not require a definitive response to FBI name checks before adjudicating naturalization applications until 2002. Thus, it clearly did not interpret 8 C.F.R. § 335.2, which was promulgated in 1998, as requiring the completion of an FBI name check.

The "full criminal background check" referenced in 8 C.F.R. § 335.2 has consistently and plainly been understood to be synonymous with an FBI fingerprint check. And where, as here, the plain and ordinary meaning of regulatory language can be read on its face, courts must adhere to that meaning. See Caminetti v. United States, 242 U.S. 470, 485 (1917); Garcia v. Teitler, 443 F.3d 202, 207 (2d Cir. 2006).

25

For these reasons, in <u>Mocanu v. Mueller</u>, 2008 WL 372459, at *8, the court rejected

Defendants' contention that the FBI name check was required by the Appropriations Act of 1998

and 8 C.F.R. § 335.2 and rightly determined that the FBI name check is not within the scope of

the full criminal background check. The <u>Mocanu</u> Court concluded that the Government's "leaps

of argument are not supported by statutory language, principles of statutory construction,

principles of administrative law, or logic." <u>Id.</u> at *7. The <u>Mocanu</u> Court noted that if Congress

intended USCIS to require an FBI name check, Congress would have explicitly included the

term "name check" in the Appropriations Act of 1998.[3] <u>Id.</u>; <u>cf.</u> <u>Blaser v. Bessemer Trust Co.</u>,

No. 01 Civ. 11599, 2002 WL 31359015, at *3 (S.D.N.Y. Oct. 21, 2002) (stating that if Congress

intended to saddle the government with "[a] task, it would have stated so explicitly"). The

<u>Mocanu</u> Court also found that the name check requirement cannot be read into the section 335.2

reference to an administrative record. 2008 WL 372459, at *8. In summary, the Court held that

"there is no support that the current USCIS practice of securing an FBI name check as a

prerequisite to [a lawful permanent resident] becoming a naturalized citizen is authorized by

statute or regulation." <u>Id.</u> at *8.

USCIS's implementation of the 2002 Rule requiring completion of the FBI name check

prior to adjudication of naturalization applications is without any adequate legislative basis. It is

thus a "legislative rule" that must comply with 5 U.S.C. § 553(a).

(iii)    **The 2002 Rule effectively amended the prior legislative rule**

The <u>AMC</u> test utilized by the Second Circuit also requires the provision of notice and an

opportunity to comment if "the rule effectively amends a prior legislative rule." <u>AMC</u>, 995 F.2d

---

[3] "The FBI name check process has been in existence since the Eisenhower administration. If in fact Congress intended USCIS to require a "name check," Congress would have used that term given that the "name check" program had been in place for many years. Congress could have directly referenced a "name check," but did not do so." <u>Mocanu</u>, 2008 WL 372459 at *7.

at 1112. The 2002 Rule created a new requirement that far exceeds the "criminal background check" authorized by 8 C.F.R. § 335.2, and that significantly amended USCIS rules concerning the type and level of background check that must be completed prior to adjudication of naturalization applications. Before 2002, according to USCIS's own interpretation of section 335.2, a fingerprint check was sufficient to comply with the requirement that a full criminal background check be completed. The Mocanu Court, with the benefit of a full factual record, considered this precise issue – whether USCIS's implementation, in 2002, of the requirement that the FBI name check be completed was a legislative rule subject to the notice-and-comment provisions of the APA – and determined that it was. The Mocanu Court conclusively ruled that by adding this requirement "USCIS has moved beyond an interpretative rule." 2008 WL 372459, at *11.

Where, as here, a government agency has implemented a legislative rule and failed to comply with the notice-and-comment provisions of section 553, "a person may not in any manner . . . be adversely affected by" the implementation of the rule. 5 U.S.C. § 552(a)(1). See also Perales v. Sullivan, 948 F.2d 1348, 1354 (2d Cir. 1991) (finding that a rule is "legislative" when it produces significant effects on private interests); Mocanu, 2008 WL 372459 at *10-*12. In the case at bar, there can be no doubt that Plaintiffs have been adversely affected – and will continue to be adversely affected – by USCIS's adherence to its 2002 Rule.

The naturalization applications of Plaintiffs have been delayed months, and in some cases, years, by USCIS's illegal refusal to process their applications without the results of an FBI name check. As discussed fully in Section I.A, supra, Plaintiffs are suffering irreparable harm while their naturalization applications languish. They have been denied opportunities for employment and are unable to sponsor spouses or relatives living abroad for immigration

27

benefits, they cannot travel freely with the protection and peace of mind that comes with citizen status, and they have been denied the right to vote.   It was precisely these harms that moved the court in <u>Mocanu</u> to enjoin USCIS's use of the FBI name check "as a factor in the decision making" as to the adjudication of the Plaintiffs' naturalization applications.   2008 WL 372459, at *17.

Thus, because USCIS's 2002 Rule effectively amended 8 C.F.R. § 335.2, a prior legislative rule, and because this action adversely impacts Plaintiffs, this Court should enjoin USCIS from continuing to withhold or delay action on Plaintiffs' naturalization applications on the basis of the FBI name checks.

### 2.    Defendants have "unreasonably delayed" adjudication of the naturalization applications of Plaintiffs in violation of the APA

USCIS Defendants are violating the APA by unlawfully withholding and unreasonably delaying adjudication of Plaintiffs' naturalization applications, applications that Defendants are required to adjudicate.  The APA requires USCIS to conclude matters presented to it "within a reasonable time."  5 U.S.C. § 555(b).  As with other federal agencies, when USCIS fails to conclude a matter presented to it within a reasonable time, this Court may compel agency action. 5 U.S.C. § 706(1); <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 64 (2004) ("a claim under § 706(1) can proceed . . . where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take"); <u>Brock v. Pierce County</u>, 476 U.S. 253, 260 n.7 (1986) (noting that the APA permits district court to compel agency action).

Agency action is "unreasonably delayed" when an agency fails to act within a reasonable time even when the governing statute does not require action by a date certain.  <u>Kim v. Ashcroft</u>, 340 F. Supp. 2d 384, 393 (S.D.N.Y. 2004) ("although there is no statutory or regulatory deadline by which the CIS must adjudicate an application, at some point, defendants' failure to take any

28

action runs afoul of section 555(b)").[4]  "A contrary position would permit the [USCIS] to delay

indefinitely.  Congress could not have intended to authorize potentially interminable delays."  Yu

v. Brown, 36 F. Supp. 2d 922, 932 (D.N.M. 1999) (internal quotation omitted); Kim, 340

F.Supp.2d at 393.  The elements of a claim for unreasonable delay under 5 U.S.C. § 706(1) are:

(1) a discrete, ministerial duty; (2) a delay in carrying out that duty; and (3) a determination that

the delay was unlawful or unreasonable in light of prejudice to one of the parties.  Norton, 542

U.S. at 62-66.

It is therefore clear that the Defendants in this case are required to adjudicate

naturalization applications.  See 8 U.S.C. § 1446; Yu, 36 F. Supp. 2d at 931 ("All other courts. . .

have held that INS has a non-discretionary duty to process. . . immigration applications.");

Eldeeb v. Chertoff, No. 8:07-CV-236-T-17EAJ, 2007 WL 2209231, at *14 (M.D. Fla. July 30,

2007).  "Were it otherwise, the CIS could hold adjustment applications in abeyance for decades

without providing any reasoned basis for doing so.  Such an outcome defies logic – the CIS

simply does not possess unfettered discretion to relegate aliens to a state of 'limbo,' leaving them

to languish there indefinitely. This result is explicitly foreclosed by the APA."  Kim, 340 F.

Supp. at 393; see also Bondarenko v. Chertoff, No. 07-mc-0002, 2007 WL 2693642, at *2-3

(W.D.N.Y. Sept. 11, 2007).  Although the INA places the decision of whether to grant a

naturalization application in the sound discretion of USCIS, it does not give USCIS unfettered

discretion to indefinitely delay that decision.

---

[4] See also Liang v. Attorney General of U.S., No. C-07-2349 CW, 2007 WL 3225441, at *5 (N.
D. Cal. Oct. 30, 2007) (finding that even though Defendants are not statutorily obliged to adhere
to any particular time-frame in adjudicating I-485 applications, "each adjudication must
ultimately be completed within a reasonable amount of time").

Defendants have unquestionably delayed in the processing of proposed class members'
naturalization applications – applicants routinely wait more than a year, and in some cases as
many as 5 years for adjudication of their naturalization applications.  See supra Statement of
Facts, Section II.  Thus, the Court must determine whether Defendants' delay is reasonable.

The Second Circuit has observed that "[i]n determining reasonableness [for purposes of
the APA], we look to the source of delay – e.g., the complexity of the investigation as well as the
extent to which the defendant participated in delaying the proceeding."  Reddy v. Commodity
Futures Trading Comm'n, 191 F.3d 109, 120 (2d Cir. 1999).  The instant case features a
proposed class of lawful permanent residents who timely filed and properly submitted
naturalization applications that have all been pending beyond 180 days, and in many cases
upwards of three to four years.  (Milanes Decl. ¶¶ 4, 6; Farfan Decl. ¶¶ 2, 4, 8; Martinez Decl. ¶¶
6, 9, 16; Sanchez Decl. ¶¶ 5, 13; Castro Decl. ¶ 5; Chalampa Decl. ¶ 3.); cf. Alkeylani v. Dep't of
Homeland Sec., 514 F. Supp. 2d 258, 266 (D. Conn. 2007).  There is no evidence that the
members of the class have contributed to the delay in the adjudication of their applications.  To
the contrary, they are simply waiting for Defendants to act.

Moreover, the delays are not caused by the complexity of the investigation conducted by
Defendants.  There is no evidence that the criminal background check or the IBIS/TECS check
delays the adjudication of naturalization applications.  In the case of the name checks, FBI has
not even begun to look at the contents of many files related to applicants with "possible
derogatory information" who applied for naturalization as long ago as 2003.  (Sant'Ambrogio
Decl. Ex. P at 106:20-107:3; 150:22-151:5.)  Thus, neither FBI nor USCIS can blame the delays
on the complexity of any issues raised by the content of the applicants' files.  Defendants have
not yet looked at them.  Moreover, the LPR applicants – who reside in this country legally – pose

30

no increased risk to national security insofar as they already underwent the required background checks prior to obtaining lawful permanent residency.

In determining whether an agency delay is unreasonable, courts have also taken guidance from the factors described by the D.C. Circuit in Telecommunications Research and Action Center v. FCC, 750 F.2d 70, 80 (D.C. Cir.1984) ("TRAC"), known as the "TRAC factors."[5]  See Natural Res. Def. Council, Inc. v. Fox, 93 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2000), aff'd in part, remanded in part on other grounds, Natural Res. Def. Council, Inc. v. Muszynski, 268 F.3d 91 (2d Cir. 2001); see also Tummino v. Von Eschenbach, 427 F. Supp. 2d 212, 231 (E.D.N.Y. 2006).  Several of the TRAC factors plainly favor the Plaintiffs in this case, including, inter alia: the Congressional timetables set out in 8 U.S.C. § 1571-1573, 8 U.S.C. § 1447(b), and 8 C.F.R. § 335.3, with which the President of the United States and Defendant USCIS concur (Sant'Ambrogio Decl. Exs. A-C); the matters of "human health and welfare" implicated by the rights of individuals and families at issue in the agency decision; and the high priority for USCIS of naturalizing law-abiding, rule-following permanent residents.[6]

---

[5]  The six TRAC factors are: "(1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." Telecomms Research and Action Ctr., 750 F.2d at 80.

[6] The TRAC test considers only the competing priorities of the particular agency at issue, not competing priorities of the executive branch in general.  See also Daraji v. Monica, No. 07-1749, 2008 WL 183643, at *7 (E.D. Pa. Jan. 18, 2008) (ordering prompt adjudication of naturalization applications despite USCIS's argument that delay caused by insufficient resources); Tang v. Chertoff, 493 F. Supp. 2d 148, 158 (D. Mass. 2007) (ordering prompt adjudication of adjustment of status application despite USCIS's argument that delay caused by "a high volume of

For the foregoing reasons, several courts have held that under the APA, USCIS has an obligation to <u>adjudicate</u> Plaintiffs' naturalization applications within 180 days.  <u>Kim</u>, 340 F. Supp. 2d at 389; <u>Huang v. Mukasey</u>, No. C07-96RSM, 2008 WL 628928, at *3 (W.D. Wash. Mar. 4, 2008) ("Several courts facing the same issue have concluded that . . . 'Congress sets a normative expectation . . . of a reasonable processing time for an immigrant benefit application as no more than 180 days after initial application.'") (citation omitted).

Accordingly, Plaintiffs are likely to prevail on the merits of their claim that USCIS has unreasonably delayed the adjudication of their naturalization applications in violation of the APA.

> **3.     USCIS has "unlawfully withheld" adjudication of the proposed sub-class members' naturalization applications in violation of 8 U.S.C. § 1447(b) and 8 C.F.R. § 335.3 and 5 U.S.C. § 555(b)**

USCIS has unlawfully withheld the adjudication of the applications of Plaintiff Sanchez and members of the proposed sub-class because USCIS has not adjudicated their applications within 120 days of their interviews.  An action is "unlawfully withheld" when an agency fails to meet a clear deadline prescribed by Congress.  <u>Forest Guardians v. Babbitt</u>, 164 F.3d 1261, 1272 (10th Cir. 1998).  The Tenth Circuit, in <u>Forest Guardians</u>, held that "when Congress by organic statute sets a specific deadline for agency action, neither the agency nor any court has discretion. The agency must act by the deadline. If it withholds such timely action, a reviewing <u>court must compel the action unlawfully withheld</u>." <u>Id.</u> at 1272 (emphasis added); <u>see also</u> <u>Biodiversity Legal Found. v. Badgley,</u> 309 F.3d 1166, 1178 (9th Cir. 2002) (holding "[t]he Service's failure to complete the listing determinations within the mandated time frame <u>compelled</u> the court to grant injunctive relief.  The court had no discretion to consider the Service's stated priorities.").

---

applications and scarce resources"); <u>Zhu v. Chertoff,</u> 525 F. Supp. 2d 1098, 1101 (W.D. Mo. 2007) (same).

This Court is therefore compelled to grant the injunctive relief requested on behalf of the proposed sub-class. Congress, in enacting 8 U.S.C. 1447(b), set a clear "specific deadline" within which the USCIS is to adjudicate applications. Forest Guardians, 164 F.3d at 1272. USCIS clearly understands this statute to create a specific deadline, as its own implementing regulation states: "[a] decision to grant or deny the application shall be made at the time of the initial examination or within 120-days after the date of the initial examination of the applicant for naturalization." 8 C.F.R. § 335.3(a). Moreover, "the majority of courts addressing this issue have concluded that the term 'examination' in § 1447(b) refers to a discrete event – the agency's initial interview of the applicant – and that the 120-day period begins to run as of the date that interview is concluded." Walji v. Gonzales, 500 F.3d 432, 435-36 (5th Cir. 2007) (collecting cases).

The "majority" referenced in Walji includes this Court, which routinely has held that the examination referred to in section 1447(b) is the agency's initial interview of the naturalization applicant. See, e.g., Al-Farisi v. Mueller, 492 F. Supp. 2d 335, 337 (S.D.N.Y. 2007) ("I follow the plain language of the statute, my distinguished colleagues Judges Koeltl and Lynch, and the overwhelming majority of federal district judges in holding that the 'examination' referred to in § 1447(b) is the applicant's CIS interview."); accord Alomari v. Keisler, No. 07 Civ. 628 (RMB), 2007 WL 3255004, at *2 (S.D.N.Y. Nov. 1, 2007); Borromeo Escaler v. USCIS, No. 03 Civ. 8418 (BSJ), 2007 WL 1975485, at *1 (S.D.N.Y. July 6, 2007) ("the applicant is examined under oath by a CIS official, who generally is required to grant or deny the application for naturalization within 120 days of the examination").

Thus, USCIS has no "discretion," and "must act by the [120 day] deadline." <u>Forest Guardians</u>, 164 F.3d at 1272. As USCIS has withheld "such timely action," this Court "<u>must compel</u>" the agency to take the "action unlawfully withheld." <u>Id.</u> (emphasis added).

**4.    FBI has unreasonably delayed completion of FBI name checks for naturalization applicants**

If the Court should find, contrary to the plain meaning of the statutory and regulatory language discussed above, that Congress has required the completion of the FBI name check prior to adjudication of naturalization applications, then Defendant FBI has a mandatory duty to complete these name checks within a reasonable time under sections 555(b) and 706(1) of the APA. There can be no doubt that FBI has failed to process FBI name checks for naturalization applicants within a "reasonable time." Hundreds of thousands of name checks requested by USCIS are pending at the FBI, of which 97,397 have been pending for more than one year and 45,820 have been stalled at FBI for more than two years. (Sant'Ambrogio Decl. Ex. O.) "As of May 2007, USCIS reported . . . 31,144 . . . name check[s] pending more than 33 months." (<u>Id.</u> Ex. M at 37.) Indeed, USCIS's own Ombudsman has noted that "[t]he delay caused by the FBI name check has substantial consequences to applicants and their families, as well as to our country and the economy." (<u>Id.</u> at 9.)

Consequently, Plaintiffs are likely to prevail on the merits of their claim that the delay caused by the FBI criminal background checks in the adjudication of naturalization applications is unreasonable under the APA. <u>See</u> <u>Alhamedi</u>, 2007 WL 1573935, at *4 (denying motion to dismiss section 555(b) claims of naturalization applicant and ordering FBI to "expedite and complete Alhamedi's name check and report the results to the CIS within 30 days.").

**C.    The Balance Of Hardships Tips Decidedly In Plaintiffs' Favor**

In determining whether to grant injunctive relief, a court must weigh the respective burdens and determine whether the balance of the equities tips in the movant's favor. <u>Green Party of New York State v. New York State Bd. of Elections</u>, 389 F.3d 411, (2d Cir. 2004). "[T]he balance of hardships . . . tips decidedly in favor of the plaintiffs [if] the injunction that will issue will require [defendants] to do no more than comply with [the laws and regulations] that [defendants are] obliged to follow in any case." <u>Capital Real Estate Investors Tax Exempt Fund Ltd. P'ship v. Schwartzberg</u>, 917 F. Supp. 1050, 1065 (S.D.N.Y. 1996); <u>see also</u> <u>Withrow v. Concannon</u>, 942 F.2d 1385, 1388 (9th Cir. 1991) ("An injunction requiring adherence to the regulations . . . imposes no inappropriate obligation on the state."); <u>Haskins v. Stanton</u>, 794 F.2d 1273, 1277 (7th Cir. 1986) ("Because the defendants are required to comply with the . . . Act, we do not see how enforcing compliance imposes any burden on them."). Finally, if the balance of hardships tips decidedly toward the movant, the movant need not demonstrate a likelihood of success on the merits; "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." <u>Jacobson & Co., Inc. v. Armstrong Cork Co.</u>, 548 F.2d 438, 442 (2d Cir. 1977) (citation omitted).

As discussed above in Section I.B., Plaintiffs suffer ongoing injury as a result of Defendants' failure to adjudicate their naturalization applications. Plaintiffs have been denied opportunities for employment and subsistence-level benefits, have been unable to sponsor spouses or relatives, cannot travel freely, and are unable to vote. Absent preliminary injunctive relief, Plaintiffs and thousands of members of the proposed class will be unable to vote in the November 2008 election. "The law is well established that the denial of the opportunity to vote is irreparable injury per se." <u>Campos</u>, 70 F. Supp. 2d at 1309.

35

The preliminary injunctive relief sought by Plaintiffs imposes no legally cognizable burden on Defendants.  First, because Defendants are required to comply with the APA, 8 U.S.C. § 1447(b), and 8 C.F.R. § 335.3(a), ordering Defendants to adjudicate the naturalization applications of the preliminary injunction group, all of whom have been waiting for adjudication of their applications for more than six months, before the November 2008 election (by which time all of them will have been waiting one to five or more years) does not impose any burden on Defendants.  "The Act itself imposes the burden; [the] injunction merely seeks to prevent the [D]efendants from shirking their responsibilities under it."  Haskins, 794 F.2d at 1277.

Second, "delays of [a significant] magnitude, particularly when they occur over uncomplicated matters of great importance to the individuals involved, may not be justified merely by assertions of overwork."  Dabone v. Thornburgh, 734 F. Supp. 195, 203 (E.D. Pa. 1990); see also supra note 6.

Third, ordering Defendants to proceed with adjudicating the applications of the preliminary injunction group without waiting for the results of FBI name checks does not impose any hardships upon Defendants.  Prior to December 2002, USCIS did not require a definitive name check response before adjudicating naturalization applications if no derogatory information was received from FBI within sixty days.  (Sant'Ambrogio Decl. Ex. G, Response No. 3.) Similarly, USCIS does not require a definitive name check response before adjudicating applications by aliens for temporary or permanent residency.  (Id. Ex. N.)

Furthermore, adjudicating the applications of the preliminary injunction group without waiting for the results of FBI name checks does not pose any threat to national security or public safety.  USCIS effectively admits that name checks are not necessary to protect the public because it does not require their completion before granting temporary or permanent residency

36

applications.  (Id.)  If granting residency in this country to aliens without the final results of an

FBI name check poses no risk to national security or public safety, neither does granting

citizenship to LPRs who typically (1) have resided in this country for at least five years, (2) have

already undergone a full criminal background check in connection with obtaining permanent

residency, and (3) undergo an additional criminal background check and IBIS/TECS check in

connection with their naturalization applications.  (Id. Ex. V.)

     Moreover, Defendants have never shown that they obtain any actionable information

from FBI name checks that is not more readily available from other sources.  FBI admits that it

does not possess <u>any</u> information about more than ninety-nine percent of naturalization

applicants.  (Id. Ex. L, ¶ 14.)  And Defendants have never ascertained whether any of the

information that FBI does possess constitutes derogatory information or what percentage of any

derogatory information FBI possesses is available only through a name check.  (Id. Ex. H at

155:24-156:2; 159:8-160:10.)  USCIS's own Ombudsman "has been unable to ascertain from

USCIS the total number of actual problem cases that the agency discovered exclusively as a

result of the FBI name check.  The Ombudsman understands that most, if not all, of the problem

cases which would result in an eventual denial of benefits also can be revealed by the other more

efficient, automated criminal and security checks that USCIS initiates."  (Id. Ex. M at 41.)

     In any event, ordering Defendant USCIS to proceed with adjudicating the applications of

naturalization applicants whose name checks have stalled at FBI merely requires USCIS to

comply with the APA, 8 U.S.C. § 1447(b), and 8 C.F.R. § 335.3(a).  Even USCIS admits that it

is "unlikely . . . that FBI name checks reveal actionable information."  (Id. Ex. N at 2.)  In that

"unlikely" event, DHS may denaturalize the applicant.  8 U.S.C. § 1451.

In sum, Plaintiffs and the preliminary injunction group continue to suffer irreparable injury due to Defendants' unlawful policies and practices, while ordering Defendants to comply with statutory and regulatory requirements poses no legally cognizable hardship on them. Accordingly, the balance of hardships tips decidedly in Plaintiffs' favor and the Court should grant them preliminary injunctive relief.

## II.    The Proposed Class And Sub-class Should Be Certified

Plaintiffs move for certification of a class of persons affected by Defendants' policies and practices defined as follows:

> All lawful permanent residents who reside in the counties served by the New York District Office of USCIS who have properly submitted or will properly submit applications for naturalization to USCIS, who have taken all actions requested of them by USCIS, and whose applications for naturalization have not been or will not be adjudicated by USCIS within 180 days of the date of submission.

Plaintiffs further move for certification of a sub-class defined as follows:

> All lawful permanent residents who reside within the counties in the Southern District of New York served by the New York District Office of USCIS, who have properly submitted or will properly submit applications for naturalization to USCIS, who have taken all actions requested of them by USCIS, and whose applications for naturalization have not been or will not be adjudicated by USCIS within 120 days of the date of their initial examination.

Plaintiffs' motion for class certification should be granted because Plaintiffs satisfy the requirements of Rule 23(a) and (b)(2) and class certification is essential to the fair and efficient adjudication of this case.

### A.    The Proposed Class And Sub-class Satisfy The Requirements Of Rule 23(a)

The proposed class and sub-class each meet the requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure because: (1) the number of persons is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class and sub-class; (3) the claims of the named Plaintiffs are typical of those of

the class and sub-class; and (4) the named Plaintiffs and their counsel will fairly and adequately protect the interests of the class and sub-class.  Fed. R. Civ. P. 23(a); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997).

### 1.    The class and sub-class are so numerous that joinder of all class and sub-class members is impracticable

Joinder of all the members of the proposed class and sub-class is completely impracticable, if not impossible, because the members of the class number several thousand and include many low-income immigrants without the financial resources to litigate individual federal court actions.  The proposed class also will grow in number over time due to the unreasonable and unlawful practices and policies of Defendants.  Therefore, class certification is the only method by which members of the class and sub-class can obtain the relief to which they are legally entitled.

Rule 23(a)(1) of the Federal Rules of Civil Procedure requires that the class be "so numerous that joinder of all members is impracticable."  Impracticability of joinder means difficulty or inconvenience of joinder; it does not mean impossibility of joinder.  Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).  The Second Circuit has held that "numerosity is presumed at a level of 40 members."  Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).  When estimating the number of class members, "[i]t is permissible for the plaintiffs to rely on reasonable inferences drawn from the available facts."  German v. Fed. Home Loan Mortgage. Corp., 885 F. Supp. 537, 552 (S.D.N.Y. 1995).  And the court may consider materials outside the pleadings in deciding whether the class is numerous.  See Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571 (2d Cir. 1982).

The proposed class and sub-class satisfy the numerosity requirement of Rule 23(a)(1). The proposed class consists of thousands of LPRs who, like the named Plaintiffs, reside in the

39

counties served by USCIS's New York District Office and are suffering from delays in excess of

180 days from the date of submission of their naturalization applications.  Many of these

individuals are also suffering from delays in excess of 120 days from the date of their initial

examination.  The precise number is available only from the records of Defendant USCIS.  But,

as discussed above in Section II.D. of the Statement of Facts, there are likely more than 100,000

existing and potential future members of the class based on USCIS's own figures.

It is not a barrier to class certification that the exact size of the class and the identity of its

members are unknown at the time of certification.  See Robidoux, 987 F.2d at 935 ("Courts have

not required evidence of exact class size or identity of class members to satisfy the numerosity

requirement."); Reynolds v. Giuliani, 118 F. Supp. 2d 352, 389 (S.D.N.Y. 2000); 1 Herbert B.

Newberg, Newberg on Class Actions § 3.05 (3d ed. 1992).  Moreover, "lack of knowledge of the

exact number of persons affected is not a bar to certification where the defendants alone have

access to such data."  German, 885 F. Supp. at 553 (quoting Clarkson v. Coughlin, 783 F. Supp.

789, 798 (S.D.N.Y. 1992)); see also Folsom v. Blum, 87 F.R.D. 443, 445 (S.D.N.Y. 1980).

Here, Defendants alone have access to their internal records from which the exact size and

identity of the class can be determined.

Joinder is impracticable here for reasons in addition to the large size of the proposed

class.  First, many persons suffering from naturalization delays are low-income immigrants who

cannot afford counsel to litigate individual federal district court actions.  "Class members' lack

of financial resources . . . makes joinder difficult."  Reynolds, 118 F. Supp. 2d at 388; see also

Robidoux, 987 F.2d at 936 (financial resources of plaintiffs a factor in impracticability of

joinder).  Second, the proposed class and sub-class include persons who will become class

members in the future.  Joinder is therefore impracticable because the class composition will

change "as existing [public] benefits are discontinued, and new applications are granted."
Folsom, 87 F.R.D. at 445; see also Reynolds, 118 F. Supp. 2d at 388 ("fluid nature of the class
further supports . . . finding that joinder is impracticable").

Accordingly, Plaintiffs have easily demonstrated that joinder of all class and sub-class
members is impossible.

### 2.     There are questions of law and fact common to the class and sub-class

Class certification is appropriate because multiple questions of law and fact are common
to members of the proposed class and sub-class.  Put simply, USCIS has failed to adjudicate the
naturalization applications of all the members of the class as a result of the same unreasonable
and unlawful policies and practices.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  The
commonality requirement is satisfied when defendants apply a common course of prohibited
conduct to the plaintiff class.  See Escalera v. New York City Hous. Auth., 425 F.2d 853, 867
(2d Cir. 1970).  The Second Circuit has approved district court findings of commonality at a
"high level of abstraction," such as "whether each [member of the plaintiff class] has a legal
entitlement to the services of which that [plaintiff] is being deprived . . . [and] whether
defendants systematically have failed to provide these legally mandated services."  Marisol A. v.
Giuliani, 126 F.3d 372, 377 (2d Cir. 1997).  The existence of factual variations in the types of
irreparable injury suffered or in the length of the delay does not preclude class certification.
Robidoux, 987 F.2d at 937-38.  Factual disputes, if any, regarding the effect of the challenged
actions on class members are irrelevant to the determination that common questions exist.  See,
e.g., Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J., 698 F.2d 150, 153-54 (2d
Cir. 1983); Norwalk CORE v. Norwalk Redev. Agency, 395 F.2d 920, 937 (2d Cir. 1968).

Plaintiffs clearly meet the commonality requirement, as this action raises multiple questions of both law and fact that are common to all members of the proposed class.  First, all members of the proposed class share the factual background of having the adjudication of their naturalization applications delayed for at least 180 days from the date the applications were submitted.  Plaintiffs' claims also raise numerous legal questions common to the class, including but not limited to:

- Whether USCIS's implementation of a policy or practice of requiring an FBI name check to be completed before adjudicating a naturalization application without first publishing a proposed regulation and providing a notice-and-comment period violates the APA;

- Whether USCIS's implementation of a policy or practice of requiring that the scope of the FBI name check be expanded to include checking whether a naturalization applicant is referenced in someone else's FBI file without first publishing a proposed regulation and providing a notice-and-comment period violates the APA;

- Whether USCIS's actions and omissions, including its failure to adjudicate the naturalization applications of the proposed class within 180 days of the date of submission, violate the INA and implementing regulations and constitute unreasonable delay and unlawful withholding of agency action in violation of the APA and the Due Process Clause of the Fifth Amendment to the U.S. Constitution;

- Whether the FBI's actions and omissions, including its failure to complete name checks in a timely manner so as to allow USCIS to adjudicate the naturalization applications of the proposed class within 180 days of the date of submission in accordance with the governing timeliness standards, constitute unreasonable delay and unlawful withholding of agency action in violation of the APA; and

- Whether USCIS's and the FBI's failure to set deadlines for completing name checks and failure to take all reasonable steps necessary to complete the adjudication of applications for naturalization of the proposed class within 180 days of the date of submission in accordance with the governing timeliness standards violate the APA.

Although members of the class may differ in whether they ultimately should be granted citizenship, those issues are not presented in this case, as Plaintiffs do not ask the Court to naturalize the entire class.  Rather, Plaintiffs challenge Defendants' policies and practices that are causing delays in the naturalization process and seek declaratory and injunctive relief to

42

remedy systemic delays and to force Defendants to adjudicate class members' applications

within a reasonable period of time, as required by law. These are the "unifying thread[s] among

the members' claims that warrant[] class treatment." Kamean v Local 363, 109 F.R.D. 391, 394

(S.D.N.Y. 1986).

The proposed sub-class likewise satisfies the commonality requirement. It consists of all

class members whose naturalization applications have not been adjudicated within 120 days of

the date of their initial examinations. The expiration of this time period gives these individuals

an additional, common cause of action under 8 U.S.C. § 1447(b). When a sub-group of a

proposed class has an additional statutory claim, certification of a sub-class is appropriate. See

Marisol A., 126 F.3d at 379 (affirming certification of class and calling for further proceedings

dividing class into sub-classes based on, inter alia, "the discrete legal claims which are at issue");

see also 7 Charles Alan Wright et al., Federal Practice and Procedure § 1790 (3d ed. 2004) (sub-

classes employed, among other reasons, in "actions in which the class members can be

subdivided into groups seeking relief under different statutes").

In sum, "[t]here are questions of law and fact common to all members of the class,

namely whether defendants are in derogation of their legal obligations under federal statutes to

process [Plaintiffs'] applications . . . in a timely manner." Brown v. Giuliani, 158 F.R.D. 251,

268 (E.D.N.Y. 1994). Accordingly, the proposed class and sub-class satisfy the commonality

requirement of class certification.

> **3.    The claims of the named plaintiffs are typical of the claims of the members of the proposed class and sub-class**

The claims of the named Plaintiffs are typical of the claims of the members of the class

and sub-class because they arise from the same unreasonable and unlawful conduct of

Defendants and all members of the class and sub-class will benefit from the named Plaintiffs'
actions.

Rule 23(a)(3) requires that the claims of the named plaintiffs be "typical" of the claims of
the proposed plaintiff class.  "Typicality requires that the claims of the class representatives be
typical of those of the class, and is satisfied when each class member's claim arises from the
same course of events, and each class member makes similar legal arguments to prove the
defendant's liability."  Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir.
2001) (internal quotation marks and citation omitted).  "When it is alleged that the same
unlawful conduct was directed at or affected both the named plaintiff and the class sought to be
represented, the typicality requirement is usually met irrespective of minor variations in the fact
patterns underlying the individual claims."  Robidoux, 987 F.2d at 936-37.  In addition, "named
plaintiffs satisfy the typicality requirement when all members of the class would benefit from the
named plaintiffs' actions."  Gulino v. Bd. of Educ. of City Sch. Dist. of New York, 201 F.R.D.
326, 332 (S.D.N.Y. 2001); see also Cortigiano v. Oceanview Manor Home for Adults, 227
F.R.D. 194, 206 (E.D.N.Y. 2005) ("That all members of the class would benefit from the named
plaintiffs' action demonstrates that the typicality requirement is met.").

The typicality requirement is easily met here.  The named Plaintiffs and all the members
of the proposed class have an identical interest in enforcing reasonable time limits on the
government's processing of naturalization applications.  Their claims arise from the same illegal
conduct by Defendants – i.e., the failure of USCIS Defendants to publish a proposed regulation
and provide a notice-and-comment period prior to implementing a policy of requiring an FBI
name check to be completed before adjudicating a naturalization application and requiring that
the scope of the FBI name check be expanded to include checking whether a naturalization

44

applicant is referenced in someone else's FBI file, the failure of USCIS Defendants and Defendant Mukasey to adjudicate their naturalization applications in a timely manner, the failure of Defendants Mukasey and Mueller to complete the FBI name check in a timely manner, and the failure of all Defendants to collectively take all steps necessary to adjudicate proposed class members' naturalization applications in a timely manner.  Similarly, named Plaintiff Sanchez, who had his naturalization examination in 2005 (Sanchez Decl. ¶ 7), has claims that are typical of those of the proposed sub-class.  See Marisol A., 126 F.3d at 379 (each sub-class must be represented by a named plaintiff).

Differences in the particular circumstances of the named Plaintiffs or whether their naturalization applications will ultimately be approved are not relevant.  See Brown, 158 F.R.D. at 268 ("The existence of factual variations in the types of irreparable injury suffered or in the length of the delay does not preclude class certification."); Latino Officers Ass'n of New York v. City of New York, 209 F.R.D. 79, 89 (S.D.N.Y. 2002) (typicality inquiry goes to "the nature of the claim of the class representatives, and not to the specific facts from which the claim arose or relief is sought") (citation omitted).  All class members would benefit from the success of the named Plaintiffs in obtaining the relief that they seek – the timely adjudication of naturalization applications.

Accordingly, Plaintiffs have satisfied Rule 23(a)(3)'s typicality requirement.  See Brown, 158 F.R.D. at 268 ("The claims of the named plaintiffs are typical of those of the plaintiff class, to wit: each has suffered irreparable injuries as a result of untimely determination and payment of welfare benefits.").

    **4.    The named plaintiffs will fairly and adequately protect the interests of the members of the proposed class and sub-class**

Plaintiffs and their counsel "will fairly and adequately protect the interests of the class [and sub-class]." Fed. R. Civ. P. 23(a)(4). In order to satisfy this requirement, Plaintiffs must show that (1) the interests of the named plaintiffs coincide with the interests of the class; and (2) class counsel is qualified, experienced, and generally able to conduct the litigation. See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60-61 (2d Cir. 2000); In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992). Both elements are satisfied in this case.

The interests of the named Plaintiffs and the members of the proposed class and sub-class are entirely co-extensive. As set forth above, all seek declaratory and injunctive relief to ensure that their naturalization applications are adjudicated in a timely manner. There are no conflicts among the named Plaintiffs, members of the proposed class, or members of the proposed sub-class, all of whom are being or will be harmed by the Defendants' failure to adjudicate their naturalization applications in a timely manner. See Brown, 158 F.R.D. at 268 ("the interests of the named parties coincide with the interests of the class as a whole, namely, to obtain speedy determination of welfare benefits"); Marisol A., 126 F.3d at 378 (Plaintiffs' interests are identical with class members when seeking broad based relief).

The adequacy of class counsel is beyond question. Plaintiffs are represented by the Puerto Rican Legal Defense and Education Fund, the New York Legal Assistance Group, and Weil, Gotshal & Manges LLP. These two non-profit organizations and one private law firm have extensive experience in immigration law and class-action litigation, and have the resources and commitment necessary to protect and advance the interests of all members of the proposed class throughout this litigation.

**B.    The Class And Sub-class Satisfy The Requirements Of Rule 23(b)(2)**

The proposed class and sub-class should be certified pursuant to Rule 23(b)(2) because Plaintiffs challenge Defendants' systemic failure to adjudicate the naturalization applications within 180 days of the date of submission and seek declaratory and injunctive relief from the practices and policies behind Defendants' failure to act.

Class certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2); see also Amchem Prods., 521 U.S. at 614 (in addition to meeting four requirements of Rule 23(a), class must be maintainable under Rule 23(b)(1), (2), or (3)).  "The [Rule 23](b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."  Robinson, 267 F.3d at 162.

Plaintiffs challenge arbitrary and unreasonable government policies that affect thousands of people and cause significant hardship, under conditions that make it extremely unlikely that individuals can effectively challenge the policies.  This is exactly the kind of problem that Rule 23(b)(2) class actions were created to remedy.  See Comer v. Cisneros, 37 F.3d 775, 796 (2d Cir. 1994) (Rule 23(b)(2) satisfied "because the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to" the class); Lovely H. v. Eggleston, 235 F.R.D. 248, 257 (S.D.N.Y. 2006) ("Cases . . . alleging systemic failure of governmental bodies to properly fulfill statutory requirements[] have been held to be appropriate for class certification under Rule 23(b)(2).") (citation omitted).

Individual suits are extremely unlikely to be effective in obtaining across-the-board relief not only because many members of the proposed class and sub-class lack resources to bring such suits, but also because of a government litigation strategy that ensures that judgments are not

47

entered by providing relief to individual plaintiffs as soon as they seek access to the courts.  In

January 2008, a federal district court in Pennsylvania concluded that the government had

deliberately implemented a litigation strategy of mooting out the claims of plaintiffs challenging

unreasonable delays in naturalization adjudications.  Mocanu v. Mueller, No. 07-445, 2008 WL

154606, at *5 (E.D. Pa. Jan. 11, 2008) ("It appears that in most cases, before a final judgment is

reached, the government finds a way to resolve the case, usually by granting the naturalization

petition and having the oath administered, so as to make the case moot.").

　　　In a subsequent order, the court noted that a declaration filed by a USCIS official in the

case "confirmed the Court's suspicion . . . that USCIS seeks to resolve all cases filed in Court

before they reach trial."  Mocanu v. Mueller, No. 07-445, 2008 WL 238443, at *4 n.11 (E.D. Pa.

Jan. 25, 2008).  By following such a practice, the government ensures that even those few

individual plaintiffs who are able to bring suit will never be able to follow through on their

claims to the point that the government would be forced to consider – much less implement – a

change in its policies and practices that would remedy this problem for the class as a whole.

　　　Moreover, individual lawsuits brought by members of the proposed class and sub-class

are unlikely to solve the underlying systemic problems challenged in this action.  Only a class-

wide remedy can sufficiently address the government's illegal policy and practice of unlawfully

withholding and/or unreasonably delaying the adjudication of naturalization applications, and of

doing so in part pursuant to a substantive policy change that violates the publication and notice-

and-comment requirements of the APA.

　　　Therefore, class certification is appropriate under Rule 23(b)(2).

### C.　　Plaintiffs Are Entitled To Discovery On Class Certification

　　　As set forth above, this case is ideally suited to class certification because of the nature of

the injury being suffered by the named Plaintiffs and thousands of members of the proposed

class and sub-class.  But if the Court has any question as to whether class certification is warranted at this time, it should permit Plaintiffs to conduct discovery in order to answer those questions.  See Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 n.13 (1978); Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 233-34 (2d Cir. 2006) (citing Oppenheimer Fund, 437 U.S. at 351 n.13).

### III.    Plaintiffs Are Entitled To Expedited Discovery Related To The Preliminary Injunction Motion

Pursuant to Rule 26(d) of the Federal Rules of Civil Procedure, Plaintiffs request that the Court order discovery on Plaintiffs' Motion for Preliminary Injunction and Class Certification (the "Motion") to proceed on an expedited basis.[7]  As described above, Plaintiffs' Motion for a Preliminary Injunction seeks an Order requiring USCIS to adjudicate the naturalization applications of a sub-set of the proposed class and sub-class and to naturalize those members of the group found eligible for naturalization by September 22, 2008.  This date is significant – it is the last date that will allow these plaintiffs sufficient time to register to vote in the 2008 elections.   In light of the extremely time-sensitive nature of the relief sought, the parties do not have the luxury of litigating this motion and engaging in discovery upon a standard timetable.  In order to allow the Court sufficient time to consider the merits of Plaintiffs' Motion, and allow Defendants sufficient time to implement any Order awarded in Plaintiffs' favor, discovery on Plaintiffs' motion must occur on an expedited basis.

In cases such as this, Courts have consistently recognized that the urgent nature of the relief sought warrants expedited discovery related to the motion for preliminary relief.  See e.g., Fed. R. Civ. P. 26 advisory committee's note to 1993 Amendments, Subdivision (d) (requests for

---

[7] Rule 26(d) of the Federal Rules of Civil Procedure permits parties to seek leave of court to conduct expedited discovery prior to the Rule 26(f) conference.  See Fed. R. Civ. P. 26(d) and advisory committee's note to 1993 Amendments, Subdivision (d).

expedited discovery will be "appropriate in some cases, such as those involving requests for preliminary injunction or motions challenging personal jurisdiction"); <u>see</u> <u>also</u> <u>Standard Inv. Chartered, Inc. v. National Ass'n of Securities Dealers, Inc.</u>, No. 07 Civ. 22014, 2007 WL 1121734, at *5-*6 (S.D.N.Y.  Apr. 11, 2007) (affirming Magistrate Judge's order granting expedited discovery related to anticipated preliminary injunction motion).

Further, the discovery sought by Plaintiffs is modest and has been narrowly targeted to uncover evidence that is critical to Plaintiffs' Motion.  And Defendants can easily respond to a significant number of Plaintiffs' limited requests by allowing Plaintiffs' counsel access to the discovery obtained by one of Plaintiffs' counsel, the New York Legal Assistance Group, in <u>Yakubova v. Chertoff</u>, a class action challenging delays in the processing of naturalization applications on behalf of naturalization applicants residing in the Eastern District of New York who have been waiting for adjudication of their applications more than 120 days after their examinations.[8]

For the foregoing reasons, this Court should grant Plaintiffs' Motion For Expedited Discovery pursuant to Rule 26(d).

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motions for Preliminary Injunction, Class Certification, and Expedited Discovery.

---

[8]  A confidentiality order was entered in <u>Yakubova</u> on March 1, 2007.  Plaintiffs' counsel in <u>Milanes</u> is prepared to enter into a similar Confidentiality Order to protect the confidentiality of discovery materials produced in this action.

New York, New York
April 3, 2008

Respectfully Submitted,

PUERTO RICAN LEGAL DEFENSE AND
EDUCATION FUND

By: _____/s_____
          Foster Maer
          Jose Pérez
          Jackson Chin
          Alan Levine
          99 Hudson Street, 14th Floor
          New York, New York 10013
          212-219-3360

NEW YORK LEGAL ASSISTANCE GROUP
By: _____/s_____
          Yisroel Schulman
          Jane Greengold Stevens
          Michael Sant'Ambrogio
          Jason Parkin
          450 West 33rd St., 11th Floor
          New York, New York 10001
          212-613-5000

WEIL, GOTSHAL AND MANGES
          James W. Quinn
          Richard W. Slack
          Caroline Hickey Zalka
          Daniel B. Hodes
          767 Fifth Avenue
          New York, NY 10153
          212-310-8000

Attorneys for Plaintiffs