UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VIRGINIA MILANES, OMAR MIGUEL FARFAN,
MANUEL ALBERTO MARTINEZ, ANDRES
GIOVANNY SANCHEZ, NANCY CASTRO, and
MARGOTH PEREZ DE CHALAMPA, on behalf of
themselves and all other similarly situated individuals,

                           Plaintiffs,

      -against-

MICHAEL CHERTOFF, in his official capacity as
Secretary of the Department of Homeland Security,
EMILIO GONZALEZ, in his official capacity as
Director of the United States Citizenship and
Immigration Services, ANDREA QUARANTILLO,
in her official capacity as District Director of the
New York City District of the United States
Citizenship and Immigration Services,
MICHAEL B. MUKASEY, in his official capacity as
Attorney General of the United States, and
ROBERT S. MUELLER, III, in his official capacity as
Director of the Federal Bureau of Investigation,

                         Defendants.
-------------------------------------------------------------------X

08 Civ. 2354

(ECF CASE)

## DECLARATION OF MICHAEL D. SANT'AMBROGIO

     I, Michael D. Sant'Ambrogio, declare and state as follows:

     1.     I am an attorney with the New York Legal Assistance Group ("NYLAG"), co-counsel for Plaintiffs, Virginia Milanes, Omar Miguel Farfan, Manuel Alberto Martinez, Andres Giovanny Sanchez, Nancy Castro, and Margoth Perez de Chalampa, and am admitted to practice in this Court. I submit this declaration based on personal knowledge in support of Plaintiffs' motions for a preliminary injunction, class certification, and expedited discovery.

     2.     No previous request for this relief has been made to any Court.

3.    The following exhibits, attached hereto, are all publicly available and/or of record in federal litigation involving Defendants:

| | |
|---|---|
| Exhibit A: | White House press release concerning signing of H.R. 2500, November 28, 2001 |
| Exhibit B: | White House press release concerning naturalization ceremony, July 10, 2001 |
| Exhibit C: | United States Citizenship and Immigration Services ("USCIS") Questions and Answers, January 31, 2007, located at http://www.uscis.gov/files/pressrelease/QA Building1.pdf |
| Exhibit D: | Excerpts from the Rule 30(b) Deposition of Donald W. Neufeld, February 1, 2008 |
| Exhibit E: | Declaration of Mary Ann Gantner in Yakubova v. Chertoff, No 06-CV-03203 (E.D.N.Y.), dated July 27, 2006 |
| Exhibit F: | USCIS Fact Sheet: Immigration Security Checks, April 25, 2006 |
| Exhibit G: | Defendant Emilio Gonzalez's Response to Plaintiffs' First Set of Interrogatories, Responses Nos. 3, 20 |
| Exhibit H: | Excerpts from 30(b)(6) Deposition of Gregory B. Smith, February 1, 2008 |
| Exhibit I: | Federal Bureau of Investigation ("FBI") Memo from Records Management to Director's Office, dated February 13, 2002 |
| Exhibit J: | Supplemental Declaration of Michael A. Cannon in Mocanu v. Mueller, No. 77-0445 (E.D. Pa.), dated January 15, 2008 |
| Exhibit K: | Declaration of Michael A. Cannon in Yakubova v. Chertoff, No 06-CV-03203 (E.D.N.Y.), dated July 20, 2006 |
| Exhibit L: | Supplemental Declaration of Michael A. Cannon in Yakubova v. Chertoff, No 06-CV-03203 (E.D.N.Y.), dated August 31, 2006 |
| Exhibit M: | Excerpts from USCIS Ombudsman Annual Report 2007, located at http://www.dhs.gov/xlibrary/assets/CISOMB_Annual_Report_2007.pdf |
| Exhibit N: | USCIS Interoffice Memorandum from Michael Aytes to Field Leadership, dated February 4, 2008 |

| Exhibit O: | FBI Name Check Pending Report Comparison |
| --- | --- |
| Exhibit P: | Excerpts from 30(b)(6) Deposition of Michael A. Cannon, December 14, 2007 |
| Exhibit Q: | Written testimony prepared for Emilio T. Gonzalez for a January 17, 2008 hearing before the House Judiciary Committee Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law, located at http://www.uscis.gov/files/testimony/testimony_ETG_17jan08.pdf |
| Exhibit R: | N-400 Naturalization Benefits, located at http://www.uscis. gov/files/article/N-400%20NATURALIZATION%20 BENEFITS_January08.pdf |
| Exhibit S: | Yearbook of Immigration Statistics: 2006, located at http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2006/OIS_2 006_Yearbook.pdf |
| Exhibit T: | Written testimony prepared for Senator Edward M. Kennedy for a March 5, 2008 United States Senate Judiciary Committee Hearing, located at http://kennedy.senate.gov/newsroom/ press_release.cfm?id=D2C19880-1B98-49F9-B6DF- 75B136296E71 |
| Exhibit U: | USCIS Interoffice Memorandum from Michael Aytes to Domestic Directors and Officers in Charge, dated December 21, 2006 |
| Exhibit V: | N-400 Naturalization Instructions, available at http://www.uscis. gov/files/form/N-400ins.pdf |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd of April 2008 in New York, New York

_____

Michael D. Sant'Ambrogio, Esq.

# EXHIBIT A



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH



For Immediate Release
Office of the Press Secretary
November 28, 2001

## President Signs Commerce Appropriations Bill

Statement by the President on H.R. 2500

**\*NOTE: THE 11TH PARAGRAPH OF THIS RELEASE REVISES THE ELEVENTH PARAGRAPH OF A
RELEASE ISSUED EARLIER ON H.R. 2500**

Today I have signed into law H.R. 2500, the "Department of Commerce, Justice, State, the Judiciary, and Related
Agencies Appropriations Act, 2002."

I appreciate the bipartisan effort that has gone into producing this Act.  The bill abides by the agreed upon
aggregate funding level for Fiscal Year 2002 of $686 billion and supports several of my Administration's key
initiatives including:

--  $100 million to support a backlog elimination initiative to achieve a

universal six-month processing standard for all immigration

applications;

--  570 additional Immigration and Naturalization Service agents to

protect our Northern and Southern borders;

--  $50 million grant program in the Office of Justice Programs to aid

counties along the Southwestern border with their costs of detaining

and prosecuting drug cases referred to them by Federal law enforcement

agents;

--  $50 million for drug courts, which provide a supervised treatment

alternative to prison sentences for non-violent drug possession

offenders, to enable Federal assistance to over 120 new or existing

drug court programs.  To date, over 57,000 offenders have completed

drug court programs, and their recidivism rate is much lower than that

of comparable offenders;

--  $15 million for grants to create community-based task forces for

reducing youth violence and to assist State and local prosecution of

firearms offenses, and $9 million for the U.S. Attorneys to hire

dedicated prosecutors who will appropriately prosecute juvenile gun

offenders and those who supply them with guns;

--  $20 million to assist State and local law enforcement agencies with

the costs associated with methamphetamine laboratory clean-up; and,

--  $5 million for a faith-based prison pre-release pilot project to

reduce the rate at which ex-offenders are returned to prison through

intensive counseling and family and community transition instruction.

In addition, at this critical time, when we are mounting a world-wide effort to defeat terrorism, I appreciate that this bill provides significant new funding for our Federal law enforcement  agencies in the Department of Justice, our diplomatic operations overseas, and for enhanced embassy security.

I note that Section 612 of the bill sets forth certain requirements regarding the organization of the Department of Justice's efforts to combat terrorism.  This provision raises separation of powers concerns by improperly and unnecessarily impinging upon my authority as President to direct the actions of the Executive Branch and its employees.  I therefore will construe the provision to avoid constitutional difficulties and preserve the separation of powers required by the Constitution.

Section 626 would require the President to submit a legislative proposal to establish a program for the compensation of victims of international terrorism.  I will apply this provision consistent with my constitutional responsibilities.  In addition, subsection (c) of that section purports to remove Iran's immunity from suit in a case brought by the 1979 Tehran hostages in the District Court for the District of Columbia. To the maximum extent permitted by applicable law, the Executive Branch will act, and encourage the courts to act, with regard to Subsection 626(c) of the bill in a manner consistent with the obligations of the United States under the Algiers Accords that achieved the release of U.S.  hostages in 1981.

Section 630 prohibits the use of appropriated funds for cooperation with, or assistance or other support to, the International Criminal Court (ICC) or its Preparatory Commission.  While Section 630 clearly reflects that Congress agrees with my Administration that it is not in the interests of the United States to become a party to the ICC treaty, I must note that this provision must be applied consistent with my constitutional authority in the area of foreign affairs, which, among other things, will enable me to take actions to protect U.S. nationals from the purported jurisdiction of the treaty.

In addition, several other provisions of the bill unconstitutionally constrain my authority regarding the conduct of diplomacy and my authority as Commander-in-Chief.  I will apply these provisions consistent with my constitutional responsibilities.

GEORGE W. BUSH

THE WHITE HOUSE,

November 28, 2001.

# # #

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2001/11/20011129-1.html

CLICK HERE TO PRINT

# EXHIBIT B



THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH


CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
July 10, 2001

## Remarks by the President At INS Naturalization Ceremony
Ellis Island
New York, New York

Listen to the President's Remarks

10:55 A.M. EDT

THE PRESIDENT: Thank you very much, Mr. Attorney General. I appreciate your kind words, and I appreciate your service to America. My fellow Americans who stand behind us, congratulations. (Applause.)

Just a few minutes ago I was the leader of another country. Now it's my honor to speak to you as the leader of your country. And the great thing about America is you don't have to listen unless you want to. (Laughter.)

Governor Pataki, it's great to be with you. Mayor Giuliani, thank you both for your kind comments. Senator Schumer -- Charles Ellis Schumer, who was named for Ellis Island -- and Senator Clinton, thank you all for being here. Congressman Fossella and Congresswoman Moloney, thank you for being here. Assistant Attorney General Dinh, thank you for your service to our country. I made a great appointment when I picked him. Silvia Sanchez, thank you for singing the National Anthem.

And ladies and gentlemen, it is an honor to be here. I'm pleased to be joined by two members of my Cabinet who are Americans by choice -- Secretary of Labor Elaine Chao, and the Secretary of Housing and Urban Development Mel Martinez. (Applause.)

This little piece of land, less than 30 acres in all, is like no other place in America. Twelve million souls arrived here, and would speak of the experience for the rest of their lives. They remembered the difficulties along with the joys. They remembered the long lines -- never longer than on a single day in 1907, when more than 11,000 new immigrants filed through this hall. They remembered how loud it was here, and how confusing.

There was no president to greet them, only people with clipboards, stethoscopes, and a lot of questions. A man from Italy describes seeing the Statue of Liberty for the first time. He said, "The thrill was unbelievable, but always the fear because you had to go through Ellis Island."

For all that, they kept hoping, they kept believing, and they kept coming. And 100 million Americans can draw a straight line from the life they know today to a moment in this hall, when a name was called and a person to the first step toward citizenship in the United States of America. Each of you took that first step sometime ago. Several of you have been here for decades.

This group of new Americans includes students, teachers, a restaurant owner, a professor, a bartender, an insurance agent, a doctor, and a violinist. For all of you, the oath of citizenship is more than a formality. And today, America is more than your home; it's your country. This is one of the things that makes our country so unique. With a single oath, all at once you become as fully American as the most direct descendant of a founding father.

The founders themselves decided that when they declared independence and wrote our Constitution. You see, citizenship is not limited by birth or background. America at its best is a welcoming society. We welcome not only immigrants themselves, but the many gifts they bring and the values they live by. Hundreds of thousands of immigrants take the oath of citizenship every year. Each has come not only to take, but to give. They come asking for a chance to work hard, support their families, and to rise in the world. And, together, they make our nation

more, not less, American.

Immigration is not a problem to be solved. It is a sign of a confident and successful nation. And people who seek to make America their home should be met in that spirit by representatives of our government. New arrivals should be greeted not with suspicion and resentment, but with openness and courtesy.

As many immigrants can testify, that standard has not always been observed. For those seeking entry, the process is often a prolonged ordeal full of complexities and burdens. I'm committed to changing this with INS reforms that treat every immigrant with respect and fairness.

Today, here's the goal for the INS: a six-month standard from start to finish for processing applications for immigration. It won't be achievable in every case, but it's the standard of this administration and I expect the INS to meet it. (Applause.)

Not every applicant is entitled to admission, but every applicant is entitled to a timely and courteous review of his or her case. We can help legal immigrants in other ways. If a child's parent and financial sponsor should pass away, we should permit the other parent to take over as a sponsor. And in the case of a minor child, entitlement to a visa should be measured by the age on the date of the application, not on the date the INS has finally processed the visa.

And we should spare families the hardship of separation while one member is awaiting a green card. I support providing an extension of the temporary window that allows people to file for legal residency without having to return to their country of origin. And I urge the members of the United States Congress to act swiftly on 245-I reform. (Applause.)

In the life of an immigrant, citizenship is a defining event. In the life of our nation, new citizens bring renewal. By taking an oath, as you have done today, immigrants affirm a belief in the American creed. For most Americans, there's no formal moment of affirmation. But to each of us fall the same responsibilities. Our democracy's sustained by the moral commitments we share: reverence for justice and obedience to the law, tolerance and decent respect for the opinions of others, responsibility not only to ourselves, but for our families and neighborhoods, love of country -- shown not in prideful boasts, but in modest gratitude, and an active concern for our nation's future.

That future depends on the values of self-government, our sense of duty, loyalty, self-confidence and regard for the common good. We're a diverse country, and getting more diverse. And these virtues are what keeps this great country together. Believing in them and living by them, this great land will always be united. (Applause.)

When they left behind the old world, the millions who landed here at Ellis Island came with a vision of a better life. They sought more than economic opportunity, but that was surely part of it. They wanted more than political freedom, though that was crucial. Above all, they wanted the rights, the duties and the dignity of American citizenship. This place is now a museum, but it stands for a living tradition. And on Ellis Island today, the great hope of America is renewed.

Since becoming the President, I've gotten to do a lot of really fascinating things. There's nothing like -- quite like the event this morning. So will you please join me, and rise, as we say the Pledge of Allegiance.

Right hand up, please. Actually, right hand on your heart.

(The pledge is repeated.)

Congratulations. (Applause.)

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2001/07/20010710-1.html

Case 1:08-cv-02354-LMM-KNF     Document 70     Filed 09/05/2008     Page 12 of 35

CLICK HERE TO PRINT

# EXHIBIT C

*Office of Communications*
**U.S. Department of Homeland Security**



**U.S. Citizenship
and Immigration
Services**

January 31, 2007

# Questions and Answers

## BUILDING AN IMMIGRATION SERVICE FOR THE 21st CENTURY
### *USCIS Fee Adjustments*

Under the Notice of Proposed Rule Making, applicants and petitioners will see substantially improved service under a new fee structure, with average processing times projected to be reduced by as much as 20 percent by the end of fiscal year 2009. U.S. Citizenship and Immigration Services (USCIS) is proposing to adjust the immigration benefit application and petition fees of the Immigration Examinations Fee Account. The proposal comes after USCIS conducted a comprehensive review of the resources and activities funded by the Account that found that current fees do not reflect the full costs of services the Agency should provide. The proposal outlines USCIS' intended fee schedule which is designed to enhance USCIS' ability to address national security and public safety concerns, prevent and detect fraud, and invest in comprehensive transformation efforts to result in a more efficient and effective organization. It is the policy of the United States government, reflected in OMB Circular A-25, to fully recover the costs of providing benefits and services. The immigration benefits that USCIS confers are extremely valuable, and it is appropriate that prospective immigrants bear the full costs of the services provided.

Finally, the proposed adjustment will allow the agency to both sustain the current six-month processing standard and improve upon it by reducing its application processing times by an average of 20 percent over the next two years.

### BACKGROUND

USCIS undertook a careful and comprehensive fee review to revise its application and petition fees in order to ensure it recovers its full business costs. Although USCIS last updated its fees on Oct. 26, 2005, solely based on inflationary increases, the fee review conducted is the agency's first comprehensive review since fiscal year 1998. At that time, fees increased by an average of 76 percent (from $85 to $150). Today, having concluded its fee review, USCIS transmitted its proposed new fee structure to the *Federal Register*; it will be available for public viewing and comment at www.regulations.gov for a 60-day period beginning February 1, 2007.

The proposed increases will ensure adequate funding to fully meet the USCIS goals to improve customer service and delivery of benefits, ensure national security and public safety, and meet business modernization needs. The agency will also merge fees for certain applications so that applicants will pay a single fee rather than paying several fees for related services.

Under the proposal, the cost to applicants for application and petition fees will now average about $438, an increase of $174 or 66 percent from the current average (when combined with the biometric fee for obtaining applicant fingerprints and photographs). The proposal also raises the biometric fee by $10, to $80.

In addition, in the Notice of Proposed Rule Making, USCIS is proposing to eliminate certain interim benefit fees for applicants who apply for adjustment of status to permanent residence. Also, the proposal will exempt

applicants for humanitarian reasons from paying a fee for certain benefits including T-Nonimmigrant Status (I-914) – Victims of Human Trafficking; and applicants seeking immigrant classification under the Violence Against Women Act.

USCIS' current procedure of waiving fees for various classes of applicants, for example those filing for asylum, and members of the U.S. Armed Forces filing for naturalization, will continue. The proposal will also clarify the waiver process by limiting fee waivers to specific situations, including consideration for one's inability to pay. In granting a waiver, USCIS will consider all factors, circumstances, and evidence supplied by the applicant including age, disability, household income, and qualification within the past 180 days for a federal means tested benefit.

## QUESTIONS AND ANSWERS:

**Q:  What is the actual increase, and what are some examples of fees that applicants will be paying under this proposed structure?**

*A.*   The weighted average increase for application and petition fees will be approximately 86 percent. The increase in actual costs to applicants and petitioners will be only 66 percent, however, because applicants for adjustment of status will no longer be required to pay a fee to apply for interim benefits. Specifically, this constitutes an average of $438, an increase of $174 (66 percent) from the current average.

Several examples of current and proposed fees for specific applications and petitions include:  (1) Application to Replace a Permanent Resident Card (I-90) – current fee is $190; proposed fee is $290; (2) Petition for Alien Fiancé (I-129F) – current fee is $170; proposed fee is $455; (3) Application to Register Permanent Status or Adjust Status (I-485) – current fee is $325; proposed fee is $905 [1]; and (4) Application for Naturalization (N-400) – current fee is $330; proposed fee is $595.

**Q.  When are the new fees effective?**

*A.*   A proposed rule on the fee adjustments will be published in the *Federal Register* on February 1, 2007. The proposed rule provides for a 60-day public comment period.  After receipt and analysis of the comments, USCIS will draft a final rule reflecting the public input.  It is important to note that a proposed rule *does not and cannot* by itself, raise any immigration benefit application fees.  Publication is only the beginning of the regulatory process where an agency announces its intentions to change its current regulations, and solicits public comments on the effect of these changes.

**Q.  Why does USCIS charge fees for immigration benefits?**

*A.*   Congress created a user fee account for the former Immigration and Naturalization Service (INS) in 1988, transforming it into a fee-based agency.  USCIS continues to be a fee-based agency.  This means that since 1988 the immigration benefit operation has operated under a user fee account instead of receiving appropriated funds for its daily operations.  The transition from funds appropriated by Congress to a user fee to support immigration case processing means that the revenue from application fees support the agency's processing of each application.  The Immigration and Nationality Act (INA) provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including the costs of providing similar services without charge to asylum applicants and certain other immigrants.  The fee received must also pay for the infrastructure USCIS must develop and maintain to support case processing, and the administration of the nation's immigration laws.

---

[1] Based on USCIS' analysis, a typical Adjustment of Status applicant pays approximately $800 when taking into account interim benefits over a multi year time period. The proposed increase is only $105 over what they pay today.

Between FY02 and FY06, USCIS received a subsidy of appropriated funds each year for the specific purpose of backlog elimination. This subsidy of $460 million was needed to address case processing backlogs as well as the insufficiency of the fee schedule. The growth of these backlogs was due in large part to failure to recover the full cost associated with the processing of applications; additional security checks and quality controls imposed following 9/11 that were not accounted for in the existing fee structure.

**Q. What prompted this comprehensive fee review?**

*A.*  USCIS conducted its last comprehensive fee review in FY 1998. A 2004 GAO report concluded that the 1998 fee review had not fully covered cost. USCIS has been cognizant of the shortfalls, but wanted to improve services before increasing fees. The current review focused on a careful examination of resources and activities funded by the Immigration Examinations Fee Account, which resulted in finding that the current fees do not reflect current processes or recover the full costs of services that should be provided. The revised fee schedule closes current funding gaps, expands national security and fraud detection initiatives, achieves performance and customer service goals, and reengineers technology and business processes. In addition, the Chief Financial Officer's (CFO) Act requires fees to be reviewed every two years. The Department of Homeland Security began being covered by the CFO Act with the passage of Public Law 108-330, enacted on October 16, 2004.

**Q: Why doesn't USCIS just phase-in these increases over time to reduce the burden on applicants and petitioners?**

A.  USCIS has marginally increased fees since its last comprehensive fee review in fiscal year 1998, when fees increased approximately 76 percent. The last fee increase accounted solely for inflation on October 26, 2005. The comprehensive fee review has made clear, however, that these marginal increases have not allowed USCIS to meet its mission responsibilities.

Since the proposed fees are based on current USCIS costs, phasing in costs would require either an appropriated subsidy to bridge the gap during the phase-in period, or a reduction in services that would result in increased processing times, backlog growth, inability to upgrade technology and modernize systems, and inability to implement security and anti-fraud measures.

**Q. What are the consequences of not increasing fees?**

*A.*  First, processing times would increase leading to backlogs which would eventually grow back to levels beyond what the agency faced at the height of its backlog in 2004. USCIS is concerned that the resulting backlogs could cause degraded national security capabilities increasing the vulnerability to fraud and abuse. Specifically, backlogs create significant public safety and national security risks as applicants remain in the U.S. unscreened while their applications are pending.

**Q. How is it possible for USCIS' costs to increase so significantly?**

*A.*  Part of the problem, as the GAO concluded in a 2004 report, is that the last major fee restructuring, which was implemented in 1998, did not fully recover USCIS' costs. Furthermore, additional security checks and quality controls imposed after September 11 are not accounted for in the existing fee structure.

In developing this proposed rule, USCIS reviewed its recent cost experiences, current service levels, goals for additional services, and various factors allocating costs to particular form types. This rule proposes a fee structure that will allow USCIS to close certain funding gaps, achieve security objectives, modernize its business infrastructure, accomplish performance goals, eliminate problematic incentives, the issuance of interim benefits, and fairly allocate costs.

**Q. What will the $524 million in "additional resource requirements" be use to fund? Why is this necessary and are these one-time costs?**

*A.* More than 70 percent of the additional resource requirements in the areas of customer service, security and operations can be directly tied to findings and recommendations identified by external organizations/offices that conducted independent reviews, for example GAO, DHS IG, and the CIS Ombudsman. These resources will be use to improve service delivery, enhance the security and integrity of the immigration system, to include a 20 percent decrease in processing times by fiscal year 2009, and modernize our business infrastructure. The additional resource requirements represent ongoing costs which will allow USCIS to continue to invest in these mission critical areas. USCIS remains committed to reviewing its fee structure every two years and can raise or lower fees based on its findings.

**Q. In general, why are immigration benefit application fees so large?**

*A.* The cost of providing the right benefit to the right person, in an appropriate amount of time and without compromising security is a careful and complex process. The proposed fees not only reflect full cost recovery, but also the complexity of the various immigration and citizenship benefits that USCIS administers.

Fees reflect the cost of maintaining operations at a network of 250 domestic and international locations and Application Support Centers for fingerprint/photograph collection. While USCIS has achieved significant process improvements by centralizing certain functions, other functions and applicant interviews are most effectively offered locally.

Since September 11, 2001, USCIS' costs to ensure a robust quality assurance function in identifying individual applicants who are a risk to national security or public safety, has grown substantially. USCIS completes more than 135,000 security and background checks daily.

It's also important to keep in mind the large number of benefits provided for which there is no charge. USCIS waives the application/petition fee for various classes of applicants/petitioners, e.g., asylum and refugee applicants, and U.S. Armed Forces personnel. Further, the proposed new fee structure will exempt applicants for T nonimmigrant status (Victims of Human Trafficking), or for status under the Violence Against Women Act from paying certain fees.

**Q. Why did USCIS take so long to conduct a comprehensive fee review?**

*A.* USCIS received feedback from various stakeholders that it should improve service levels first before taking on a comprehensive reform of the fee structure. One of those services was to eliminate the backlog without passing that cost on to applicants. USCIS met that challenge on time at the end of fiscal year 2006.

In January 2004, a Government Accountability Office (GAO) Report in January 2004 concluded that the "fees were not sufficient to fully fund [US]CIS' operations." GAO stated that "[i]n part, this has resulted because (1) the current fee schedule is based on an outdated fee study that did not include all costs of [US]CIS' operations and (2) costs have increased since that study was completed due to an additional processing requirement and other actions." GAO recommended that USCIS "perform a comprehensive fee study to determine the costs to process new immigration applications." The fee review that is the basis for the proposed fees in this rule addresses that recommendation.

In addition, since fee revenues have been insufficient to recover full operating costs, USCIS has been forced to rely on funding from temporary programs, to use premium processing funds for base infrastructure rather than for major business infrastructure improvements to the adjudication and customer-service processes, and to use fees from pending applications to fund applications being

processed. This insufficiency has delayed necessary investment in a new technology and business process platform to substantially improve USCIS' capabilities and service levels-the purpose originally envisioned by Congress when it first established the premium-processing program.

**Q. What if an applicant/petitioner cannot afford the fee?**

*A.* USCIS has historically waived the application/petition fee for entire classes of applicants. For example, there is no fee for filing an application for asylum, nor for members of the U.S. Armed Forces filing for naturalization. USCIS also has the ability to waive fees on a case-by-case basis for "inability to pay." USCIS considers waiving the fee for a single individual based on his or her circumstances when all others in similar circumstances applying for the same benefit or service must pay the fee. In determining "inability to pay", USCIS officers consider all factors, circumstances, and evidence supplied by the applicant including age, disability, household income, and qualification within the past 180 days for a federal means tested benefit.

In tandem with the proposed increase in fees, USCIS proposes to modify and clarify eligibility for an individual fee waiver. Individual fee waiver requests have been rising, both in terms of total volume and as a percentage of applications filed. The process of considering a fee waiver request itself has a significant associated adjudication cost.

Since USCIS is funded from application fees, a fee waiver transfers the cost to all other fee-paying applicants. Fairness requires that there be compelling reasons when granting an individual fee waiver to one applicant while making others applying for the same benefit or service pay full cost plus a surcharge to pay for the free service provided to the first customer.

This rule clarifies the fee waiver process by limiting fee waivers to certain situations. Specifically, the proposed rule limits the list of applications for which an individual fee waiver based on inability to pay may be granted to the Form I-90; Form I-751; Form I-765; Form I-817; Form N-300; Form N-336; Form N-400; Form N-470; Form N-565; Form N-600; Form N-600k; and the Forms I-290B and motions filed with USCIS.

**Q. What is the legal authority for USCIS to charge fees?**

*A.* USCIS fees are determined under the authority of section 286(m) of the Immigration and Nationality Act, which authorizes USCIS to set fees at a level that will recover the full costs of USCIS services, including those provided to some applicants without fee.

**Q. Will USCIS conduct another fee review?**

*A.* Yes. USCIS plans to review fees every two years to ensure that it is recovering the full cost of processing immigration benefit petitions/applications. USCIS is committed to update its fees through a similar analysis at least once every two years. In comparison to fee reviews over the last decade, which essentially made retrospective adjustments on a narrowly calculated fee review, future fee reviews will combine assumptions from recent experiences and incorporate productivity gains resulting from the modernization of USCIS operations (which may allow for cost reductions from new efficiencies) and from prospective activity changes (such as those that may arise from additional security measures or performance changes).

**Q. Will USCIS continue to raise fees? What is being done to improve efficiencies in the process?**

*A.* USCIS continues to seek ways to improve productivity while decreasing costs. USCIS is firmly committed to seeking new ways of doing business and reengineering processes in order to contain costs and pass on the savings to all of its customers. Large portions of this fee restructuring are designed to

invest revenue in improvements to improve efficiency and effectiveness that will help reduce agency costs. Additionally, for the first time, USCIS has incorporated a productivity measure into the fee model to ensure that productivity gains resulting from automated business processes and better technology will be factored into future fee reviews.

**Q. You have increased fees before with the promise of improved service. Why is this fee increase any different?**

*A.* There are two key differences. First, the clear distinction between this proposed fee schedule and prior fee schedules is that the proposed fee schedule does not simply reflect costs and performance retrospectively, locking USCIS into a revenue stream that at best allows it to maintain the status quo. Instead the proposed fee schedule is designed to provide for an adequate and sustainable level of investment in staff, infrastructure, and processes designed to improve USCIS' ability to administer the nation's immigration laws.

Second, the recent temporary infusion of appropriated dollars has allowed USCIS to significantly improve service levels at no additional cost to applicants. Thus tomorrow's customers are not being asked to pay higher fees to allow us to process yesterday's backlogged cases. Rather, they are simply being asked to pay the full cost of processing their application, including costs that help maintain an organization that will continue to achieve ongoing improvements in efficiency and effectiveness. The immigration benefits that USCIS confers are truly valuable and it is appropriate that prospective immigrants bear the full costs of the service provided.

**Q. Why should applicants and petitioners pay higher fees for an inefficient process? USCIS should first become more efficient with improved service levels before it considers a fee increase.**

*A.* USCIS has delayed this comprehensive fee review because we listened to our stakeholders who asked us to improve service levels first. USCIS has already substantially improved service levels, achieving the President's goal of six months processing times for immigration applications in October of 2006. Even in the absence of full funds to do so, USCIS has undertaken to improve its customer service and national security processes. Yet the necessary improvements, which we all seek to meet the agency's mission and enhance our current efforts, cannot be met without the necessary financial resources to permanently improve our business model in an entirely fee-funded environment.

**Q. What will be the overall impact of this proposed rule?**

*A.* USCIS will be better positioned to fully secure the integrity of our immigration system, to improve fraud prevention and detection efforts, and to introduce new national security enhancements to create a fair and equitable immigration system that ensures public safety.

Applicants and petitioners will see substantially improved service under a new fee structure, with average processing times projected to be reduced by as much as 20 percent by the end of fiscal year 2009. Secure documents will be delivered faster and customer requests for immigration records will be made more efficient. This effort will be bolstered by USCIS' transformation from its current paper-based data systems into digital processing resources and expanded on-line services, including e-filing and end-to-end electronic processing capabilities. Improvements in service will be more than cosmetic, as our strategy will provide greater access by USCIS customers to office locations and information.

Investments to modernize our business infrastructure will fundamentally transform the United States' immigration services for years to come. Information systems will be updated to improve service delivery, expand on-line service options and largely eliminate paper-based processes. Finally, the timeliness of background checks and anti-fraud efforts will be improved by various initiatives, such as expanding name check resolution capabilities and adjusting resources at co-located facilities as required.

As a result of these improvements, USCIS is poised to begin a new chapter in its critical national mission with an updated fee structure directly corresponding to the growing costs of administering a secure and efficient immigration system for the 21st century. By creating a fair means to ensure the recovery of operational costs, USCIS will fulfill its responsibility to the American people to protect our Nation and maintain the integrity of our national immigration system.

**Q. Why doesn't USCIS continue to receive appropriated funds instead of receiving fees?**

*A.* Congress created a user fee account for the former INS in 1988, transforming it into a fee-based agency. As a fee-based agency, USCIS uses revenue from application fees rather than appropriated funds to pay for the administration of the nation's immigration laws, processing of applications, and the infrastructure needed to support these activities. It is the policy of the United States government, reflected in OMB Circular A-25 to fully recover the cost of providing benefits and services. Congress determines the amount and source of USCIS funds in its annual appropriations legislation, subject to Presidential action on enacted bills. The Administration has directed USCIS to become fully fee funded with respect to its adjudicative activities of immigrant petitions. This allows the business costs to be supported by its consumers.

**Q. How may I provide comments on the proposed fee increases?**

*A.* To comment on the proposed rule, USCIS requests the public to submit written comments by <u>one</u> of the following methods:
- Federal eRulemaking Portal: http://www.regulations.gov. Follow the instructions for submitting comments.
- Facsimile: Federal eRulemaking portal at 866-466-5370.
- Mail: Director, Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW, 3rd Floor, Washington, DC 20529. To ensure proper handling, please reference DHS Docket No. USCIS-2006-0044 on your correspondence. This mailing address may also be used for paper, disk, or CD-ROM submissions.
- Hand Delivery/Courier: Regulatory Management Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 111 Massachusetts Avenue, NW, 3rd Floor, Washington, DC 20529. Contact Telephone Number (202) 272-8377.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

RAISA YAKUBOVA, EMMA UNGURYAN,

BELLA VESNOVSKAYA, DAVID VESNOVSKIY, VYACHESLAV

VOLOSIKOV AND SHEHATA AWAD IBRAHIM, ON BEHALF OF

THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

     Plaintiffs,

     vs.          CASE NO. 06 CIV 3203

MICHAEL CHERTOFF, IN HIS OFFICIAL CAPACITY AS

SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, ET

AL.,

     Defendants.

THE DEPOSITION OF

DONALD W. NEUFELD

U.S. DEPARTMENT OF JUSTICE

OFFICE OF IMMIGRATION LITIGATION

CIVIL DIVISION

450 5th Street, NW, 10th Floor, Room 10525

Washington, D.C. 20001

FEBRUARY 1, 2008

9:05 A.M.

Case 1:08-cv-02354-LMM-KNF    Document 70    Filed 09/05/2008    Page 23 of 35

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

Michael D. Sant'Ambrogio, Esquire

Jason Parkin, Esquire

NEW YORK LEGAL ASSISTANCE GROUP

    450 West 33rd Street, 11th Floor

    New York, New York 10001

    Telephone: 212.613.5000

    Fax: 212.750.0820

    Email: jparkin@nylag.org


ON BEHALF OF THE DEFENDANTS:

Elizabeth J. Stevens, Attorney

Sheri R. Glaser, Attorney

U.S. DEPARTMENT OF JUSTICE

    Civil Division

    450 5th Street, NW

    Washington, D.C. 20530

    Telephone: 202.616.9752

    Fax: 202.305.7000

    Email: elizabeth.stevens@usdoj.gov



COURT REPORTING
Videography    Litigation Technology ™

APPEARANCES CONTINUED:

ON BEHALF OF THE U.S. CITIZENSHIP

AND IMMIGRATION SERVICE:

Annemarie E. Roll, Litigation Coordinator

OFFICE OF THE CHIEF COUNSEL

U.S. CITIZENSHIP AND IMMIGRATION SERVICES

U.S. DEPARTMENT OF HOMELAND SECURITY

    20 Massachusetts Avenue, NW

    Suite 4210

    Washington, D.C. 20529

    Telephone: 202.272.1435

    Fax: 202.272.1405

    Email: annemarie.roll@dhs.gov



COURT REPORTING
Videography    Litigation Technology ™

DEPOSITION OF

2       DONALD W. NEUFELD

3       FEBRUARY 1, 2008

4       **COURT REPORTER:**  My name is Mark Reif

5   and I am the Court Reporter who will record today's

6   testimony.  I am with the firm of County Court

7   Reporters.  Thank you.  Today is the first day of

8   February, 2008.  The time is approximately 9:05 a.m.

9           We are at the Department of Justice, Office

10  of Immigration and Litigation, Civil Division, to take

11  the deposition of Donald Neufeld, in the matter of

12  Raisa Yakubova, et al versus Michael Chertoff, et al,

13  pending in the U. S. District Court for the Eastern

14  District of New York, Case No. 06CIV3203.  Will Counsel

15  please identify themselves for the record, stating your

16  name, firm and who you represent.

17          **MR. SANT'AMBROGIO:**  Michael

18  Sant'Ambrogio, with the New York Legal Assistance

19  Group, for the Plaintiffs.

20          **MR. PARKIN:**  Jason Parkin with the New

21  York Legal Assistance Group for the Plaintiffs.

22          **MS. STEVENS:**  Elizabeth Stevens,

23  Department of Justice, Office of Immigration and

24  Litigation for Defendants.

25          **MS. GLASER:**  Sherry Glaser, Department



1   of Justice, Office of Immigration and Litigation are

2   Defendants.

3           **COURT REPORTER:**  Mr. Neufeld, will you

4   please raise your right hand and be sworn.  Do you

5   solemnly swear or affirm the testimony you are about to

6   give will be the truth, the whole truth, and nothing

7   but the truth, so help you God.

8           **MR. NEUFELD:**  I do.

9   **DONALD W. NEUFELD,** having been duly sworn by the

10  Notary, was examined and testified as follows:

11  **DIRECT EXAMINATION**

12  **BY MR. SANT'AMBROGIO:**

13      **Q.**    Good morning, Mr. Neufeld.

14      A.    Good morning.

15      **Q.**    We met earlier but my name is Michael

16  Sant'Ambrogio.  Would you tell me have you ever been

17  deposed before?

18      A.    Yes.

19      **Q.**    How many times have you been deposed?

20      A.    I don't know how many, I know recently in the

21  last year it's been once.

22      **Q.**    Was that in connection with the Caplin case?

23      A.    That's correct.

24      **Q.**    Okay, and that was in connection with your

25  responsibilities for USCIS?



1  those same components for users as a whole but he's the

2  one who interfaces with them and handles that for

3  domestic operations.

4      **Q.**    Okay, and anybody else report to you besides

5  the people you've just named?

6      A.    Yes, David Gulich who is the Chief of Staff

7  for Domestic Operations and actually I should correct

8  Mark Phillips reports directly to Dave Gulich and I

9  would be a second.

10      **Q.**    Okay, do you know about how many CIS staff

11  report to you either directly or indirectly through

12  other reports?

13      A.    I believe the number is around six thousand.

14      **Q.**    Okay, are you aware that CIS's customer

15  service line currently estimates that it may take up to

16  fifteen months...fifteen weeks, excuse me, for

17  applicants to receive a Notice of Receipt of

18  Application?

19      A.    I'm not aware that that's currently what

20  they're saying.

21      **Q.**    Okay would that surprise you?

22      A.    Yes.

23      **Q.**    Why would that surprise you?

24      A.    Because it doesn't take that long, it took

25  that long at one point in time following the surge of



1   filings in June and July, but since the end of

2   December, the beginning of January, we are current with

3   issuing Receipts for Naturalization Applications.

4       Q.    What does that mean, you're current for

5   issuing Receipts?

6       A.    That means that there's no delay in getting

7   to data entry and issuing their Receipts, that happens

8   usually within two or three days, two or three days for

9   us to do the data entry and then the Receipt obviously

10  takes some time in the mail to arrive.

11      Q.    Right, what is the data entry that has to

12  take place before the Receipt is issued, mailed out?

13      A.    Applicants mail their applications to one of

14  the four service centers and then we have contract

15  staff that data enter various fields of data off of

16  that application that the applicant would have

17  submitted  into our claims four system.

18      Q.    Okay, so then just taking information from

19  the application to getting into your data base is a

20  claims form?

21      A.    That's correct.

22      Q.    Okay, does anything else happen before the

23  Notice of Receipt is sent out?

24      A.    No, I mean there's lots of clerical

25  activities that occur but in terms of opening the mail



1    and seeing what's inside, the data entry process

2    includes the receiving of the fees that are deposited

3    or that are collected with the applications

4        Q.    Okay anything other that the data entry

5    process I guess, does anything other than the data

6    entry process happen while...sorry let me start that

7    again.  Does anything other than data entry process

8    happen before the Notice of Receipt is mailed out?

9        A.    No.

10       Q.    Okay, now why were the...why was CIS

11   experiencing these delays following the

12   surge...actually let me start that...the surge you

13   referred to can you just tell me what that surge was?

14       A.    Sure, we had steadily increasing  numbers of

15   Naturalization Receipts for all of fiscal year 2007,

16   but in the months of June and July but principally July

17   we had a huge increase, over the normal volume of

18   receipts coming in.

19            We received, I believe the number was about

20   450,000 Naturalization applications in the month of

21   July alone and a typical month we would normally

22   receive about 60,000 Applications for Naturalization.

23            In addition, because it impacts the

24   receipting process we had a fee increase that was

25   effective July 30 that caused volumes in filings for



1  months.

2      Q.    And what were the causes of those delays?

3      A.    Same situation where incoming receipts would

4  have exceeded our capacity to do the data entry.

5      Q.    Okay, so after the Notice of Receipt is sent

6  out what happens next with a Naturalization Application

7  at the Service Center?

8      A.    Well, there's a lot that happens within the

9  system once it's data entered but the system would then

10  generate an appointment notice for the applicant to go

11  into one of our ASC's , application support centers, to

12  be...have their biometrics captured which would include

13  their finger prints and their photograph.   The

14  applications that the applicant mailed to us would be

15  placed in a hard copy file.   The other records that we

16  might have that pertain to the alien would be requested

17  and upon receipt consolidated with the application that

18  they submitted.

19      Q.    Which files are those?

20      A.    The A files.

21      Q.    Does the service center request the A files

22  from who?

23      A.    Wherever they reside.

24      Q.    How do they know where it resides?

25      A.    Again that's...it's not a human that usually



1 claims four will initiate a name check request with the

2 FBI.

3    Q.    Okay, let me just ask you just to clarify, do

4 these things happen as the data is entered or does it

5 happen...what's the relationship in terms of timing

6 between these activities and the Notice of Receipt?

7    A.    Well, there are systems and so systems have

8 to interact and I'm not sure of the exact timing of

9 when those happen but it's all within days, you know

10 over night, a lot of these processes involving the

11 exchange of information between systems happen

12 overnight.

13        So for instance the name check would be

14 initiated, usually within I would...a couple of days

15 from data entry.  That process results in a tape being

16 produced that gets forwarded to the FBI for them to

17 check their records and then they return that tape

18 usually within a week or two with the results of their

19 initial efforts to identify records that might be

20 responsive.

21    Q.    Okay, so if an Applicant say in the fall is

22 waiting ten weeks for a Notice of Receipt to be mailed

23 out, does that mean the request to the FBI likely went

24 out about two weeks after the application was mailed in

25 as well?



1       A.    Yes.

2       Q.    Okay, because that's when the data was

3  eventually entered, right?

4       A.    Yes.

5       Q.    So the Notice of Receipt is kind of a good

6  marker of when these other activities are occurring?

7       A.    Yes.

8       Q.    Okay what else besides the FBI name check?

9       A.    IBIS checks.

10      Q.    IBIS checks?

11      A.    Again that's an automated process.  If there

12 were hits associated with those IBIS checks then a

13 report would be produced and then staff at the service

14 center would...

15      Q.    Okay, hold on I don't mean to stop you

16 because I'll ask you what happens afterwards.  Right

17 now I just want to know kind of what is initiated from

18 the service center at this point.  Once the data is

19 entered, what activities are then initiated, what are

20 the next steps in the process.  So IBIS check and then

21 I'll ask you later about what happens with the IBIS

22 check but is there any other process that's initiated?

23      A.    Say I did name checks, IBIS checks,

24 scheduling of ASC appointments, file requests that,

25 those are the principal activities.



1  depends on the available slots for appointments, is

2  that true?

3      A.    That would be ASC, correct.

4      Q.    The ASC, is there a queue that applicants

5  fall into waiting for an appointment to be scheduled?

6      A.    Yes.

7      Q.    And, do you know how long those ques are at

8  the moment?

9      A.    For most locations it's less than three weeks

10 for the actual date of the appointment, in other words

11 the appointment is immediately available but it's very

12 time, that could be as long as three weeks later.   In

13 certain locations the different times depending on the

14 volume of the need for an ASC appointment.   Individual

15 ASC's may temporarily experience backlogs.   Folks that

16 monitor that and share the resources as appropriate so

17 that we can bring them down within to something less

18 than three weeks.

19     Q.    Okay, who monitors those back logs?

20     A.    Well, the name of the individual escapes me

21 at the moment but it's somebody within the domestic

22 operations within the Office of Field Operations.

23     Q.    In the Office of Field Operations?

24     A.    Yes.

25     Q.    So they monitor back-logs in these



1  appointments. What's the longest backlog that you are

2  aware of?

3      A.   It's been a while since I looked at one of

4  those reports.  I think that we have had as long as ten

5  weeks for naturalization.

6      Q.   Do you remember when that was?

7      A.   I don't  We do prioritize naturalization

8  applications so

9      Q.   Over...

10     A.   Over other applications that require

11 biometrics capture.

12     Q.   Okay, and are the back logs simply the result

13 of not having enough CIS officers to meet with the

14 applicants?

15     A.   Well again we're talking about  the ASC

16 appointments and we have...volumes can peak and surge

17 and then decline, and during those surges it could

18 temporarily exceed the capacity of ASC  to immediately

19 have appointments available for three weeks but if it's

20 perceived...if we believe that to be a longer term

21 situation, then we will work with the contractor to

22 provide more resources to deal with that heightened

23 level of receipts.  If it is a temporary surge then

24 generally they would accommodate it with existing staff

25 perhaps working overtime.



1  from the applicant?

2       A.   Finger print, photograph and signature.

3       Q.   Okay and what do they do with that

4  information, biometrics is how you referred to it

5  right?

6       A.   Yes.

7       Q.   What do they do with those biometrics?

8       A.   They are all captured electronically, the

9  finger prints are forwarded to the FBI, for them to do

10  their finger print check and I have to say I'm not sure

11  what we do with the images and the signatures for

12  Naturalization applicants because we don't use them to

13  produce naturalization certificates.  So I'm not just

14  the person familiar with that.

15       Q.   Okay, how do they forward them, to... the

16  finger prints?

17       A.   Actually, let me clarify I'm not even a

18  hundred percent sure that we take the photographs of

19  naturalization applicants.  At ASC they take

20  photographs, signatures, and finger prints and for

21  adjustment of status applicants we need them to produce

22  green cards and for you know applicants for employment

23  authorization we use them to produce their employment

24  authorization.  Documents but we don't use them for

25  naturalization so I'm just not sure whether we even



Case 1:08-cv-02354-LMM-KNF    Document 70-2    Filed 09/05/2008    Page 1 of 41

1 application for that.

2    Q.    Does anybody look at the wrap sheet?

3    A.    .    I don't believe so, not at present.

4    Q.    Do you know when the first time that somebody

5 will look at the wrap sheet is?

6    A.    At the field office, when cases are scheduled

7 for interview, that's when they are adjudicated and

8 that's where decisions, any follow on activity or any

9 impact to the case from that wrap sheet would be

10 determined by the adjudicator.

11    Q.    Okay, is there any reason why the service

12 center might look at the wrap sheet before they explore

13 the application to the field office?

14    A.    I'm not aware of it.

15    Q.    Okay, does CIS track the time that it takes

16 for the wrap sheets to come back to the service center?

17    A.    I'm not aware of how that...that was being

18 done, but again that's something...the overall process

19 is managed by each of the centers, the service centers

20 but I don't know how they do that.

21    Q.    Okay, so headquarters doesn't do that?

22    A.    We do not.

23    Q.    And it would be up to the service center to

24 do that in their discretion?

25    A.    That's correct.



1      Q.     No, it's part of DHS?

2             A,     That's correct.

3      Q.     And so when you, when the claims four

4    requests an IBIS check it's going to come back

5    either...what are the different results that it can

6    be...hit or no hit?

7             A.     I don't know, you know, of the different

8    categories of hits or what the acronyms would be in

9    identifying it, I know that it comes back with

10   information that would be...a report

11   that...specifically for naturalization cases where this

12   is a batch check conducted at the service centers what

13   would come back it's an overnight process, that the

14   next day a report would be available provided to the

15   center that had run the batch check identifying all of

16   the cases for which a hit, positive response had come

17   from the IBIS check.  I'm not sure how it's

18   categorized, how they name those, but that's what

19   happens.

20     Q.     Okay, fair enough, so if...let's take the

21   easy part first, if there's no records in IBIS, there's

22   no hits, then the...that information is reported in

23   claims four, correct?

24            A.     I believe so.

25     Q.     And is anything else done with that



1       Q.   Okay.  So, that, I mean that factors into the

2    volume, but it doesn't factor in how old those cases

3    are in that volume.  Correct?

4       A.   Well, the ages of an individual case doesn't

5    determine the amount of resources that you need to

6    adjudicate that case.  So, yes--the very old cases are

7    included in the pending workload that needs to be--is

8    projected that we would need to complete to achieve the

9    overall processing time goal.

10      Q.   But, you don't consider how old the case--the

11   individual cases are within your workload to determine

12   how much you need?  What your staffing needs are in

13   order to adjudicate those cases?

14      A.   It has no bearing on the resource

15   requirement.

16      Q.   So, you don't consider it, right?  I mean,

17   you don't think it has any bearing and you don't

18   consider it.  Right?

19      A.   I guess the answer is right.

20      Q.   Okay.  So, you've had however, cases that

21   have exceeded the normal processing time for quite

22   awhile.  Correct.

23      A.   Yes.

24      Q.   Since at least 2002. Correct?

25      A.   Yes.



1      Q.    And, in that time, since 2002, you have had

2   cases that exceeded the normal processing time?

3      A.    Yes.

4      Q.    Have you--has CIS ever considered whether

5   additional resources could eliminate those cases which

6   exceed normal processing time?

7      A.    Those cases, by and large, are pending due to

8   circumstances that are beyond our control to influence

9   with our own resources.  For instance, the name check.

10     Q.    Okay.  So, is the answer then that you have

11  considered staffing--whether additional staffing to

12  eliminate those cases and then decided that it would

13  not eliminate those cases that are older than your

14  normal processing time?

15     A.    That's a difficult question to answer because

16  it starts--the premise is that they are that old

17  because they are beyond our control, so it's not --

18  there isn't a process that I need to go through

19  mentally to determine whether if I had more resources I

20  could complete it.  They are there because of

21  circumstances beyond my control that I can influence

22  with my own resources.

23     Q.    Okay.  So, you've determined that they're

24  there for reasons beyond your-- beyond CIS's control?

25     A.    Yes.



DEPOSITION OF DONALD W NEUFELD, 02/01/07 CCB# 15746-2    Page 201

 1  years?

 2      A.    Again, we request resources based on our

 3  projection of the requirements to complete the cases

 4  that are either pending or projected.  That would

 5  include the old cases.

 6      Q.    Well, okay.  How does that include the old

 7  cases?

 8      A.    They're pending and our request is based on

 9  the resources we project we require to complete the

10  cases that are pending and the cases that are projected

11  to be received.

12      Q.    But the backlog elimination plan is to bring

13  the normal processing time down to a certain level,

14  right?

15      A.    Correct.

16      Q.    Well, that doesn't necessarily mean that it

17  eliminates the old cases, right?

18      A.    The backlog isn't defined by the age of

19  individual cases, no.

20      Q.    Right.  So...

21      A.    But, again, this goes back to what we were

22  talking about earlier.  The level of effort required to

23  complete those cases is included in our resource

24  allocation -- or resource requirements and in our

25  budget requests.



# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAISA YAKUBOVA, EMMA UNGURYAN, BELLA VESNOVSKAYA, DAVID VESNOVSKIY, VYACHESLAV VOLOSIKOV, AND SHEHATA AWAD IBRAHIM, ET AL.,) PLAINTIFFS) <br><br> . V. <br><br> MICHAEL CHERTOFF, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL., DEFENDANTS | CIVIL ACTION NO. CV06-3203 (KORMAN, J.) |

## Declaration of Mary Ann Gantner

I, Mary Ann Gantner, do hereby declare and say:

1.  I am the District Director of the New York City District Office (located at 26 Federal Plaza, New York, New York 10278) for United States Citizenship and Immigration Services ("USCIS") in the Department of Homeland Security ("DHS"). The New York District office of USCIS includes the sub-office located in Garden City, New York. I oversee the adjudication of applications for benefits including applications for adjustment of status to that of lawful permanent residence and applications for naturalization. I have held the position of District Director since March 2003.

2.  The New York District Citizenship office is one of the offices under my jurisdiction. That office is responsible for the adjudication of all naturalization applications ("N-400" applications) filed by persons residing in 14 counties of New York.  My present duties and responsibilities include overseeing all the components of USCIS located in the New York District, which also includes the sub-office in Garden City, New York.  I supervise approximately 330 employees in the New York District Office and an additional 110 employees in the sub-office.  I make this declaration based upon personal knowledge and information made known to me in the course of my professional duties.

3.  I am familiar with the procedures followed in the processing of background and security clearances in conjunction with naturalization applications. The following paragraphs describe the chronology of how N-400s filed by persons residing in the New York District, including the Garden City sub-office, were processed until approximately late April 2006.

4.  Applications for Naturalization (N-400s) are mailed directly by the applicant to the Vermont Service Center ("VSC") located in St. Albans, Vermont.  After the VSC receives the application, data entry contract workers enter the data contained on the N-400, including the applicant's name, date of birth, country of birth, current address and residency history, employment history, marital and children

information, basis of eligibility and responses to eligibility questions, and remittance information into the CLAIMS 4 processing system.

5. "CLAIMS" is the acronym for the Computer Linked Application Information Management System. This system is USCIS's processing system for N-400 applications.

6. Within approximately a week after the input into CLAIMS 4, performance contractors located at USCIS Headquarters in Washington, D.C. initiate a "name check". The name check is initiated by extracting data out of the Vermont Service Center CLAIMS 4 system including the applicant's name, date of birth, country of birth and Administrative file number, also known as the A-Number. These Headquarters contractors initiate a "batch job" which is a program that automatically collects data from recently keyed cases. Headquarters performs these batch jobs on cases for all the Service Centers. Not only are they performed for Vermont's cases but these name checks are initiated for cases from the other three Service Centers as well. (Located in Nebraska, California and Texas)

7. The data is sent from USCIS Headquarters to the FBI.

8. Concurrently, the Application Support Center (ASC) program office in Headquarters, through computer- generated letters, sets up the applicants for

fingerprint appointments at local ASCs. This automated scheduling is another type of "batch job" that is run on recently keyed cases into CLAIMS 4.

9. Within 15 days of receipt of the N-400 application, another automated program initiates a "batch job" for IBIS checks based on the date of birth and the name that appears on the N-400 application.

10. When a lawful permanent resident alien applies to USCIS for naturalization, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for that benefit and that he or she is not a risk to national security or public safety. In addition to record checks against DHS' own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g. arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies. IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity; and (c) a national security check (commonly referred to as the "FBI name check"), which is run against databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS.

11. These law enforcement checks have revealed significant derogatory information on alien applicants for immigration benefits, including applicants seeking naturalization, which has resulted in those aliens being found ineligible for the benefit and USCIS' denial of their applications. Where applicable, the information has also resulted in aliens being arrested by law enforcement agencies or charged under removal grounds and deported/removed from the United States following a final Executive Office of Immigration Review order. In many instances, the disqualifying information on the alien has been discovered as a result of the IBIS or national security check, but has not been revealed by a fingerprint check alone.

12. If a background or security check reveals derogatory information on the alien (i.e., a "hit"), then USCIS works with other divisions of DHS and other law enforcement and intelligence agencies, as necessary, to obtain all available information concerning the derogatory information. Depending on the information, DHS/CIS may place the alien in removal proceedings to remove him/her from the United States.

13. FBI name checks are required to be completed for many applications for immigration benefits, including an application for naturalization. Multiple FBI databases are searched to determine whether the individual has been encountered by the FBI or other law enforcement and intelligence agencies in connection with

an investigation of criminal, security, or other activities that might render him or her ineligible for benefits.

14. Although an alien's file may show that an FBI fingerprint check was performed, these checks frequently do not reveal the types of derogatory information described above, particularly when it is not information that has resulted in an arrest or criminal conviction. For example, persons on a "watch list" who are suspected of terrorist activity will not necessarily be identified through an FBI fingerprint check, but could be identified through an IBIS record check or the FBI name check.

15. It would be unconscionable and potentially risk the safety and security of the nation for USCIS to grant United States citizenship without ensuring that the government's law enforcement and national intelligence databases do not contain significant derogatory information about the alien.

16. The results of an FBI fingerprint check expire after 15 months. Thereafter, an alien will be required to be reprinted. An updated fingerprint clearance can usually be obtained within 24 hours.

17. Once the FBI has completed the name check request, and reported the results to USCIS, USCIS must consider any information provided by law enforcement or

intelligence agencies in response to this name check in exercising its responsibility to determine whether to grant or deny the application.

18. USCIS cannot complete the adjudication of the naturalization application until the name check has been adequately resolved.

19. When the fingerprints have cleared, CLAIMS 4 is programmed to set up a queue of cases that are ready to be scheduled.

20. A Supervisory District Adjudications Officer ("SDAO") in New York creates a schedule of available times and days and in an interactive program directs the computer to drop in cases from the queue into the available dates and times. At that point New York requests the Vermont Service Center to pull the files off their shelves and send the files to New York.

21. Prior to, or on the day of the interview, another IBIS check is completed if the last check was run more than 180 days ago.

22. If the FBI name check has not been completed by the date of the interview, the District Adjudication Officer must continue the case before making a decision.

23. In the New York District Office, a person, normally a District Adjudications Officer ("DAO"), is assigned to re-run the FBI name checks that are pending

clearance at least once or twice per week to see if they have cleared so that the case may then proceed to completion.

24. USCIS has a database that stores the name check response information received from the FBI. The USCIS database shows if the FBI provided a definitive response on a name check or if the FBI provided a 'pending' response on a name check.

25. Per memos from Michael Aytes, USCIS Associate Director, Domestic Operations, dated April 25, 2006 and May 22, 2006, as of late April 2006, N-400 cases are not interactively scheduled from the queue without first verifying that a definitive FBI name check has been initiated and completed. This ensures that no applicant for naturalization will be initially interviewed unless and until the FBI name check has been initiated and CIS has received a response. Only thereafter, will CIS schedule the initial interview.

26. From October 1, 2005 to June 30, 2006 we have completed 92,447 N-400 applications. During Fiscal Year 2004 we completed 84,141 N-400 applications. During Fiscal Year 2005 we completed 102,461 N-400 applications.

27. Our current processing time for N-400 applications is between five to six months from time of filing to completion (oath or denial).

28. Of the named plaintiffs, one was naturalized on July 18, 2006.  One is scheduled for an oath ceremony on 7/27/06.  One is pending the FBI name check.  Two are scheduled to take a new set of fingerprints on July 29, 2006 and then, if cleared, will be scheduled for a naturalization oath ceremony.  One is pending the results of a request to the Detroit office of Citizenship and Immigration Services to search for a duplicate "A" file before the adjudication can proceed.

29. The following is a breakdown of the status of the additional 118 cases as of the date of this declaration:

    1) Completed cases (includes those naturalized, scheduled for an oath ceremony or denied:  75

    2) Pending final adjudication (includes FBI name check completed):  13

    3) Pending FBI name check:  18

    4) Other (includes cases referred for a fraud investigation, awaiting duplicate files for review, awaiting additional evidence from alien, etc.):  12

30. On May 25, 2006, this office visited Victor Kuznetsoff of the Office of the Mayor, City of New York, who indicated that he had been contacted by a number of individuals who had indicated a concern about losing their SSI benefits for failing to become a United States Citizen within a seven year period.  At that time, we indicated that we would provide any assistance we could regarding these cases.  Thereafter, a list of approximately 12 cases were sent to us by Mr. Kuznetsoff and

we have either adjudicated or are endeavoring to adjudicate all of the cases sent by him. Of the 12 cases: 3 have naturalized, 4 are scheduled for, or awaiting scheduling of, an oath ceremony, 1 has been denied and 4 are pending adjudication.

Pursuant to 28 U.S.C. § 1746, I declare under penalty or perjury that, based upon reasonable inquiry and my knowledge, information and belief, the foregoing is true and correct.

Executed on the 27th day of July, 2006 at New York, New York

Mary Ann Gantner
District Director
US Citizenship & Immigration Services
US Department of Homeland Security

# EXHIBIT F

Press Office
U.S. Department of Homeland Security



U.S. Citizenship
and Immigration
Services

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

Immigration Security Checks—How and Why the Process Works

---

## How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

---

several years to resolve. Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided. USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

RAISA YAKUBOVA, et al.,

          Plaintiffs,

-against-

MICHAEL CHERTOFF, et al.,

          Defendants.

No. CV-06-3203

**DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT EMILIO GONZALEZ**
(ERK) (RLM)

Defendants, pursuant to Fed. R. Civ. P. 33, hereby respond to Plaintiffs' First Set of Interrogatories and Request for Production of Documents To Emilio Gonzalez as follows:

**<u>General Objections</u>:**

      Defendants object to providing all of the responsive documents and all of the objections to producing responsive documents on or before March 1, 2007, because the scope of the requests and the fact that this is a class action make it impossible to do so, and therefore a complete response by that date would be unduly burdensome. Defendants are continuing their search and will continue to produce documents, provide objections to production, and supplement the privilege log at a reasonable pace and on regular intervals until their full response can reasonably be provided.

      Defendants object to providing a privilege log for communications between the attorneys handling this litigation and their client agencies, because such communications are so numerous and will continue to occur on such a frequent basis that listing them all on a log would be unduly burdensome.

1

Defendants object to Plaintiffs' First Set of Interrogatories and Request for Production of Documents to the extent they require the disclosure of law enforcement sensitive and information that is related to national security and other criminal investigative procedures conducted by the Federal Bureau of Investigation ("FBI") and other investigative entities.

## INTERROGATORIES

**Interrogatory No. 1:   Describe each and every step involved in the processing of a naturalization application from the date of receipt of the application to the date of adjudication.**

Defendants object to this Interrogatory as it relates to processes that are not relevant to any claims brought forth in Plaintiffs' Complaints.

Defendants further object to this Interrogatory as it requires descriptions of computer processes that implicate computer security.

**Subject to these specific objections and the General objections above, Defendants respond as follows:**

Please refer to the following documents which outline every step involved in the processing of a naturalization application from the date of receipt of the application to the date of adjudication: YAKUB000949-YAKUB001075.  Additionally, the Microsoft Excel Workbook named "C4_Workflow.xls" contains two worksheets.  The WF_ACTIVITY sheet lists all the N400 workflow activity codes and their description.  The WF_TRANSIT sheet lists the transit values that determine the sequence of workflow activities.   Please refer to YAKUB007298 for that information.

An application is initiated with the workflow activities MrRecv and DeEnter.  The application is completed with the workflow activity CompleteProc.

**Interrogatory No. 2:  For each step described in response to Interrogatory Number 1, state which entity is responsible for completing that step.**

2

Defendants object to this Interrogatory as it relates to processes that are not relevant to any claims brought forth in Plaintiffs' Complaints.

**Subject to these specific objections and the General objections above, Defendants respond as follows:**

Please refer to the following documents which outline the parties responsible for each step in the processing of a naturalization application from the date of receipt of the application to the date of adjudication: YAKUB000949-YAKUB001075.  Additionally, the Microsoft Excel Workbook named "C4_Workflow.xls" contains two worksheets.  The WF_ACTIVITY sheet lists all the N400 workflow activity codes and their description, and what entity is responsible for completion of the activity.  Please refer to YAKUB007298 for that information.

**Interrogatory No. 3:  Describe how USCIS' procedure for performing background checks on naturalization applicants has changed since 2001.**

The procedure for performing FBI fingerprint checks has not changed since 2001.

Prior to December 2002, USCIS did conduct FBI name checks, but a definitive response from the FBI was not required for the adjudication process.  60 days after the FBI name check was submitted to the FBI, the adjudication could proceed as long as no derogatory information was received from the FBI.  After December 2002, a new policy was established that required a definitive response for all FBI name checks before the final adjudication decision.  The new procedure requires the adjudicator to check the USCIS system for the FBI name check response.

The procedure for performing IBIS name checks for Naturalization applicants did not begin until 2002.  Starting in 2002, an IBIS name check was triggered by the data entry of a new N-400 application in to CLAIMS 4 and the response was valid for 35 days. An IBIS name check is still triggered by the data entry of a new N-400 application in to CLAIMS 4 but

3

in 2004, the validity period for an IBIS name check response was extended to 90 days.  In

2006, the validity period for an IBIS name check response was extended to 180 days.

**Interrogatory No. 4: State the length of time taken to complete any and every step of the processing of naturalization applications (including each step described in response to Interrogatory Number 1) for each naturalization applicant residing in Kings, Nassau, Queens, Richmond, and Suffolk counties who has filed an application since June 28, 2003. Please indicate the length of time between each step, if any, and include the date that the application was received and adjudicated.**

Defendants object to this Interrogatory as overbroad to the extent that it seeks information

on any and every step of the processing of naturalization applications for <u>each</u> applicant residing

in Kings, Nassau, Queens, Richmond, and Suffolk counties who has filed an application since

June 28, 2003, and is not limited only to putative class members, all persons in Kings, Nassau,

Queens, Richmond, and Suffolk counties who have properly submitted or who will properly

submit applications to be naturalized as U.S. citizens whose naturalization applications are not

adjudicated within 120 days after the date of the initial examinations.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

The workflow records for the 192,515 naturalization applicants meeting the criteria of the

interrogatory have been provided in response to Document Request Number 29.  Calculations

have been provided which indicated the time taken to complete each workflow activity.  Lead and

lag times are not separately recorded.  In addition, some data responsive to this question is found

in the Microsoft Excel file accompanying this response: GONZ_INTEROG_4.  Please refer to

Bates number YAKUB005484.

**Interrogatory No. 5:  State how USCIS monitors the length of time that elapses during and between each and every step in the processing of a naturalization application, including but not limited to identifying which, if any, computer systems are used.**

4

CLAIMS 4 is based on a workflow subsystem. The workflow creates activities to be accomplished by a user or system component in a predetermined method. When the activity is completed by the user or the system accomplishing a necessary function, the condition of the activity is measured. The end condition(s) measured determines the next step(s) in the workflow process that are created. All workflow activities are date/time stamped using the central database server's system date/time.

**Interrogatory No. 6: State how USCIS tracks and/or monitors the length of time that elapses between a naturalization applicant's initial interview and the adjudication of that applicant's naturalization application, including but not limited to identifying which, if any, computer systems are used.**

Such monitoring occurs at the local level. Please refer to the response to Interrogatory Number 7 in the Response to Plaintiff's First Interrogatories and Request for Production of Documents to Defendant Mary Anne Gantner answered by Gwynne MacPherson, Deputy District Director, USCIS District 3 (New York City); Dennis Bunce, Section Chief, NY Naturalization; Elizabeth Miller, Section Chief, Garden City Naturalization; Yuniya A. Van Gronigen, Supervisory District Adjudications Officer, Garden City Naturalization.

**Interrogatory No. 7: State the number of naturalization applications USCIS received per year in 2004, 2005 and 2006.**

Defendants object to this Interrogatory as overbroad to the extent that it seeks information on the number of naturalization applications USCIS received per year in 2004, 2005 and 2006, and is not limited only to putative class members, all persons in Kings, Nassau, Queens, Richmond, and Suffolk counties who have properly submitted or who will properly submit applications to be naturalized as U.S. citizens whose naturalization applications are not adjudicated within 120 days after the date of the initial examinations.

5

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

The USCIS received the following numbers of naturalization applications in each of the respective years.

| Year | Number Received |
|------|-----------------|
| 2004 | 650,404 |
| 2005 | 615,686 |
| 2006 | 783,343 |

**Interrogatory No. 8: State the number of naturalization applications USCIS adjudicated for each of the years 2004, 2005 and 2006, and the percentage of those adjudicated applications that were granted and denied naturalization for each year.**

Defendants object to this Interrogatory as overbroad to the extent that it seeks information on all naturalization applications USCIS adjudicated for each of the years 2004, 2005 and 2006, and the percentage of those adjudicated applications that were granted and denied naturalization for each year, and is not limited only to putative class members, all persons in Kings, Nassau, Queens, Richmond, and Suffolk counties who have properly submitted or who will properly submit applications to be naturalized as U.S. citizens whose naturalization applications are not adjudicated within 120 days after the date of the initial examinations.

Defendants further object to this response as overly burdensome. For this office to provide an answer would require a review of each individual file. The files number in the tens of thousands, which would make such a review overly burdensome and one that could not be completed in a reasonable time frame.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

6

The USCIS adjudicated the following numbers of applications in 2004, 2005 and 2006. Percentages of approvals, denials, and cases that were withdrawn by the applicant or administratively closed are provided.

|  | **2004** | | **2005** | | **2006** | |
|---|---|---|---|---|---|---|
| **Approve** | 560,877 | 85.72% | 632,915 | 85.98% | 685,685 | 87.01% |
| **Deny** | 68,136 | 10.41% | 77,652 | 10.55% | 80,812 | 10.25% |
| **Withdrawn** | 10,235 | 1.56% | 10,617 | 1.44% | 9,790 | 1.24% |
| **Admin Closed** | 15,063 | 2.30% | 14,937 | 2.03% | 11,753 | 1.49% |
| **Total** | 654,311 | | 736,121 | | 788,040 | |

**Interrogatory No. 9: Of those applicants who were denied naturalization in 2004, 2005 and 2006, for each year, state the percentage of those applicants who were:**
**(a) denied because they failed to pass either the English or United States History exam;**
**(b) denied because of information revealed by the FBI name check;**
**(c) denied because of information revealed by the FBI fingerprint check;**
**(d) denied because of information revealed by the IBIS check; and**
**(e) denied because of information revealed by the USCIS background check.**

Defendants object to this Interrogatory to the extent that it seeks information on <u>all</u>

applicants who were denied naturalization in 2004, 2005 and 2006, and is not limited only to

putative class members, all persons in Kings, Nassau, Queens, Richmond, and Suffolk counties

who have properly submitted or who will properly submit applications to be naturalized as U.S.

citizens whose naturalization applications are not adjudicated within 120 days after the date of the

initial examinations.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

Of those applications who were denied naturalization in 2004, 2005 and 2006, the

following table states the percentage of the applicants who were denied because the failed to pass

either the English or United States history exam:

7

|                            | 2004   | 2005   | 2006   |
|----------------------------|--------|--------|--------|
| **Denied - English**       | 2.68%  | 2.94%  | 3.11%  |
| **Denied - History/Civics** | 0.64%  | 0.61%  | 0.57%  |

Of those applications denied naturalization in 2004, 2005 and 2006, the data in CLAIMS 4 is not of sufficient granularity to identify the cases that were denied because of information revealed by the FBI name check.

Of those applications denied naturalization in 2004, 2005 and 2006, the data in CLAIMS 4 is not of sufficient granularity to identify the cases that were denied because of information revealed by the FBI fingerprint check.

Of those applications denied naturalization in 2004, 2005 and 2006, the data in CLAIMS 4 is not of sufficient granularity to identify the cases that were denied because of information revealed by the IBIS check.

Of those applications denied naturalization in 2004, 2005 and 2006, the data in CLAIMS 4 is not of sufficient granularity to identify the cases that were denied because of information revealed by the USCIS background check.

For this office to provide a complete answer would require a review of each individual file. The files number in the tens of thousands, which would make such a review overly burdensome and one that could not be completed in a reasonable time frame.

**Interrogatory No. 10:  State how many FBI name checks revealed derogatory information about a naturalization applicant that was not also revealed by either that applicant's IBIS check or the fingerprint check in each of the years 2004, 2005 and 2006.**

Defendants object to this Interrogatory as overbroad to the extent that it seeks information on <u>all</u> naturalization applicants where the FBI name checks revealed derogatory information about

a naturalization applicant that was not also revealed by either that applicant's IBIS check or the fingerprint check in each of the years 2004, 2005 and 2006, and is not limited only to putative class members, all persons in Kings, Nassau, Queens, Richmond, and Suffolk counties who have properly submitted or who will properly submit applications to be naturalized as U.S. citizens whose naturalization applications are not adjudicated within 120 days after the date of the initial examinations.

Defendants further object to responding to this request because the request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the law enforcement privilege, and deliberative process under the executive privilege.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

The data in CLAIMS 4 is not of sufficient granularity to identify the cases that were denied because of information revealed by any specific background check, or if the information revealed in one background check was also contained in another background check.

For this office to provide a complete answer would require a review of each individual file. The files number in the tens of thousands, which would make such a review overly burdensome and one that could not be completed in a reasonable time frame.

**Interrogatory No. 11: State the percentage of naturalization applicants who were denied naturalization in each of the years 2004, 2005 and 2006 based upon information discovered through the FBI name check that was not also discovered through the fingerprint check.**

Defendants object to this Interrogatory as overbroad to the extent that it seeks information on all naturalization applicants who were denied naturalization in each of the years 2004, 2005 and 2006 based upon information discovered through the FBI name check that was not also discovered through the fingerprint check, and is not limited only to putative class members, all persons in Kings, Nassau, Queens, Richmond, and Suffolk counties who have properly submitted

9

or who will properly submit applications to be naturalized as U.S. citizens whose naturalization applications are not adjudicated within 120 days after the date of the initial examinations.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

The data in CLAIMS 4 is not of sufficient granularity to identify the cases that were denied because of information revealed by any specific background check, or if the information revealed in one background check was also contained in another background check.

For this office to provide a complete answer would require a review of each individual file. The files number in the tens of thousands, which would make such a review overly burdensome and one that could not be completed in a reasonable time frame.

**Interrogatory No. 12: Identify the ten countries of origin of naturalization applicants who had the longest lengths of time elapse between the filing of their naturalization applications and the adjudication of those applications in each of the years 2004, 2005 and 2006.**

Defendants object to this Interrogatory to the extent that it seeks information on the ten countries of origin of naturalization applicants who had the longest lengths of time elapse between the filing of their naturalization applications and the adjudication of those applications in each of the years 2004, 2005 and 2006, and is not limited only to putative class members, all persons in Kings, Nassau, Queens, Richmond, and Suffolk counties who have properly submitted or who will properly submit applications to be naturalized as U.S. citizens whose naturalization applications are not adjudicated within 120 days after the date of the initial examinations.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

The data responsive to this question is found in the Microsoft Excel file accompanying this response: GONZALEZ Interogatories_12.xls. Please refer to Bates number YAKUB007299.

10

**Interrogatory No. 13: For each of the countries listed in response to Interrogatory Number 12, describe any effort DHS, USCIS or any other governmental entity has made to expedite information sharing efforts.**

Defendants object to this Interrogatory because responding may reveal privileged

information.  Privileges that apply include, but are not limited to, the attorney-client privilege, the

attorney work product privilege, the law enforcement privilege, and deliberative process under the

executive privilege.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

USCIS does not expedite cases based on the country of origin of an applicant.

**Interrogatory No. 14: Fully define "derogatory information" as that term is used in the declaration of Mary Ann Gantner, dated July 27, 2006, filed in the within action.**

Defendants object to this Interrogatory to the extent that it calls for legal analysis and

conclusions not required to be provided in response to interrogatories.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

Derogatory information is defined as information, which has a bearing on an individual's

eligibility for a benefit, and tends to lessen the merit, character or reputation of the person.

**Interrogatory No. 15: Fully define "DHS's immigration systems" as that term is used in the declaration of Mary Ann Gantner, dated July 27, 2006, filed in the within action.**

Defendants object to this Interrogatory to the extent that it calls for legal analysis and

conclusions not required to be provided in response to interrogatories.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

Please see the following fact sheets produced in response to Document Request 19 in

Plaintiff's First Interrogatories and Request for Production of Documents to Defendant Emilio

11

Gonzalez: YAKUB001495-YAKUB001649 (which will be produced once the parties agree on

additional protections for sensitive documents).

**Interrogatory No. 16: State the amount of money that USCIS currently pays FBI for every a) name check of a naturalization applicant and b) fingerprint check of a naturalization applicant.**

FBI Fingerprints are reimbursed at $16.00 per print.

Name checks are reimbursed to the FBI at:

> $1.40 for automated check

> $1.40 for a duplicate check within 6 months

> $1.40 for a format error

> $12.00 for a manual submission

> $10.65 for a manual search on an indices popular (IP)

> $22.35 for an expedite

> Average cost in FY 2006 was $3.32 per Name Check.

**Interrogatory No. 17:  Identify every computer program used in processing a naturalization application, and the role that computer program plays in the process.**

Defendants further object to this Interrogatory as it requires descriptions of computer

processes that would implicate computer security.

**Subject to these specific objections and the General objections above, Defendants respond as follows:**

| System Name | System Role |
| --- | --- |
| Computer Linked Automated Information Management System 4 | Main Naturalization Case Management |
| Reengineered Naturalization Automated Case System | Predecessor to CLAIMS 4 |
| National File Tracking System | Tracks the location of the Alien File |
| RAFACS | Tracks the location of the Alien File in the Vermont, Nebraska and California Service Centers. |

12

| FD258EE | Records the FBI Response to Fingerprints. |
| FD258MF | Records the FBI Response to Fingerprints and the FBI Response to Name Checks. |
| BBSS/IAFIS | Provides management of fingerprint submissions to the FBI. |
| Treasury Electronic Communication System | Provides the input/response to IBIS inquiries. |
| Marriage Fraud System | Provides case management for I-829 applications. |
| Change Of Address | Provides management of address changes via the customer call center for Naturalization applicants. |
| Central Index System | Provides management for alien information and records the naturalization data after the oath ceremony. |

**Interrogatory No. 18: Describe the purpose, use and significance of the CLAIMS 4 processing system.**

The primary objective of CLAIMS 4 is to provide automated support for the processing of N-400 naturalization applications, including the receipting, data entry, and other initial processing operations of the Service Centers, as well as the adjudications and oath ceremony management activities of the local offices.

The CLAIMS 4 application has initially been divided into subsystems, which support the major functions that CLAIMS 4 is required to provide. A subsystem is a collection of functionally cohesive modules that work together to satisfy a major CLAIMS 4 function. The CLAIMS 4 system architecture comprises several major subsystems, which include the following:

- Receipting
- Adjudication
- Batch Status Update (BSU)
- Case Status
- Case Management (CM)
- Scheduler/Batch Scheduler
- Notices

13

- Reports
- Oath Ceremony Management (formerly DocProd)
- System Maintenance
- External Interface
- Workflow Admin

**Interrogatory No. 19: Describe the purpose, use and significance of DHS's immigration systems.**

Please see the following fact sheets produced in response to Document Request 19 in

Plaintiff's First Interrogatories and Request for Production of Documents to Defendant Emilio

Gonzalez: YAKUB001495-YAKUB001649 (which will be produced once the parties agree on

additional protections for sensitive documents).

**Interrogatory No. 20: Describe the purpose, use and significance of the IBIS system.**

The Interagency Border Inspection System (IBIS) is a multi-agency effort to improve

border enforcement and facilitate inspections of applicants for admission into the United

States. Its usage was expanded to include background investigations on persons seeking

immigration benefits. A complete IBIS query also includes a concurrent check of the NCIC

Hot Files. An approved NCIC check queries the following databases:

- Wants and Warrants;
- Missing Persons;
- Violent Gang and Terrorists;
- Protection Order File;
- Registered Sexual Offender;
- Secret Service Presidential Protection;
- Foreign Fugitives;
- Deported Felons; and
- Supervised Release File.

IBIS queries are conducted to assist law enforcement agencies to identify risks to the

community and/or to national security and to prevent ineligible aliens from obtaining

14

immigration benefits. Employees working with benefit applications in application support

centers, asylum offices, district offices, and service centers, who have the required security

clearances for the Interagency Border Inspection System (IBIS), and who have been trained

and certified, currently conduct IBIS queries as part of the adjudication process.

**Interrogatory No. 21: Identify, by name and job title, the person or people at USCIS who are responsible for requesting that the FBI conduct fingerprint and/or name checks for naturalization applicants.**

Defendants object to this Interrogatory, because the requested information is protected

under the Privacy Act.

**Subject to these specific objections and the General Objections above, Defendants respond as follows:**

The people responsible for requesting the FBI fingerprint checks for naturalization

applicants include numerous fingerprint technicians at the Application Support Centers where the

10 prints are captured and electronically sent to the FBI for the criminal background check.

A name check is generally an automated product of data entering a case into the USCIS

system (CLAIMS 4). Where a manual request for a name check is required, Supervisory District

Adjudications Officers in the local USCIS Office and other management personnel are

responsible for requesting the name check.

**Interrogatory No. 22: Describe the criteria USCIS uses for determining whether to expedite or to request the expediting of a naturalization applicant's background check, including but not limited to the IBIS check, the fingerprint check and/or the name check.**

Since the responses to the IBIS checks and the FBI fingerprint checks are returned to

USCIS within 24 hours, there is no need to request expedited treatment for these background

checks for naturalization applicants.

The criteria for expediting an FBI name check are outlined in a USCIS Update entitled

USCIS CLARIFIES CRITERIA TO EXPEDITE FBI NAME CHECK, issued on February 20,

15

2007, produced as Bates number YAKUB005314, and available to the public at

http://www.uscis.gov/files/pressrelease/ExpediteNameChk022007.pdf.  They include:

- Military Deployment;
- Age-out cases not covered under the provision of the Child Status Protection Act (CSPA) and applications affected by sunset provisions such as Diversity Visas (DVs);
- Compelling reasons as provided by the requesting office (e.g. critical medical conditions);
- Loss of Social Security benefits or other subsistence in the discretion of the District Director.

**Interrogatory No. 23: Describe, for each Named Plaintiff and Identified Individual whose naturalization application has not yet been adjudicated, the reason each application has not been adjudicated and where in the process the application is stalled.**

**Subject to the General Objections above, Defendants respond as follows:**

The following applications are pending these actions in CLAIMS 4 as of the date of this

response preparation.

| Application ID | Alien Number | Status |
| --- | --- | --- |
| ESC*001234903 | A045662979 | Awaiting Adjudicator Decision |
| ESC*001345845 | A073556719 | Interview Sched 5/10/2005 12:55:00 PM |
| ESC*001207022 | A071360921 | Awaiting Adjudicator Decision |
| ESC*000900915 | A076559242 | Awaiting Adjudicator Decision |
| ESC*001347168 | A071306485 | Awaiting Adjudicator Decision |

More specific information may be obtained in the Gantner answers.

**Interrogatory No. 24: For each Named Plaintiff and Identified Individual, state the date(s) on which each step of the processing of his or her naturalization application began and concluded, from the date of receipt of the application to the date of adjudication (if applicable) including but not limited to all of the steps identified in response to Interrogatory Number 1.**

A Microsoft Access 2003 database, named "GONZ_INTEROG_24.mdb" has been

furnished providing the requested information.  Please refer to YAKUB007297.  All data fields

are identified and described, and a database relationship diagram is provided indicating data

relationships.

16

**Interrogatory No. 25:  Identify, by name and job title, all persons who participated in preparing your response to these Requests.**

Susan Arroyo, Branch Chief, Business Systems and Form Requirements, Office of Domestic Operations; Herman Buckley, Adjudications Officer, Office of Field Operations, USCIS; Michael T. Jaromin, District Director, USCIS District 15 (Kansas City), Acting Special Assistant to the Associate Director, Office of Domestic Operations; David J. Keevis, Chief Engineer, CLAIMS 4; Patrick Lyden, Lyden Consulting Inc, Contractor for USCIS Field Operations; Joseph Moore, Chief, Operations Planning Division, USCIS Domestic Operations

## DOCUMENT REQUESTS

**Request for Production No. 1: All documents setting forth any and every step involved in the processing and adjudication of naturalization applications from the date of application to the date of adjudication.**

Defendants object to this Request as it relates to processes that are not relevant to any claims brought forth in Plaintiffs' Complaints.  Without waiving these objections or the General objections, an answer to this Request for Production of Documents will be included as Bates numbers YAKUB000949- YAKUB001075; Immigration and Nationality Act; Title 8, Code of Federal Regulations.

**Request for Production No. 2: All documents setting forth any and every deadline, timeline and/or projected timeline for any and every step involved in the processing of naturalization applications.**

Defendants object to this Request as it relates to processes that are not relevant to any claims brought forth in Plaintiffs' Complaints.  Without waiving these objections or the General objections, an answer to this Request for Production of Documents will be included as Bates numbers YAKUB000949- YAKUB001075; Immigration and Nationality Act; Title 8, Code of Federal Regulations.

**Request for Production No. 3: All documents concerning USCIS' meeting or failing to meet any and every deadline, timeline and/or projected timeline for any and every step involved in the processing of naturalization applications.**

Defendants object that this Request is overly broad in that it requests information and data regarding many individuals who are not in the putative class.

Defendants further object to responding to this Request because the Request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 4: All documents setting forth any efforts USCIS has made to shorten the length of time taken to complete any and every step involved in the processing of naturalization applications.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 5: Documents setting forth the process by which USCIS sends fingerprint and name check requests to the FBI.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and

18

deliberative process under the executive privilege.  Without waiving these objections or the

General objections, an answer to this Request for Production of Documents will be included as

Bates numbers YAKUB005002-YAKUB005017.  Defendants continue to diligently search for

any non-privileged, responsive documents and will produce such documents, if located, as soon

as they can be made available.

**Request for Production No. 6: All documents setting forth the process by which USCIS makes requests to the FBI to expedite fingerprint checks for naturalization applicants.**

Defendants object to responding to this Request because the Request is, in part, directed at

information that is obviously privileged.  Privileges that apply include, but are not limited to, the

attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and

deliberative process under the executive privilege.  Without waiving these objections or the

General objections, an answer to this Request for Production of Documents will be included as

Bates numbers YAKUB005002-YAKUB005017; and YAKUB005314.

**Request for Production No. 7: All documents setting forth the process by which USCIS makes requests to the FBI to expedite name checks for naturalization applicants.**

Defendants object to responding to this Request because the Request is, in part, directed at

information that is obviously privileged.  Privileges that apply include, but are not limited to, the

attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and

deliberative process under the executive privilege.  Without waiving these objections or the

General objections, an answer to this Request for Production of Documents will be included as

Bates numbers YAKUB005002-YAKUB005017; and YAKUB005314.

**Request for Production No. 8: All documents setting forth the establishment, existence of and compliance with deadlines, timelines and/or projected timelines within which USCIS requests that the FBI complete fingerprint and name checks.**

19

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege. Subject to the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 9: All documents setting forth the process by which USCIS investigates derogatory information that it receives as a result of a naturalization applicant's FBI name check.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege. Without waiving these objections or the General objections, an answer to this Request for Production of Documents will be included as Bates numbers YAKUB00005315-YAKUB005331.

**Request for Production No. 10: All documents setting forth the process by which USCIS determines whether to grant naturalization once it completes its investigation into derogatory information it receives as a result of a naturalization applicant's FBI name check.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege. Subject to the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

20

**Request for Production No. 11: All training materials concerning the establishment, existence of and compliance with deadlines, timelines and/or projected timelines for any and every step involved in the processing of naturalization applications.**

Defendants object to responding to this Request because the Request is, in part, directed at

information that is obviously privileged.  Privileges that apply include, but are not limited to, the

attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and

deliberative process under the executive privilege.  Subject to the General Objections above,

Defendants are diligently searching for any non-privileged, responsive documents and will

produce such documents, if located, as soon as they can be made available.

**Request for Production No. 12: All training materials concerning the process by which USCIS investigates derogatory information that it receives as a result of a naturalization applicant's FBI name check.**

Defendants object to responding to this Request because the Request is, in part, directed at

information that is obviously privileged.  Privileges that apply include, but are not limited to, the

attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and

deliberative process under the executive privilege.  Subject to the General Objections above,

Defendants are diligently searching for any non-privileged, responsive documents and will

produce such documents, if located, as soon as they can be made available.

**Request for Production No. 13: All training materials concerning the process by which USCIS determines whether to grant naturalization once it completes its investigation into derogatory information it receives as a result of a naturalization applicant's FBI name check.**

Defendants object to responding to this Request because the Request is, in part, directed at

information that is obviously privileged.  Privileges that apply include, but are not limited to, the

attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and

deliberative process under the executive privilege.  Subject to the General Objections above,

21

Defendants are diligently searching for any non-privileged, responsive documents and will

produce such documents, if located, as soon as they can be made available.

**Request for Production No. 14: A copy of the CLAIMS 4 User Manual.**

Defendants further object to this Request as it requires descriptions of computer processes

that would implicate computer security.  Without waiving these objections or the General

objections, an answer to this Request for Production of Documents will be included as Bates

numbers YAKUB000173-YAKUB000946 (which will be produced once the parties agree on

additional protections for sensitive documents).

**Request for Production No. 15:  Sample printouts of every screen type for every computer
program utilized by USCIS to process naturalization applications.**

Defendants object to this Request as it requires descriptions of computer processes that

would implicate computer security.

Defendants further object to this Request as USCIS is unable to provide a response to this

request without undue burden and expense.  Estimates of simply identifying every screen for

every program and printing said screens range up to 1500 person hours of effort.  However,

USCIS will provide the computer manuals for all key systems involved in the processing of

naturalization applications, and these manuals include not only screenshots but also interpretive

text.  These are included as Bates numbers YAKUB000001-YAKUB000946 (which will be

produced once the parties agree on additional protections for sensitive documents);

YAKUB001076-YAKUB001494 (which will be produced once the parties agree on additional

protections for sensitive documents).

**Request for Production No. 16:  Sample printouts of every screen type for every computer
program utilized by USCIS to track the time elapsed between and during any and every
step of the processing of naturalization applications.**

Defendants object to this Request as it requires descriptions of computer processes that would implicate computer security.

Defendants further object to this Request as USCIS is unable to provide a response to this request without undue burden and expense. Estimates of simply identifying every screen for every program and printing said screens range up to 1000 person hours of effort. However, USCIS will provide the computer manuals for all key systems involved in the tracking and processing of naturalization applications, and these manuals include not only screenshots but also interpretive text. These are included as Bates numbers YAKUB000001-YAKUB000946 (which will be produced once the parties agree on additional protections for sensitive documents); YAKUB001076-YAKUB001494 (which will be produced once the parties agree on additional protections for sensitive documents).

**Request for Production No. 17: Sample of every type of document generated by USCIS in the course of processing a naturalization application.**

An answer to this Request for Production of Documents will be included as Bates numbers YAKUB005332-YAKUB005435.

**Request for Production No. 18: Documents sufficient to set forth the purpose, use and significance of the CLAIMS 4 processing system.**

An answer to this Request for Production of Documents will be included as Bates numbers YAKUB00173-YAKUB00946 (which will be produced once the parties agree on additional protections for sensitive documents); YAKUB001551-YAKUB001579 (which will be produced once the parties agree on additional protections for sensitive documents) .

**Request for Production No. 19: Documents sufficient to set forth the purpose, use and significance of each of DHS's immigration systems.**

23

An answer to this Request for Production of Documents will be included as Bates numbers YAKUB001495-YAKUB001721 (which will be produced once the parties agree on additional protections for sensitive documents).

**Request for Production No. 20:  Documents sufficient to set forth the purpose, use and significance of the IBIS system.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged.  Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.  Without waiving these objections or the General objections, an answer to this Request for Production of Documents will be included as Bates numbers YAKUB005026-YAKUB005042, YAKUB005439-YAKUB005483.

**Request for Production No. 21:  Documents sufficient to set forth the purpose, use and significance of each component of the background check USCIS performs on naturalization applicants.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged.  Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.  Without waiving these objections or the General objections, an answer to this Request for Production of Documents is included as Bates numbers YAKUB005038-YAKUB005042; YAKUB005436-YAKUB005438.

**Request for Production No. 22:  All communications between and among USCIS and USCIS-NYC, DHS, and FBI concerning deadlines, timelines, projected timelines and/or the length of time required to complete any and every step involved in the processing of naturalization applications.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged.  Privileges that apply include, but are not limited to,

24

the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 23:  All communications between DHS and/or USCIS and any other government agencies concerning deadlines, timelines, projected timelines and/or the length of time required to complete any and every step of the processing of naturalization applications.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged.  Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 24:  All internal communications or memoranda within DHS and/or USCIS concerning deadlines, timelines, projected timelines and/or the length of time required to complete any and every step of the processing of naturalization applications.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged.  Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

25

**Request for Production No. 25: All complaints and either final orders or stipulations of settlement from lawsuits against any of the Defendants, USCIS, the FBI and/or DHS, citing 8 U.S.C. §1447(b).**

Defendants object that this Request is overly broad in that it requests information and data regarding many individuals who are not in the putative class.

Defendants further object to the scope of this Request, because it requires information regarding litigation outside of the geographic scope of the putative class.

Defendants further object as USCIS is unable to provide a response to this request without undue burden and expense. USCIS came into existence on March 1, 2003, at which time it assumed the benefits litigation from the former INS. Since that time, USCIS has been a party to over 2500 cases involving naturalization issues in nearly every federal district court in the United States. To pull the information requested would require research on PACER, possibly combined with a hand review of some files where, due to forum, date of the case, or incomplete PACER information, information could not be acquired electronically. Such review and production could take up to 300 attorney hours to complete. Plaintiffs are on substantially similar footing as far as access to these records as they may review virtual court records as easily as can USCIS.

**Request for Production No. 26: All complaints and either final orders or stipulations of settlement from lawsuits against any of the Defendants, USCIS, the FBI and/or DHS, concerning the length of time taken to process one or more naturalization applications.**

Defendants object that this Request is overly broad in that it requests information and data regarding many individuals who are not in the putative class.

Defendants further object to the scope of this Request, because it requires information regarding litigation outside of the geographic scope of the putative class.

26

Defendants further object as USCIS is unable to provide a response to this request without undue burden and expense.  USCIS came into existence on March 1, 2003, at which time it assumed the benefits litigation from the former INS.  Since that time, USCIS has been a party to over 2500 cases involving naturalization issues in nearly every federal district court in the United States.  To pull the information requested would require research on PACER, possibly combined with a hand review of some files where, due to forum, date of the case, or incomplete PACER information, information could not be acquired electronically.  Although such a review and production would substantially overlap with Document Request number 25, sorting through the massive volume of cases to determine whether a retrieved case met the criteria for 25 or 26 could add up to 100 attorney hours to complete.  Plaintiffs are on substantially similar footing as far as access to these records as they may review virtual court records as easily as can USCIS.

**Request for Production No. 27:  Documents setting forth and/or concerning the number of naturalization applications that have been filed with USCIS by persons residing in Kings, Nassau, Queens, Richmond, and Suffolk counties and had not been adjudicated as of December 31, 2006.**

Defendants object that this Request is overly broad in that it requests information and data regarding many individuals who are not in the putative class.

Subject to the above objections and the General Objections above, there are 28,594 naturalization applications filed by persons residing in Kings, Nassau, Queens, Richmond, and Suffolk counties that have not been adjudicated as of December 31, 2006.

**Request for Production No. 28:  Documents setting forth and/or concerning the number of naturalization applications that have been filed with USCIS by persons residing in Kings, Nassau, Queens, Richmond, and Suffolk counties whose initial interviews were more than 120 days before December 31, 2006 and whose applications were not adjudicated by December 31, 2006.**

27

There are 7,880 naturalization applications filed by persons residing in Kings, Nassau, Queens, Richmond, and Suffolk counties whose initial interviews were more than 120 days before December 31, 2006 and whose applications were not adjudicated by December 31, 2006.

**Request for Production No. 29: Documents setting forth and/or concerning the length of time taken to complete each and every step of the processing of naturalization applications for each naturalization applicant residing in Kings, Nassau, Queens, Richmond and Suffolk counties who has filed an application since June 28, 2003.**

Defendants object that this Request is overly broad in that it requests information and data regarding many individuals who are not in the putative class. Without waiving these objections or the General objections, an answer to this Request for Production of Documents is included as Bates number YAKUB005484. The workflow records for the 192,515 naturalization applicants meeting the criteria of this Request for Production of documents have been provided in a Microsoft Access database "GONZ_INTEROG_4.mdb". Calculations have been provided which indicated the time taken to complete each workflow activity. Lead and lag times are not separately recorded, and the data to support these calculations is not available.

**Request for Production No. 30: Any contracts between or among DHS, USCIS and FBI concerning fingerprint checks and/or name checks.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged. Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 31:  All documents setting forth the amount of money that DHS or USCIS pays FBI for each fingerprint and/or name check performed as part of a naturalization applicant's background check.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged.  Privileges that apply include, but are not limited to, the law enforcement privilege, and deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 32:  All documents concerning or generated in connection with any review or evaluation of USCIS' procedure for performing background checks on naturalization applicants from 2001 until and including the present, including but not limited to the review or evaluation conducted in 2002.**

Defendants object to responding to this Request because the Request is, in part, directed at information that is obviously privileged.  Privileges that apply include, but are not limited to, the attorney-client privilege, the attorney work product privilege, the law enforcement privilege, and deliberative process under the executive privilege.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 33:  All documents setting forth any changes in USCIS' procedure for performing background checks on naturalization applicants since 2001.**

An answer to this Request for Production of Documents will be included as YAKUB00005002-YAKUB005042, YAKUB005439-YAKUB005483.

**Request for Production No. 34:  Documents sufficient to show the organizational structure and relationship of all divisions, subdivisions, units, departments and/or bureaus of USCIS and the person or people in charge of each division, subdivision, unit, department and/or bureau.**

29

Defendants object to this request, as it is overbroad, unduly burdensome, and seeks information irrelevant to this litigation. Plaintiffs seek information regarding the organizational structure of the USCIS, including all of its divisions, subdivisions, units, departments and/or bureaus. However, many of the divisions, subdivisions, units, departments and/or bureaus of USCIS have no connection to the litigation. To the extent that documents are produced responsive to this request, they will be produced regarding divisions, subdivisions, units, departments and/or bureaus of USCIS that are involved in the subject matter of the litigation. Defendants note that most if not all of the information requested is available on websites accessible by the general public, including but not limited to http://uscis.gov/graphics/fieldoffices/index.htm.

Subject to the above objections and the General Objections above, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

**Request for Production No. 35: All documents concerning any Named Plaintiff and Identified Individual, including but not limited to:**
- **N-400 applications,**
- **"A" files,**
- **printouts of all files/cases from the CLAIMS 4 processing system,**
- **all documents concerning or generated in connection with USCIS initiating an FBI name check,**
- **all documents concerning or generated in connection with the record check of DHS's own immigration systems,**
- **all documents concerning or generated in connection with the scheduling of fingerprint appointments;**
- **all documents concerning or generated in connection with the initial IBIS check;**
- **all documents concerning or generated in connection with any subsequent IBIS check;**
- **all documents concerning any derogatory information uncovered; all documents concerning or generated in connection with requests to expedite any aspect of the processing of the naturalization application, including but not limited to the FBI fingerprint check and the FBI name check;**

30

- **all documents concerning or generated in connection with the case being added to the queue of cases ready to be scheduled to be interviewed;**
- **all documents concerning or generated in connection with any check by USCIS of the status of the pending FBI name check;**
- **all documents concerning or generated in connection with the initial interview, and if applicable, any subsequent interview;**
- **if applicable, all documents concerning or generated in connection with the adjudication of the naturalization application;**
- **and if applicable, all documents concerning or generated in connection with the naturalization oath ceremony.**

Defendants object to this Request to the extent that it seeks documentation from named Plaintiffs' "A" files that is protected under the Privacy Act and other statutory and regulatory promulgations.

Subject to the above objections and the General Objections, the NY District office is providing copies of A-files. Defendants request that Plaintiffs consider limiting their request to documents from the A-Files that post-date the individual applicant's adjustment to lawful permanent resident status. In addition, an answer to this Request for Production of Documents will be included in a Microsoft Access 2003 database, named "GONZ_INTEROG_24.mdb" has been furnished providing the requested information. Please refer to YAKUB007297. All data fields are identified and described, and a database relationship diagram is provided indicating data relationships.

**Request for Production No. 36: All documents not otherwise requested, that are in any way relevant to the claims alleged in the Complaint in the within action or any defense or affirmative defense Defendants may have.**

Defendants object to providing all documents that "are in any way relevant to the claims alleged in the Complaint in the within action or any defense or affirmative defense Defendants may have" as being vague.

31

Defendants further object to this Request as overbroad because it relates to processes that do not occur in the NY District Office.

Subject to the above objections and the General Objections, Defendants are diligently searching for any non-privileged, responsive documents and will produce such documents, if located, as soon as they can be made available.

Dated: March 1, 2007
       Washington, D.C.

           By:       _____

                  ELIZABETH J. STEVENS (ES2663)
                  Attorney
                  Office of Immigration Litigation
                  Civil Division
                  United States Department of Justice
                  1331 Pennsylvania Avenue, N.W.
                  Washington, D.C.  20044
                  (202) 616-9752

TO:    YISROEL SCHULMAN, ESQ
       Jane Greengold Stevens, of counsel
       Deborah B. Berkman, of counsel
       Jason Parkin, of counsel
       New York Legal Assistance Group
       450 West 33rd St., 11th Floor
       New York, NY 10001
       Ph.: (212) 613-5000

32

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

RAISA YAKUBOVA, EMMA UNGURYAN, BELLA VESNOVSKAYA,

DAVID VESNOVSKIY, VYACHESLAV VOLOSIKOV AND SHEHATA

AWAD IBRAHIM, ON BEHALF OF THEMSELVES AND ALL OTHERS

SIMILARLY SITUATED,

        Plaintiffs,

        vs.        CASE NO. 06 CIV 3203

MICHAEL CHERTOFF, IN HIS OFFICIAL CAPACITY AS

SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY, ET

AL.,

        Defendants.

THE DEPOSITION OF

GREGORY B. SMITH

U.S. DEPARTMENT OF JUSTICE

OFFICE OF IMMIGRATION LITIGATION

CIVIL DIVISION

450 5th Street, NW, 10th Floor, Room 10525

Washington, D.C. 20001

FEBRUARY 1, 2008

3:47 P.M.

COURT REPORTING
Videography — Litigation Technology ™

Maryland Court Reporting & Video Services LLC
Baltimore, MD 2228
www.marylandreporting.com

The Reporter's Group
Stephenson, VA 22656
www.reportersgroup.com

Court Reporting, Video & Litigation Technology
Pittsburgh, PA
www.advidigalltech.com

Court Reporting Video & Litigation Technology
Breckenridge, CO 80424
www.advidigalltech.com

County Court Reporters, Inc.
Stephenson, VA 22656
www.countycourtreporters.com

Corporate: Historic Jordan Springs ¿ 1160 Jordan Springs Road ¿ Stephenson, VA 22656

```
 1                              APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4   Michael D. Sant'Ambrogio, Esquire

 5   Jason Parkin, Esquire

 6   NEW YORK LEGAL ASSISTANCE GROUP

 7        450 West 33rd Street, 11th Floor

 8        New York, New York 10001

 9        Telephone: 212.613.5000

10        Fax: 212.750.0820

11        Email: jparkin@nylag.org

12

13   ON BEHALF OF THE DEFENDANTS:

14   Elizabeth J. Stevens, Attorney

15   Sheri R. Glaser, Attorney

16   U.S. DEPARTMENT OF JUSTICE

17        Civil Division

18        450 5th Street, NW

19        Washington, D.C. 20530

20        Telephone: 202.616.9752

21        Fax: 202.305.7000

22        Email: elizabeth.stevens@usdoj.gov

23

24

25
```



COURT REPORTING
Videography    Litigation Technology ™

1                    APPEARANCES CONTINUED:

2

3   ON BEHALF OF THE U.S. CITIZENSHIP

4   AND IMMIGRATION SERVICE:

5   Annemarie E. Roll, Litigation Coordinator

6   OFFICE OF THE CHIEF COUNSEL

7   U.S. CITIZENSHIP AND IMMIGRATION SERVICES

8   U.S. DEPARTMENT OF HOMELAND SECURITY

9        20 Massachusetts Avenue, NW

10       Suite 4210

11       Washington, D.C. 20529

12       Telephone: 202.272.1435

13       Fax: 202.272.1405

14       Email: annemarie.roll@dhs.gov

15

16

17

18

19

20

21

22

23

24

25



DEPOSITION OF GREGORY B. SMITH 02/01/08 CCRL 1574602    Page 4

                        DEPOSITION OF

                     GREGORY B. SMITH

                     February 1, 2008

            **COURT REPORTER:**  Mr. Smith, will you

please raise your right hand and be sworn?  Do you

solemnly swear or affirm that the testimony you're

about to give will be the truth, the whole truth, and

nothing but the truth, so help you God?

            **THE WITNESS:**  I do.

            **COURT REPORTER:**  Thank you.

**GREGORY B. SMITH**, having been duly sworn by the Notary,

was examined and testified, as follows:

**DIRECT EXAMINATION**

**BY MR. SANT'AMBROGIO:**

     **Q.**   Good afternoon, Mr. Smith.  As I said before,

my name is Michael Sant'Abrogio.  I'm an attorney for

the Plaintiffs in this case, and I will be asking you

some questions today.  Let me ask you first, have you

ever been deposed before?

     **A.**   I have been deposed in one case.

     **Q.**   Okay.  And was that in connection with your

responsibilities USCIS?

     **A.**   Yes, this is an EEO proceeding.

     **Q.**   Okay.  Have you ever been depose...and that's

the only time you've been deposed, I guess?



1  who is told that his file is in Washington or his file

2  is in...is in Alaska or his file is in Hawaii or his

3  file is in...is in Missouri.  It's going to tell that

4  person if this information is out and there exactly

5  what the general bounds of what is known about the

6  person.  For that reason, the law enforcement privilege

7  is asserted in this...in the response to question.

8          **MR. SANT'AMBROGIO:**  Okay, let me see if

9  I can ask it in a way that avoids your concern.

10      **Q.**  Are some...are the results of some IBIS

11  checks initiated by the field office referred to

12  headquarters?

13      A.  Yes.

14      **Q.**  And are results of some IBIS checks initiated

15  by the field office resolved by the field office?

16      A.  Yes.

17      **Q.**  Some IBIS checks with derogatory information?

18      A.  Yes.

19      **Q.**  Okay.  Now, IBIS checks...tell me what IBIS

20  checks, to the extent that you can tell me.

21      A.  Well, it's a collection of information, a

22  number of different types of files and data from over

23  20 federal agencies, law enforcement agencies, and it

24  contains, among other things, wants and warrant

25  information, lookout information, watch this



**COURT REPORTING**
Videography    Litigation Technology ™

1   information, and that's...that's about it.

2       **Q.**   Okay.  So...okay.  Are you aware that in

3   2006, a study conducted by CIS determined that the

4   validity of the IBIS check could be extended to 180

5   days?

6       A.   I am aware of that fact.

7       **Q.**   Okay.  Are you aware of whether CIS has ever

8   investigated whether the validity of the IBIS check

9   could be extended beyond 180 days?

10      A.   I am not aware of that fact.

11      **Q.**   You don't know whether they have or they

12  haven't or...

13      A.   I don't know if they have or they haven't.

14      **Q.**   Okay.  If...do you...and CI...yes, go ahead.

15      A.   Could I correct that?

16      **Q.**   Sure can.

17      A.   I don't know whether we have or haven't.

18      **Q.**   Okay.  Good...keep...

19      A.   I'm in Washington now.

20      **Q.**   Do you know whether CIS has ever denied any

21  applications based solely on the results of the IBIS

22  check?

23      A.   Based solely on the results of the IBIS

24  check?  If, by that, you mean that information revealed

25  through the IBIS check was used to...to deny an



1   check are still being resolved when the second IBIS

2   check is performed, or does that ever happen?

3       A.   I would never say that it couldn't happen,

4   but it would be unusual, very unusual.

5       Q.   And is that because the application would

6   still be at the service center on hold because the...

7   **(WHEREUPON,** the witness indicated affirmatively.)

8            **MS. STEVENS:**  Don't forget to say yes or

9   no.

10      A.   Yes.

11      Q.   Okay.

12      A.   Coffee deprivation.

13      Q.   You're welcome to one of mine.

14      A.   Not an aptitude.

15      Q.   But all of them are very cold at this point.

16           Okay, so if the...if CIS is investigating the

17  results of an IBIS check that's initiated out in the

18  service center, then it is...the application is put on

19  hold until that investigation is completed.  Is that

20  fair to say?

21      A.   I wouldn't call it an investigation.

22  It's...it's a...a resolution.

23      Q.   Okay.

24      A.   An action, but it's not an investigation in

25  the formal sense.



1    Q.    Okay.  And...and why is that?

2    A.    Well, because it's not going out and doing de

3 novo fact finding.  It is retrieving records and

4 information from the holding agency, the source agency.

5    Q.    Okay.  And is it also writing some type of

6 report on those records?

7    A.    Yes, usually.

8    Q.    Okay.

9    A.    Or doing a...a request for evidence, for

10 example, the court records pertaining to the conviction

11 or disposition of an arrest, of warrants, arrest

12 actions.

13    Q.    Okay.  So, the...the end point of the

14 resolution of the IBIS check is either gathering all

15 the records or gathering all the records and creating

16 some type of report.  Is that correct?

17    A.    Mm-hmm (indicating affirmatively).

18    Q.    Okay.  Or putting it on hold while a third

19 agency is involved in some way?  Is that a possibility?

20    A.    Normally not at the...at the IBIS check

21 level.

22    Q.    Okay.

23    A.    Normally, would just move to the field

24 office.  The field office would take over.

25    Q.    So, it's resolved in some way, either by



 1  and we can consult.

 2  **(WHEREUPON,** a brief recess was taken.)

 3  **CONTINUED DIRECT EXAMINATION**

 4  **BY MR. SANT'AMBROGIO:**

 5              **THE WITNESS:**  May I correct something

 6  that I said?

 7              **MR. SANT'AMBROGIO:**  Yes.  Let me

 8  just...before you correct, just...let me just say I'm

 9  just going to withdraw my last question which I hope

10  you didn't have to spend too much time determining

11  whether it was a law enforcement privilege, but you

12  can...

13              **MS. STEVENS:**  No, actually, it wasn't on

14  the question.  The discussion was on the previous

15  error.

16              **MR. SANT'AMBROGIO:**  Oh.

17              **THE WITNESS:**  Where, indeed, an Ident

18  can be just a person who's referenced in the file.  It

19  is not necessarily adverse information.

20              **MR. SANT'AMBROGIO:**  Okay.

21              **THE WITNESS:**  It can be an associate

22  or...

23              **MR. SANT'AMBROGIO:**  Okay.

24     **Q.**   Now, did...did CIS try to evaluate the value

25  of the information in the reference files before the



```
 1  rerun project?

 2      A.   I don't know the answer to that question,

 3  whether or not any research was done or any studies

 4  were done.  It was advice given to the agency and

 5  taken.

 6      Q.   And...and by...it was advice given to the

 7  agency by whom?

 8      A.   I believe the...no, that's...it's belief.  I

 9  don't know first hand.  It's hear...hearsay, and I

10  wouldn't want to go there.  That's too...too central a

11  point.

12      Q.   Okay.  Well, let me ask you this.  Had...was

13  there...are you aware of the advice from the FBI that

14  they check the reference files?

15            MS. STEVENS:  Umm...

16            THE WITNESS:  You tell me.

17            MS. STEVENS:  I believe there are

18  documents provided by the FBI regarding the

19  discussions, regarding the re-check.

20      Q.   Okay, and I just want to ask you...

21      A.   I don't know...

22            MS. STEVENS:  No.

23      A.   ...personally.  I don't know personally.  I

24  have not seen the documents.

25      Q.   Okay.  So, are you...do you have...have any
```



 1  knowledge about any advice that was given to CIS to

 2  run...to rerun the name checks of these individuals?

 3         **MS. STEVENS:**  You can answer.

 4      A.   All I know is from a communication I had with

 5  Bill Yates to find out more about the history and his

 6  statement to me that...or his statement that...that

 7  there was concern that, in this case, there was a no

 8  hit, no record had come back.  This is the terrorist

 9  case.  And as a consequence, they wanted to be...they

10  felt compelled to be much more diligent in the level of

11  inquiry, given the proximity to 9-11 and all of the

12  adverse information that was coming out about...all of

13  the negative information about the lax security in the

14  immigration process at that time.

15      Q.   Okay.

16      A.   And that was a decision he took upon himself.

17  Bill Yates made that decision.

18      Q.   And this was...you know this from your

19  meeting with him in preparation for this deposition?

20      A.   I know this...I know it from...from a

21  communication that he had that I...I was privy to.

22      Q.   Okay.  And just...

23      A.   Yeah, it was.

24      Q.   In preparation for this deposition?

25      A.   And...and not necess...no, not this



```
 1  deposition.

 2      Q.    Okay.

 3      A.    Another...another matter, another case.

 4      Q.    And was it another case involving a

 5  naturalization application?

 6      A.    It was involving a range of...of application

 7  types.

 8      Q.    And delays in those...in the adjudication of

 9  those applications?

10      A.    Correct.

11      Q.    Okay.  You haven't testified...

12      A.    The issue is why the 2.666 million names were

13  rerun.  That was basically it.

14      Q.    Okay.

15      A.    What was the history.

16      Q.    Okay.  Now, these names had already been

17  checked against the main index files of FBI.  Is that

18  correct?

19      A.    If you're talking about the ones that were

20  rerun?

21      Q.    yes.

22      A.    Yes.

23      Q.    Okay.  And when they were rerun, were they

24  checked against the main index files again?

25      A.    And references.
```



1  **CONTINUED DIRECT EXAMINATION**

2  **BY MR. SANT'AMBROGIO:**

3     **Q.**   Okay.  What happens when FBI completes its

4  review of the name check, when it completes the name

5  check?

6     **A.**   Mm-hmm.

7     **Q.**   What happens to that?

8     **A.**   They report back to USCIS their findings.

9  Either it's a no-record finding, in which case the case

10 proceeds right to the field office or the center for

11 adjudication electronically, and if it's a, if a hit is

12 there, they will assess the information and send us a

13 summary of that information called the letterhead

14 memorandum.  And that will go to the office of field

15 operations, and then depending on the nature of the

16 letterhead memorandum, it will either go back to the

17 field or someplace else or someplace else.

18    **Q.**   Okay.  What is FGNS' involvement in that

19 process?

20    **A.**   We would be -- usually it involves if, if, if

21 there is a hit, we at one level or another would be

22 interacting with the source of the information, the

23 owner of the record to elaborate what the contents of

24 the record are, the nature of the information, doing

25 supplemental checks with other systems for



```
 1          Q.    I imagine.

 2          A.    Mm-hmm.

 3          Q.    Can you define a while for me?

 4          A.    It is, it is all over the board depending on,

 5    on what's going on with other agencies.  Nobody is so

 6    flush that they can give first priority to, you know,

 7    your request unless they don't have anything else on

 8    their desk of higher priority, you know.  It's, it's

 9    all over the board.

10          Q.    Do you know --

11          A.    And some require multiple followup --

12          Q.    With the agencies --

13          A.    -- calls.

14          Q.    -- that you're requesting --

15          A.    Sure.

16          Q.    -- the information from?

17          A.    Sure.

18          Q.    Now, do you know whether there are any

19    applications from 2001 that FGNS is still waiting for

20    information for to resolve a name check?

21          A.    I don't know that, but I suspect you're going

22    to tell me.

23          Q.    No.  I'm going to ask you.

24          A.    No.  No.  I don't know that.

25          Q.    What about 2002?
```



```
 1        A.    I am aware of a couple cases from 2002.

 2        Q.    Okay.  And, and these are cases you're still

 3  waiting for information for?

 4        A.    These are, these are cases in, in various

 5  states of play.  Not all, not, some of them we have the

 6  information, but their, their other information is

 7  being gathered as we speak.

 8        Q.    Okay.  After the information gathering --

 9        A.    Mm-hmm.

10        Q.    -- what has to happen next?

11        A.    An assessment of the information is done, and

12  then a some guidance or advice to the field will be

13  issued, you know, field adjudication.  And lines of

14  questioning might be identified if that's appropriate,

15  legal issues might be identified for consideration, and

16  then it's, now it's sent back to the field.

17        Q.    How long can that process take after the

18  information is gathered?

19        A.    Quite a while.  Depends, you know, it really

20  has depended a lot on the volume, and the size of the

21  staff, and the fact that for a period of time while the

22  agency was working out it's procedures and

23  organizational model, a lot of cases were accrued at

24  Washington.  And we are in the process of getting those

25  out to the field on an expeditious, expedited bases
```



```
 1  for, for local examination and disposition.

 2        Q.   And you said it's --

 3        A.   Boy that sounded bureaucratic.

 4        Q.   Let me see if I can break it down a little.

 5  You said the volume and staff impact how fast you can

 6  assess --

 7        A.   Sure.

 8        Q.   -- the files once you have all the

 9  information?

10        A.   Sure.

11        Q.   Okay.  So does that mean that staff is

12  engaged with --

13        A.   Other cases.

14        Q.   -- other cases?  Okay.  So they can't turn

15  their attention to new cases?

16        A.   Correct.

17        Q.   Okay.  Do you measure how long the wait is

18  for cases in which all the information has been

19  gathered?

20        A.   We do now.

21        Q.   Okay.  And do you now what the longest period

22  of time --

23        A.   No, I don't.  I don't off the top of my head.

24        Q.   Okay.

25        A.   In fact, this, we will have some pretty,
```



1        **THE WITNESS:** Yeah.

2        **MS. STEVENS:** -- information.

3        **THE WITNESS:** If, if there is a change in

4  the status of the --

5        **MR. SANT'AMBROGIO:** Oh, I think I --

6        **THE WITNESS:** -- of the record, then we

7  would life, we would permit them to be adjudicated and,

8  and approved at the appropriate level with the

9  appropriate official signing.

10       **Q.**    Okay.

11       A.    All right.  If there's a change in the

12  circumstance of the record of evidence.

13       **Q.**    Okay.

14       A.    Evidence of record, excuse me.

15       **Q.**    But if these -- okay.  And going back to

16  these applications.  These are applications we're

17  talking about that have been pending, you believe some

18  of them since 2002?

19       A.    And we're doing checks before we send them

20  back to the field, and that's, some of those checks

21  IBIS checks and some of those cases, hits are removed,

22  and, and so they're sent back for regular adjudication.

23       **Q.**    Okay.

24       A.    As if there was no, no hit.

25       **Q.**    Okay.  Well then do those cases not have LHMs



1  applications.

2      Q.    I'm just interested in the naturalization

3  applications, so if --

4      A.    In the case of naturalization applications,

5  no.  Nothing can be done until everything is resolved

6  with the name check processed, and everything has been

7  bedded.

8      Q.    But it can be denied?

9      A.    If, if it merits denial.

10     Q.    Without resolution of the name check process?

11     A.    Statutorily, yes.

12     Q.    They cannot be granted --

13     A.    Correct.

14     Q.    -- until -- so if the field doesn't grant the

15 applications, these applications that you're sending

16 out now, they will come back to FGNS, either --

17     A.    Somewhere.

18     Q.    Somewhere.  Yeah.  Okay.  And some of these

19 that you're sending out have been at FGNS since 2002?

20     A.    No.  None of them have been at FGNS since

21 2002.

22     Q.    Some of them are applications that were filed

23 in 2002?

24     A.    Some of them were applications that were that

25 may have been filed in 2002, but FGNS wouldn't have



 1  gotten then until late 2004, early 2005 because the

 2  original unit that was created to look at these, the

 3  focus unit, was in another part of the organization.

 4      Q.    Okay.  Did the focus unit resolve the results

 5  of the neck check?

 6      A.    For the most part, no.  No.

 7      Q.    No?

 8      A.    No.

 9      Q.    Okay.  Were they, was that their mission to

10  resolve the results of the name check?

11      A.    Part of their mission to do the additional

12  research and pull in the information.

13      Q.    Okay.

14      A.    And then provide, and then to make

15  determinations and actually adjudicate the cases, and

16  that's been reversed because the, the people with the

17  authority to make those determinations are the field

18  directors and service center directors.

19      Q.    Both the field and the service center can

20  adjudicate?

21      A.    Mm-hmm.  Depending on the form type.

22      Q.    Now naturalization applications.

23      A.    The naturalization applications have to be

24  done by field office directors, right.

25      Q.    Okay.  So --



 1  but it may be different than the information, it may

 2  relate to something that's different from the

 3  information you get in the, in the name check; that's

 4  our experience.

 5      Q.    But this statement says that there is only

 6  information in 39% of the FBI letterhead memoranda

 7  that's not in IBIS, right?

 8      A.    Correct, correct, but it may be different

 9  information is what I'm saying.

10      Q.    Okay.  But then the information in the 61%

11  information that's contained in IBIS.

12      A.    What this means to say is that, that 39% of

13  the cases, of the positive responses we got, there was

14  no record in IBIS, okay.  That is not the same thing as

15  saying in 61% of the cases the information in the

16  letterhead was all in IBIS.  It's a different

17  proposition.  It may be that the letterhead is

18  referring to activities other than the flags that are

19  in IBIS.  That's what IBIS is, is a flag.  It's just a

20  semaphore to say there's something here you got to look

21  at.

22      Q.    Has CIS ever analyzed the number of cases

23  that could be denied on the basis -- no, strike that.

24  Has CIS ever analyzed the number of cases that were

25  denied because of information contained in the name



1  check that was not obtained through IBIS?

2      A.   That is not an analysis I am aware of.

3      Q.   Okay.

4      A.   It's an analysis I very much want to have

5  completed, and we are doing the work to prepare for

6  that.

7      Q.   So you plan to do that analysis?

8      A.   Yes, indeed.

9      Q.   Okay.  And when do you plan to do it?

10     A.   Very soon.

11     Q.   How soon is very soon?

12     A.   This, this year, this fiscal year.

13     Q.   Okay.  Is there any preconditions to doing

14  that analysis?

15     A.   The only precondition is ensuring we've got

16  the right data; that we can get what we need 'cause

17  there are a number of other questions that have to be

18  answered in connection with that analysis that I can't,

19  you know, I really can't go into.

20          MS. STEVENS: Much beyond that.  You

21  would be going both into deliberate of process and law

22  enforcement privilege.

23          THE WITNESS: Correct.

24  CONTINUED DIRECT EXAMINATION

25  BY MR. SANT'AMBROGIO:



1   information --

2       A.    That's true.

3       Q.    -- from the reference index, reference files?

4       A.    Other, other than the fact, other than the

5   information from the 2002 rerun, no, but the 2002 rerun

6   indicated substantial additional value of the reference

7   check.

8       Q.    Was there any formal audit of that, of the

9   additional value of the reference check?

10      A.    I have not seen it if there was.

11      Q.    Okay.  Has CIS ever asked FBI to tell them to

12  assess the value of the reference index checks?

13      A.    In the discussions in 2002 and 2003, there

14  was certainly a query to the Bureau whether or not

15  there would be value added, and of course the response,

16  as I understand it, was, was there would be greater

17  value.  But what's material is how much greater value.

18  I don't think that issue was ever, ever discussed or

19  resolved.

20      Q.    Okay.  So CIS has never FBI to report on the

21  additional value that was added by the check of the

22  reference index?

23      A.    Not that I'm aware of.

24      Q.    Okay.  Do you know whether anyone has ever

25  been deported as a result of evidence uncovered by an



```
 1  FBI name check requested by CIS in connection with a

 2  naturalization application?

 3       A.   I don't not know that; that's one of the

 4  questions that's going to be answered.  In fact,

 5  pulling together the information to be able to answer

 6  that question is already underway.

 7       Q.   Okay.  But CIS doesn't know the answer to

 8  that at the moment?

 9       A.   I, I don't know the answer to that.  I'm not

10  sure that anybody does know the answer to that.

11       Q.   Okay.

12       A.   There is a -- if I can explain that a little

13  bit.

14       Q.   Okay.

15       A.   There is a handoff of the case once CIS has

16  completed it's adjudication.  If it's a denial, it is

17  referred to another agency.  What that agency does we

18  don't necessarily know.  Okay.  We can get to the

19  information, but it's a totally different database; and

20  there isn't a normal correspondence on that.  We would

21  have to go in and check the other databases to

22  ascertain whether or not the alien has been removed or

23  not and then to try to backtrack for what reason, you

24  know, which could be another issue.

25       Q.   And removal is handled by whom?
```



# EXHIBIT I

(Rev. 08-28-2000)

## FEDERAL BUREAU OF INVESTIGATION

**Precedence:** IMMEDIATE                    **Date:** 12/13/2002

**To:** Director's Office            **Attn:** Director Mueller
                                            Deputy Director Gebhardt
                                            EAD/Admistration Lowery

**From:** Records Management
         **Contact:** DAD Bob Garrity, 4-7141

**Approved By:** Lowery W Wilson Jr                    Gebhardt

**Drafted By:** Garrity Robert J Jr

**Case ID #:** 66F-HQ-A1358157-55 (Pending)
              62-HQ-C1039976-12 (Pending)

**Title:** RECORDS MANAGEMENT DIVISION
          NATIONAL NAME CHECK PROGRAM
          IMMIGRATION AND NATURALIZATION SERVICE

**Synopsis:** This summarizes the current status of name checks for
the Immigration and Naturalization Service (INS) and recommends
approval for the FBI to waive one-half of the user fees to re-
check 2.2 million names of aspiring citizens.

**Details:** At the weekly briefing meeting this date, the Director
inquired about a *New York Times* article critical of FBI
performance in the checking of names of aliens seeking
citizenship through the naturalization process.

### Mission of the National Name Check Program

         The mission of the National Name Check Program (NNCP)
is to disseminate information from the FBI's Central Records
System in response to requests submitted by federal agencies,
congressional committees, the federal judiciary, friendly foreign
police and intelligence agencies, and state and local criminal
justice agencies. The Central Records System contains
administrative, personnel and investigative files. The NNCP has
its genesis in Executive Order 10450, issued during the
Eisenhower Administration. This executive order addresses
personnel security issues, and mandates National Agency Checks
(NAC) as part of the pre-employment vetting and background
investigation process. The FBI is a primary NAC conducted on all
U. S. Government employees. These checks are all coordinated
through the NNCP Unit. The NNCP has historically conducted
nearly three million name checks annually.

uploaded
12/29/2002                    (S)

FBI0000620

To:  Director's Office  From:  Records Management
Re:  66F-HQ-A1358157, 12/13/2002

### FBI-INS MOU

The FBI conducted names checks for INS pursuant to a
Memorandum of Understanding (MOU), executed on January 15, 1985,
which established and defined the searching requirements agreed
to between the two agencies.  Since the name checks are a fee-
for-service arrangement, all agencies execute an MOU defining the
contractual arrangements agreed upon.  There is an escalating fee
schedule, depending on the nature and scope of the records search
requested.  The greater the depth of search of FBI records, the
higher the fee charged.  The checks requested by INS were
searched using the "three-way phonetic" search and with a report
of <u>main files</u> only.  This is a risk management issue, the factors
of which, of course, changed after September 11.  Agencies which
heretofore were willing to save money by requesting a less-than-
complete search, are now no longer willing to risk that course of
action.

### "Missed" Name Check

INS recently notified the FBI that one of the names
searched with a "no record" response had subsequently been
determined to be involved in a foreign counterintelligence
investigation.  INS inquired as to how the FBI could have an
investigation on an individual, yet report "no record" when INS
inquired.  Based on the information provided, the NNCP re-checked
the name and found <u>no main file</u>, but did identify cross
references concerning the individual.  In other words, the FBI
did not have the individual listed as the subject of a main file,
but did have his name referenced in another file.  Because of the
search parameters established by the MOU, the computerized search
was only searching for and reporting on main files.

This explanation was provided to INS representatives
Terrance M. O'Reilly, Associate Commissioner, Field Service
Operations, and Janise Sposato, Deputy Associate Commissioner
(DAC), in a meeting on October 16, 2002.  INS representatives
stated that none of them were in their current positions in 1985,
and none were aware that they had contracted with the FBI for
less than a full and complete search of FBI records.  They
intended to discuss this revelation with the Commissioner, INS,
and would re-contact the FBI.  Not waiting for INS response, NNCP
immediately modified the search criteria to cover "around-the-
clock phonetic" searches and main and cross reference hits.

### Request for Re-Check

On November 21, 2002, DAC     (S)    met with Section
Chief David Hardy, Record/Information Dissemination Section, RMD,

2

FBI0000621

To:  Director's Office  From:  Records Management
Re:  66F-HQ-A1358157, 12/13/2002

to discuss the need for many names to be re-checked.  She
explained that in the post-September 11 environment, the INS
could not accept anything less than a full and complete search of
all FBI records on aliens seeking citizenship through the
naturalization process.  INS was requesting that the FBI re-check
2.2 million names; names already checked once but under the old
main file search criteria.  During this meeting, DAC    (S)
estimated costs to the INS for the re-submission of the 2.2
million names, which ranges from a low of $9.6 million to a high
of $28.8, depending on the number of "hits" and files reviewed.
Reiterating the governments' mission regarding the fight against
terrorism, DAC   (S)    requested that the FBI share the burden of
this expense by waiving one-half of the fees normally charged for
such a search.  There is no direct cost to the FBI, only the loss
of additional revenue from other agency customers.

### New York Times Article

       The December 13, 2002 edition of the *New York Times*
carried an article entitled, Citizenship Delayed for 1,500;
Security Check Backlog Cited.  In this article, a comment
attributed to an anonymous source states, ". . . *[w]hile there is
disagreement about exactly what the problem is, several
government officials said it concerned the FBI's inability to*
check all the names they are given.  *A law enforcement official
who insisted on anonymity said recent communication problems
between the FBI and the naturalization service had allowed some
people with questionable backgrounds to become citizens.*"

       The "communication problems" alluded to are doubtless
the misunderstanding about the scope and depth of the records
searches under the MOU.

       INS officials advised us that they had instructed all
regional offices to suspend any further naturalization
proceedings until all 2.2 million names were re-checked and the
aspiring citizen's background vetted.  That is what is happening
now, and the background behind the recent cancellation of
naturalization proceedings throughout the country.

### Name Re-Check Progress

       The first batch of the INS electronic tapes with names
to be re-checked arrived on December 1, 2002.  Since then, a
total of 87 tapes have been received.  Forty-one (41) tapes have
been run against our indices and completed.  These tapes
contained 947,779 names, of which 809,181 (85.4%) were "no
record" responses back to INS.  This 85% no record response is
consistent with our historic relationship with INS records

3

To:  Director's Office  From:  Records Management
Re:  66F-HQ-A1358157, 12/13/2002

checks.  The remaining 138,598 (14.6%) names resulted in a "hit"
within our records, and require us to retrieve the file to first
determine if the subject is identical to the name checked, and
then prepare a summary of any derogatory information in our
files.

### Recommend Fee Sharing

     National security interests dictate that the 2.2
million names be reprocessed.  If a terrorist was inadvertently
naturalized, it would be an indefensible position from a
Department of Justice standpoint for the FBI to argue that we
were in strict compliance with the agreed upon MOU, especially
since it is with a sister DOJ agency.  The NNCP has already
received the tapes with the 2.2 million names and has begun the
process of re-checking these names.  Processing the tapes will
delay more recent INS submissions, but they have accepted this
likelihood.

     RMD recommends Director Mueller approve the FBI's
waiver of one-half of the normal fees for re-checking the 2.2
million names.

### Remedial Action Initiated

- The NNCP is expeditiously re-checking these names
  and providing INS with full and complete information
  from FBI records.
- The NNCP is contacting all of our agency customers
  and reviewing with them the provisions of existing
  MOUs, to ensure that no other agency is laboring
  under a misperception about the depth and scope of
  their requested FBI name check.

Recommendation:  That the Director approve the waiving of one-
half of the normal fee charged to INS.  This will result in
significant savings to INS, and not result in out-of-pocket
expenses for the FBI, although there will be lost opportunity
costs in that we will not be able to serve fee-paying customers
as timely as preferred.

     Under the circumstances, in the post-September 11
environment, the NNCP shares in the culpability of not ensuring
that all customers were completely aware of the services
contracted for under existing MOUs.

4

FBI0000623

To:   Director's Office   From:   Records Management
Re:   66F-HQ-A1358157, 12/13/2002

Approved: _____ (S) _____   Date: _12/13/02_

Not Approved: _____   Date: _____

◆◆

5

FBI0000624

# EXHIBIT J

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| VICTOR MOCANU )<br><br>v. )<br><br>ROBERT S. MUELLER, et al. ) | No. 07-0445 |
| GUISEPPE CUSUMANO )<br><br>v. )<br><br>MICHAEL B. MUKASEY, et al. ) | No. 07-0971 |
| MOHAMMAD BARIKBIN )<br><br>v. )<br><br>UNITED STATES, et al. ) | No. 07-3223 |
| JEAN ELISSANT )<br><br>v. )<br><br>UNITED STATES, et al. ) | No. 07-4747 |

## SUPPLEMENTAL DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program

Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in

Washington, D.C.  I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am familiar with the name check requests for plaintiffs Victor Mocanu, Guiseppe Cosumano, Mohammad Baribkin, and Jean Elissant.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government

2

employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)    FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

3

victims. Searches made in the index to locate records concerning particular subjects are made by

searching the name of the subject requested in the index.

      (8)     The entries in the General Indices fall into two categories:

          (a)     "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

          (b)     "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

      (9)     In 1995, the FBI implemented the Automated Case Support ("ACS")

system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records

were converted from automated systems previously utilized by the FBI. The ACS system

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

          (a)     Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

          (b)     Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based

4

documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c)   Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 100.2 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

(10)   The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

5

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name check: batch processing, name searching, file review, and dissemination. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the

NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Historically, during the batch processing phase, approximately 68 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)   The second stage in the process is name searching. For the name check requests that are still pending after the initial electronic check, additional review is required. An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)   The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the

7

request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)     Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)     Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

(18)     At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)     The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

8

(20)    Expedited service allows USCIS to allocate name checks toward its highest priorities and to generally minimize possible health and welfare harm to applicants that may arise while an application is pending. However, the FBI limits the number of expedite requests it will accept from USCIS because only a limited number of applications can be expedited for the process to remain meaningful, as too many expedited applications would merely reorder the queue and lead to no net benefit.

(21)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (34) below.

## GROWTH OF THE NAME CHECK PROGRAM

(22)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2007, the FBI processed in excess of 4 million name checks.

(23)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2007, 52% (~2,113,000) of the total incoming name checks were submitted by USCIS.

9

## USCIS NAME CHECK REQUESTS

(24)    In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. Because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well.

(25)    In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent – or over 440,000 – resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than 1,800 of those resubmitted requests remain pending.

(26)   The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions.

(27)   There are numerous factors that have contributed to delays in the processing of name check requests. One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume. As it concerns submissions by USCIS, for fiscal year 2007, USCIS submitted approximately 2,113,600 name check requests, of which approximately 1,112,400 represented naturalization-related name checks and approximately 794,800 represented adjustment of status-related name checks. As of the end of fiscal year 2007, the NNCPS had over 402,800 pending USCIS name check requests, of which over 167,000 represented naturalization-related name checks and over 197,900 represented adjustment of status-related name checks.

(28)   The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request. A "hit" is a possible match with a name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(29)   The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as

11

combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(30)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(31)    Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(32)    The FBI is seeking a number of improvements to its process. Over the short-term:

12

(33)   NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(34)   NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks.  For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request.  By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(35)   The FBI is using overtime to maximize productivity.  It is also in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload.  These efforts have led to the development of a name check employee training manual.

(36)   NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database.  It is also building an Electronic Records System that allows for future automation of the name check process.

(37)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(38)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(39)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check services. This will allow the FBI to scale resources proportionally with workload demands – pending name checks will pay for themselves. Until recently, fees did not cover the basic costs of providing the service. Therefore, the FBI could not adequately apply resources to processing name checks without pulling critically needed personnel and funding from other programs. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee

14

structure is undergoing the Federal rulemaking process. Consistent with this process, on October 1, 2007, the FBI began charging increased fees up front on an interim basis.

(40)    For the reasons stated earlier, the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to complete the review once it has begun. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

15

(41)    Despite the constraints described above, the FBI's initiatives have yielded positive results. For example, the total backlog of pending name checks requested by USCIS fell during the first quarter of fiscal year 2008.

(42)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## THE FBI CANNOT DISCLOSE THE UNDERLYING RESULTS OF NAME CHECKS

(43)    Plaintiffs occasionally request access to the documents examined during their name checks. The FBI does not publicly disclose the name checks' results, because disclosing such results could alert plaintiffs or other individuals to the existence of pending investigations, thus compromising confidential sources or investigative techniques. Through the FBI's name check process, the FBI discloses derogatory information, including information pertaining to immigration fraud, espionage, terrorism, and other illegal and criminal activities before USCIS renders final decisions on applicants' petitions. Moreover, the FBI cannot confirm that a name check result reveals that a person is *not* the subject of an FBI investigative record, because a denial as to one person may imply that silence as to others could be taken as confirmation that they are of investigative interest.

Executed this _15th_ day of January 2008.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

17

# EXHIBIT K

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
                                        )
RAISA YAKUBOVA, EMMA UNGURYAN,          )
BELLA VESNOVSKAYA, DAVID VESNOVSKIY,    )
VYACHESLAV VOLOSIKOV,                   )
SHELATA AWAD IBRAHIM                    )
                                        )
              Plaintiffs,               )
                                        )
        v.                              )    Case No:
                                        )    1:06-cv-03203-ERK-RLM
MICHAEL CHERTOFF,                       )
et al.,                                 )
                                        )
              Defendants.               )
                                        )
```

## DECLARATION OF MICHAEL A. CANNON

I, Michael A. Cannon, declare as follows:

(1)     I am currently the Section Chief of the National Name Check Program Section ("NNCPS"), formerly part of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at the Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C.  I have held this position since March 7, 2005.

(2)     In my current capacity as Section Chief, I supervise the National Name Check Units.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for plaintiffs Raisa Yakubova, Emma Unguryan, Bella Vesnovskaya, David Vesnovskiy, Vyacheslav Volosikov, and Shehata Awad Ibrahim.

# NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("NNCP") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by Federal agencies, congressional committees, the Federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System contains the FBI's administrative, personnel, and investigative files. The NNCP has its genesis in Executive Order 10450, issued during the Eisenhower Administration. This executive order addresses personnel security issues and mandates National Agency Checks ("NACs") as part of the pre-employment vetting and background investigation process. The FBI performs the primary NAC conducted on all U.S. Government employees. From this modest beginning, the NNCP has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege – whether that privilege is Government employment or an appointment, a security clearance, attendance at a White House function, a Green card or naturalization, admission to the bar, or a visa for the privilege of visiting our homeland. More than 70 Federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular governmental customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

# EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The Central Records System ("CRS") utilized by the FBI enables it to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBIHQ. Records which are pertinent to specific field offices are maintained at those field offices.

2

(6)     Through the General Indices, FBIHQ and each field division can access the CRS.  The General Indices are arranged in alphabetical order and consist of an index on various subjects, including the names of individuals and organizations.  Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7)     Communications directed to FBIHQ from various field offices and Legal Attaches ("Legats") are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims.  Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

(a)     A "main" entry – an entry that carries the name corresponding with the subject of a file contained in the CRS.

(b)     A "reference" entry – an entry, sometimes called a "cross-reference," that generally only mentions or references an individual, organization, etc., contained in a document located in another "main" file.

(9)     On or about October 16, 1995, the Automated Case Support ("ACS") system was implemented for all Field Offices, Legats, and FBIHQ.  More than 105 million records were converted from automated systems previously utilized by the FBI.  ACS consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a)     Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads.  A case is opened by the Office of Origin ("OO"), which sets leads for itself and other field offices, as needed.  The offices that receive the leads are referred to as Lead Offices ("LOs"), formerly known as Auxiliary Offices.  When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is utilized by FBIHQ and all offices conducting or assisting in the investigation.  Using fictitious file number "111-HQ-12345" as an example, an explanation of

3

1   the UCFN is as follows: "111" indicates the classification for that specific type of investigation;

2   "HQ" is the abbreviated form used for the Office of Origin of the investigation, which in this

3   case is FBI Headquarters; and "12345" indicates the individual case file number for that

4   particular investigation.

5           (b)     Electronic Case File ("ECF") – ECF serves as the central electronic

6   repository for the FBI's official text-based documents. ECF supports the universal serial

7   concept, where only the creator of a document serializes it into a file, providing single source

8   entry of serials into the computerized system. All serials originated by the OO are maintained in

9   the OO's case file.

10          (c)     Universal Index ("UNI") – UNI continues the universal concepts of ACS

11   by providing a complete subject/case index to all investigative and administrative cases. Only

12   the OO is required to index. However, the LOs may index additional information as needed.

13   UNI, an index of approximately 94.6 million records, functions to index names to cases, and to

14   search names and cases for use in the FBI investigative and administrative cases. Names of

15   individuals or entities are recorded with identifying information such as the date or place of birth,

16   race, sex, locality, social security number, address, or date of event.

17          (10)    The decision to index names other than subjects, suspects, and victims is a

18   discretionary decision made by the investigative FBI Special Agent ("SA"), the supervisor in the

19   field division conducting the investigation, and the supervising FBI SA at FBIHQ. The FBI does

20   not index every name in its files, but indexes only that information considered pertinent, relevant,

21   or essential for future retrieval. Without a "key" (index) to this mass information, information

22   essential to ongoing investigations could not be readily retrieved. The FBI files would thus be

23   merely archival in nature and could not be effectively used to serve the mandated mission of the

24   FBI, which is to investigate violations of Federal criminal statutes. Therefore, the General

25   Indices to the CRS files are the means by which the FBI can determine what retrievable

26   information, if any, the FBI may have in its CRS files on a particular subject matter.

27

28

4

(11)     When the FBI searches a person's name, the name is electronically
checked against the UNI.  The searches seek all instances of the individual's name, a close date
of birth, and social security number, whether a main file name or reference.  Again, a main file
name is that of an individual who is, himself, the subject of an FBI investigation, whereas a
reference is someone whose name appears in an FBI investigation.  References may be
associates, witnesses, or conspirators.  Additionally, there may be a myriad of other reasons to
explain why an FBI SA believed it important to index a particular name in an investigation for
later recovery.  The names are searched in a multitude of combinations, switching the order of
first, last, and middle names, as well as combinations with just the first and last, first and middle,
and so on.  The Name Check Program (NCP) application searches the names phonetically against
the UNI records and retrieves similar spelling variations.  This is especially important
considering that many names in our indices have been transliterated from a language other than
English.

(12)     If there is a match with a name in a FBI record, it is designated as a "Hit,"
meaning that the system has stopped on a possible match with the name being checked.  At that
point, a person must review the file or indices entry to further refine the names "Hit" on.  If a
search comes up with a match to a name and either a birth date or social security number, it is
designated an "Ident."  An "Ident" is usually easier to resolve.

## RESOLUTION RATE

(13)     Approximately 68% of the name checks submitted by USCIS are
electronically checked and returned to USCIS as having "No Record" within 48 hours.  A "No
Record" indicates that the FBI's UNI database contains no identifiable information regarding a
particular individual.  Duplicate submissions (i.e., identically spelled names with identical dates
of birth and other identical information submitted while the original submission is still pending)
are not checked, and the duplicate findings are returned to USCIS within 48 hours.

(14)     For the name check requests that are still pending after the initial
electronic check, additional review is required.  A secondary manual name search completed

5

within 30 - 60 days usually identifies an additional 22% of the USCIS requests as having "No Record," for a 90% overall "No Record" response rate. The results of this 22% are returned to USCIS. The remaining 10% are identified as possibly being the subject of an FBI record. At this point, the FBI record must now be retrieved and reviewed. If the record was electronically uploaded into the FBI ACS electronic record keeping system, it can be reviewed quickly. If not, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record," and USCIS is notified as such.

(15)     Once a record is retrieved, the information in the file is reviewed for possible derogatory information. Less than 1% of the requests are identified with a file containing possible derogatory information. If appropriate, the FBI then forwards a summary of the derogatory information to USCIS.

## GROWTH OF THE NAME CHECK PROGRAM

(16)     Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2005, the FBI processed in excess of 3.7 million name checks.

## USCIS NAME CHECK REQUESTS

(17)     In this period of heightened national security concerns, a review of the background check procedures employed by USCIS was conducted in November 2002. It was determined that in order to better protect the people and the interests of the United States, a more detailed, in-depth clearance procedure was required. One of these procedures involved the name check clearance performed by the FBI. At that time only those "main" files that could be positively identified with an individual were considered responsive. The risk of missing a match to possible derogatory record(s) was too great and therefore, the search criteria was changed to

6

access references. From a process standpoint, this meant many more files were required to be reviewed for each individual.

(18)     In December of 2002 and January of 2003, USCIS resubmitted 2.7 million name check requests to the FBI for all pending applications for benefits under the Immigration and Nationality Act for which name checks were required. The 2.7 million requests were in addition to the regular submissions by USCIS. The FBI has now returned an initial response for all 2.7 million requests. While many initial responses unquestionably indicated that the FBI had no information relating to a specific individual, approximately sixteen percent of the responses (over 440,000) indicated that the FBI _may_ have information relating to the subject of the inquiry. These 440,000 requests are in the process of being resolved.

(19)     The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. As directed by USCIS specifically, the FBI processes name check requests on a first-in, first-out basis unless USCIS directs that a name check be expedited.

(20)     Once the FBI has completed the name check request for an individual, it is the responsibility of USCIS to determine whether to grant or deny a pending application for benefits under the Immigration and Nationality Act.

## NNCPS DOES NOT SORT REQUESTS BY A
## NAME CHECK SUBJECT'S GEOGRAPHIC LOCATION

(21)     NNCPS receives name check requests from USCIS on data tapes. Each data tape can hold up to 10,000 names, and contains fields that are completed for each name, e.g., name, date of birth, etc.

(22)     NNCPS personnel do not sort, rearrange, delay, or manipulate the order in which name check requests are resolved other than to respond to a request to expedite a particular name check request.

7

(23) Thus, NNCPS personnel do not sort, rearrange, delay, or manipulate the order in which name check requests are resolved based upon a name check subject's geographic location.

### PLAINTIFFS' NAME CHECK REQUESTS

(24) The name check request for plaintiff Raisa Yakubova was submitted by USCIS on March 13, 2004, and was completed on May 26, 2006. The results were forwarded to USCIS, Washington, D.C., in accordance with our normal protocol.

(25) The name check request for plaintiff Emma Unguryan was submitted by USCIS on February 4, 2004 and February 9, 2005, and was completed on May 25, 2006. In both cases, the results were forwarded to USCIS, Washington, D.C., in accordance with our normal protocol.

(26) The name check request for plaintiff Bella Vesnovskaya was submitted by USCIS on December 30, 2004, and has not been completed. Upon completion of the name check, the results will be forwarded to USCIS, Washington, D.C., in accordance with our normal protocol.

(27) The name check request for plaintiff David Vesnovskiy was submitted by USCIS on December 30, 2004 and was completed on July 17, 2006. The results were forwarded to USCIS, Washington, D.C., in accordance with our normal protocol.

(28) The name check request for plaintiff Vyacheslav Volosikov was submitted by USCIS on December 17, 2004 and was completed on July 17, 2006. The results were forwarded to USCIS, Washington, D.C., in accordance with our normal protocol.

(29) The name check request for plaintiff Shehata Awad Ibrahim was submitted by USCIS on December 7, 2002 and completed on the same day. A second name check request for plaintiff Shehata Awad Ibrahim was submitted by USCIS on June 7, 2004, and was completed on September 22, 2004. In both cases, the results were forwarded to USCIS, Washington, D.C., in accordance with our normal protocol.

(30)   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this **20th** day of July 2006.

_Michael A. Cannon_

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

9

# EXHIBIT L

1
2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

3
4
5

RAISA YAKUBOVA, EMMA UNGURYAN,
BELLA VESNOVSKAYA, DAVID VESNOVSKIY,
VYACHESLAV VOLOSIKOV,
SHELATA AWAD IBRAHIM

6            Plaintiffs,

7            v.

Case No:
1:06-cv-3203-ERK-RLM

8      MICHAEL CHERTOFF, et al.

9            Defendants.

10

11        **SUPPLEMENTAL DECLARATION OF MICHAEL A. CANNON**

12        I, Michael A. Cannon, declare as follows:

13            (1)      I am currently the Section Chief of the National Name Check Program

14      Section ("NNCPS"), formerly part of the Record/Information Dissemination Section ("RIDS"),

15      Records Management Division ("RMD"), at the Federal Bureau of Investigation Headquarters

16      ("FBIHQ") in Washington, D.C.  I have held this position since March 7, 2005.

17            (2)      In my current capacity as Section Chief, I supervise the National Name

18      Check Units.  The statements contained in this declaration are based upon my personal

19      knowledge, upon information provided to me in my official capacity, and upon conclusions and

20      determinations reached and made in accordance therewith.

21            (3)      Due to the nature of my official duties, I am familiar with the procedures

22      followed by the FBI in responding to requests for information from its files pursuant to the policy

23      and the procedures of the United States Citizenship and Immigration Services ("USCIS"), which

24      was constituted from portions of the former Immigration and Naturalization Service ("INS").

25            (4)      I hereby incorporate by reference all the information previously provided

26      in my Declaration dated July 20, 2006, which was submitted earlier in this case.

27            (5)      The purpose of this Declaration is to provide the Court and the plaintiffs

28      further explanation regarding 1) the processing of name check requests by the NNCPS which is

1   generally completed on a first-in, first-out basis ensuring that all applicants are treated equally

2   and fairly; 2) the increasing volume of requests that must be processed with a limited budget and

3   resources; 3) the factors contributing to the delays; and 4) the specific steps taken by the NNCPS

4   to process requests more efficiently and expeditiously with its limited resources.

5                    **BACKGROUND OF THE NATIONAL NAME CHECK PROGRAM**

6                    (6)     The National Name Check Program ("NNCP") has the mission of

7   disseminating information from the FBI's Central Records System in response to requests

8   submitted by Federal agencies, congressional committees, the Federal judiciary, friendly foreign

9   police and intelligence agencies, and state and local criminal justice agencies.  The Central

10  Records System contains the FBI's administrative, personnel, and investigative files.  The NNCP

11  has its genesis in Executive Order 10450, issued during the Eisenhower Administration.  This

12  executive order addresses personnel security issues and mandates National Agency Checks

13  ("NACs") as part of the pre-employment vetting and background investigation process.  The FBI

14  performs the primary NAC conducted on all U.S. Government employees.  From this modest

15  beginning, the NNCP has grown exponentially, with more and more customers seeking

16  background information from FBI files on individuals before bestowing a privilege – whether

17  that privilege is Government employment or an appointment, a security clearance, attendance at a

18  White House function, a Green card or naturalization, admission to the bar, or a visa for the

19  privilege of visiting our homeland.  More than 70 Federal, state, and local agencies regularly

20  request FBI name searches.  In addition to serving our regular governmental customers, the FBI

21  conducts numerous name searches in direct support of the FBI's counterintelligence,

22  counterterrorism, and homeland security efforts.

23                    (7)     Congress enacted Public Law 105-119, Title I, 111 Stat. 2448-49 (1997)

24  which provided that the INS could not adjudicate an application for naturalization unless the

25  agency received confirmation from the FBI that a full criminal background check had been

26  completed on the applicant.  Pursuant to this law, the USCIS submits name check requests to the

27  NNCPS for processing.

28

1     (8)  According to 8 C.F.R. Section 335.2(b), a definitive response that a full

2 criminal background check on an applicant has been completed includes: 1) Confirmation from

3 the FBI that an applicant does not have an administrative or criminal record; 2) Confirmation

4 from the FBI that an applicant has an administrative or criminal record; or 3) Confirmation from

5 the FBI that two properly prepared fingerprint cards (Form FD-258) have been determined

6 unclassifiable for the purpose of conducting a criminal background check and have been rejected.

7     (9)  A full description of the FBI's Central Records System (CRS) is contained

8 in my earlier Declaration dated July 20, 2006, and filed in this case. The earlier Declaration

9 explains, among other things, the manner in which information is "indexed" in the CRS and

10 retrievable.

11    **THE NNCPS OPERATES ON A FIRST-IN, FIRST-OUT BASIS**

12     (10)  The NNCPS generally processes all name check requests submitted by

13 USCIS on a first-in, first-out basis. The first-in, first-out process applies to the residual name

14 check requests that are still pending after the initial electronic batch check and secondary check

15 described in my earlier Declaration. This policy of first-in, first-out reflects that all applicants are

16 equally deserving and ensures that all applicants are treated fairly. However, if an applicant's

17 name check requires a review of numerous FBI records and files, even though that person came

18 in first, the name check may require additional time until all responsive records are located and

19 reviewed. An exception to the first-in, first-out policy exists when USCIS directs that a name

20 check be handled on an "expedited" basis. USCIS determines which name checks are to be

21 expedited. Once designated as an "expedite," that name check proceeds to the front of the queue,

22 in front of the others waiting to be processed. The FBI limits the number of expedites USCIS

23 can submit per week.

24     (11)  There are four stages involved in the completion of an individual name

25 check: Batch Processing, Name Searching, File Review, and Dissemination.

26     (12)  The first stage in the process, Batch Processing, involves the transfer of

27 the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to

28

1   10,000 names. Some requests are transmitted via facsimile. The tapes are uploaded into an FBI

2   system and the names are electronically checked against the FBI's Universal Index (UNI).

3   Approximately 68% of the name checks submitted by USCIS on the batch tapes are returned to

4   USCIS as having "No Record" within 48 hours. A "No Record" indicates that the FBI's UNI

5   database contains no identifiable information regarding a particular individual. Duplicate

6   submissions (i.e., identically spelled names with identical dates of birth and other identical

7   information submitted while the original submission is still pending) are not checked, and the

8   duplicate findings are returned to USCIS within 48 hours.

9          (13)    The second stage in the process is Name Searching. For the name check

10   requests that are still pending after the initial electronic check, additional review is required. An

11   FBI employee in the NNCPS physically enters the applicant's name into the computer database

12   searching different fields and information. This secondary manual name search completed

13   within 30 - 60 days usually identifies an additional 22% of the USCIS requests as having "No

14   Record," for a 90% overall "No Record" response rate. The results of this 22% are returned to

15   USCIS.

16          (14)    The third and fourth stages in the process are File Review and

17   Dissemination. The remaining 10% of name check requests are identified as possibly being the

18   subject of an FBI record. At this point, the FBI records in question must now be retrieved and

19   reviewed. If the record was electronically uploaded into the FBI ACS electronic record keeping

20   system, it can be reviewed quickly. If not, the relevant information must be retrieved from an

21   existing paper record. Review of this information will determine whether the information is

22   identified with the request. If the information is not identified with the request, the request is

23   closed as a "No Record," and USCIS is notified as such. Once a record is retrieved, the

24   information in the file is reviewed for possible derogatory information. Less than 1% of the

25   requests are identified with a file containing possible derogatory information. If appropriate, the

26   FBI then forwards a summary of the derogatory information to USCIS. A backlog applies to a

27   small number of overall applications for naturalization. Because of the significance and

28

1    permanence of the outcome, the NNCPS diligently follows the procedures established for each

2    applicant's name check.

3            (15)    After the FBI has completed the name check request for an individual, it is

4    the responsibility of USCIS to determine whether to grant or deny a pending application for

5    benefits under the Immigration and Nationality Act.  The FBI is not involved in the adjudication

6    of a pending application.

7                    **INCREASING VOLUME AND DEMANDS ON THE NNCPS**

8            (16)    Prior to September 11, 2001, the FBI processed approximately 2.5 million

9    name check requests per year.  As a result of the government's post-9/11 counterterrorism

10   efforts, the number of FBI name checks has grown.  In fiscal year 2002, the FBI processed

11   approximately 2.7 million name check requests per year; in fiscal year 2003, the FBI processed

12   approximately 5.7 million name check requests per year; in fiscal year 2004, the FBI processed

13   approximately 3.8 million name check requests per year; in fiscal year 2005, the FBI processed in

14   excess of 3.7 million name checks.

15           (17)    A significant portion of the incoming name checks submitted over the past

16   few years has been submitted by USCIS.  In fiscal year 2003, 64% of the total incoming name

17   checks were submitted by USCIS; in fiscal year 2004, 46% of the total incoming name checks

18   were submitted by USCIS; in fiscal year 2005, 45% of the total incoming name checks were

19   submitted by USCIS; and in fiscal year 2006, as of August 23, 2006, 45% of the total incoming

20   name checks have been  submitted by USCIS.

21                    **FACTORS CONTRIBUTING TO THE DELAYS**

22           (18)    As mentioned in my previous Declaration dated July 20, 2006, which I

23   incorporated by reference in paragraph (4), in December of 2002 and January of 2003, USCIS

24   resubmitted 2.7 million name check requests to the FBI for all pending applications for benefits

25   under the Immigration and Nationality Act for which name checks were required.  This was due

26   to a review of the background check procedures employed by USCIS conducted in November

27   2002.  It was determined that in order to better protect the people and the interests of the United

28

States, a more detailed, in-depth clearance procedure was required. One of these procedures involved the name check clearance performed by the FBI. At that time only those "main" files that could be positively identified with an individual were considered responsive. The risk of missing a match to possible derogatory record(s) was too great, and therefore it was agreed by the FBI and USCIS that the search criteria be changed to also include access to references. *From a process standpoint, this meant many more files were required to be reviewed for each individual, thus adding additional time and cost to the process.*

(19)     The 2.7 million requests were in addition to the regular submissions by USCIS. The FBI has now returned an initial response for all 2.7 million requests. While many initial responses unquestionably indicated that the FBI had no information relating to a specific individual, approximately sixteen percent of the responses (over 440,000) indicated that the FBI *may* have information relating to the subject of the inquiry. These 440,000 requests have been in the process of being resolved, with over 427,000 being processed. Currently, less than 13,000 of those resubmitted requests remain pending.

(20)     The FBI's processing of the more than 440,000 residuals has delayed the processing of regular submissions from USCIS. A dedicated team within NNCPS has been assigned to handle only these re-submitted name check requests. To the extent that the team members are working on only these applications, they are unavailable to process the normal submissions which are completed on a first-in, first-out basis, unless otherwise directed by USCIS.

(21)     USCIS's name check requests outpace NNCPS's available resources. In FY-05, USCIS submitted 1,512,256 or 45% of NNCPS's incoming requests. That number exceeds the requests of NNCPS's next two largest customers combined. To meet the demands of its customers, NNCPS currently employs 52 Research Analysts and 15 File Assistants in its Dissemination Phase to process and review files for possible derogatory information, and disseminate the results. Of those, 10 Research Analysts and 1 File Assistant are dedicated to USCIS Resubmissions; and 15 Research Analysts and 2 File Assistants are dedicated to new

6

USCIS submissions.  If a file must be retrieved from one of the 56 FBI field offices, the NNCPS staff must coordinate their requests with personnel in the field.

(22)     The NNCPS is currently relocating to a new location, outside of Washington D.C.  This physical relocation has directly contributed to a loss of experienced and seasoned staff.  The decreased number of experienced staff has contributed to a delay in the processing of a name check request.

(23)     The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request.  A "hit" is a possible match with a name in an FBI record.  The number of times the name appears in FBI records correlates to the number of records which require review.

(24)     The processing of common names also contributes to a delay in processing a name check request.  The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on.  Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records.  Common names often have more than 200 hits on FBI records.

(25)     The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request.  If the date of the record is later than October 1995, the record text may be available electronically; if the record predates October 1995, the paper record has to be located, pulled, and reviewed.  A record could be at one of over 265 possible locations across the country.  Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices.  One person's name check may involve locating and reviewing numerous files, all at different physical locations.  Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office.  Since it is a paper based process, it is time consuming and labor intensive.

(26)     Another contributing factor which was briefly mentioned earlier in this document is the expedited request.  Processing an expedited case means that an employee is not available to work on a normal name check request.  As directed by USCIS specifically, the FBI processes name check requests on a first-in, first-out basis unless USCIS directs that a name check be expedited.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(27)     NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(28)     NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks.

(29)     NNCPS has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload.

(30)     NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database.  The scanning is also creating an Electronic Records System that allows for future automation of the name check process.

(31)     NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(32)     NNCPS is exploring technology updates to the Name Check process.

### EXHIBITS

(33)     Volume of Incoming Name Check Requests.

| | |
|---|---|
| FY-94 | 1,792,874 |
| FY-95 | 2,091,426 |
| FY-96 | 2,939,521 |

8

|       |           |
|-------|-----------|
| FY-97 | 2,850,769 |
| FY-98 | 2,148,993 |
| FY-99 | 2,957,525 |
| FY-00 | 2,449,981 |
| FY-01 | 2,771,241 |
| FY-02 | 3,288,018 |
| FY-03 | 6,309,346 |
| FY-04 | 3,884,467 |
| FY-05 | 3,346,435 |
| FY-06* | 3,267,349 |

(34)    Pending Name Checks at End of Fiscal Year.

|       |         |
|-------|---------|
| FY-02 | 381,645 |
| FY-03 | 818,397 |
| FY-04 | 737,412 |
| FY-05 | 368,041 |
| FY-06* | 519,539 |

(35)    National Name Check Program FY-05

|                        | Total     | USCIS          |
|------------------------|-----------|----------------|
| Pending as of 10/1/2004 | 737,412   | 236,656 (32%)  |
| Incoming:              | 3,346,435 | 1,512,256 (45 %) |
| Processed:             | 3,715,806 | 1,514,340 (41 %) |
| Pending as of 9/30/05: | 368,041   | 233,806 (64 %) |

(36)    National Name Check Program FY-06*

|                         | Total     | USCIS          |
|-------------------------|-----------|----------------|
| Pending as of 10/01/2005 | 368,041   | 233,806 (64%)  |
| Incoming:               | 3,267,349 | 1,479,506 (45%) |
| Processed:              | 3,115,851 | 1,352,840 (43%) |
| Pending as of 8/23/2006: | 519,539   | 360,472 (69%)  |

*FY-06 as of August 23, 2006

(38)    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _**31**ˢᵗ_ day of August 2006.

*[signature]*

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

9

# EXHIBIT M



Citizenship and Immigration Services Ombudsman

# Annual Report 2007

**Submitted to:**

**United States Senate**
**Committee on the Judiciary**

**United States House of Representatives**
Committee on the Judiciary

**June 11, 2007**



Homeland
Security

The Honorable Patrick J. Leahy, Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

The Honorable Arlen Specter, Ranking Member
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

The Honorable John Conyers, Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Lamar Smith, Ranking Member
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Edward M. Kennedy, Chairman
Subcommittee on Immigration, Refugees, and Border Security
United States Senate
Washington, D.C. 20510

The Honorable John Cornyn, Ranking Member
Subcommittee on Immigration, Refugees, and Border Security
United States Senate
Washington, D.C. 20510

The Honorable Zoe Lofgren, Chairwoman
Subcommittee on Immigration, Citizenship, Refugees, Border Security,
and International Law
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Peter King, Ranking Member
Subcommittee on Immigration, Citizenship, Refugees, Border Security,
and International Law
U.S. House of Representatives
Washington, D.C. 20515

## MESSAGE FROM THE OMBUDSMAN



The Citizenship and Immigration Services Ombudsman's 2007 Annual Report marks 46 months of cumulative analysis and recommendations since the establishment of the office. The Ombudsman's office is Congressionally-mandated to assist individuals and employers in resolving problems with the U.S. Citizenship and Immigration Services (USCIS) of the Department of Homeland Security (DHS) by advancing recommendations on improving USCIS services and operations. It is an independent DHS office that reports directly to the DHS Deputy Secretary with an annual report to Congress without prior review and comment by DHS or the executive branch, as directed by the Homeland Security Act of 2002.

The Ombudsman's first three annual reports focused on the systemic issues that caused delay in granting immigration benefits and customer service complaints. These reports identified pervasive and serious issues that were addressed in 28 formal recommendations directed at solving problems faced by individuals and employers in their interactions with USCIS. The USCIS Director and the Ombudsman generally agree on the identified problems and their need for priority attention, although the solutions proposed and those adopted by USCIS may differ.

Challenges still exist within USCIS. Customers continue to have difficulties with confusing forms and processes and many customers wait months, and perhaps years, for final adjudication of their cases. The Ombudsman will continue to assist individuals to receive lawful benefits in a timely, customer-friendly, secure, and efficient manner.

I want to thank DHS Secretary Michael Chertoff, Deputy Secretary Michael P. Jackson, former Secretary Tom Ridge, former Deputy Secretary Jim Loy, former Deputy Secretary Gordon England, USCIS Director Emilio Gonzalez, Deputy Director Jonathan "Jock" Scharfen, and former Director Eduardo Aguirre for their dedication to our mission of providing secure, efficient, and expeditious immigration services. I have been privileged to work with committed professionals in DHS, USCIS, and the Ombudsman's office.

The preparation of this annual report was accomplished by tireless efforts of a dedicated staff of professionals who spent many hundreds of hours reviewing and validating facts and figures, as well as drafting and editing the report. I thank them for assisting me in completing it and for their public service in addressing national security and customer service. I especially would like to thank Wendy Kamenshine who again this year skillfully managed this complicated project.

We have accomplished a great deal, but there is much more to do in the spirit of responsive government.

Prakash Khatri
Citizenship & Immigration Services Ombudsman

# I.   INTRODUCTION

The Homeland Security Act of 2002 (the Act) § 452, 6 U.S.C. § 272 (2002) established the position of Citizenship and Immigration Services Ombudsman (Ombudsman)[1] to be appointed by the Secretary of DHS and report directly to the Deputy Secretary. The first DHS Secretary, Tom Ridge, appointed Prakash Khatri as the first Ombudsman on July 28, 2003.[2]

This annual report is submitted pursuant to 6 U.S.C. § 272(c)(1) and covers the activities of the Ombudsman[3] from June 1, 2006 through May 31, 2007.

## A.   Mission

The statutory mission of the Ombudsman is to:[4]

- Assist individuals and employers in resolving problems with USCIS;

- Identify areas in which individuals and employers have problems dealing with USCIS; and

- Propose changes to mitigate identified problems.

The Ombudsman serves as a spokesperson and advocate for individuals and employers who encounter problems with the immigration benefits system.[5] The Ombudsman believes the best way to assist individuals and employers is to encourage efficiency and better customer service at USCIS by recommending solutions to systemic problems in USCIS processes.

The Ombudsman continues to work with USCIS and DHS headquarters to create more efficient, secure, and responsive methods for providing immigration services that respect the dignity of individuals and enhance our economy, while simultaneously protecting the country from those who would harm the United States.

---

[1] *See* Appendix 4 for excerpts of relevant sections of the Homeland Security Act.

[2] *See* Appendix 6 for Mr. Khatri's biography.

[3] In this report, the term "Ombudsman" and the acronym "CISOMB" refer interchangeably to Ombudsman Prakash Khatri, his staff, and the Ombudsman's office.

[4] *See* 6 U.S.C. § 272(b).

[5] "Immigration benefits" is the term used to describe the services side of the immigration system, versus enforcement. Primary immigration benefits include lawful nonimmigrant status, permanent residence (also known as adjustment of status, evidenced by a "green card"), naturalization, asylum, etc. Secondary immigration benefits or interim benefits include work permits, *i.e.*, Employment Authorization Documents (EADs), and travel documents (*e.g.* advance parole), obtained while awaiting a primary benefit.

---

### B.    State of USCIS

During the reporting period, USCIS made substantial progress in eliminating its backlogs, improving customer service, and implementing 90-day green card processing programs throughout the country.  USCIS also published a new fee structure to correct its funding shortfall.

However, USCIS remains an agency with significant problems including case backlogs, lengthy waits for security name checks for certain individuals, inefficient intake and adjudications processes, insufficient workforce training, and antiquated IT systems that present an ongoing challenge to the efficient and timely delivery of immigration services.

Congress included provisions in the Act requiring USCIS to respond to Congress on the Ombudsman's recommendations in the annual report, within three months.[6]  However, it was not until May 18, 2007, nearly eight months after the statutorily required due date and just a few weeks prior to the release of this year's report, that USCIS responded to the Ombudsman's June 29, 2006 Annual Report to Congress (2006 Annual Report Response).  This delay limited the Ombudsman's ability to evaluate the USCIS responses.

In addition, inherent to developing recommendations for USCIS improvements, the Ombudsman requires full and unrestricted access to USCIS information and data.  In recent months, this access has been selectively restricted at USCIS headquarters and a few field offices.  The Ombudsman hopes that this approach will change so that customers can receive the assistance they need and deserve.

The Ombudsman challenges USCIS to:  (1) establish measurable milestones to verify that it is achieving the service objectives used to justify its fees; (2) establish a culture of innovation; (3) test and implement new approaches to benefits processing; and (4) be transparent in its adjudications processing.

### 1.    USCIS Budget and Funding

During the reporting period, the Ombudsman's numerous visits to USCIS facilities nationwide reinforced the belief that USCIS funding problems drive agency policy.  The lack of an adequate funding source and requirements to provide for unfunded mandates force USCIS leaders to make management decisions that can be inconsistent with efficiency in processing immigration benefits.  For that reason, the Ombudsman supports a fee structure that provides fully for USCIS' cost of doing business.

The Ombudsman also recognizes that agency spending requires diligent, focused oversight through the budgeting and spending process.  Because USCIS is primarily fee funded, it does not receive the same scrutiny from congressional appropriations committees as an agency would receive if its budget were obtained from appropriations.

---

[6] *See* 6 U.S.C. § 271(a)(3)(F).

As a self-funded government monopoly, USCIS should be held to no lesser a standard of accountability and transparency than private sector entities such as publicly traded companies. U.S. citizens and legal residents have an interest in efficient management and accounting of receipts similar to that of shareholders and their interest in the operations of a public company. USCIS must efficiently manage its resources and funding, while monitoring the internal controls of the many aspects of immigration benefits processing. The agency must pay particular attention to those aspects that are delegated to other service providers such as name checking by the FBI, assisting applicants at Application Support Centers (ASCs), collecting and depositing fees at the commercial bank lockboxes, and responding to public inquiries at national call centers. Like any publicly traded company, USCIS should take full responsibility for these delegated services.

The Ombudsman also has recommended a revolving trust to help address USCIS budget and funding problems. A revolving trust would assist USCIS in handling fluctuations in immigration benefits filings, which causes substantial variability in the fee revenue stream. It also would help enable USCIS to make investments in infrastructure and training. The 2006 Annual Report Response (at p. 2) that "the proposed legislation has budget scorekeeping implications within the context of the scorekeeping conventions of the Administration and the Congress," does not address the relative benefits or drawbacks of establishing a revolving trust account for the agency.

### 2. Testing and Implementation of Innovative Approaches to Benefits Processing

The Ombudsman devotes a substantial part of this report to the up-front processing model, which has been implemented and tested in the USCIS Dallas Field Office. The Ombudsman strongly believes that, if USCIS were to implement this model or a similar up-front process nationally, it would result in more efficient, timely, and secure delivery of immigration benefits. The Ombudsman encourages USCIS to test and implement other innovative programs that eliminate redundant, inefficient processes, and leverage technology.

### 3. Transparency in Adjudications Processing

The agency should be transparent in all of its decisions and activities. The Ombudsman recognizes that the details of USCIS security screening and anti-fraud efforts cannot and should not be made public. However, criteria for classifications and case status should be transparent to customers.

USCIS should take pride in all that it has done and is doing, including its continuous, critical self-evaluations that should be public. When the agency is not transparent, customers even misunderstand positive initiatives developed to assist them. Best practices developed independently by conscientious, devoted employees are not shared. Vertical and horizontal communication within the agency (or to the public) is inadequate. Inefficiencies continue due to unshared data that the agency fears may reveal the very inefficiencies it needs to correct. The Ombudsman would like transparency to become part of the USCIS culture.

### 4. USCIS Relationship with the Ombudsman

Inherent to developing recommendations for USCIS improvements, in accordance with the Act, the Ombudsman requires access to USCIS information – policies, operational directives,

data, and reports used – as well as agency personnel. In the past 46 months, this access has evolved from the agency withholding information to more openness and cooperation back to the most recent USCIS directives to selectively share information and tighten direct access to personnel and data.

The first USCIS Director fostered a sharing of information personified by the Senior Management Counsel and Liaison to the Ombudsman who traveled with the Ombudsman frequently and who typically would open field visits with this statement:

> We ought to be prideful in what we do, and if not, we ought not be doing it . . . and if we are prideful, we can be transparent in what we do. Show me a growing and innovative organization that does not have challenges. Rest assured there will be robust discussions at headquarters on the best way to address these challenges, but in the time the Ombudsman is with us we want to ensure he has as complete picture of your operations and the challenges faced.

However, rather than building on this transparent approach, during the reporting period the Ombudsman experienced repeated efforts by a few USCIS leaders to limit access to non-sensitive data and information. These efforts hindered the Ombudsman from learning about some processes necessary for informed evaluations and recommendations. In many important instances and throughout USCIS, the Ombudsman has seen USCIS supervisors and managers welcome open dialogue and demonstrate efforts to become more transparent and provide complete information to the public. It is regrettable that some leaders within the agency have chosen to restrict the Ombudsman's efforts to achieve the common goal of customer assistance.

## C.    Accomplishments

During the reporting period, the Ombudsman made four formal recommendations to USCIS and numerous informal recommendations. The formal recommendations primarily sought to make USCIS more transparent in its operations, to enhance customer access to information by ensuring that there is adequate notice for changes to USCIS policy and procedures, and to address the Freedom of Information Act backlogs. Additionally, the Ombudsman included 14 recommendations in the 2006 Annual Report. The Ombudsman repeatedly addressed many of the identified pervasive and serious problems with USCIS and DHS leadership that, if solved, would increase USCIS efficiency, improve customer service, and enhance national security.

To identify problems and collect data, the Ombudsman held numerous meetings with representatives from community based organizations, the immigration legal community, and employer organizations. The Ombudsman also met with other federal government agency partners including representatives from the Departments of State, Commerce, Justice, and Labor to address interagency coordination.

During the reporting period, the Ombudsman visited over 40 USCIS facilities, including field offices, service centers, and other facilities.[7] The purpose of these visits was to see first-hand the issues that individuals and employers encountered, identify systemic problems, and consult with USCIS field offices on proposed solutions. The travel and site visits provided the Ombudsman opportunities for candid dialogue on a variety of issues including: impact of immigration processing backlogs on families and employers; lack of standardization in immigration adjudications; imprecise and confusing instructions on requests for information for cases; and ongoing problems due to long pending security name checks.

In addition, the Ombudsman expanded the office's outreach by starting a pilot teleconference series for customers and stakeholders with the relevant USCIS components listening in. The Ombudsman continued work to develop a Virtual Ombudsman's Office, and devoted substantial resources to assisting individuals and employers in resolving problems with USCIS.

## II.    USCIS TRANSFORMATION

Transformation of USCIS is vital to the agency's future success. As discussed in the 2006 Annual Report (at p. 29), the transformation program encompasses IT modernization efforts, forms revision, and other initiatives to provide USCIS with world-class digital processing capability. However, USCIS has devoted considerable resources to various types of transformation since the 1990s with minimal progress. The Immigration and Naturalization Service (INS) had a history of stagnated transformation efforts. With each new leader, transformation planning begins anew. Its eventual success requires focus, resources, and credible performance measures to assess outcomes.

As stated in the DHS Inspector General's November 2006 Report:

> USCIS recognizes the unique challenges it faces to reengineer business processes and modernize technology to better accomplish mission objectives . . .. The accomplishments to date are steps in the right direction for both business and IT modernization. However, USCIS remains entrenched in a cycle of continual planning, with limited progress toward achieving its long term transformation goals.[8]

The Ombudsman is concerned that the agency's current seven-year initiative will not allow it to implement immediate and necessary changes to address existing pervasive and serious problems.

Currently, the Transformation Program Office is developing three programs:

---

[7] *See* Appendix 3 for complete list of facilities visited.

[8] DHS Office of the Inspector General Report, "[USCIS'] Progress in Modernizing Information Technology," OIG-07-11 (Nov. 2006) at 21; http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-11_Nov06.pdf (last visited June 3, 2007).

This discrepancy is best reflected in Appendix 1, which provides servicewide data on denials for selected forms. In 1993, the denial rates for green card applications were four percent, but by 2003 this figure grew to over 20 percent nationally with some offices such as New York denying as many as 47 percent of green card applications. The most recent data provide some hope that recent reductions in processing times may help reduce the volume of ineligible applicants who may file incomplete or fraudulent applications solely for procuring interim benefits.

USCIS is reviewing its forms to update them and revise instructions. The agency is seeking to ensure that information provided on its website and through its website links are consistent. The importance of making sure these changes are implemented within a reasonable time cannot be overemphasized. Without the changes, there is more confusion than necessary in an already unwieldy process.

## B.    Backlogs and Pending Cases

Thanks to the dedication and leadership of staff in support centers, field offices, and service centers, there has been a substantial reduction in the backlog. The Ombudsman appreciates the detailed backlog data provided by the 2006 Annual Report Response (at pp. 4-6). Unfortunately, USCIS has not received the unqualified praise it rightfully deserves for progress made under the old definitions. Instead, the agency's redefinition of the backlog obscures the issue and raises questions about its backlog reduction efforts.

### 1.    Backlog Definition and Data

USCIS reports on September 2006 backlog data in its 2006 Annual Report Response, *i.e.*, the end of the 2006 fiscal year and the target for elimination of the backlog. In its Response (at p. 5), USCIS stated: "[t]he overall backlog, using exactly the same methodology as was used to calculate the original backlog of 3.85 million in 2004, is now just over 1 million (1,020,042)."[17] By March 2007, and using that same calculation, USCIS had a backlog of 1,275,795.[18]

In last year's annual report (at pp. 6-11), the Ombudsman analyzed USCIS' redefinition of its backlog. That analysis is not repeated here, as the backlog redefinition is unchanged. The current definition continues to consider "backlogged" only the cases pending after subtracting those cases not yet ripe for adjudication, "where even if the application or petition were approved today, a benefit could not be conferred for months or years to come. [Unripe cases are] excluded from the number of cases in the backlog but remain in the pending."[19]

The funds provided to jumpstart USCIS' backlog elimination project have expired and the total number of pending cases has increased. This result does not bode well for USCIS as it

---

[17] The sum of USCIS' "active suspense" cases by category for September 2006 is 1,139,059. *See* USCIS' 2006 Annual Report Response (at pp. 4-5); *see also* Figure 1.

[18] *See* USCIS' Processing Report, March 2007.

[19] Ombudsman's 2006 Annual Report (at p. 8), *citing* USCIS Backlog Elimination Plan (BEP), 3rd Quarter FY 04 Update (Nov. 5, 2005) at 4.

must rely on only its own resources to continue the backlog reduction effort. This could be particularly problematic if there is comprehensive immigration reform.

The DHS Inspector General's assessment cited in last year's annual report remains true today: "[. . .] reclassifications, as well as the strategy of relying upon temporary employees, may benefit USCIS in the short-term, [but] will not resolve the long-standing processing and IT problems that contributed to the backlog in the first place. Until these problems are addressed, USCIS will not be able to apply its resources to meet mission and customer needs effectively."[20]

The data on pending I-130 petitions for foreign national relatives, the largest component of backlogged benefits applications, illustrate these problems. According to USCIS records, the agency had 1,244,166 pending I-130 petitions through March 2007 of which 818,206 USCIS classifies as "active suspense" cases or those cases excluded from the pending count for calculation of the backlog.[21] The number of active suspense cases has increased about ten percent or over 100,000 additional cases compared to the pending numbers reported in the Ombudsman's 2006 Annual Report (at pp. 18-19).[22]

In its May 1, 2007 Production Update (FY 07, 1st Qtr.[23]), USCIS explains:

> The re-appearance of a backlog is a symptom of the fact that the fees charged by USCIS currently do not recover its full costs. Furthermore, while the temporary subsidy of appropriated dollars ended September 30, 2006, USCIS has not yet implemented the proposed filing fee rule to allow it to fully recover costs and ensure that capacity is sufficient to keep up with demand.[24]

Referring to its redefinition of the "backlog," an updated report stated that "USCIS has implemented 'Active Case Management' (ACM)" and:

> Pursuant to ACM, cases that do not have an available visa or an FBI name check, and cases that are in suspense for other reasons deemed beyond USCIS' control have been taken out of the

---

[20] Ombudsman's 2006 Annual Report (at pp. 8-9), *citing* DHS Inspector General Report "USCIS Faces Challenges in Modernizing Information Technology," OIG-05-41 (Sept. 2005) at 28; http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf (last visited June 3, 2007).

[21] *See* USCIS Production Status Report, Mar. 2007.

[22] "For each application type, USCIS removes from the calculated backlog the total number of pending applications that it is unable to complete due to statutory caps or other bars, including applications where a benefit is not immediately available to the applicant or beneficiary (such as "non-ripe" Form I-130, Relative Alien Petitions where a required visa number is not available, and I-485 cases where the visa number is no longer available due to regression . . ..") USCIS Backlog Elimination Plan, 3rd Quarter FY 06 Update (Dec. 11, 2006) at 1.

[23] USCIS has replaced quarterly "Backlog Elimination Plan" reports with "Production Updates," so-called because the Backlog Elimination Plan was officially retired at the end of FY 06 ("After eliminating the I-485 backlog, and nearly eliminating the I-130 backlog at the end of [FY 06], a backlog for these form types has reappeared . . .." USCIS Production Update, 1st Quarter FY 07 Update (May 1, 2007) at 2).

[24] *Id.*, at 3.

production queue.  This allows USCIS to focus its attention on those cases which are ripe for adjudication.[25]

As stated in the 2006 Annual Report, the Ombudsman remains concerned that such formulations obscure USCIS' continued difficulty to timely process applications and petitions. As further explained below, it is particularly troublesome that USCIS continues to rely upon future applicants to pay for these backlogged cases excluded by redefinition.

In its Response to the Ombudsman's 2006 Annual Report recommendation (AR 2006 – 01), USCIS agreed in principle to provide a breakdown of all incomplete cases by the number of months pending and application type, and stated (at p. 7):

> USCIS is committed to working to develop systems that would give this level of detail to help manage both overall workload and individual cases . . .. Under its Transformation Program, USCIS has already begun a multi-year redesign of its current business environment [which] will give USCIS new operational data and reports, including the type of data described in the recommendation.  Given the constraints of existing legacy case management systems, USCIS would today need to perform a cumbersome, labor intensive, recurring manual audit of all pending files in order to compile the suggested data.  Such audits would be cost prohibitive.

USCIS states that the constraints of existing management systems prevent it from providing information on discrete processing times of each application.  This is in conflict with previous outputs from those systems, which can provide the necessary data.  The Ombudsman has observed many USCIS facilities using such data drawn from the three most commonly used systems -- CLAIMS 3, CLAIMS 4, and the Marriage Fraud Amendment System.

USCIS has opted not to use its limited financial resources to extract data from current systems and prefers to spend it on prospective systems that are years in the planning.  For example, USCIS has not made corrections to the CLAIMS 3 system to capture data on applicants' priority date information, country of nationality, and the preference category under which the application is filed that USCIS must review before the application is accepted for green card processing.  The Ombudsman first raised this issue 42 months ago with senior USCIS leadership and proposed several solutions over that time.  Instead of fixing CLAIMS 3 now, USCIS is waiting for the "case management system" it has promised to implement for many years.  Failing to correct the system annually results in hundreds, if not thousands, of wasted hours by all levels of USCIS leadership in trying to account for an often asked question by Congress, the Ombudsman, stakeholders, and others: "Exactly how many employment-based green card applications does the agency have pending?"  USCIS still cannot answer that question today with certainty.

---

[25] *Id.*

Figure 1:  USCIS Cases Excluded from the USCIS "Backlog"

| | March 2007 (most recent final data available) | as of end of September 2006 (end of FY 06 and "backlog" elimination goal) |
|---|---|---|
| **Total -- Pending Customer Action** | **137,405** | **150,122** |
| *Customer did not file necessary evidence or material* | 122,608 | 135,155 |
| *Customer failed initial naturalization test and second opportunity was scheduled* | 14,797 | 14,967 |
| | | |
| **Total -- Unripe Due to Limits on Annual Immigration** | **869,544** | **823,439** |
| *Processed applications for green cards that cannot be approved due to annual statutory limits* | 29,303 | 39,121 |
| *I-130 relative petitions* | 799,043 | 710,119 |
| *Asylum-based green card applicants* | 41,198 | 74,200 |
| | | |
| **Total -- Pending Other Agency Action** | **309,791** | **264,262** |
| *No appointment for oath of allegiance is scheduled within month of USCIS decision for naturalization cases where the federal courts have exclusive jurisdiction over the oath* | 2,417 | 1,552 |
| *USCIS is waiting for the investigations requested of other agencies* | 11,879 | 6,879 |
| **Total -- FBI Name Check Cases** | **295,495** | **255,831** |
| *USCIS is waiting for FBI name check results for naturalization applicants who have not been interviewed* | 149,003 | 98,764 [1] |
| *USCIS is waiting for FBI name check result for otherwise processed cases or interviewed cases* | 146,492 [2] | 157,067 |
| | | |
| **TOTAL -- Pending Cases Not Included in "Backlog"** | **1,316,740** | **1,237,823** |

[1] USCIS did not provide this number in its Response to the Ombudsman's 2006 Annual Report, which shows September 2006 data.  Consequently, the data point above is from USCIS' November 2006 Production Status Report.

[2] The separate USCIS FBI Pending Name Check Aging Report of May 4, 2007 indicates the pending number of FBI name checks for both green card and naturalization cases has increased to 329,160.

Sources:  USCIS Production Status Report (Mar. 2007); USCIS Production Status Report (Nov. 2006); USCIS Response to the Ombudsman's 2006 Annual Report (May 18, 2007), at 4-5.

## 2.    Adjudications of Backlogged Cases

From numerous visits to USCIS facilities, the Ombudsman has observed that adjudicators prefer to work on the cases that are easiest to complete.  Adjudicators pick the "low hanging fruit" first because supervisors base performance evaluations on the number of cases completed.  Consequently, adjudicators put aside the most difficult and time-intensive cases.  These cases remain pending, perhaps for years, while backlog reduction appears generally to be succeeding.

The Ombudsman fully supports USCIS efforts to quickly and efficiently complete the cases.  However, the current drive to complete large numbers of cases presents problems.  For example, USCIS provides field offices resources based on what is needed to complete a typical

case. It is the Ombudsman's understanding that if field offices have a workload of 1,000 cases and USCIS determines each case usually takes one hour to complete, USCIS will provide financial support for 1,000 hours. Cases that take longer than an hour to complete are not provided additional resources in the office's budget. Offices with more than the average numbers of difficult cases or offices that try to work the difficult cases thoroughly will not be adequately funded because the number of completions will be low. Meanwhile, offices that push to complete the easy cases will see their budgets grow. One field office visited by the Ombudsman has a large number of long-pending cases which require substantial adjudicator hours. However, officers at that office indicate that they cannot address the older, difficult cases without negatively affecting their productivity report to USCIS headquarters.

> *RECOMMENDATION AR 2007 -- 02*
>
>     *The Ombudsman has observed that newer cases are processed more quickly while cases more than six months old are increasingly backlogged. The Ombudsman supports the USCIS drive to maximize case completions, but attention needs to be directed at clearing older cases.*
>
>     *The Ombudsman recommends that USCIS provide a clearer picture of the current backlog by providing information on the number of pending cases by form type with receipts that are: (1) less than 90 days; (2) less than 180 days; (3) less than one year; (4) less than two years; (5) less than three years; (6) less than four years; and (7) greater than four years.*

### 3.    Backlogged Form I-130 Petitions for Foreign National Relatives

In its Response to the Ombudsman's 2006 Annual Report (at pp. 8-9) and the recommendation (AR 2006 – 03) regarding the timely processing of I-130s, USCIS stated that it is not practical to process them as soon as they are received:

> Where the person will not be able to immigrate within a year due to the overall limits on legal immigration, USCIS' goal . . . is to process the case twelve months ahead of visa availability to ensure that DOS has sufficient time to complete their part of the processing. This process ensures that an eligible person's eventual immigration to the United States will not be delayed by USCIS processing . . ..
>
> USCIS believes having different service levels for different kinds of applications, which reflect relative time sensitivity and risk, while using those with less time sensitivity as a buffer, results in a system that is more cost effective for both USCIS and its customers.
>
> Further, while processing a relative petition immediately, even if the person will thereafter have to wait to immigrate, may appear ideal [. . . ,] the evaluation is best performed closer to the time the

were approved.  This process would ensure that USCIS does not accept more applications than the number of visas available.

Another issue with priority dates and workloads is connected to the new fee rule.  The Ombudsman anticipates that when the new fee rule goes into effect in July, delays in adjudication will significantly impact the agency if it does not track visa information, including visa classifications, priority dates, and country of chargeability.  Without tallying cases receipted by visa category, USCIS inevitably will accept ineligible applications and more applications than it can process in the given timeframe.  The agency will not collect fees for interim benefits issued for new green card applicants, as the new fee rule requires only one payment for both.  In addition, there may be large numbers of retrogressed cases and, eventually, multiple issuances of interim benefits.

As described in the Ombudsman's 2006 Annual Report (at pp. 13-16), the Ombudsman continues to be concerned about USCIS' data integrity and failure to meet its obligation to maintain an accurate count of pending employment- and family-based preference applications.  Although the focus is on employment-based visa applications, similar concerns exist for family-based preference cases.  The continued collaboration of these agencies supports the Ombudsman's vision of cooperation to provide benefits in a timely and efficient manner.

### F.    Name Checks and Other Security Checks

FBI name checks, one of several security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reductions efforts, and may not achieve their intended national security objectives.  FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits.  The problem of long-pending FBI name check cases <u>worsened</u> during the reporting period.

#### 1.    Background

As of May 2007, USCIS reported a staggering 329,160 FBI name check cases pending, with approximately 64 percent (211,341) of those cases pending more than 90 days and approximately 32 percent (106,738) pending more than one year.[40]  While the percentages of long-pending cases compared to last year are similar, the absolute numbers have increased.  There are now 93,358 more cases pending the name check than last year.  Perhaps most disturbing, there are 31,144 FBI name check cases pending more than 33 months as compared to 21,570 last year – over a 44 percent increase in the number of cases pending more than 33 months.[41]

---

[40] *See* USCIS FBI Pending Name Check Aging Report (May 4, 2007).  It is important to note that USCIS does not include within its backlog cases pending due to FBI name checks.  There are 155,592 FBI name check cases pending more than six months that otherwise may be part of USCIS' backlog.  *See* section III.B for a discussion of USCIS backlogs.

[41] *See id.*

Figure 10:  Pending FBI Name Checks

| Age of Pending Response | Total Count (May 4, 2007) | Total Count (May 17, 2006) |
|---|---|---|
| < 3 months | 117,819 | 82,636 |
| 3 - 6 months | 55,749 | 33,450 |
| 6 - 9 months | 28,029 | 20,047 |
| 9 - 12 months | 20,825 | 16,845 |
| 12 - 15 months | 14,133 | 15,064 |
| 15 - 18 months | 13,931 | 10,636 |
| 18 - 21 months | 11,035 | 8,144 |
| 21 - 24 months | 12,398 | 8,325 |
| 24 - 27 months | 11,765 | 9,754 |
| 27 - 30 months | 6,600 | 4,435 |
| 30 - 33 months | 5,732 | 4,896 |
| > 33 months | 31,144 | 21,570 |
| **Total Pending** | **329,160** | **235,802** |

During the reporting period, processing delays due to FBI name checks were an issue in approximately 25 percent of all written case problems received by the Ombudsman.  Resolving the FBI name check issue is included in the Ombudsman's top five priorities posted on the office website.[42]  Unlike FBI name checks, other types of background and security checks – *e.g.*, fingerprint checks, the Interagency Border Inspection Systems name checks (IBIS), and the Automated Biometric Identification System (IDENT) checks – return results within a few days, if not a few minutes.  These law enforcement and watch list checks do not significantly prolong USCIS processing times or contribute to the USCIS backlog.

As described in the Ombudsman's 2006 Annual Report (at p. 24), the FBI provides information to USCIS regarding anyone who is the principal subject of an investigation or is a person referenced in a file.  USCIS adjudicators and the Fraud Detection and National Security (FDNS) unit use this information to determine if applicants are ineligible for benefits.  The FBI provides the name check results at USCIS' request.  Name checks are not conducted by the FBI as part of ongoing investigations or from a need to learn more about an individual because of any threat or risk perceived by the FBI.  Instead, the name checks are a fee-for-service that the FBI provides to USCIS and according to USCIS-defined standards.

Once USCIS forwards records to the FBI for name checks, the process and the turnaround time for the checks are outside of USCIS' control.  Completion of the name check process may take considerable time because manual reviews of FBI files are sometimes required.  This review may include FBI reporting on fragments of names of people who are not necessarily central or directly related to an investigation or law enforcement matter.  In discussions with the

---

[42] *See* section VI.F.

Ombudsman, the FBI has stated that it lacks the resources to perform the function in a timely manner.

### 2.     Impact of Long-Pending FBI Name Checks on USCIS Customers

The delay caused by the FBI name check has substantial consequences to applicants and their families, as well as to our country and the economy. Examples of how legitimate applicants suffer include:

- Loss of employment and employment opportunities where the position requires green card status or U.S. citizenship;

- Possible termination of employment due to the inability to comply with required Form I-9 employment verification procedures where USCIS delays interim EAD issuance;

- Difficulties obtaining drivers' licenses;

- Inability to qualify for certain federal grants and funds;

- Limitations on the ability to purchase property;

- Difficulties obtaining credit and student loans; and

- Disqualification from in-state tuition.

---

*CASE PROBLEM*

*The applicant's green card application has been pending since early 2005 due to the FBI name check. The applicant is a valued researcher at a U.S. pharmaceutical company.*

---

*CASE PROBLEM*

*The applicant's green card application has been pending with USCIS for approximately four years due to the FBI name check. The applicant is a researcher at a U.S. university and, because of the adjudication delay, the university and the individual have been disadvantaged in seeking grant proposals and funding. Specifically, the individual reports that he is currently working on federal research projects. The applicant's inability to advance critical work for the project is a serious impediment to the university, its competitiveness, and the applicant's professional advancement.*

---

> **CASE PROBLEM**
>
> In fall 2003, an applicant filed a green card application, which remained pending due to FBI name checks until spring 2007. During the course of the adjudication, the applicant was fingerprinted and applied for interim benefits several times. Although the applicant applied for most of the interim benefits in a timely manner, the filing of the last EAD was not timely, and the applicant had to end his employment. In correspondence to the Ombudsman in the winter of 2007, the applicant related that he is a cancer patient who no longer has income necessary to pay for treatments.

In February 2007, USCIS made public the criteria for expedited treatment of FBI name checks. While this change should help with specific cases, the *status quo* for FBI name check completion is unacceptable from the standpoint of national security and immigration benefits processing.

### 3.    Value of the FBI Name Checks

The challenge for USCIS (and perhaps the challenge for DHS and the entire federal government) is to evaluate the value of maintaining the current FBI name check process relative to considerations of threat, vulnerability, and consequence. The Ombudsman agrees with the assessment of many case workers and supervisors at USCIS field offices and service centers that the FBI name check process has limited value to public safety or national security because in almost every case the applicant is in the United States during the name check process, living or working without restriction.

The Ombudsman recommended in the 2006 Annual Report (at p. 25) that the FBI name check process be re-examined. Delays in the name check process actually prolong an individual's presence in the United States while the check is pending. In this sense, the current USCIS name check policy may increase the risk to national security by extending the time a potential criminal or terrorist remains in the country.

In its 2006 Annual Report Response (at p. 10), USCIS stated:

> Although these security checks may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means . . . in, a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available. Information contained in 39 [percent] of the FBI positive responses (letterhead memoranda) received in FY 06 was not contained in IBIS/TECS, USCIS' primary background check tool. . .. [A]lthough a heavy price is paid in inquiries, mandamus actions, and other forms of litigation, USCIS is committed to effective

background checks, and thus is committed to the FBI name check. In fact, under the new fee rule currently under review, USCIS proposes to dedicate more funds to the FBI name check process as the FBI has indicated the fees they charge for these checks will increase and additional staff will be added to the process. This should help to speed up the name check process and reduce the backlog significantly.

Use of the 39 percent positive response rate as referenced by USCIS to justify continuing this program may exaggerate the value of the FBI name check. It is unclear how many of the FBI name check "responses" also were revealed by one or more of the other security checks conducted for the applications. To date, the Ombudsman has been unable to ascertain from USCIS the total number of actual problem cases that the agency discovered exclusively as a result of the FBI name check. The Ombudsman understands that most, if not all, of the problem cases which would result in an eventual denial of benefits also can be revealed by the other more efficient, automated criminal and security checks that USCIS initiates.

---

*COMMENTS FROM OMBUDSMAN'S TELECONFERENCE*

*One caller mentioned that USCIS does not schedule applicants for interviews because security clearances are not yet completed. He suggested that USCIS needs to look at the cost-benefit of doing these clearances. The caller stated he is in the military and has a top secret clearance.*

*Another caller suggested that information could be sent every "X" number of months to the applicant or attorney that the application still is held up for pending name checks, which would avert the many update requests.*

---

#### 4.    Possible Solutions to the FBI Name Check Delays

During this and previous reporting periods, the Ombudsman had numerous meetings with USCIS leadership on FBI name checks and discussed a number of solutions to the name check logjam.

#### a.    Pre-Application Security Checks

A possible solution to the name check problem is pre-application security checks. USCIS has not chosen to implement such a process, which would dramatically impact the agency's revenue stream for a short period of time. Simultaneously, USCIS is failing to make basic changes to its processing methodology to reduce fraud and ineligible applicants. Instead, USCIS continues to substantially fund a process with questionable value. USCIS maintains that the name check process is of value, but it remains unclear whether the process has added any additional value over the security processes already in place.

### Figure 11: Ombudsman's Suggested Pre-Application Security Check Process



## Pre-Application Process[1]

**1. PROCESS INITIATION[2]**

- Applicant/Petitioner registers intent electronically
- Individual pays Pre-Clearance fee
- Individual submits to fingerprinting, photographing, medical screen/review, DNA collection (if necessary) and financial review
- Naturalization tests (if necessary) are administered
- File created/located/obtained

Visa not available. Case suspended until visa is available.

Visa available. Proceed to Step 2.

**2. BIOMETRIC/BIOGRAPHIC DATA SHARE[3]**

- Biometric and biographic information is shared with law enforcement and other appropriate agencies/offices for security/public safety risk determination
- Medical information is reviewed to determine health risk determination
- DNA material sent for testing to establish claimed relationships
- Financial documents reviewed/verified
- Results from checks/reviews returned for consolidation into a Clearance Report

**3. CLEARANCE**

- Clearance Report is issued
- Clearance Report will establish eligibility in security, criminal, health, financial, and immigration history areas
- Clearance Report will contain DNA test results (if required)
- Clearance Report will authorize an applicant to proceed to the USCIS application process
- Clearance Report will be available online for interested law enforcement and intelligence entities
- Copy of Clearance Report provided to Applicant

## Application Process[1]

Temporary Status/ Employment Authorization (EAD)

Green Card

Citizenship/ Naturalization

**Same-Day Issuance**

**5. INTERVIEW**

- Interview to determine whether basis for immigration/naturalization is valid (marriage interview, employment verification, diversity lottery winner, passport review, etc.), admissibility has been established, and/or naturalization tests have been completed satisfactorily
- Decision
- Card/Certificate production order or Denial Notice production order (as appropriate)
- On-site card/certification production and **SAME-DAY DELIVERY**

**Same Day Interview (if required)**

**Pre-Cleared Applicant**

- Nonimmigrant – Found Admissible
- Green card applicant – Found Admissible
- Naturalization – Found Eligible

**4. APPLICATION**

- Applicant files electronic application, or
- Applicant appears at USCIS or Consulate
- Application, required documents, and fees are submitted
- Applications not meeting all filing standards are rejected immediately
- Applications by individuals who have not undergone Pre-Clearance process are rejected immediately
- Visa number (if necessary) secured by USCIS or assigned by DOS

1. May be performed in the United States or abroad.
2. Can include individuals applying for nonimmigrant visas or changes of status, individuals applying for immigrant status (adjustment or consular process), refugees, and naturalization applicants.
3. DHS/USCIS will collect and share data through an integrated case (person-based) management system. A component of this system will be an immigration case management system.

Figure 11 outlines the security screening steps to clear an applicant prior to interview, where necessary, and for adjudication of the immigration benefits application. The applicant/petitioner would register intent and pay a fee to cover the costs of the process. Pre-application is more than a pre-screening that determines *prima facie* eligibility. It moves the case to an adjudicating officer who reviews the file and interviews the applicant, if necessary. Since all fingerprints, biometrics, security clearances, necessary documents, medical evaluation, financial support, and visa availability are cleared, the applicant can be processed to conclusion immediately after interview. A Clearance Report is documentary proof that the applicant successfully completed the pre-application process. This process would place biometrics capture and security screening in the hands of appropriate law enforcement/contract employees, trained in the pre-screening process, and the determination of eligibility for benefits in the hands of USCIS officers trained in immigration law.

The agency also should review the DHS resources available to assist in exploring options to solve the backlogged FBI name check process. A number of DHS law enforcement entities perform security checks similar to those performed by USCIS.

### b.    USCIS Background Check Service IT System for Tracking FBI Name Check Cases

USCIS' 2006 Annual Report Response (at p. 10) indicates that the agency's planned Background Check Service (BCS), a new IT system that will track the status of background and security checks for pending cases, was to be implemented in late April with deployment beginning in May 2007. As of this writing, the BCS is not yet deployed. Currently, USCIS has limited capability to produce reports detailing the status of long-pending FBI name check cases. In addition, USCIS systems do not automatically indicate when a delayed name check is complete and the case can be adjudicated. Often, this leads to a situation where the validity of other checks expire before USCIS reviews the case. Those other checks then need to be reinitiated, adding financial and time costs for applicants and USCIS. The Ombudsman fully supports the expeditious rollout of the BCS system.

### c.    A Risk-Based Approach to FBI Name Checks

Name checks do not differentiate whether the individual has been in the United States for many years or a few days, is from and/or has traveled frequently to a country designated as a State Sponsor of Terrorism, or is a member of the U.S. military. Many individuals subject to lengthy name checks are either already green card holders or have been issued Employment Authorization Documents (EADs). These documents allow them to receive Social Security cards and state drivers' licenses. Most green card applicants are also eligible to receive advance parole enabling them to travel outside the United States and return as long as their cases are pending, which can be for many years under the current process.

---

> *CASE PROBLEM*
>
> *In early 2006, the applicant applied for naturalization. USCIS informed the applicant that the application is pending due to the FBI name check. The applicant currently is a contract employee for a federal agency and was security screened prior to beginning that employment.*

---

> *CASE PROBLEM*
>
> *The applicant's green card application was filed in early 2004. The application remains pending due to the FBI name check. The applicant previously served as a security officer at a U.S. embassy and was subject to rigorous security screening for the position.*

---

In November 2006, Secretary Chertoff discussed a risk-based approach to homeland security threats, vulnerabilities, and consequences:

> [T]he core principle that animates what we do at DHS . . . is risk management. It is a recognition of the fact that management of risk is not elimination of risk. There is no elimination of risk in life, and anybody who promises every single person protection against every threat at every moment in every place in the country is making a false promise . . .. What we do have to do is identify and prioritize risks -- understanding the threat, the vulnerability and the consequence. And then we have to apply our resources in a cost-effective manner, using discipline and common sense in order to minimize the risk without imposing undue cost on our communities and our families.[43]

Despite Secretary Chertoff's continuing emphasis on risk management, USCIS performs FBI name checks without the benefit of risk management modeling. In recent visits to USCIS field offices, a number of leaders have questioned the usefulness of the FBI name checks citing some of the same concerns discussed here. The process is not working and consideration should be given to re-engineering it to include a risk-based approach to immigration screening and national security. The U.S. Government Accountability Office recently noted in a report that "[w]hile the Secretary of DHS has expressed a commitment to risk management, DHS has not

---

[43] DHS Secretary Michael Chertoff, Prepared Remarks at the 2006 Grants & Training National Conference, Washington, D.C. (Nov. 28, 2006); http://www.dhs.gov/xnews/speeches/sp_1164738645429.shtm (last visited June 3, 2007).

performed comprehensive risk assessments in . . . immigration and customs systems to guide resource allocation decisions."[44]

Every effort should be undertaken to identify and remove persons who pose threats to the United States, which would include rescinding immigration benefits after USCIS has granted them. It would be irresponsible for law enforcement entities to stop their investigation of a potential crime merely because the person who is the subject of their investigation has obtained a green card or U.S. citizenship. Similarly, it would be illogical to think that delaying issuance of a green card or U.S. citizenship will prevent a criminal from committing a crime. Considering the protection the FBI name check provides, the cost of government resources used, and mental and actual hardships to applicants and their families, USCIS should reassess the continuation of its policy to require FBI name checks in their current form.

---

*RECOMMENDATION AR 2007 -- 06*

*In addition to the Ombudsman's recommendation in the 2006 Annual Report, AR 2006 –04, the Ombudsman recommends that USCIS: (1) evaluate the value of the name check in its current format and establish a risk-based approach to screening for national security concerns; (2) work with the FBI to provide the necessary resources to perform name checks in a timely manner; and (3) provide greater transparency to customers by publishing monthly the number of long-pending FBI name check cases.*

---

## G.    Interim Benefits

The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit.

### 1.    Background

Generally, USCIS issues interim benefits – EADs and advance parole documents (international travel documents) – to individuals who have green card applications pending with the agency for over 90 days.[45] The Ombudsman is encouraged by constructive dialogue with USCIS during the reporting period that addresses funding and security issues related to the processing of interim benefits.

On May 30, 2007, USCIS established new filing fees for immigration benefits.[46] Under the new fee schedule, USCIS will charge a single fee for green card applications to include recovery of the processing costs for interim benefits. The Ombudsman supports this approach to

---

[44] U.S. Government Accountability Office Report "Homeland Security: Management and Programmatic Challenges Facing the Department of Homeland Security," GAO-07-398T at 2 (Feb. 2007); http://www.gao.gov/new.items/d07398t.pdf (last visited June 6, 2007).

[45] *See* 8 C.F.R. § 274a.13(d).

[46] *See* "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 29,851 (May 30, 2007); *see also* section III.H.1.

# EXHIBIT N

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Domestic Operations of Directorate*
Washington, DC 20529



**U.S. Citizenship
and Immigration
Services**

FEB 4 - 2008

HQ 70/23 & 70/28.1

# Interoffice Memorandum

**TO:**       Field Leadership

**FROM:**   Michael Aytes
            Associate Director, Domestic Operations

**SUBJECT:**   Revised National Security Adjudication and Reporting Requirements

**Background**

U.S. Citizenship and Immigration Services (USCIS) conducts background checks on all applicants, petitioners, and beneficiaries seeking immigration benefits. This is done both to enhance national security and to ensure the integrity of the immigration process. USCIS has previously mandated that FBI name checks be completed and resolved before any positive adjudication can proceed on certain form types. This memorandum modifies existing guidance for applications where statutory immigration provisions allow for the detention and removal of an alien who is the subject of actionable information that is received from the FBI or other law enforcement agencies after approval of the application.

USCIS is issuing revised guidance in response to recommendations of the DHS Office of Inspector General (OIG-06-06) regarding the need to align the agency's background and security check policies with those of U.S. Immigration and Customs Enforcement (ICE). The *Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals* regulations prevent immigration judges and the Board of Immigration Appeals (BIA) from granting benefits to aliens before DHS confirms that all background and security checks have been completed. *See* 8 C.F.R. § 1003.47(g); 8 C.F.R. § 1003.1(d)(6)(i). In the context of removal proceedings, ICE has determined that FBI fingerprint checks and Interagency Border Inspection Services (IBIS) checks are the required security checks for purposes of the applicable regulations. In the unlikely event that FBI name checks reveal actionable information after the immigration judge grants an alien permanent resident status, DHS may detain and initiate removal proceedings against the permanent resident. *See* 8 U.S.C. § 1227; *see also* 8 U.S.C. § 1256 (allowing DHS to rescind an alien's adjustment of status).

**Revised National Security Adjudication and Reporting Requirements**
Page 2

**Revised Guidance**

A definitive FBI fingerprint check and the IBIS check must be obtained and resolved before an Application for Adjustment of Status (I-485), Application for Waiver of Ground of Inadmissibility (I-601), Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act (I-687), or Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of Public Law 99-603) (I-698) is approved. USCIS will continue to initiate FBI name checks when those applications are received. Where the application is otherwise approvable and the FBI name check request has been pending for more than 180 days, the adjudicator shall approve the I-485, I-601, I-687, or I-698 and proceed with card issuance. The FBI has committed to providing FBI name check results within this timeframe.

There is no change in the requirement that FBI fingerprint check, IBIS check and FBI name check results be obtained and resolved prior to the adjudication of an Application for Naturalization (N-400).

Pending further guidance regarding post-audit reporting and tracking requirements and modifications to associated quality assurance procedures, applications approved pursuant to this memorandum shall be held at the adjudicating office. If derogatory or adverse information is received from the FBI after the application is approved, USCIS will determine if rescission or removal proceedings are appropriate and warranted.

Subject to the reporting requirements set forth in the February 16, 2007, memorandum titled "FBI Name Checks Policy and Process Clarification for Domestic Operations," an application or petition may be denied, dismissed, administratively closed, withdrawn, or referred to the Immigration Court at any time.

Questions regarding this memorandum should be directed through appropriate supervisory and operational channels. Local offices should work through their chain of command.

Distribution List:
Regional Directors
Service Center Directors
District Directors (except foreign)
Field Officer Directors (except foreign)
National Benefits Center Director

# EXHIBIT O

## FBI Name Check Pending Report Comparison

| AGE OF PENDING RESPONSE | 6-Sep-06 Count | 5-Jun-07 Count | Change Sept 2006 to June 2007 | 3-Jul-07 Count | 7-Aug-07 Count | 17-Sep-07 Count | 2-Oct-07 Count | 2-Oct-07 Change from Prior Month | 1-Nov-07 Count | 1-Nov-07 Change from Prior Month | 4-Dec-07 Count | 4-Dec-07 Change from Prior Month | 8-Jan-08 Count | 8-Jan-08 Change from Prior Month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| < 3 MOS. | 89,216 | 110,423 | 21,207 | 121,502 | 121,440 | 93,328 | 114,244 | 20,916 | 169,539 | 54,295 | 133,359 | (35,180) | 102,466 | (30,893) |
| 3 - 6 MOS. | 56,317 | 45,654 | (10,663) | 43,327 | 45,643 | 38,026 | 46,320 | 8,294 | 32,483 | (13,837) | 40,386 | 7,903 | 67,013 | 26,627 |
| 6 - 9 MOS. | 20,145 | 23,518 | 3,373 | 17,184 | 19,233 | 19,351 | 21,740 | 2,389 | 21,911 | 171 | 21,026 | (885) | 24,263 | 3,227 |
| 9 - 12 MOS. | 16,346 | 19,836 | 3,490 | 18,006 | 16,956 | 17,807 | 16,903 | (904) | 16,789 | (114) | 17,015 | 226 | 16,546 | (469) |
| 12 - 15 MOS. | 16,835 | 15,644 | (1,191) | 17,312 | 19,348 | 17,661 | 16,752 | (909) | 15,915 | (837) | 15,177 | (738) | 14,209 | (968) |
| 15 - 18 MOS. | 14,655 | 12,691 | (1,964) | 12,558 | 12,965 | 15,286 | 17,464 | 2,178 | 17,941 | 477 | 16,280 | (1,661) | 13,353 | (2,927) |
| 18 - 21 MOS. | 11,460 | 11,442 | (18) | 10,867 | 11,167 | 12,076 | 11,209 | (867) | 10,303 | (906) | 12,103 | 1,800 | 13,455 | 1,352 |
| 21 - 24 MOS. | 6,504 | 13,384 | 6,890 | 12,883 | 11,808 | 9,186 | 9,458 | 272 | 11,593 | 2,135 | 10,573 | (1,020) | 10,560 | (13) |
| 24 - 27 MOS. | 7,084 | 11,514 | 4,430 | 11,323 | 11,239 | 11,359 | 11,208 | (151) | 7,468 | (3,740) | 7,839 | 371 | 6,939 | (900) |
| 27 - 30 MOS. | 8,745 | 8,467 | (278) | 9,670 | 10,593 | 9,479 | 8,928 | (551) | 8,262 | (666) | 8,256 | (6) | 6,453 | (1,803) |
| 30 - 33 MOS. | 4,945 | 5,075 | 130 | 5,178 | 6,821 | 7,358 | 8,394 | 1,036 | 7,888 | (506) | 6,524 | (1,364) | 5,691 | (833) |
| > 33 MOS. | 24,490 | 31,570 | 7,080 | 31,613 | 32,399 | 31,611 | 31,863 | 252 | 30,686 | (1,177) | 30,608 | (78) | 26,737 | (3,871) |
| TOTAL PENDING | 276,742 | 309,228 | 32,486 | 311,423 | 319,612 | 282,528 | 314,483 | 31,955 | 349,778 | 35,295 | 319,146 | (30,632) | 307,675 | (11,471) |
| > 6 MOS. | 131,209 | 153,151 | 21,942 | 146,594 | 152,529 | 151,174 | 153,919 | 2,745 | 148,756 | (5,163) | 145,401 | (3,355) | 138,196 | (7,205) |
| > 1 Year | 94,718 | 109,797 | 15,079 | 111,404 | 116,340 | 114,016 | 115,276 | 1,260 | 110,056 | (5,220) | 107,360 | (2,696) | 97,397 | (9,963) |
| > 2 Years | 45,264 | 56,626 | 11,362 | 57,784 | 61,052 | 59,807 | 60,393 | 586 | 54,304 | (6,089) | 53,227 | (1,077) | 45,820 | (7,407) |

*Source: USCIS FBI Name Check Pending Report*

YAKUBO14142

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


RAISA YAKUBOVA, ET AL.,

Plaintiffs,


vs.                    CASE NO. 06 Civ. 3203


MICHAEL CHERTOFF, ET AL.,

Defendants.



THE DEPOSITION OF

MICHAEL CANNON


UNITED STATES DEPARTMENT OF JUSTICE

450 5TH STREET, NW

10th FLOOR

WASHINGTON, D.C. 20044


DECEMBER 14, 2007

10:00 A.M.

```
 1                        APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4   Jane Greengold Stevens, Attorney

 5   Deborah B. Berkman, Attorney

 6   Jason Parkin, Esquire

 7   NEW YORK LEGAL ASSISTANCE GROUP

 8   450 West 33rd Street

 9   11th Floor

10   New York, New York 10001

11   Telephone: 212.613.5070

12

13   ON BEHALF OF THE DEFENDANTS:

14   Elizabeth J. Stevens, Attorney

15   Nancy N. Safavi, Attorney

16   U.S. DEPARTMENT OF JUSTICE

17   P.O. Box 878

18   Washington, D.C. 20044

19   Telephone: 202.616.9752

20

21   ON BEHALF OF THE DEFENDANTS:

22   Marta Ivashkiv, Attorney

23   FBI HEADQUARTERS, OFFICE OF GENERAL COUNSEL

24   935 Pennsylvania Avenue, NW

25   Washington, D.C. 20535
```



1            **DEPOSITION OF MICHAEL CANNON**

2               **DECEMBER 14, 2007**

3   **WHEREUPON, MICHAEL CANNON** called as a witness, and

4   having been first duly sworn, was examined and

5   testified as follows:

6   **EXAMINATION**

7   **BY MS. J. STEVENS:**

8     **Q**     Good morning, Mr. Cannon.

9     A     Good morning.

10     **Q**     Do you still have the position of section

11   chief of the National Name Check Program that you told

12   us in your declaration that you held in July of 2006?

13     A     Yes.

14     **Q**     And prior to attaining that position were you

15   employed?

16     A     Yes.

17     **Q**     By whom?

18     A     I was employed by the US Department of

19   ~~Consumers.~~ *Commerce.*

20     **Q**     So did you come to the FBI for the first name

21   time in March 2005?

22     A     Yes.

23     **Q**     And what did you do at the Department of

24   Commerce?

25     A     Department of Commerce, I was employed as an



**COURT REPORTING**
Videography    Litigation Technology ™

800.262.8777  ⌁  Historic Jordan Springs  ⌁  1160 Jordan Springs Road  ⌁  Stephenson, VA 22656  ⌁  540.667.6562

1       A      Rephrase your question.  I just want to make

2  sure I understand what you're asking.  I think I do,

3  but I want to make sure I answer your question, if I'm

4  able to answer your question.

5       Q      Well, there was a particular universe that

6  was put in as a rerun, is that correct?

7              MS. E. STEVENS:  Why don't we define

8  what reruns are for the record, what you mean by

9  "rerun" and what he means by "rerun"?

10             THE WITNESS:  When I refer to a rerun,

11 I'm referring to the name checks that ~~we~~ were submitted from

12 December 2002 until January of 2003.

13 **EXAMINATION**

14 **BY MS. J. STEVENS:**

15       Q      Do you know whether there are any pending

16 name checks that are as old as 2002, 2003, that weren't

17 part of the rerun?

18       A      Yes.

19       Q      Yes, there are?

20       A      Yes, there are.

21       Q      Okay.  So my question now is whether checks

22 pending -- name checks that were requested in, say,

23 2001 or 2002 are now being treated in the same way

24 whether they were part of the rerun or not?

25       A      There are none that are pending from 2001



1    A    In Dissemination.

2    Q    And do you know whether there are any that

3 were received in 2005 that are now being worked on in

4 Dissemination?

5    A    No.  Unless it was an expedite request and

6 that name check came in in 2005, then it would be

7 worked on.  If you're talking about my analysts that

8 are pulling down name checks from the buckets the way

9 they are created, the whole reason we did this was to

10 make sure that the oldest ones were worked on first.

11         Now, before we put the buckets in place, had

12 an analyst been working on one from 2005, we didn't

13 just say, No one is going to touch that one until you

14 get to it.  If they had requested information on that,

15 that information would continue to come back in and

16 they would continue to work it and knock it out,

17 process it.

18    Q    If they were already working on it?

19    A    Yes, ma'am.

20    Q    So nobody is working except for expedites on

21 2005 requests, right?

22    A    To my knowledge.

23    Q    But people are working on 2004 requests, is

24 that right?

25    A    They're working on 2002, 2003 -- you know, I



1  said they are working on 2004 but I would have to go

2  back and look at the stats to confirm that.  I couldn't

3  tell you the answer to that off the top of my head.

4       Q    Well, we've had a lot of references to

5  expedites.  Maybe before we break for lunch we could

6  talk about expedites and then we could come back after

7  lunch and go over other things.

8            MS. J. STEVENS:  I'd like to have this

9  marked as a Plaintiff's -- (Cannon Exhibit A was marked

10 for identification.)

11 **EXAMINATION**

12 **BY MS. J. STEVENS:**

13      Q    Mr. Cannon, I think you've gotten what's been

14 marked as Plaintiff's Exhibit A.  Is this something

15 you're familiar with?

16      A    Yes.

17      Q    It looks like a letter from William Hooton to

18 the chairman of the committee on the judiciary dated

19 December 13, 2005.  And it looks as though you received

20 a copy of it, is that right?

21      A    It's annotated that a copy would have been

22 sent to me.  My secretary at that point in time -- I

23 don't recall if I had one at that point in time --

24 would have taken it and put it in the file.

25      Q    If you could look at the fourth page of the



1 | assigned cases not it in a first in, first worked

2 | manner, isn't that right?

3 |     A    Yes, they would have been working on one

4 | which was newer than an older one.

5 |     Q    And doesn't that mean -- does that mean that

6 | in general before this change, they were not being

7 | assigned cases on a first in, first work done basis?

8 |     A    No, they were being assigned work on a first

9 | in, first worked basis.  It's just that for some reason

10 | they may have been working on one, how they got it, I

11 | don't know, how they would have got it, I don't know.

12 |     Q    Well, prior to your new system, how were

13 | cases assigned in the dissemination phase?

14 |     A    Cases were being assigned by the -- excuse

15 | me, the team captains would assign them to the

16 | contractors that would come in the August time frames.

17 |     Q    What about before August?

18 |     A    Before August the contractors weren't there,

19 | and most of the work was being done either by the rerun

20 | team or focused on the expedites.  So the oldest ones,

21 | unless it was a rerun, weren't being done.

22 |     Q    Am I right that you said that in the new

23 | bucket system some people were assigned to buckets for

24 | 2002 and some people were assigned to buckets for 2003

25 | and some people for buckets for 2004?

